

Transcript of the Deposition of

# John Bertholomey (Defendant Officer)

**Case:** Fabiola Rosiles v. Village of Round Lake Beach; et al.

**Taken On:** August 15, 2022

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

EXHIBIT

**E**

Case: 1:21-cv-03236 Document #: 44-4 Filed: 05/15/23 Page 2 of 67 PageID #:195

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

FABIOLA ROSILES, as            )

Independent Administrator      )

of the Estate of ABEL          )

ROSILES, JR., deceased,        )

            Plaintiff,      )

    -vs-                       )  No. 21-cv-3236

VILLAGE OF ROUND LAKE          )

BEACH; J. SCHEITHE; J          )

BERTHOLOMEY; T. CRAMER;        )

and H. ATWELL,                 )

          Defendants.      )

      The deposition of JOHN BERTHOLOMEY,

taken via videoconference, taken before Karen A.

Fazio, Certified Shorthand Reporter, taken pursuant

to the provisions of the Code of Civil Procedure

and the Rules of the Supreme Court of the State of

Illinois pertaining to the taking of depositions

for the purpose of discovery, commencing on the

15th day of August, A.D. 2022, at 9:00 a.m.

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

```
                                              Page 2
  1    PRESENT:

  2          HALE & MONICO, LLC

  3          53 West Jackson Boulevard, Suite 337

  4          Chicago, Illinois 60604

  5          (312) 341-9646

  6          BY: MR. JASON MARX

  7              appeared on behalf of the Plaintiff;

  8

  9          HERVAS, CONDON & BERSANI, P.C.

 10          333 Pierce Road, Suite 195

 11          Itasca, Illinois 60143

 12          (630) 773-4774

 13          BY: MR. G. DAVID MATHUES,

 14              appeared on behalf of the Defendants.

 15

 16

 17

 18

 19

 20

 21

 22

 23    REPORTED BY:  KAREN A. FAZIO, CSR

 24                     CSR No. 84-1834
```

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 3

1                    I N D E X

2   JOHN BERTHOLOMEY                    EXAMINATION

3   BY MR. MARX                          4, 148

4   BY MR. MATHUES                        145

5

6

7                  E X H I B I T S

8   EXHIBIT                       MARKED FOR ID

9   No. 1                             116

10  No. 2                             123

11  No. 3                             132

12  No. 4                             134

13  No. 5                             135

14  No. 6                             135

15  No. 7                             136

16  No. 8                             137

17  No. 9                             138

18  No. 10                            138

19

20      Exhibits Nos. 1 and 2 retained by Mr. Marx

21

22

23

24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 4

1    (WHEREUPON, the witness was duly
2    sworn.)
3    JOHN BERTHOLOMEY,
4    having been first duly sworn, was examined and
5    testified via videoconference as follows:
6    EXAMINATION
7    BY MR. MARX:
8    Q.   Can you please state and spell your full
9    name?
10   A.   Sure.  My name is John Bertholomey.
11   First name is J-O-H-N, last name is
12   B-E-R-T-H-O-L-O-M-E-Y.
13   Q.   Thank you.  Officer, have you ever given
14   a deposition before?
15   A.   I have not.
16   Q.   You have not?
17   A.   No, sir.
18   Q.   Okay.  Well, I'll just go over a couple
19   things.  Your attorney may or may not have gone
20   over this, but I'll just go over them briefly.
21   So it's important that we not talk over
22   each other.  So even though you can anticipate some
23   of my questions, where I'm going with them, please
24   just wait until I finish speaking, and I'll do the

Page 5

1    same thing for you.  Okay?
2    A.   Yes, sir.
3    Q.   If you don't understand a question I'm
4    asking, and that might happen, please let me know.
5    I'll be happy to rephrase it or restate it.  So
6    please don't be shy.  If you don't understand what
7    I'm asking you, please let me know, and I'll do my
8    best to rephrase.  Okay?
9    A.   Understood.
10   Q.   If you want to take a break, just let me
11   know.  I'll honor that.  You don't have to tell me
12   why you want to take a break.  Just tell me you'd
13   like to take a break.  But, of course, if there's a
14   question pending, please answer the question to the
15   best of your ability, and then ask for the break.
16   Okay?
17   A.   Sounds good.
18   Q.   And this deposition is my one chance to
19   ask you questions before trial, if there is a
20   trial.  So if you'd like to change, correct, or go
21   back over any of your previous testimony, please
22   let me know during the deposition, and I'll be
23   happy to go over what we previously talked about.
24   Okay?

Page 6

1    A.   Yes, sir.
2    Q.   Officer, is there any reason that you
3    won't be able to give complete and honest answers
4    here today?
5    A.   No, sir.
6    Q.   Did you review any materials in
7    preparation for your deposition today?
8    A.   I reviewed my report given to the major
9    crimes task force, as well as the interrogatories,
10   and also reviewed various body cam footage and
11   field notes from major crimes.
12   Q.   Did you yourself write a report
13   regarding this incident?
14   A.   I did not.
15   Q.   So when you say report from the major
16   crimes task force, are you talking about the report
17   of the interview that they conducted with you as it
18   was their report?
19   A.   Yes, sir.
20   Q.   Did you believe that report to be
21   accurate; that is, accurate as to what you told the
22   major crimes task force?
23   A.   Yes, sir.  I only found one slight
24   inaccuracy.

Page 7

1    Q.   Do you recall what it is?
2    A.   Yes.  They made a statement that I
3    stated I did not see the bag that was removed from
4    the suspect's mouth, and I had mentioned to them
5    that I'd briefly seen it.  I don't recall my exact
6    statement of it, but I described it as having a
7    green saliva or bile on the bag, which after
8    reviewing their field notes was in their field
9    notes from my interview, but their typed report did
10   not have that in it.
11   Q.   Okay.  When you say "field notes," you
12   looked at the major crimes task force actual
13   notes -- alleged notes of what you were telling
14   them?
15   A.   Yes, just their handwritten notes from
16   their interview with me.
17   Q.   Okay.
18   MR. MATHUES:  John, I saw just a second ago
19   you were looking over to the task force report.  If
20   you're going to do that, just let Mr. Marx know or
21   ask him saying to do that so we're honest with
22   Mr. Marx about whether or not you're looking at
23   anything.  If you want to ask to see the report,
24   you know, you can ask.

4  (Pages 4 to 7)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 8

1    THE WITNESS: Understood.
2  BY MR. MARX:
3    Q.  Yeah.  Thank you.  If you don't recall
4  something and would like to see a report, just let
5  me know.  It sounds like you have that report next
6  to you there, and, of course, you can look at it.
7  But, yeah, just let me know if you'd like to see
8  it, and I'll be happy to let you take a moment to
9  look at it.
10   A.  Sounds good.  Thank you.
11   Q.  You said you looked at various body-worn
12 camera videos in preparation for your deposition?
13   A.  Yes, sir.
14   Q.  Do you recall specifically whose cameras
15 you were looking at?
16   A.  To the best of my recollection, it was,
17 I believe, Officer Kaminski from Round Lake
18 Heights, and Detective Schultz from Round Lake
19 Police Department.
20   Q.  When was the last time -- strike that.
21        Have you ever seen the 1 minute,
22 42 second cell phone video that was taken by
23 witness Sinahy Reyes Gomez?
24   A.  I have seen a cell phone taken by a

Page 9

1  witness.  I don't recall her name or the length of
2  the video.
3    Q.  When was the last time you saw that
4  video?
5    A.  I reviewed that also on Saturday with my
6  attorney.
7    Q.  Okay.  Did you review any in-car camera
8  footage in preparation for your deposition?
9    A.  I did.  I believe it was, from what I
10 recall, only my squad car, which was squad 6, I
11 believe.
12   Q.  All these materials that we have been
13 talking about, did you review them on Saturday with
14 your attorney?
15   A.  Yes.
16   Q.  And that would be Mr. Mathues?
17   A.  Yes, sir.
18   Q.  Was anybody else present when you were
19 reviewing these materials with your attorney?
20   A.  No, sir.
21   Q.  Was this in person or via Zoom?
22   A.  This was in person.
23   Q.  About how long did you meet with your
24 attorney to prepare, that is, on Saturday?

Page 10

1    A.  Roughly, a couple hours.
2    Q.  Any other materials that you reviewed
3  besides what we've already talked about?
4    A.  Not that I can recall at this time.
5    Q.  You worked for the Village of Round Lake
6  Beach police from September of 2017 to February
7  of 2021, correct?
8    A.  Yes, sir.
9    Q.  And you resigned in February of 2021,
10 correct?
11   A.  Yes, sir.
12   Q.  Why did you resign?
13   A.  I had another career path I wanted to
14 seek in the sheet metal industry and had the
15 potential of making a much higher salary.
16   Q.  Where do you currently work?
17   A.  I work for the Oneida County Sheriff's
18 Office.
19   Q.  And that's in northern Wisconsin?
20   A.  Yes, sir.
21   Q.  When did you start working for Oneida
22 County?
23   A.  Just about a year ago.  August 30th of
24 last year.

Page 11

1    Q.  Did you have a job working in the sheet
2  metal industry for a few months?
3    A.  I did.
4    Q.  Where did you work?
5    A.  I worked for International Test &
6  Balance.  They're based out of Northbrook, but most
7  of our work was in Chicago.
8    Q.  What type of work was it?
9    A.  It was test and balance work related to
10 HVAC systems in commercial buildings.
11   Q.  I don't know what "test and balance"
12 means.  What does that mean?  Sorry.
13   A.  It's basically calibrating machines
14 related to HVAC systems.
15   Q.  And why did you go from that job to
16 Oneida County?
17   A.  I just missed work in law enforcement,
18 and I had always wanted to move up to that area
19 because I spent a lot of time there as a kid.
20   Q.  Besides the Village of Round Lake Beach
21 and Oneida County, have you had any other law
22 enforcement jobs?
23   A.  No, sir.
24   Q.  Why did you become a police officer?

5 (Pages 8 to 11)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 12

1    A.   For me, I wanted a career that was
2 exciting and different every day, and more
3 fulfilling than a desk job which I had worked in
4 previously, and just wanted something more.
5    Q.   What types of jobs did you have before
6 becoming a law enforcement officer?
7    A.   I worked for my father's insurance
8 business.  I worked for L.L. Bean retail store.  I
9 worked in construction.
10    Q.   When's the last time you talked to Heath
11 Atwell?
12    A.   I spoke to him yesterday by phone.
13    Q.   Was it just the two of you on the phone?
14    A.   Yes, sir.
15    Q.   What did you guys talk about?
16    A.   Just about the upcoming depositions, and
17 just checking in because we haven't spoken in
18 several months.
19    Q.   How long had it been since you spoke to
20 him last?
21    A.   Probably six months.
22    Q.   Did you talk to him about this case?
23    A.   Nothing specifically.  Just about I had
24 met with my attorney to review our videos and

Page 13

1 things of that nature.
2    Q.   Have you ever talked to him about this
3 case?  That is, after you found out that there was
4 a lawsuit filed, did you ever talk to Heath Atwell
5 about that?
6    A.   I'm sure we have.  I don't recall any
7 details of what we discussed, but I'm sure we
8 talked about it at some point.
9    MR. MATHUES:  And, John, for any conversations
10 with your fellow officers, answer Mr. Marx's
11 question of if those conversations occurred outside
12 of my presence or Mr. Hervas's presence.  If you
13 talked to them with us there, I'm going to claim
14 attorney-client privilege and instruct you not to
15 answer.  If you had a conversation with them
16 without Mr. Hervas or I around, answer Mr. Marx's
17 questions to the best of your ability.
18    THE WITNESS:  Yes, sir.
19 BY MR. MARX:
20    Q.   Yes.  That's true.  Every conversation
21 that you had in the presence of your attorney is
22 very likely privileged.  So I'm not interested in
23 that.  Of course, if there's a third person
24 present, the privilege might be broken, but I'll

Page 14

1 make it clear.
2    A.   Okay.
3    Q.   Do you know where Heath Atwell works
4 today?
5    A.   No, I do not.
6    Q.   How long did you work with him at the
7 Round Lake Beach Police Department?
8    A.   He was there from when I started until I
9 left.
10    Q.   And when you worked there, would you --
11 strike that.
12         When you worked with him, would you
13 consider him your friend when you worked with him?
14    A.   Yes, I would.
15    Q.   Okay.  Fair to say you had a beer with
16 him after work?
17    A.   No.  We never really hung out outside of
18 work.  We maybe went shooting a couple of times,
19 but we didn't hang out socially.
20    Q.   Okay.  When is the last time you talked
21 to Timothy Cramer?
22    A.   Also yesterday by phone.
23    Q.   Okay.  Was it just the two of you on the
24 phone?

Page 15

1    A.   Yes, sir.
2    Q.   What did you guys talk about?
3    A.   Same thing.  I asked about what
4 happened with his deposition that he said was
5 canceled earlier in the week, because I was
6 planning on sitting in on it.
7    Q.   Had you ever talked to him about this
8 lawsuit?
9    A.   I'm sure we discussed it at some point
10 when it came out months ago.
11    Q.   How many times have you talked to him,
12 let's say, in the past year?
13    A.   Two to three times probably, by phone.
14    Q.   And would you say that was more -- would
15 you say it's about the same for Heath Atwell?
16    A.   Approximately.  It's very infrequent.
17    Q.   Would you consider yourself to be a
18 friend of Mr. Cramer?
19    A.   I would say we're work friends, but,
20 again, we don't associate -- we never associated
21 outside of work, to my recollection.
22    Q.   And I'm not sure how to pronounce it
23 properly, but when was the last time you talked to
24 Jeremy Scheithe?

6  (Pages 12 to 15)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 16

1    A.  Probably over a year ago.  I don't
2   recall.
3        Q.  Do you know how to say his last name
4   better than I do?
5        A.  It's Scheithe.
6        Q.  Scheithe.  Thank you.  Do you recall
7   ever speaking to Mr. Scheithe about this lawsuit?
8        A.  I do not.  Again, we may have.  I just
9   don't recall any specific conversations.
10       Q.  How long did you work with Timothy
11   Cramer?
12       A.  I believe he came in approximately
13   after -- I don't know, six months to a year after I
14   did, but I don't actually recall when he started.
15   But pretty much the whole time I was there, he was
16   there.
17       Q.  And how about Mr. Scheithe?
18       A.  He was there as well from when I started
19   until briefly after this incident occurred.
20       Q.  When you worked for the Village of Round
21   Lake Beach, was your rank that of a patrol officer?
22       A.  Yes.
23       Q.  What were your duties as a patrol
24   officer?

Page 17

1        A.  Just responding to 911 calls or crimes
2   in progress, various traffic stops.  Occasionally,
3   we'd participate in gang and drug enforcements.
4   Just general patrol duties.
5        Q.  Do you recall the approximate size of
6   the, let's say, sworn members of the Village of
7   Round Lake Police Department when you worked there?
8        A.  I believe it was approximately 40.
9        Q.  And do you know about how many unsworn
10   members there were?
11       A.  No, I do not.
12       Q.  Did you have a shift that you typically
13   worked or always worked?
14       A.  I mostly worked, in my time there,
15   afternoon shift, which was 2:45 p.m. to 11:15 p.m.
16       Q.  Are you aware of any complaints that
17   were made against you while working for the Round
18   Lake Beach Police Department?
19       A.  No, none to my knowledge.
20       Q.  Are you aware of any complaints that
21   have been made against you while working at your
22   current job?
23       A.  No, not that I know of.
24       Q.  Have you ever received any form of

Page 18

1   discipline in your capacity as a law enforcement
2   officer?
3        A.  No.
4        Q.  Have you ever been stripped of your
5   police powers?
6        A.  No.
7        Q.  Have you ever been found unfit for duty?
8        A.  No.
9        Q.  Have you ever been sued in your capacity
10   as a law enforcement officer?
11       A.  Only related to this incident, but
12   nothing else that I'm aware of.
13       Q.  Have you ever been convicted of a crime?
14       A.  No.
15       Q.  You went to the police academy, correct?
16       A.  Yes.
17       Q.  When did you go?
18       A.  It was approximately September to
19   December of 2017.
20       Q.  What are some of the things you were
21   taught in the police academy?
22       A.  Just various patrol tactics, use of
23   force, defense tactics.  Just general things we use
24   in day-to-day patrol.

Page 19

1        Q.  In the police academy did you receive
2   any first aid classes?
3        A.  I believe we did.  I don't recall
4   specifically.
5        Q.  In your entire law enforcement career,
6   have you taken at least one first aid class?
7        A.  Yes.  I believe we had some sort of
8   in-house CPR training at Round Lake Beach, if I
9   recall.
10       Q.  How about at Oneida County?
11       A.  I have not had any first aid at that
12   location.
13       Q.  Do you recall when this first aid/CPR
14   class was for Round Lake Beach?
15       A.  I don't recall exactly.
16       Q.  Outside of your profession as a law
17   enforcement officer, have you ever received any
18   first aid classes?
19       A.  I believe I have.  I just don't recall
20   which jobs they were associated with.
21       Q.  Have you ever received training about
22   what the word "asphyxiation" means?
23       A.  You broke up a little bit.  Can you
24   repeat that?

7 (Pages 16 to 19)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 20

1    Q.   Sure.  Have you ever received training
2  on what the word "asphyxiation" means?
3    A.   What it means?
4    Q.   Yes.
5    A.   I'm sure as part of those first aid
6  classes.  Just common knowledge to me, it would
7  mean choking on an item or being unable to breathe
8  due to some other reason.
9    Q.   Have you ever received training on
10  recognizing the signs and symptoms of someone who
11  might be suffering from asphyxia?
12    A.   Yes.  Again, I can recall that being in
13  some sort of first aid class.
14    Q.   What's your understanding of what some
15  of the signs and symptoms are of somebody who might
16  be suffering from asphyxia or asphyxiation?
17    A.   Gasping, turning white, unable to speak.
18    Q.   Have you ever received training on
19  treating someone who might be suffering from
20  asphyxia?
21    A.   At some point, I received training on
22  the Heimlich maneuver.
23    Q.   What's the Heimlich maneuver?
24    A.   It's using your hands in the area of the

Page 21

1  sternum to propel air out of the lungs to get the
2  object dislodged.  I'm not a doctor, but that would
3  be my best explanation of it.
4    Q.   I recognize that you're not a doctor.
5  I'm just trying to understand what you've been
6  trained on.
7    A.   Sure.
8    Q.   And you said you've taken a CPR class or
9  classes?
10    A.   Yes, sir.
11    Q.   What's CPR?
12    A.   I don't recall the actual term for it,
13  but it's giving chest compressions and/or breaths
14  if somebody is not breathing or their heart is
15  stopped.
16    Q.   Is it fair to say that there are many
17  things that could cause someone to suffer from
18  asphyxiation?
19    A.   I would say that's fair to say.
20    Q.   Okay.  Can you give me some examples of
21  what could cause somebody to suffer from asphyxia?
22    A.   I would say choking on some sort of
23  object, or being strangled, or just having a large
24  amount of pressure on your neck.

Page 22

1    Q.   Have you ever heard of the term
2  "positional asphyxia"?
3    A.   Yes, I have.
4    Q.   What's your understanding of what that
5  term means?
6    A.   Typically, from what I recall in
7  training as a police officer, it typically applies
8  when somebody is in the prone position for an
9  extended period of time.  I recall that certain
10  risk factors, like drug use or obesity, increase
11  somebody's chance at being at risk of positional
12  asphyxia if they're left prone for an extended
13  period of time.
14    Q.   What's the prone position?
15    A.   Face down into the -- whatever surface
16  they're on.
17    Q.   Would you agree with me that positional
18  asphyxia could also be -- an example of it could be
19  where somebody is in the prone position and their
20  face is in the ground and their nose and mouth are
21  obstructed by the ground such that they can't
22  breathe in and breathe out?
23    MR. MATHUES:  Objection to foundation.
24    And, John, unless I tell you not to, I'm

Page 23

1  just making my record.  Answer Mr. Marx's questions
2  to the best of your ability.
3  BY THE WITNESS:
4    A.   Can you repeat that one more time?
5  BY MR. MARX:
6    Q.   Sure.  Have you ever heard positional
7  asphyxiation described as -- an example of it being
8  someone who is prone on the ground, and their face
9  is in the ground such that their nose and mouth are
10  covered and aren't able to inhale and exhale enough
11  oxygen?
12    A.   I have not heard of it described that
13  way.
14    Q.   Okay.  Have you ever heard of a newborn
15  baby having a risk of positional asphyxia such that
16  you shouldn't put a newborn baby on their stomach
17  because they might not have the ability to roll
18  over and get their face and nose off the ground?
19  Have you ever heard that before?
20    A.   I haven't, but I don't have kids.
21    Q.   Okay.  Were you taught basic human
22  anatomy in any of your first aid class or classes?
23    A.   I'm sure it was briefly touched on, but
24  I don't recall any specifics.

8  (Pages 20 to 23)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 24

1    Q.   Okay.  Do you know what the diaphragm is
2  in the human body?
3    A.   I believe it controls the airway in and
4  out of the lungs.
5    Q.   Would you agree with me that it's a
6  muscle used for breathing?
7    A.   I would, I guess, agree with that.
8    Q.   Okay.  Do you know more specifically how
9  it's used to help breathing?
10    A.   No, I do not.
11    Q.   Were you ever trained that if the
12  diaphragm can't move for whatever reason, that
13  could lead to a person having asphyxiation?
14    A.   Not that I recall.
15    Q.   You said previously that you received
16  training on an officer's use of force, correct?
17    A.   Yes.
18    Q.   Generally, when can an officer use force
19  on a person?
20    A.   If there's a risk to the officer or
21  others, or if the suspect is resisting or evading
22  arrest.
23    Q.   Is it fair to say that there are many
24  types of force that an officer might use, depending

Page 25

1  on the situation that they're confronted with?
2    A.   Yes, sir.
3    Q.   Can you give me some examples of
4  different types of force that an officer might use
5  depending on the circumstances?
6    A.   It can be as simple as an escort tactic,
7  escorting an uncooperative subject to his vehicle.
8  It could be pointing a gun at somebody for
9  compliance if there's a fear of weapons.  It could
10  be deadly force if there's an imminent threat to an
11  officer or others in the vicinity.
12    Q.   Have you ever been trained on the term
13  "prone restraint," that is, in the law enforcement
14  context?
15    A.   I wouldn't say specifically prone
16  restraint.  We were taught how to handcuff in a
17  prone position.
18    Q.   Okay.  What were you taught regarding
19  that?
20    A.   Just, basically, a technique as far as
21  getting handcuffs on quickly and securing the
22  subject.
23    Q.   More specifically, were you taught what
24  you were to do in that situation?

Page 26

1    A.   I'm not sure what you mean by that.
2    Q.   For example, were you ever trained that
3  if someone's in a prone position that you should or
4  could put your knee on their back temporarily to
5  help gain control of the person so that you get
6  their hands behind their back and in handcuffs?
7    A.   I would say that would be part of the
8  handcuffing procedure, if they're in a prone
9  position.
10    Q.   Do you agree with me that keeping a
11  person in a prone position for an extended period
12  of time can increase the risk of that person
13  suffering from asphyxiation?
14    MR. MATHUES:  Objection to form, vague.
15    BY THE WITNESS:
16    A.   Can you repeat that one more time?
17    BY MR. MARX:
18    Q.   Sure.  Do you agree with me that keeping
19  a detained subject in a prone position for an
20  extended period of time can increase the risk of
21  that person suffering from asphyxiation?
22    MR. MATHUES:  Same objection.
23    BY THE WITNESS:
24    A.   I would agree if it was an extended

Page 27

1  period of time or if there was other risk factors,
2  like drug use or something, excited delirium.  But
3  if the subject is still being resistive to
4  officers, you have to control them somehow, and
5  that's a position to gain control of somebody.
6    BY MR. MARX:
7    Q.   Do you agree with me that otherwise
8  healthy people that are in the prone position can
9  suffer from asphyxiation if there're left in that
10  position for an extended period of time?
11    MR. MATHUES:  Objection to form, vague.
12    BY THE WITNESS:
13    A.   I would agree if it was a very extended
14  period of time.
15    BY MR. MARX:
16    Q.   Were you ever trained that it's an
17  acceptable use of force to restrain somebody who's
18  in the prone position by putting pressure on their
19  back?
20    A.   I would say just what I was taught as
21  far as handcuffing someone in the prone position.
22  You do position, basically, one knee above their
23  hands, if their hands are at the low of their back,
24  and one on the other side of their hands to control

9  (Pages 24 to 27)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 28

1    their hands and handcuff them.
2        Q.    Okay.  But more specifically, were you
3    ever trained that's an acceptable use of force to
4    restrain someone, that is, to keep somebody in a
5    position that's in a prone position, by putting
6    pressure on their back?
7        A.    I don't recall any specific training.
8        Q.    Were you ever trained that applying
9    pressure to someone's back when they're in the
10   prone position could prevent the diaphragm from
11   moving, thereby making it difficult for the person
12   to breathe?
13       A.    I don't recall any training.
14       Q.    Besides training, do you agree with that
15   statement that if one is in the prone position and
16   has pressure applied to their back, that that might
17   make it difficult for that person to breathe?
18       MR. MATHUES:  Objection to form and
19   foundation.
20   BY THE WITNESS:
21       A.    It -- there's a lot of different factors
22   that would come into play there.  It depends on
23   where you're applying force on their back.  I would
24   say it potentially could if it was a lot of force

Page 29

1    for an extended period of time.
2    BY MR. MARX:
3        Q.    Okay.  You had mentioned neck pressure
4    before, and by saying "neck pressure" before, it
5    seems like you would agree that if you put pressure
6    on one's neck who's in the prone position for a
7    certain amount of time, that could lead to
8    difficulty for that person breathing, correct?
9        A.    Yes, it potentially could, depending on
10   the amount of force being applied.
11       Q.    And that same principle applies if one
12   were to apply back pressure.  Do you agree with
13   that?
14       A.    I would agree in certain cases.  As I
15   stated, it would depend on where that pressure is
16   being applied and how much force is being applied.
17       Q.    Prior to June 10th, 2020, did you know
18   who Abel Rosiles, Jr. was?
19       A.    I did not.
20       Q.    To the best of your recollection, did
21   you have any contact with him whatsoever prior to
22   that date?
23       A.    No, none that I'm aware of.
24       Q.    And prior to that date, do you have any

Page 30

1    recollection whatsoever of any officer talking
2    about him or mentioning him at any point?
3        A.    No.
4        Q.    The same questions apply to an Antoine
5    Stanley.
6        A.    Before this incident, approximately
7    30 minutes, I responded to an initial report from
8    Antoine, and then responded to this incident.
9        Q.    How about before that initial response,
10   had you had any idea who Antoine Stanley is, that
11   is, by having contact with him or having heard of
12   his name before?
13       A.    No, I had never heard of him.  It's
14   possible we saw each other at that gas station just
15   stopping in while on patrol, but never that I
16   recall.
17       Q.    Do you know how many residents are
18   approximately in the Village of Round Lake Beach,
19   that is, during the time you worked there?
20       A.    I believe approximately in the number of
21   35,000 or so.
22       Q.    Prior to June 10, 2020, did you know who
23   Sinahy Gomez Reyes was?
24       A.    No.

Page 31

1        Q.    Prior to June 10, 2020, did you know who
2    a Shelby Brubaker was?
3        A.    No.
4        Q.    Prior to June 10, 2020, did you know who
5    my client was, Fabiola Rosiles?
6        A.    No.
7        Q.    To the best of your recollection, did
8    you ever hear of the family -- the Rosiles family
9    prior to June 10, 2020?
10       A.    No, not that I can recall.
11       Q.    I'm going to go through parts of your
12   statement that you gave to investigators.
13   According to the statement that is written by Lake
14   County major crimes task force investigators, they
15   say that a C. Buhrmeister and a K. Kolar
16   investigated -- I'm sorry, interviewed you on
17   June 11, 2020.
18       So my question is did you know who those
19   two investigators were when they interviewed you?
20       A.    No, I had never met them until that day.
21       Q.    According to their report, they
22   interviewed you at 7:32 p.m.  Do you have any
23   reason to think that's inaccurate?
24       A.    No, sir.

10 (Pages 28 to 31)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 32

1    Q.  Do you actually have, like, an
2  independent recollection of sitting there and
3  talking to investigators?
4    A.  I remember sitting in a room with them,
5  speaking, yes.
6    Q.  And did that interview take place in the
7  Round Lake Beach Police Department?
8    A.  Yes, sir.
9    Q.  And did you have an attorney present
10 when you gave that interview?
11   A.  No.  I believe we had a union
12 representative.
13   Q.  Do you recall the name of that person?
14   A.  I do not.  It was somebody from the FOP,
15 I believe.
16   Q.  Had you met that FOP person before?
17   A.  No, sir.
18   Q.  Why was that person there?  Do you know?
19   A.  I don't know.  I believe it was just
20 from the circumstances of the incident.
21   Q.  Did you request that person to be
22 present with you?
23   A.  I don't believe I specifically did.  I
24 believe we were just advised to.

Page 33

1    Q.  Was your interview audio or video
2  recorded, to your knowledge?
3    A.  Not that I am aware of.
4    Q.  Did they ask you for permission to audio
5  or video record it?
6    A.  Not that I recall.
7    Q.  Would you have given your permission had
8  they asked?
9    A.  Yes.
10   Q.  So according to my understanding of what
11 happened, my client was arrested a little bit after
12 11:00 p.m. on June 10th, 2020.  Does that sound
13 correct?
14   A.  Yes, sir.
15   Q.  And if your interview took place at 7:32
16 the next day, that would be a little bit less than
17 24 hours that you gave a statement.  Correct?
18   A.  Yes.
19   Q.  Who did you talk to about this incident
20 during that time period, that is, after my client's
21 arrest until the time you gave a statement?
22   A.  I recall speaking with officers on
23 scene, and I recall speaking with Deputy Chief
24 Wilde, who arrived on-scene and basically wanted a

Page 34

1  summary of events from me.  I was one of the
2  officers still on scene there.
3    Q.  Do you remember specifically who you
4  talked to on scene, that is, officerwise, besides
5  Wilde?
6    A.  I'm sure I briefly talked to several
7  officers.  I don't remember specific conversations.
8    Q.  So, therefore, you don't remember
9  specifically what you talked about?
10   A.  No, sir.
11   Q.  Are you aware of any body-worn camera
12 that captures you talking to officers shortly after
13 my client's arrest?
14   A.  I'm aware I'm on body cam footage.  I
15 don't specifically know what statements the cameras
16 picked up or not, but I'm sure there are some.
17   Q.  And how long after my client's arrest
18 would you say you talked to Deputy Chief Wilde?
19   A.  It was sometime before I cleared the
20 scene.  I don't recall an exact time.  It was
21 probably after midnight.
22   Q.  Who was your direct supervisor that day?
23   A.  At the time of the call, it would have
24 been Officer Atwell.  It was right at the crossing

Page 35

1  of my shift and night shift.  So prior to that
2  call, it would have been Commander Barr, I believe,
3  who eventually did show up on the scene.
4    Q.  Did you watch any videos prior to
5  talking to the task force?
6    A.  No, not that I can recall.
7    Q.  Did you listen to any audio prior to
8  talking to the task force?
9    A.  No, not that I can recall.
10   Q.  Were you advised that the task force was
11 conducting a criminal investigation?
12   A.  No.
13   Q.  Were you advised of your Miranda
14 warnings or Miranda rights during this conversation
15 with the task force?
16   A.  No.
17   Q.  Were you yourself ever a member of the
18 Lake County task force?
19   A.  No.
20   Q.  I'm sorry.  I didn't get an answer.
21   A.  I'm sorry.  I said no.
22   Q.  Sorry about that.  Is it fair to say
23 that the Lake County major crime task force is
24 comprised of various members of law enforcement in

11 (Pages 32 to 35)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 36

1 Lake County, Illinois?
2    A.   Yes.
3    Q.   Therefore, it might contain a detective
4 from Waukegan or a police officer from Round Lake
5 Beach?
6    A.   Yes, it could.
7    Q.   At the time of this incident, did you
8 know if any members of the Round Lake Beach Police
9 Department were members of the Lake County major
10 crimes task force?
11    A.   I was aware of that Commander Lunn was a
12 task force member.
13    Q.   I'm sorry.  Commander who?
14    A.   Lunn.
15    Q.   Did you ever talk to Commander Lunn
16 about this incident?
17    A.   No, not that I can recall.
18    Q.   Can you tell me how you first became
19 aware of an incident happening at the Thornton's
20 gas station on that particular day?
21    A.   Sure.  Do you want the first call or the
22 second call?
23    Q.   Sure.  Your first involvement with the
24 Thornton's gas station that night.

Page 37

1    A.   Sure.  I was dispatched on afternoon
2 shift about 30 minutes roughly to the second
3 incident, prior to that, for a threat report.  And
4 I had met with the clerk, Antoine Stanley.
5    Q.   Who advised you of a threat report?
6    A.   I believe it was dispatch who called.
7    Q.   Did dispatch give you any more specific
8 details, or more or less was it just a threat
9 report at the Thornton's?
10    A.   I'm sure there was more details in the
11 call notes.  I don't recall at this time.
12    Q.   And how does it work for the Village of
13 Round Lake Beach?  Was it assigned to you or did
14 you volunteer for that call?
15    A.   I believe on that specific day, it was
16 9273, which is a north car, and that was on the
17 north side of the town.  So that call would have
18 come to me.
19    Q.   That call would have came to you unless
20 you were otherwise on another call, correct?
21    A.   Yes, sir.
22    Q.   And that sounds like you weren't at the
23 time, so you responded?
24    A.   Yeah.  I don't believe I was on anything

Page 38

1 else.
2    Q.   Do you have any recollection of what you
3 were doing; that is, anything of note coming to
4 mind of what happened prior to this Thornton's call
5 during your shift?
6    A.   I don't have any recollection of what I
7 was doing.
8    Q.   And did you have a partner that day?
9    A.   No.  We were in solo squads.
10    Q.   Did you ever have a partner while
11 working for Round Lake?
12    A.   No.  We never have designated partners
13 unless you're in field training, you have a field
14 training officer.
15    Q.   And how were you dressed?
16    A.   In a regular patrol uniform.
17    Q.   Okay.  And did you carry equipment on
18 your person?
19    A.   Yes.
20    Q.   What equipment did you carry that day?
21    A.   Just standard patrol, firearm, Taser, I
22 probably had a baton, tourniquet, bulletproof vest.
23 Things of that nature.  Maybe gloves, medical
24 supplies.

Page 39

1    Q.   How about OC spray?
2    A.   Yes, I would have had OC spray.
3    Q.   And handcuffs, I assume?
4    A.   Yes.
5    Q.   How many handcuffs did you carry?
6    A.   Usually, I would have two pairs of
7 handcuffs.
8    Q.   Did you say you carried medical supplies
9 on your person?
10    A.   Typically, yes, for myself, gloves and
11 bandages and a tourniquet.
12    Q.   Could you keep those on your vest
13 somewhere?
14    A.   Usually, it would be in my pants pocket.
15    Q.   Do you have a specific recollection of
16 carrying those things on this particular day?
17    A.   Not specifically, but I almost always
18 had them while on duty.
19    Q.   Were you wearing a body-worn camera?
20    A.   No, sir.
21    Q.   Did you ever wear a body-worn camera for
22 the Village of Round Lake Beach police?
23    A.   We did not have them until maybe the
24 last three weeks that I was there, and I don't

12  (Pages 36 to 39)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 40

1  recall exactly when we got them.
2      Q.  Am I correct that you were driving a
3  vehicle by yourself?
4      A.  Yes, sir.
5      Q.  What type of vehicle?
6      A.  A police vehicle.
7      Q.  More specifically, what type, make,
8  model?
9      A.  It would have either been a Ford Taurus
10  or a Dodge Charger.  I don't even remember which
11  one I was in that day other than it was squad 6,
12  and I can't remember which type squad 6 was.
13      Q.  Was it marked?
14      A.  Yes.
15      Q.  Can you describe the markings?
16      A.  It said Police and Round Lake Beach on
17  the side.
18      Q.  Did you have an in-car camera system in
19  that vehicle?
20      A.  Yes.
21      Q.  Do you know what positions it faced?
22  That is, do you know if the position was forward
23  facing, rear facing, and/or in the interior of the
24  vehicle?

Page 41

1      A.  I believe it was forward facing, and
2  there was typically a wide view and a narrow view.
3      Q.  Did you wear a microphone on your person
4  such that it could pick up audio?
5      A.  No, not during that incident.
6      Q.  Have you ever worn a microphone on your
7  person while working for the Village of Round Lake
8  Beach police?
9      A.  Yes.  Typically, it was only used on
10  traffic stops.
11      Q.  Why is that, do you know?
12      A.  I don't know.  I believe that was just
13  standard practice.  And it had a pretty limited
14  range, or if you went in buildings, it typically
15  wouldn't work.
16      Q.  Were you trained that you should only
17  turn it on during traffic stops?
18      A.  I don't know if I was specifically
19  trained that, but that seemed to be what we all
20  did.
21      Q.  And before 11:15, your supervisor was
22  Atwell or Barr?
23      A.  So the actual shift change was at 10:45.
24  So typically, up until 10:45, it would be the

Page 42

1  afternoon supervisor, and then at shift change, it
2  would transition over to whoever was working
3  midnights.
4      Q.  I'm sorry.  Are you saying it was Atwell
5  up until 10:45?
6      A.  It would have been Barr up until 10:45,
7  and then Atwell afterwards.
8      Q.  And as far as your assignment goes, you
9  said you were assigned the north section?
10      A.  Yes.  I believe I was 9273, which is
11  basically north of Rollins Road.
12      Q.  And besides being assigned to that
13  geographic area -- strike that.
14          Can you give me the geographic
15  boundaries of your assigned patrol?
16      A.  Sure.  Basically, any part of the
17  Village of Round Lake Beach north of Rollins Road.
18      Q.  And besides being assigned to the north
19  area, did you have any more specific assignment for
20  that day?
21      A.  No.
22      Q.  Do you recall where you were when you
23  got a call about a threat report at the Thornton's?
24      A.  The first one or the second one?

Page 43

1      Q.  Yes, let's start at the first one.  Do
2  you recall where you were when you got that call?
3      A.  I don't.  I remember for the second
4  incident I left from the police department parking
5  lot.
6      Q.  It's fair to say that you had been to
7  that Thornton's prior to this date?
8      A.  Yes.
9      Q.  How many times would you say?
10      A.  I don't know.  We've had lots of calls
11  there, and then we typically would just stop in and
12  get coffee or something.
13      Q.  Do you fill up your squad there, too?
14      A.  I think we did.  I can't actually recall
15  where we got gas from.  It's been a while.
16      Q.  Sometimes police departments have their
17  own designated pump on, like, the city property.
18  Did Round Lake Beach have that, to your knowledge?
19      A.  No.  I believe we just had a credit
20  card, and we could go to whatever station we
21  wanted.
22      Q.  So what do you recall happening when you
23  got to the Thornton's, that is, the first time?
24      A.  I had met with the caller who was

13 (Pages 40 to 43)

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 44

1  Antoine. He had stated that he had some sort of
2  dispute with a person named Abel -- he only gave me
3  the first name -- over a skateboard, and he said
4  they communicated on Snapchat. He said that the
5  subject had come in and threatened to wait for him
6  after work, and he was concerned about it. And he
7  gave a brief description of the suspect and advised
8  he had left before I had gotten there.
9      Q.  Were you taking notes while he was
10 talking to you?
11     A.  I don't recall.
12     Q.  When he said it was over a skateboard,
13 did that raise your suspicion in that doesn't make
14 a lot of sense to me?
15     A.  Yes. Typically, for people of that age,
16 I would be surprised if it was over a skateboard.
17     Q.  Did you question him about that and say,
18 really? This is regarding a skateboard? Or some
19 words to that effect?
20     A.  I don't recall any such statement.
21     Q.  Did he say that he wanted you to do
22 something more specifically?
23     A.  Not that I can specifically recall. It
24 just seemed like he was concerned about the subject

Page 45

1  coming back to his place of employment.
2      Q.  About how long did you talk to
3  Mr. Stanley?
4      A.  I don't recall specifically. Probably a
5  few minutes.
6      Q.  Did you do anything else to investigate
7  what he was reporting to you?
8      A.  I did. I recall logging into a TLO
9  program and searching the name Abel in the Round
10 Lake area.
11     Q.  What's TLO?
12     A.  It's -- I forgot what it stands for,
13 but, basically, you can look up information for
14 people such as addresses or a specific name if they
15 live in a certain area.
16     Q.  It's a police database? That is, law
17 enforcement are only supposed to access it?
18     A.  I believe it's law enforcement and
19 probably other private investigators and things
20 like that.
21     Q.  Okay. So you're saying to the best of
22 your recollection you put Abel's name into TLO,
23 that is, just the word "Abel"?
24     A.  Yes, just the first name.

Page 46

1      Q.  And did any results come back?
2      A.  It did. As far as I can recall, I found
3  the name for Abel Rosiles and a Round Lake address.
4  I don't recall the specific address.
5      Q.  What was your purpose in doing that or
6  reason for doing that?
7      A.  Just to further investigate the threat
8  report and potentially find a suspect.
9      Q.  What, if anything, did you do when you
10 found out it came back Abel Rosiles and came back
11 with an address in Round Lake?
12     A.  I don't believe -- between that time and
13 the time the second call came in was pretty close
14 together, and I just headed to that second call
15 once I heard the dispatch for it.
16     Q.  Do you recall the description Antoine
17 gave you of Abel?
18     A.  I don't, but I believe that's in my
19 major crimes report.
20     Q.  As in the report that the major crimes
21 task force made of your interview?
22     A.  Yes, sir.
23     Q.  And do you recall doing anything of note
24 in between the time of that first call and then the

Page 47

1  second call?
2      A.  No, just that TLO search is the only
3  thing notable that I still recall.
4      Q.  So can you tell me how you became aware
5  of a second call?
6      A.  I believe I was still sitting in my
7  patrol car around 11:00 p.m., in the parking lot,
8  and I heard it come out over the radio as a panic
9  alarm.
10     Q.  And you believe you're still literally
11 on the scene still?
12     A.  No. I'm on scene at the police
13 department.
14     Q.  And how far is the police department
15 from Thornton's?
16     A.  Probably a half mile to a mile, I would
17 think.
18     Q.  Okay. And do you recall what dispatch
19 advised you of?
20     A.  Not exactly. I believe it was
21 dispatched as a panic alarm and that someone had
22 hit the panic alarm more than one time.
23     Q.  What's the panic alarm, to your
24 knowledge?

14 (Pages 44 to 47)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 48

1    A.   Typically, businesses like gas stations
2  or banks have some sort of button hooked up to
3  their phone lines, I believe, and if there's a
4  situation where they need assistance without being
5  able to call, they can hit the button.
6    Q.   To your knowledge, had you ever
7  responded to a panic alarm at the Thornton's prior
8  to this date?
9    A.   I don't recall.  We responded to a lot
10 of panic alarms.
11   Q.   Was the first call that you got to go to
12 Thornton's -- was that also a panic alarm?
13   A.   No.  I believe it was just called in as
14 a threat report.
15   Q.   So to the best of your recollection, you
16 were less than a mile away at the police station
17 when you heard that call?
18   A.   Yes, sir.
19   Q.   And what did you do?
20   A.   I began driving that way with some of
21 the midnight shift officers who had just started
22 their shift.
23   Q.   Do you recall approximately what time
24 this call came out?

Page 49

1    A.   I believe it was a few minutes after
2  11:00 p.m.
3    Q.   And did you talk to any other officers?
4  That is, shortly before going, did you go on the
5  radio or talk in person and say hey, are you going
6  to go over there, or something to that effect?
7    A.   No, not that I recall.
8    Q.   Did you go over there with lights and
9  sirens?
10   A.   No, I did not.
11   Q.   Any reason why not?
12   A.   Typically, in that type of scenario, we
13 wouldn't want the potential suspects to see us or
14 hear us coming.
15   Q.   Did you speed over there, do you recall?
16   A.   I don't recall.  What do you mean by
17 "speed"?
18   Q.   Well, I don't know what the speed limit
19 is there, but did you go over the speed limit on
20 the way there?
21   A.   I very well could have.  I don't recall
22 my exact speed.
23   Q.   Do you recall -- you said you believe
24 other officers were with you.  Is that what you

Page 50

1  said?
2    A.   Yes, they were just -- I believe they
3  were just coming out of the building from roll call
4  as I started driving over there.
5    Q.   Okay.  Do you know who else went with
6  you, so to speak?
7    A.   Initially, when we went into the store,
8  it was me and Officer Cramer.
9    Q.   Do you know who got there first?
10   A.   I believe me and him got there basically
11 at the same time.
12   Q.   Driving separate squads, correct?
13   A.   Yes, sir.
14   Q.   And where did you park when you got
15 there?
16   A.   The best I can recall, it was in the car
17 wash parking lot, which is basically right behind
18 the building on the east -- more on the east side
19 of the building.
20   Q.   Why didn't you park right in front of
21 the store?
22   A.   Because that would not be safe
23 tactically.
24   Q.   Why not?

Page 51

1    A.   Because if it's a robbery situation, you
2  can be taking rounds as you pull into the parking
3  lot.
4    Q.   You didn't know what the nature of the
5  panic was, though, correct?
6    A.   No.
7    Q.   Have you ever responded to a panic alarm
8  call and it was a false alarm, so to speak, a
9  person accidentally hit it?
10   A.   Yes.
11   Q.   Does that happen more than once?
12   A.   What do you mean, "more than once"?  Has
13 that happened more than once for me?
14   Q.   Yes, for you.
15   A.   I'm sure I've been to more than several
16 of those.
17   Q.   So you didn't know what you were dealing
18 with besides it was a panic alarm at that point,
19 correct?
20   A.   Yes, sir.
21   Q.   Did you and Officer Cramer say anything
22 to each other before going into the store?
23   A.   Not that I can recall.
24   Q.   There was no strategy or game plan

15 (Pages 48 to 51)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 52

1    formulated outside the store?
2        A.   No.  We were just going in to make
3    contact with whoever was at the desk that may have
4    hit the panic alarm.
5        Q.   And did you go inside the Thornton's?
6        A.   Yes.
7        Q.   And what happened when you got inside?
8        A.   I saw the same caller from earlier,
9    Antoine, behind the counter, and he had stated that
10   that subject who threatened him had returned.
11       Q.   Did he say more specifically what he
12   said as in how he threatened him?
13       A.   I believe on the second occasion, he
14   said the threat was relayed to him by his
15   girlfriend.  I don't recall her name.
16       Q.   Did he say more specifically what the
17   threat was?
18       A.   Something along the lines that Abel was
19   going to wait for him after work.
20       Q.   And where is Officer Cramer when you
21   talked to the clerk, Antoine?
22       A.   He was, I believe, standing very close
23   to me inside the store.
24       Q.   Did Antoine say anything else?

Page 53

1        A.   He said that the subject went into the
2    bathroom in the Thornton's.
3        Q.   Okay.  And what did you do?
4        A.   Right around when he said that, we
5    turned that way, and we saw that subject exit the
6    bathroom hallway.
7        Q.   How did you know it was him?
8        A.   Just based on his description and him
9    coming out of the bathroom.
10       Q.   Tell me what happened after you noticed
11   Abel come out of the bathroom.
12       A.   He walked out of the little side hallway
13   from the bathroom and began walking towards us.  I
14   recall seeing him put his hands into his pocket,
15   and I could see something that looked like a bulge
16   in his pocket, in his hoodie, I believe.
17       Q.   You saw him put his hands into the
18   pocket of his hoodie?
19       A.   I believe he put his hands into the
20   hoodie pocket.  I can't exactly recall.  I just
21   remember seeing a bulge in his hoodie pocket that I
22   thought could have been a weapon.
23       Q.   So you're not sure if you saw him put
24   his hands into the pocket of his hoodie?

Page 54

1        A.   I'm not sure if he put it in that pocket
2    or his pants pocket.  I can't recall.
3        Q.   So you're saying you did see at least
4    one of his hands go into either his pants pocket or
5    his hoodie pocket, but you're just not sure which
6    one it was?
7        A.   Yeah.
8        Q.   And you saw a bulge where?
9        A.   In his hoodie pocket.
10       Q.   Okay.  When we're talking about hoodie
11   pocket, is that typically one that's near the
12   waistband and has pockets on either side of one's
13   side?
14       A.   Yes.
15       Q.   Do you recall what side you saw the
16   bulge?
17       A.   I believe it was just somewhere in the
18   middle of the pocket.  I can't remember
19   specifically.
20       Q.   To your recollection, did it have any
21   sort of shape that you could describe besides more
22   than just the bulge?
23       A.   No, I can't recall.
24       Q.   And did that concern you?

Page 55

1        A.   It did.  The way he was walking towards
2    us, and the fact that people don't typically reach
3    into pockets when they're encountering us.  I
4    believe we ordered him to place his hands on his
5    head, and I also at that same time drew my duty
6    weapon and put it in the low ready position.
7        Q.   Well, how do you know that he was
8    putting his hands in a pocket in response to seeing
9    you?
10       A.   It just -- the behavior seemed odd that
11   he would be walking towards us and placing his
12   hands in his pocket, which is concerning for our
13   safety.
14       Q.   Well, he had to walk towards you, right?
15   He's walking out of a small hallway that led to the
16   bathroom.
17       A.   Yes, but we were standing pretty much
18   directly in front of him.
19       Q.   Right.  So, I mean, he wasn't walking
20   towards you -- strike that.
21            I mean, he's walking out of the bathroom
22   when you saw him, correct?
23       A.   Yes, he was walking out of the bathroom
24   hallway.

16 (Pages 52 to 55)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 56

1    Q.   He had nowhere to go besides walk
2  towards you, unless he walked into the women's
3  bathroom, right?
4    A.   He could have gone the other direction.
5  The hallway was -- or the hallway entrance to the
6  bathroom was in the corner, so he could have turned
7  and gone basically perpendicular to us.
8    Q.   This is during COVID times.  I mean, I
9  guess, technically, we're still in COVID times.
10  But do you recall if he was wearing a face mask
11  when you encountered him?
12    A.   I don't recall.
13    Q.   Were you wearing a face mask?
14    A.   I believe I was.
15    Q.   Face mask is kind of a broad term.  Were
16  you wearing what's typically called a neck gaiter
17  or was it a face mask that went around your ears?
18    A.   I was probably wearing a neck gaiter.
19    Q.   You said you drew your firearm?
20    A.   Yes.
21    Q.   And you put it in a low ready position,
22  correct?
23    A.   Yes.
24    Q.   What's that?

Page 57

1    A.   Basically, you're not pointing it at the
2  subject.  It's just ready to go if need be.
3    Q.   And why did you do that?
4    A.   Because I felt him reaching into his
5  pocket, along with the bulge I could see in his
6  pocket was a potential weapon and a potential
7  threat to me.
8    Q.   Do you know if Officer Cramer drew his
9  weapon?
10    A.   I do not believe so.
11    Q.   When you noticed Abel do these things
12  that you described, you said you told him put his
13  hands on his head?
14    A.   Yes, sir.
15    Q.   Did he comply?
16    A.   Yes, he pretty much immediately
17  complied, and I reholstered my duty weapon.
18    Q.   And then what happened?
19    A.   He came to us, I believe, as we
20  instructed, and was taken into custody by
21  Officer Cramer.
22    Q.   As in Officer Cramer then handcuffed
23  him?
24    A.   Yes, sir.

Page 58

1    Q.   Behind his back?
2    A.   Yes.
3    Q.   Was it Officer Cramer's handcuffs that
4  were on Abel Rosiles then?
5    A.   I believe so, yes.
6    Q.   Did Mr. Rosiles resist the handcuffing?
7    A.   No, he did not.
8    Q.   Did you or Officer Cramer pat
9  Mr. Rosiles down while in the Thornton's?
10    A.   Not that I recall.
11    Q.   Why not?
12    A.   I don't know.  Around the time he was
13  taken into custody, I started speaking with the
14  caller, Antoine, more.
15    Q.   You previously said you noticed a bulge,
16  correct?
17    A.   Yes.
18    Q.   Weren't you concerned that was a
19  possible weapon?
20    A.   Yes, but at that point, Officer Cramer
21  was dealing with him more directly.
22    Q.   So you would have expected
23  Officer Cramer to search him?
24    A.   He very well could have.  I just don't

Page 59

1  recall.
2    Q.   Did you tell Officer Cramer about the
3  bulge that you noticed?
4    A.   I don't remember specifically.
5    Q.   Did any other officers enter the
6  Thornton's before Mr. Rosiles exited?
7    A.   I don't recall specifically.  Possibly
8  Officer Atwell around the time he was being taken
9  outside by Officer Cramer.
10    Q.   You said after my client was handcuffed,
11  you turned more of your attention towards the clerk
12  again?
13    A.   Yes.
14    Q.   And what did you talk about with the
15  clerk?
16    A.   I don't remember specifics.  I believe
17  he relayed that another threat was conveyed by the
18  subject's girlfriend, who had been in the store.
19    Q.   Was Abel placed under arrest?
20    A.   Yes.
21    Q.   What was he placed under arrest for at
22  that moment?
23    A.   I believe disorderly conduct.
24    Q.   Do you know what the elements of

17 (Pages 56 to 59)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 60

1  disorderly conduct are?
2      A.  Basically, an act to alarm or disturb an
3  individual.
4      Q.  And, specifically, how did Abel violate
5  that statute?
6      A.  By conveying threats to the clerk saying
7  he was going to wait for him until after work.
8      Q.  And you made that determination without
9  talking to Abel about what happened first?
10     A.  Yes.
11     Q.  Before you turned your attention back to
12  the clerk, did you look at Abel's face?
13     A.  I'm sure I did.
14     Q.  Okay.  Did you notice anything about his
15  mouth?
16     A.  No, not that I recall.
17     Q.  Did you hear Abel speak in the
18  Thornton's?
19     A.  I don't recall specifically.
20     Q.  Do you have any recollection while in
21  Thornton's, that is, of Abel having difficulty
22  speaking or having something in his mouth?
23     A.  No, not that I recall.
24     Q.  Is it fair to say that Abel cooperated

Page 61

1  with being escorted out of the Thornton's?
2      A.  Yes, that's fair to say.
3      Q.  And about how long did you talk to the
4  clerk before you exited the Thornton's?
5      A.  I couldn't say exactly.  Probably a
6  couple of minutes.
7      Q.  Did you exit with Officer Cramer, that
8  is, with Officer Cramer and Abel?
9      A.  No, I believe they exited before I did.
10     Q.  Just the two of them?
11     A.  I can't recall exactly.
12     Q.  Do you recall Abel saying anything as he
13  was exiting out the door?
14     A.  No, I do not.
15     Q.  Were you taking notes while you were
16  talking to this clerk, that is, while you were in
17  the Thornton's?
18     A.  I don't recall specifically taking
19  notes.  I remember I later obtained a written
20  statement from him.
21     Q.  Is it your normal practice to take notes
22  while you're talking to a witness or a victim?
23     A.  Depending on the case, yes.  If it's
24  just basic information, I typically wouldn't need

Page 62

1  notes.
2      Q.  When you do take notes, what type of
3  notes do you typically take down?
4      A.  If I don't have it already, I would take
5  the caller's information and date of birth or
6  contact number, things of that nature.  Anything
7  specific that would be important to a case.
8      Q.  Do you know if you took any handwritten
9  notes regarding what happened on June 10, 2020 at
10  all?
11     A.  I very well could have.  I just don't
12  remember specifically.
13     Q.  What do you typically do with your notes
14  if you do take them?
15     A.  As far as where would they be?
16     Q.  As in -- I take notes, and I put them in
17  a folder, and then the folder eventually goes to a
18  storage place for a certain period of time, maybe
19  five years, maybe ten years.  So I'm saying if you
20  do take notes, what do you typically do with the
21  notes?
22     A.  I would just take notes in a memo pad I
23  keep in my pocket, and I typically wouldn't keep my
24  notes after that memo pad was used up.

Page 63

1      Q.  Okay.  Would you throw away the notes at
2  some point?
3      A.  Typically, yes, or shred them.
4      Q.  Okay.  How long after an incident do you
5  typically throw away or shred?
6      A.  Just like I said, whenever I don't have
7  anymore space in that notepad.
8      Q.  So at this point, to the best of your
9  recollection, Officer Cramer walks Abel out of the
10  store, and you're not sure if somebody accompanied
11  him.  Is that fair?
12     A.  Yes, I would say that's fair.  I know
13  there was another officer outside.  I just don't
14  know exactly the extent to which they escorted him
15  to the vehicle.
16     Q.  And you said you talked with the clerk
17  for approximately a couple of minutes.  You're not
18  exactly sure how long?
19     A.  No -- I'm sorry to interrupt you.
20     Q.  Go ahead.
21     A.  I'm not exactly sure on the timeline.
22  That's just a rough estimate.
23     Q.  What's the next thing you can recall
24  doing?

18  (Pages 60 to 63)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 64

1      A.   After speaking with Antoine, I remember
2 exiting, and the suspect was escorted to the side
3 of Officer Cramer's squad car, I believe with
4 Officer Cramer and Officer Scheithe at his sides.
5      Q.   Okay. So you saw Abel being escorted by
6 those two officers to the side of somebody's squad
7 car?
8      A.   Yes. I believe it was Officer Cramer's
9 squad car.
10      Q.   And, again, Abel is handcuffed behind
11 his back?
12      A.   Yes, sir.
13      Q.   Is it fair to say that one officer was
14 on one side and the other officer was on the other
15 side of Abel?
16      A.   They were in close proximity to him.
17 I'm not exactly sure if they were by his sides, but
18 they were close to it.
19      Q.   And is it fair to say that Abel didn't
20 resist being escorted to the police car at that
21 moment?
22      A.   No, not until he was at the side of the
23 police car.
24      Q.   Did you hear Abel say anything before he

Page 65

1 made it to that police car?
2      A.   Not that I can recall, no.
3      MR. MATHUES: Jason, we've been going about an
4 hour and 15 minutes. Can you take a short break?
5      MR. MARX: Sure. How long would you like?
6      MR. MATHUES: Just five minutes to use the
7 restroom.
8      MR. MARX: Okay. No problem. Five minutes it
9 is.
10      (WHEREUPON, a recess was had.)
11      MR. MARX: Miss Reporter, I can't remember
12 where we left off. Can you read that back?
13      (WHEREUPON, the record was read
14      by the reporter.)
15 BY MR. MARX:
16      Q.   You previously said that Abel was
17 wearing a hooded sweatshirt, correct?
18      A.   Yes.
19      Q.   Do you recall what else he was wearing?
20      A.   I believe athletic shorts and gym shoes.
21      Q.   When you walked outside, did you notice
22 anybody else near you and/or Abel?
23      A.   Well, myself and Officer Atwell were
24 standing near each other, at a distance from

Page 66

1 Officer Scheithe and Officer Cramer, who had the
2 suspect by the side of the squad car.
3      Q.   What I'm saying is did you notice a
4 female outside near the squad car, anywhere near
5 the squad car?
6      A.   I did. I believe it was Mr. Rosiles's
7 girlfriend, who had been around us throughout the
8 incident.
9      Q.   Did you hear her say anything at that
10 moment, that is, before Abel actually reaches the
11 squad car?
12      A.   I believe she was saying things. I just
13 don't remember her specific statements.
14      Q.   Do you know if she was talking to Abel
15 or talking to you, or do you recall either way?
16      A.   I don't know.
17      Q.   Fair to say you didn't know who that
18 person was?
19      A.   I believe either there was some
20 indication by Antoine that he had had his
21 girlfriend relay a message the second time he came
22 in, but to my knowledge, I didn't really know who
23 she was to him.
24      Q.   Right. At that moment, you didn't know

Page 67

1 if that was his girlfriend or not -- let me say
2 this. Did you suspect that might be his girlfriend
3 when you saw her?
4      A.   I just suspected it just because she was
5 kind of following the scene as it evolved.
6      Q.   And whose squad car was Abel brought to?
7      A.   I believe it was Officer Cramer's, but
8 I'm not entirely positive on that.
9      Q.   Okay. Did you see Abel actually make it
10 to the squad car?
11      A.   He made it roughly to the side of the
12 squad car.
13      Q.   And then what did you see happen?
14      A.   I saw Abel break free from
15 Officer Cramer and Officer Scheithe and begin
16 running away into the roadway on Orchard Lane.
17      Q.   Did you hear Abel say anything right
18 before or right as he broke away?
19      A.   No, I don't recall anything.
20      Q.   Did Officer Scheithe or Cramer say
21 anything as Abel broke away?
22      A.   Not that I recall. They just began
23 pursuing him on foot.
24      Q.   What did you do when you saw that?

19 (Pages 64 to 67)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 68

```
 1        A.  I basically just stayed where I was at
 2   and watched them reapprehend him in the middle of
 3   Orchard Lane.  And then Officer Atwell went to
 4   assist them, and they began escorting him back to
 5   the squad car a second time.
 6        Q.  Did you say that Abel ran into the
 7   middle of Orchard Lane?
 8        A.  Yes, approximately.
 9        Q.  About how far did he run or how long did
10   he run?
11        A.  If I had to give a rough estimate of the
12   distance he ran, I would probably say 20 to
13   25 yards.
14        Q.  And you said Cramer and Scheithe were
15   able to catch up to him?
16        A.  Yes, sir.
17        Q.  And what did they do with Abel once they
18   caught up to him?
19        A.  They basically went to the ground very
20   briefly in the roadway, and then got him back to
21   his feet and escorted him back to the squad car
22   with Officer Atwell as well.
23        Q.  How did Abel get to the ground?
24        A.  I mean, it was basically just all of
```

Page 69

```
 1   them, Officer Cramer and Scheithe grabbing onto him
 2   as he was running, and they kind of all went down
 3   to the ground.
 4        Q.  More specifically, did you see Abel get
 5   pushed, pulled, or tripped to the ground?
 6        A.  Not specifically, no.  It was more just
 7   everybody kind of grabbed onto him, and they went
 8   down to the ground.
 9        Q.  Did you see how Abel landed on the
10   ground, that is, what body part or parts hit the
11   ground?
12        A.  I can't recall specifically.  It was
13   pretty quick on how it happened.
14        Q.  How far away were you when you observed
15   Abel go to the ground?
16        A.  I was probably about 20 to 25 yards
17   away.
18        Q.  And why didn't you, well, assist the
19   other officers at that moment?
20        A.  There wasn't really a need to.  He was
21   in handcuffs, and they were clearly going to catch
22   up to him, and they didn't need more than three
23   officers to escort him back to the vehicle.
24        Q.  How long was Abel on the ground?
```

Page 70

```
 1        A.  I couldn't say for sure.  I would say a
 2   matter of seconds.
 3        Q.  A matter of seconds did you say?
 4        A.  Yeah.  I would say seconds.  Less than
 5   30 seconds, I would assume, based on what I can
 6   recall.
 7        Q.  And, again, you don't recall what
 8   position Abel was on the ground?
 9        A.  Not specifically.  I mean, he wasn't on
10   the ground for very long, and everybody was kind of
11   moving around.
12        Q.  Did you see Abel do anything on the
13   ground?
14        A.  Just being generally resistive to them
15   trying to apprehend him.
16        Q.  You already described the running,
17   obviously, but besides the running, how was he
18   being generally resistive?
19        A.  Just pulling his arms and moving his
20   legs away from the officers.
21        Q.  And did you see the officers touching
22   him while he was on the ground?
23        A.  I saw them grab onto him, and then they
24   got him back to his feet and walked him back to the
```

Page 71

```
 1   squad car.
 2        Q.  Did you hear Abel say anything while he
 3   was on the ground?
 4        A.  Not that I can recall.
 5        Q.  Did you hear officers say anything while
 6   Abel was on the ground?
 7        A.  Not that I can recall.  I'm sure they
 8   were giving some sort of commands, but I don't
 9   recall specifically.
10        Q.  Do you recall specifically how Abel was
11   brought off the ground?
12        A.  I believe he was just picked up by his
13   arms and got up to his feet, and then they walked
14   him back to the squad.
15        Q.  Were you standing near the squad?
16        A.  I was near to it, yes.
17        Q.  That's Officer Cramer's squad?
18        A.  I believe so.
19        Q.  And what's the next thing you recall
20   happening?
21        A.  They -- Officer Cramer and Officer
22   Scheithe stood him next to the rear door of the
23   squad where we would typically have a suspect enter
24   the squad.  They then -- I believe they then
```

20  (Pages 68 to 71)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 72

1  started to perform another search on him before
2  they placed him in the squad, which is something we
3  would always do. And I saw that he was becoming
4  very resistive again, and trying to wiggle away and
5  pulling his arms away, and then he began locking
6  his feet together on his legs.
7     Q.  Before Abel made it back to the squad,
8  didn't you see officers take Abel over to the
9  grassy area first?
10    A.  I don't recall that. Can you be more
11 specific with that question?
12    Q.  So from what you just described, it
13 sounds like you saw officers take Abel to the
14 ground, then they got him off the ground, and then
15 they took him directly over to the squad.
16    But my question is before he was taken
17 over to the squad, didn't you see officers take him
18 over to a grassy area first?
19    A.  I don't recall that specifically. I
20 could check my report, if you'd like.
21    Q.  That's okay. I just want to know what
22 your memory is at this moment.
23    So you don't have a memory of him being
24 brought over to the grassy area before he actually

Page 73

1  went over to the squad?
2     A.  From what I remember, he was brought
3  over to the squad, and once the incident continued
4  further, then he was brought into that grassy area.
5     Q.  Okay. So you don't have a recollection
6  of him being brought from the street to the grassy
7  area, and then being brought back down to the
8  ground on the grassy area?
9     A.  I don't. As best as I can remember, I
10 believe he was brought to that grassy area after
11 what I was just speaking of when he began locking
12 his legs together.
13    Q.  Okay. So he was brought over to the
14 squad, as you said, and the purpose at this point
15 was to conduct a pat down. Is that what you said?
16    A.  It would be a search, yes.
17    Q.  Okay. A search for weapons, narcotics,
18 anything illegal, correct?
19    A.  Just a search incident to arrest, that
20 anything he may have on his person that we want to
21 make sure we keep track of so we don't lose any of
22 his belongings.
23    Q.  And who started conducting the search?
24    A.  I don't know specifically. I just know

Page 74

1  Officer Cramer and Atwell were handling him at the
2  side of the vehicle at that time.
3     Q.  And how far away are you watching this
4  happen?
5     A.  I was probably approximately -- I really
6  couldn't say for sure. I was within a few steps of
7  them, I would say.
8     Q.  And you said that you noticed Abel
9  putting his feet together?
10    A.  Yeah. It was -- the best I can describe
11 it, he basically, like, locked his ankles around
12 his shins, and then he started kicking pretty
13 aggressively to get his -- almost like he was
14 trying to kick his socks off.
15    Q.  Well, did he have his shoes on at this
16 point that you noticed?
17    A.  I believe he had at least one shoe on.
18    Q.  Do you know which shoe he had on?
19    A.  No, I can't remember.
20    Q.  Are you saying then, therefore, you
21 believe he lost one of his shoes during that time
22 period prior to him being brought over to the car
23 there?
24    A.  I believe so, yes.

Page 75

1     Q.  Do you know how it happened?
2     A.  No, I don't. I can assume it was from
3  running or something of that nature.
4     Q.  But you don't have, like, a specific
5  recollection of how it came off prior to you first
6  noticing it, that it was actually off?
7     A.  No, I don't.
8     Q.  Do you know if he had a sock on on the
9  shoeless foot?
10    A.  I can't recall. I know he had socks on.
11 I just don't know specifically which foot they were
12 on.
13    Q.  So it would appear to be that Abel is
14 trying to lock his legs together to avoid them
15 being spread apart and searched. Is that what
16 you're saying?
17    A.  Yes. We kind of assumed that. And I
18 remember indicating to those two officers that he
19 was trying to do something with his feet, almost
20 like he had something in his shoes or socks.
21    Q.  What did you see him doing with his
22 feet?
23    A.  So he had been told by one of the
24 officers to spread his legs apart, and he locked

21 (Pages 72 to 75)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 76

1  them together very tightly, like I said, with his
2  feet wrapped around his opposing ankles, basically.
3  And he was just pushing downward with his feet
4  against his opposing foot, I guess, to kick off
5  his -- what appeared to be to kick off his shoes
6  and/or socks.
7      Q.   And, again, you don't remember which
8  shoe or sock he was trying to get off?
9      A.   No, I can't recall.  It was kind of a
10  rapid pushing downward on both feet.  So me in it
11  looked like he was trying to kick off both sides.
12      Q.   Did you say something to the other
13  officers when you noticed this?
14      A.   Yeah.  As I said, I indicated it looked
15  like he was trying to do something, and I remember
16  saying something along the fact, "I'll try to
17  control his legs," and basically picked -- I
18  basically wrapped one of my arms around his ankle
19  area on his legs to try to stop him from doing that
20  kicking motion, and then when I did that, I was
21  immediately kicked in the chest twice by Abel.
22      Q.   I'm just trying to understand exactly
23  the positioning here.  So Abel is standing up and
24  he's facing Officer Cramer's squad car at this

Page 77

1  moment?
2      A.   Yes.  I would be -- I guess, the best I
3  can describe, I would be behind him and slightly to
4  one side.
5      Q.   Okay.  So Abel's facing the squad car.
6  Is it fair to say that the squad car he's facing
7  is -- he's facing, like, the rear passenger door of
8  the squad car?
9      A.   Yes, I would say that.
10      Q.   Is he pressed up against or touching
11  that squad car at this moment?
12      A.   I don't believe so, but I was more
13  focusing on his feet.
14      Q.   So you're not sure if he was touching
15  the squad car with any part of his body at this
16  point?
17      A.   No, I couldn't say for sure.
18      Q.   And you noticed that his feet were
19  locked -- strike that.
20           You're behind him and slightly to the
21  left, you said?
22      A.   Slightly -- I believe it was to the
23  left, yes.
24      Q.   And two officers are on his side, that

Page 78

1  is, one officer is on his right side, one officer
2  is on his left side?
3      A.   Yes.
4      Q.   Do you remember which officer was on
5  which side?
6      A.   Not specifically.  I believe it was
7  Officer Cramer to my left and Officer Scheithe to
8  my right.
9      Q.   And you noticed these foot movements
10  you've been saying, and in response to that, you
11  tried to grab one, was it, or both of his ankles?
12      A.   So he had them still locked, like, very
13  tightly together.  So I basically just hooked my
14  arm around the front of his -- I guess you could
15  say ankles or shins to try to control his feet, and
16  I think the intent was we were going to then move
17  him to that grassy area.  And, basically,
18  immediately when I tried to lock his feet up with
19  my -- wrapping my arm around it, he kicked me twice
20  in the chest.
21      Q.   Where specifically on your chest?
22      A.   I just remember it being, like, pretty
23  much in the middle of my vest that I was wearing.
24      Q.   You had a bulletproof vest on?

Page 79

1      A.   Yes, sir.
2      Q.   Do you know what a donkey kick is, so to
3  speak?
4      A.   Not particularly.  Could you describe
5  it?
6      Q.   Yes, I can.  It's where one -- I'm kind
7  of standing up and demonstrating here.  It's where
8  one kicks backwards.  They're facing forwards, but
9  they raise their leg and they kick backwards.  Is
10  that kind of what Abel did to you?
11      A.   From what I recall, I don't believe he
12  had the other foot on the ground because I had kind
13  of picked up both of his feet, I guess you could
14  say, while the other officers were holding him by
15  his arms.  And the best I recall, our goal was to
16  control his legs and get him back onto the grass,
17  onto the ground, just so we could control him
18  better when he was still resisting.  And I think he
19  used both feet and just pushed off my vest twice in
20  kind of a kicking motion and pushed me back.  And
21  then I was pulled away due to other activity.
22      Q.   When you grabbed both feet, I think you
23  said you pretty much wrapped your arms around his
24  shins, right?

22  (Pages 76 to 79)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

---

Page 80

1      A.   I believe it was just one arm.
2      Q.   Okay.  And in response, Abel then used
3  both of his feet to kick you in the chest?  Is that
4  what you're saying?
5      A.   Yes, best I can recall.
6      Q.   Did you lift him up and then he kicked
7  you or how did that work?
8      A.   From what I recall, I was basically
9  starting to pick his feet up off the ground.  While
10  they were still both locked together, he kicked me
11  with both feet still kind of locked in that same
12  pattern.
13      Q.   Did you say anything when he did that?
14      A.   No.  Right around that time, my
15  attention was pulled away.
16      Q.   Your attention was what?  I'm sorry.
17      A.   Pulled away due to other activity going
18  on behind me.
19      Q.   Up until this point, that is, up until
20  the point that you're kicked, did you ever hear
21  Abel say anything?
22      A.   I believe I did.  I just don't recall
23  any specific statements.
24      Q.   And do you have any recollection of Abel

---

Page 81

1  having any difficulty -- in your opinion any
2  difficulty speaking, if you did, in fact, hear him
3  speak?
4      A.   No, none that I can recall.
5      Q.   Okay.  So what happened after you were
6  kicked twice by Abel in the chest?
7      A.   Right around that time, I believe it was
8  Miss Brubaker arrived on scene, and I saw
9  Officer Atwell trying to control her behind me
10  pretty much right after I was kicked.  So I left
11  those two officers in order to take her into
12  custody -- I left those two officers to assist
13  Officer Atwell take her into custody.
14      Q.   Where did Miss Brubaker appear from?
15  That is, where did you first see her?
16      A.   I don't know where she appeared from.  I
17  just remember basically turning around and seeing
18  Officer Atwell trying to take her into custody and
19  she was being resistive.
20      Q.   Do you recall her saying anything, that
21  is, before she was actually taken into custody?
22      A.   I just remember her yelling.  I don't
23  remember any specific statements.
24      Q.   Do you recall her doing anything with

---

Page 82

1  her body before she was actually taken into
2  custody?
3      A.   I remember just her flailing her arms
4  and not putting her hands behind her back for
5  Officer Atwell.
6      Q.   Do you recall Officer Atwell saying
7  something while this is happening?
8      A.   I don't remember specifics about any
9  statements he made.
10      Q.   And so you went to assist
11  Officer Atwell, is that what you said?
12      A.   Yes, sir.
13      Q.   How did you assist?
14      A.   We ended up taking Miss Brubaker down to
15  the ground and handcuffing her, and then I
16  basically stood by with her for a period of time
17  after that because she was now in my custody.
18      Q.   How did you take her to the ground?
19      A.   Basically, it was just similar to the
20  one-arm takedown that we would be taught in
21  defensive tactics, but, obviously, it's more of a
22  fluid situation, so it's basically dynamic
23  application of something we're trained to do.
24      Q.   Okay.  What's a one-arm takedown?

---

Page 83

1      A.   It was part of the PPCT training.
2  Again, what they train and how that applies to an
3  actual fluid resisting subject.  It doesn't all the
4  look exactly the same, but it was similar in
5  nature.
6      Q.   I know what it stands for.  It says
7  one-arm takedown, so I have a general idea, but can
8  you tell me more specifically how that works?  Can
9  you give me an example of a one-arm takedown?
10      A.   Basically, you control one of the
11  subject's arms, and you're standing behind them at
12  what's called the two and a half position, and you
13  basically use your body and their momentum to bring
14  them down to the ground, and then transition right
15  into handcuffing.
16      Q.   It's an attempt to pull somebody to the
17  ground, correct?
18      A.   Yes.
19      Q.   And in doing so, it's your goal to keep
20  control of that arm so you can handcuff that person
21  behind their back, correct?
22      A.   Yes, sir.
23      Q.   And is that what you did to
24  Miss Brubaker?

---

23  (Pages 80 to 83)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 84

1    A.   A version of that.  Again, it was more
2  dynamic and --
3    Q.   What was she doing while you were trying
4  to do this?
5    A.   Again, she was still flailing her arms
6  and actively resisting being taken into custody.
7    Q.   Were you or Officer Atwell saying
8  anything to her?
9    A.   I know we were.  I don't remember
10  specifically what was said.
11    Q.   Did she eventually go to the ground to
12  get handcuffed behind her back?
13    A.   Yes.
14    Q.   Whose handcuffs?  Yours or Atwell's?
15    A.   I believe it was Officer Atwell's, but I
16  couldn't tell you with certainty.
17    Q.   And about how far away was she from the
18  position that Abel was in, that is, when she's on
19  the ground and when Abel is by the squad car?
20    A.   If I had to give an estimate, I would
21  say 10 to 15 feet.
22    Q.   And you said you remained with her
23  because she was now in your custody?
24    A.   Yes, I remained with her.

Page 85

1    Q.   And is it fair to say she was lying in
2  the prone position on a grassy area about 10 to
3  15 feet away from Abel?
4    A.   Yes.
5    Q.   And when you were with her, what were
6  you doing?  Standing?  Sitting?  Squatting?
7    A.   I believe I was just squatting at her
8  side, and eventually we stood her up and walked her
9  over to a patrol vehicle.
10    Q.   And do you recall what a person who you
11  now know as Sinahy Reyes Gomez was doing while all
12  this was happening?
13    A.   She was -- from where I was with
14  Miss Brubaker, I believe she was standing off to
15  our right somewhere watching at a distance.
16    Q.   Did you notice if she was using her
17  phone and appeared to be recording with her phone
18  at any point?
19    A.   I did.  It appeared that she had her
20  phone out.  I don't know what she was doing with
21  it, though.
22    Q.   Do you recall anything she said while on
23  scene?
24    A.   No.  Just kind of yelling, but I don't

Page 86

1  remember any specifics.
2    Q.   Do you recall anything Miss Brubaker was
3  saying, that is, before she was placed in a squad
4  car?
5    A.   Not specifically.  I just remember her
6  yelling when she came on scene, and I don't
7  remember any specific statements.
8    Q.   After Miss Brubaker was in custody and
9  you said you were kind of squatting next to her,
10  did you notice the officers and Abel?
11    A.   Yes, I noticed them.
12    Q.   Okay.  And what position was Abel in
13  when you noticed him?
14    A.   He was back on the ground.  When I had
15  last had contact with him, I had last seen him
16  standing, and then by the time I had Miss Brubaker
17  secured and I went back to them, he was back on the
18  ground.
19    Q.   Do you know specifically how he got back
20  on the ground?
21    A.   I don't.  I assume that occurred while I
22  was trying to take Miss Brubaker into custody.
23    Q.   About how long would you say it took for
24  you and Officer Atwell to take Miss Brubaker into

Page 87

1  custody, so to speak?
2    A.   I don't know specifically.  I would
3  guess a minute or two.
4    Q.   So when you first looked up again at the
5  officers and Abel, what position was Abel in?
6    A.   He was sort of in a prone position, but
7  also sort of turned to one side with his head up
8  off the ground.
9    Q.   Do you know what side he was turned to?
10    A.   I don't.
11    Q.   Is he near the squad car at this point?
12    A.   Yes.
13    Q.   About how far is his head from the squad
14  car, would you say?
15    A.   I couldn't give an accurate guess
16  because I was at a distance from him.
17    Q.   Is it fair to say that there's a grassy
18  area, a curb, and then the parking lot right where
19  Abel was?
20    A.   Yes, that sounds fair.
21    Q.   Okay.  And is it also fair to say that
22  the lower half of Abel's body was in the grassy
23  area, his midsection or abdomen area was on the
24  curb, and the upper half of his body was on the

24  (Pages 84 to 87)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 88

1  pavement?
2      A.  I don't recall specifically.  That very
3  well could be.  I just don't remember specifically
4  what parts of his body were where.
5      Q.  And did you see officers near Abel?
6      A.  Yes.
7      Q.  Who did you see near him?
8      A.  I believe it was Officer Cramer and
9  Officer Scheithe still.
10     Q.  Do you know what side Cramer was on,
11 which side Scheithe was on?
12     A.  I don't.  Best I can recall, I think he
13 was still with Cramer on the left and Scheithe on
14 the right from my position looking at them.
15     Q.  And do you recall what Officer Cramer
16 was doing?
17     A.  I don't specifically.  It looked like
18 they were still just trying to calm him down and
19 get control of him.
20     Q.  Do you recall what Officer Scheithe was
21 doing?
22     A.  No.  I would give the same answer for
23 that.
24     Q.  What do you mean it looked like they

Page 89

1  were trying to calm him down?
2      A.  Just from not trying to pull away and
3  being fairly resistive.
4      Q.  Did you see Officer Cramer touching
5  Abel?
6      A.  I'm sure he was controlling him somehow.
7  I don't specifically remember where he was
8  touching.
9      Q.  Did you see Officer Scheithe touching
10 Abel?
11     A.  I would give the same answer as well.
12     Q.  So you're not sure where Cramer or
13 Scheithe were touching him, but you're pretty sure
14 they were touching him somewhere on his body?
15     A.  Yes.
16     Q.  Did you see Abel do anything while he
17 was lying, as you said, somewhat prone on the
18 ground?
19     A.  I just recall when I was paying
20 attention to Miss Brubaker, I remember hearing I
21 believe it was Officer Scheithe say, "Are you
22 choking?"  And Abel kind of had his -- was still
23 sort of prone and turned to the side slightly with
24 his head up, and it looked like he sort of made a

Page 90

1  nodding motion like yes.
2      Q.  Before that happened, did you see either
3  officer remove a shoe or a sock from Abel's body?
4      A.  I did not see that.
5      Q.  And I'm sorry if I asked you this, but I
6  don't remember.  Where was Officer Atwell while you
7  were with Miss Brubaker and Cramer and Scheithe are
8  with Mr. Rosiles?
9      A.  I can't remember specifically.  I assume
10 he was very nearby, but I don't recall what he was
11 exactly doing.
12     Q.  You said you heard somebody say, "Are
13 you choking?"
14     A.  Yes, I believe it was Officer Scheithe.
15     Q.  About how long after you first noticed
16 Abel in this somewhat prone position did you hear
17 Officer Scheithe say that?
18     A.  I couldn't give an accurate guess at
19 that.
20     Q.  Could you give me an estimate?  For
21 example, was it under 30 seconds or over
22 30 seconds?
23     A.  Beginning from when I last had contact
24 with Abel or --

Page 91

1      Q.  Right.  Okay.  I'll clarify.  So you
2  said you took Miss Brubaker into custody, and then
3  you were with her because she was in your custody.
4  Right?
5      A.  Yes.
6      Q.  Then you must have, at some point,
7  looked up and noticed Abel in the position that you
8  described, correct?
9      A.  Yes.
10     Q.  So I'm asking in the moment you first
11 looked up and noticed Abel in the position that you
12 described until the moment you heard what you
13 believe Officer Scheithe say, "Are you choking,"
14 about how much time passed?
15     A.  I really couldn't say if it was
16 20 seconds or a minute and a half.  I really
17 couldn't narrow it down enough to give you a good
18 answer.
19     Q.  While Abel was on the ground in the
20 somewhat prone position, did you see what you
21 believe to be excessive force to be used by Cramer
22 or Scheithe on Abel?
23     A.  No.
24     Q.  But, again, you don't remember

25 (Pages 88 to 91)

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 92

1    specifically where they were touching Abel,
2    correct?
3        A.  No.  But I didn't see any sort of
4    striking or anything egregious that, in my opinion,
5    would be seen as excessive force.
6        Q.  Well, did you see either one or both
7    officers pushing down on Abel's body in any
8    fashion?
9        A.  I can't specifically remember that.  I
10   just remember them being directly next to him, but
11   I don't remember what their actual positioning was.
12       Q.  If you did see either officer use what
13   you believed to be excessive force, would you have
14   done something?
15       A.  Yes.  I would have interfered if I knew
16   something inappropriate was going on.
17       Q.  For example, how could you have
18   interfered?  What would you have done, for example?
19       A.  I could have verbally told the officers
20   that what they were doing was inappropriate or
21   excessive and took over -- basically took over for
22   them in dealing with that subject.
23       Q.  Have you ever seen an officer perform
24   what you believe to be excessive force on a

Page 93

1    subject?
2        A.  No, not in my experience.
3        Q.  Okay.  So Officer Scheithe said words to
4    the effect, "Are you choking on something," and you
5    said you noticed Abel shake his head up and down as
6    if to indicate yes?
7        A.  To me it seemed sort of like a nod in
8    the affirmative, and he -- from my viewpoint, it
9    looked like he was starting to turn white in the
10   face.
11       Q.  Did you hear Abel say anything to
12   indicate he was choking or you just say you noticed
13   a nod?
14       A.  I didn't hear anything.
15       Q.  And, again, you're about 10 to 15 feet
16   away from him when you're making these
17   observations?
18       A.  Yes, if I had to give an estimate.
19       Q.  I'll represent to you that
20   Officer Scheithe said he saw Abel with a black sock
21   in his mouth.  My question to you is did you ever
22   see Abel with a black sock in his mouth?
23       A.  No, I never saw Abel with a sock in his
24   mouth.

Page 94

1        Q.  Did you ever see a sock anywhere near
2    Abel's mouth?
3        A.  No.  But, again, I was primarily dealing
4    with another person.
5        Q.  I understand.  But you're also looking
6    at the people and other officers, too, correct?
7        A.  Correct.  At some points in time, yes.
8        Q.  Right.  Is it fair sometimes you're
9    looking at Miss Brubaker, sometimes you're looking
10   at Abel and the officers?
11       A.  Yes, absolutely.
12       Q.  What's the next thing you can recall
13   happening?  After Scheithe asked, "Are you choking
14   on something," Abel seemed to indicate yes.  What's
15   the next thing you recall?
16       A.  I recall then Officer Atwell being next
17   to them.  They got Abel to his feet, and Officer
18   Atwell started doing the Heimlich maneuver on Abel.
19       Q.  Before the Heimlich maneuver was
20   performed, did you look in Abel's mouth?
21       A.  No, I did not.
22       Q.  Before the Heimlich was performed, did
23   any officers, to your knowledge, look in Abel's
24   mouth?

Page 95

1        A.  Not that I observed.
2        Q.  Do you recall any training indicating
3    that you should look in the person's mouth before
4    you perform the Heimlich?
5        A.  Not specifically, but that very well
6    could be a part of the training.
7        Q.  When you said Abel indicated with a head
8    nod that he was choking, and I believe you said you
9    thought his face was turning white, did that
10   concern you that he might be choking?
11       A.  Yes, it did.
12       Q.  Did you or any other officers say
13   anything at that point when you made these
14   observations?
15       A.  I don't recall specific statements.  I
16   do remember I believe it was Officer Atwell
17   requesting medics on the radio.  And also, prior to
18   that, when we were dealing with Mrs. Brubaker, he
19   began requesting more police officers from
20   neighboring jurisdictions.
21       Q.  Did you say Atwell then started
22   performing the Heimlich maneuver?
23       A.  Yes, sir.
24       Q.  And what did you do?

26 (Pages 92 to 95)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 96

1    A.   I still had Miss Brubaker with me and
2  tended to her.
3    Q.   Did you notice if that Sinahy Gomez
4  Reyes was on scene at this point when the Heimlich
5  started?
6    A.   I'm sure she was there.  I don't
7  remember looking at her during that part of the
8  incident.
9    Q.   Do you remember if she ever left and
10 came back?  Do you have a recollection of that
11 happening?
12   A.   I don't have a personal recollection of
13 it.  I do recall when reviewing the body cam
14 footage on -- I believe it was body camera,
15 possibly their video, as well, that she was
16 instructed by Miss Brubaker to leave and take her
17 car somewhere.
18   Q.   Okay.  So Officer Cramer is now
19 performing the Heimlich.  You're standing or
20 squatting next to Miss Brubaker.  What's the next
21 thing you recall happening?
22   A.   Just to correct, it was Officer Atwell
23 who I saw doing the Heimlich.
24   Q.   Thank you for the correction.  So you

Page 97

1  saw him doing that, and what's the next thing you
2  recall happening?
3    A.   I just remember Officer Atwell
4  continuing that, and then it appeared that -- Abel
5  was still standing at this time, and it appeared he
6  was still conscious, just struggling to breathe.
7  And while Officer Atwell was doing that,
8  Officer Kaminski from Round Lake Heights PD arrived
9  on scene with his trainee.
10   Q.   I'm confused.  Did you say that Abel was
11 still standing at this point?
12   A.   Yes, they stood him up.  I had stated
13 earlier they had stood him up once it appeared that
14 he was choking, and Officer Atwell was doing the
15 Heimlich from a standing position.
16   Q.   Okay.  And did it appear to you that
17 Abel -- strike that.
18       Did it appear to you that Abel was able
19 to stand on his own volition?
20   A.   Yes.
21   Q.   Okay.  Did it appear to you that he
22 remained standing on his own volition?
23   A.   It appeared so while they were doing the
24 Heimlich maneuver.

Page 98

1    Q.   How long did Atwell do the Heimlich
2  maneuver before he stopped?
3    A.   I couldn't give an accurate timeline.  I
4  don't know.  It could have been 30 seconds or so.
5  And then once Officer Kaminski arrived on scene
6  from Round Lake Heights, they took him out of
7  handcuffs and Officer Kaminski continued the
8  Heimlich and took over for Officer Atwell.
9    Q.   Did you recognize Kaminski, as in did
10 you know who he was when he arrived?
11   A.   Yes.  I was familiar with him from
12 working on other calls together.
13   Q.   Okay.  And you said he arrived with a
14 field training officer, too?
15   A.   Yes, sir.
16   Q.   Did you know who that was?
17   A.   No.  We had actually met for the first
18 time after that incident concluded.
19   Q.   So Kaminski took over with the Heimlich
20 you said?
21   A.   Yes, sir.
22   Q.   When Kaminski took over, was Abel still
23 standing?
24   A.   Yes, he was doing the Heimlich while

Page 99

1  standing.
2    Q.   Did it appear that Abel was able to
3  stand on his own while Kaminski was doing the
4  Heimlich?
5    A.   It appeared so.  I wasn't specifically
6  looking at his feet, but he was standing up and
7  appeared to still be conscious.
8    Q.   How long did Kaminski do the Heimlich?
9    A.   Estimate the same.  Approximately
10 30 seconds, and then rescue personnel began
11 arriving on scene.
12   Q.   Okay.  Specifically, do you recall who
13 from rescue appeared on scene?
14   A.   I don't.  It was just paramedics.  I
15 don't remember their names specifically.
16   Q.   At that time did you know the names of
17 any paramedics that worked for Round Lake?
18   A.   I did.  The only one I remember, just
19 from reviewing video and seeing him come out of the
20 ambulance, was -- I don't know if he was a
21 lieutenant or something like that.  It was Carraro.
22 I don't remember his first name.
23   Q.   Carraro?
24   A.   Yes.

27 (Pages 96 to 99)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 100

1      Q.   To the best of your recollection, it was
2  Atwell that called for paramedics?
3      A.   As best as I can recall, yes.
4      Q.   To the best of your recollection, that
5  happened around or shortly after the time that
6  Brubaker was taken into custody?
7      A.   Yes. It was around when I had heard
8  Officer Atwell ask Abel if he was choking, which
9  was pretty much in the very close time frame there.
10     Q.   So do you recall how long it took for
11 paramedics to arrive on scene from the time they
12 were called?
13     A.   I don't. I would probably say two to
14 three minutes.
15     Q.   When the paramedics first arrived, would
16 you describe their motion in getting to Abel as
17 quick or kind of slow and deliberate?
18     A.   Initially, I would say they were walking
19 slowly from their ambulance over to where the
20 officers were.
21     Q.   Okay. Did you or somebody else say
22 anything to them when they first arrived?
23     A.   I remember on video Officer Kaminski in
24 layman's terms, encouraging them to pick up the

Page 101

1  pace because somebody was possibly going into
2  cardiac arrest.
3      Q.   Did you agree with that statement, that
4  they should pick up the pace?
5      A.   I would say that they could have walked
6  faster.
7      Q.   And did you see paramedics render aid to
8  Abel?
9      A.   Yes. From what I recall, they moved him
10 onto the grass and began performing CPR on him. I
11 don't remember specifically who was doing the CPR.
12     Q.   Do you ever remember seeing what's
13 called a bag valve mask or something like that
14 placed on Abel's face?
15     A.   I'm sorry. A what valve mask?
16     Q.   A bag, B-A-G. Some sort of apparatus --
17 breathing apparatus placed over his nose and mouth?
18     A.   I don't specifically remember seeing
19 that.
20     Q.   And what were you doing while the
21 paramedics were rendering aid?
22     A.   Around that time, I'm not sure if I was
23 standing with Miss Brubaker in the grassy area or
24 if I was standing with her by the squad car that

Page 102

1  she was escorted to. I can't recall my exact
2  positioning, but I was still with Miss Brubaker at
3  that moment, I believe.
4      Q.   Can you tell me who you remember
5  arriving on scene? You already described Kaminski
6  and his field training officer, and you already
7  described a couple of paramedics. Did anybody else
8  arrive on scene?
9      A.   I recall Detective Schultz of Round Lake
10 arriving on scene. And also Officer -- it's either
11 Robinson or Robertson, I don't remember. I think
12 it's Robinson of Round Lake.
13     Q.   Okay. When paramedics are giving aid to
14 Mr. Rosiles and you're with Miss Brubaker, what's
15 the next thing you can recall happening?
16     A.   I just remember at some point he was
17 brought into the back of the ambulance, and
18 Miss Brubaker was seated in the back of one of our
19 squad cars.
20     Q.   Did somebody tell you to put her in the
21 back of the squad car?
22     A.   I believe Commander Barr told me to
23 secure her in the squad car, but I can't
24 specifically remember what he said.

Page 103

1      Q.   Did you take her to a squad car?
2      A.   Yes.
3      Q.   Whose squad car? Do you recall?
4      A.   It was a Charger. I don't know whose
5  specifically it was, but it was a Round Lake Beach
6  squad car. It would be on Detective Schultz's
7  body cam because he stood by with her at the rear
8  of the squad.
9      Q.   And the squad wasn't that far away from
10 where Abel was getting aid on the ground, right?
11     A.   If I had to guess, it was probably ten
12 yards away parked in one of the spaces in front of
13 the store.
14     Q.   And did you have any further contact
15 with Miss Brubaker while on scene?
16     A.   I believe I remember speaking with her
17 briefly while she was in the back of the squad car,
18 but I don't remember our conversation specifically.
19     Q.   I'll represent that there is audio of
20 somebody asking Miss Brubaker questions. Do you
21 have a recollection if it's actually you that had a
22 short conversation with Miss Brubaker asking more
23 specifically about Abel?
24     A.   From what I recall reviewing the videos

28 (Pages 100 to 103)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 104

1    on Saturday, Detective Schultz was questioning her
2    about Abel, as far as like health, medical --
3    previous medical history and things of that nature.
4    I very well may be on video talking to her, but I
5    don't specifically remember that, and I didn't -- I
6    don't recall seeing that on Saturday in the video.
7         Q.    About how long were paramedics on scene
8    before you saw Abel being taken into the back of
9    the vehicle that they arrived in?
10        A.    I couldn't really say, but if I had to
11   guess, I would say a few minutes.
12        Q.    Do you know what aid paramedics were
13   providing Abel in the back of that ambulance?
14        A.    No, I didn't have any sight into the
15   back of the ambulance.
16        Q.    Do you know specifically who went in the
17   ambulance with them?
18        A.    No, I don't.
19        Q.    What do you recall doing after
20   Miss Brubaker was placed in the police vehicle?
21        A.    At some point, I had gotten a written
22   statement from Antoine.  As far as chronologically,
23   I don't remember exactly when that occurred, but it
24   did occur sometime in that time frame.  Generally,

Page 105

1    just kind of preserving the scene and standing by
2    with other officers.
3         Q.    So you don't recall if you actually took
4    a statement from Antoine while he was still at the
5    Thornton's or some other time is what you're
6    saying?
7         A.    No.  I had brought him a paper form to
8    write his own written statement out, and I had gone
9    in and given that to him and I believe retrieved it
10   when he was done writing it.
11        Q.    And do you recall talking to other
12   officers while on scene before you left?
13        A.    As I stated earlier, Deputy Chief Wilde
14   arrived on scene and basically wanted a summary of
15   events that had occurred.
16        Q.    How long did you speak to him on scene?
17        A.    Probably a few minutes.
18        Q.    Did you tell him anything different or
19   additional than what we spoke about here?
20        A.    No, it was basically a summary of my
21   words here.
22        Q.    When did you first become aware that
23   Abel may have choked on a bag of cocaine?
24        A.    I recall hearing from -- I'm not sure if

Page 106

1    it was a medic or an officer that they had
2    retrieved a baggy out of his throat using some sort
3    of device.  I don't know what they retrieved it
4    with.  But I wasn't aware that it was cocaine.  I
5    just was told that it was a baggy, best I can
6    remember.  And, as I stated, at some point when it
7    was being secured as evidence, I did see the bag
8    briefly, which I had advised major crimes of, and
9    said that it appeared to have, like, a greenish
10   saliva or something on it that stuck in my mind.
11   And it looked like a white substance, but I didn't
12   have any confirmation that it actually was cocaine
13   then.
14        Q.    I'm pretty sure that Abel was taken into
15   custody at about 11:04, according to the report
16   that I saw.  When was it, would you say, the first
17   time that you were advised that he may have choked
18   on a baggy?
19        A.    I couldn't give you a specific time.  It
20   was after he had been brought in the back of the
21   ambulance.  I really couldn't tell you what time it
22   would have been.
23        Q.    Well, if you can give an estimate.  Of
24   course, if you can't -- if the paramedics arrived

Page 107

1    at around 11:15 approximately, and they took him
2    into the ambulance shortly thereafter, can you give
3    me an estimate as to how long after he was in the
4    ambulance you became aware that he may have choked
5    on a baggy?
6         A.    I don't have any confidence in giving an
7    estimate, but if I would have to guess, it would be
8    a few minutes after they took him into the back of
9    the ambulance.  But, again, I couldn't really give
10   you a good time frame there.
11        Q.    And you're not sure if it was an officer
12   or a paramedic that advised you it was a baggy that
13   they recovered from his throat?
14        A.    I'm not sure who I heard it from
15   initially.  In reviewing video, I do remember that
16   Carraro was standing by the back of the ambulance,
17   that they retrieved a baggy from his mouth.
18        Q.    And where were you when you first saw
19   the baggy?
20        A.    It was being secured and put in the back
21   of a squad car as evidence.  I just remember
22   briefly seeing it when I was standing in the area.
23        Q.    And who did you see have custody of it
24   when you saw it?

29 (Pages 104 to 107)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 108

1  A. I can't recall. I tried to see if that
2  was on video, but I didn't see it anywhere in the
3  body cams that I was able to watch.
4  Q. But you believe it was a police officer?
5  A. Yes.
6  Q. Would you expect a police officer to
7  file a report that they took custody and were going
8  to, so to speak, put it in evidence?
9  A. Yes. I don't recall seeing one for this
10  incident, but I've really only seen my report that
11  major crimes took.
12  Q. How long would you see this baggy while
13  on scene?
14  A. Just very briefly. It was more just a
15  glance at it. I don't remember specifically.
16  Q. And did you see this officer handle it
17  with gloves?
18  A. I can't recall, but that would be common
19  practice.
20  Q. Do you recall the officer saying
21  anything while he had the baggy in his possession?
22  A. No, I do not.
23  Q. Are you saying you actually saw what you
24  believe to be, like, a green saliva on the bag, or

Page 109

1  you're saying that from your memory of seeing a
2  photo of it?
3  A. No, that was from my personal
4  recollection. I remember seeing some sort of
5  greenish coloration on the plastic that looked like
6  saliva. Or I believe in my -- I described it as
7  almost looking kind of like stomach bile to major
8  crimes.
9  Q. And would you describe the baggy as a
10  sandwich-size baggy?
11  MR. MATHUES: Objection to foundation.
12  BY THE WITNESS:
13  A. I just remember it was clear plastic. I
14  don't remember if it was like a Ziploc. I think it
15  was more like general sheets of clear plastic
16  wrapped around some white substance.
17  Q. Do you know what a sandwich baggy is?
18  A. Sure. Like a Ziploc-type bag.
19  Q. Yeah, like a Ziploc baggy. There's
20  various sizes, obviously. But sandwich baggy is a
21  pretty common term, I guess.
22  I mean, would you describe the baggy as
23  being larger or smaller than a sandwich baggy?
24  A. I would say it was smaller and more like

Page 110

1  a plastic wrap type of plastic, not like a thicker
2  Ziploc type of plastic. But it was clear.
3  Q. Do you recall when you saw this --
4  strike that.
5  About how long did you actually get a
6  glance at it?
7  A. Again, I couldn't tell you for sure. It
8  was very briefly.
9  Q. When you did get a glance at it, did you
10  notice anything in the baggy?
11  A. Just the white-looking substance, as I
12  stated.
13  Q. Okay. Did you know what that was?
14  A. No, I didn't know at the time. I mean,
15  based on previous experience, it resembled cocaine,
16  but I wasn't certain of that.
17  Q. Would you describe the size of that
18  cocaine to be about the size of a golf ball?
19  A. I would say slightly smaller than that.
20  Q. In your experience, do you know how much
21  cocaine that was?
22  A. No. Without weighing it, I couldn't
23  venture a guess.
24  Q. Do you know who, if anyone, did a test

Page 111

1  to see what the substance was?
2  A. I am aware of afterwards somebody tested
3  it in the evidence room because I remember seeing a
4  photograph of it with one of the -- it's called,
5  like, a NIK test where you touch it to the
6  substance, and if it's cocaine, it will turn blue.
7  I just remember seeing a photo of that afterwards.
8  Q. Did you ever see -- go ahead. Sorry.
9  A. I don't recall specifically who did that
10  testing.
11  Q. And you don't recall specifically who
12  took that photo?
13  A. No, I don't. I wasn't there when that
14  photo was taken.
15  Q. And you didn't -- strike that.
16  Have you ever seen a photo of that baggy
17  and alleged cocaine on a scale?
18  A. Not that I can recall. I believe it was
19  on a counter in the evidence room in the photo I
20  saw.
21  Q. Have you ever seen a picture of that
22  baggy and alleged cocaine -- strike that.
23  Have you ever seen that baggy and
24  alleged cocaine next to a ruler?

30 (Pages 108 to 111)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

---

Page 112

1    A.  No.  I really only remember seeing one
2  photograph, but I'm sure there are more of them.
3  I'm just not aware.
4    Q.  I know you don't know who took that
5  specific photograph that we've been talking about
6  here, but do you know in general who would have
7  been responsible for taking photographs of anything
8  of evidentiary value that night?
9    A.  I don't specifically.  It could have
10  been any of the responding officers.  I just don't
11  know who submitted that into evidence.
12    Q.  In your experience, have you ever seen
13  anybody try to hide narcotics in their mouth?
14    A.  Yes.
15    Q.  About how many times, in your
16  experience, does that happen?
17    A.  I would say a few.  I couldn't give a
18  specific number, but more than once.  Prior to this
19  incident, more than once for sure.
20    Q.  And how about since this incident?
21    A.  I don't recall any in Wisconsin so far
22  that were in their mouth.
23    Q.  In your experience, have you ever seen
24  anybody try to hide this amount of alleged cocaine

---

Page 113

1  in their mouth?
2    A.  I don't --
3    MR. MATHUES:  Objection to foundation.
4  BY THE WITNESS:
5    A.  I don't actually know what the amount
6  was, so I couldn't give an answer to that.
7  BY MR. MARX:
8    Q.  Well, that's fair.  You described it as
9  being slightly smaller and a golf ball size.  My
10  question is in your experience, have you ever seen
11  anybody try to hide something that size cocaine-
12  wise in their mouth?
13    MR. MATHUES:  Objection to foundation.
14  BY THE WITNESS:
15    A.  I mean, the ones I recall seeing was
16  various sizes.  It could have been smaller.  It
17  could have been the same size.  I don't have enough
18  information to compare.  I don't remember the
19  specifics of those other incidents.
20  BY MR. MARX:
21    Q.  Do you know if that plastic baggy was
22  ever tested for DNA?
23    A.  No, I have no knowledge of that.
24    Q.  Do you know if that plastic baggy was

---

Page 114

1  ever tested for fingerprints?
2    A.  No, I have no knowledge of that.
3    Q.  Do you think that plastic baggy should
4  be tested for either DNA or fingerprints?
5    A.  In regards to what?
6    Q.  Well, I'm just asking you, do you
7  believe that that should be tested for fingerprints
8  or DNA or do you believe that's not necessary?
9    MR. MATHUES:  Objection to foundation and
10  calls for speculation.
11  BY THE WITNESS:
12    A.  I don't have experience in investigating
13  this sort of in-custody death.  I don't know if
14  that's common practice or not in this exact
15  scenario.  I wouldn't have any objection to that if
16  that was something, you know, investigators wanted
17  to do.
18  BY MR. MARX:
19    Q.  Do you have any idea if anybody has
20  requested the baggy be tested for DNA or
21  fingerprints?
22    A.  No, I do not.
23    Q.  Do you know whose responsibility that
24  would be to make that request?

---

Page 115

1    A.  I don't, but I would assume since major
2  crimes investigated the incident, it would fall on
3  them.  But I really don't know.
4    Q.  Well, have you yourself ever requested
5  an item be tested for the presence of DNA or
6  fingerprints?
7    A.  I don't think I've ever requested DNA,
8  and I wasn't an evidence technician, so I would
9  have never requested fingerprints, either.  The
10  only thing I have requested in other cases is drugs
11  to be tested at the crime lab.
12    Q.  I'm going to show you a couple exhibits
13  here, so let's take a second to find them.
14    A.  Okay.
15    Q.  Okay.  Can you see what looks like the
16  start of a video on your screen?
17    A.  Yeah, I can see it.
18    Q.  This is Exhibit 1 -- strike that.
19      This is going to be Exhibit 2, but we're
20  going to come back to this one.  I'm going to show
21  you a different video first.  Sorry.
22    A.  Okay.
23    MR. MATHUES:  Jason, let's just take a couple
24  minutes while you're doing that.  I need to run to

---

31 (Pages 112 to 115)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 116

1  the restroom.
2      MR. MARX:  Sure.
3          (WHEREUPON, a recess was had.)
4          (WHEREUPON, a certain document was
5          marked Exhibit No. 1, for
6          identification, as of 8-15-22.)
7  BY MR. MARX:
8      Q.   Officer, do you see that video on your
9  screen?
10     A.   Yep, I see it.
11     MR. MARX:  For the record, it's Exhibit 1.
12 It's marked Round Lake 3662, and it's the in-car
13 camera for Officer Scheithe.
14 BY MR. MARX:
15     Q.   I'm going to start playing it at
16 2 minutes and 14 seconds.
17     A.   Okay.
18     Q.   Well, without playing it, first, do you
19 recall if this is something that you've ever seen
20 before, this particular video?
21     A.   No, I don't recall specifically.
22     Q.   I'm going to start it at 2:14, and I'll
23 let you watch it, and I'll ask you some questions
24 about it.

Page 117

1      A.   Okay.
2          (WHEREUPON, a videotape was shown.)
3  BY MR. MARX:
4      Q.   I'm stopping it at 2:30.  In that clip
5  there, do you recognize who's depicted in that
6  clip?
7      A.   Yes, it appeared to be Officer Cramer
8  and Scheithe and Abel.
9      Q.   And I'm not that familiar with them.
10 Who is Cramer and who is Scheithe?  Do you know?
11     A.   In the video there?
12     Q.   Yeah.
13     A.   If you could pause it on them, I could
14 tell you.
15     Q.   Sure.  I'll go back to, like, the
16 beginning.  I'll just pause in the middle.
17     A.   Okay.  You can pause it there.
18         So the one closest to you is Cramer, and
19 that one is Scheithe.
20     Q.   So the one on the right is Cramer, and
21 Scheithe is on the left?
22     A.   Yes.
23     Q.   Thank you.  I'm going to start it again
24 at 2:30.

Page 118

1      A.   Okay.
2          (WHEREUPON, a videotape was shown.)
3  BY MR. MARX:
4      Q.   I'm stopping it at 2:59.  Do you
5  recognize who's depicted in this screenshot?
6      A.   The one your cursor was on there, the
7  balder looking one, is Atwell, and this is me with
8  the glasses on there.
9      Q.   Okay.  Thank you.  Having watched a
10 little bit of this video, does this look like
11 something you've seen before?
12     A.   I don't think so.
13     Q.   I say that to say if you could please
14 draw your attention to the far right-hand corner
15 because I'm going to ask you something about what's
16 happening over there.  Okay?
17     A.   Okay.
18     Q.   Starting it again at 2:59.
19         (WHEREUPON, a videotape was shown.)
20 BY MR. MARX:
21     Q.   Stopping it at 3:22.  Do you know what
22 happened in that clip we just played there?
23     A.   Yes.  That was when Abel ran into the
24 roadway.

Page 119

1      Q.   Okay.  Is it fair to say on this video
2  he was taken to the ground in the roadway?
3      A.   It's hard to say.  This is not a very
4  great video.  I will say, though, from my squad
5  car, the video was slightly better.
6      Q.   Well, I actually want to show you
7  slightly better then.  This will still be
8  Exhibit 1, but I may or may not show you your squad
9  video, but let's see here.  Let me just pull it
10 back to 3:10, and then I'll play it from there.
11 Okay.
12     A.   Okay.
13         (WHEREUPON, a videotape was shown.)
14 BY MR. MARX:
15     Q.   Okay.  I'm stopping at 3:24.  In this
16 video, would you agree with me that after being in
17 the street, Abel is then taken down again on the
18 grassy area?
19     A.   I can't tell where they're at
20 specifically right where you just stopped it at.
21     Q.   Okay.  Well, the part that I stopped it
22 at, did it appear to you that Abel went to the
23 ground with officers near him?
24     A.   Yes.

32 (Pages 116 to 119)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 120

1    Q.   Okay.  And there's a female depicted in
2  this video.  Is that fair?
3    A.   Yep.  That appears to be the girlfriend,
4  from what I recall.
5    Q.   Who we now know as Sinahy?
6    A.   Sure.
7    Q.   Okay.  Well, I guess I'm asking.  Do you
8  know if it's Sinahy or Shelby or somebody else?
9    A.   It's the girlfriend.  I don't even
10  remember her name, to be honest with you.
11    Q.   Okay.  I'm going to play it from 3:24.
12    A.   Okay.
13       (WHEREUPON, a videotape was shown.)
14  BY MR. MARX:
15    Q.   I'm stopping it at 4:10.  Would you
16  agree with me that from approximately 3:24 until
17  approximately 4:10 Abel was on the ground with
18  officers near him?
19    A.   Yes.  At one point in there it looked
20  like he tried to get up based on what I could see
21  with the officers' bodies moving.
22    Q.   Would you agree with me based on the
23  video that it looked like three officers were very
24  close to him, and then one officer was kind of

Page 121

1  standing up and kind of just walking around them?
2    A.   Uh-huh.
3    Q.   I'm sorry.  Is that a yes?
4    A.   Yes.  I'm sorry.
5    Q.   That's okay.  Do you know which three
6  officers were very close to him and which officer
7  was, in fact, standing around him?
8    A.   It would have been me standing around
9  them, and the other three officers, Atwell, Cramer,
10  Scheithe, dealing with him directly.
11    Q.   So does this refresh your recollection
12  that after being in the street, he was then taken
13  down to the ground again on the grassy area before
14  he made it over to the squad car?
15    A.   Yes.  I still can't tell if that's in
16  the street or the grassy area.  It looks like I see
17  maybe a sidewalk there in front of us.  But I would
18  agree it would appear that way.
19    Q.   Okay.  I'm going to start it again at
20  4:10, then stop it.
21       (WHEREUPON, a videotape was shown.)
22  BY MR. MARX:
23    Q.   I'm stopping it at 4:20.  Would you
24  agree with me that it appeared that Abel was walked

Page 122

1  over to what was likely the squad car that's just
2  off camera?
3    A.   Yes, I would agree.
4    Q.   And would you agree with me there
5  appears to be an officer talking to Abel's
6  girlfriend?
7    A.   Yes.  It appears to be Officer Atwell.
8    Q.   Thank you.  Could you tell from the
9  video what the officers were specifically doing, if
10  anything, to Abel while Abel was on the ground?
11    A.   No, I couldn't tell from that video.
12    Q.   So from this video you can't tell if the
13  officers are touching Abel or not?
14    A.   I would say they were touching him just
15  based on what I saw in reviewing this video.  They
16  were just trying to reapprehend him.
17    Q.   Well, he was already apprehended, right?
18  He was already in handcuffs, and officers had --
19  they were touching him, correct?
20    A.   Yes.  He was in handcuffs, but I've seen
21  people run away in handcuffs before.
22    Q.   Is it fair to say that the officers in
23  this video were trying to control him?  That is,
24  get him under control?

Page 123

1    A.   Yes, that's fair to say.
2    Q.   And is it fair to say that one way of
3  doing that is putting your hands on somebody to
4  keep them from running away?
5    A.   Yes.  You would need to in order to
6  control a resistive subject and take him into
7  custody.
8    Q.   Okay.  And when Abel was on the ground
9  in this video, could you tell what position Abel
10  was in?
11    A.   Just based on what I remember -- I
12  couldn't tell from this video, but from what I
13  remember, he was running away from them, and they
14  grabbed him from behind and went down.  So I would
15  assume he would be chest down to the ground.
16       (WHEREUPON, a certain document was
17       marked Exhibit No. 2, for
18       identification, as of 8-15-22.)
19  BY MR. MARX:
20    Q.   I'm going to show you -- thank you.  I'm
21  going to show you Exhibit 2 now, which is the video
22  I was going to show you first.
23       Do you see a video on your screen?
24    A.   Yes.

33 (Pages 120 to 123)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 124

1      Q.   It's marked Plaintiff's Exhibit 184. It
2   will be Exhibit 2. It's the cell phone video, I'll
3   represent to you, that was taken by Sinahy.
4          This is the 1 minute and 42 second
5   video -- cell phone video. Is this one of the
6   videos you saw on Saturday?
7      A.   Yes. I don't recall the length of it,
8   but I believe this was the cell phone video I saw.
9      Q.   Okay. This is the only cell phone video
10  I'm aware of, and this particular video says it's
11  1:42, that is, 1 minute, 42 seconds.
12         To the best of your recollection, have
13  you seen any other cell phone video that depicts
14  this incident?
15     A.   No.
16     Q.   When was the first time you saw this
17  cell phone video?
18     A.   I don't know. I know I saw it on
19  Saturday -- this past Saturday when reviewing it
20  with my attorney. I believe it was several months
21  after the incident when our -- sometime around when
22  our major crimes reports were made available.
23     Q.   When you first saw it, did you see it
24  with anybody else, that is, with any other officers

Page 125

1   present or anybody else in the room?
2      A.   I don't recall. It was quite a while
3   ago.
4      Q.   I'm just going to play it, since it's
5   only a minute and 42. Then I'll go back over a
6   couple sections and ask you questions about it.
7   Okay?
8      A.   Okay.
9          (WHEREUPON, a videotape was shown.)
10  BY MR. MARX:
11     Q.   I'm stopping it actually, going back.
12  Can you hear the video, as well?
13     A.   Yeah, I can hear it.
14     Q.   Thank you. I'm going to start from the
15  beginning.
16         (WHEREUPON, a videotape was shown.)
17  BY MR. MARX:
18     Q.   Okay. The video stopped playing. I'm
19  just going to go back and stop it at a couple of
20  spots and ask you a couple questions.
21     A.   Sure.
22     Q.   So at 1 to 2 seconds, do you see
23  yourself depicted in this clip?
24     A.   I think that's me, and I believe the

Page 126

1   camera started looking at Mrs. Brubaker, if that is
2   her there. I'm pretty sure it started there. That
3   would be me then.
4      Q.   And I know it's a little bit blurry
5   because we're just at 0 seconds or 1 second, but is
6   that you and Officer Atwell with Miss Brubaker?
7      A.   Yes. You can't tell in the video, but I
8   know for certain that that was us.
9      Q.   Okay. Thank you. So I'm stopping it at
10  3 seconds here. Would you agree with me that you
11  see Abel prone on the ground?
12     A.   Yes.
13     Q.   And do you recognize the two officers
14  that are near Abel?
15     A.   That one that your cursor was just on to
16  the left, that one appears to be Officer Cramer.
17     Q.   So Officer Cramer is on Abel's left-hand
18  side?
19     A.   Yes. That is kind of grainy, but that
20  looks like Officer Cramer. So the other would be
21  Officer Scheithe.
22     Q.   Okay. Thank you.
23         MR. MATHUES: Just for clarity, can we
24  identify which officer is looking towards the

Page 127

1   camera with the white mask on?
2          THE WITNESS: Are you asking me?
3          MR. MATHUES: I'm asking Jason if that's okay.
4          I think you know what I mean, Jason. If
5   you don't mind, just for clarity, I would
6   respectfully ask if we could just identify the
7   officer that's looking towards the camera with the
8   white mask on for approximately three seconds.
9   BY MR. MARX:
10     Q.   Sure. Officer, do you recognize who
11  that is as counsel just described?
12     A.   To me, on the video it appears to be
13  Officer Cramer.
14     Q.   Okay. And on this 3 second mark, to the
15  best of your knowledge, is this Officer Scheithe,
16  the other officer depicted in the video?
17     A.   Yes, it would be. I'm pretty certain
18  that that is Officer Cramer. It's just kind of
19  blurry. So the other one would be Officer
20  Scheithe.
21     Q.   Thank you. And at 3 seconds, would you
22  agree with me that Officer Cramer is holding one of
23  Abel's legs?
24     A.   It appears that way.

34 (Pages 124 to 127)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

---

Page 128

1    Q.   And do you know if one or both of his
2  knees are touching Abel in any way?
3    A.   I can't tell based on what we're looking
4  at.
5    Q.   Would you agree with me that in this
6  3 second mark that most of Abel's legs are on the
7  grassy area depicted in the video?
8    A.   I would say it looks like at least from
9  the knee down is from the curb to the grassy area.
10   Q.   Okay.  And would you agree with me that
11 his waistline is near the curb that's depicted in
12 this video?
13   A.   I can't say just because it's blocked
14 from my view.
15   Q.   Is it fair to say in this video that is
16 at 3 seconds that the upper half of Abel's body is
17 on the pavement that's depicted in the video?
18   A.   It appears that way behind that officer.
19   Q.   I'm going to play it again from
20 3 seconds and stop it at some other point.
21   A.   Okay.
22       (WHEREUPON, a videotape was shown.)
23 BY MR. MARX:
24   Q.   Stopping at 13 seconds here.  Would you

---

Page 129

1  agree with me that Cramer and Scheithe are
2  approximately the same position as they were when
3  we saw them at 3 seconds?
4    A.   Yes.
5    Q.   And that Abel is in the same position?
6    A.   Yes.  It looks like his head is off the
7  ground at this point.
8    Q.   I'll play it again and stop it.
9        (WHEREUPON, a videotape was shown.)
10 BY MR. MARX:
11   Q.   I'm stopping it at 46 seconds.  Would
12 you agree with me in this video that Officer
13 Scheithe is touching Abel's back?
14   A.   I can't say that for certain.  This
15 looks like he's just hovering near him.  But I
16 can't see where his hands or legs are to actually
17 say that he's touching him.
18   Q.   It's not illegal to touch somebody's
19 back, right?
20   A.   No.
21   Q.   Okay.  So in this video, did you ever
22 see Officer Scheithe's hands touch Abel's back?
23   A.   It appears that way, but I can't
24 actually confirm that based on what I'm seeing.

---

Page 130

1    Q.   Okay.  You did confirm and you can
2  confirm that Officer Cramer is touching Abel's leg,
3  correct?
4    A.   Yes, I have a lot better view of that.
5    Q.   I'm going to play it from 46 seconds and
6  stop it again.
7        (WHEREUPON, a videotape was shown.)
8  BY MR. MARX:
9    Q.   Would you agree with me at 55 seconds
10 that you saw Officer Scheithe touch Abel's back?
11   A.   Again, I can't tell what he's touching.
12 I just saw him pick his arm up, and other than
13 that, I can't really tell what he's doing.
14   Q.   In that clip that we just watched, you
15 couldn't tell if Officer Scheithe was specifically
16 pushing his hands on Abel's back?
17   A.   No, I can't discern that from this
18 video.
19   Q.   Okay.  I'm going to play it again here
20 starting at 55 seconds.
21       (WHEREUPON, a videotape was shown.)
22 BY MR. MARX:
23   Q.   I'm stopping it at 1:08 seconds.  In
24 that clip we just watched, did you see Officer

---

Page 131

1  Cramer take off one of Abel's socks?
2    A.   I couldn't say if he took off his sock.
3  It just looked like he was manipulating something
4  by the foot area.
5    Q.   I'll just play that clip again and ask
6  you to pay specific attention to what Cramer is
7  doing.
8    A.   Okay.
9    Q.   I'm going to try to start it at 55
10 again.
11   A.   Okay.
12       (WHEREUPON, a videotape was shown.)
13 BY MR. MARX:
14   Q.   I'm stopping at 1:09.  In that clip, did
15 you see Cramer take off one of Abel's socks?
16   A.   It appeared that way, like one sock was
17 on and one sock was off.
18   Q.   Did it appear in that clip that one of
19 Abel's feet didn't have a sock, and Officer Cramer
20 took the sock off the one that did have a sock on
21 it?
22   A.   That's how it appeared.
23   Q.   Do you know why Cramer did that?
24   A.   I would assume, based on my prior

---

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 132

1  contact with him when he was standing and trying to
2  kick his shoes and socks off, he wanted to search
3  that area based on that behavior.
4      Q.   And would you agree with me at the 1:09
5  mark that Officer Scheithe is putting his hands on
6  Abel's back?
7      A.   I can't tell for certain what his hands
8  are on. It's just too dark for me to positively
9  say what he's touching or not touching.
10     Q.   I'm just going to play it one more time.
11         (WHEREUPON, a videotape was shown.)
12  BY MR. MARX:
13     Q.   Would you agree with me that throughout
14  the entire 1 minute and 42 second video that Abel
15  was in the prone position.
16     A.   I believe so, based on the beginning. I
17  think that's accurate.
18         (WHEREUPON, a certain document was
19          marked Exhibit No. 3, for
20          identification, as of 8-15-22.)
21  BY MR. MARX:
22     Q.   I'm going to show you a couple photos.
23  This one will be Exhibit 3. By the way, have you
24  ever seen any photos of Abel in the hospital?

Page 133

1      A.   Not that I'm aware of.
2      Q.   Okay. I'm about to show you a couple,
3  and I'll just ask you a couple of questions after
4  each one.
5      A.   Okay.
6      Q.   Exhibit 3 is produced to me as --
7  actually, this is a photograph that I produced to
8  defense counsel recently. It doesn't have a Bates
9  stamp on it yet, but it's marked Image 3612.
10         To the best of your knowledge, Officer,
11  have you ever seen this photo before?
12     A.   No, not that I recall.
13     Q.   Okay. I'll represent to you that's Abel
14  Rosiles.
15     A.   Okay.
16     Q.   Would you agree with me that in this
17  photograph, there appear to be three abrasions to
18  my client's head: This is one that's above the
19  left high brow, one that's on the left eyelid, and
20  one that's on the left sideburn area of his face?
21     A.   Without seeing them closer, I couldn't
22  say what they are other than dark marks. It
23  appears they could be, but I have no knowledge that
24  they actually are abrasions.

Page 134

1      MR. MARX: Okay. I'll show you a different
2  photograph. This will be Exhibit 4. It's
3  Image 3564.
4          (WHEREUPON, a certain document was
5           marked Exhibit No. 4, for
6           identification, as of 8-15-22.)
7  BY MR. MARX:
8      Q.   Do you agree with me that there appears
9  to be what's now a healing abrasion above my
10  client's left eyebrow in this photo?
11     A.   It very well could be, but I can't tell
12  if that's an abrasion or a birthmark or what that
13  is.
14     Q.   Do you know if there appears to be an
15  abrasion on my client's left eyelid on this photo?
16     A.   Again, it appears that way, but I don't
17  know when these were taken or what those actually
18  are.
19     Q.   And do you know if this appears to be an
20  abrasion near his left sideburn here?
21     A.   It could be. It could also be dirt on
22  his face. I don't know without actually seeing
23  that.
24     Q.   Well, having said that, if they are

Page 135

1  abrasions, do you have any idea as to how my client
2  received those abrasions?
3      A.   No, not specifically.
4          (WHEREUPON, a certain document was
5           marked Exhibit No. 5, for
6           identification, as of 8-15-22.)
7  BY MR. MARX:
8      Q.   I'll show you Exhibit 5 here. It's
9  marked 3567. Do you see some discoloration on my
10  client's right side of his face in this photo?
11     A.   Yes.
12     Q.   Do you know if that's an abrasion or
13  not?
14     A.   I can't discern that from the photo. I
15  also can't see the face of this individual to know
16  if -- to know who that is.
17     Q.   Well, if, in fact, this is my client --
18  I'll represent to you that it is. And if it is,
19  and if this is an abrasion, do you have any idea as
20  to how that abrasion got on my client's face?
21     A.   I do not, sir.
22          (WHEREUPON, a certain document was
23           marked Exhibit No. 6, for
24           identification, as of 8-15-22.)

36 (Pages 132 to 135)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 136

1  BY MR. MARX:
2      Q.   I'm going to show you what's been
3  produced to me as Round Lake 3929. It's a photo
4  from the autopsy. By the way, have you seen any
5  autopsy photos in this case?
6      A.   No, sir.
7      Q.   This is the only one I'm going to show
8  you. I'll represent to you that this was produced
9  to me, and it is my client, Abel Rosiles. It was
10 produced to me by your attorney.
11         Do you agree with me that it appears to
12 be an injury near the top of my client's head here
13 that I'm circling with my cursor?
14     A.   I do see some -- what appear to be
15 staples and a dark mark.
16     Q.   Okay. If that is an injury, do you have
17 any idea as to how my client got that injury?
18     A.   No, sir, I do not.
19         (WHEREUPON, a certain document was
20         marked Exhibit No. 7, for
21         identification, as of 8-15-22.)
22 BY MR. MARX:
23     Q.   I'll show you another photo here. This
24 will be Exhibit 7. It's photo 3562. Now I'll

Page 137

1  represent to you it's my client, but I'm not clear
2  as to which body part that is. I believe it to be
3  the leg -- one of his legs.
4          But do you see a discoloration on the
5  body part that's near the center of the photo?
6      A.   I do.
7      Q.   Do you know if that's an abrasion or
8  not?
9      A.   I don't know for sure. It appears that
10 it could be.
11     Q.   Well, if it is an abrasion on my client,
12 do you have any idea how it got there?
13     A.   No, sir.
14         (WHEREUPON, a certain document was
15         marked Exhibit No. 8, for
16         identification, as of 8-15-22.)
17 BY MR. MARX:
18     Q.   I'll show you another photo here. This
19 will be Exhibit 8. It's Image 3609, and I believe
20 this to be my client's left leg.
21         Do you see discoloration -- a couple
22 spots of discoloration on this photo?
23     A.   I do.
24     Q.   Do you know if those are abrasions or

Page 138

1  not?
2      A.   I don't know.
3      Q.   I'm sorry. What was your answer?
4      A.   I don't know. It appears as if they
5  could be again.
6      Q.   If they are abrasions, do you know how
7  my client sustained them?
8      A.   I do not.
9          (WHEREUPON, a certain document was
10         marked Exhibit No. 9, for
11         identification, as of 8-15-22.)
12 BY MR. MARX:
13     Q.   I'll show you Exhibit 9 here. Exhibit 9
14 is Image 3611. It's one of my client's legs.
15         Do you see discoloration on the skin
16 here?
17     A.   Yes.
18     Q.   Do you know if it's an abrasion or not?
19     A.   I don't. It appears like one.
20     Q.   Do you know how my client sustained that
21 abrasion?
22     A.   I don't.
23
24

Page 139

1          (WHEREUPON, a certain document was
2          marked Exhibit No. 10, for
3          identification, as of 8-15-22.)
4  BY MR. MARX:
5      Q.   And I'll show you one more photo.
6  Exhibit 10 will be Image 3610. I'll represent to
7  you that's my client's right hand.
8          Do you see a discoloration on my
9  client's hand?
10     A.   I do.
11     Q.   Do you know if that's an abrasion or
12 not?
13     A.   I don't know for certain.
14     Q.   If it is an abrasion, do you know how my
15 client sustained it?
16     A.   I do not.
17     Q.   Have you ever spoken to a state's
18 attorney or a representative from the state's
19 attorney's office regarding this incident?
20     A.   No, sir.
21     Q.   Are you aware if a state's attorney is,
22 in fact, investigating this case for possible
23 criminal charges?
24     A.   I am not aware.

37 (Pages 136 to 139)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 140

1     Q.   So by saying that, are you aware if
2  there's an investigation, and, if so, are you aware
3  what the status of it is?
4     A.   I don't know what the status of it is or
5  who is investigating it. I'm sure in-custody
6  incidents like this, that they all are
7  investigated, but I don't know the common practice
8  on that.
9     Q.   You believe the state's attorneys
10  investigate all in-custody incidents?
11    A.   I would assume of this nature, yes.
12    Q.   What do you mean "of this nature"?
13    A.   In-custody death or related death.
14    Q.   If you just give me a minute to look at
15  my notes here, I may be done. I just want to make
16  sure I'm not missing something. Just a minute.
17  Bear with me. Okay?
18    A.   Sounds good.
19         (WHEREUPON, a recess was had.)
20  BY MR. MARX:
21    Q.   Officer, are you aware that there was a
22  coroner's inquest that took place related to my
23  client's death?
24    A.   I was aware, yes.

Page 141

1     Q.   Did you go to it?
2     A.   I don't -- I know we weren't at it. We
3  may have been by video. I don't remember.
4     Q.   Do you recall if you provided testimony?
5     A.   I don't recall. I don't think I did.
6     Q.   I don't think you did, either. I was
7  just testing your memory, if you actually had a
8  memory of doing that. I have the transcript --
9  what purports to be the transcript of it, and I
10  don't see you in it.
11         Do you think you appeared via Zoom or at
12  least were watching via Zoom the testimony?
13    A.   From what I remember, I think it was --
14  we were in -- at the police department, and it was
15  either by phone or Zoom. I really don't remember.
16    Q.   Okay. Do you remember watching it with
17  other people or listening to it with other people?
18    A.   I know there were a couple people there.
19  I don't remember specifically who it was.
20    Q.   So you don't remember if it was Cramer,
21  Scheithe, or Atwell that were watching it or
22  listening to it with you?
23    A.   It very well could have been. I just
24  don't specifically remember who was in the room.

Page 142

1     Q.   Do you remember hearing a doctor named
2  Dr. Michael Baden, B-A-D-E-N -- do you remember
3  hearing him speak?
4     A.   No. I recognize his name, but I don't
5  remember hearing him speak.
6     Q.   How do you recognize his name?
7     A.   Just from this incident, I remember
8  hearing that name.
9     Q.   Did you ever see a report or at least
10  have part of a report read to you regarding
11  Dr. Baden's findings?
12    A.   No, I never saw anything from that
13  doctor.
14    Q.   And, again, you don't specifically
15  remember him testifying at the coroner's inquest?
16  He could have, you just don't recall specifically?
17    A.   I don't. I remember very little about
18  that.
19    Q.   Why were you listening to or watching
20  it, by the way?
21    A.   I don't even remember that, either.
22    Q.   Is it fair to say you were curious as to
23  what they were going to talk about?
24    A.   Sure. I mean, I was there. I know what

Page 143

1  took place, so I wasn't expecting to learn
2  anything.
3     Q.   Did you learn anything?
4     A.   Not that I can recall.
5     Q.   Have you ever seen or heard a coroner's
6  inquest before?
7     A.   No, I've never seen or participated in
8  one.
9     Q.   I'll represent to you that Dr. Baden
10  spoke at it, and he also wrote a report regarding
11  this incident; that he said and also wrote the
12  following regarding this incident -- I'll just read
13  to you specifically what he wrote here. It's one
14  sentence. "It is my opinion, to a reasonable
15  degree of medical certainty, that the cause of
16  Mr. Rosiles's death was hypoxic brain damage caused
17  by interference of oxygen going to his brain by
18  prone back pressure and a plastic bag containing
19  white powder in his throat."
20         My question is have you ever heard
21  anybody say that before to you?
22    A.   Not that I can specifically recall.
23    Q.   Do you agree with that opinion?
24    MR. MATHUES: Objection to foundation and to

38 (Pages 140 to 143)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 144

1    the extent it would call for testimony under
2    Rule 702 and 703.
3    BY THE WITNESS:
4        A.  I don't have any medical experience that
5    would qualify me to agree or disagree with that
6    statement.
7    BY MR. MARX:
8        Q.  Do you agree with me that the sentence I
9    just read said that Abel died because of prone back
10   pressure and a plastic bag containing white powder
11   in his throat?
12       A.  Do I agree that that's what that
13   sentence states?
14       Q.  Yeah.
15       A.  Yeah, I agree with that.
16       Q.  Did you see any officer apply prone back
17   pressure to Abel on June 10th, 2020?
18       A.  Not that I specifically can elaborate
19   on.  I know they were just trying to control him in
20   the prone position, but I don't know what their
21   specific positioning was, if it was on the
22   subject's back or what area of his back.
23       Q.  Did you put any prone back pressure on
24   Abel on that day?

Page 145

1        A.  No, I did not.
2        MR. MARX:  That's all the questions I have for
3    you.  Your attorney may have some, but I'll leave
4    that up to him.
5             EXAMINATION
6    BY MR. MATHUES:
7        Q.  I have five minutes or fewer.
8            Picking up where Mr. Marx left off, you
9    said you didn't apply any back pressure to
10   Mr. Rosiles.  Did you ever apply any pressure to
11   his neck?
12       A.  No.
13       Q.  Did you ever see anybody -- other law
14   enforcement officers apply any pressure to
15   Mr. Rosiles's neck?
16       A.  Not that I saw.
17       Q.  When Mr. Rosiles was taken into the
18   ambulance for medical treatment, did you go into
19   the ambulance?
20       A.  No, I did not.
21       Q.  Do you have any personal knowledge of
22   what medical professionals did inside that
23   ambulance?
24       A.  No, I do not.

Page 146

1        Q.  Do you have any personal knowledge of
2    what medical care Mr. Rosiles got or didn't get at
3    the hospital?
4        A.  No, I do not.
5        Q.  In addition to -- strike that.
6            On Saturday, did you also watch video
7    from inside the Thornton's?
8        A.  Yes.
9        Q.  Were you able to recognize yourself on
10   those videos?
11       A.  Yes, I was.
12       Q.  In addition to the videos that you
13   watched with Mr. Marx this morning, the other
14   videos that you saw Saturday, you recognize
15   yourself by either appearance or by voice?
16       A.  Yes.
17       Q.  Did you ever see any law enforcement
18   officer hit, kick, or punch Mr. Rosiles?
19       A.  No.
20       Q.  You had mentioned seeing an individual
21   who you believe to be Mr. Rosiles's girlfriend
22   taking some cell phone video?
23       A.  She was holding her cell phone.  I can't
24   say she was videotaping or not.

Page 147

1        Q.  Do you have any personal knowledge as to
2    when she started or stopped videotaping beyond the
3    cell phone video that you've seen?
4        A.  I don't recall specifically.  It was
5    just throughout that incident.
6        Q.  Did you ever tell Ms. Gomez Reyes or
7    anyone else to stop taking video?
8        A.  No, not that I recall.
9        Q.  The Dr. Baden that Mr. Marx mentioned to
10   you, do you know whether he was retained by the
11   Rosiles family?
12       A.  I believe that you and Charles may have
13   advised me of that at some point.
14       Q.  Okay.  Don't talk about any
15   conversations that you had with myself or
16   Mr. Hervas.
17       A.  Okay.
18       Q.  Do you know whether Dr. Baden conducted
19   the original autopsy on Mr. Rosiles?
20       A.  No, I believe it was the Lake County
21   coroner.
22       Q.  And outside of conversations you may
23   have had with myself or my partner, Mr. Hervas, do
24   you know Dr. Baden's role in the case?

39 (Pages 144 to 147)

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 148

1    A.   Not specifically.
2    MR. MATHUES:  That's all I have.
3         FURTHER EXAMINATION
4    BY MR. MARX:
5    Q.   Just something briefly based on that.
6         Your counsel mentioned paramedics and
7    hospital personnel.  I know we previously mentioned
8    that you thought that the hospital -- strike that.
9         I know you previously mentioned that you
10   thought that the paramedics that arrived maybe
11   should have quickened their pace a little bit
12   towards the scene.  Is that fair?
13   A.   Yes.  I would say they arrived pretty
14   quickly by ambulance.  It was just their walk from
15   the ambulance to the scene.
16   Q.   Besides that, do you have any opinion as
17   to the level of care or the lack of care that the
18   paramedics gave to my client?
19   A.   No, I have no other concerns.  They
20   seemed very attentive.
21   Q.   So you're not saying that the paramedics
22   had something to do with Mr. Rosiles's death,
23   correct?
24   A.   No, I'm not.

Page 149

1    Q.   Okay.  And how about hospital personnel?
2    Do you have any reason to believe that hospital
3    personnel somehow failed to provide him with
4    appropriate care?
5    A.   No.  I have no knowledge of his hospital
6    care or what hospital he was even transported to.
7    Q.   So you have no reason to believe that
8    the hospital personnel played a part in causing
9    Mr. Rosiles's death, do you?
10   A.   No.
11   Q.   Have you ever heard of a woman named
12   Julie Contrares?
13   A.   I've heard the name.
14   Q.   Have you ever heard of her name outside
15   of something that your attorneys may have advised
16   you of?
17   A.   I believe just at the police department.
18   Q.   Okay.  When is the first time you heard
19   her name?
20   A.   When she was posting photos of us,
21   accusing us of -- basically, blindly accusing us of
22   crimes.
23   Q.   Have you ever spoken with her before?
24   A.   No, I have not.

Page 150

1    Q.   Have you ever seen her, to your
2    knowledge?
3    A.   No.
4    Q.   When is the first time you saw these
5    photos?
6    A.   I don't recall.  It was probably weeks
7    or months after this incident, but I can't say
8    specifically.
9    Q.   Do you know what role, if any, she
10   played in contacting Dr. Baden regarding this case?
11   A.   No, I have no knowledge of that.
12   Q.   Do you know if she's an actual family
13   member of the Rosiles family?
14   A.   I have no knowledge of that, either.
15   Q.   Have you yourself ever posted anything
16   on social media regarding this incident?
17   A.   No.
18   Q.   Your attorney produced a bunch of emails
19   to me, which I appreciate it.  He still owes me a
20   privilege log, but we'll talk about that off the
21   camera.
22        Have you ever written an email regarding
23   this incident?
24   A.   I may have at the department, but it

Page 151

1    would have been on department email.
2    Q.   Okay.  So you have no specific
3    recollection of writing an email regarding this
4    incident?
5    A.   No, not that I can recall.  I'm sure you
6    would have it if there was one, but I can't
7    remember specifically any.
8    Q.   Did you typically write emails while
9    working for Round Lake Beach or is that very rare?
10   A.   We used our emails fairly often just for
11   various cases.  Not as far as formal reporting,
12   but, for example, if we needed to get photos or
13   video for a retail theft, we would communicate with
14   the complainant or whoever the victim was.
15   Q.   Okay.  Did you sometimes internally talk
16   to each other, that is, from police officer to
17   police officer, over email?
18   A.   No, not unless it was business-related,
19   like, for a specific case or something.  Not just
20   for informal communicating.
21   Q.   I understand.  That's what I'm
22   interested in.
23        Did you occasionally use your business
24   email to contact other officers like, hey, where is

40 (Pages 148 to 151)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 152

1    this report, or, hey, I thought you said you were
2    going to do this for me?  Something like that?
3    Business-related, of course.
4        A.    Yes, we would do that.
5        Q.    But, again, you have no specific
6    recollection of giving any emails regarding this
7    incident?
8        A.    Not specifically, no.  There very well
9    could be.  I just don't remember any.
10       Q.    Why didn't you draft a report regarding
11   this incident?
12       A.    We were advised that major crimes would
13   be drafting our verbal interviews as a report.
14       Q.    Who advised you of that?
15       A.    I don't remember.
16       Q.    Are you saying otherwise you would have
17   written a report?
18       A.    As far as I know, when major crimes
19   investigates an incident, reports are given
20   verbally to them, and that would be the only report
21   given.
22       Q.    And I'm sorry.  Won't be very long, but
23   this just occurred to me.  Shelby Brubaker, did you
24   say that you talked to her at the station after

Page 153

1    this incident?
2        A.    I don't believe I said that, no.
3        Q.    Sorry.  Did you take part in any
4    processing of her at the station at all?
5        A.    I believe I did, as far as transporting
6    her to CenCom, which is a different building than
7    the station.
8        Q.    So you transported her to CenCom, did
9    you say?
10       A.    Yeah.  That's the building where
11   dispatch and, I guess, holding cells are located.
12       Q.    Okay.  Did you talk to her while
13   transporting?
14       A.    I don't recall that.  I'm sure we
15   exchanged words at some point at that building or
16   in the vehicle, but I don't recall anything
17   specific.  There probably is in-car video of that
18   transport, I would assume.
19       Q.    There is.  I haven't seen it in a while.
20   Have you seen that lately?
21       A.    No.  I don't believe I've ever seen it.
22       Q.    Okay.  When you got to CenCom, you don't
23   recall having any -- well, let me say this.  Do you
24   have any recollection of having any conversation

Page 154

1    with her while at CenCom?
2        A.    No.  Again, I'm sure we did just as far
3    as the booking process and documenting what
4    property she has and things like that, but nothing
5    specific that I remember.
6        MR. MARX:  Okay.  That's all I have.  David
7    might have something.
8        MR. MATHUES:  Nothing based on that.
9        MR. MARX:  Okay.  I'm going to order it, so
10   would you like to read or waive?
11       MR. MATHUES:  We'll reserve.
12       THE COURT REPORTER:  Do you want a copy of the
13   transcript?
14       MR. MATHUES:  Yes, please.
15       THE COURT REPORTER:  Will you send the
16   exhibits to Royal?
17       MR. MARX:  Yes.  David, if you want me to send
18   the videos to Royal, I can, but -- what do you
19   think?
20       MR. MATHUES:  Honestly, I think we both know
21   what the videos are.  You identified them clearly,
22   and it tends to be a pain.  So I'm not going to
23   stop you from sending them if you want to.
24       MR. MARX:  That's fair.

Page 155

1        MR. MATHUES:  I think you identified them
2    clearly for purposes of the deposition transcript.
3        MR. MARX:  Yeah, the one video is short, but
4    the other one will probably take a long time to
5    load and could crash.  So I'm not going to let that
6    happen.  So I'll let Royal know I'm retaining those
7    two videos, and I'll make it clear as to which
8    ones.
9        MR. MATHUES:  If you want to put that part on
10   the record, that there's no objection from counsel
11   that the videos are retained, that's fine.
12       MR. MARX:  Video Exhibits 1 and 2 will be
13   retained by me.
14       (The deposition concluded at 12:42 p.m.)
15
16
17
18
19
20
21
22
23
24

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 156

1                    I, KAREN A. FAZIO, CSR No. 84-1834, a

2        Notary Public within and for the County of Cook,

3        State of Illinois, and a Certified Shorthand

4        Reporter of said state, do hereby certify:

5

6                    That previous to the commencement of the

7        examination of the witness, the witness was duly

8        sworn to testify the whole truth concerning the

9        matters herein;

10

11                   That the foregoing deposition transcript

12       was reported stenographically by me, was thereafter

13       reduced to typewriting under my personal direction

14       and constitutes a true record of the testimony

15       given and the proceedings had;

16

17                   That the said deposition was taken

18       via videoconference before me on the date and time

19       specified;

20

21                   That I am not a relative or employee or

22       attorney or counsel, nor a relative or employee of

23       such attorney or counsel for any of the parties

24       hereto, nor interested directly or indirectly in

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 157

1   the outcome of this action.

2

3            IN WITNESS WHEREOF, I do hereunto set my

4   hand of office at Chicago, Illinois, this 31st day

5   of August, 2022.

6

7

8

9

10            KAREN A. FAZIO, CSR No. 84-1834

11            Notary Public, Cook County, Illinois.

12            My commission expires 5/10/24

13

14

15

16

17

18

19

20

21

22

23

24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 158

1                          DEPOSITION ERRATA SHEET

2

3    No. 28969

4    Rosiles vs. Village of Round Lake Beach

5

6                 DECLARATION UNDER PENALTY OF PERJURY

7

8               I declare under penalty of perjury that I

9    have read the entire transcript of my Deposition

10   taken in the captioned matter or the same has been

11   read to me, and the same is true and accurate, save

12   and except for changes and/or corrections, if any,

13   as indicated by me on the DEPOSITION ERRATA SHEET

14   hereof, with the understanding that I offer these

15   changes as if still under oath.

16

17                    Signed on the _____ day of

18                    _____, 20___.

19                    _____

20                    JOHN BERTHOLOMEY

21

22

23

24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey – Taken 8/15/2022

Page 159

| A |
|---|
| **A.D** 1:22 |
| **a.m** 1:22 |
| **abdomen** 87:23 |
| **Abel** 1:6 29:18 |
| 44:2 45:9,23 |
| 46:3,10,17 |
| 52:18 53:11 |
| 57:11 58:4 |
| 59:19 60:4,9 |
| 60:17,21,24 |
| 61:8,12 63:9 |
| 64:5,10,15,19 |
| 64:24 65:16,22 |
| 66:10,14 67:6 |
| 67:9,14,17,21 |
| 68:6,17,23 |
| 69:4,9,15,24 |
| 70:8,12 71:2,6 |
| 71:10 72:7,8 |
| 72:13 74:8 |
| 75:13 76:21,23 |
| 79:10 80:2,21 |
| 80:24 81:6 |
| 84:18,19 85:3 |
| 86:10,12 87:5 |
| 87:5,19 88:5 |
| 89:5,10,16,22 |
| 90:16,24 91:7 |
| 91:11,19,22 |
| 92:1 93:5,11 |
| 93:20,22,23 |
| 94:10,14,17,18 |
| 95:7 97:4,10 |
| 97:17,18 98:22 |
| 99:2 100:8,16 |
| 101:8 103:10 |
| 103:23 104:2,8 |
| 104:13 105:23 |
| 106:14 117:8 |
| 118:23 119:17 |
| 119:22 120:17 |
| 121:24 122:10 |
| 122:10,13 |

123:8,9 126:11
126:14 128:2
129:5 132:14
132:24 133:13
136:9 144:9,17
144:24
**Abel's** 45:22
60:12 77:5
87:22 90:3
92:7 94:2,20
94:23 101:14
122:5 126:17
127:23 128:6
128:16 129:13
129:22 130:2
130:10,16
131:1,15,19
132:6
**ability** 5:15
13:17 23:2,17
**able** 6:3 23:10
48:5 68:15
97:18 99:2
108:3 146:9
**abrasion** 134:9
134:12,15,20
135:12,19,20
137:7,11
138:18,21
139:11,14
**abrasions**
133:17,24
135:1,2 137:24
138:6
**absolutely** 94:11
**academy** 18:15
18:21 19:1
**acceptable**
27:17 28:3
**access** 45:17
**accidentally**
51:9
**accompanied**
63:10
**accurate** 6:21,21

87:15 90:18
98:3 132:17
158:11
**accusing** 149:21
149:21
**act** 60:2
**action** 157:1
**actively** 84:6
**activity** 79:21
80:17
**actual** 7:12
21:12 41:23
83:3 92:11
150:12
**addition** 146:5
146:12
**additional**
105:19
**address** 46:3,4
46:11
**addresses** 45:14
**Administrator**
1:5
**advised** 32:24
35:10,13 37:5
44:7 47:19
106:8,17
107:12 147:13
149:15 152:12
152:14
**affirmative** 93:8
**afternoon** 17:15
37:1 42:1
**age** 44:15
**aggressively**
74:13
**ago** 7:18 10:23
15:10 16:1
125:3
**agree** 22:17 24:5
24:7 26:10,18
26:24 27:7,13
28:14 29:5,12
29:14 101:3
119:16 120:16

120:22 121:18
121:24 122:3,4
126:10 127:22
128:5,10 129:1
129:12 130:9
132:4,13
133:16 134:8
136:11 143:23
144:5,8,12,15
**ahead** 63:20
111:8
**aid** 19:2,6,11,18
20:5,13 23:22
101:7,21
102:13 103:10
104:12
**aid/CPR** 19:13
**air** 21:1
**airway** 24:3
**alarm** 47:9,21
47:22,23 48:7
48:12 51:7,8
51:18 52:4
60:2
**alarms** 48:10
**alleged** 7:13
111:17,22,24
112:24
**ambulance**
99:20 100:19
102:17 104:13
104:15,17
106:21 107:2,4
107:9,16
145:18,19,23
148:14,15
**amount** 21:24
29:7,10 112:24
113:5
**anatomy** 23:22
**and/or** 21:13
40:23 65:22
76:6 158:12
**ankle** 76:18
**ankles** 74:11

76:2 78:11,15
**answer** 5:14
13:10,15,16
23:1 35:20
88:22 89:11
91:18 113:6
138:3
**answers** 6:3
**anticipate** 4:22
**Antoine** 30:4,8
30:10 37:4
44:1 46:16
52:9,21,24
58:14 64:1
66:20 104:22
105:4
**anybody** 9:18
65:22 102:7
112:13,24
113:11 114:19
124:24 125:1
143:21 145:13
**anymore** 63:7
**apart** 75:15,24
**apparatus**
101:16,17
**appear** 75:13
81:14 97:16,18
97:21 99:2
119:22 121:18
131:18 133:17
136:14
**appearance**
146:15
**appeared** 2:7,14
76:5 81:16
85:17,19 97:4
97:5,13,23
99:5,7,13
106:9 117:7
121:24 131:16
131:22 141:11
**appears** 120:3
122:5,7 126:16
127:12,24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

128:18 129:23
133:23 134:8
134:14,16,19
136:11 137:9
138:4,19
**application**
82:23
**applied** 28:16
29:10,16,16
**applies** 22:7
29:11 83:2
**apply** 29:12 30:4
144:16 145:9
145:10,14
**applying** 28:8
28:23
**appreciate**
150:19
**apprehend**
70:15
**apprehended**
122:17
**appropriate**
149:4
**approximate**
17:5
**approximately**
15:16 16:12
17:8 18:18
30:6,18,20
48:23 63:17
68:8 74:5 99:9
107:1 120:16
120:17 127:8
129:2
**area** 11:18 20:24
42:13,19 45:10
45:15 72:9,18
72:24 73:4,7,8
73:10 76:19
78:17 85:2
87:18,23,23
101:23 107:22
119:18 121:13
121:16 128:7,9

131:4 132:3
133:20 144:22
**arm** 78:14,19
80:1 83:20
130:12
**arms** 70:19
71:13 72:5
76:18 79:15,23
82:3 83:11
84:5
**arrest** 24:22
33:21 34:13,17
59:19,21 73:19
101:2
**arrested** 33:11
**arrive** 100:11
102:8
**arrived** 33:24
81:8 97:8 98:5
98:10,13
100:15,22
104:9 105:14
106:24 148:10
148:13
**arriving** 99:11
102:5,10
**asked** 15:3 33:8
90:5 94:13
**asking** 5:4,7
91:10 103:20
103:22 114:6
120:7 127:2,3
**asphyxia** 20:11
20:16,20 21:21
22:2,12,18
23:15
**asphyxiation**
19:22 20:2,16
21:18 23:7
24:13 26:13,21
27:9
**assigned** 37:13
42:9,12,15,18
**assignment** 42:8
42:19

**assist** 68:4 69:18
81:12 82:10,13
**assistance** 48:4
**associate** 15:20
**associated** 15:20
19:20
**assume** 39:3
70:5 75:2
86:21 90:9
115:1 123:15
131:24 140:11
153:18
**assumed** 75:17
**athletic** 65:20
**attempt** 83:16
**attention** 59:11
60:11 80:15,16
89:20 118:14
131:6
**attentive** 148:20
**attorney** 4:19
9:6,14,19,24
12:24 13:21
32:9 124:20
136:10 139:18
139:21 145:3
150:18 156:22
156:23
**attorney's**
139:19
**attorney-client**
13:14
**attorneys** 140:9
149:15
**Atwell** 1:13
12:11 13:4
14:3 15:15
34:24 41:22
42:4,7 59:8
65:23 68:3,22
74:1 81:9,13
81:18 82:5,6
82:11 84:7
86:24 90:6
94:16,18 95:16

95:21 96:22
97:3,7,14 98:1
98:8 100:2,8
118:7 121:9
122:7 126:6
141:21
**Atwell's** 84:14
84:15
**audio** 33:1,4
35:7 41:4
103:19
**August** 1:22
10:23 157:5
**autopsy** 136:4,5
147:19
**available** 124:22
**avoid** 75:14
**aware** 17:16,20
18:12 29:23
33:3 34:11,14
36:11,19 47:4
105:22 106:4
107:4 111:2
112:3 124:10
133:1 139:21
139:24 140:1,2
140:21,24

___
**B**

**B** 3:7
**B-A-D-E-N**
142:2
**B-A-G** 101:16
**B-E-R-T-H-O...**
4:12
**baby** 23:15,16
**back** 5:21 26:4,6
27:19,23 28:6
28:9,16,23
29:12 45:1
46:1,10,10
58:1 60:11
64:11 65:12
68:4,20,21
69:23 70:24,24

71:14 72:7
73:7 79:16,20
82:4 83:21
84:12 86:14,17
86:17,19 96:10
102:17,18,21
103:17 104:8
104:13,15
106:20 107:8
107:16,20
115:20 117:15
119:10 125:5
125:11,19
129:13,19,22
130:10,16
132:6 143:18
144:9,16,22,22
144:23 145:9
**backwards** 79:8
79:9
**Baden** 142:2
143:9 147:9,18
150:10
**Baden's** 142:11
147:24
**bag** 7:3,7 101:13
101:16 105:23
106:7 108:24
109:18 143:18
144:10
**baggy** 106:2,5
106:18 107:5
107:12,17,19
108:12,21
109:9,10,17,19
109:20,22,23
110:10 111:16
111:22,23
113:21,24
114:3,20
**balance** 11:6,9
11:11
**balder** 118:7
**ball** 110:18
113:9

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 161

**bandages** 39:11
**banks** 48:2
**Barr** 35:2 41:22
  42:6 102:22
**based** 11:6 53:8
  70:5 110:15
  120:20,22
  122:15 123:11
  128:3 129:24
  131:24 132:3
  132:16 148:5
  154:8
**basic** 23:21
  61:24
**basically** 11:13
  25:20 27:22
  33:24 42:11,16
  45:13 50:10,17
  56:7 57:1 60:2
  68:1,19,24
  74:11 76:2,17
  76:18 78:13,17
  80:8 81:17
  82:16,19,22
  83:10,13 92:21
  105:14,20
  149:21
**Bates** 133:8
**bathroom** 53:2
  53:6,9,11,13
  55:16,21,23
  56:3,6
**baton** 38:22
**Beach** 1:11 10:6
  11:20 14:7
  16:21 17:18
  19:8,14 30:18
  32:7 36:5,8
  37:13 39:22
  40:16 41:8
  42:17 43:18
  103:5 151:9
  158:4
**Bean** 12:8
**Bear** 140:17

**becoming** 12:6
  72:3
**beer** 14:15
**began** 48:20
  53:13 67:22
  68:4 72:5
  73:11 95:19
  99:10 101:10
**beginning** 90:23
  117:16 125:15
  132:16
**behalf** 2:7,14
**behavior** 55:10
  132:3
**believe** 6:20
  8:17 9:9,11
  16:12 17:8
  19:3,7,19 24:3
  30:20 32:11,15
  32:19,23,24
  35:2 37:6,15
  37:24 41:1,12
  42:10 43:19
  45:18 46:12,18
  47:6,10,20
  48:3,13 49:1
  49:23 50:2,10
  52:13,22 53:16
  53:19 54:17
  55:4 56:14
  57:10,19 58:5
  59:16,23 61:9
  64:3,8 65:20
  66:6,12,19
  67:7 71:12,18
  71:24 73:10
  74:17,21,24
  77:12,22 78:6
  79:11 80:1,22
  81:7 84:15
  85:7,14 88:8
  89:21 90:14
  91:13,21 92:24
  95:8,16 96:14
  102:3,22

103:16 105:9
  108:4,24 109:6
  111:18 114:7,8
  124:8,20
  125:24 132:16
  137:2,19 140:9
  146:21 147:12
  147:20 149:2,7
  149:17 153:2,5
  153:21
**believed** 92:13
**belongings**
  73:22
**BERSANI** 2:9
**Bertholomey**
  1:12,15 3:2 4:3
  4:10 158:20
**best** 5:8,15 8:16
  13:17 21:3
  23:2 29:20
  31:7 45:21
  48:15 50:16
  63:8 73:9
  74:10 77:2
  79:15 80:5
  88:12 100:1,3
  100:4 106:5
  124:12 127:15
  133:10
**better** 16:4
  79:18 119:5,7
  130:4
**beyond** 147:2
**bile** 7:7 109:7
**birth** 62:5
**birthmark**
  134:12
**bit** 19:23 33:11
  33:16 118:10
  126:4 148:11
**black** 93:20,22
**blindly** 149:21
**blocked** 128:13
**blue** 111:6
**blurry** 126:4

127:19
**bodies** 120:21
**body** 6:10 24:2
  34:14 69:10
  77:15 82:1
  83:13 87:22,24
  88:4 89:14
  90:3 92:7
  96:13,14 103:7
  108:3 128:16
  137:2,5
**body-worn** 8:11
  34:11 39:19,21
**booking** 154:3
**Boulevard** 2:3
**boundaries**
  42:15
**brain** 143:16,17
**break** 5:10,12
  5:13,15 65:4
  67:14
**breathe** 20:7
  22:22,22 28:12
  28:17 97:6
**breathing** 21:14
  24:6,9 29:8
  101:17
**breaths** 21:13
**brief** 44:7
**briefly** 4:20 7:5
  16:19 23:23
  34:6 68:20
  103:17 106:8
  107:22 108:14
  110:8 148:5
**bring** 83:13
**broad** 56:15
**broke** 19:23
  67:18,21
**broken** 13:24
**brought** 67:6
  71:11 72:24
  73:2,4,6,7,10
  73:13 74:22
  102:17 105:7

106:20
**brow** 133:19
**Brubaker** 31:2
  81:8,14 82:14
  83:24 85:14
  86:2,8,16,22
  86:24 89:20
  90:7 91:2 94:9
  95:18 96:1,16
  96:20 100:6
  101:23 102:2
  102:14,18
  103:15,20,22
  104:20 126:1,6
  152:23
**Buhrmeister**
  31:15
**building** 50:3,18
  50:19 153:6,10
  153:15
**buildings** 11:10
  41:14
**bulge** 53:15,21
  54:8,16,22
  57:5 58:15
  59:3
**bulletproof**
  38:22 78:24
**bunch** 150:18
**business** 12:8
  151:23
**business-related**
  151:18 152:3
**businesses** 48:1
**button** 48:2,5

———————————
      **C**
**C** 31:15
**calibrating**
  11:13
**call** 34:23 35:2
  36:21,22 37:11
  37:14,17,19,20
  38:4 42:23
  43:2 46:13,14

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 162

46:24 47:1,5
48:5,11,17,24
50:3 51:8
144:1
called 37:6
48:13 56:16
83:12 100:2,12
101:13 111:4
caller 43:24 52:8
58:14
caller's 62:5
calls 17:1 43:10
98:12 114:10
calm 88:18 89:1
cam 6:10 34:14
96:13 103:7
camera 8:12 9:7
34:11 39:19,21
40:18 96:14
116:13 122:2
126:1 127:1,7
150:21
cameras 8:14
34:15
cams 108:3
canceled 15:5
capacity 18:1,9
captioned
158:10
captures 34:12
car 9:10 37:16
47:7 50:16
64:3,7,9,20,23
65:1 66:2,4,5
66:11 67:6,10
67:12 68:5,21
71:1 74:22
76:24 77:5,6,8
77:11,15 84:19
86:4 87:11,14
96:17 101:24
102:21,23
103:1,3,6,17
107:21 119:5
121:14 122:1

card 43:20
cardiac 101:2
care 146:2
148:17,17
149:4,6
career 10:13
12:1 19:5
Carraro 99:21
99:23 107:16
carried 39:8
carry 38:17,20
39:5
carrying 39:16
cars 102:19
case 12:22 13:3
61:23 62:7
136:5 139:22
147:24 150:10
151:19
cases 29:14
115:10 151:11
catch 68:15
69:21
caught 68:18
cause 21:17,21
143:15
caused 143:16
causing 149:8
cell 8:22,24
124:2,5,8,9,13
124:17 146:22
146:23 147:3
cells 153:11
CenCom 153:6
153:8,22 154:1
center 137:5
certain 22:9
29:7,14 45:15
62:18 110:16
116:4 123:16
126:8 127:17
129:14 132:7
132:18 134:4
135:4,22
136:19 137:14

138:9 139:1,13
certainty 84:16
143:15
Certified 1:17
156:3
certify 156:4
chance 5:18
22:11
change 5:20
41:23 42:1
changes 158:12
158:15
Charger 40:10
103:4
charges 139:23
Charles 147:12
check 72:20
checking 12:17
chest 21:13
76:21 78:20,21
80:3 81:6
123:15
Chicago 2:4
11:7 157:4
Chief 33:23
34:18 105:13
choked 105:23
106:17 107:4
choking 20:7
21:22 89:22
90:13 91:13
93:4,12 94:13
95:8,10 97:14
100:8
chronologically
104:22
circling 136:13
circumstances
25:5 32:20
city 43:17
Civil 1:18
claim 13:13
clarify 91:1
clarity 126:23
127:5

class 19:6,14
20:13 21:8
23:22
classes 19:2,18
20:6 21:9
23:22
clear 14:1
109:13,15
110:2 137:1
155:7
cleared 34:19
clearly 69:21
154:21 155:2
clerk 37:4 52:21
59:11,15 60:6
60:12 61:4,16
63:16
client 31:5 33:11
59:10 135:1,17
136:9,17 137:1
137:11 138:7
138:20 139:15
148:18
client's 33:20
34:13,17
133:18 134:10
134:15 135:10
135:20 136:12
137:20 138:14
139:7,9 140:23
clip 117:4,6
118:22 125:23
130:14,24
131:5,14,18
close 46:13
52:22 64:16,18
100:9 120:24
121:6
closer 133:21
closest 117:18
cocaine 105:23
106:4,12
110:15,18,21
111:6,17,22,24
112:24

cocaine- 113:11
Code 1:18
coffee 43:12
coloration 109:5
come 28:22
37:18 44:5
46:1 47:8
53:11 99:19
115:20
coming 38:3
45:1 49:14
50:3 53:9
Commander
35:2 36:11,13
36:15 102:22
commands 71:8
commencement
156:6
commencing
1:21
commercial
11:10
commission
157:12
common 20:6
108:18 109:21
114:14 140:7
communicate
151:13
communicated
44:4
communicating
151:20
compare 113:18
complainant
151:14
complaints
17:16,20
complete 6:3
compliance 25:9
complied 57:17
comply 57:15
compressions
21:13
comprised

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 163

35:24
concern 54:24
    95:10
concerned 44:6
    44:24 58:18
concerning
    55:12 156:9
concerns 148:19
concluded 98:18
    155:14
CONDON 2:9
conduct 59:23
    60:1 73:15
conducted 6:17
    147:14
conducting
    35:11 73:23
confidence
    107:6
confirm 129:24
    130:1,2
confirmation
    106:12
confronted 25:1
confused 97:10
conscious 97:6
    99:7
consider 14:13
    15:17
constitutes
    156:14
construction
    12:9
contact 29:21
    30:11 52:3
    62:6 86:15
    90:23 103:14
    132:1 151:24
contacting
    150:10
contain 36:3
containing
    143:18 144:10
context 25:14
continued 73:3

98:7
continuing 97:4
Contrares
    149:12
control 26:5
    27:4,5,24
    76:17 78:15
    79:16,17 81:9
    83:10,20 88:19
    122:23,24
    123:6 144:19
controlling 89:6
controls 24:3
conversation
    13:15,20 35:14
    103:18,22
    153:24
conversations
    13:9,11 16:9
    34:7 147:15,22
conveyed 59:17
conveying 60:6
convicted 18:13
Cook 156:2
    157:11
cooperated
    60:24
copy 154:12
corner 56:6
    118:14
coroner 147:21
coroner's
    140:22 142:15
    143:5
correct 5:20
    10:7,10 18:15
    24:16 29:8
    33:13,17 37:20
    40:2 50:12
    51:5,19 55:22
    56:22 58:16
    65:17 73:18
    83:17,21 91:8
    92:2 94:6,7
    96:22 122:19

130:3 148:23
correction 96:24
corrections
    158:12
counsel 127:11
    133:8 148:6
    155:10 156:22
    156:23
counter 52:9
    111:19
County 10:17,22
    11:16,21 19:10
    31:14 35:18,23
    36:1,9 147:20
    156:2 157:11
couple 4:18 10:1
    14:18 61:6
    63:17 102:7
    115:12,23
    125:6,19,20
    132:22 133:2,3
    137:21 141:18
course 5:13 8:6
    13:23 106:24
    152:3
Court 1:1,19
    154:12,15
covered 23:10
COVID 56:8,9
CPR 19:8 21:8
    21:11 101:10
    101:11
Cramer 1:12
    14:21 15:18
    16:11 50:8
    51:21 52:20
    57:8,21,22
    58:8,20,23
    59:2,9 61:7,8
    63:9 64:4 66:1
    67:15,20 68:14
    69:1 71:21
    74:1 78:7 88:8
    88:10,13,15
    89:4,12 90:7

91:21 96:18
    117:7,10,18,20
    121:9 126:16
    126:17,20
    127:13,18,22
    129:1 130:2
    131:1,6,15,19
    131:23 141:20
Cramer's 58:3
    64:3,8 67:7
    71:17 76:24
crash 155:5
credit 43:19
crime 18:13
    35:23 115:11
crimes 6:9,11,16
    6:22 7:12 17:1
    31:14 36:10
    46:19,20 106:8
    108:11 109:8
    115:2 124:22
    149:22 152:12
    152:18
criminal 35:11
    139:23
crossing 34:24
CSR 2:23,24
    156:1 157:10
curb 87:18,24
    128:9,11
curious 142:22
current 17:22
currently 10:16
cursor 118:6
    126:15 136:13
custody 57:20
    58:13 81:12,13
    81:18,21 82:2
    82:17 84:6,23
    86:8,22 87:1
    91:2,3 100:6
    106:15 107:23
    108:7 123:7

                 D

D 3:1
damage 143:16
dark 132:8
    133:22 136:15
database 45:16
date 29:22,24
    43:7 48:8 62:5
    156:18
David 2:13
    154:6,17
day 1:22 12:2
    31:20 33:16
    34:22 36:20
    37:15 38:8,20
    39:16 40:11
    42:20 144:24
    157:4 158:17
day-to-day
    18:24
deadly 25:10
dealing 51:17
    58:21 92:22
    94:3 95:18
    121:10
death 114:13
    140:13,13,23
    143:16 148:22
    149:9
deceased 1:7
December 18:19
DECLARATI...
    158:6
declare 158:8
Defendants 1:14
    2:14
defense 18:23
    133:8
defensive 82:21
degree 143:15
deliberate
    100:17
delirium 27:2
demonstrating
    79:7
department

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 164

17:18 32:7
36:9 43:4
47:13,14
141:14 149:17
150:24 151:1
**departments**
43:16
**depend** 29:15
**depending**
24:24 25:5
29:9 61:23
**depends** 28:22
**depicted** 117:5
118:5 120:1
125:23 127:16
128:7,11,17
**depicts** 124:13
**deposition** 1:15
4:14 5:18,22
6:7 8:12 9:8
15:4 155:2,14
156:11,17
158:1,9,13
**depositions** 1:20
12:16
**Deputy** 33:23
34:18 105:13
**describe** 40:15
54:21 74:10
77:3 79:4
100:16 109:9
109:22 110:17
**described** 7:6
23:7,12 57:12
70:16 72:12
91:8,12 102:5
102:7 109:6
113:8 127:11
**description** 44:7
46:16 53:8
**designated**
38:12 43:17
**desk** 12:3 52:3
**details** 13:7 37:8
37:10

**detained** 26:19
**detective** 8:18
36:3 102:9
103:6 104:1
**determination**
60:8
**device** 106:3
**diaphragm** 24:1
24:12 28:10
**died** 144:9
**different** 12:2
25:4 28:21
105:18 115:21
134:1 153:6
**difficult** 28:11
28:17
**difficulty** 29:8
60:21 81:1,2
**direct** 34:22
**direction** 56:4
156:13
**directly** 55:18
58:21 72:15
92:10 121:10
156:24
**dirt** 134:21
**disagree** 144:5
**discern** 130:17
135:14
**discipline** 18:1
**discoloration**
135:9 137:4,21
137:22 138:15
139:8
**discovery** 1:21
**discussed** 13:7
15:9
**dislodged** 21:2
**disorderly** 59:23
60:1
**dispatch** 37:6,7
46:15 47:18
153:11
**dispatched** 37:1
47:21

**dispute** 44:2
**distance** 65:24
68:12 85:15
87:16
**DISTRICT** 1:1
1:2
**disturb** 60:2
**DIVISION** 1:3
**DNA** 113:22
114:4,8,20
115:5,7
**doctor** 21:2,4
142:1,13
**document** 116:4
123:16 132:18
134:4 135:4,22
136:19 137:14
138:9 139:1
**documenting**
154:3
**Dodge** 40:10
**doing** 38:3,7
46:5,6,23
63:24 75:21
76:19 81:24
83:19 84:3
85:6,11,20
88:16,21 90:11
92:20 94:18
96:23 97:1,7
97:14,23 98:24
99:3 101:11,20
104:19 115:24
122:9 123:3
130:13 131:7
141:8
**donkey** 79:2
**door** 61:13
71:22 77:7
**downward** 76:3
76:10
**Dr** 142:2,11
143:9 147:9,18
147:24 150:10
**draft** 152:10

**drafting** 152:13
**draw** 118:14
**dressed** 38:15
**drew** 55:5 56:19
57:8
**driving** 40:2
48:20 50:4,12
**drug** 17:3 22:10
27:2
**drugs** 115:10
**due** 20:8 79:21
80:17
**duly** 4:1,4 156:7
**duties** 16:23
17:4
**duty** 18:7 39:18
55:5 57:17
**dynamic** 82:22
84:2

---
**E**

**E** 3:1,7
**earlier** 15:5 52:8
97:13 105:13
**ears** 56:17
**east** 50:18,18
**EASTERN** 1:3
**effect** 44:19 49:6
93:4
**egregious** 92:4
**either** 40:9 54:4
54:12 66:15,19
90:2 92:6,12
102:10 114:4
115:9 141:6,15
142:21 146:15
150:14
**elaborate**
144:18
**elements** 59:24
**email** 150:22
151:1,3,17,24
**emails** 150:18
151:8,10 152:6
**employee**

156:21,22
**employment**
45:1
**encountered**
56:11
**encountering**
55:3
**encouraging**
100:24
**ended** 82:14
**enforcement**
11:17,22 12:6
18:1,10 19:5
19:17 25:13
35:24 45:17,18
145:14 146:17
**enforcements**
17:3
**enter** 59:5 71:23
**entire** 19:5
132:14 158:9
**entirely** 67:8
**entrance** 56:5
**equipment**
38:17,20
**ERRATA** 158:1
158:13
**escort** 25:6
69:23
**escorted** 61:1
63:14 64:2,5
64:20 68:21
102:1
**escorting** 25:7
68:4
**Estate** 1:6
**estimate** 63:22
68:11 84:20
90:20 93:18
99:9 106:23
107:3,7
**evading** 24:21
**events** 34:1
105:15
**eventually** 35:3

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 165

62:17 84:11
85:8
**everybody** 69:7
70:10
**evidence** 106:7
107:21 108:8
111:3,19
112:11 115:8
**evidentiary**
112:8
**evolved** 67:5
**exact** 7:5 34:20
49:22 102:1
114:14
**exactly** 19:15
40:1 47:20
53:20 61:5,11
63:14,18,21
64:17 76:22
83:4 90:11
104:23
**examination** 3:2
4:6 145:5
148:3 156:7
**examined** 4:4
**example** 22:18
23:7 26:2 83:9
90:21 92:17,18
151:12
**examples** 21:20
25:3
**excessive** 91:21
92:5,13,21,24
**exchanged**
153:15
**excited** 27:2
**exciting** 12:2
**exhale** 23:10
**Exhibit** 3:8
115:18,19
116:5,11 119:8
123:17,21
124:1,2 132:19
132:23 133:6
134:2,5 135:5

135:8,23
136:20,24
137:15,19
138:10,13,13
139:2,6
**exhibits** 3:20
115:12 154:16
155:12
**exit** 53:5 61:7
**exited** 59:6 61:4
61:9
**exiting** 61:13
64:2
**expect** 108:6
**expected** 58:22
**expecting** 143:1
**experience** 93:2
110:15,20
112:12,16,23
113:10 114:12
144:4
**expires** 157:12
**explanation**
21:3
**extended** 22:9
22:12 26:11,20
26:24 27:10,13
29:1
**extent** 63:14
144:1
**eyebrow** 134:10
**eyelid** 133:19
134:15

_____

**F**

**Fabiola** 1:4 31:5
**face** 22:15,20
23:8,18 56:10
56:13,15,17
60:12 93:10
95:9 101:14
133:20 134:22
135:10,15,20
**faced** 40:21
**facing** 40:23,23

41:1 76:24
77:5,6,7 79:8
**fact** 55:2 76:16
81:2 121:7
135:17 139:22
**factors** 22:10
27:1 28:21
**failed** 149:3
**fair** 14:15 21:16
21:19 24:23
35:22 43:6
60:24 61:2
63:11,12 64:13
64:19 66:17
77:6 85:1
87:17,20,21
94:8 113:8
119:1 120:2
122:22 123:1,2
128:15 142:22
148:12 154:24
**fairly** 89:3
151:10
**fall** 115:2
**false** 51:8
**familiar** 98:11
117:9
**family** 31:8,8
147:11 150:12
150:13
**far** 25:20 27:21
42:8 46:2
47:14 62:15
68:9 69:14
74:3 84:17
87:13 103:9
104:2,22
112:21 118:14
151:11 152:18
153:5 154:2
**fashion** 92:8
**faster** 101:6
**father's** 12:7
**Fazio** 1:17 2:23
156:1 157:10

**fear** 25:9
**February** 10:6,9
**feet** 68:21 70:24
71:13 72:6
74:9 75:19,22
76:2,3,10
77:13,18 78:15
78:18 79:13,19
79:22 80:3,9
80:11 84:21
85:3 93:15
94:17 99:6
131:19
**fellow** 13:10
**felt** 57:4
**female** 66:4
120:1
**fewer** 145:7
**field** 6:11 7:8,8
7:11 38:13,13
98:14 102:6
**file** 108:7
**filed** 13:4
**fill** 43:13
**find** 46:8 115:13
**findings** 142:11
**fine** 155:11
**fingerprints**
114:1,4,7,21
115:6,9
**finish** 4:24
**firearm** 38:21
56:19
**first** 4:4,11 19:2
19:6,11,13,18
20:5,13 23:22
36:18,21,23
42:24 43:1,23
44:3 45:24
46:24 48:11
50:9 60:9 72:9
72:18 75:5
81:15 87:4
90:15 91:10
98:17 99:22

100:15,22
105:22 106:16
107:18 115:21
116:18 123:22
124:16,23
149:18 150:4
**five** 62:19 65:6,8
145:7
**flailing** 82:3
84:5
**fluid** 82:22 83:3
**focusing** 77:13
**folder** 62:17,17
**following** 67:5
143:12
**follows** 4:5
**foot** 67:23 75:9
75:11 76:4
78:9 79:12
131:4
**footage** 6:10 9:8
34:14 96:14
**FOP** 32:14,16
**force** 6:9,16,22
7:12,19 18:23
24:16,18,24
25:4,10 27:17
28:3,23,24
29:10,16 31:14
35:5,8,10,15
35:18,23 36:10
36:12 46:21
91:21 92:5,13
92:24
**Ford** 40:9
**foregoing**
156:11
**forgot** 45:12
**form** 17:24
26:14 27:11
28:18 105:7
**formal** 151:11
**formulated** 52:1
**forward** 40:22
41:1

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 166

forwards 79:8
found 6:23 13:3
    18:7 46:2,10
foundation
    22:23 28:19
    109:11 113:3
    113:13 114:9
    143:24
frame 100:9
    104:24 107:10
free 67:14
friend 14:13
    15:18
friends 15:19
front 50:20
    55:18 78:14
    103:12 121:17
fulfilling 12:3
full 4:8
further 46:7
    73:4 103:14
    148:3

_____
        G
_____
G 2:13
gain 26:5 27:5
gaiter 56:16,18
game 51:24
gang 17:3
gas 30:14 36:20
    36:24 43:15
    48:1
Gasping 20:17
general 17:4
    18:23 83:7
    109:15 112:6
generally 24:18
    70:14,18
    104:24
geographic
    42:13,14
getting 25:21
    100:16 103:10
girlfriend 52:15
    59:18 66:7,21

67:1,2 120:3,9
122:6 146:21
give 6:3 21:20
    25:3 37:7
    42:14 68:11
    83:9 84:20
    87:15 88:22
    89:11 90:18,20
    91:17 93:18
    98:3 106:19,23
    107:2,9 112:17
    113:6 140:14
given 4:13 6:8
    33:7 105:9
    152:19,21
    156:15
giving 21:13
    71:8 102:13
    107:6 152:6
glance 108:15
    110:6,9
glasses 118:8
gloves 8:23
    39:10 108:17
go 4:18,20 5:20
    5:23 11:15
    18:17 31:11
    43:20 48:11
    49:4,6,8,19
    52:5 54:4 56:1
    57:2 63:20
    69:15 84:11
    111:8 117:15
    125:5,19 141:1
    143:19 145:18
goal 79:15 83:19
goes 42:8 62:17
going 4:23 7:20
    13:13 31:11
    49:4,5 51:22
    52:2,19 60:7
    65:3 69:21
    78:16 80:17
    92:16 101:1
    108:7 115:12

115:19,20,20
116:15,22
117:23 118:15
120:11 121:19
123:20,21,22
125:4,11,14,19
128:19 130:5
130:19 131:9
132:10,22
136:2,7 142:23
143:17 152:2
154:9,22 155:5
golf 110:18
    113:9
Gomez 8:23
    30:23 85:11
    96:3 147:6
good 5:17 8:10
    91:17 107:10
    140:18
gotten 44:8
    104:21
grab 70:23
    78:11
grabbed 69:7
    79:22 123:14
grabbing 69:1
grainy 126:19
grass 79:16
    101:10
grassy 72:9,18
    72:24 73:4,6,8
    73:10 78:17
    85:2 87:17,22
    101:23 119:18
    121:13,16
    128:7,9
great 119:4
green 7:7 108:24
greenish 106:9
    109:5
ground 22:20,21
    23:8,9,18
    68:19,23 69:3
    69:5,8,10,11

69:15,24 70:8
70:10,13,22
71:3,6,11
72:14,14 73:8
79:12,17 80:9
82:15,18 83:14
83:17 84:11,19
86:14,18,20
87:8 89:18
91:19 103:10
119:2,23
120:17 121:13
122:10 123:8
123:15 126:11
129:7
guess 24:7 56:9
    76:4 77:2
    78:14 79:13
    87:3,15 90:18
    103:11 104:11
    107:7 109:21
    110:23 120:7
    153:11
gun 25:8
guys 12:15 15:2
gym 65:20

_____
        H
_____
H 1:13 3:7
HALE 2:2
half 47:16 83:12
    87:22,24 91:16
    128:16
hallway 53:6,12
    55:15,24 56:5
    56:5
hand 139:7,9
    157:4
handcuff 25:16
    28:1 83:20
handcuffed
    57:22 59:10
    64:10 84:12
handcuffing
    26:8 27:21

58:6 82:15
83:15
handcuffs 25:21
26:6 39:3,5,7
58:3 69:21
84:14 98:7
122:18,20,21
handle 108:16
handling 74:1
hands 20:24
26:6 27:23,23
27:24 28:1
53:14,17,19,24
54:4 55:4,8,12
57:13 82:4
123:3 129:16
129:22 130:16
132:5,7
handwritten
7:15 62:8
hang 14:19
happen 5:4
51:11 67:13
74:4 112:16
155:6
happened 15:4
33:11 38:4
51:13 52:7
53:10 57:18
60:9 62:9
61:3 75:1
81:5 90:2
100:5 118:22
happening
36:19 43:22
71:20 82:7
85:12 94:13
96:11,21 97:2
102:15 118:16
happy 5:5,23
8:8
hard 119:3
head 55:5 57:13
87:7,13 89:24
93:5 95:7

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 167

129:6 133:18
136:12
**headed** 46:14
**healing** 134:9
**health** 104:2
**healthy** 27:8
**hear** 31:8 49:14
60:17 64:24
66:9 67:17
71:2,5 80:20
81:2 90:16
93:11,14
125:12,13
**heard** 22:1 23:6
23:12,14,19
30:11,13 46:15
47:8 48:17
90:12 91:12
100:7 107:14
143:5,20
149:11,13,14
149:18
**hearing** 89:20
105:24 142:1,3
142:5,8
**heart** 21:14
**Heath** 12:10
13:4 14:3
15:15
**Heights** 8:18
97:8 98:6
**Heimlich** 20:22
20:23 94:18,19
94:22 95:4,22
96:4,19,23
97:15,24 98:1
98:8,19,24
99:4,8
**help** 24:9 26:5
**hereof** 158:14
**hereto** 156:24
**hereunto** 157:3
**Hervas** 2:9
13:16 147:16
147:23

**Hervas's** 13:12
**hey** 49:5 151:24
152:1
**hide** 112:13,24
113:11
**high** 133:19
**higher** 10:15
**history** 104:3
**hit** 47:22 48:5
51:9 52:4
69:10 146:18
**holding** 79:14
127:22 146:23
153:11
**honest** 6:3 7:21
120:10
**Honestly** 154:20
**honor** 5:11
**hooded** 65:17
**hoodie** 53:16,18
53:20,21,24
54:5,9,10
**hooked** 48:2
78:13
**hospital** 132:24
146:3 148:7,8
149:1,2,5,6,8
**hour** 65:4
**hours** 10:1
33:17
**hovering** 129:15
**human** 23:21
24:2
**hung** 14:17
**HVAC** 11:10,14
**hypoxic** 143:16

———————
**I**
**ID** 3:8
**idea** 30:10 83:7
114:19 135:1
135:19 136:17
137:12
**identification**
116:6 123:18

132:20 134:6
135:6,24
136:21 137:16
138:11 139:3
**identified**
154:21 155:1
**identify** 126:24
127:6
**illegal** 73:18
129:18
**Illinois** 1:2,20
2:4,11 36:1
156:3 157:4,11
**Image** 133:9
134:3 137:19
138:14 139:6
**immediately**
57:16 76:21
78:18
**imminent** 25:10
**important** 4:21
62:7
**in-car** 9:7 40:18
116:12 153:17
**in-custody**
114:13 140:5
140:10,13
**in-house** 19:8
**inaccuracy** 6:24
**inaccurate**
31:23
**inappropriate**
92:16,20
**incident** 6:13
16:19 18:11
30:6,8 32:20
33:19 36:7,16
36:19 37:3
41:5 43:4 63:4
66:8 73:3,19
96:8 98:18
108:10 112:19
112:20 115:2
124:14,21
139:19 142:7

143:11,12
147:5 150:7,16
150:23 151:4
152:7,11,19
153:1
**incidents** 113:19
140:6,10
**increase** 22:10
26:12,20
**independent** 1:5
32:2
**indicate** 93:6,12
94:14
**indicated** 76:14
95:7 158:13
**indicating** 75:18
95:2
**indication** 66:20
**indirectly**
156:24
**individual** 60:3
135:15 146:20
**industry** 10:14
11:2
**informal** 151:20
**information**
45:13 61:24
62:5 113:18
**infrequent**
15:16
**inhale** 23:10
**initial** 30:7,9
**initially** 50:7
100:18 107:15
**injury** 136:12,16
136:17
**inquest** 140:22
142:15 143:6
**inside** 52:5,7,23
145:22 146:7
**instruct** 13:14
**instructed** 57:20
96:16
**insurance** 12:7
**intent** 78:16

**interested** 13:22
151:22 156:24
**interfered** 92:15
92:18
**interference**
143:17
**interior** 40:23
**internally**
151:15
**International**
11:5
**interrogatories**
6:9
**interrupt** 63:19
**interview** 6:17
7:9,16 32:6,10
33:1,15 46:21
**interviewed**
31:16,19,22
**interviews**
152:13
**investigate** 45:6
46:7 140:10
**investigated**
31:16 115:2
140:7
**investigates**
152:19
**investigating**
114:12 139:22
140:5
**investigation**
35:11 140:2
**investigators**
31:12,14,19
32:3 45:19
114:16
**involvement**
36:23
**Itasca** 2:11
**item** 20:7 115:5

———————
**J**
**J** 1:11,11
**J-O-H-N** 4:11

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 168

**Jackson** 2:3
**Jason** 2:6 65:3
  115:23 127:3,4
**Jeremy** 15:24
**job** 11:1,15 12:3
  17:22
**jobs** 11:22 12:5
  19:20
**John** 1:15 3:2
  4:3,10 7:18
  13:9 22:24
  158:20
**Jr** 1:7 29:18
**Julie** 149:12
**June** 29:17
  30:22 31:1,4,9
  31:17 33:12
  62:9 144:17
**jurisdictions**
  95:20

———————
**K**

**K** 31:15
**Kaminski** 8:17
  97:8 98:5,7,9
  98:19,22 99:3
  99:8 100:23
  102:5
**Karen** 1:16 2:23
  156:1 157:10
**keep** 28:4 39:12
  62:23,23 73:21
  83:19 123:4
**keeping** 26:10
  26:18
**kick** 74:14 76:4
  76:5,11 79:2,9
  80:3 132:2
  146:18
**kicked** 76:21
  78:19 80:6,10
  80:20 81:6,10
**kicking** 74:12
  76:20 79:20
**kicks** 79:8

**kid** 11:19
**kids** 23:20
**kind** 56:15 67:5
  69:2,7 70:10
  75:17 76:9
  79:6,10,12,20
  80:11 85:24
  86:9 89:22
  100:17 105:1
  109:7 120:24
  121:1 126:19
  127:18
**knee** 26:4 27:22
  128:9
**knees** 128:2
**knew** 92:15
**know** 5:4,7,11
  5:22 7:20,24
  8:5,7 11:11
  14:3 16:3,13
  17:9,23 24:1,8
  29:17 30:17,22
  31:1,4,18
  32:18,19 34:15
  36:8 40:21,22
  41:11,12,18
  43:10 49:18
  50:5,9 51:4,17
  53:7 55:7 57:8
  58:12 59:24
  62:8 63:12,14
  66:14,16,17,22
  66:24 72:21
  73:24,24 74:18
  75:1,8,10,11
  79:2 81:16
  83:6 84:9
  85:11,20 86:19
  87:2,9 88:10
  98:4,10,16
  99:16,20 103:4
  104:12,16
  106:3 109:17
  110:13,14,20
  110:24 112:4,4

112:6,11 113:5
113:21,24
114:13,16,23
115:3 117:10
118:21 120:5,8
121:5 124:18
124:18 126:4,8
127:4 128:1
131:23 134:14
134:17,19,22
135:12,15,16
137:7,9,24
138:2,4,6,18
138:20 139:11
139:13,14
140:4,7 141:2
141:18 142:24
144:19,20
147:10,18,24
148:7,9 150:9
150:12 152:18
154:20 155:6
**knowledge**
  17:19 20:6
  33:2 43:18
  47:24 48:6
  66:22 94:23
  113:23 114:2
  127:15 133:10
  133:23 145:21
  146:1 147:1
  149:5 150:2,11
  150:14
**Kolar** 31:15

———————
**L**

**L.L** 12:8
**lab** 115:11
**lack** 148:17
**Lake** 1:10 8:17
  8:18 10:5
  11:20 14:7
  16:21 17:7,18
  19:8,14 30:18
  31:13 32:7

35:18,23 36:1
36:4,8,9 37:13
38:11 39:22
40:16 41:7
42:17 43:18
45:10 46:3,11
97:8 98:6
99:17 102:9,12
103:5 116:12
136:3 147:20
151:9 158:4
**landed** 69:9
**Lane** 67:16 68:3
  68:7
**large** 21:23
**larger** 109:23
**lately** 153:20
**law** 11:17,21
  12:6 18:1,10
  19:5,16 25:13
  35:24 45:16,18
  145:13 146:17
**lawsuit** 13:4
  15:8 16:7
**layman's** 100:24
**lead** 24:13 29:7
**learn** 143:1,3
**leave** 96:16
  145:3
**led** 55:15
**left** 14:9 22:12
  27:9 43:4 44:8
  65:12 77:21,23
  78:2,7 81:10
  81:12 88:13
  96:9 105:12
  117:21 126:16
  133:19,19,20
  134:10,15,20
  137:20 145:8
**left-hand** 126:17
**leg** 79:9 130:2
  137:3,20
**legs** 70:20 72:6
  73:12 75:14,24

76:17,19 79:16
127:23 128:6
129:16 137:3
138:14
**length** 9:1 124:7
**let's** 15:12 17:6
  43:1 115:13,23
  119:9
**level** 148:17
**lieutenant** 99:21
**lift** 80:6
**lights** 49:8
**limit** 49:18,19
**limited** 41:13
**lines** 48:3 52:18
**listen** 35:7
**listening** 141:17
  141:22 142:19
**literally** 47:10
**little** 19:23
  33:11,16 53:12
  118:10 126:4
  142:17 148:11
**live** 45:15
**LLC** 2:2
**load** 155:5
**located** 153:11
**location** 19:12
**lock** 75:14 78:18
**locked** 74:11
  75:24 77:19
  78:12 80:10,11
**locking** 72:5
  73:11
**log** 150:20
**logging** 45:8
**long** 9:23 12:19
  14:6 16:10
  34:17 45:2
  61:3 63:4,18
  65:5 68:9
  69:24 70:10
  86:23 90:15
  98:1 99:8
  100:10 104:7

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 169

105:16 107:3
108:12 110:5
152:22 155:4
**look** 8:6,9 45:13
60:12 83:4
94:20,23 95:3
118:10 140:14
**looked** 7:12 8:11
53:15 76:11,14
87:4 88:17,24
89:24 91:7,11
93:9 106:11
109:5 120:19
120:23 131:3
**looking** 7:19,22
8:15 88:14
94:5,9,9 96:7
99:6 109:7
118:7 126:1,24
127:7 128:3
**looks** 115:15
121:16 126:20
128:8 129:6,15
**lose** 73:21
**lost** 74:21
**lot** 11:19 28:21
28:24 43:5
44:14 47:7
48:9 50:17
51:3 87:18
130:4
**lots** 43:10
**low** 27:23 55:6
56:21
**lower** 87:22
**lungs** 21:1 24:4
**Lunn** 36:11,14
36:15
**lying** 85:1 89:17

**M**
**machines** 11:13
**major** 6:8,11,15
6:22 7:12
31:14 35:23

36:9 46:19,20
106:8 108:11
109:7 115:1
124:22 152:12
152:18
**making** 10:15
23:1 28:11
93:16
**maneuver** 20:22
20:23 94:18,19
95:22 97:24
98:2
**manipulating**
131:3
**mark** 127:14
128:6 132:5
136:15
**marked** 3:8
40:13 116:5,12
123:17 124:1
132:19 133:9
134:5 135:5,9
135:23 136:20
137:15 138:10
139:2
**markings** 40:15
**marks** 133:22
**Marx** 2:6 3:3,20
4:7 7:20,22 8:2
13:19 23:5
26:17 27:6,15
29:2 65:5,8,11
65:15 113:7,20
114:18 116:2,7
116:11,14
117:3 118:3,20
119:14 120:14
121:22 123:19
125:10,17
127:9 128:23
129:10 130:8
130:22 131:13
132:12,21
134:1,7 135:7
136:1,22

137:17 138:12
139:4 140:20
144:7 145:2,8
146:13 147:9
148:4 154:6,9
154:17,24
155:3,12
**Marx's** 13:10,16
23:1
**mask** 56:10,13
56:15,17
101:13,15
127:1,8
**materials** 6:6
9:12,19 10:2
**Mathues** 2:13
3:4 7:18 9:16
13:9 22:23
26:14,22 27:11
28:18 65:3,6
109:11 113:3
113:13 114:9
115:23 126:23
127:3 143:24
145:6 148:2
154:8,11,14,20
155:1,9
**matter** 70:2,3
158:10
**matters** 156:9
**mean** 11:12 20:7
26:1 49:16
51:12 55:19,21
56:8 68:24
70:9 88:24
109:22 110:14
113:15 127:4
140:12 142:24
**means** 11:12
19:22 20:2,3
22:5
**media** 150:16
**medic** 106:1
**medical** 38:23
39:8 104:2,3

143:15 144:4
145:18,22
146:2
**medics** 95:17
**meet** 9:23
**member** 35:17
36:12 150:13
**members** 17:6
17:10 35:24
36:8,9
**memo** 62:22,24
**memory** 72:22
72:23 109:1
141:7,8
**mentioned** 7:4
29:3 146:20
147:9 148:6,7
148:9
**mentioning** 30:2
**message** 66:21
**met** 12:24 31:20
32:16 37:4
43:24 98:17
**metal** 10:14 11:2
**Michael** 142:2
**microphone**
41:3,6
**middle** 54:18
68:2,7 78:23
117:16
**midnight** 34:21
48:21
**midnights** 42:3
**midsection**
87:23
**mile** 47:16,16
48:16
**mind** 38:4
106:10 127:5
**minute** 8:21
87:3 91:16
124:4,11 125:5
132:14 140:14
140:16
**minutes** 30:7

37:2 45:5 49:1
61:6 63:17
65:4,6,8
100:14 104:11
105:17 107:8
115:24 116:16
145:7
**Miranda** 35:13
35:14
**missed** 11:17
**missing** 140:16
**model** 40:8
**moment** 8:8
59:22 64:21
66:10,24 69:19
72:22 77:1,11
91:10,12 102:3
**momentum**
83:13
**MONICO** 2:2
**months** 11:2
12:18,21 15:10
16:13 124:20
150:7
**morning** 146:13
**motion** 76:20
79:20 90:1
100:16
**mouth** 7:4 22:20
23:9 60:15,22
93:21,22,24
94:2,20,24
95:3 101:17
107:17 112:13
112:22 113:1
113:12
**move** 11:18
24:12 78:16
**moved** 101:9
**movements** 78:9
**moving** 28:11
70:11,19
120:21
**muscle** 24:6

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

**N**

N 3:1
name 4:9,10,11
4:11 9:1 16:3
30:12 32:13
44:3 45:9,14
45:22,24 46:3
52:15 99:22
120:10 142:4,6
142:8 149:13
149:14,19
named 44:2
142:1 149:11
names 99:15,16
narcotics 73:17
112:13
narrow 41:2
91:17
nature 13:1
38:23 51:4
62:6 75:3 83:5
104:3 140:11
140:12
near 54:11
65:22,24 66:4
66:4 71:15,16
87:11 88:5,7
94:1 119:23
120:18 126:14
128:11 129:15
134:20 136:12
137:5
nearby 90:10
necessary 114:8
neck 21:24 29:3
29:4,6 56:16
56:18 145:11
145:15
need 48:4 57:2
61:24 69:20,22
115:24 123:5
needed 151:12
neighboring
95:20

never 14:17
15:20 30:13,15
31:20 38:12
93:23 115:9
142:12 143:7
newborn 23:14
23:16
night 35:1 36:24
112:8
NIK 111:5
nod 93:7,13 95:8
nodding 90:1
normal 61:21
north 37:16,17
42:9,11,17,18
Northbrook
11:6
northern 1:2
10:19
Nos 3:20
nose 22:20 23:9
23:18 101:17
notable 47:3
Notary 156:2
157:11
note 38:3 46:23
notepad 63:7
notes 6:11 7:8,9
7:11,13,13,15
37:11 44:9
61:15,19,21
62:1,2,3,9,13
62:16,20,21,22
62:24 63:1
140:15
notice 60:14
65:21 66:3
85:16 86:10
96:3 110:10
noticed 53:10
57:11 58:15
59:3 74:8,16
76:13 77:18
78:9 86:11,13
90:15 91:7,11

93:5,12
noticing 75:6
number 30:20
62:6 112:18

**O**

oath 158:15
obesity 22:10
object 21:2,23
objection 22:23
26:14,22 27:11
28:18 109:11
113:3,13 114:9
114:15 143:24
155:10
observations
93:17 95:14
observed 69:14
95:1
obstructed
22:21
obtained 61:19
obviously 70:17
82:21 109:20
OC 39:1,2
occasion 52:13
occasionally
17:2 151:23
occur 104:24
occurred 13:11
16:19 86:21
104:23 105:15
152:23
odd 55:10
offer 158:14
office 10:18
139:19 157:4
officer 4:13 6:2
8:17 11:24
12:6 16:21,24
18:2,10 19:17
22:7 24:18,20
24:24 25:4,11
30:1 34:24
36:4 38:14

50:8 51:21
52:20 57:8,21
57:22 58:3,8
58:20,23 59:2
59:8,9 61:7,8
63:9,13 64:3,4
64:4,8,13,14
65:23 66:1,1
67:7,15,15,20
68:3,22 69:1
71:17,21,21
74:1 76:24
78:1,1,4,7,7
81:9,13,18
82:5,6,11 84:7
84:15 86:24
88:8,9,15,20
89:4,9,21 90:3
90:6,14,17
91:13 92:12,23
93:3,20 94:16
94:17 95:16
96:18,22 97:3
97:7,8,14 98:5
98:7,8,14
100:8,23 102:6
102:10 106:1
107:11 108:4,6
108:16,20
116:8,13 117:7
120:24 121:6
122:5,7 126:6
126:16,17,20
126:21,24
127:7,10,13,15
127:16,18,19
127:22 128:18
129:12,22
130:2,10,15,24
131:19 132:5
133:10 140:21
144:16 146:18
151:16,17
officer's 24:16
officers 13:10

27:4 33:22
34:2,7,12
48:21 49:3,24
59:5 64:6
69:19,23 70:20
70:21 71:5
72:8,13,17
75:18,24 76:13
77:24 79:14
81:11,12 86:10
87:5 88:5,7 92:7
92:19 94:6,10
94:23 95:12,19
100:20 105:2
105:12 112:10
119:23 120:18
120:23 121:6,9
122:9,13,18,22
124:24 126:13
145:14 151:24
officers' 120:21
officerwise 34:4
okay 4:18 5:1,8
5:16,24 7:11
7:17 9:7 14:2
14:15,20,23
21:20 23:14,21
24:1,8 25:18
28:2 29:3
38:17 45:21
47:18 50:5
53:3 54:10
60:14 63:1,4
64:5 65:8 67:9
72:21 73:5,13
73:17 77:5
80:2 81:5
82:24 86:12
87:21 91:1
93:3 96:18
97:16,21 98:13
99:12 100:21
102:13 110:13
115:14,15,22
116:17 117:1

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

117:17 118:1,9
118:16,17
119:1,11,12,15
119:21 120:1,7
120:11,12
121:5,19 123:8
124:9 125:7,8
125:18 126:9
126:22 127:3
127:14 128:10
128:21 129:21
130:1,19 131:8
131:11 133:2,5
133:13,15
134:1 136:16
140:17 141:16
147:14,17
149:1,18 151:2
151:15 153:12
153:22 154:6,9
**on-scene** 33:24
**once** 46:15
51:11,12,13
68:17 73:3
97:13 98:5
112:18,19
**one's** 29:6 54:12
**one-arm** 82:20
82:24 83:7,9
**Oneida** 10:17,21
11:16,21 19:10
**ones** 113:15
155:8
**opinion** 81:1
92:4 143:14,23
148:16
**opposing** 76:2,4
**Orchard** 67:16
68:3,7
**order** 81:11
123:5 154:9
**ordered** 55:4
**original** 147:19
**outcome** 157:1
**outside** 13:11

14:17 15:21
19:16 52:1
59:9 63:13
65:21 66:4
147:22 149:14
**owes** 150:19
**oxygen** 23:11
143:17

_____

**P**

**P.C** 2:9
**p.m** 17:15,15
31:22 33:12
47:7 49:2
155:14
**pace** 101:1,4
148:11
**pad** 62:22,24
**pain** 154:22
**pairs** 39:6
**panic** 47:8,21,22
47:23 48:7,10
48:12 51:5,7
51:18 52:4
**pants** 39:14 54:2
54:4
**paper** 105:7
**paramedic**
107:12
**paramedics**
99:14,17 100:2
100:11,15
101:7,21 102:7
102:13 104:7
104:12 106:24
148:6,10,18,21
**park** 50:14,20
**parked** 103:12
**parking** 43:4
47:7 50:17
51:2 87:18
**part** 20:5 26:7
42:16 69:10
77:15 83:1
95:6 96:7

119:21 137:2,5
142:10 149:8
153:3 155:9
**participate** 17:3
**participated**
143:7
**particular** 36:20
39:16 116:20
124:10
**particularly**
79:4
**parties** 156:23
**partner** 38:8,10
147:23
**partners** 38:12
**parts** 31:11
69:10 88:4
**passed** 91:14
**passenger** 77:7
**pat** 58:8 73:15
**path** 10:13
**patrol** 16:21,23
17:4 18:22,24
30:15 38:16,21
42:15 47:7
85:9
**pattern** 80:12
**pause** 117:13,16
117:17
**pavement** 88:1
128:17
**pay** 131:6
**paying** 89:19
**PD** 97:8
**penalty** 158:6,8
**pending** 5:14
**people** 27:8
44:15 45:14
55:2 94:6
122:21 141:17
141:17,18
**perform** 72:1
92:23 95:4
**performed**
94:20,22

**performing**
95:22 96:19
101:10
**period** 22:9,13
26:11,20 27:1
27:10,14 29:1
33:20 62:18
74:22 82:16
**perjury** 158:6,8
**permission** 33:4
33:7
**perpendicular**
56:7
**person** 9:21,22
13:23 24:13,19
26:5,11,12,21
28:11,17 29:8
32:13,16,18,21
38:18 39:9
41:3,7 44:2
49:5 51:9
66:18 73:20
83:20 85:10
94:4
**person's** 95:3
**personal** 96:12
109:3 145:21
146:1 147:1
156:13
**personnel** 99:10
148:7 149:1,3
149:8
**pertaining** 1:20
**phone** 8:22,24
12:12,13 14:22
14:24 15:13
48:3 85:17,17
85:20 124:2,5
124:8,9,13,17
141:15 146:22
146:23 147:3
**photo** 109:2
111:7,12,14,16
111:19 133:11
134:10,15

135:10,14
136:3,23,24
137:5,18,22
139:5
**photograph**
111:4 112:2,5
133:7,17 134:2
**photographs**
112:7
**photos** 132:22
132:24 136:5
149:20 150:5
151:12
**pick** 41:4 80:9
100:24 101:4
130:12
**picked** 34:16
71:12 76:17
79:13
**Picking** 145:8
**picture** 111:21
**Pierce** 2:10
**place** 32:6 33:15
45:1 55:4
62:18 140:22
143:1
**placed** 59:19,21
72:2 86:3
101:14,17
104:20
**placing** 55:11
**Plaintiff** 1:8 2:7
**Plaintiff's** 124:1
**plan** 51:24
**planning** 15:6
**plastic** 109:5,13
109:15 110:1,1
110:2 113:21
113:24 114:3
143:18 144:10
**play** 28:22
119:10 120:11
125:4 128:19
129:8 130:5,19
131:5 132:10

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 172

**played** 118:22
149:8 150:10
**playing** 116:15
116:18 125:18
**please** 4:8,23 5:4
5:6,7,14,21
118:13 154:14
**pocket** 39:14
53:14,16,18,20
53:21,24 54:1
54:2,4,5,9,11
54:18 55:8,12
57:5,6 62:23
**pockets** 54:12
55:3
**point** 13:8 15:9
20:21 30:2
51:18 58:20
63:2,8 73:14
74:16 77:16
80:19,20 85:18
87:11 91:6
95:13 96:4
97:11 102:16
104:21 106:6
120:19 128:20
129:7 147:13
153:15
**pointing** 25:8
57:1
**points** 94:7
**police** 8:19 10:6
11:24 14:7
17:7,18 18:5
18:15,21 19:1
22:7 32:7 36:4
36:8 39:22
40:6,16 41:8
43:4,16 45:16
47:12,14 48:16
64:20,23 65:1
95:19 104:20
108:4,6 141:14
149:17 151:16
151:17

**position** 22:8,14
22:19 25:17
26:3,9,11,19
27:5,8,10,18
27:21,22 28:5
28:5,10,15
29:6 40:22
55:6 56:21
70:8 83:12
84:18 85:2
86:12 87:5,6
88:14 90:16
91:7,11,20
97:15 123:9
129:2,5 132:15
144:20
**positional** 22:2
22:11,17 23:6
23:15
**positioning**
76:23 92:11
102:2 144:21
**positions** 40:21
**positive** 67:8
**positively** 132:8
**possession**
108:21
**possible** 30:14
58:19 139:22
**possibly** 59:7
96:15 101:1
**posted** 150:15
**posting** 149:20
**potential** 10:15
49:13 57:6,6
**potentially**
28:24 29:9
46:8
**powder** 143:19
144:10
**powers** 18:5
**PPCT** 83:1
**practice** 41:13
61:21 108:19
114:14 140:7

**preparation** 6:7
8:12 9:8
**prepare** 9:24
**presence** 13:12
13:12,21 115:5
**present** 2:1 9:18
13:24 32:9,22
125:1
**preserving**
105:1
**pressed** 77:10
**pressure** 21:24
27:18 28:6,9
28:16 29:3,4,5
29:12,15
143:18 144:10
144:17,23
145:9,10,14
**pretty** 16:15
41:13 46:13
55:17 57:16
69:13 74:12
78:22 79:23
81:10 89:13
100:9 106:14
109:21 126:2
127:17 148:13
**prevent** 28:10
**previous** 5:21
104:3 110:15
156:6
**previously** 5:23
12:4 24:15
58:15 65:16
148:7,9
**primarily** 94:3
**principle** 29:11
**prior** 29:17,21
29:24 30:22
31:1,4,9 35:1,4
35:7 37:3 38:4
43:7 48:7
74:22 75:5
95:17 112:18
131:24

**private** 45:19
**privilege** 13:14
13:24 150:20
**privileged** 13:22
**probably** 12:21
15:13 16:1
34:21 38:22
45:4,19 47:16
56:18 61:5
68:12 69:16
74:5 100:13
103:11 105:17
150:6 153:17
155:4
**problem** 65:8
**procedure** 1:18
26:8
**proceedings**
156:15
**process** 154:3
**processing**
153:4
**produced** 133:6
133:7 136:3,8
136:10 150:18
**profession** 19:16
**professionals**
145:22
**program** 45:9
**progress** 17:2
**prone** 22:8,12
22:14,19 23:8
25:13,15,17
26:3,8,11,19
27:8,18,21
28:5,10,15
29:6 85:2 87:6
89:17,23 90:16
91:20 126:11
132:15 143:18
144:9,16,20,23
**pronounce**
15:22
**propel** 21:1
**properly** 15:23

**property** 43:17
154:4
**provide** 149:3
**provided** 141:4
**providing**
104:13
**provisions** 1:18
**proximity** 64:16
**Public** 156:2
157:11
**pull** 51:2 83:16
89:2 119:9
**pulled** 69:5
79:21 80:15,17
**pulling** 70:19
72:5
**pump** 43:17
**punch** 146:18
**purports** 141:9
**purpose** 1:21
46:5 73:14
**purposes** 155:2
**pursuant** 1:17
**pursuing** 67:23
**pushed** 69:5
79:19,20
**pushing** 76:3,10
92:7 130:16
**put** 23:16 26:4
29:5 45:22
53:14,17,19,23
54:1 55:6
56:21 57:12
62:16 102:20
107:20 108:8
144:23 155:9
**putting** 27:18
28:5 55:8 74:9
82:4 123:3
132:5

---

**Q**

**qualify** 144:5
**question** 5:3,14
5:14 13:11

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 173

31:18 44:17
72:11,16 93:21
113:10 143:20
**questioning**
104:1
**questions** 4:23
5:19 13:17
23:1 30:4
103:20 116:23
125:6,20 133:3
145:2
**quick** 69:13
100:17
**quickened**
148:11
**quickly** 25:21
148:14
**quite** 125:2

**R**

**radio** 47:8 49:5
95:17
**raise** 44:13 79:9
**ran** 68:6,12
118:23
**range** 41:14
**rank** 16:21
**rapid** 76:10
**rare** 151:9
**reach** 55:2
**reaches** 66:10
**reaching** 57:4
**read** 65:12,13
142:10 143:12
144:9 154:10
158:9,11
**ready** 55:6
56:21 57:2
**really** 14:17
44:18 66:22
69:20 74:5
91:15,16
104:10 106:21
107:9 108:10
112:1 115:3

130:13 141:15
**reapprehend**
68:2 122:16
**rear** 40:23 71:22
77:7 103:7
**reason** 6:2 20:8
24:12 31:23
46:6 49:11
149:2,7
**reasonable**
143:14
**recall** 7:1,5 8:3
8:14 9:1,10
10:4 13:6 16:2
16:6,9,14 17:5
19:3,9,13,15
19:19 20:12
21:12 22:6,9
23:24 24:14
28:7,13 30:16
31:10 32:13
33:6,22,23
34:20 35:6,9
36:17 37:11
40:1 42:22
43:2,14,22
44:11,20,23
45:4,8 46:2,4
46:16,23 47:3
47:18 48:9,23
49:7,15,16,21
49:23 50:16
51:23 52:15
53:14,20 54:2
54:15,23 56:10
56:12 58:10
59:1,7 60:16
60:19,23 61:11
61:12,18 63:23
65:2,19 66:15
67:19,22 69:12
70:6,7 71:4,7,9
71:10,19 72:10
72:19 75:10
76:9 79:11,15

80:5,8,22 81:4
81:20,24 82:6
85:10,22 86:2
88:2,12,15,20
89:19 90:10
94:12,15,16
95:2,15 96:13
96:21 97:2
99:12 100:3,10
101:9 102:1,9
102:15 103:3
103:24 104:6
104:19 105:3
105:11,24
108:1,9,18,20
110:3 111:9,11
111:18 112:21
113:15 116:19
116:21 120:4
124:7 125:2
133:12 141:4,5
142:16 143:4
143:22 147:4,8
150:6 151:5
153:14,16,23
**receive** 19:1
**received** 17:24
19:17,21 20:1
20:9,18,21
24:15 135:2
**recess** 65:10
116:3 140:19
**recognize** 21:4
98:9 117:5
118:5 126:13
127:10 142:4,6
146:9,14
**recognizing**
20:10
**recollection**
8:16 15:21
29:20 30:1
31:7 32:2 38:2
38:6 39:15
45:22 48:15

54:20 60:20
63:9 73:5 75:5
80:24 96:10,12
100:1,4 103:21
109:4 121:11
124:12 151:3
152:6 153:24
**record** 23:1 33:5
65:13 116:11
155:10 156:14
**recorded** 33:2
**recording** 85:17
**recovered**
107:13
**reduced** 156:13
**refresh** 121:11
**regarding** 6:13
25:18 44:18
62:9 139:19
142:10 143:10
143:12 150:10
150:16,22
151:3 152:6,10
**regards** 114:5
**regular** 38:16
**reholstered**
57:17
**related** 11:9,14
18:11 140:13
140:22
**relative** 156:21
156:22
**relay** 66:21
**relayed** 52:14
59:17
**remained** 84:22
84:24 97:22
**remember** 32:4
34:3,7,8 40:10
40:12 43:3
53:21 54:18
59:4,16 61:19
62:12 64:1
65:11 66:13
73:2,9 74:19

75:18 76:7,15
78:4,22 81:17
81:22,23 82:3
82:8 84:9 86:1
86:5,7 88:3
89:7,20 90:6,9
91:24 92:9,10
92:11 95:16
96:7,9 97:3
99:15,18,22
100:23 101:11
101:12,18
102:4,11,16,24
103:16,18
104:5,23 106:6
107:15,21
108:15 109:4
109:13,14
111:3,7 112:1
113:18 120:10
123:11,13
141:3,13,15,16
141:19,20,24
142:1,2,5,7,15
142:17,21
151:7 152:9,15
154:5
**remove** 90:3
**removed** 7:3
**render** 101:7
**rendering**
101:21
**repeat** 19:24
23:4 26:16
**rephrase** 5:5,8
**report** 6:8,12,15
6:16,18,20 7:9
7:19,23 8:4,5
30:7 31:21
37:3,5,9 42:23
46:8,19,20
48:14 72:20
106:15 108:7
108:10 142:9
142:10 143:10

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 174

152:1,10,13,17
152:20
**reported** 2:23
156:12
**reporter** 1:17
65:11,14
154:12,15
156:4
**reporting** 45:7
151:11
**reports** 124:22
152:19
**represent** 93:19
103:19 124:3
133:13 135:18
136:8 137:1
139:6 143:9
**representative**
32:12 139:18
**request** 32:21
114:24
**requested**
114:20 115:4,7
115:9,10
**requesting**
95:17,19
**rescue** 99:10,13
**resembled**
110:15
**reserve** 154:11
**residents** 30:17
**resign** 10:12
**resigned** 10:9
**resist** 58:6 64:20
**resisting** 24:21
79:18 83:3
84:6
**resistive** 27:3
70:14,18 72:4
81:19 89:3
123:6
**respectfully**
127:6
**responded** 30:7
30:8 37:23

48:7,9 51:7
**responding** 17:1
112:10
**response** 30:9
55:8 78:10
80:2
**responsibility**
114:23
**responsible**
112:7
**restate** 5:5
**restrain** 27:17
28:4
**restraint** 25:13
25:16
**restroom** 65:7
116:1
**results** 46:1
**retail** 12:8
151:13
**retained** 3:20
147:10 155:11
155:13
**retaining** 155:6
**retrieved** 105:9
106:2,3 107:17
**returned** 52:10
**review** 6:6 9:7
9:13 12:24
**reviewed** 6:8,10
9:5 10:2
**reviewing** 7:8
9:19 96:13
99:19 103:24
107:15 122:15
124:19
**Reyes** 8:23
30:23 85:11
96:4 147:6
**right** 34:24
50:17,20 53:4
55:14,19 56:3
66:24 67:17,18
78:1,8 79:24
80:14 81:7,10

83:14 85:15
87:18 88:14
91:1,4 94:8
103:10 117:20
119:20 122:17
129:19 135:10
139:7
**right-hand**
118:14
**rights** 35:14
**risk** 22:10,11
23:15 24:20
26:12,20 27:1
**Road** 2:10 42:11
42:17
**roadway** 67:16
68:20 118:24
119:2
**robbery** 51:1
**Robertson**
102:11
**Robinson**
102:11,12
**role** 147:24
150:9
**roll** 23:17 50:3
**Rollins** 42:11,17
**room** 32:4 111:3
111:19 125:1
141:24
**Rosiles** 1:4,7
29:18 31:5,8
46:3,10 58:4,6
58:9 59:6 90:8
102:14 133:14
136:9 145:10
145:17 146:2
146:18 147:11
147:19 150:13
158:4
**Rosiles's** 66:6
143:16 145:15
146:21 148:22
149:9
**rough** 63:22

68:11
**roughly** 10:1
37:2 67:11
**Round** 1:10 8:17
8:18 10:5
11:20 14:7
16:20 17:7,17
19:8,14 30:18
32:7 36:4,8
37:13 38:11
39:22 40:16
41:7 42:17
43:18 45:9
46:3,11 97:8
98:6 99:17
102:9,12 103:5
116:12 136:3
151:9 158:4
**rounds** 151:2
**Royal** 154:16,18
155:6
**Rule** 144:2
**ruler** 111:24
**Rules** 1:19
**run** 68:9,10
115:24 122:21
**running** 67:16
69:2 70:16,17
75:3 123:4,13

———————
**S**
———————

**S** 3:7
**safe** 50:22
**safety** 55:13
**salary** 10:15
**saliva** 7:7
106:10 108:24
109:6
**sandwich**
109:17,20,23
**sandwich-size**
109:10
**Saturday** 9:5,13
9:24 104:1,6
124:6,19,19

146:6,14
**save** 158:11
**saw** 7:18 9:3
30:14 52:8
53:5,17,23
54:8,15 55:22
64:5 67:3,14
67:24 70:23
72:3,13 81:8
93:20,23 96:23
97:1 104:8
106:16 107:18
107:24 108:23
110:3 111:20
122:15 124:6,8
124:16,18,23
129:3 130:10
130:12 142:12
145:16 146:14
150:4
**saying** 7:21 29:4
42:4 45:21
54:3 60:6
61:12 62:19
66:3,12 74:20
75:16 76:16
78:10 80:4
81:20 82:6
84:7 86:3
105:6 108:20
108:23 109:1
140:1 148:21
152:16
**says** 83:6 124:10
**scale** 111:17
**scenario** 49:12
114:15
**scene** 33:23 34:2
34:4,20 35:3
47:11,12 67:5
81:8 85:23
86:6 96:4 97:9
98:5 99:11,13
100:11 102:5,8
102:10 103:15

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

104:7 105:1,12
105:14,16
108:13 148:12
148:15
Scheithe 1:11
15:24 16:5,6,7
16:17 64:4
66:1 67:15,20
68:14 69:1
71:22 78:7
88:9,11,13,20
89:9,13,21
90:7,14,17
91:13,22 93:3
93:20 94:13
116:13 117:8
117:10,19,21
121:10 126:21
127:15,20
129:1,13
130:10,15
132:5 141:21
Scheithe's
129:22
Schultz 8:18
102:9 104:1
Schultz's 103:6
screen 115:16
116:9 123:23
screenshot
118:5
search 47:2
58:23 72:1
73:16,17,19,23
132:2
searched 75:15
searching 45:9
seated 102:18
second 7:18 8:22
36:22 37:2
42:24 43:3
46:13,14 47:1
47:5 52:13
66:21 68:5
115:13 124:4

126:5 127:14
128:6 132:14
seconds 70:2,3,4
70:5 90:21,22
91:16 98:4
99:10 116:16
124:11 125:22
126:5,10 127:8
127:21 128:16
128:20,24
129:3,11 130:5
130:9,20,23
section 42:9
sections 125:6
secure 102:23
secured 86:17
106:7 107:20
securing 25:21
see 7:3,23 8:4,7
49:13 53:15
54:3 57:5 67:9
67:13 69:4,9
70:12,21 72:8
72:17 75:21
81:15 88:5,7
89:4,9,16 90:2
90:4 91:20
92:3,6,12
93:22 94:1
101:7 106:7
107:23 108:1,2
108:12,16
111:1,8 115:15
115:17 116:8
116:10 119:9
120:20 121:16
123:23 124:23
125:22 126:11
129:16,22
130:24 131:15
135:9,15
136:14 137:4
137:21 138:15
139:8 141:10
142:9 144:16

145:13 146:17
seeing 53:14,21
55:8 81:17
99:19 101:12
101:18 104:6
107:22 108:9
109:1,4 111:3
111:7 112:1
113:15 129:24
133:21 134:22
146:20
seek 10:14
seen 7:5 8:21,24
86:15 92:5,23
108:10 111:16
111:21,23
112:12,23
113:10 116:19
118:11 122:20
124:13 132:24
133:11 136:4
143:5,7 147:3
150:1 153:19
153:20,21
send 154:15,17
sending 154:23
sense 44:14
sentence 143:14
144:8,13
separate 50:12
September 10:6
18:18
set 157:3
shake 93:5
shape 54:21
sheet 10:14 11:1
158:1,13
sheets 109:15
Shelby 31:2
120:8 152:23
Sheriff's 10:17
shift 17:12,15
35:1,1 37:2
38:5 41:23
42:1 48:21,22

shins 74:12
78:15 79:24
shoe 74:17,18
76:8 90:3
shoeless 75:9
shoes 65:20
74:15,21 75:20
76:5 132:2
shooting 14:18
short 65:4
103:22 155:3
Shorthand 1:17
156:3
shortly 34:12
49:4 100:5
107:2
shorts 65:20
show 35:3
115:12,20
119:6,8 123:20
123:21,22
132:22 133:2
134:1 135:8
136:2,7,23
137:18 138:13
139:5
shown 117:2
118:2,19
119:13 120:13
121:21 125:9
125:16 128:22
129:9 130:7,21
131:12 132:11
shred 63:3,5
shy 5:6
side 27:24 37:17
40:17 50:18
53:12 54:12,13
54:15 64:2,6
64:14,15,22
66:2 67:11
74:2 77:4,24
78:1,2,5 85:8
87:7,9 88:10
88:11 89:23

126:18 135:10
sideburn 133:20
134:20
sides 64:4,17
76:11
sidewalk 121:17
sight 104:14
Signed 158:17
signs 20:10,15
similar 82:19
83:4
simple 25:6
Sinahy 8:23
30:23 85:11
96:3 120:5,8
124:3
sir 4:17 5:2 6:1,5
6:19,23 8:13
9:17,20 10:8
10:11,20 11:23
12:14 13:18
15:1 21:10
25:2 31:24
32:8,17 33:14
34:10 37:21
39:20 40:4
46:22 48:18
50:13 51:20
57:14,24 64:12
68:16 79:1
82:12 83:22
95:23 98:15,21
135:21 136:6
136:18 137:13
139:20
sirens 49:9
sitting 15:6 32:2
32:4 47:6 85:6
situation 25:1
25:24 48:4
51:1 82:22
six 12:21 16:13
size 17:5 110:17
110:18 113:9
113:11,17

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

**sizes** 109:20
113:16
**skateboard** 44:3
44:12,16,18
**skin** 138:15
**slight** 6:23
**slightly** 77:3,20
77:22 89:23
110:19 113:9
119:5,7
**slow** 100:17
**slowly** 100:19
**small** 55:15
**smaller** 109:23
109:24 110:19
113:9,16
**Snapchat** 44:4
**social** 150:16
**socially** 14:19
**sock** 75:8 76:8
90:3 93:20,22
93:23 94:1
131:2,16,17,19
131:20,20
**socks** 74:14
75:10,20 76:6
131:1,15 132:2
**solo** 38:9
**somebody** 20:15
21:14,21 22:8
22:19 25:8
27:5,17 28:4
32:14 63:10
83:16 90:12
100:21 101:1
102:20 103:20
111:2 120:8
123:3
**somebody's**
22:11 64:6
129:18
**someone's** 26:3
28:9
**somewhat** 89:17
90:16 91:20

**sorry** 11:12
31:16 35:20,21
35:22 36:13
42:4 63:19
80:16 90:5
101:15 111:8
115:21 121:3,4
138:3 152:22
153:3
**sort** 19:7 20:13
21:22 44:1
48:2 54:21
71:8 87:6,7
89:23,24 92:3
93:7 101:16
106:2 109:4
114:13
**sound** 33:12
**sounds** 5:17 8:5
8:10 37:22
72:13 87:20
140:18
**space** 63:7
**spaces** 103:12
**speak** 20:17
50:6 51:8
60:17 79:3
81:3 87:1
105:16 108:8
142:3,5
**speaking** 4:24
16:7 32:5
33:22,23 58:13
60:22 64:1
73:11 81:2
103:16
**specific** 16:9
28:7 34:7 37:7
37:15 39:15
42:19 45:14
46:4 62:7
66:13 72:11
75:4 80:23
81:23 86:7
95:15 106:19

112:5,18 131:6
144:21 151:2
151:19 152:5
153:17 154:5
**specifically** 8:14
12:23 19:4
24:8 25:15,23
28:2 32:23
34:3,9,15
39:17 40:7
41:18 44:22,23
45:4 52:11,16
54:19 59:4,7
60:4,19 61:18
62:12 69:4,6
69:12 70:9
71:9,10 72:19
73:24 75:11
78:6,21 83:8
84:10 86:5,19
87:2 88:2,3,17
89:7 90:9 92:1
92:9 95:5 99:5
99:12,15
101:11,18
102:24 103:5
103:18,23
104:5,16
108:15 111:9
111:11 112:9
116:21 119:20
122:9 130:15
135:3 141:19
141:24 142:14
142:16 143:13
143:22 144:18
147:4 148:1
150:8 151:7
152:8
**specifics** 23:24
59:16 82:8
86:1 113:19
**specified** 156:19
**speculation**
114:10

**speed** 49:15,17
49:18,19,22
**spell** 4:8
**spent** 11:19
**spoke** 12:12,19
105:19 143:10
**spoken** 12:17
139:17 149:23
**spots** 125:20
137:22
**spray** 39:1,2
**spread** 75:15,24
**squad** 9:10,10
40:11,12 43:13
64:3,6,9 66:2,4
66:5,11 67:6
67:10,12 68:5
68:21 71:1,14
71:15,17,23,24
72:2,7,15,17
73:1,3,14
76:24 77:5,6,8
77:11,15 84:19
86:3 87:11,13
101:24 102:19
102:21,23
103:1,3,6,8,9
103:17 107:21
119:4,8 121:14
122:1
**squads** 38:9
50:12
**squatting** 85:6,7
86:9 96:20
**stamp** 133:9
**stand** 97:19 99:3
**standard** 38:21
41:13
**standing** 52:22
55:17 65:24
71:15 76:23
79:7 83:11
85:6,14 86:16
96:19 97:5,11
97:15,22 98:23

99:1,6 101:23
101:24 105:1
107:16,22
121:1,7,8
132:1
**stands** 45:12
83:6
**Stanley** 30:5,10
37:4 45:3
**staples** 136:15
**start** 10:21 43:1
115:16 116:15
116:22 117:23
121:19 125:14
131:9
**started** 14:8
16:14,18 48:21
50:4 58:13
72:1 73:23
74:12 94:18
95:21 96:5
126:1,2 147:2
**starting** 80:9
93:9 118:18
130:20
**state** 1:19 4:8
156:3,4
**state's** 139:17,18
139:21 140:9
**stated** 7:3 29:15
44:1 52:9
97:12 105:13
106:6 110:12
**statement** 7:2,6
28:15 31:12,13
33:17,21 44:20
61:20 101:3
104:22 105:4,8
144:6
**statements**
34:15 66:13
80:23 81:23
82:9 86:7
95:15
**states** 1:1 144:13

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 177

station 30:14
36:20,24 43:20
48:16 152:24
153:4,7
stations 48:1
status 140:3,4
statute 60:5
stayed 68:1
stenographica...
156:12
steps 74:6
sternum 21:1
stomach 23:16
109:7
stood 71:22
82:16 85:8
97:12,13 103:7
stop 43:11 76:19
121:20 125:19
128:20 129:8
130:6 147:7
154:23
stopped 21:15
98:2 119:20,21
125:18 147:2
stopping 30:15
117:4 118:4,21
119:15 120:15
121:23 125:11
126:9 128:24
129:11 130:23
131:14
stops 17:2 41:10
41:17
storage 62:18
store 12:8 50:7
50:21 51:22
52:1,23 59:18
63:10 103:13
strangled 21:23
strategy 51:24
street 73:6
119:17 121:12
121:16
strike 8:20

14:11 42:13
55:20 77:19
97:17 110:4
111:15,22
115:18 146:5
148:8
striking 92:4
stripped 18:4
struggling 97:6
stuck 106:10
subject 5:7,22
26:19 27:3
44:5,24 52:10
53:1,5 57:2
83:3 92:22
93:1 123:6
subject's 59:18
83:11 144:22
submitted
112:11
substance
106:11 109:16
110:11 111:1,6
sued 18:9
suffer 21:17,21
27:9
suffering 20:11
20:16,19 26:13
26:21
Suite 2:3,10
summary 34:1
105:14,20
supervisor
34:22 41:21
42:1
supplies 38:24
39:8
supposed 45:17
Supreme 1:19
sure 4:10 13:6,7
15:9,22 20:1,5
21:7 23:6,23
26:1,18 34:6
34:16 36:21,23
37:1,10 42:16

51:15 53:23
54:1,5 60:13
63:10,18,21
64:17 65:5
70:1 71:7
73:21 74:6
77:14,17 89:6
89:12,13 96:6
101:22 105:24
106:14 107:11
107:14 109:18
110:7 112:2,19
116:2 117:15
120:6 125:21
126:2 127:10
137:9 140:5,16
142:24 151:5
153:14 154:2
surface 22:15
surprised 44:16
suspect 24:21
44:7 46:8 64:2
66:2 67:2
71:23
suspect's 7:4
suspected 67:4
suspects 49:13
suspicion 44:13
sustained 138:7
138:20 139:15
sweatshirt 65:17
sworn 4:2,4 17:6
156:8
symptoms 20:10
20:15
system 40:18
systems 11:10
11:14
_____
**T**
**T** 1:12 3:7
tactic 25:6
tactically 50:23
tactics 18:22,23
82:21

take 5:10,12,13
8:8 32:6 61:21
62:2,3,4,14,16
62:20,22 65:4
72:8,13,17
81:11,13,18
82:18 86:22,24
96:16 103:1
115:13,23
123:6 131:1,15
153:3 155:4
takedown 82:20
82:24 83:7,9
taken 1:16,16,17
8:22,24 19:6
21:8 57:20
58:13 59:8
72:16 81:21
82:1 84:6
100:6 104:8
106:14 111:14
119:2,17
121:12 124:3
134:17 145:17
156:17 158:10
talk 4:21 12:15
12:22 13:4
15:2 33:19
36:15 45:2
49:3,5 59:14
61:3 142:23
147:14 150:20
151:15 153:12
talked 5:23 10:3
12:10 13:2,8
13:13 14:20
15:7,11,23
34:4,6,9,18
52:21 63:16
152:24
talking 6:16
9:13 30:1 32:3
34:12 35:5,8
44:10 54:10
60:9 61:16,22

66:14,15 104:4
105:11 112:5
122:5
Taser 38:21
task 6:9,16,22
7:12,19 31:14
35:5,8,10,15
35:18,23 36:10
36:12 46:21
taught 18:21
23:21 25:16,18
25:23 27:20
82:20
Taurus 40:9
technically 56:9
technician 115:8
technique 25:20
tell 5:11,12
22:24 36:18
47:4 53:10
59:2 83:8
84:16 102:4,20
105:18 106:21
110:7 117:14
119:19 121:15
122:8,11,12
123:9,12 126:7
128:3 130:11
130:13,15
132:7 134:11
147:6
telling 7:13
temporarily
26:4
ten 62:19 103:11
tended 96:2
tends 154:22
term 21:12 22:1
22:5 25:12
56:15 109:21
terms 100:24
test 11:5,9,11
110:24 111:5
tested 111:2
113:22 114:1,4

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

114:7,20 115:5
115:11
**testified** 4:5
**testify** 156:8
**testifying**
142:15
**testimony** 5:21
141:4,12 144:1
156:14
**testing** 111:10
141:7
**thank** 4:13 8:3
8:10 16:6
96:24 117:23
118:9 122:8
123:20 125:14
126:9,22
127:21
**theft** 151:13
**thicker** 110:1
**thing** 5:1 15:3
47:3 63:23
71:19 94:12,15
96:21 97:1
102:15 115:10
**things** 4:19 13:1
18:20,23 21:17
38:23 39:16
45:19 57:11
62:6 66:12
104:3 154:4
**think** 31:23
43:14 47:17
78:16 79:18,22
88:12 102:11
109:14 114:3
115:7 118:12
125:24 127:4
132:17 141:5,6
141:11,13
154:19,20
155:1
**third** 13:23
**Thornton's**
36:19,24 37:9

38:4 42:23
43:7,23 47:15
48:7,12 52:5
53:2 58:9 59:6
60:18,21 61:1
61:4,17 105:5
146:7
**thought** 53:22
95:9 148:8,10
152:1
**threat** 25:10
37:3,5,8 42:23
46:7 48:14
52:14,17 57:7
59:17
**threatened** 44:5
52:10,12
**threats** 60:6
**three** 15:13
39:24 69:22
100:14 120:23
121:5,9 127:8
133:17
**throat** 106:2
107:13 143:19
144:11
**throw** 63:1,5
**tightly** 76:1
78:13
**time** 8:20 9:3
10:4 11:19
12:10 14:20
15:23 16:15
17:14 22:9,13
23:4 26:12,16
26:20 27:1,10
27:14 29:1,7
30:19 33:20,21
34:20,23 36:7
37:11,23 43:23
46:12,13,24
47:22 48:23
50:11 55:5
58:12 59:8
62:18 66:21

68:5 74:2,21
80:14 81:7
82:16 86:16
91:14 94:7
97:5 98:18
99:16 100:5,9
100:11 101:22
104:24 105:5
106:17,19,21
107:10 110:14
124:16 132:10
149:18 150:4
155:4 156:18
**timeline** 63:21
98:3
**times** 14:18
15:11,13 43:9
56:8,9 112:15
**Timothy** 14:21
16:10
**TLO** 45:8,11,22
47:2
**today** 6:4,7 14:4
**told** 6:21 57:12
75:23 92:19
102:22 106:5
**top** 136:12
**touch** 111:5
129:18,22
130:10
**touched** 23:23
**touching** 70:21
77:10,14 89:4
89:8,9,13,14
92:1 122:13,14
122:19 128:2
129:13,17
130:2,11 132:9
132:9
**tourniquet**
38:22 39:11
**town** 37:17
**track** 73:21
**traffic** 17:2
41:10,17

**train** 83:2
**trained** 21:6
24:11 25:12
26:2 27:16
28:3,8 41:16
41:19 82:23
**trainee** 97:9
**training** 19:8,21
20:1,9,18,21
22:7 24:16
28:7,13,14
38:13,14 83:1
95:2,6 98:14
102:6
**transcript** 141:8
141:9 154:13
155:2 156:11
158:9
**transition** 42:2
83:14
**transport**
153:18
**transported**
149:6 153:8
**transporting**
153:5,13
**treating** 20:19
**treatment**
145:18
**trial** 5:19,20
**tried** 78:11,18
108:1 120:20
**tripped** 69:5
**true** 13:20
156:14 158:11
**truth** 156:8
**try** 76:16,19
78:15 112:13
112:24 113:11
131:9
**trying** 21:5
70:15 72:4
74:14 75:14,19
76:8,11,15,22
81:9,18 84:3

86:22 88:18
89:1,2 122:16
122:23 132:1
144:19
**turn** 41:17 93:9
111:6
**turned** 53:5 56:6
59:11 60:11
87:7,9 89:23
**turning** 20:17
81:17 95:9
**twice** 76:21
78:19 79:19
81:6
**two** 12:13 14:23
15:13 31:19
39:6 61:10
64:6 75:18
77:24 81:11,12
83:12 87:3
100:13 126:13
155:7
**type** 11:8 40:5,7
40:12 49:12
62:2 110:1,2
**typed** 7:9
**types** 12:5 24:24
25:4
**typewriting**
156:13
**typically** 17:12
22:6,7 39:10
41:2,9,14,24
43:11 44:15
48:1 49:12
54:11 55:2
56:16 61:24
62:3,13,20,23
63:3,5 71:23
151:8

---

**U**

**Uh-huh** 121:2
**unable** 20:7,17
**uncooperative**

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 179

25:7
**understand** 5:3
  5:6 21:5 76:22
  94:5 151:21
**understanding**
  20:14 22:4
  33:10 158:14
**Understood** 5:9
  8:1
**unfit** 18:7
**uniform** 38:16
**union** 32:11
**UNITED** 1:1
**unsworn** 17:9
**upcoming** 12:16
**upper** 87:24
  128:16
**use** 18:22,23
  22:10 24:16,18
  24:24 25:4
  27:2,17 28:3
  65:6 83:13
  92:12 151:23
**Usually** 39:6,14

**V**

**vague** 26:14
  27:11
**value** 112:8
**valve** 101:13,15
**various** 6:10
  8:11 17:2
  18:22 35:24
  109:20 113:16
  151:11
**vehicle** 25:7
  40:3,5,6,19,24
  63:15 69:23
  74:2 85:9
  104:9,20
  153:16
**venture** 110:23
**verbal** 152:13
**verbally** 92:19
  152:20

**version** 84:1
**vest** 38:22 39:12
  78:23,24 79:19
**vicinity** 25:11
**victim** 61:22
  151:14
**video** 8:22 9:2,4
  33:1,5 96:15
  99:19 100:23
  104:4,6 107:15
  108:2 115:16
  115:21 116:8
  116:20 117:11
  118:10 119:1,4
  119:5,9,16
  120:2,23 122:9
  122:11,12,15
  122:23 123:9
  123:12,21,23
  124:2,5,8,9
  124:10,13,17
  125:12,18
  126:7 127:12
  127:16 128:7
  128:12,15,17
  129:12,21
  130:18 132:14
  141:3 146:6,22
  147:3,7 151:13
  153:17 155:3
  155:12
**videoconference**
  1:16 4:5
  156:18
**videos** 8:12
  12:24 35:4
  103:24 124:6
  146:10,12,14
  154:18,21
  155:7,11
**videotape** 117:2
  118:2,19
  119:13 120:13
  121:21 125:9
  125:16 128:22

129:9 130:7,21
  131:12 132:11
**videotaping**
  146:24 147:2
**view** 41:2,2
  128:14 130:4
**viewpoint** 93:8
**Village** 1:10
  10:5 11:20
  16:20 17:6
  30:18 37:12
  39:22 41:7
  42:17 158:4
**violate** 60:4
**voice** 146:15
**volition** 97:19
  97:22
**volunteer** 37:14
**vs** 158:4
**vs-** 1:9

**W**

**waistband** 54:12
**waistline** 128:11
**wait** 4:24 44:5
  52:19 60:7
**waive** 154:10
**walk** 55:14 56:1
  148:14
**walked** 53:12
  56:2 65:21
  70:24 71:13
  85:8 101:5
  121:24
**walking** 53:13
  55:1,11,15,19
  55:21,23
  100:18 121:1
**walks** 63:9
**want** 5:10,12
  7:23 36:21
  49:13 72:21
  73:20 119:6
  140:15 154:12
  154:17,23

155:9
**wanted** 10:13
  11:18 12:1,4
  33:24 43:21
  44:21 105:14
  114:16 132:2
**warnings** 35:14
**wash** 50:17
**wasn't** 55:19
  69:20 70:9
  99:5 103:9
  106:4 110:16
  111:13 115:8
  143:1
**watch** 35:4
  108:3 116:23
  146:6
**watched** 68:2
  118:9 130:14
  130:24 146:13
**watching** 74:3
  85:15 141:12
  141:16,21
  142:19
**Waukegan** 36:4
**way** 23:13 48:20
  49:20 53:5
  55:1 66:15
  121:18 123:2
  127:24 128:2
  128:18 129:23
  131:16 132:23
  134:16 136:4
  142:20
**we'll** 150:20
  154:11
**we're** 7:21 15:19
  54:10 56:9
  82:23 115:19
  126:5 128:3
**we've** 10:3 43:10
  65:3 112:5
**weapon** 53:22
  55:6 57:6,9,17
  58:19

**weapons** 25:9
  73:17
**wear** 39:21 41:3
**wearing** 39:19
  56:10,13,16,18
  65:17,19 78:23
**week** 15:5
**weeks** 39:24
  150:6
**weighing** 110:22
**went** 14:18
  18:15 41:14
  50:5,7 53:1
  56:17 68:3,19
  69:2,7 73:1
  82:10 86:17
  104:16 119:22
  123:14
**weren't** 37:22
  58:18 141:2
**West** 2:3
**whatsoever**
  29:21 30:1
**When's** 12:10
**WHEREOF**
  157:3
**white** 20:17 93:9
  95:9 106:11
  109:16 127:1,8
  143:19 144:10
**white-looking**
  110:11
**wide** 41:2
**wiggle** 72:4
**Wilde** 33:24
  34:5,18 105:13
**Wisconsin** 10:19
  112:21
**wise** 113:12
**witness** 4:1 8:1
  8:23 9:1 13:18
  23:3 26:15,23
  27:12 28:20
  61:22 109:12
  113:4,14

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of John Bertholomey - Taken 8/15/2022

Page 180

woman 149:11
women's 56:2
word 19:22 20:2
  45:23
words 44:19
  93:3 105:21
  153:15
work 10:16,17
  11:4,7,8,9,17
  14:6,16,18
  15:19,21 16:10
  37:12 41:15
  44:6 52:19
  60:7 80:7
worked 10:5
  11:5 12:3,7,8,9
  14:10,12,13
  16:20 17:7,13
  17:13,14 30:19
  99:17
working 10:21
  11:1 17:17,21
  38:11 41:7
  42:2 98:12
  151:9
works 14:3 83:8
worn 41:6
wouldn't 25:15
  41:15 49:13
  61:24 62:23
  114:15
wrap 110:1
wrapped 76:2
  76:18 79:23
  109:16
wrapping 78:19
write 6:12 105:8
  151:8
writing 105:10
  151:3
written 31:13
  61:19 104:21

114:11 127:2
144:3 156:7,7
157:3

105:8 150:22
152:17
wrote 143:10,11
  143:13

**X**

X 3:1,7

**Y**

yards 68:13
  69:16 103:12
yeah 8:3,7 37:24
  54:7 70:4
  74:10 76:14
  109:19 115:17
  117:12 125:13
  153:10 155:3
year 10:23,24
  15:12 16:1,13
years 62:19,19
  85:24 86:6
yelling 81:22
Yep 116:10
  120:3
yesterday 12:12
  14:22

**Z**

Ziploc 109:14
  109:19 110:2
Ziploc-type
  109:18
Zoom 9:21
  141:11,12,15

**0**

0 126:5

**1**

1 3:9,20 8:21
  115:18 116:5
  116:11 119:8
  124:4,11
  125:22 126:5

132:14 155:12
1:08 130:23
1:09 131:14
  132:4
1:42 124:11
10 3:18 30:22
  31:1,4,9 62:9
  84:21 85:2
  93:15 139:2,6
10:45 41:23,24
  42:5,6
10th 29:17 33:12
  144:17
11 31:17
11:00 33:12 47:7
  49:2
11:04 106:15
11:15 17:15
  41:21 107:1
116 3:9
12:42 155:14
123 3:10
13 128:24
132 3:11
134 3:12
135 3:13,14
136 3:15
137 3:16
138 3:17,18
14 116:16
145 3:4
148 3:3
15 65:4 84:21
  85:3 93:15
15th 1:22
184 124:1
195 2:10

**2**

2 3:10,20 115:19
  116:16 123:17
  123:21 124:2
  125:22 155:12
2:14 116:22
2:30 117:4,24

2:45 17:15
2:59 118:4,18
20 68:12 69:16
  91:16 158:18
2017 10:6 18:19
2020 29:17
  30:22 31:1,4,9
  31:17 33:12
  62:9 144:17
2021 10:7,9
2022 1:22 157:5
21-cv-3236 1:9
24 33:17
25 68:13 69:16
28969 158:3

**3**

3 3:11 126:10
  127:14,21
  128:6,16,20
  129:3 132:19
  132:23 133:6
3:10 119:10
3:22 118:21
3:24 119:15
  120:11,16
30 30:7 37:2
  70:5 90:21,22
  98:4 99:10
30th 10:23
312 2:5
31st 157:4
333 2:10
337 2:3
341-9646 2:5
35,000 30:21
3562 136:24
3564 134:3
3567 135:9
3609 137:19
3610 139:6
3611 138:14
3612 133:9
3662 116:12
3929 136:3

**4**

4 3:3,12 134:2,5
4:10 120:15,17
  121:20
4:20 121:23
40 17:8
42 8:22 124:4,11
  125:5 132:14
46 129:11 130:5

**5**

5 3:13 135:5,8
5/10/24 157:12
53 2:3
55 130:9,20
  131:9

**6**

6 3:14 9:10
  40:11,12
  135:23
60143 2:11
60604 2:4
630 2:12

**7**

7 3:15 136:20,24
7:32 31:22 33:15
702 144:2
703 144:2
773-4774 2:12

**8**

8 3:16 137:15,19
8-15-22 116:6
  123:18 132:20
  134:6 135:6,24
  136:21 137:16
  138:11 139:3
84-1834 2:24
  156:1 157:10

**9**

9 3:17 138:10,13
  138:13