

Transcript of the Deposition of
**Timothy Cramer**
**(Defendant Officer)**

**Case:** Fabiola Rosiles v. Village of Round Lake Beach; et al.
**Taken On:** August 17, 2022

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

**EXHIBIT
G**

Case: 1:21-cv-03236 Document #: 44-5 Filed: 05/15/23 Page 2 of 73 PageID #:262

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FABIOLA ROSILES, as          )
Independent Administrator     )
of the Estate of ABEL         )
ROSILES, JR., deceased,       )
                              )
            Plaintiff,        )
                              )
    -vs-                      ) No. 21-cv-3236
                              )
VILLAGE OF ROUND LAKE         )
BEACH, J. SCHEITHE, J.        )
BERTHOLOMEY, T. CRAMER, and   )
H. ATWELL,                    )
                              )
            Defendants.       )


     The deposition of TIMOTHY CRAMER, called for
examination, taken pursuant to the Federal Rules of
Civil Procedure of the United States District Courts
pertaining to the taking of depositions, taken before
KAREN WATERS, CSR No. 84-4693, a Certified Shorthand
Reporter of the State of Illinois, and a Registered
Professional Reporter, via videoconference, on
August 17, 2022, commencing at 1:00 p.m.

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 2

1   PRESENT: (via videoconference)

2        HALE & MONICO, LLC
         MR. JASON MARX
3        53 West Jackson Boulevard
         Suite 337
4        Chicago, Illinois 60604
         Phone:  312.341.9646
5        E-mail:  jmarx@halemonico.com

6            Appeared on behalf of the Plaintiff;

7        HERVAS, CONDON & BERSANI, P.C.
         MR. G. DAVID MATHUES
8        333 Pierce Road
         Suite 195
9        Itasca, Illinois 60143
         Phone:  630.773.4774
10       E-mail:  dmathues@hcbattorneys.com

11           Appeared on behalf of the Defendants.

12

13  ALSO PRESENT:  Officer Jeremiah Scheithe
                   Officer Heath Atwell
14

15

16

17

18

19

20

21

22

23  REPORTED BY:  KAREN WATERS, CSR, RPR,

24  CSR Certificate No. 84-4693

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 3

1                         I N D E X

2

3    WITNESS                                        PAGE

4    TIMOTHY CRAMER

5         Examination by Mr. Marx....................   4

6         Examination by Mr. Mathues................ 158

7         Further Examination by Mr. Marx........... 161

8         Further Examination by Mr. Mathues........ 162

9         Further Examination by Mr. Marx........... 162

10

11                      E X H I B I T S

12

     CRAMER DEPOSITION EXHIBIT                       PAGE
13

14        Exhibit 1 (retained by Mr. Marx)......... 130

15        Exhibit 2................................ 137

16        Exhibit 3................................ 138

17        Exhibit 4................................ 139

18        Exhibit 5................................ 139

19        Exhibit 6................................ 140

20        Exhibit 7................................ 141

21        Exhibit 8................................ 141

22        Exhibit 9................................ 142

23        Exhibit 10............................... 144

24        Exhibit 11............................... 149

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

## Page 4

1          (Witness sworn.)
2    WHEREUPON:
3               TIMOTHY CRAMER
4    called as a witness herein, having been first duly
5    sworn, was examined and testified as follows:
6               EXAMINATION
7    BY MR. MARX:
8        Q.  Will you please state and spell your name for
9    the record?
10       A.  Timothy Cramer, T-i-m-o-t-h-y.  Last name is
11   C-r-a-m-e-r.
12       Q.  Mr. Cramer, you are an officer, correct?
13       A.  Yes.
14       Q.  Okay.  Have you ever given a deposition
15   before?
16       A.  Yes.
17       Q.  About how many times?
18       A.  Probably a dozen.
19       Q.  I noticed you worked in Florida; is that
20   correct?
21       A.  Yes.
22       Q.  Did you give depositions in criminal cases in
23   Florida?
24       A.  I believe once.  Most of them were civil.

## Page 5

1        Q.  Okay.  I'm not going to go over the rules of a
2    deposition.  I'm sure your attorney has gone through
3    most if not all of them.  It sounds like you've been
4    through depositions before.
5            Just one thing, this deposition is my one
6    chance to get to ask you questions before trial, if
7    there is a trial, of course.  So if you would like to
8    change, correct, or go over any of your answers during
9    this deposition, please let me know.  I will be happy to
10   go back and we can clarify or change, correct, whatever
11   you would like to go back over.  Okay?
12       A.  Okay.
13       Q.  Is there any reason that you won't be able to
14   give complete and honest answers here today in your
15   deposition today?
16       A.  No.
17       Q.  Did you review any materials in preparation
18   for your deposition today?
19       A.  Yes.
20       Q.  What did you review?
21       A.  The supplemental report that I wrote along
22   with just field notes from the task force or the task
23   force report itself.
24       Q.  So you read the task force report that,

## Page 6

1    according to them, was the interview that they conducted
2    of you, correct?
3        A.  Right.  Mine.  No one else's.
4        Q.  Okay.  And you read the field notes that they
5    purportedly wrote down while you were talking to them?
6        A.  I -- not the field notes themselves.  That was
7    just this -- it's their report notating what happened,
8    basically.
9        Q.  And when did you review those things?
10       A.  Last week.
11       Q.  And did you review any audio or video in
12   preparation for your deposition?
13       A.  Yes.
14       Q.  Okay.  What did you review as far as audio and
15   video goes?
16       A.  The videos, there were a couple from the
17   incident itself, body cam, and I believe one or two
18   videos of the in-car dash or the dash camera from the
19   in-car.
20       Q.  Did you watch these videos last week as well?
21       A.  Correct.
22       Q.  Is it fair to say that you have seen all those
23   videos before but it had been a while?
24       A.  Yes.

## Page 7

1        Q.  Now, I don't want to know what you discussed
2    with your attorney because that's privileged, but did
3    you meet with your attorney to prepare for the
4    deposition?
5        A.  Yes.
6        Q.  Is that Mr. Mathues?
7        A.  Yes.
8        Q.  When did you meet with him?
9        A.  That was last week, to go over the videos and
10   the reports.
11       Q.  Was that in person, over Zoom, over the phone?
12       A.  In person.
13       Q.  Okay.  Was anybody else present when you were
14   reviewing materials with your attorney?
15       A.  Just us two.
16       Q.  About how long did you meet for?
17       A.  I want to say about an hour.
18       Q.  And am I correct that Officer Atwell and
19   Scheithe are present in the room with you?
20       A.  Yes.
21       Q.  And I assume -- of course, I don't want to
22   know what you talked to with them in the presence of
23   your attorney; but I assume, is it fair to say, that you
24   talked to them briefly today?

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 8

1    A. Briefly.
2    Q. Okay. Before today, when was the last time
3 you talked to either one of them?
4    A. I had a phone call with them last week just
5 advising them that we were not going to be meeting for
6 the deposition for the illness. Other than that, it was
7 probably at least a couple of months.
8    Q. Okay. You currently don't work with them
9 anymore, correct?
10    A. Correct.
11    Q. I keep in contact with some but not all of my
12 former coworkers. So I'm just trying to find out if
13 that's the same with you. For example, have you kept in
14 contact with Mr. Atwell or Scheithe since you have left
15 the Round Lake Beach Police Department?
16    A. Random messages, hey, how you doing type deals
17 every few months. Nothing that's more than just
18 basically, hey, how are you.
19    Q. Okay. Have you ever talked about this lawsuit
20 with either one of them outside the presence of your
21 attorney?
22    A. Just about what's going on and, like, have you
23 heard anything, but nothing with specifics.
24    Q. Do you know about how large the police

Page 9

1 department was -- that is, the sworn members were --
2 when you worked for the Round Lake Beach police?
3    A. I want to say it was sworn of 40; but there
4 were, like, 20 or 24 officers and the rest were command
5 level or vacant positions and a few detectives.
6    Q. And I know they are sitting in the room with
7 you, and I know to a certain extent some of these
8 questions are a little bit awkward, but would you
9 consider yourself friends with Mr. Atwell or Scheithe or
10 just work acquaintances?
11    A. Both.
12    Q. Okay. Is it fair to say that you have had a
13 beer with them after work?
14    A. I don't think I've ever done that, but we have
15 met for breakfast and stuff while we were working.
16    Q. Okay.
17    A. We are friendly.
18    Q. Okay. Is fair to say that you have both their
19 cell phone numbers?
20    A. Yes.
21    Q. Okay. So it's my understanding that you
22 worked for the following law enforcement agencies: The
23 Florida Highway Patrol, the Bureau of Prisons, the
24 Village of Round Lake Heights, the Lake County Sheriff's

Page 10

1 Office, the Village of the Round Lake Beach, the Village
2 of Mundelein, and the City of Waukegan.
3        So my question is, is that all of them or are
4 there more?
5    A. That's all of them.
6    Q. Okay. And you worked for the Village of Round
7 Lake Beach Police Department from August 2017 to April
8 of 2021, correct?
9    A. Yes.
10    Q. And you resigned in April of 2021, correct?
11    A. Correct.
12    Q. Why did you resign?
13    A. Just the animosity from this case itself. I
14 had to take a lesser paying police job in Mundelein to
15 basically get better mental health family life.
16    Q. What animosity do you believe you were facing?
17    A. Just from the activists from this case that
18 wanted us, basically, to be framed as murderers. And
19 for me to advance in that agency, being so small, I saw
20 it as very unlikely because of that. And I just felt it
21 was better to leave at that point but still do policing.
22 So I found my way out.
23    Q. Okay. You started your law enforcement career
24 in the Florida Highway Patrol; is that fair?

Page 11

1    A. Yes.
2    Q. Is it fair to say you are from Florida?
3    A. Yes.
4    Q. Why did you come up here to Northern Illinois?
5    A. My father-in-law retired out of Waukegan PD.
6 And I knew the finances were much better up here for
7 police and decided to make a change up this way to have
8 a better financial life. And plus I got tired of the
9 heat year-round. It was a good balance of money and
10 being able to be outdoors more than a couple of months a
11 year.
12    Q. Florida is a big state, lots of different
13 areas to it. What part of Florida Highway Patrol were
14 you, South Florida, Central, Northern?
15    A. It was Central West. I started in
16 Fort Myers, which was southwest on the Gulf Coast. Then
17 I transferred about four hours north in the Brooksville
18 District, which is north of Tampa, also West Coast, more
19 Central Florida. Then I transferred for my final year,
20 before I left, to the Ocala District, which is a little
21 further north also but still considered Central West.
22    Q. How long did you work for the Florida Highway
23 Patrol?
24    A. Let's see. I believe it was a little over

5 (Pages 8 to 11)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 12

1   eight years.
2        Q.   And then you went to the Federal Bureau of
3   Prisons from there?
4        A.   Yes.
5        Q.   Why did you stop working for the Bureau of
6   Prisons?
7        A.   I had kids and could no longer afford to be a
8   trooper, so I went to federal prison to make more money.
9        Q.   How long were you there for?
10       A.   A year.
11       Q.   And then at some point thereafter, you went to
12   the Village of Round Lake Heights, correct?
13       A.   Yes.  The Federal Bureau of Prisons was in
14   Florida, and then that's about the time we made the
15   decision to move up North and try my luck at policing up
16   here.
17       Q.   Okay.
18       A.   That's when I got on with Round Lake Heights.
19       Q.   How long did you work there?
20       A.   Five/six months, part-time.
21       Q.   Why did you stop working there?
22       A.   It was just a part-time job, and I needed
23   something full-time.  So that's when I went to the next
24   one for --

Page 13

1        Q.   And then you went to Lake County Sheriff's
2   Office from there?
3        A.   Yes.  Corrections Department.
4        Q.   Okay.  So you worked in the Lake County Jail
5   in Waukegan?
6        A.   Yes.
7        Q.   Okay.  How long did you do that?
8        A.   Just over a year.
9        Q.   Okay.  And why did you stop doing that?
10       A.   I was able to find a full-time police job,
11   which was Round Lake Beach.
12       Q.   Okay.  And we covered Round Lake Beach.  You
13   worked there until April of '21.
14            Then you went to the Village of Mundelein, you
15   said.  How long did you work for Mundelein?
16       A.   Just over a year.
17       Q.   Why did you leave there?
18       A.   Better financial opportunity in Waukegan.
19       Q.   Did you say your father was a former Waukegan
20   officer?
21       A.   Father-in-law, my wife's dad.
22       Q.   Oh.  Sorry.  Father-in-law.
23            How long was he a Waukegan officer?
24       A.   30 and a half years.

Page 14

1        Q.   Okay.  In all of your law enforcement jobs
2   that you have had, are you aware of any complaints that
3   have been made against you, whether they be civilian
4   complaints or internal, so to speak, law enforcement
5   internal complaints?
6        A.   I've never had anything brought up to me.
7        Q.   Have you ever received any form of discipline
8   in your capacity as a law enforcement officer?
9        A.   Yes.
10       Q.   Okay.  What discipline?
11       A.   When I was with Lake County Corrections, I was
12   given a verbal-written reprimand for not having constant
13   contact with a high-risk inmate who was in the seg unit.
14   While I was transporting him from court back to his
15   cell, I had him stand next to a wall while we were
16   waiting for the one elevator working; and I apparently
17   took my hands off, which was not part of policy.  I
18   didn't know that.  So I was given a verbal-written
19   reprimand just basically coaching, telling me to make
20   sure I keep constant contact with them.
21       Q.   Have you received any other discipline besides
22   that?
23       A.   Yes.
24       Q.   Okay.  What else?

Page 15

1        A.   With Round Lake Beach, I was en route to a
2   call that was upgraded to a home invasion.  I was going
3   105 miles per hour, which was against policy.  So I was
4   given a reprimand for going too fast to a home invasion.
5        Q.   To your knowledge, did the policy state how
6   fast you were allowed to go?
7        A.   I believe it said 20 or 25 miles per hour over
8   the posted speed limit.  So at most, I should have been
9   doing maybe 60 or 65.  But I would have to look at the
10   policy to know the exact mileage over.
11       Q.   What punishment did they give you for that
12   alleged violation?
13       A.   Just a one-year on my record or a written --
14   same thing, basically a written-verbal telling me it
15   happened and not to do it again.
16       Q.   Any other discipline besides that which you've
17   already mentioned?
18       A.   No.
19       Q.   Have you ever been stripped of your police
20   powers?
21       A.   No.
22       Q.   Have you ever been found unfit for duty?
23       A.   No.
24       Q.   Besides this lawsuit, have you ever been sued

6  (Pages 12 to 15)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 16

1  in your capacity as a law enforcement officer?
2     A. No.
3     Q. Have you ever been convicted of a crime?
4     A. No.
5     Q. Is it fair to say that you have received first
6  aid classes at every jurisdiction you've worked at as a
7  police officer?
8     A. Every one? I don't believe I did at Round
9  Lake Heights. I possibly did. But all the other ones,
10  we had yearly training.
11     Q. So you received first aid training multiple
12  times, correct?
13     A. Yes.
14     Q. Were you ever trained on what the word
15  "asphyxiation" or "asphyxia" means?
16     A. Yes.
17     Q. What's your understanding of what that word
18  means?
19     A. Restriction of breathing.
20     Q. Okay. Have you received training on
21  recognizing the signs and symptoms of someone who might
22  be suffering from asphyxiation?
23     A. Yes.
24     Q. What's your understanding of what those signs

Page 17

1  and symptoms are?
2     A. Unable to breathe, unable to make sound, or,
3  like, gasping for air. The appearance of choking,
4  basically.
5     Q. Have you ever received training on how to
6  treat someone who may be suffering from asphyxiation?
7     A. Yes.
8     Q. Okay. What type of training have you received
9  in that regard?
10     A. Basically to place the individual on the
11  recovery position on their sides or sit them up as best
12  we can.
13     Q. Why were you trained that that was important?
14     A. Because it allows them to breathe normally, or
15  at least the most normal way they can. It doesn't
16  restrict the breathing as much as being on their chest
17  would do.
18     Q. Okay. You have taken classes in CPR, correct?
19     A. Yes.
20     Q. Do you know what CPR stands for?
21     A. I don't know the exact phrase. Something with
22  pulmonary resuscitation, I believe, cardio or -- I don't
23  know. I just know it as CPR.
24     Q. While working as a law enforcement officer,

Page 18

1  have you ever given anyone CPR?
2     A. Yes.
3     Q. How many times?
4     A. Probably four or five.
5     Q. Okay. Outside of training I'm talking about.
6  Are you saying four or five times while you're on the
7  job outside of training?
8     A. Yes.
9     Q. And have you received training on performing
10  the Heimlich maneuver?
11     A. Yes.
12     Q. Can you briefly describe your understanding of
13  what that is?
14     A. To attempt to expel an item that is lodged in
15  somebody's throat if they are choking to no longer have
16  their airway restricted. You do so by upward thrusts
17  around the midsection.
18     Q. On the job have you ever performed the
19  Heimlich maneuver?
20     A. No.
21     Q. Is it fair to say -- that is, would you agree
22  with me -- that there could be several things that could
23  cause asphyxiation?
24     A. It's possible.

Page 19

1     Q. What's your understanding of what could cause
2  asphyxiation?
3     A. Having someone -- like, laying on someone,
4  putting downward pressure on them while they are laying
5  down or too much tightening of them, like a bear
6  hug-type deal.
7     Q. Have you ever heard of the term positional
8  asphyxia?
9     A. Yes.
10     Q. What's your understanding of what that means?
11     A. Based on the position, they are unable to
12  breathe. So basically laying down.
13     Q. Were you ever taught basic anatomy classes or
14  did you receive any sort of, like, basic anatomy lessons
15  in any of your first aid training?
16     A. I can't recall.
17     Q. Well, do you know what the diaphragm is in the
18  human body?
19     A. I know it helps your breathing and has to
20  expand, and that allows you to breathe.
21     Q. Is it fair to say that it's an important
22  muscle that is used for breathing?
23     A. If it's a muscle, yes. I don't know if it is
24  or not. I know it's important to breathe.

7 (Pages 16 to 19)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 20

1     Q.  Do you know more specifically how that
2  diaphragm works to help one breathe?
3     A.  It just has to expand, so it's easier while
4  someone is positioned upright or on their side.
5     Q.  Were you ever trained that if the diaphragm
6  can't move for whatever reason, that that could lead to
7  someone having difficulty breathing?
8     A.  I've not trained specifically for that, but
9  that's kind of common knowledge.  I put one and one
10  together to figure that out.
11     Q.  You have received training on an officer's use
12  of force; is that fair?
13     A.  Yes.
14     Q.  Is it likely that you received that training
15  at every single place you've worked at least once?
16     A.  Yes.
17     Q.  Generally speaking, when can an officer use
18  force on a person?
19     A.  When there's a threat to an officer effecting
20  an arrest.  Use of force has so many different ways.  At
21  some agencies, putting handcuffs on somebody is use of
22  force.  It's just being able to detain a person to
23  prevent injury to them or somebody else.  That's more or
24  less when we've been using -- that's when use of force

Page 21

1  is utilized.
2     Q.  Would you agree that there's many types of
3  force that an officer might use depending on the
4  circumstances that they are faced with?
5     A.  Yes.
6     Q.  And I think you kind of touched on it.  Would
7  you agree that there's varying levels of force ranging
8  from what might be considered a very minimal amount of
9  force to something that's a large amount of force?
10     A.  Yes.
11     Q.  For example, a minimal amount of force might
12  be considered handcuffing or simply member presence; is
13  that fair?
14     A.  Yes.
15     Q.  And an example of a great amount of force
16  might be deadly force, like discharging your firearm
17  when faced with deadly force, correct?
18     A.  Yes.
19     Q.  And do you know what the prone position is?
20     A.  Yes.
21     Q.  What's the prone position?
22     A.  Being on their stomach.
23     Q.  Okay.  It's the position in which some person
24  is lying on their stomach or on their stomach, correct?

Page 22

1     A.  Correct.
2     Q.  In all the use of force training that you
3  received, have you ever received training on prone
4  restraint?
5     A.  I don't know about restraints.  Just I know we
6  have practiced handcuffing in the prone position.
7  Restraint itself, I can't say exactly.  I can explain
8  what I've been told; but as far as actual training, I
9  would have to go back to all the records.
10     Q.  Sure.  I will get more specific.  Have you
11  ever received training on doing what's called a takedown
12  or emergency takedown or emergency handcuffing,
13  something like that?
14     A.  Yes.
15     Q.  And is it fair to say that, generally
16  speaking, those terms mean to take a person to the
17  ground, get them in the prone position, and then
18  handcuff them behind their back?
19     A.  Just emergency handcuffing is grabbing control
20  of them and getting them cuffed, not necessarily on the
21  ground or anything.
22     Q.  Okay.  I guess I'm talking about a takedown,
23  then.  You've received training on taking people to the
24  ground, correct?

Page 23

1     A.  Yes.
2     Q.  What are some of the ways that you have been
3  trained on how to take someone to the ground?
4     A.  You can take them down with leg sweeps.  You
5  can take them down with hip tosses, with two-man, one
6  go high, one go low.  You can both take them by the
7  shoulder, go down.  We have control techniques where you
8  lower them to the ground as long as they are cooperative
9  enough and you have control.  There are many different
10  takedowns.
11     Q.  I forgot to ask, how tall are you?
12     A.  6'1", 6'2".
13     Q.  How much do you weigh?
14     A.  About 200.
15     Q.  To the best of your knowledge, did you weigh
16  that much and were you that height in June of 2020?
17     A.  Yeah.  I've been about the same.
18     Q.  It sounds like you have received training on
19  how to take somebody down.  Have you ever received
20  training on how to handcuff someone who is in the prone
21  position -- strike that.
22     After a takedown has been completed, typically
23  the goal is to put that person in hand restraints,
24  correct?

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 24

1    A. Yes.
2    **Q. All right. Have you ever received training on**
3    **how to handcuff someone who is in the prone position?**
4    A. Yes.
5    **Q. What training have you received in that**
6    **regard?**
7    A. There are some where you have two people
8    helping. You just do it yourself. Again, there's many
9    different ways to handcuff, many different trainings.
10   You can get them behind their back, one hand at a time,
11   two hands at the same time. There's many different ways
12   to do it. Basically, the best way to do it is the
13   quickest if they are fighting. And if they're
14   compliant, you just make sure they're on properly as
15   soon as possible.
16   **Q. Were you ever trained that's acceptable to put**
17   **your knee on someone's back temporarily to be able to**
18   **control the person to be able to handcuff them behind**
19   **their back?**
20   A. My original training in Florida, we would use
21   the shoulder blade area where we would apply pressure if
22   needed. That was more for stability while we were
23   handcuffing, and it's also because we were solo. And as
24   time has gone on, the goal has been to no longer do

Page 25

1    that, and my training throughout the years has gone away
2    from placing knees on people's backs and do your best
3    not to do so. And if you have to, make sure it's not
4    for a prolonging period of time.
5    **Q. Do you agree with me that keeping a person in**
6    **a prone position for an extended period of time could**
7    **increase the risk of that person suffering from**
8    **asphyxia?**
9    MR. MATHUES: Objection to form and foundation.
10   Tim, I'm just making it for the record. Once
11   I make an objection, just answer Mr. Marx's question as
12   best as you can.
13   BY THE WITNESS:
14   A. Yes, for a prolonged period of time, it could
15   cause asphyxiation.
16   **Q. Why do you believe that to be true?**
17   A. The longer somebody stays on their chest, the
18   less their diaphragm is able to open, which causes their
19   breathing to become shallower and not normal.
20   **Q. Were you ever trained that it's an acceptable**
21   **use of force to restrain someone who's in the prone**
22   **position by putting pressure on their back?**
23   MR. MATHUES: Objection to form and foundation.
24

Page 26

1    BY THE WITNESS:
2    A. The pressure on the back, yes, but slight
3    pressure and for control only.
4    **Q. What do you mean for "control only"?**
5    A. If somebody is still fighting and able to get
6    up and you have to keep them until another officer gets
7    there to help restrain them, then you can apply the
8    pressure needed to make sure that everybody else is
9    safe. But pressure needed, also meaning if they are not
10   fighting, we try to get them in the sitting-up position
11   as quick as possible or, at the very least, on their
12   side in the recovery position to allow them to breathe
13   better quicker.
14   **Q. What do you mean by "fighting"? I believe you**
15   **said if the person is fighting, you may need to put**
16   **pressure on their back. What do you mean by that?**
17   A. If they are still fighting -- like not
18   handcuffed, obviously -- but if they're fighting and
19   able to get up, then you do what you have to do to win
20   the fight. But at that point, once they are able to be
21   handcuffed, you try to get them on their side again or
22   sitting up. The pressure on their back is only to keep
23   them on the ground long enough for you to handcuff.
24   **Q. Thank you for clarifying.**

Page 27

1    **So have you ever been trained that it's**
2    **acceptable use of force to put prone back pressure on**
3    **somebody who is already in handcuffs?**
4    MR. MATHUES: Objection to form and foundation.
5    BY THE WITNESS:
6    A. If they are still able to get up and cause
7    injury to you and you still are able to restrain them
8    properly, which the pressure on the back, we avoided
9    that as much as we could. And typically what would
10   happen is you would have someone having their hand on
11   somebody but not necessarily putting downward pressure
12   on them. It's more of a stability until backup would
13   arrive and you would be able to assess the situation and
14   move forward.
15   But the majority of the times when you see
16   someone's hand on the back, it's not pushing downward
17   pressure on them. It's for control purposes. If
18   someone is in handcuffs and you're able to keep slight
19   pressure on them, it can keep them from rolling over,
20   from kicking, from headbutting you, from doing numerous
21   things. And just the back shoulder blade area helps
22   with that because it's a broader part; and if they're
23   not able to move as easily, you are less likely to get
24   hurt.

9 (Pages 24 to 27)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 28

1    Q.  So are you saying that you yourself would only
2  put pressure on someone's back who's in the prone
3  position and handcuffed in order to keep them from
4  further fighting with you, like kicking or headbutting,
5  as you said?
6    A.  If they are still fighting, we are not going
7  to put them -- not going to stand them up right away.
8  We will try and get them in the prone position or in
9  the -- sorry -- the recovery position if we can.  If
10  they are fighting, they are obviously breathing fine at
11  that point.  So we want to restrain them as much as
12  possible until we are able to get them secured in a
13  better location.
14    Q.  I'm going to ask you about your knowledge of a
15  few people here.  Prior to June 10, 2020, did you know
16  who Abel Rosiles, Jr., was?
17    A.  No.
18    Q.  To the best of your knowledge, had you had any
19  contact with him prior to that date?
20    A.  No.
21    Q.  Prior to that date, to the best of your
22  recollection, had you ever heard his name spoken by
23  anybody?
24    A.  No.

Page 29

1    Q.  The same questions apply for somebody named
2  Antwan Stanley.  How about him?
3    A.  Yes.
4    Q.  How did you know about him?
5    A.  We would typically go to Thorntons for coffee
6  or soda at 2:00 o'clock/3:00 o'clock in the morning,
7  that would be our meet-up, and Stanley was a clerk
8  there.
9    Q.  Had you ever arrested him before?
10    A.  No.
11    Q.  I'm sorry.  That was poorly worded.  Have you
12  ever arrested him ever?
13    A.  No.
14    Q.  Had you ever -- that is, prior to June 10,
15  2020 -- engaged in any communication with him more than
16  how are you doing in paying for your beverage or
17  whatever?
18    A.  We tried to get him -- just speak with him
19  friendly and see how he's doing, just your normal hi.
20  But as you're there for an hour or so, you get caught up
21  in random conversations.
22    Q.  Prior to June 10, 2020, did you ever talk to
23  him in the capacity of him being a witness or a victim
24  of a crime?

Page 30

1    A.  He might have been a witness to some stuff,
2  but I'd have to look at all my reports from Thorntons
3  and see if he was a witness or not to verify that.
4    Q.  Prior to June 10, 2020, how many times would
5  you have seen him would you estimate?
6    A.  Probably -- I don't know when he started
7  working there; but I would say roughly half the time,
8  probably.
9    Q.  What shift did you typically work while at the
10  Village of Round Lake Beach?
11    A.  Mainly the nights.
12    Q.  What hours was that?
13    A.  Roll call is 10:45, and 7:15 in the morning
14  was the end of the shift, eight-and-a-half-hour shifts.
15    Q.  Prior to June 10, 2020, did you ever have an
16  issue with Mr. Stanley's credibility or veracity?
17    A.  No.
18    Q.  Prior to June 10, 2020, have you ever heard of
19  a person named Sinahy Gomez Reyes?
20    A.  No.
21    Q.  Prior to June 10, 2020, did you know who a
22  Shelby Brubaker or Brubaker is?
23    A.  No.
24    Q.  Same questions with regard to my client,

Page 31

1  Fabiola Rosiles.
2    A.  No.
3    Q.  Same question with regard to a person named
4  Julie Contreras?
5    A.  No.
6    Q.  To the best of your knowledge, had you ever
7  heard of a family named Rosiles; that is, the Rosiles
8  family living in Round Lake Beach?
9    A.  No.
10    Q.  What was your position; that is, what was your
11  rank at the Round Lake Beach Police Department?
12    A.  Police officer.  And when I left, I was also
13  officer in charge during several midnight shifts.
14    Q.  Okay.  What were some of your duties while
15  working for the Round Lake Beach Police Department?
16    A.  It was normal patrolling.  Responding to calls
17  for service, making arrests for crimes, working traffic
18  crashes.  Typical patrolling.
19    Q.  Is it fair to say those are the same duties as
20  an officer in charge but you were technically a
21  supervisor of patrol officers on that shift?
22    A.  Yeah.  Pretty much, for the most part, it was
23  just someone filling in to make the decision.  And I had
24  the direct contact to a commander or deputy chief if

10  (Pages 28 to 31)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 32

1 there was a major incident.
2      Q.  When did you become an officer in charge?
3      A.  It would have been, probably, a few months
4 after this incident.
5      Q.  Is there a pay raise involved, or was it just
6 an additional title and responsibilities?
7      A.  We got a whopping $20 per shift which raised
8 to $25 after a little while.
9      Q.  Before taxes or after?
10      A.  I'm sorry?
11      Q.  Before or after taxes?
12      A.  I'm sure it's before taxes.
13      Q.  I'm going to walk through parts of your
14 statement, but at least the statement that you gave to
15 the Lake County Major Crimes Task Force.  I am not going
16 to show it to you, but I'm just going to talk about
17 certain sections of it and ask you about it.  Okay?
18      A.  Okay.
19      Q.  So according to the task force, you were
20 interviewed by an Investigator Salato and Nichols.  My
21 question to you is, do you know who those investigators
22 were prior to talking with them?
23      A.  No.  That was the first time I saw them.
24      Q.  Were you yourself ever a member of the Lake

Page 33

1 County Major Crimes Task Force?
2      A.  No.
3      Q.  Are you currently?
4      A.  No.
5      Q.  Is it fair to say that it's comprised of law
6 enforcement personnel from Lake County; that is, it
7 could be anybody from a detective from Waukegan to an
8 officer from Round Lake Beach?
9      A.  Yes.
10      Q.  In June of 2020, did you know any members of
11 the Round Lake Beach Police Department that were on the
12 task force?
13      A.  Yes.
14      Q.  Who?
15      A.  Commander -- I'm drawing a blank on his name,
16 but he was the major crimes -- he was in charge of the
17 major crimes at the time.  If I look at my phone, I
18 could tell you his name.  But he was our commander.  I
19 completely forgot his name.
20      Q.  That's okay.  I don't need you to look at your
21 phone for that.
22          And according to the report that major crimes
23 made during this interview, you had an FOP attorney
24 present John Roche?

Page 34

1      A.  Yes.
2          Backtrack on the major crimes, I believe
3 Detective Carrie Ann Schuster was also part of the major
4 crimes at the time.
5      Q.  Schuster did you say?
6      A.  Carrie Ann.  Yes.  Or Hill.  I don't know what
7 she went by.
8      Q.  With regard to this FOP representative, did
9 you know who he was prior to you giving an interview
10 that day?
11      A.  I believe so.  I know of his name.  I can't
12 remember the FOP contract for the Village, but I believe
13 it was before that.  But I was part of the union board
14 at the time, so I met him through that.  The union
15 contract itself, I don't know exactly when that went
16 into effect or when we spoke, but it would have been
17 probably close to that time also.  So I don't know if I
18 met him beforehand or after, but I knew of his name.
19      Q.  Do you know why he was there when you spoke to
20 the Major Crimes Task Force?
21      A.  It was called in.  And he was already present
22 when the task force came, so just legal representation
23 to make sure everything was handled properly.
24      Q.  Did you request that he be present?

Page 35

1      A.  I didn't originally request him to be present,
2 but he was there.  So I took his presence while I was
3 there.
4      Q.  Well, would you have been willing to give a
5 statement without him being present?
6      A.  Yes.
7      Q.  Was this interview audio or video recorded, to
8 your knowledge?
9      A.  I don't remember.  I don't remember a video,
10 but I don't know if it was or was not audio.
11      Q.  Do you remember if they asked you for
12 permission to video or audio record you?
13      A.  I can't remember.
14      Q.  Would you have given them permission?
15      A.  Yes.
16      Q.  According to the report, it says the interview
17 took place at about 8:30 p.m. on Thursday, June 11th.
18 That would be a little bit less than 24 hours than the
19 incident we are here to talk about; is that fair?
20      A.  Yes.
21      Q.  It's more like 20 hours beforehand; is that
22 fair?
23      A.  Yes.
24      Q.  In that less than 24-hour period, did you

11  (Pages 32 to 35)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 36

1    review any audio or video during that period in which
2    the incident happened in which you gave your statement?
3        A.  No.
4        Q.  Did you know if any other video existed at
5    that point?
6        A.  I knew there was -- I didn't know for sure,
7    but I saw the girlfriend recording on her phone.  So I
8    believe that caught most of it, if not all of it, on her
9    phone.  But obviously I didn't have access to that.  And
10   the officers who responded had body cams.  Not the Round
11   Lake Beach, but Round Lake and Round Lake Heights had
12   body cams.  So I knew that they had body cam footage
13   available.  And our dash cameras were not activated at
14   the time, but I knew at some point they would have gone
15   back and done a backtrack of recording so a
16   record-after-the-fact option.  So I had a feeling they
17   were going through all that, but I did not see them
18   beforehand.
19       Q.  Who did you talk to before you spoke to the
20   investigator, so the crime's task force?  That is, after
21   my client's arrest but up until the time you gave your
22   statement, who did you speak to?
23       A.  That would have been whoever was supervisor at
24   the time, just to give our original what happened and

Page 37

1    how his status is.
2        Q.  Who was that?
3        A.  Commander Barr stayed late, so I believe it
4    was him just basically giving updates.  Or it might have
5    been Deputy Chief Wilde at the time, who is now chief.
6    I can't remember exactly what I called or who called me,
7    but it was more for the status of Abel while in the
8    hospital because I was tasked with going to the hospital
9    and being present to try to get an update on status.
10       Q.  Is it fair to say that you talked to the other
11   three officers who are defendants in this lawsuit?
12       A.  Yes.
13       Q.  Okay.  And that was during the approximate
14   20 hours between the time of the incident until the
15   statement you gave?
16       A.  That night I had our conversations of what
17   happened and how it happened, like trying to figure out
18   and piece it all together.  Other than that, I went
19   home, got some sleep, and woke up to someone saying
20   the -- someone called me and said, Major comes is here,
21   so they are going to want you to come in and give a
22   statement.
23       Q.  With regard to talking to the other three
24   defendant officers in this case, did you talk to them on

Page 38

1    scene?
2        A.  I don't believe we had more -- I don't think
3    there was much conversation on scene other than maybe a
4    few minutes because I was in the ambulance and went in
5    the ambulance to the hospital.
6        Q.  Okay.  Did you talk to those three other
7    officers then at the station at some point?
8        A.  Possibly at the station.  I don't remember
9    what time I got back.  So, again, it wasn't anything
10   in-depth as far as how long we were talking.  It was
11   just getting a gist of what needed to be done going
12   forward.  Just basically what needed to be done since it
13   was obviously a major incident.
14       Q.  Do you recall anything else about the
15   conversation that you had with the three other defendant
16   officers in this case besides what you just spoke about?
17       A.  No.
18       Q.  Were you advised by the task force
19   investigators that they were conducting a criminal
20   investigation?
21       A.  I don't know if they -- I know that it's
22   always a criminal investigation until otherwise, but I
23   don't know if they told me it was or not.
24       Q.  Were you advised of your Miranda rights or

Page 39

1    warnings?
2        A.  I might have.  I don't know.  I would have
3    agreed to talk anyway.
4        Q.  Let's talk more about June 10, 2020.  It's my
5    understanding you were working -- strike that.
6            You typically work 10:45 to 7:15 previously,
7    correct?
8        A.  Yes.
9        Q.  Is it fair to say this particular day you were
10   working from 7:00 p.m. to 7:00 a.m.?
11       A.  Yes.
12       Q.  Why was that?
13       A.  Because there was low manpower and a lot of
14   overtime, so I worked overtime.
15       Q.  You agreed to.  You weren't required to, fair?
16       A.  I don't know.  There's a lot of forced
17   overtime.  So...
18       Q.  There was a lot of what?
19       A.  A lot of forced overtime to work there.  So a
20   lot of us worked 12-hour shifts whether we wanted to or
21   not, but sometimes it was scheduled in advance.  So I
22   wouldn't know if it was scheduled in advance or I was
23   told I had to come in.  But it was typical to work
24   12 hours there while working midnight shifts.

12  (Pages 36 to 39)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 40

1  Q.  I've heard answers similar to that before.  Is
2  it fair to say that sometimes your days off were
3  canceled as well?
4      A.  No.
5      Q.  No?
6      A.  Days off stayed days off unless you were
7  scheduled to work.  They could cancel your requested
8  days off; but as far as your normal days off, they were
9  yours.  But sometimes you would have to come in early on
10  your Monday or leave late on your Friday.
11     Q.  Did they occasionally cancel your requested
12  days off?
13     A.  I never requested days because then I would
14  lose my other overtime, so I just worked.
15     Q.  This particular day we're talking about,
16  June 10th, did you actually start your shift at 10:45
17  that day or was it 7:00 p.m., or do you know?
18     A.  It would have been 7:00 p.m.
19     Q.  Okay.  And how were you dressed that day?  Can
20  you describe it?
21     A.  In a fully -- full Class B uniform with
22  Round Lake Beach attire, patches, badge, vest, gun belt.
23  Your typical patrol officer, beat officer uniform.
24     Q.  And what equipment did you carry on your

Page 41

1  person?
2      A.  Let's see.  Handcuffs, magazine, handgun, OC
3  spray.  I don't believe I carried a baton there.  If I
4  did, it was in my bag and not on me.  Taser.
5      Q.  How many sets of cuffs did you have?
6      A.  Usually two.  I'm not sure if I carried one or
7  two.
8      Q.  Did you ever carry in your vehicle leg
9  shackles?
10     A.  No.
11     Q.  Do you know where those are kept, if anywhere?
12     A.  I believe they are in the OIC room.
13     Q.  What's the OIC room?
14     A.  Officer in charge.
15         So there was typically, I believe, a pair of
16  leg shackles there; but they were more for, I believe,
17  prisoner transports to the jail or somewhere else.  I
18  don't remember them ever being used on anyone on the
19  streets.
20     Q.  Have you yourself every used leg shackles on
21  someone; that is, when they're not being transported as
22  you described?
23     A.  I have used a hobble restraint on someone but
24  not leg shackles.

Page 42

1      Q.  What's the difference?
2      A.  Hobble restraints, it's basically a piece of
3  material that's wrapped around the person's -- above
4  their knee to keep their legs together to prevent them
5  from kicking.  And it more or less restricts them from
6  being able to violently kick.  But that was down in
7  Florida when I used that.
8      Q.  Is it like a giant rubber band of some sort?
9      A.  Yeah.  It's probably an inch or two thick,
10  just nylon material.  It's just a circle that has a
11  clasp, or it's a piece that has a clasp and the clasp
12  gets tightened around the legs and keeps it from -- it's
13  able to keep it from loosening up with the clasp itself.
14     Q.  You only used that in Florida?
15     A.  Yes.  I only used that once in Florida for a
16  transport.
17     Q.  Did you find it helpful?
18     A.  Very.  It kept my back glass from getting
19  kicked out, which had happened before, which was why it
20  was used when you are transporting someone 30,
21  45 minutes to the jail and they're kicking the window.
22  That's why he used it down there.
23     Q.  I'm just repeating what I think you just said.
24  You were not wearing a body-worn camera, correct?

Page 43

1      A.  Correct.  Our agency did not have them at the
2  time.
3      Q.  Do you know when they started having them?
4      A.  A few months after that.  They were always
5  saying they were in the process of getting them; but
6  until we saw them, we didn't know.  But it would have
7  been a few months after that, I believe, when they
8  purchased them and got it all ready.
9      Q.  Do you wear one now as a Waukegan officer?
10     A.  Yes.  I've worn one at every agency from Round
11  Lake Heights to Waukegan, other than Round Lake Beach
12  until they got them.
13     Q.  Do you have any idea as to why it took them a
14  while?
15     A.  I am assuming the finances with storage, but
16  I'm not -- I wasn't part of the higher up.  So I
17  couldn't tell you.
18     Q.  On June 10th, were you working with a partner?
19     A.  We always worked solo.  We have other officers
20  that respond to calls with us, but we worked solo in our
21  car.
22     Q.  Were you assigned a particular patrol area or
23  section?
24     A.  Yeah.  Every shift you were told where you are

13  (Pages 40 to 43)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 44

1  going, whether it's east car, west car, or north car.
2      Q.  And what were you that day?
3      A.  Since I was assigned to Thorntons, I would
4  assume I was the north car, which would be -- I believe
5  9271 would be the car number.  But sometimes you would
6  get called even if it wasn't even your zone.  Dispatch
7  would still call you either way.  So it's possible that
8  I was actually assigned a different beat but just
9  responded because there was an ongoing issue already and
10 I was already with my stuff in my squad car.
11     Q.  Is it fair to say these patrol zones you get
12 assigned to, that it's your primary but it's not your
13 exclusive?  That is, if dispatch or yourself feels it
14 was necessary or helpful to assist somebody else, you
15 would do so?
16     A.  Yes.
17     Q.  Do you know who else was working that night;
18 that is, patrol officer-wise?
19     A.  It would have been Officer Scheithe and
20 Officer Atwell.  I believe we were the only three
21 assigned because I believe -- yeah, I believe Atwell was
22 OIC that night, so that would have been two officers and
23 an OIC.
24     Q.  And did your vehicle have an in-car camera

Page 45

1  system?
2      A.  Yes.
3      Q.  Was it front facing, rear facing, interior,
4  none of those, or all of those?
5      A.  Front facing and a rear compartment for
6  prisoner transports.
7      Q.  To your knowledge, was it in working order
8  that night?
9      A.  Yes.
10     Q.  And how do you know that?  Did you do
11 something each night regarding your in-car camera
12 system?
13     A.  Yes.  You would just log in and you would see
14 that it's working.
15     Q.  Okay.  And were you wearing a microphone,
16 which is typically, maybe, pen size or so, on your
17 person?
18     A.  Yeah.  I think over there it was like a pager
19 size.  On my right shoulder more than likely, that's
20 usually where I put it.
21     Q.  Okay.  And how does that get activated, and
22 what's the range; do you know?
23     A.  I believe you could hit it a couple of times
24 to activate it, depending on where you are.  I know a

Page 46

1  lot of times, it would vibrate where it would be out of
2  range.  So I would say probably a couple houses down,
3  maybe a couple hundred feet.
4      Q.  I ask you this because I'm not aware of any
5  audio that's depicted from you or the other three
6  defendant officers in this case.  So I guess my question
7  is, is there a reason why you didn't activate that audio
8  device?
9      A.  It's possible that it wasn't on me at the
10 time.  Like I said, typically I would wear it on my
11 right shoulder, on my lapel.  But it's possible it was
12 also up in the charging port since I was just not going
13 from the -- going from the station for roll call, you
14 put it up to charge it.  But it wasn't activated at the
15 time, so I couldn't give you a good answer to that.
16     Q.  Is it required that you wear it on your body
17 when you are interacting with citizens just like a
18 body-worn camera?
19     A.  I don't know if it was required.  You would
20 have to look at policy for that.  I don't know.
21     Q.  I'm asking you if you know there was a policy
22 that addressed that.
23     A.  I don't know if there was.  That's why I'm
24 saying if you want to know specifically, you would have

Page 47

1  to go to the policies.
2      Q.  Have you ever turned it on before?
3      A.  I believe I probably have.
4      Q.  In the several years that you worked there,
5  how often did you turn it on?
6      A.  I wouldn't know.  I would have to go back into
7  every single one of my videos to see if it was
8  activated.
9      Q.  You could give me an estimate if you know.
10 For example, did you turn it on most of the time or
11 infrequently or frequently?  Can you give me an idea?
12     A.  Typically, when the car turns on -- when the
13 dash cam is on, it would activate it.  Unless it was
14 activated by a dash camera, I wouldn't have it on unless
15 I remembered to turn it on itself.  And I know there are
16 a few of them in certain quads that it didn't activate
17 when you hit it, so it just wouldn't sync up for some
18 reason.  So if you would try to turn it on, some of them
19 would not; but that night, I don't remember even
20 attempting to activate it.  So I don't know if it was on
21 my body at the time.
22     Q.  But if it's working properly, it either gets
23 activated by the squad camera being activated or you
24 manually pressing it, correct?

14  (Pages 44 to 47)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 48

1    A. Correct. And as far as manually activating
2  it, I don't know -- at the most, I might have done it a
3  handful of times.
4    Q. Did you ever activate your in-car camera
5  system that night?
6    A. That night, no.
7    Q. Why not?
8    A. It was an alarm, a holdup alarm call for that
9  specific call. And I'm not going to go lights and
10  sirens on an activated holdup alarm to cause panic. So
11  drive there, park, strategically enter, and figure out
12  what we got.
13    Q. We'll get to that in just one second. I just
14  have a couple more background.
15    Did you have any particular assignment that
16  day; that is, any -- was there a roll call and were you
17  assigned to do a particular task that day?
18    A. I don't know about any particular tasks.
19    Q. Did you have a roll call?
20    A. We were in the middle of roll call when this
21  call came out.
22    Q. What did roll call consist of, you physically
23  being in the station or what?
24    A. We have a roll call room with chairs and

Page 49

1  desks. Typically, you go over the -- you would start
2  out with whose zone is where or who's working which
3  zone; and then any major incidents that occurred, if we
4  had follow-ups to do, just that relayed to us for
5  anything critical that needed to be passed on.
6    Q. Do you recall anything being talked about at
7  roll call?
8    A. I don't remember roll call lasting very long
9  because of this call.
10    Q. You said you started at 7:00. So I assume
11  your roll call is at 7:00 or no?
12    A. No. Roll call was at the shift change itself.
13  At 7:00 o'clock, I'm already midway through the
14  afternoon shift. So I don't go to roll call. I just
15  simply go on duty and I'm told which zone I'm working.
16  And if there's anything specific at that point, they
17  would tell us.
18    Q. Who was your direct supervisor that night?
19    A. Commander Barr was the afternoon, and then
20  Officer Atwell was the OIC that night. So he would have
21  been the one for that night because Officer Barr was
22  coming off shift.
23    Q. And this incident began more or less during
24  the transition between the two supervisory shifts,

Page 50

1  right?
2    A. Yes.
3    Q. Okay. How did you first become aware of an
4  incident happening at Thorntons that night?
5    A. So I knew there was a previous incident
6  throughout the night because I was working overtime and
7  Officer Bertholomey was dispatched to a call at
8  Thorntons. He handled the call itself. The person at
9  the time, which now we know was Abel, was no longer at
10  the Thorntons when he arrived. And the clerk Antwan
11  advised him of just an incident that was going on and
12  that he was unwanted there. And Bertholomey knew more
13  about the situation, like we briefly talked about it,
14  about the previous situation that was basically just he
15  was an unwanted subject at Thorntons and if he came
16  back, Antwan was looking at pursuing charges for
17  harassment.
18    Q. Thank you. I will stop you there. I want to
19  backtrack for a second.
20    How did you find out this information?
21    A. I was on duty when a call from Thorntons came
22  on. So naturally I'm curious about what happened since
23  it was an unwanted subject and something that I can take
24  with me for midnight shift to see if something

Page 51

1  continued. And it appears that the situation resolved
2  itself with Abel leaving at the time. And we were under
3  the impression that it was probably over with, at least
4  for the night, but then that's when we got the holdup
5  alarm at the Thorntons. And you put one and one
6  together, doing this enough years, and you assume that
7  it's probably the same person. And Antwan would never
8  hit the holdup alarm when he was working. We knew there
9  was something a little more urgent than the false holdup
10  alarms that some of the clerks would do.
11    Q. Okay. So did you actually go to the Thorntons
12  during this initial call?
13    A. I believe I was en route to it just to assist
14  if needed; but the call was handled quickly from what I
15  remember, and I never had to go there. So that's why I
16  asked Bertholomey what it was all about, just to see if
17  there was anything else to follow up on.
18    Q. And Bertholomey told you about what happened
19  then; is that what you are saying?
20    A. Yes. He said there was an issue with some guy
21  but he already left.
22    Q. And where did you talk to him? Was it, like,
23  in the parking lot of Thorntons or somewhere else?
24    A. It was probably just meeting up somewhere

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 52

1    else. Probably a random parking lot.
2        Q.   About how long did you talk to Bertholomey
3    about it?
4        A.   It wouldn't have been long. Probably just a
5    few minutes at most just going over that it was not a
6    big deal, the guy left, and the problem was over.
7        Q.   Do you recall about what time that initial
8    call came out?
9        A.   I would have to go back, but it would have
10   been after 7:00 o'clock since that's when I came on
11   duty.
12       Q.   It's my understanding it happened around
13   10:30. Does that sound about right?
14       A.   It could have been.
15       Q.   Do you recall anything of note happening
16   between 7:00 p.m. and that first call?
17       A.   Nothing that sticks in my mind.
18       Q.   Okay. So is it fair to say, then, shortly
19   thereafter, you heard about another call?
20       A.   While at roll call with the holdup alarm, yes.
21       Q.   How did you become aware of the holdup alarm?
22       A.   Our communications center relayed over the
23   radio that we had a holdup alarm at Thorntons. You'd
24   have to go back to the audio to listen to what they say;

Page 53

1    but it's probably to the effect that, We have a holdup
2    alarm at Thorntons, any available unit. Because at roll
3    call, we are taking different roles and they want to
4    know who's working the zones and who to dispatch there.
5    But since it was an urgent call, they wanted to make
6    sure that we were aware that it was going on and for us
7    to just go and then we will advise when we are en route,
8    who we are.
9        Q.   So is it your recollection you got this
10   information about a holdup alarm while you were at roll
11   call at the station?
12       A.   Yes.
13       Q.   Who else was with you at the station when you
14   heard about this holdup alarm?
15       A.   That would have been probably the majority of
16   the afternoon shift along with our midnight guys. So
17   me, Officer Scheithe, and Officer Atwell. And then I
18   know Officer Bertholomey was there because he
19   volunteered to go to the call since he already had an
20   idea of what was going on; and since I was already
21   ready, both of us were the primary officers that
22   responded.
23       Q.   Was it your understanding that Bertholomey's
24   shift was just about to end but he agreed to go back

Page 54

1    there anyways?
2        A.   Their shift would end at 11:15. So he would
3    have had enough time to assist, do whatever needed to be
4    done; and then if there was paperwork or anything that
5    would take time, us midnight officers would have handled
6    that aspect of it.
7             But as far as a holdup and everything, since
8    he was already ready, he was being a good officer and
9    not just taking the last 30 minutes of his shift off,
10   basically. So he was willing to work; and it ended up
11   with me and him going quickly, quicker than if the other
12   officers had to get in their cars and get ready.
13       Q.   So is it fair to say that you and him agreed
14   to respond to this call, as in you notified dispatch and
15   he notified dispatch that you were going to go?
16       A.   Yes.
17       Q.   And did you receive any more information about
18   the nature of the call besides there being a holdup
19   alarm at the Thorntons?
20       A.   They might have. I don't know if it was
21   Antwan who told us or if it was dispatch. But someone
22   said that there was basically someone in the bathroom.
23   I believe it was Antwan who told us when we showed up,
24   but it possibly could have been dispatch if Antwan

Page 55

1    relayed it to them. I don't know if he spoke with
2    dispatch at that time or if it was just an alarm.
3        Q.   Would you say it was unusual to have a holdup
4    alarm at the Thorntons?
5        A.   Not unusual; but when Antwan was working, it
6    was unusual. There were some who would trip it on
7    accident; but to my knowledge, Antwan has never tripped
8    it before that. It was unusual for him to have to go
9    off while he was working. And there were some other
10   clerks who were scared who didn't work in Round Lake
11   Beach, they worked elsewhere, and they got scared when
12   the normal clientele would go in there that they didn't
13   feel comfortable with.
14       Q.   But it was your experience that Antwan wasn't
15   one to just quickly push the button?
16       A.   Correct.
17       Q.   So how long did it take you to get there; that
18   is, from the station to the Thorntons?
19       A.   Get downstairs, get in the car, so probably
20   less than two minutes.
21       Q.   To the best of your recollection, you didn't
22   do any other tasks; that is, go on the computer or talk
23   to anyone else before you went?
24       A.   At the time it was just go to the call and

16  (Pages 52 to 55)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 56

1 figure it out as we get there. And with Bertholomey
2 already responding, he had an idea of what was happening
3 more than likely. So there was no reason to even try to
4 talk to anybody.
5 **Q. And I believe you said you went without lights**
6 **and sirens, correct?**
7 A. Yes.
8 **Q. And you said more or less because it's better**
9 **to be covert in a situation like this?**
10 A. Yes.
11 **Q. Why is that?**
12 A. If you have somebody actually holding up the
13 store and you alert them, you may end up with people
14 shot.
15 **Q. Where did you park when you got there?**
16 A. We came up off of Orchard. I parked facing
17 Thorntons. So I was facing westbound after I just
18 pulled into their parking lot from the east. So I came
19 down, made a right, and parked next to the curb facing
20 the store itself. So I was facing the front door in the
21 parking lot just off of Orchard.
22 **Q. And you did that on purpose, correct? You**
23 **parked over there for a reason?**
24 A. Yes. So if there was anything that happened

Page 57

1 outside of the store, if someone was to run out, we
2 could always go -- play an after-the-fact to try to
3 capture someone on video if needed. But that was to
4 keep me out of eyeshot of someone in the store to not
5 alarm them that we were -- that police were already
6 there.
7 **Q. I understand the desire to keep it covert to a**
8 **certain extent, but wouldn't you want at least one squad**
9 **to have their camera running in the event that something**
10 **happens near the front of the store where you're**
11 **entering?**
12 A. If you have time to think about it, yes. But
13 at the same time, we were worried about just getting
14 there. And I know that our cameras have after-the-fact
15 playback. So it wasn't something that I would think of
16 other than just make sure that we get inside. I'm not
17 worried about a video from the outside when stuff
18 happens inside. But it was just a way of positioning
19 that I thought was good at the time.
20 **Q. I mean, when you first heard about the panic**
21 **alarm, what did you think? What was going through your**
22 **mind?**
23 A. That there was probably a fight inside or
24 possibly the person came back and continued their

Page 58

1 threats.
2 **Q. And had you been there for that type of**
3 **situation before, that is a panic alarm at that gas**
4 **station and there was a fight inside?**
5 A. I don't know if there was a panic alarm, but
6 typically we would get a phone call that there was a
7 fight inside. But every once in a while, we would get
8 the panic alarms; but the majority of time, it was just
9 a clerk calling that there was --
10 **Q. How about a robbery or armed robbery? To the**
11 **best of your recollection, did you ever respond to that**
12 **at the Thorntons?**
13 A. No. There were no armed robberies while I was
14 working at Thorntons.
15 **Q. Okay. So you and Bertholomey went in separate**
16 **vehicles to the Thorntons, correct?**
17 A. Yes.
18 **Q. Who got there first; do you know?**
19 A. He might have got there first. Whoever pulled
20 out of the parking lot first got there first. I
21 couldn't tell you.
22 **Q. You just parked your vehicle on the east side**
23 **of the property; is that what you said?**
24 A. Yes.

Page 59

1 **Q. Near Orchard, you said?**
2 A. Yes. I pulled right off of Orchard. So the
3 back of my car was close to Orchard but in the parking
4 lot.
5 **Q. And what did do you then?**
6 A. Walked inside the store with Bertholomey.
7 **Q. And what did you notice when you first got to**
8 **the store?**
9 A. Antwan was highly upset, which was unlike him.
10 And as we were ready to ask him what happened or what's
11 going on to try to get a grasp of the entire situation,
12 he said he was in the bathroom and then he came out,
13 which would be Abel. Abel continued the confrontation
14 being threatening towards Antwan. At that point Antwan
15 wanted him arrested for the harassment and for the
16 threats.
17 **Q. Did Antwan tell you the name Abel?**
18 A. No.
19 **Q. How did he refer to him?**
20 A. He referred to him as "the guy." Like he
21 pointed him out as the only one coming out of the
22 bathroom, specifically pointed -- or made suggestion
23 that the person who was right there in our presence was
24 the one who was the person that he wanted arrested.

17 (Pages 56 to 59)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 60

1    Q.  By the way, did Bertholomey tell you that this
2    is -- when he talked to you about that first incident,
3    you said you talked to him briefly about the first call,
4    did he tell you it was over a dispute over a skateboard
5    or something like that?
6        A.  Afterwards, yes.  But before that, I just knew
7    that he was an unwanted subject and that was it.  As far
8    as the skateboard, I believe that was something that I
9    found out about after the fact.
10       Q.  Okay.  So the first thing you do when you
11   enter is talk to Mr. Stanley; is that right?
12       A.  Yes.  As we briefly speak with him, that's
13   when Abel popped out of the bathroom, or at least the
14   area of the bathroom, and Antwan pointed him out to us.
15       Q.  You said he was excited or agitated and that's
16   unlike him.  Was he swearing or using words like that?
17       A.  I can't say that he was swearing, but it's
18   possible.
19       Q.  And he told you that the person was in the
20   bathroom, correct?
21       A.  Yes.  He said he was in the bathroom; and then
22   after just a couple of seconds, he was already out of
23   the bathroom.
24       Q.  Okay.  And how did you know that that was the

Page 61

1    subject, that Abel was the suspect when he walked out of
2    the bathroom?
3        A.  Because he was the only one there and in that
4    direction where Antwan pointed him out, and he
5    identified him specifically.
6        Q.  Are you saying that Antwan said "that's him"
7    when he came out of the bathroom?
8        A.  Yes.
9        Q.  Okay.  And what did you do then?
10       A.  Tried to get him to calm down.  He wouldn't
11   calm down.  And when Antwan said he wants him arrested
12   or just wanted him out, he wanted charges originally.
13   He wouldn't listen.  So he was placed in handcuffs.
14   Abel continued to go in his pockets.  For officer safety
15   reasons, we put him in handcuffs, detained him for the
16   crime itself until we got further from Antwan.
17       Q.  You said he continued to go into his pocket.
18   Did you see Abel go into his pocket?
19       A.  Yes.  He continued to put his hands in his
20   pockets, and we don't know the situation.  We don't
21   know if there's a weapon involved or not, with both of
22   them being agitated and being upset with each other and
23   already having charges on him, if Antwan continued to
24   pursue charges after the fact.  We detained him for the

Page 62

1    disorderly conduct, harassment, whatever Antwan was
2    looking to do, and escorted him outside.
3        Q.  As Abel exited the restroom, what did you
4    notice, if anything, about him?
5        A.  He was very agitated, yelling, screaming.
6        Q.  Abel was?
7        A.  Yes.
8        Q.  What was he screaming and yelling?
9        A.  Towards Antwan.  He was just yelling
10   obscenities towards Antwan.
11       Q.  Was Antwan yelling back?
12       A.  At some point he began yelling back.  There
13   was just an issue between the two, obviously.
14       Q.  Was it words to the effect of, like, fuck you
15   and fuck you, or something like that?
16       A.  Could be.  I don't recall the actual words, so
17   I'm not going to say yes or no.  But it very well could
18   have been since it was a heated argument.
19       Q.  When you heard Abel speak, did he appear, to
20   you at least, to have difficulty speaking in any way?
21       A.  No.
22       Q.  Physically, did you see him do anything as he
23   was walking out of the restroom?
24       A.  No.  He was just standing with his hands in

Page 63

1    his pockets yelling.
2        Q.  What pockets?
3        A.  I believe it was his hoodie pocket or like a
4    sweatshirt of some sort.  I couldn't recall exactly
5    without seeing the video.
6        Q.  Do you know if he had one or both hands in his
7    hooded sweatshirt pockets?
8        A.  I can't recall whether it was both or just
9    one.  I know his right hand kept going into it.  He
10   wouldn't listen and Bertholomey was kind of nervous
11   about that, so we put him in the handcuffs.
12       Q.  Did you notice him go into his pocket more
13   than once with his right hand?
14       A.  Yes.
15       Q.  How many times did you notice?
16       A.  It would have been at least twice.  We went
17   in, told him to take his hands off, he took them out, he
18   was yelling at Antwan, put his hands back in his pocket.
19   At that point we don't know his reasoning is.  So
20   just to be safe, we all tried to de-escalate the
21   situation as much as possible with the issue at hand.
22   And that's why we escorted him out.
23       Q.  Besides putting his hand into his pocket and
24   yelling as you described, did you notice anything else

18  (Pages 60 to 63)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 64

1 about Abel that he was doing or saying?
2     A. No.
3     Q. When he put his hand in his pocket several
4 times, as you described, were you concerned that he had
5 a weapon?
6     A. It's always in the back of your mind, that he
7 possibly does have a weapon. And with him being this
8 agitated, you never know how someone is going to react
9 and if you wait too long, you are dead. So instead of
10 waiting until we were dead, we made sure that we
11 de-escalated as much as we could and made it safe for
12 everybody.
13     Q. When he put his hand into his pocket, did you
14 suspect he might have narcotics?
15     A. No.
16     Q. When you noticed Abel going into his pocket,
17 did you draw your Taser or gun?
18     A. No.
19     Q. Did you notice if Officer Bertholomey did?
20     A. I don't remember if he did or not. There was
21 nothing pointed at him if he did.
22     Q. Did you give any orders or commands to Abel?
23     A. Just to remove his hands from his pockets and
24 put his hands behind his back.

Page 65

1     Q. Did he do that?
2     A. Yes.
3     Q. Do you recall what he was wearing?
4     A. I believe it was like a black hooded
5 sweatshirt and jeans, but I would have to see the video
6 to see what he was actually wearing.
7     Q. When was the last time you saw that
8 individual?
9       That is, first of all, have you ever seen the
10 inside of the Thorntons video?
11     A. I don't believe I have seen the inside. If I
12 have, I can't remember it.
13     Q. Did Abel to resist the handcuffing in any way?
14     A. No.
15     Q. Was he placed under arrest?
16     A. Yes.
17     Q. For what?
18     A. Disorderly conduct.
19     Q. Do you know what the definition of disorderly
20 conduct is in Illinois?
21     A. Alarmed and disturbed the public, which would
22 be Antwan, in a public place.
23     Q. Did you arrest Abel before you spoke to him
24 about what was going on?

Page 66

1     A. He was arrested and detained at that point,
2 yes. He didn't want to speak with us, so he was
3 detained with those charges.
4     Q. Well, did you try to speak to him?
5     A. Yes. He was just yelling at Antwan.
6     Q. Well, I'm asking did you try to speak to him.
7 Did you say anything to him to try to speak to him?
8     A. Yes.
9     Q. What did you say?
10     A. Can you tell us what's going on, and he just
11 yelled over us to Antwan. It was almost like we weren't
12 there. Since he wouldn't speak with us, that's -- we
13 weren't going to get his side.
14     Q. Abel was handcuffed behind his back?
15     A. Yes.
16     Q. You did the handcuffing?
17     A. Yes.
18     Q. Do you know if Abel had a mask on or not?
19     A. I can't recall if he did or not.
20     Q. And, again, just to be clear, when you heard
21 him yelling at Antwan, he didn't appear to have any
22 difficulty yelling or speaking at that point?
23     MR. MATHUES: Objection to asked and answered.
24       Go ahead, Tim.

Page 67

1 BY THE WITNESS:
2     A. Yes. He had no difficulty.
3     Q. And after you handcuffed him, did you search
4 him in the Thorntons?
5     A. No.
6     Q. Why not?
7     A. I was getting him out of the situation to try
8 to de-escalate it where I would do a pat-down outside.
9     Q. Well, were you concerned that he might have a
10 weapon on him?
11     A. It's always possible, but I knew at that point
12 he wasn't going to be able to easily access it with his
13 hands behind his back.
14     Q. Okay. After you handcuffed him, what did you
15 do?
16     A. Walked him outside, made a left. And when we
17 got out of the front doors, we started escorting
18 him -- Officer Scheithe was there at the time, so I
19 escorted him with Officer Scheithe towards my squad car.
20     As we were going towards our car, Abel's
21 girlfriend came out of the car, was clearly upset
22 wondering what's going on. And Abel said, Call George;
23 everything will be okay. She went back to the car, and
24 we brought him to my car.

19 (Pages 64 to 67)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 68

1    Q. When you got outside, you were approached by a
2 female, you said?
3    A. Yes.
4    Q. Did you know who that was when she approached
5 you?
6    A. No. I just assumed it was his girlfriend at
7 the time because they were together.
8    Q. How do you know they were together?
9    A. She knew who he was and he talked to her.
10   Q. He said something about George, you said?
11   A. He said, Call George; he will know what to do.
12   Q. Did you have any idea who that was?
13   A. No.
14   Q. To this day, do you know who George is or
15 allegedly is?
16   A. I always assumed it was some other person, but
17 I don't know for sure who exactly it is.
18   Q. To your knowledge, did Antwan ever go by
19 George?
20   A. Not to me.
21   Q. Do you know what Antwan's middle name is?
22   A. No.
23   Q. Did you ever hear anybody call Antwan a
24 nickname?

Page 69

1    A. Just Twan or Twanie, I think.
2    Q. When Abel was saying, "Call George," to his
3 girlfriend, to your knowledge, was he able to speak
4 clearly?
5    A. Yes.
6    Q. Is it fair to say that you now know this
7 woman's name to be Sinahy Gomez Reyes?
8    A. That's what I believe it is. I've still never
9 spoken with her. So if that's what was on this, that's
10 what her name is.
11   Q. So she briefly talked and then went back to
12 the car she came from; is that what she said?
13   A. Yes.
14   Q. And you proceeded to walk Abel towards your
15 vehicle, correct?
16   A. Yes.
17   Q. You are escorting with Officer Scheithe,
18 correct?
19   A. Yes.
20   Q. What side were you on; do you recall?
21   A. Right side.
22   Q. Did Abel resist your efforts to escort him to
23 your squad?
24   A. No.

Page 70

1    Q. And then what happened?
2    A. We got to the back right door of my squad car
3 where I proceeded to do a pat-down search of him since
4 he was going to be placed in the squad car. As I
5 started doing the pat-down going towards his right leg,
6 he attempted to break free and run eastbound.
7    Q. And did he, in fact, run and he was handcuffed
8 behind his back, correct?
9    A. Yes.
10   Q. Did you lose grasp of him?
11   A. Momentarily.
12   Q. And what did you do?
13   A. Ran after him and got ahold of him after that.
14   Q. Did Scheithe run after him?
15   A. Scheithe was with him the entire time, and he
16 had a grasp the entire time.
17   Q. Okay. Did Abel make it into the street?
18   A. Yes.
19   Q. That was Orchard, you said?
20   A. Yes.
21   Q. How far did he make it?
22   A. Close to about in the middle of the 4lane,
23 probably the left-turn lane going southbound. So more
24 middle of the road.

Page 71

1    Q. And what happened when he reached the middle
2 of the road?
3    A. We took him down to the ground to try to
4 figure out what was going on, get a grasp of him. We
5 then brought him back up to his feet, walked him over
6 to the curb on the shoulder, which was a grassy area, and
7 placed him back on the ground in a controlled manner
8 until he could talk to us.
9    Q. When you say, We took him to the ground --
10 that is, in the street -- who is the "we"?
11   A. Officer Scheithe and I.
12   Q. Okay. And to your knowledge, had Atwell and
13 Bertholomey arrived -- that was a poor question. Sorry.
14 Let me repeat.
15      You and Scheithe took him to the ground in the
16 street, correct?
17   A. Yes.
18   Q. And at that moment or near that time, did you
19 notice Atwell and Bertholomey near you?
20   A. I'm not sure if Bertholomey was near me, but I
21 believe Atwell said, Let's bring him to the grass. So
22 we picked him up, brought him to the grass, walked him
23 over there, placed him back down to try to figure out
24 what was going on, why he was trying to run. And while

20  (Pages 68 to 71)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 72

1  we were walking back, I tripped over one of his shoes
2  and at that point, I was on his left side.
3     **Q. How was Abel taken to the ground in the**
4  **street?**
5     A. The same way, just lowered him down. Just a
6  controlled takedown.
7     **Q. More specifically, what do you mean "lowered**
8  **him down"?**
9     A. His body was lowered to the ground. Like
10  there was nothing -- there was no hard takedowns. We
11  had him off-balance and he went down to the ground on
12  his knees and then onto his stomach.
13     **Q. There are several ways one can go to the**
14  **ground. I mean, clearly, one can just voluntarily go**
15  **and flop to the ground themselves or they can be pushed**
16  **or pulled or tripped. How would you describe him going**
17  **to the ground?**
18     A. More willingly, but off-balance.
19     **Q. Officers are allowed to use force on people**
20  **who run away from them, correct?**
21     A. Yes.
22     **Q. And you have been trained it's okay to take**
23  **somebody to the ground, correct?**
24     A. Yes.

Page 73

1     **Q. So it's okay if you tell me. I mean, did you**
2  **push him a little bit? Did you trip him a little bit?**
3  **Did you pull him a little bit? Are you telling me he**
4  **literally just stopped and decided to flop down on the**
5  **ground by himself?**
6     A. He was lowered with him off-balance. So his
7  feet were under him, behind him as he started getting
8  lowered down. As he is being lowered down with his
9  shoulders, it's controlled to make sure that he doesn't
10  slam the ground.
11     **Q. Okay. So you pushed on his shoulders a little**
12  **bit, right?**
13     A. It would be controlled, yeah.
14     **Q. Now, I understand it would be controlled, but**
15  **I'm just trying to figure out what you physically did.**
16  **Is it your recollection that you pushed on his shoulders**
17  **a little bit so that he went to the ground?**
18     A. And his upper body would have been pushed
19  towards the ground.
20     **Q. Okay. And what part of his body hit the**
21  **ground?**
22     A. It would have been his knees and lower body
23  and then his chest.
24     **Q. And it was you and Officer Scheithe doing this**

Page 74

1  taking to the ground, so to speak, correct?
2     A. Yes.
3     **Q. And what position was Abel on the ground in?**
4     A. Prone.
5     **Q. Prone. Okay.**
6     **How long was he in the prone position on the**
7  **ground?**
8     A. A few seconds.
9     **Q. After a few seconds, what happened?**
10     A. Again, I believe Officer Atwell said, Hey,
11  bring him to the grass. So we bring him up, get him up
12  to his feet, walk him over to the grassy area, and
13  placed him down again while we figured out what he was
14  doing and why he was doing it.
15     **Q. Is the grassy area next to the street?**
16     A. Next to the street and next to the squad car.
17  So it would have been the northeast part of the parking
18  lot. There's a sidewalk and then the grassy shoulder.
19     **Q. So there's the street, there's a curb, there's**
20  **a sidewalk, and then there's a grassy area, correct?**
21     A. Yes.
22     **Q. While he was running, did you say anything?**
23     A. Not that I know of. I just went and ran and
24  assisted him in getting him back.

Page 75

1     **Q. Did you hear any other officers say anything**
2  **while he was running?**
3     A. No.
4     **Q. How about while you were in the street with**
5  **him? Did you or Abel say anything?**
6     A. I don't believe so.
7     **Q. Did you hear any other officer say anything**
8  **while he was still in the street?**
9     A. That's where I believe Atwell told us it might
10  be a good idea to get out of the street. But that's all
11  I remember. Someone said that.
12     **Q. Did you say you tripped over one of Abel's**
13  **shoes?**
14     A. Yes.
15     **Q. At what point?**
16     A. While walking him back to the grass after the
17  original takedown.
18     **Q. Where was the shoe?**
19     A. Somewhere in the roadway.
20     **Q. Do you recall what type of shoe it was?**
21     A. Sneaker.
22     **Q. Do you know how he got out of that shoe?**
23     A. I assume he kicked it off. I don't know.
24     **Q. So he was brought back to the grass by you and**

21  (Pages 72 to 75)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 76

1  Scheithe?
2      A. Yes.
3      Q. And did he go back to the ground at that point
4  then?
5      A. Yes.
6      Q. How?
7      A. The same way we originally took him down,
8  controlled. Just placed him down on his chest in the
9  prone position.
10     Q. You used a controlled pushed on his shoulders
11  to push him down towards the ground, you said?
12     A. Yeah, you can explain it that way.
13     Q. Well, I don't want to put words in your mouth.
14  Let me just say this: I know you said you did a
15  controlled -- you took him to the ground in a controlled
16  manner, and I appreciate that. I'm just trying to find
17  out more specifically, on the grass here, how did you
18  specifically take him to the ground on the grassy area?
19     A. It would have been the same manner, just get
20  him off-balance and lower him down.
21     Q. And was he in the prone position on the grassy
22  area?
23     A. Yes.
24     Q. Why was he placed back on the ground in the

Page 77

1  grassy area?
2      A. At this point he was squirming a little bit
3  and still trying to escape, I guess you could say.
4      Q. What do you mean by squirm?
5      A. His shoulders were still moving and he wasn't
6  as compliant at that time walking with us. So instead
7  of just walking him over, we believed it was best to
8  lower him back down and get him to settle down enough to
9  start cooperating again.
10     Q. Did you put any of your body weight on him
11  while he was prone on the grass?
12     A. No.
13     Q. Did any officer?
14     A. No.
15     Q. So you are saying that he was just placed on
16  the ground prone on the grass and nobody touched him?
17  MR. MATHUES: Objection to the extent it
18  mischaracterizes testimony and calls for speculation.
19  BY THE WITNESS:
20     A. When he is placed on the ground, we still have
21  control of him with his hands on him; but as far as body
22  weight on him, no.
23     Q. Where are your hands on him at that point?
24     A. They would be towards the shoulder or left

Page 78

1  side.
2      Q. You were on his left side then?
3      A. At that point, yes.
4      Q. And it's your recollection that you were
5  touching his shoulder?
6      A. If I was having contact with him, it would
7  have been on his shoulder or his left side.
8      Q. You don't recall specifically if you were
9  having contact with him at that point?
10     A. No.
11     Q. Do you recall if any other officer was having
12  contact with him at that point?
13     A. No.
14     Q. Did you say anything to him while he was in
15  that position?
16     A. At some point within a few seconds, I asked
17  him if he was done. And he said yes at that point. I
18  gave a little double tap on the shoulder, like, okay,
19  let's get him up. And we assisted him back to his
20  feet.
21     Q. Did you hear any other officer say anything to
22  him while he was in that position; before he got on his
23  feet, that is?
24     A. I can't recall.

Page 79

1      Q. How long was Abel in the prone position?
2      A. I would less than 30 seconds.
3      Q. And do you recall where the position was of
4  the other officers when he was in that position?
5      A. Where the other officers were?
6      Q. Yeah. You said you're pretty sure you were on
7  his left side. Do you recall where the other officers
8  were while you were on Abel's left side and he was
9  prone?
10     A. If my memory is right, it would have been
11  Scheithe on his right side. Atwell would have been in
12  the grass coming over trying to figure out what was
13  going on. And Bertholomey, I can't remember if he was
14  still in the store at the time or if he was coming out
15  at the time. And then there might have been other
16  officers that were already en route. I don't know where
17  they would have been.
18     Q. Okay. So it sounds like after approximately
19  30 seconds, you asked him, Are you done, or words to
20  that effect. And he said, Yes. And then you helped
21  pick him up?
22     A. Yes.
23     Q. And then what did you do?
24     A. Put him back over in the original position,

22  (Pages 76 to 79)

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 80

1   back to the squad car, started to do a pat-down search
2   on him again to make sure it was all good. His
3   clothing, I believe he might have actually had shorts
4   on. But anyway, as we're getting down to his feet,
5   Bertholomey mentioned something about he is trying to
6   kick his -- he was, like, manipulating his sock with his
7   foot.
8       Q. So what side are you on when you are trying to
9   do the pat-down again?
10      A. I was on the left side.
11      Q. And Scheithe was on the right side?
12      A. I don't recall if Scheithe was on the right
13  side or not at this point. I believe he was. And I
14  believe Bertholomey approached at that time because he
15  noticed something that we didn't notice.
16      Q. And you said Bertholomey said words to the
17  effect of, He is trying to get out of his shoe or sock?
18      A. He was kicking his feet. Like he was trying
19  to do something with his foot or with his sock. So he
20  was manipulating his right foot area. It was just odd.
21      Q. Did you look down at his feet -- that is,
22  Abel's feet -- when you heard that?
23      A. No. Bertholomey came up and started assisting
24  with the pat-down and trying to figure out what it is

Page 81

1   himself. And at that point, Bertholomey got kicked in
2   the chest.
3       Q. He got what?
4       A. Kicked in the chest by Abel.
5       Q. So at this point you and, you believe,
6   Scheithe are on either side of Abel, correct?
7       A. Yes.
8       Q. And Abel is facing your squad at this point?
9       A. Yes.
10      Q. Is he touching the squad? That is, is his
11  body touching the squad?
12      A. Probably. It would have been up on it or
13  close to it.
14      Q. Okay. And Bertholomey, you remember, comes
15  over and says something about his foot or shoe, correct?
16      A. Right. He was doing something with his feet.
17      Q. And you didn't look down to see that what was
18  at that moment, right?
19      MR. MATHUES: Objection.
20      BY THE WITNESS:
21      A. I don't recall.
22      Q. But you do recall Abel kicking Bertholomey; is
23  that what you are saying?
24      A. Yes.

Page 82

1       Q. How did he kick him? As in describe to me
2   what happened.
3       A. Like a donkey kick. He was facing the squad
4   car. Behind him, takes his right foot and kicks at a
5   90-degree angle just like a donkey or mule would kick.
6       Q. Where did he hit Bertholomey?
7       A. It appeared to be in his chest or stomach
8   area.
9       Q. How many times did you see that? Once or
10  more?
11      A. I noticed one time, and then he was taken back
12  to the ground.
13      Q. You and Scheithe, most likely?
14      A. Most likely, yes.
15      Q. And how did you take him to the ground?
16      A. At this point, since he was kicking, I believe
17  I might have taken his legs and lowered them with his
18  shoulder and leg back down to his chest.
19      Q. You are saying you believe you grabbed ahold
20  of one of his legs; is that what you are saying?
21      A. Right. If someone is kicking, I'm going to
22  grab them by their feet to stop them from kicking. So
23  that's probably how I did it; but without the video, I
24  couldn't tell you 100 percent.

Page 83

1       Q. It's not depicted in the video, to my
2   knowledge; and that's why I am asking you very
3   specifically, obviously.
4          So it's your recollection you grabbed on to
5   which leg?
6       A. It would have been the left leg.
7       Q. And then what did you do after you grabbed on
8   to his left leg?
9       A. Used his left arm, left leg, lower him to the
10  ground.
11      Q. What, if anything, did you notice Scheithe
12  doing?
13      A. Lowering him to the ground with me.
14      Q. And what part of Abel's body hit the ground?
15      A. His pelvis area and then his chest.
16      Q. And when he hits the ground, where
17  specifically is he? Can you describe what part of the
18  parking lot, grassy area, or street that you were at?
19      A. His head was near the right rear tire and
20  right rear door of my squad car. His chest was on the
21  concrete. His legs were over the curb. And then his
22  feet would have been towards the grass or in the grass.
23  I believe the top of his legs were on the concrete; and
24  it was like his knees and lower legs would have been on

23  (Pages 80 to 83)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 84

1  the curb or at the curb and the concrete, meaning the
2  parking lot.
3      Q.  I think you said this, but I just want to be
4  clear.  You noticed that he had one shoe off at least
5  because you said you tripped over it in the street,
6  right?
7      A.  Yes.
8      Q.  Okay.  So he is taken to the ground again.  Is
9  it fair to say that his head is near the rear passenger
10 wheel of your vehicle?
11     A.  Yes.  It would have been closer to that than
12 anything else.
13     Q.  And while you were at the vehicle -- that is,
14 right before the kicking happens and right after the
15 kicking happens -- are you saying anything or is Abel
16 saying anything?
17     A.  I can't remember.
18     Q.  Do you recall any other officers saying
19 anything during this time?
20     A.  No.
21     Q.  Is it possible they were saying things like,
22 Stop resisting, or words to that effect, but you just
23 don't recall as you sit here today?
24     A.  I'm sure, but I can't recall hearing anything.

Page 85

1      Q.  Is it possible that Abel was saying something
2  too but you just don't recall as you sit here today?
3      A.  Correct.
4      Q.  Do you have any recollection of hearing him
5  having any trouble speaking at this point; that is,
6  right before the kicking and right after the kicking?
7      A.  No.
8      Q.  Okay.  So now Abel is on the ground, as you
9  described.  What is the next thing you recall happening?
10     A.  As we were attempting to, basically, take care
11 of him and figure out why he is doing what he is doing,
12 and get him in custody and search properly, that's when
13 we hear voices and two people coming towards our way.
14 And two officers had to break off to make sure that the
15 scene was handled.  So we had basically an angry crowd
16 coming up to us, which ended being two people, making
17 the scene unsafe for us to continue with his detention.
18     Q.  Did you look up and see who those two females
19 were?
20     A.  Yes.  When I looked up, his girlfriend that I
21 noticed from the car had her camera -- her phone facing
22 us.  And the other one, later known as Shelby Brubaker,
23 continued to aggress towards us, would not listen to
24 commands to stay back, and then she had to be forcefully

Page 86

1  restrained by Atwell and Bertholomey, who had to break
2  off from our situation with the resisting.
3      Q.  So is it your recollection that when you first
4  looked up, you noticed both of these women together?
5      A.  Yes.
6      Q.  That is, you didn't see one of them arrive
7  before the other one?
8      A.  I knew the girlfriend was there already but
9  didn't notice the other one until she came up at the
10 scene.
11     Q.  And right after Abel was put on the ground, as
12 you described, and you first looked up, are you saying
13 that that's your recollection, that the girlfriend had
14 her phone out as if she was recording?
15     A.  Yes.  She was listening to orders, staying
16 back.  She just had her camera out.  So she was not an
17 issue at the time.  The only issue was Shelby Brubaker.
18     Q.  Do you recall what his girlfriend was saying,
19 if anything, while she was appearing to be recording?
20     A.  She was just hysterical, just yelling.  I
21 don't know what she was saying, just a lot of noises.
22     Q.  Do you recall what, if anything, Shelby
23 Brubaker was saying?
24     A.  Just more to the fact that you can't do that,

Page 87

1  you can't keep me back, and she didn't do anything
2  wrong.  Just very noncompliant.
3      Q.  And she was told to step back and she
4  wouldn't?
5      A.  Yes.
6      Q.  How close did she get to the three of you?
7      A.  Well, the girlfriend was at the sidewalk,
8  which we could do a distance on that if needed.  That
9  was only a few feet away.  So when they were both told
10 to stay back, I remember saying something where the
11 girlfriend is listening, she's fine, because I could
12 notice her.  But Shelby was the only one coming close.
13 So she was then probably within ten feet.  She was
14 quickly handled by Officer Bertholomey and Atwell making
15 sure that she didn't get too close to us.  Otherwise,
16 she would have been.
17     Q.  Bertholomey and Atwell dealt with
18 Ms. Brubaker, correct?
19     A.  Yes.
20     Q.  And you remained with Scheithe and Abel on the
21 ground?
22     A.  Yes.
23     Q.  Is it your recollection that you were on
24 Abel's left side when you were on the ground?

24  (Pages 84 to 87)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 88

1    A. Yes.
2    Q. And Scheithe is on the right then, correct?
3    A. Yes.
4    Q. And what were you doing with Abel on the
5    ground?
6    A. I was looking up at the scene, trying to
7    figure out and assess what's going on, why we have an
8    angry mob coming towards us and why there's yelling.
9    And my left hand was touching Abel on his left side
10   somewhere just to have physical contact to make sure he
11   is not doing anything where he is going to try to get up
12   and run. At that point my observations were looking
13   towards other threats that were going on at the time.
14   Q. You said your hands were on Abel's left side?
15   A. Yes. I was on his left side, so my hand would
16   have been in contact with his left side.
17   Q. As in the left side of his body, like the
18   torso-abdomen area; is that what you mean?
19   A. He was on his chest at the time. So probably
20   his lower back or left arm, something along those lines.
21   Wherever my body was positioned at the time would have
22   been where I likely would have been.
23   Q. Do you have a specific recollection of where
24   you were touching him on his body?

Page 89

1    A. No.
2    Q. So it would have likely been his left arm or
3    left shoulder area?
4    A. Right.
5    Q. And are you applying pressure to the left arm
6    or left shoulder area?
7    A. No. It's just physical contact to make sure
8    that if anything abruptly changed, I would notice.
9    Q. And what was the purpose of you being near
10   him? Strike that.
11   Were you on your knees? Were you crouched or
12   were you standing when you were next to Abel?
13   A. I would have been on my left or right knee
14   next to him.
15   Q. Did you ever place your knees on Abel?
16   A. No.
17   Q. Did you ever place both your hands on Abel
18   while he was prone on the ground in this position?
19   A. For the original takedown, yes. But while
20   he's prone, it would have likely been just my left hand
21   as my right hand would have had to be accessible for any
22   threat.
23   Q. But, again, you don't have a specific
24   recollection of where you were touching him. So you're

Page 90

1    saying it's likely you were touching him with your left;
2    but you just don't specifically recall, right?
3    A. Correct.
4    Q. Did you notice if Officer Scheithe was
5    touching Abel?
6    A. No, I don't know.
7    Q. Well, he was right next to you, was he not?
8    A. Yes. But I wasn't focused on him. I was
9    focused on the unknown threats.
10   Q. As an officer, you are trained to be aware of
11   all of your surroundings, correct?
12   A. Yes.
13   Q. Right. So you are not just staring at the two
14   women; you're also looking at Abel at some points,
15   correct?
16   A. At some point, I would glance down.
17   Q. Right. And at some point you would look to
18   your left; you'd also look to your right to make sure
19   there were no other threats around you, right?
20   A. Yes.
21   Q. You are doing your best to make yourself aware
22   of what's going on around you to keep yourself safe,
23   right?
24   A. Yes.

Page 91

1    Q. But you don't know more than right next to
2    you?
3    A. No. Scheithe is not a threat to me, so I
4    wasn't focused on him.
5    Q. So to be clear, you don't recall -- strike
6    that.
7    Is it fair to say that you believe you did
8    touch Abel while he was on the ground in the prone
9    position as you described, but you just don't recall
10   exactly where you touched him?
11   MR. MATHUES: Objection to asked and answered.
12   BY THE WITNESS:
13   A. I would have been touching his left side.
14   Q. And you believe that to be his left arm or
15   left shoulder area, correct?
16   A. It could be his left side itself, not the arm.
17   I don't know.
18   Q. And how long were you touching his left side?
19   A. Probably a matter of less than a minute.
20   Q. And what was the purpose of you touching his
21   left side?
22   A. Just to make sure I have physical contact in
23   case he tried to get up, I can apply force to keep him
24   down on the ground.

25 (Pages 88 to 91)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 92

1  Q.  You believe it was important to keep him on
2  the ground at that time?
3    A.  Until we knew what was going on around us,
4  yes.
5    Q.  Besides touching Abel on his left side for, I
6  believe you said, less than a minute, did you touch Abel
7  in any other spot?
8    MR. MATHUES:  Objection to form.
9  BY THE WITNESS:
10    A.  It's possible I would have touched his legs if
11  he was still kicking, but I don't remember if there was
12  anything else.
13    Q.  At some point while Abel is on the ground in
14  this prone position, as you described, did you hear
15  Officer Scheithe say anything to you?
16    A.  Yes.
17    Q.  What did you hear?
18    A.  I heard, Dude, he is chewing on his sock.
19    Q.  And did you then look and see that Abel was
20  chewing on his sock?
21    A.  Yes.
22    Q.  And what did you see?
23    A.  Officer Scheithe immediately took the sock
24  from him and placed him on, I believe, the trunk of my

Page 93

1  squad car.  It was either on the tire or on the trunk or
2  of my squad car.  But he removed it from there.  And at
3  that point I took off Abel's left sock trying to figure
4  out -- it's not very common that someone chews on their
5  socks.
6    Q.  Did you see the sock in Abel's mouth?
7    A.  I saw it at his face when Scheithe took it
8  away from him.
9    Q.  Which led you to infer that it was just in his
10  mouth?
11    A.  Well, if he's saying, He's chewing on his
12  sock, I would trust Scheithe's judgment that he was
13  chewing on his sock.
14    Q.  Do you recall what color the sock was?
15    A.  Black.
16    Q.  Do you know how long he had been chewing on
17  his sock?
18    A.  It would have been the brief time he was on
19  the ground while Shelby was approaching us.  So how
20  long, I don't know, but it would have been in that time
21  frame.
22    Q.  You never actually saw him chewing on his
23  sock, right?
24    A.  No.  I wasn't worried about what he was doing

Page 94

1  with his face while I was looking for threats.
2    Q.  But Scheithe was.  Do you know how he became
3  aware of it, what caused him to be aware of it?
4    A.  I don't know.  I can only assume.
5    Q.  Do you have any idea how that sock got near
6  Abel's mouth?
7    A.  Nope.  I only assumed that he manipulated it
8  from his foot.
9    Q.  Did you ever see him take off his sock with
10  one of his feet?
11    A.  No.
12    Q.  To your knowledge, was there a sock already
13  there; that is, at your squad car?
14    A.  I do not --
15    Q.  Strike that.  That was a bad question.
16    I mean, to your knowledge, was there a sock
17  already at your squad car before you initially arrived
18  with Abel at your squad car?
19    A.  No.  There was nothing noticed there.
20    Q.  So that led you to believe that that was
21  actually Abel's sock, then, correct?
22    A.  Yes.
23    Q.  I'm sorry.  Did you say that you then took the
24  sock and put it in top of your squad or Scheithe did?

Page 95

1    A.  Scheithe did.  And then I took his left sock
2  off of his foot at that time.
3    Q.  Why did you do that?
4    A.  Because it's not every day you get someone
5  chewing on their sock.  So since he was doing something
6  with his right sock, it was just a hunch that he might
7  have had something in his left sock also, and just to
8  make sure there was nothing there.
9    Q.  And did you suspect he had narcotics in his
10  left sock?
11    A.  At that point, it was a hunch that he had
12  something, but I didn't know what.
13    Q.  Had you ever seen somebody conceal narcotics
14  in one of their socks?
15    A.  Yes.
16    Q.  Had you ever seen someone conceal anything
17  else in their sock?
18    A.  A knife.
19    Q.  Did you have gloves on when you touched the
20  sock?
21    A.  Probably not.
22    Q.  Do you recall ever having gloves on that
23  night?
24    A.  I can't recall if I did or did not.

26  (Pages 92 to 95)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 96

1    Q.  Do you normally carry what they call rubber
2  gloves or Nitrile gloves?  Do you keep those in your
3  squad or on your person?
4    A.  At certain times, I do.  Typically, for drug
5  overdoses, I will put them on.  But other than that, I
6  had patrol gloves that are material gloves, but I don't
7  believe I wore them that night.
8    Q.  The gloves you normally have are leather or
9  something like that?
10    A.  Just like a material.
11    Q.  Just not like a thin plastic, right?
12    A.  Correct.
13    Q.  Before you heard Scheithe say, Dude, he is
14  chewing on his sock, did you hear Abel say anything
15  while he was on the ground?
16    A.  No.
17    Q.  Are you saying that he did not say anything or
18  you don't recall if he said anything or not?
19    A.  Well, I remember he was kind of quiet, didn't
20  really say anything, nothing specific in my mind.
21    MR. MATHUES:  Jason, I want to note for the record,
22  Officer Atwell, who has been present, is leaving the
23  room.  He's got to take off.  Officer Scheithe will
24  remain here the rest of the deposition.

Page 97

1    MR. MARX:  Okay.  Thank you, David.
2  BY MR. MARX:
3    Q.  How long was Abel on the ground by your squad
4  in the prone position, as you described, before you
5  heard Scheithe say, Dude, he's got a sock in his mouth?
6    A.  I believe it was no more than a minute, minute
7  and a half.
8    Q.  And what happened after the sock was placed on
9  top of your squad?
10    A.  That's when I took his left sock off of him
11  and Scheithe and I started to try to figure out what he
12  was doing.  And Scheithe inquired by asking him, Did you
13  swallow something?  And he shook his head yes.  At that
14  point we attempted to get him up to his knees and
15  started assessing him since he became the priority at
16  that time.
17    Q.  What did you do with the left sock that you
18  took off?
19    A.  I likely threw it in the same place the right
20  sock was, just over by the car.
21    Q.  How long after you took his left sock off did
22  Scheithe ask a question?
23    A.  It would have been a matter of seconds from
24  the time that he saw him chewing on the sock to me

Page 98

1  taking off his other sock and asking him if he swallowed
2  something because he appeared to have some -- he had a
3  look on his face that was worried -- like he was
4  worried.
5    Q.  When Scheithe asked him, Did you swallow
6  something?  And what did you say Abel did in response?
7    A.  He shook his head yes.
8    Q.  Did he say any words?
9    A.  No.
10    Q.  Did you see people choke on something before?
11    A.  I can't say I've seen someone in person choke
12  on anything, no.
13    Q.  And since this incident, you haven't either?
14    A.  No.
15    Q.  Did you believe he was choking on something?
16    A.  Yes.  He definitely had a worrisome look on
17  his face and he shook his head yes when Scheithe asked
18  if he swallowed something.
19    Q.  How would you describe worrisome?  What do you
20  mean?
21    A.  Wide-eyed, open mouth.
22    Q.  Did you look in his mouth?
23    A.  I believe we looked to see if we could see
24  something, but we didn't find anything.

Page 99

1    Q.  Did you personally look in his mouth?
2    A.  I can't say that I did.
3    Q.  You don't recall?
4    A.  Right.  It's possible, but I can't say that I
5  did 100 percent.
6    Q.  Do you recall if any other officer looked in
7  his mouth?
8    A.  Same thing.  I can't recall.
9    Q.  Did you have a flashlight on you?
10    A.  Yes.
11    Q.  Where did you keep it?
12    A.  I believe it was in my vest.  On my body
13  somewhere.
14    Q.  Was it working, to your knowledge, that night?
15    A.  Yes.
16    Q.  After Scheithe asked him, Are you choking on
17  something -- I'm sorry.  Did he say, Did you swallow
18  something?  What did Scheithe ask him again?  Sorry.
19    A.  He just asked him if he swallowed something.
20    Q.  Okay.  And Abel shook his head yes and he had
21  a worried look on his face.  What's the next thing you
22  recall happening?
23    A.  He was up on his feet.  We brought him back to
24  his feet to try to help him breathe.  He was having

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

---

Page 100

1  gasps of air, if I recall it correctly. He wasn't able
2  to speak. I believe that was when Scheithe started
3  doing upward thrusts, the Heimlich.
4      Q.  Let's take a step back.
5          While Abel was on the ground, his head was
6  positioned toward your rear passenger-side tire,
7  correct?
8      A.  Yes. His body was with his head that way.
9      Q.  Did you notice where his face was facing, so
10  to speak, as in was it facing the ground? Was it facing
11  up towards the tire? To the left? To the right? Do
12  you recall?
13     A.  Once Scheithe made a comment about him chewing
14  on his sock, that's when I noticed that his head was
15  towards the right, towards Scheithe.
16     Q.  How about prior to that; that is, prior to him
17  making the comment about the sock? Where was Abel's
18  face?
19     A.  I don't know what he was doing with it at the
20  time.
21     Q.  Have you ever heard of a problem sometimes
22  associated with babies in which it's technically
23  positional asphyxia where they are on their stomach,
24  that is prone, and their face is in the ground or the

---

Page 101

1  floor such that their nose and their mouth are into the
2  floor? Have you ever heard of that happening to a baby?
3      A.  No.
4      Q.  Okay. Have you ever in your personal life or
5  professional life ever heard that it's important to keep
6  a baby -- that is, a small baby -- on their back so that
7  they don't end up on their face with the inability to
8  lift their face off the ground such that it might make
9  it hard for them to breathe?
10     A.  Yes.
11     Q.  Okay. And I guess I'm asking you, did you
12  ever notice Abel with his face into the ground such that
13  it might be difficult for him to breathe while he was in
14  the prone position?
15     A.  No. The only time I noticed him was when his
16  face was to the right.
17     Q.  Is it fair to say you weren't really looking
18  at his face while he was on the ground?
19     A.  Yes.
20     Q.  Okay. So Abel was brought up to his feet; is
21  that what you had said?
22     A.  Yes. We brought him up to his knees and then
23  up to his feet.
24     Q.  And was he standing on his own when he

---

Page 102

1  actually got up to his feet?
2      A.  Yes.
3      Q.  And what did you do when he was standing?
4      A.  Just trying to figure out what was going on
5  and ask him what he swallowed to try to -- even though
6  he wasn't able to use words -- trying to decipher what
7  was swallowed.
8      Q.  Okay. And you heard him making gasping sounds
9  as if he was gasping for air?
10     A.  I heard some noise come from him but no words.
11     Q.  Well, I think most people know what gasping
12  for air is. Is that more or less what you described
13  seeing from him?
14     A.  Yes.
15     Q.  Okay. Did it appear to you that he was trying
16  to move his lips and form words, though, too?
17     A.  I couldn't say yes or no, so I don't know.
18     Q.  When you noticed him gasping for air, was his
19  mouth open or closed or partially open; do you recall?
20     A.  I believe it was open.
21     Q.  And you were on one of his sides while he was
22  standing, I assume?
23     A.  While he was standing up, yes, I would be on
24  his right side.

---

Page 103

1      Q.  Okay. So you switched sides at this point?
2      A.  When he was stood up, he was facing the
3  opposite direction. So instead of his left side, I was
4  on his right side.
5      Q.  Okay. What do you recall happening as he is
6  standing and, as you said, appeared to be gasping for
7  air?
8      A.  We were just encouraging him to cough and do
9  what you are supposed to do when someone is choking.
10  Once we realized that he was no longer able to expel
11  air, Scheithe began the Heimlich to try to dislodge what
12  was in his throat.
13     Q.  How long after he was stood up would you say
14  the Heimlich was attempted?
15     A.  I would say within 20, 30 seconds. Possibly
16  quicker.
17     Q.  And who started to perform it?
18     A.  Scheithe.
19     Q.  And you had been trained on it, correct?
20     A.  Yes.
21     Q.  To the best of your knowledge, was Scheithe
22  doing it the way you were trained?
23     A.  Yes.
24     Q.  And Abel was standing up at this point or

---

28  (Pages 100 to 103)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 104

1  sitting down or how...
2      A.  He was standing up at that point.
3      Q.  Okay.  Did Scheithe appear to be -- well,
4  strike that.
5          Did Abel appear to be positively responding to
6  the Heimlich; that is, did it appear to be working?
7      A.  At some point I believe he went down to the
8  ground on his knees, so he wasn't responding -- he
9  wasn't adequately responding.  I don't know -- I can't
10 remember how he responded, but I know at some point he
11 did collapse toward the ground.  He was lowered to the
12 ground on his knees where the handcuffs were taken off
13 and Narcan was administered for a possible overdose.
14     Q.  Do you know how long Scheithe performed the
15 Heimlich?
16     A.  He gave quite a few thrusts.  So I would say
17 at least 10, 20 seconds before he went down to his
18 knees.
19     Q.  Did you ever see anything expel out of Abel's
20 mouth?
21     A.  No.
22     Q.  You said while the Heimlich was being
23 performed, Abel eventually started going to his knees?
24     A.  Yes.

Page 105

1      Q.  Did that indicate to you that he was not
2  responding well to the Heimlich?
3      A.  Yes.
4      Q.  Did you notice if his mouth was open or closed
5  or partially open when he went to his knees?
6      A.  I can't recall.
7      Q.  Do you recall if his eyes were open or closed
8  or partially open when he went to his knees?
9      A.  I believe his eyes were still open, but I
10 couldn't tell you 100 percent.
11     Q.  When he went to his knees, is it fair to say
12 that he went limp, so to speak, his body weight was no
13 longer being supported by himself?
14     A.  Not fully by himself, but he wasn't fully
15 limp.  He still had some strength but not enough to
16 stand on his own.
17     Q.  Okay.  So after Scheithe does the Heimlich,
18 you said that -- strike that.
19         Did you ever call for an ambulance?
20     A.  I believe two or three of us called for an
21 ambulance.  I don't know who all called out; but once I
22 heard it called out or if I called it out myself, then
23 there's no need to continue calling.
24     Q.  You don't recall specifically who called out

Page 106

1  for an ambulance?
2      A.  No.
3      Q.  And do you recall when an ambulance was
4  called?
5      A.  It would have been once we realized he was
6  choking, somebody called and said, Advise EMS that he
7  was choking, or something to that effect.
8      Q.  Do you recall paramedics arriving on scene?
9      A.  Yes.
10     Q.  Do you recall about how long it took for them
11 to arrive?
12     A.  It was pretty quick from the time that he
13 started to choke to them getting there.
14     Q.  Where is the fire-rescue in relation to
15 Thorntons; do you know?
16     A.  They are off the Cedar Lake Road and Rollins.
17 So just a couple of traffic lights.  I believe they were
18 there within five minutes, possibly less.
19     Q.  After Scheithe performed the Heimlich, you
20 said that somebody administered Narcan?
21     A.  Yes.  At least two people administered Narcan.
22 I believe there was two nasal and one injection.
23     Q.  Do you recall who administered it?
24     A.  No.

Page 107

1      Q.  We have been talking all along about you,
2  Scheithe, Bertholomey, and Atwell.  Do you recall at
3  some point other officers arriving on scene?
4      A.  Yes.
5      Q.  Who was the first officer or first officers
6  you recall arriving on scene?
7      A.  The first one I remember is Officer Kaminski
8  from Round Lake Heights and his trainee.  I don't recall
9  his name.
10     Q.  Did you recognize Kaminski when he first
11 arrived?
12     A.  Yes.
13     Q.  Did you talk to him?
14     A.  Just a quick assessment of what was going on
15 so we were all on the same page.
16     Q.  Who was the next set of officers, or officer,
17 that you remember besides Kaminski and his partner?
18     A.  Officer Robinson from Round Lake.  And I
19 remember seeing another officer from Round Lake.
20     Q.  Do you remember that person's name?
21     A.  I'm horrible with names.  But he was like a
22 detective, one of their street gang guys.  I'd have to
23 look at my phone to get the names.
24     Q.  What did you do while the Narcan was being

29  (Pages 104 to 107)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 108

1 administered?
2    A.  Kaminski came by and took over the Heimlich
3 also.  And at that point I was standing to the side,
4 trying to just make sure that if there was anything that
5 I could do, that I would do it.  But at that point you
6 could only do one person at a, time and Kaminski quickly
7 jumped in and started doing the Heimlich.
8    Q.  What's the purpose of Narcan, to your
9 knowledge?
10    A.  To reverse -- temporarily reverse an opioid
11 overdose.
12    Q.  Had you administered Narcan before that day?
13    A.  Quite a few times, yes.
14    Q.  Okay.  And had you ever administered it to
15 somebody that you thought was choking?
16    A.  Administered to someone who wasn't breathing
17 but not that I believe was choking.
18    Q.  Do you have any understanding if it has any
19 effect on helping somebody who's choking?
20    A.  Physically choking, it would not help, but we
21 administered it due to a possible overdose to reverse
22 the overdose if that was the case.
23    Q.  Do you have any knowledge if Narcan hurts
24 somebody who's choking; that is, makes it worse in any

Page 109

1 respect?
2    A.  No.
3    Q.  Do you know the names of the paramedics who
4 arrived?
5    A.  No.
6    Q.  Did you see them actually arrive?
7    A.  Yes.
8    Q.  How would you describe their level of urgency
9 when they arrived?
10    MR. MATHUES:  Objection to the extent it calls for
11 speculation.
12 BY THE WITNESS:
13    A.  Just like us, when we arrive on scene, I
14 assume that they were observing the situation and
15 assessing the situation as they gathered what they could
16 as they're walking up.  They began to work on him.
17 So...
18    Q.  Did you observe them walk?
19    A.  The urgency may have appeared to be lacking,
20 but I believe they were actually assessing the situation
21 to better assist him the best they can.
22    Q.  You don't take any issue with them apparently
23 walking up to Abel as opposed to jogging or running?
24    A.  No.  As long as they are assessing the

Page 110

1 situation, rushing to someone quickly isn't going to
2 help process information any quicker.  So as they are
3 processing the information, they get the urgency and
4 that's when they begin doing everything else.
5    Q.  When the call went out to fire and rescue, do
6 you know if whoever made the call said words to the
7 effect of, We have a person who might be choking, or
8 words to that effect?
9    A.  It was relayed that someone was choking; but
10 what went through with dispatch, I don't know.  Because
11 I know sometimes the radios don't always go through and
12 every word is caught.  I know it was said on our side
13 that someone was choking, but I don't know if it was
14 relayed that way.
15    Q.  Do you have a recollection of somebody saying,
16 We have somebody choking here?
17    A.  Someone swallowed something and we believe
18 he's choking, yes, something to that effect.  But I
19 don't know if that was done through the radio or if that
20 was done just as we were talking and if the radio didn't
21 go through or did go through.  You would have to play
22 that to figure that out.
23    Q.  Okay.  What do you recall happening after
24 paramedics arrived?

Page 111

1    A.  Right before we got the AED out, they arrived
2 and assessed and began taking over medical treatment.
3 They loaded him up in the ambulance and then got CPR
4 started.  At some point they were able to dislodge a
5 plastic baggie with forceps, I believe, had to be used
6 to dislodge it.
7    Q.  What's AED?
8    A.  Automated electronic defibrillator.  Something
9 to restart the heart if needed, like a cardiac patient.
10 It just assesses the heart rhythm, and the monitor
11 itself decides whether or not a shot has to be
12 administered.
13    Q.  Did you go get the AED?
14    A.  No.  Officer Kaminski asked his trainee to do
15 it; and by the time he came back with it, EMS had
16 already arrived.
17    Q.  How much time would you say passed from the
18 moment that Scheithe said the comment about the sock and
19 Abel actually made it to the back of an ambulance?
20    A.  Back of the ambulance, I don't know.  I know
21 they were trying to assess him and work on him on the
22 grassy area briefly.  So to the actual back of the
23 ambulance, I don't know.  But when EMS was starting to
24 assess and work on him, it was pretty much as soon as

30  (Pages 108 to 111)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 112

1    Kaminski showed up, which would have been within a
2    minute, minute and a half of his body camera starting on
3    scene, and then just replayed that to the time that EMS
4    showed up. So I would say roughly five, no more than
5    ten minutes.
6          But to get a better calculation, it would be
7    when Kaminski shows up, then when EMS arrives, you
8    should be able to see it on his body cam, replay that
9    time and then no more than a minute and a half prior to
10   Kaminski showing up, just add that to it.
11        Q. Did you actually see Abel get taken into an
12   ambulance?
13        A. Yes.
14        Q. What did you say at this point?
15        A. Just trying to figure out what I needed to do
16   for my part of the case. I was told to ride with the
17   ambulance, to go to the hospital, to basically be there
18   to relay information necessary for command staff.
19        Q. So is it fair to say that you are still on
20   scene more or less in the same area while Abel was in
21   the back of the ambulance?
22        A. Yes.
23        Q. And how long did you stay? That is, from the
24   moment that Abel got put into the ambulance until you

Page 113

1    yourself went to the ambulance, how much time passed?
2         A. I went to the ambulance about the time they
3    loaded up to leave. I know they had to make calls to, I
4    believe it was, Condell just to see if they would even
5    take a patient. And that takes time. So I'd say
6    probably ten minutes from their dispatch time and
7    leaving time. By the time they left the scene, I would
8    have jumped in the ambulance a few minutes before that.
9         Q. So from the time that Abel was taken into the
10   ambulance to the time that you actually jumped into the
11   ambulance was about ten minutes, and in that ten
12   minutes; you remained on scene?
13        A. Yes.
14        Q. What did you do in that ten-minute period?
15        A. Looking for any signs of what he possibly
16   could have taken, if there was anything that would
17   assist us in getting him the treatment needed. And just
18   any crime-related evidence.
19        Q. Did you find any crime-related evidence?
20        A. No.
21        Q. Who told you to go you into the ambulance with
22   him?
23        A. I believe it was Commander Barr. Someone at
24   the command level, or someone who was in charge at least

Page 114

1    at the time.
2         Q. And you went in the back of the ambulance,
3    correct?
4         A. Yes.
5         Q. And what happened when you got back there?
6         A. They drove to the hospital, and I sat at the
7    hospital until I was relieved.
8         Q. Were you told anything in the back of the
9    ambulance?
10        MR. MATHUES: Objection to form, vague.
11        MR. MARX: Well, strike that.
12   BY MR. MARX:
13        Q. Did any medical personnel speak to you while
14   you were in the back of the ambulance?
15        A. I am sure there was conversation, but I don't
16   know what it entailed.
17        Q. Did you ask any medical personnel any
18   questions while you were in the back of the ambulance?
19        A. Nothing that I can recall.
20        Q. Were you advised that he had choked on
21   something while you were in the ambulance?
22        A. Prior to going in the ambulance, I was advised
23   that they pulled a plastic bag from his throat and that
24   there was no way that we could have gotten that out by

Page 115

1    the Heimlich, that they needed forceps for it.
2         Q. Who advised you of that?
3         A. One of the paramedics.
4         Q. How long before you got in the back of the
5    ambulance were you advised of that?
6         A. Just a few minutes.
7         Q. Did you ever see the plastic bag that was
8    allegedly pulled out of his throat while on scene?
9         A. Yes.
10        Q. Who showed it to you?
11        A. One of the paramedics placed -- I believe it's
12   Officer Atwell. I don't believe we had an evidence bag;
13   but it was placed in like a blue bootie, like a bootie
14   for your shoes, just to temporarily hold it. And I
15   observed that bag while Atwell was walking from the
16   ambulance with it.
17        Q. What type of bag was he holding?
18        A. It was like a footie. So it's like a
19   hospital bootie that the doctor -- scrub nurses wear,
20   just to -- to keep the floor sanitary.
21        Q. Okay.
22        A. It was just a temporary thing until they can
23   place it, you know, in a proper bag because they needed
24   to basically get rid of it, and we wanted to contain it

31 (Pages 112 to 115)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 116

1  the best we could.
2      Q.  Do you recall if Atwell was wearing gloves
3  while handling this plastic bag?
4      A.  I don't know if he was, but I would assume he
5  did.
6      Q.  And what happened?  Did you walk over to him
7  and see it, or did he walk over to you and show you it?
8      A.  I saw it.  I believe I was next to the
9  ambulance while he was coming around with it.  We were
10  just saying that that's what it was, that's what he was
11  choking on.
12      Q.  Did you actually see Atwell leave the
13  ambulance with it, as in exit the ambulance with it?
14      A.  Yeah.  I was on the right side of the
15  ambulance walking to the back of the ambulance when I
16  observed it.
17      Q.  So, no, you didn't see him exit the ambulance;
18  you saw him walk around the other side of the ambulance
19  towards you?
20      A.  I was on the right side in the back of the
21  ambulance, like, on the roadway area when he came out
22  with the baggie.  So I didn't see him exit the ambulance
23  itself, but as he was coming out of that side is when I
24  observed him with that in his hand.

Page 117

1      Q.  And it was already in a footie?
2      A.  Yes.
3      Q.  And is it fair to say he said words to the
4  effect of, This is what was taken out of his throat, or
5  something like that?
6      A.  Yes.
7      Q.  And how close were you when you saw it?
8      A.  Right next to him.
9      Q.  Can you describe what you saw?
10      A.  Like a mucousy plastic bag.  It was like a
11  Saran Wrap type thin plastic bag that was probably about
12  this long (indicating).  So six/seven inches, roughly.
13      Q.  Would you describe it like a sandwich bag
14  size?
15      A.  Probably a little less than a sandwich bag.
16      Q.  It didn't have like a ziplock top to it like a
17  sandwich bag does, does it?
18      A.  No.
19      Q.  And did you notice a substance or any
20  substance in the bag?
21      A.  At the time there was a part of it that
22  was -- like the top part that I saw was unraveled, and
23  that had the mucousy part that I noticed.  And there was
24  part of it that was more solid, but I couldn't tell if

Page 118

1  there was an object in it or not at the time.
2      Q.  How long did you observe it?
3      A.  A couple of seconds at most.
4      Q.  Did you touch it?
5      A.  No.
6      Q.  Did Atwell say anything else besides, This
7  came out of Abel's throat, or words to that effect?
8      A.  Not that I can tell.
9      Q.  You said, There's a mucousy-type thing on the
10  bag?
11      A.  Yes.  It was kind of slimy.  So there was a
12  weird mucousy slime to it.
13      Q.  How would you describe it, a lot, a little...
14      A.  It was enough to notice.  Like it wasn't like
15  it was definitely covered but not to the effect that --
16  it was just like a glob.  So it definitely covered all
17  the sides of the baggie itself.  It made it hard to see
18  anything other than that.
19      Q.  In your opinion, did Abel lose consciousness
20  before he was taken into the back of the ambulance?
21      A.  Around the time EMS arrived would be about the
22  time he lost consciousness.
23      Q.  What leads you to believe that?
24      A.  Because while Kaminski was there, he was still

Page 119

1  gasping, still having gasps of air, and then EMS
2  arrived.
3      Q.  So you went in the ambulance.  How long were
4  you sitting in the ambulance before it took off for the
5  hospital?
6      A.  Just a couple of minutes.
7      Q.  And where did you go?
8      A.  Condell.
9      Q.  How far is that from Thorntons?
10      A.  It was probably a 10-minute drive.
11      Q.  And what did you do when you got to the
12  hospital?
13      A.  I went over to where his room was and stayed
14  there because at that point, he was just a prisoner in
15  custody.  We were determining what to do with him, if he
16  was to regain consciousness, whether we were going to
17  sit on him or not or just get a warrant later on.  So
18  check his well-being, obviously, to make sure that he
19  was going to survive and relay that to the command staff
20  also.
21      Q.  Was he handcuffed to the bed in the hospital?
22      A.  Once he was in custody during the Heimlich, he
23  was never handcuffed again.
24      Q.  And is it fair to say that you sat outside

32  (Pages 116 to 119)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 120

1  Abel's room but near it?
2      A.  Yes.
3      Q.  Okay.  Did you actually ever go inside his
4  room while you were in the hospital?
5      A.  No.
6      Q.  Did you talk to anybody who said they were a
7  family member, reported to be a member of his family at
8  the hospital?
9      A.  No.  His family showed up, but I did not speak
10 with them.
11     Q.  How do you know the family showed up?
12     A.  Nursing staff advised me that they showed up.
13     Q.  Was it just you at the hospital, or did
14 another officer accompany you?
15     A.  I was the only one at the hospital until
16 Officer Atwell was transported himself for an injury.
17     Q.  How did he arrive?  That is, did he drive or
18 come via ambulance or do you know?
19     A.  I believe he came via ambulance.
20     Q.  How long after you arrived there was Atwell
21 there?
22     A.  Probably about a good hour or so, if not more.
23     Q.  The moment he got there, did you know what he
24 was there for?

Page 121

1      A.  No.  I asked him what was going on, and he
2  said that his thumb hurt.  He was there for X-rays.
3      Q.  How long were you at the hospital before you
4  left?
5      A.  It would have been a few hours until someone
6  from investigations picked me up and we decided to no
7  longer sit on him since he was not -- when I was advised
8  not to sit on him anymore, we had an investigator pick
9  me up.
10     Q.  Sit on him, you mean he was technically a
11 detainee and somebody had to take custody of him, at
12 least at the beginning?
13     A.  Yes.
14     Q.  And did you receive word at some point that he
15 was -- it was no longer required for you to sit on him
16 or be with him, so to speak?
17     A.  Yes.
18     Q.  Who told you that you could go?
19     A.  I believe it was -- it was definitely someone
20 from the command staff that said that someone would be
21 coming by to pick me up because I didn't have a squad
22 car myself since I went in the ambulance.  And they made
23 arrangements.  I don't know which one called me up.  It
24 might have been Deputy Chief Wilde, but I couldn't tell

Page 122

1  you.
2      Q.  Did you ever speak to any hospital personnel
3  about Abel's condition while Abel was in the hospital?
4      A.  Yes.
5      Q.  What did you learn?
6      A.  I learned that it's -- according to a couple
7  of them -- that it's possible that because he was young,
8  he would recover from it and be fine.
9      Q.  Who did you speak to?
10     A.  Just whoever was assisting him.  I don't know.
11 I don't remember exactly who.  It was just -- we had an
12 update.  And they said, Seems like he should be fine, he
13 should regain consciousness, give him a little time, and
14 he will be back to normal.
15     Q.  You don't recall if that was a doctor or a
16 nurse or someone else?
17     A.  I believe it was a nurse.
18     Q.  Female?
19     A.  I don't remember if it was a male or female.
20 I tried to get updates from whoever I could, a nurse or
21 doctor.
22     Q.  The whole time you were in the hospital, you
23 never spoke to Abel's family members or person who said
24 they were a friend?

Page 123

1      A.  No.
2      Q.  Do you recall what time you left the hospital?
3      A.  No.  That should be time-stamped with -- I
4  believe Detective Herrera (phonetic) was the one who
5  picked me up.  So he probably advised dispatch when he
6  arrived at the hospital to pick me up.
7      Q.  Did you go back to the station?
8      A.  Yes.
9      Q.  What did you do back at the station?
10     A.  It was my original case since I was a primary
11 on it, so I went back.  My squad car was parked in the
12 secured sally port, which had evidence to submit into
13 the temporary storage.
14     Q.  What evidence did you have?
15     A.  It was the clear bag that was extracted from
16 his throat.  And there were a couple of socks and shoes.
17     Q.  When you left to get inside the ambulance, you
18 saw the plastic bag briefly just outside the ambulance,
19 correct?
20     A.  Yes.
21     Q.  And what was your understanding of what Atwell
22 was going to do with it at that point?
23     A.  Just to keep it as chain of custody.  I'm not
24 sure if it was admitted or not; but because it was my

33  (Pages 120 to 123)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 124

1  case, it ended up being me. So I'm assuming that
2  because Atwell also got hurt, that kind of messed that
3  up a little bit.
4  **Q. I just want to make it clear, though, it's**
5  **your understanding he was going to keep custody of it**
6  **until it was given to you because it was, quote/unquote,**
7  **your case; you were the primary on it?**
8  A. More than likely, yes.
9  **Q. Did you know specifically what he did with it**
10 **after you only briefly saw it?**
11 A. I was going into the ambulance shortly after
12 that. So I didn't see what he did with it, but I was
13 advised that it was in the trunk of my car to be
14 secured.
15 **Q. Okay. So do you believe that he placed it in**
16 **the trunk of your car at some point?**
17 A. Yes.
18 **Q. Do you have any reason to think that he did**
19 **anything with it beforehand?**
20 A. No.
21 **Q. And when you got back to the station and saw**
22 **your car, was it in the trunk of your car?**
23 A. Yes.
24 **Q. What did you do with it?**

Page 125

1  A. I took it into the evidence room and looked at
2  the bag itself, observed a substance inside of the
3  baggie, and at which point I field-tested it. Since it
4  was a white-ish powder, tested it with a cocaine swab,
5  and it tested positive for it.
6  **Q. Were you wearing gloves when you were touching**
7  **the baggie?**
8  A. Yes. I would have been wearing gloves at that
9  point.
10 **Q. What type of gloves were you wearing?**
11 A. At the station, I believe they had the black
12 Nitrile rubber gloves. They could have been blue or
13 purple. I don't know. But they were rubber gloves.
14 **Q. So you took the baggie with the rubber gloves**
15 **and you went into the station with it, correct?**
16 A. Into the evidence lab, yes.
17 **Q. Okay. That's a room within the station?**
18 A. Yes.
19 **Q. And you also took the socks and a shoe, did**
20 **you say?**
21 A. The shoes and socks would have been with it,
22 and I would have submitted them as property.
23 **Q. Did you also take those items into the**
24 **evidence room as well?**

Page 126

1  A. Yes.
2  **Q. Okay. You placed the plastic baggie on the**
3  **table, I assume?**
4  A. Yes.
5  **Q. And then what did you do with the plastic**
6  **baggie at that point?**
7  A. Since there was a substance inside, I opened
8  it up enough to get to test the substance. It tested
9  positive. I put it in an evidence bag, secured it with
10 evidence tape, and submitted it into the temporary
11 facility storage locker.
12 **Q. How did you test the evidence?**
13 A. There are cocaine swabs from a test kit. Just
14 opened up the bag; took the swab, which is just a little
15 alcohol-type pad -- not alcohol, obviously, but the
16 cocaine swab with the chemicals; swiped the inner area
17 of the bag itself where the residue was; looked at it;
18 it showed that it was positive based on the coloring for
19 cocaine.
20 **Q. What color did the pad turn?**
21 A. I will have to check my notes or the picture
22 itself, but I believe the cocaine always was blue. I
23 can't remember every one exactly; but whatever it was
24 supposed to test for, it tested properly for.

Page 127

1  **Q. And did you take a photograph of the bag?**
2  A. Officer Scheithe took a photo of the bag.
3  **Q. Were you present when that photo was taken?**
4  A. Yes.
5  **Q. Was that present in the evidence room as you**
6  **described?**
7  A. Yes.
8  **Q. How long after you tested it -- and you say it**
9  **tested possible for cocaine -- how long after the**
10 **positive test for cocaine was that photograph taken?**
11 A. It would have been within minutes, I'm sure.
12 **Q. Do you have a specific recollection, or you**
13 **are not exactly sure?**
14 A. I'm not sure. I just know it would have been
15 relatively quick.
16 **Q. How come you didn't take the picture?**
17 A. I don't know. I don't know if Officer
18 Scheithe was an evidence tech or not. Maybe he had a
19 specific OIC phone that was used. I don't know.
20 **Q. What's a specific OIC phone? What is that?**
21 A. Officer in charge phone. Sometimes, if
22 there's evidence that has to be gathered, we'll use the
23 phone from, like, the command staff phone to take a
24 picture so it's not on our personal phones.

34 (Pages 124 to 127)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 128

1    Q.  It's a work cell phone, right?
2    A.  Yes.
3    Q.  Okay.  While working for the Village of Round
4  Lake Beach, were you ever issued a work cell phone?
5    A.  I was not issued one to take home; but as you
6  are in charge or if you need it for photographic
7  reasons, they would allow you to use it, take it, and
8  then upload it to the photo driver, "the Peak" I believe
9  they called it.
10   Q.  How many photos were taken; do you know?
11   A.  I don't know.
12   Q.  Did you ever see a photo -- strike that.
13      Have you ever seen a photo of this baggie?
14   A.  Yes.
15   Q.  Have you ever seen a photo of it on a scale?
16   A.  I don't believe so.
17   Q.  Have you ever seen a photo of it next to a
18  ruler?
19   A.  I don't believe so.
20   Q.  Do you know how much cocaine was in the
21  baggie?
22   A.  I would have weighed it to submit it into
23  evidence, so it would be on the evidence log.
24   Q.  According to the document, it says it was four

Page 129

1  grams.  Does four grams sound correct to you?
2    A.  Yes.
3    Q.  Is there any reason why you or Scheithe or
4  anybody else, for that matter, didn't take a picture of
5  it on a scale?
6    A.  No.
7    Q.  Any reason, again, why it wasn't photographed
8  next to a ruler?
9    A.  No.
10   Q.  Would you describe that baggie of cocaine as
11  about the side of a golf ball?
12   A.  I would say probably smaller than a golf ball.
13   Q.  Have you, in your experience, ever come across
14  somebody who's hiding narcotics in their mouth?
15   A.  Yes.
16   Q.  About how many times has that happened in your
17  career?
18   A.  Not very many.  Maybe two or three times at
19  most.
20   Q.  Is it fair to say you have never seen anybody
21  try to hide that much cocaine in their mouth?
22   MR. MATHUES:  Objection to form and foundation.
23  BY THE WITNESS:
24   A.  I have never observed someone with cocaine.

Page 130

1  It's always been swallowing a bag of weed and then a
2  small -- couple grams at most, or just chewing it up
3  without a bag.
4    Q.  I'm going to show you just one video here.
5  It's going to be Exhibit 1.
6       (Deposition Exhibit 1 was marked.)
7  BY THE WITNESS:
8    A.  Officer Schultz was the other Round Lake
9  officer I just remembered, and Deputy Chief Lunn was the
10  major crimes from our agency.
11   Q.  Thank you.
12      I'm showing you Plaintiff's Exhibit 1 in this
13  deposition.  Do you see -- do you see a video or still
14  screen of a video on your screen?
15   A.  Yes.
16   Q.  It's Bates-stamped Plaintiff's Exhibit 24.
17  It's called Cell Phone Video.  I will represent to you
18  that this video is one minute and 42 seconds long.
19      Is this one of the videos you would have
20  reviewed fairly recently in preparation for your
21  deposition?
22   A.  Based on the still frame, it looks like it.
23   Q.  Okay.  I am just going to play parts of it and
24  I will stop it and ask you questions.  Starting from

Page 131

1  zero.
2       Okay.  I stopped it at three seconds.  Do you
3  see yourself in this video at three seconds?
4    A.  Yes.
5    Q.  Where are you?
6    A.  I am the one with the face mask looking this
7  way.
8    Q.  Okay.  In the still frame at three seconds,
9  you have a face mask on and your right arm is on Abel's
10  shin area?
11   A.  Yes.  And it looks like I have gloves on.
12   Q.  Okay.  And just so we are clear, this
13  individual that's on the ground in the video is Abel,
14  correct?
15   A.  Yes.
16   Q.  And is he on the ground in that position that
17  you described with part of his body on the pavement and
18  part of his body on the grass?
19   A.  Yes.
20   Q.  Would you agree that his midsection is near
21  this curve here in the video?
22   A.  Yeah.  Looks close.
23   Q.  And would you agree there's another officer
24  here that's in the video?

35 (Pages 128 to 131)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 132

1    A.  Yes.
2    Q.  Is that Scheithe?
3    A.  Yes.
4    Q.  I'm going to play it for three seconds.
5    At three seconds here, do you know what
6  Scheithe is doing?
7    A.  No.
8    Q.  I'm stopping at five seconds.  There's a
9  female on the ground here, correct?
10   A.  Yes.
11   Q.  That's Shelby Brubaker to your knowledge?
12   A.  Yes.
13   Q.  And that's fair to say that's Atwell or
14  Bertholomey near her?
15   A.  Yes.
16   Q.  I am going to play it from five seconds.
17    I'm stopping at 12 seconds.  Would you agree
18  with me that your right hand in this video is more or
19  less in the same spot near Abel's shin?
20   A.  Yes.
21   Q.  And would you agree with me that Scheithe
22  appears to have at least one of his hands on Abel's
23  back?
24   A.  I can't tell from the video.

Page 133

1    Q.  You see his arm, correct?
2    A.  Yes.
3    Q.  But you are saying you can't see that he has
4  his hand on his back or not?
5    A.  Correct.
6    MR. MATHUES:  Jason, I'm not trying to interrupt
7  your questioning, but we can't hear the sound.  And if
8  that's intentional, that's perfectly fine.
9    MR. MARX:  It's not.  I'm sorry.
10   MR. MATHUES:  Let me check my sound as well.
11   MR. MARX:  My sound was low.  It was on, but it was
12  low.  Let me start from five seconds again.  Thank you
13  for stopping me.  Stop me again if you can't hear the
14  sound.  Otherwise, I'm going to assume you heard the
15  sound.
16   MR. MATHUES:  Fair enough.  I can't hear it very
17  well.  I think we are past the point where you would be
18  able to hear Ms. Gomez Reyes making statements.  And I
19  can hear like a little bit of crying at the beginning
20  and then I can't hear anything else.  Like I can't hear
21  Ms. Brubaker yelling like I believe that she is.
22   MR. MARX:  Okay.  I'm not sure what the problem is.
23  I turned it up.  The volume is up all the way, but I am
24  not interested in what Ms. Brubaker is saying or not.
25  So I'm not going to ask him anything regarding that.

Page 134

1  But I appreciate you pointing that out to me.  I am more
2  interest interested in what his actions are and it
3  doesn't require sound for that.
4    MR. MATHUES:  As long as we are clear that the
5  sound isn't there, I have no objection to you asking
6  those sorts of questions.
7    MR. MARX:  To be clear, you can hear a little bit
8  of sound but it's not real loud; is that what you're
9  saying?
10   MR. MATHUES:  I can hear a little bit of sound, but
11  I'll let Mr. Cramer say what he can and can't hear.
12  BY MR. MARX:
13   Q.  I'm going to start it at five seconds again
14  and just play it and stop it.
15    All right.  From five seconds to 38 seconds
16  where I stopped it, would you agree with me that your
17  hand appears to be more or less in the same position in
18  Abel's shin area --
19   A.  Yes.
20   Q.  Okay.  I'm starting again at 38 seconds.
21    Stopping at 57 seconds.  In that clip that we
22  just watched, would you agree with me that Officer
23  Scheithe put at least one of his hands on Abel's back?
24   A.  I can't tell if it's on his back or not.

Page 135

1    Q.  By saying that, are you saying you didn't see
2  him push at least a little bit on Abel's back with his
3  hand?
4    A.  No.  I saw him place something at the car or
5  on the car.  I didn't see him push on anyone's back.
6    Q.  In this video can you tell where your knees
7  are?
8    A.  Looks like they are to the side, but I can't
9  tell.
10   Q.  The side of what?
11   A.  On the ground next to Abel.
12   Q.  You can't see where the bottom of your knees
13  are, right?
14   A.  Right.
15   Q.  Is it possible that they are on Abel?
16   A.  From my recollection, it was never on Abel,
17  but I cannot tell from the video.
18   Q.  You previously said you don't recall if your
19  knees touched Abel, correct?
20   A.  Correct.  I would have been to the side of
21  him.
22   Q.  But now you are saying you recall not touching
23  him with your knees?
24   MR. MATHUES:  Objection to the extent it

36  (Pages 132 to 135)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 136

1  mischaracterizes prior testimony.
2  BY THE WITNESS:
3      A.  I don't believe I ever had my knees on him at
4  any time; but according to the video itself, it's not
5  clear 100 percent.
6      Q.  I'll start again at 57 seconds.
7          Stopping at 109, in that clip did you see
8  yourself remove Abel's sock?
9      A.  Yes.
10     Q.  Okay.  And at 109 do you have both hands on
11 his leg at this point?
12     A.  I don't know if they are on his leg or if it's
13 just putting his sock down.
14     Q.  And at 109 does Scheithe appear to have at
15 least one of his hands on Abel's back?
16     A.  Again, I can't tell if it's on his back or
17 not.  I can't tell.
18     Q.  To your knowledge, was Scheithe wearing black
19 clothes?
20     A.  Based on the video, it looks like he was.
21     Q.  Okay.  The video is stopped at 142.  Would you
22 agree with me that that 1-minute and 42-second video
23 that Abel was in the prone position the entire time?
24     A.  Yes.

Page 137

1      Q.  And why was he kept in that position for that
2  1-minute, 42-second video that we saw?
3      A.  Well, Shelby was being taken care of with her
4  arrest.  And with my hands on his legs, I would only
5  assume that he was still kicking at that point, and it's
6  not safe to put someone up who's kicking.  When I took
7  off his sock, then it seemed like the scene was starting
8  to be more secure at that point.
9      Q.  Did you see Abel kicking in this video?
10     A.  No.
11     Q.  Besides the cell phone video, are you aware of
12 any other cell phone video that captures any part of
13 this incident?
14     A.  No.
15     Q.  I'm going to show you Exhibit 2 here.  Do you
16 see a document on your screen?
17         (Deposition Exhibit 2 was marked.)
18 BY THE WITNESS:
19     A.  Yes.
20     Q.  Okay.  It's Bates-stamped Round Lake 3929.
21         By the way, have you ever seen any hospital
22 photos or autopsy photos in this case?
23     A.  I saw a couple of photos, but I couldn't tell
24 you which ones.

Page 138

1      Q.  Okay.  This was produced to me by defense, and
2  it was produced as part of the autopsy photos.  To the
3  best of your recollection, have you seen this photo
4  before?
5      A.  No.
6      Q.  Do you see something that I'm circling in the
7  cursor in the middle of Abel's head?
8      A.  Yes.
9      Q.  Does that appear to be some sort of a cut or
10 abrasion to you?
11     A.  Looks like something metal.  I couldn't tell.
12     Q.  Well, if it's an abrasion or a cut, do you
13 have any idea how he sustained that abrasion or a cut?
14     A.  No.
15     Q.  I'm going to show you Exhibit 3.
16         (Deposition Exhibit 3 was marked.)
17 BY MR. MARX:
18     Q.  Do you see a document on your screen?
19     A.  Yes.
20     Q.  Exhibit 3 is Image 3564.  To the best of your
21 knowledge, have you seen this photo before?
22     A.  No.
23     Q.  I will represent to you that's my client.  And
24 do you see three brownish looking markings on my

Page 139

1  client's face?
2      A.  Yes.
3      Q.  Do you know what those are?
4      A.  No.
5      Q.  Is it possible that they are prior abrasions
6  that are healing?
7      A.  It almost looks like birthmarks, but I
8  couldn't tell you.
9      Q.  Okay.  Well, if they are abrasions, do you
10 know how my client sustained those?
11     A.  No.
12     Q.  Exhibit 4 is 3567.
13         (Deposition Exhibit 4 was marked.)
14 BY MR. MARX:
15     Q.  To the best of your knowledge, have you seen
16 this document before?
17     A.  No.
18     Q.  Do you see a brown discoloration on the cheek
19 area of my client?
20     A.  Yes.
21     Q.  Do you what that is?
22     A.  No.
23     Q.  Exhibit 5 is 3562.
24         (Deposition Exhibit 5 was marked.)

37  (Pages 136 to 139)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 140

1    BY MR. MARX:
2        Q.  Have you seen this document before?
3        A.  No.
4        Q.  I believe, but I'm not 100 hundred percent
5    certain, this is my client's left leg that we are
6    looking at here.  Do you see some areas of discoloration
7    in the photo?
8        A.  Yes.
9        Q.  Do you know what those are?
10       A.  No.
11       Q.  If it is an abrasion, do you know how he got
12   that abrasion?
13       A.  No.
14       Q.  Exhibit 6 will be 3563.
15          (Deposition Exhibit 6 was marked.)
16   BY MR. MARX:
17       Q.  Have you seen this photo before?
18       A.  No.
19       Q.  I will represent to you it's my client's left
20   hand.  Do you see discoloration on the hand here?
21       A.  Yes.
22       Q.  Do you know if those are abrasions?
23       A.  No.
24       Q.  If they are, do you know how he sustained

Page 141

1    those?
2        A.  No.
3          (Deposition Exhibit 7 was marked.)
4    BY MR. MARX:
5        Q.  Showing you Exhibit 7.  Exhibit 7 is 36509.
6          Have you seen this photo before?
7        A.  No.
8        Q.  To the best of my knowledge, that's my
9    client's left knee and shin area.  Do you see
10   discoloration on the skin that I'm pointing to?
11       A.  Yes.
12       Q.  Do you know if those are abrasions or not?
13       A.  No.
14       Q.  If they are, do you know how he sustained
15   those?
16       A.  No.
17       Q.  One last photo here.  Exhibit 8 will be 3568.
18          (Deposition Exhibit 8 was marked.)
19   BY MR. MARX:
20       Q.  To best of your knowledge, have you seen this
21   photo before?
22       A.  No.
23       Q.  I believe this is my client's torso area.
24   Would you agree with me that some of the skin appears to

Page 142

1    be purple?
2        A.  Yes.
3        Q.  Do you have any idea how the skin became like
4    that?
5        A.  No.
6        Q.  I'm going to show you one document here.  You
7    filled out a report in this case, correct?
8        A.  Yes.
9        Q.  What was the purpose of your report?
10       A.  Just documentation that we were involved with
11   an incident.
12       Q.  Okay.  Do you remember what you wrote more or
13   less?
14       A.  Just that I was there and major crimes took
15   over.
16       Q.  Do you remember how long the report was?
17       A.  Probably one or two sentences.
18       Q.  I'm going to show you here Exhibit 9.
19          (Deposition Exhibit 9 was marked.)
20   BY MR. MARX:
21       Q.  Do you see a document on your screen?
22       A.  Yes.
23       Q.  It's Bates-stamped Round Lake 2642.
24          Is this your report?

Page 143

1        A.  Yes.
2        Q.  The report states that you submitted this
3    evidence for this case, amongst other things, correct?
4        A.  Yes.
5        Q.  And it's referring to the bag, correct?
6        A.  Yes.
7        Q.  The end of it, it says, I then packaged and
8    submitted this evidence into a secure evidence locker
9    along with several other items.  Do you see that?
10       A.  Yes.
11       Q.  And what did you package it in?
12       A.  I would have to see the evidence to know what
13   it was packaged in.  But typically cocaine, I would
14   either put into a plastic evidence bag or a paper
15   evidence bag, like a Manila envelope.  I probably would
16   have used a Manila envelope for this case.  The other
17   items would have been the shoes and socks.
18       Q.  And then what does it mean, Secured into an
19   evidence locker?  What does that mean?
20       A.  That would be the temporary storage locker in
21   the evidence room, place it in there and shut it.  Once
22   the door is shut, the only way that it can be accessed
23   is the other side of the evidence room by the evidence
24   technician, the evidence room technician or a commander,

38  (Pages 140 to 143)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 144

1   whoever has access to that room.
2       Q.   Did you fill out a further report indicating
3   that it was placed into this evidence locker; that is,
4   like, documenting that it's in there at a specific time
5   in a specific locker or anything to that effect?
6       A.   That should be the on the BEAST report, which
7   would be the evidence page itself.  So the system that's
8   used, they call the BEAST system.
9       Q.   Beast?  Like an animal, a beast?
10      A.   B-E-A-S-T.  That's what it called.  And that's
11  the chain of custody itself.  That's what I used for
12  that.
13      Q.   I will show you another document that will be
14  Exhibit 10.
15          (Deposition Exhibit 10 was marked.)
16  BY MR. MARX:
17      Q.   Do you see a document on your screen?
18      A.   Yes.
19      Q.   It's Bates-stamped Round Lake 2646.
20          Is this the BEAST document you were talking
21  about?
22      A.   Yes.
23      Q.   Did you fill out this document?
24      A.   Yes.

Page 145

1       Q.   Item Number 1 is what?
2       A.   That would be the white powder substance that
3   field tested positive for cocaine, four grams of weight
4   packaged in a sealed paper bag.
5       Q.   How come the detailed description doesn't say
6   it's a plastic baggie as well?
7       A.   That's just how I submitted it.
8       Q.   And you did submit the plastic baggie inside
9   this sealed envelope?
10      A.   Yes.  The original packaging would have been
11  placed into the envelope.
12      Q.   It says "sealed paper bag," but are you saying
13  it's better described as an envelope?
14      A.   There's paper bags, like lunch bags, and also
15  Manila envelopes.  Each different agency uses something
16  similar.  Sometimes the paper bag just means the
17  envelope, and other times they have actual Manila
18  envelope as a drop-down.  But I can't remember which one
19  Round Lake Beach uses.  So it could mean the sandwich
20  bag type of paper bag or it could be a Manila envelope,
21  which is a paper bag.
22      Q.   Did you type in these words in the detailed
23  description section?
24      A.   Yes.

Page 146

1       Q.   And did you type in the words in the packaging
2   quantity, item, type section?
3       A.   Yes.  Under that section to the right is what
4   I typed.
5       Q.   You typed the words -- the number 1 and
6   powdered substance?
7       A.   Yes.
8       Q.   Are you saying that the words to the left are
9   pre-filled out or a drop-down fill-out?
10      A.   Yes.  That's actually a fill-out, a drop-down
11  box underneath that, the detailed description.  That's
12  what I write.  So that's all my verbiage.  Everything
13  else is just drop-downs.
14      Q.   Okay.  But you also type in the words, for
15  example, weight 4.0, correct?
16      A.   There's a section for weight.  I would type in
17  the 4, and it would do 4.00, and then the G would be a
18  drop-down box.  So the only thing I would have typed in
19  there would be the 4 and then select gram for the
20  drop-down.
21      Q.   Now, I assume in Illinois all possession of
22  cocaine is a felony, correct?
23      A.   It depends on the state attorney, but it
24  should be.

Page 147

1       Q.   Well, in the statute it's listed as a felony,
2   correct?
3       A.   Yes.
4       Q.   All right.  Do you know 4.0, what level felony
5   that is; that is, 4.0 grams?
6       A.   Right.  To me I believe it would just be a
7   felony.  I don't know what level.  That would be
8   something I would have to call the state attorney and
9   they would make the decision.
10      Q.   Well, was Abel arrested for felony possession
11  of cocaine?
12      A.   At the time it was just going to be held for
13  evidence.  And if he was going to come to and be able to
14  survive it, then he would have been -- the case itself
15  would have been screened by the state attorney, from me
16  to the state attorney, and they would have made the
17  decision.  So it was held at this point for evidence
18  until his status was determined.
19      Q.   But is it fair that he wasn't placed under
20  arrest for cocaine by you, correct?
21      A.   Correct.
22      Q.   He was placed under arrest for disorderly
23  conduct, correct?
24      A.   Right.

39 (Pages 144 to 147)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 148

1    Q.  Was he placed under arrest for any other
2    charges?
3        A.  In the end it was going to also be for kicking
4    Officer Bertholomey.  That was going to be the next
5    charge that would have upped it due to him resisting.
6    And at that point, that's when everything went south, it
7    seemed.  So he was going to have another charge of
8    kicking Officer Bertholomey.
9        Q.  Did you ever fill out a document that said
10   that he kicked Officer Bertholomey?
11       A.  No.  That was going to be part of the major
12   crimes.  Since they took over, there was nothing else
13   done with that.
14       Q.  Well, they interviewed you, right, and you
15   told them what happened, correct?
16       A.  Yes.
17       Q.  Did you tell him anything different than what
18   you have told me today?
19       A.  No.
20       Q.  But you yourself did not fill out a document
21   saying that he kicked Officer Bertholomey, correct?
22       A.  Correct.
23       Q.  Is there any reason why you didn't do that?
24       A.  We were advised not to type up reports because

Page 149

1    it was going to be a major crimes incident and major
2    crimes would have to do all the investigation from this
3    point forward.  And the reason why we did the reports is
4    to document our short -- just summarize that we were
5    there, essentially.
6        Q.  Just one last exhibit.
7            (Deposition Exhibit 11 was marked.)
8    BY MR. MARX:
9        Q.  Do you see a document on your screen?
10       A.  Yes.
11       Q.  This is Round Lake 3628, Exhibit 11.
12           What do you recognize is depicted in this
13   document?
14       A.  That would be the bag that was placed in the
15   bootie from Abel's throat.  That's was what was placed
16   in my squad car, put into the evidence locker or
17   evidence room.  The material on the right would be the
18   cocaine swab.  The blue dots would depict that it
19   field-tested positive for cocaine.  And the bag on the
20   left is what was dislodged from him.
21       Q.  It's what you were told was dislodged from
22   him, correct?
23       A.  Yes.
24       Q.  And Atwell told you that, correct?

Page 150

1        A.  Yes.
2        Q.  Do you know if Atwell saw that happen?
3        A.  I don't know.  You would have to ask him.
4        Q.  You said this was in the trunk of your car
5    when you got back to your vehicle after the hospital,
6    correct?
7        A.  Yes.  It was in my squad car.
8        Q.  Was it still inside of the bootie or footie,
9    as you described it?
10       A.  I believe so, but I couldn't tell you
11   100 percent.
12       Q.  Having said that, do you know what happened
13   with the bootie or footie?
14       A.  If it was in there, I probably threw it away.
15       Q.  Any reason why?
16       A.  It was just holding it until it could be
17   placed in a proper bag.
18       Q.  Do you know if it was in a proper bag in your
19   trunk?
20       A.  No, I don't know that.
21       Q.  You don't have a recollection of that is what
22   you are saying, correct?
23       A.  Correct.
24       Q.  Do you know if the alleged cocaine itself or

Page 151

1    the baggie has ever been tested for DNA or fingerprints?
2        A.  No, I don't.
3        Q.  Did you ever request that the baggie or
4    cocaine be tested for DNA or fingerprints?
5        A.  No, I did not.
6        Q.  Why not?
7        A.  It was a major crimes case at that point.  I
8    wasn't going to go forward with the DNA and all that.  I
9    was just going to make the state attorney make the
10   determination and if I needed more to charge him, then I
11   would have done what they suggested.  But I wasn't going
12   to do more for this case unless necessary.  And then
13   major crimes took over.
14       Q.  I understand they were investigating.  Are you
15   saying it was their decision and not your decision as to
16   who -- strike that.
17           By saying major crimes is investigating, are
18   you saying that it's your understanding that it's their
19   decision as to what, if anything, to test for DNA and
20   fingerprints?
21       A.  Yes.
22       Q.  And by saying that, are you saying that's not
23   your place to make suggestions to them and that's why
24   you didn't do it?

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 152

1    A. All I was told to do is do what they asked.
2    Q. What did they ask you?
3    A. What happened with the case.
4    Q. Well, they asked to you give a statement,
5    right?
6    A. Right.
7    Q. They didn't ask you to take a photograph and
8    test it for a substance, correct?
9    A. No. This was all done before they were
10   involved.
11   Q. Who asked you to do that; that is, take
12   possession of it, photograph it, test it?
13   A. That's just basic protocol.
14   Q. I think you said that you were the primary on
15   this case; is that fair?
16   A. Yes.
17   Q. What does that mean?
18   A. It means I would have had the main report.
19   Q. What's a main report?
20   A. Any arrests or charges that come from this
21   would have been documented on my side and it would be my
22   case to try.
23   Q. You would be considered the arresting officer,
24   so to speak?

Page 153

1    A. Yes.
2    Q. And therefore, you would be the primary on the
3    case?
4    A. Yes.
5    Q. Did you come to find out that there was --
6    strike that.
7    When is the first time you came to learn that
8    Abel had passed?
9    A. It would have been a few days after the fact.
10   Q. Who notified you?
11   A. It might have been done at roll call. I don't
12   know. I just know the next day when major crimes was
13   involved, they said that he had zero brain activity and
14   that's why they were called in.
15   Q. That's what an investigator told from you
16   major crimes?
17   A. That's what I heard from someone from the PD
18   of why they were there.
19   Q. Did it surprise you that he didn't survive?
20   A. It did based on what I was told by one of the
21   nurses that said he would probably recover.
22   Q. Did you attend what was called a coroner's
23   inquest?
24   A. I was there via Zoom, yes.

Page 154

1    Q. Where did you watch it via Zoom from?
2    A. From the Round Lake Beach Police Department.
3    Q. Who was with you when watching it?
4    A. Let's see. Laura Scarry, an attorney. I
5    believe John Roche was there, the other FOP attorney.
6    Q. Why were you watching it?
7    A. Because we were subpoenaed for it. And that
8    was if we were needed to testify, we would have done so
9    through Zoom. And I believe Scheithe, Bertholomey, and
10   Atwell were also present, but I don't know if they were
11   or not.
12   Q. You were served a subpoena for it, though?
13   A. Yes. We were on-call, on standby. And that
14   was what was determined would be the safest route
15   because of the rowdy crowd outside of the courthouse.
16   So it was safer for everyone for us just to do it
17   through Zoom.
18   Q. Did you prepare in any way to give potential
19   testimony?
20   A. I don't remember if I did or not.
21   Q. Well, are you prepared to testify if need be?
22   A. Yes.
23   Q. Were you called?
24   A. No.

Page 155

1    Q. Do you know why not?
2    A. Probably because I wasn't needed.
3    Q. Did you ever speak to a State's Attorney or
4    State's Attorney's representative regarding this
5    incident?
6    A. I don't believe so.
7    Q. Are you aware if the State's Attorney is
8    investigating this case for possible criminal charges?
9    A. He was allegedly doing that. I don't know if
10   he still is.
11   Q. Were you ever informed by anyone that there
12   was, in fact, an investigation happening?
13   A. Not individually, no, I was not informed.
14   Q. How were you made aware that there might have
15   been?
16   A. The coroner's inquest.
17   Q. What was said there that led you to believe
18   that was true?
19   A. It was my understanding that the inquest was
20   to determine whether or not use of force was utilized or
21   if there was something else utilized that caused his
22   death. So the determining factors were to be depicted
23   at that time.
24   Q. If, in fact, there was a criminal

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 156

1    investigation by the State, do you have any idea what
2    the status of that was?
3        A.  I was never informed of one, so no.
4        Q.  Are you curious to know the status of any if
5    there is one?
6        A.  Not really.  I didn't do anything wrong, so
7    I'm not worried about it.
8        Q.  Do you recall Dr. Baden, B-a-d-e-n, giving
9    testimony at this coroner's inquest?
10       A.  I don't recall seeing him do it, but it's
11   possible he did.
12       Q.  I'll represent to you that he was on Zoom and
13   he also wrote a report, which I produced to your
14   attorney.  Do you recall ever seeing a report by
15   Dr. Baden regarding this incident?
16       A.  I don't remember if I saw it or if I just
17   heard what it was roughly about.
18       Q.  I don't want to know what you and your
19   attorney talked about.  I just want to read one sentence
20   from the report that you might have seen or heard about.
21   Dr. Baden states, It's my opinion to a degree of medical
22   certainty that the cause of Mr. Rosiles' death was
23   hypoxic brain damage caused by interference with oxygen
24   going to his brain by prone back pressure and a plastic

Page 157

1    bag containing white powder in his throat.
2            So my question is, do you agree with
3    Dr. Baden's opinion?
4        MR. MATHUES:  Objection to the extent that this
5    calls for expert medical testimony under Rule 702 and
6    703, and this witness has not been so qualified.
7            Go ahead.  I'm not instructing you not to
8    answer the question.
9    BY THE WITNESS:
10       A.  No, I don't agree with it.  I do agree that he
11   suffocated but not to the way that he is describing.
12       Q.  What do you believe caused my client's death?
13       A.  His own willingness to swallow a bag of
14   cocaine which lodged in his throat, which caused him to
15   not be able to breathe.
16       MR. MARX:  If you give me a minute, I'm going to
17   look at my notes.  I may be done.  Just bear with me for
18   a minute, please.
19           (Recess taken, 3:51 p.m. to 3:57 p.m.)
20       MR. MARX:  That's all the questions I have.  Your
21   attorney may have some, but I'll leave it up to him.
22       MR. MATHUES:  I have three to five minutes of
23   questions.
24

Page 158

1            EXAMINATION
2    BY MR. MATHUES:
3        Q.  Tim, once the paramedics showed up to the
4    scene, did you essentially defer to their judgment as to
5    what sort of care to provide to Mr. Rosiles?
6        A.  Yes.
7        Q.  Do you know the name of the person who
8    recovered or reported that they recovered the plastic
9    bag from Mr. Rosiles' throat?
10       A.  No.
11       Q.  Do you know whether any police officer saw
12   that happen with their own eyes?
13       A.  No.
14       Q.  In all of your training, have you ever heard
15   that Narcan can be potentially harmful to someone?
16       A.  No.
17       Q.  Would it be -- is it fair to say that
18   Mr. Rosiles was given Narcan just in case whatever he
19   ingested included an opiate?
20       A.  Yes.
21       Q.  Would it be fair to say that you and Officer
22   Scheithe put Mr. Rosiles on the ground at the side of
23   your squad car approximately the time Ms. Brubaker came
24   running up?

Page 159

1        A.  Yes.
2        Q.  And have you seen on your dash cam video, as
3    part of getting ready for this deposition, Ms. Brubaker
4    come running?
5        A.  Yes.
6        Q.  Have you seen on your dash cam a video getting
7    ready for this case, Officer Kaminski's squad car
8    arrive?
9        A.  I saw him arrive on my dash cam; I'm not sure
10   about his squad car, though.
11       Q.  When Officer Kaminski arrived at the side of
12   his squad car, was Mr. Rosiles still in the prone
13   position on the ground?
14       A.  No.
15       Q.  What position was he?
16       A.  He went from standing to on his knees about
17   the time Kaminski showed up.
18       Q.  Can you estimate approximately how much time
19   passed from the time Mr. Rosiles was lifted from a prone
20   position to the time Officer Kaminski arrived?
21       A.  Roughly a minute and a half.
22       Q.  You mentioned Officer Scheithe doing the
23   Heimlich maneuver.  Did you do the Heimlich maneuver?
24       A.  No.

42  (Pages 156 to 159)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 160

1  Q.  Did you see anyone else besides Officer
2  Scheithe and Officer Kaminski do the Heimlich maneuver?
3  A.  No.
4  Q.  You were asked a few questions about a
5  Dr. Baden and his opinion.  Do you have any personal
6  knowledge what Dr. Baden did or didn't do to come to
7  that opinion?
8  A.  No.
9  Q.  And do you have any personal knowledge who
10  retained Dr. Baden in order to give the opinions that he
11  has?
12  A.  I know it was the family; but not personally,
13  no, I don't know which one retained him.
14  Q.  You were asked some questions about the
15  microphone.  Generally speaking, does the microphone
16  attached to your squad car and dash car camera
17  automatically activate if going lights and sirens?
18  A.  As long as it's working properly.
19  Q.  Generally speaking, you could also activate
20  them manually?
21  A.  Yes.
22  Q.  Would it be fair to say you didn't go lights
23  and sirens to the Thorntons in this incident because if
24  there was criminal activity going on, you didn't want to

Page 161

1  alert those inside you were coming?
2  A.  That's correct.
3  MR. MATHUES:  That's all the questions I have.
4  Mr. Marx may have some questions based on that.
5  FURTHER EXAMINATION
6  BY MR. MARX:
7  Q.  How do you know a Rosiles family member hired
8  Dr. Baden?
9  A.  It just became to be known as general
10  knowledge through social media outlets.
11  Q.  I mentioned this Julie Contreras person
12  before.  Do you remember me mentioning her name?
13  A.  Yes.
14  Q.  Do you know what her occupation is?
15  A.  Yes.
16  Q.  What's your understanding?
17  A.  She is a pastor in Waukegan and also fights
18  for immigrants' rights.
19  Q.  To your knowledge, is she a member of the
20  Rosiles family?
21  A.  No.
22  Q.  To be clear, you know that I don't represent
23  Ms. Contreras, right?
24  A.  As long as you say so, then yes.

Page 162

1  Q.  Well, I will represent to you that I represent
2  Fabiola Rosiles.  That's her sister.  Do you have any
3  reason to think otherwise?
4  A.  No.
5  MR. MARX:  That's all the questions I have.
6  Anything else, David.
7  MR. MATHUES:  I did want to ask one more question.
8  FURTHER EXAMINATION
9  BY MR. MATHUES:
10  Q.  If you sent any e-mails related to this
11  incident, would that have been on your official work
12  account with the Village of Round Lake?
13  A.  Yes.
14  MR. MATHUES:  That's all I have.
15  MR. MARX:  Sorry.  You mentioned it.  Now I have to
16  bring it up.
17  MR. MATHUES:  Fair enough.
18  FURTHER EXAMINATION
19  BY MR. MARX:
20  Q.  Officer, did you write anything regarding this
21  incident on your work e-mail?
22  A.  It's possible.  Writing two commanders or
23  someone who inquired about the incident.  And also major
24  crimes, they relayed information to look over the report

Page 163

1  to make sure it was correct before submitting it.
2  Q.  Oh.  Are you saying they submitted -- strike
3  that.
4  Major crimes made a report of their interview
5  of you, correct?
6  A.  Yes.
7  Q.  Did they submit it to you?
8  A.  Yes.
9  Q.  Okay.  And did you agree that it was accurate?
10  A.  Initially no, because they mentioned body-worn
11  cameras.  And then I looked at it again and it appeared
12  to be correct the second time around.
13  Q.  Did you find it strange that they asked you if
14  your report was correct when, in fact, it was their
15  report?
16  A.  No.  I just want to make sure that they
17  understand what I was describing.
18  Q.  Well, do you know -- strike that.
19  Do you know if they have an obligation to
20  change anything if you say, I didn't say that?
21  A.  No.  It was just all they were getting was my
22  side of the story.  And when they want to relate that in
23  the report, they wanted to make sure that it is what I
24  actually am stating.

43  (Pages 160 to 163)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 164

1     **Q. Besides the body-worn camera issue, did you**
2   **find anything else inaccurate about what they wrote**
3   **about the interview?**
4     A. I don't believe so.
5     MR. MARX: Okay. That's all the questions I have.
6     MR. MATHUES: Nothing based on that.
7     MR. MARX: Would you like to waive or reserve?
8     MR. MATHUES: The witness says he will waive, so
9   that's fine by me.
10     MR. MARX: For the record, Counsel and I agreed
11   that I'm going to retain the video that was Exhibit 1 in
12   this case.
13     THE COURT REPORTER: Mr. Marx, do you need me to
14   write this up?
15     MR. MARX: Yes. I'm going to order.
16     THE COURT REPORTER: Any rush?
17     MR. MARX: No rush.
18     MR. MATHUES: We will take a copy, E-tran, regular
19   time, no rush.
20       (Witness excused.)
21
22
23
24

44 (Page 164)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 165

```
 1    UNITED STATES OF AMERICA         )
      NORTHERN DISTRICT OF ILLINOIS    )
 2    EASTERN DIVISION                 )   SS.
      STATE OF ILLINOIS                )
 3    COUNTY OF COOK                   )

 4

 5              I, Karen Waters, Certified Shorthand Reporter,

 6    Registered Professional Reporter, and Notary Public, do

 7    hereby certify that TIMOTHY CRAMER was first duly sworn

 8    by me to testify to the whole truth and that the above

 9    deposition was reported stenographically by me and

10    reduced to typewriting under my personal direction.

11              I further certify that the said deposition was

12    taken on the date and time specified and that the

13    taking of said deposition commenced on the 17th day of

14    August, A.D., 2022, at 1:00 p.m.

15              I further certify that I am not a relative or

16    employee or attorney or counsel of any of the parties,

17    nor a relative or employee of such attorney or counsel,

18    nor financially interested directly or indirectly in

19    this action.

20

21

22

23

24
```

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 166

1         In witness whereof, I have hereunto set my

2    hand and affixed my seal of office at Chicago, Illinois,

3    this 7th day of September, A.D., 2022.

4

5

6

7

8

9

10         _____
                KAREN WATERS, CSR, RPR

11

12

13    CSR No.   084-004693

14

15

16

17

18

19

20

21

22

23

24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 167

**A**

**A.D** 165:14
166:3
**a.m** 39:10
**Abel** 1:4 28:16
37:7 50:9 51:2
59:13,13,17
60:13 61:1,14
61:18 62:3,6
62:19 64:1,16
64:22 65:13,23
66:14,18 67:22
69:2,14,22
70:17 72:3
74:3 75:5 79:1
81:4,6,8,22
84:15 85:1,8
86:11 87:20
88:4,9 89:12
89:15,17 90:5
90:14 91:8
92:5,6,13,19
94:18 96:14
97:3 98:6
99:20 100:5
101:12,20
103:24 104:5
104:23 109:23
111:19 112:11
112:20,24
113:9 118:19
122:3 131:13
135:11,15,16
135:19 136:23
137:9 147:10
153:8
**Abel's** 67:20
75:12 79:8
80:22 83:14
87:24 88:14
93:3,6 94:6,21
100:17 104:19
118:7 120:1
122:3,23 131:9

132:19,22
134:18,23
135:2 136:8,15
138:7 149:15
**able** 5:13 11:10
13:10 20:22
24:17,18 25:18
26:5,19,20
27:6,7,13,18
27:23 28:12
42:6,13 67:12
69:3 100:1
102:6 103:10
111:4 112:8
133:17 147:13
157:15
**abrasion** 138:10
138:12,13
140:11,12
**abrasions** 139:5
139:9 140:22
141:12
**abruptly** 89:8
**acceptable**
24:16 25:20
27:2
**access** 36:9
67:12 144:1
**accessed** 143:22
**accessible** 89:21
**accident** 55:7
**accompany**
120:14
**account** 162:12
**accurate** 163:9
**acquaintances**
9:10
**action** 165:19
**actions** 134:2
**activate** 45:24
46:7 47:13,16
47:20 48:4
160:17,19
**activated** 36:13
45:21 46:14

47:8,14,23,23
48:10
**activating** 48:1
**activists** 10:17
**activity** 153:13
160:24
**actual** 22:8
62:16 111:22
145:17
**add** 112:10
**additional** 32:6
**addressed** 46:22
**adequately**
104:9
**administered**
104:13 106:20
106:21,23
108:1,12,14,16
108:21 111:12
**Administrator**
1:3
**admitted** 123:24
**advance** 10:19
39:21,22
**advise** 53:7
106:6
**advised** 38:18
38:24 50:11
114:20,22
115:2,5 120:12
121:7 123:5
124:13 148:24
**advising** 8:5
**AED** 111:1,7,13
**affixed** 166:2
**afford** 12:7
**after-the-fact**
57:2,14
**afternoon** 49:14
49:19 53:16
**agencies** 9:22
20:21
**agency** 10:19
43:1,10 130:10
145:15

**aggress** 85:23
**agitated** 60:15
61:22 62:5
64:8
**agree** 18:21 21:2
21:7 25:5
131:20,23
132:17,21
134:16,22
136:22 141:24
157:2,10,10
163:9
**agreed** 39:3,15
53:24 54:13
164:10
**ahead** 66:24
157:7
**ahold** 70:13
82:19
**aid** 16:6,11
19:15
**air** 17:3 100:1
102:9,12,18
103:7,11 119:1
**airway** 18:16
**alarm** 48:8,8,10
51:5,8 52:20
52:21,23 53:2
53:10,14 54:19
55:2,4 57:5,21
58:3,5
**Alarmed** 65:21
**alarms** 51:10
58:8
**alcohol** 126:15
**alcohol-type**
126:15
**alert** 56:13
161:1
**alleged** 15:12
150:24
**allegedly** 68:15
115:8 155:9
**allow** 26:12
128:7

**allowed** 15:6
72:19
**allows** 17:14
19:20
**ambulance** 38:4
38:5 105:19,21
106:1,3 111:3
111:19,20,23
112:12,17,21
112:24 113:1,2
113:8,10,11,21
114:2,9,14,18
114:21,22
115:5,16 116:9
116:13,13,15
116:15,17,18
116:21,22
118:20 119:3,4
120:18,19
121:22 123:17
123:18 124:11
**AMERICA**
165:1
**amount** 21:8,9
21:11,15
**anatomy** 19:13
19:14
**angle** 82:5
**angry** 85:15
88:8
**animal** 144:9
**animosity** 10:13
10:16
**Ann** 34:3,6
**answer** 25:11
46:15 157:8
**answered** 66:23
91:11
**answers** 5:8,14
40:1
**Antwan** 29:2
50:10,16 51:7
54:21,23,24
55:5,7,14 59:9
59:14,14,17

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 168

60:14 61:4,6
61:11,16,23
62:1,9,10,11
63:18 65:22
66:5,11,21
68:18,23
**Antwan's** 68:21
**anybody** 7:13
28:23 33:7
56:4 68:23
120:6 129:4,20
**anymore** 8:9
121:8
**anyone's** 135:5
**anyway** 39:3
80:4
**anyways** 54:1
**apparently**
14:16 109:22
**appear** 62:19
66:21 102:15
104:3,5,6
136:14 138:9
**appearance**
17:3
**appeared** 2:6,11
82:7 98:2
103:6 109:19
163:11
**appearing** 86:19
**appears** 51:1
132:22 134:17
141:24
**apply** 24:21 26:7
29:1 91:23
**applying** 89:5
**appreciate**
76:16 134:1
**approached**
68:1,4 80:14
**approaching**
93:19
**approximate**
37:13
**approximately**

79:18 158:23
159:18
**April** 10:7,10
13:13
**area** 24:21 27:21
43:22 60:14
71:6 74:12,15
74:20 76:18,22
77:1 80:20
82:8 83:15,18
88:18 89:3,6
91:15 111:22
112:20 116:21
126:16 131:10
134:18 139:19
141:9,23
**areas** 11:13
140:6
**argument** 62:18
**arm** 83:9 88:20
89:2,5 91:14
91:16 131:9
133:1
**armed** 58:10,13
**arrangements**
121:23
**arrest** 20:20
36:21 65:15,23
137:4 147:20
147:22 148:1
**arrested** 29:9,12
59:15,24 61:11
66:1 147:10
**arresting** 152:23
**arrests** 31:17
152:20
**arrive** 27:13
86:6 106:11
109:6,13
120:17 159:8,9
**arrived** 50:10
71:13 94:17
107:11 109:4,9
110:24 111:1
111:16 118:21

119:2 120:20
123:6 159:11
159:20
**arrives** 112:7
**arriving** 106:8
107:3,6
**asked** 35:11
51:16 66:23
78:16 79:19
91:11 98:5,17
99:16,19
111:14 121:1
152:1,4,11
160:4,14
163:13
**asking** 46:21
66:6 83:2
97:12 98:1
101:11 134:5
**aspect** 54:6
**asphyxia** 16:15
19:8 25:8
100:23
**asphyxiation**
16:15,22 17:6
18:23 19:2
25:15
**assess** 27:13
88:7 111:21,24
**assessed** 111:2
**assesses** 111:10
**assessing** 97:15
109:15,20,24
**assessment**
107:14
**assigned** 43:22
44:3,8,12,21
48:17
**assignment**
48:15
**assist** 44:14
51:13 54:3
109:21 113:17
**assisted** 74:24
78:19

**assisting** 80:23
122:10
**associated**
100:22
**assume** 7:21,23
44:4 49:10
51:6 75:23
94:4 102:22
109:14 116:4
126:3 133:14
137:5 146:21
**assumed** 68:6,16
94:7
**assuming** 43:15
124:1
**attached** 160:16
**attempt** 18:14
**attempted** 70:6
97:14 103:14
**attempting**
47:20 85:10
**attend** 153:22
**attire** 40:22
**attorney** 5:2 7:2
7:3,14,23 8:21
33:23 146:23
147:8,15,16
151:9 154:4,5
155:3,7 156:14
156:19 157:21
165:16,17
**Attorney's**
155:4
**Atwell** 1:9 2:13
7:18 8:14 9:9
44:20,21 49:20
53:17 71:12,19
71:21 74:10
75:9 79:11
86:1 87:14,17
96:22 107:2
115:12,15
116:2,12 118:6
120:16,20
123:21 124:2

132:13 149:24
150:2 154:10
**audio** 6:11,14
35:7,10,12
36:1 46:5,7
52:24
**August** 1:19
10:7 165:14
**Automated**
111:8
**automatically**
160:17
**autopsy** 137:22
138:2
**available** 36:13
53:2
**avoided** 27:8
**aware** 14:2 46:4
50:3 52:21
53:6 90:10,21
94:3,3 137:11
155:7,14
**awkward** 9:8

**B**

**B** 3:11 40:21
**B-a-d-e-n** 156:8
**B-E-A-S-T**
144:10
**babies** 100:22
**baby** 101:2,6,6
**back** 5:10,11
14:14 22:9,18
24:10,17,19
25:22 26:2,16
26:22 27:2,8
27:16,21 28:2
36:15 38:9
42:18 47:6
50:16 52:9,24
53:24 57:24
59:3 62:11,12
63:18 64:6,24
66:14 67:13,23
69:11 70:2,8

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

71:5,7,23 72:1
74:24 75:16,24
76:3,24 77:8
78:19 79:24
80:1 82:11,18
85:24 86:16
87:1,3,10
88:20 99:23
100:4 101:6
111:15,19,20
111:22 112:21
114:2,5,8,14
114:18 115:4
116:15,20
118:20 122:14
123:7,9,11
124:21 132:23
133:4 134:23
134:24 135:2,5
136:15,16
150:5 156:24
**background**
48:14
**backs** 25:2
**backtrack** 34:2
36:15 50:19
**backup** 27:12
**bad** 94:15
**Baden** 156:8,15
156:21 160:5,6
160:10 161:8
**Baden's** 157:3
**badge** 40:22
**bag** 41:4 114:23
115:7,12,15,17
115:23 116:3
117:10,11,13
117:15,17,20
118:10 123:15
123:18 125:2
126:9,14,17
127:1,2 130:1
130:3 143:5,14
143:15 145:4
145:12,16,20

145:20,21
149:14,19
150:17,18
157:1,13 158:9
**baggie** 111:5
116:22 118:17
125:3,7,14
126:2,6 128:13
128:21 129:10
145:6,8 151:1
151:3
**bags** 145:14,14
**balance** 11:9
**ball** 129:11,12
**band** 42:8
**Barr** 37:3 49:19
49:21 113:23
**based** 19:11
126:18 130:22
136:20 153:20
161:4 164:6
**basic** 19:13,14
152:13
**basically** 6:8
8:18 10:15,18
14:19 15:14
17:4,10 19:12
24:12 37:4
38:12 42:2
50:14 54:10,22
85:10,15
112:17 115:24
**Bates-stamped**
130:16 137:20
142:23 144:19
**bathroom** 54:22
59:12,22 60:13
60:14,20,21,23
61:2,7
**baton** 41:3
**Beach** 1:8 8:15
9:2 10:1,7
13:11,12 15:1
30:10 31:8,11
31:15 33:8,11

36:11 40:22
43:11 55:11
128:4 145:19
154:2
**bear** 19:5
157:17
**beast** 144:6,8,9
144:9,20
**beat** 40:23 44:8
**bed** 119:21
**beer** 9:13
**began** 49:23
62:12 103:11
109:16 111:2
**beginning**
121:12 133:18
**behalf** 2:6,11
**believe** 4:24
6:17 10:16
11:24 15:7
16:8 17:22
25:16 26:14
34:2,11,12
36:8 37:3 38:2
41:3,12,15,16
43:7 44:4,20
44:21,21 45:23
47:3 51:13
54:23 56:5
60:8 63:3 65:4
65:11 69:8
71:21 74:10
75:6,9 80:3,13
80:14 81:5
82:16,19 83:23
91:7,14 92:1,6
92:24 94:20
96:7 97:6
98:15,23 99:12
100:2 102:20
104:7 105:9,20
106:17,22
108:17 109:20
110:17 111:5
113:4,23

115:11,12
116:8 118:23
120:19 121:19
122:17 123:4
124:15 125:11
126:22 128:8
128:16,19
133:20 136:3
140:4 141:23
147:6 150:10
154:5,9 155:6
155:17 157:12
164:4
**believed** 77:7
**belt** 40:22
**BERSANI** 2:7
**Bertholomey**
1:8 50:7,12
51:16,18 52:2
53:18 56:1
58:15 59:6
60:1 63:10
64:19 71:13,19
71:20 79:13
80:5,14,16,23
81:1,14,22
82:6 86:1
87:14,17 107:2
132:14 148:4,8
148:10,21
154:9
**Bertholomey's**
53:23
**best** 17:11 23:15
24:12 25:2,12
28:18,21 31:6
55:21 58:11
77:7 90:21
103:21 109:21
116:1 138:3,20
139:15 141:8
141:20
**better** 10:15,21
11:6,8 13:18
26:13 28:13

56:8 109:21
112:6 145:13
**beverage** 29:16
**big** 11:12 52:6
**birthmarks**
139:7
**bit** 9:8 35:18
73:2,2,3,12,17
77:2 124:3
133:18 134:7
134:10 135:2
**black** 65:4 93:15
125:11 136:18
**blade** 24:21
27:21
**blank** 33:15
**blue** 115:13
125:12 126:22
149:18
**board** 34:13
**body** 6:17 19:18
36:10,12,12
46:16 47:21
72:9 73:18,20
73:22 77:10,21
81:11 83:14
88:17,21,24
99:12 100:8
105:12 112:2,8
131:17,18
**body-worn**
42:24 46:18
163:10 164:1
**bootie** 115:13,13
115:19 149:15
150:8,13
**bottom** 135:12
**Boulevard** 2:3
**box** 146:11,18
**brain** 153:13
156:23,24
**break** 70:6
85:14 86:1
**breakfast** 9:15
**breathe** 17:2,14

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 170

19:12,20,24
20:2 26:12
99:24 101:9,13
157:15
**breathing** 16:19
17:16 19:19,22
20:7 25:19
28:10 108:16
**brief** 93:18
**briefly** 7:24 8:1
18:12 50:13
60:3,12 69:11
111:22 123:18
124:10
**bring** 71:21
74:11,11
162:16
**broader** 27:22
**Brooksville**
11:17
**brought** 14:6
67:24 71:5,22
75:24 99:23
101:20,22
**brown** 139:18
**brownish**
138:24
**Brubaker** 30:22
30:22 85:22
86:17,23 87:18
132:11 133:20
133:23 158:23
159:3
**Bureau** 9:23
12:2,5,13
**button** 55:15

———————
**C**
———————
**C-r-a-m-e-r**
4:11
**calculation**
112:6
**call** 8:4 15:2
30:13 44:7
46:13 48:8,9

48:16,19,20,21
48:22,24 49:7
49:8,9,11,12
49:14 50:7,8
50:21 51:12,14
52:8,16,19,20
53:3,5,11,19
54:14,18 55:24
58:6 60:3
67:22 68:11,23
69:2 96:1
105:19 110:5,6
144:8 147:8
153:11
**called** 1:12 4:4
22:11 34:21
37:6,6,20 44:6
105:20,21,22
105:22,24
106:4,6 121:23
128:9 130:17
144:10 153:14
153:22 154:23
**calling** 58:9
105:23
**calls** 31:16 43:20
77:18 109:10
113:3 157:5
**calm** 61:10,11
**cam** 6:17 36:12
47:13 112:8
159:2,6,9
**camera** 6:18
42:24 44:24
45:11 46:18
47:14,23 48:4
57:9 85:21
86:16 112:2
160:16 164:1
**cameras** 36:13
57:14 163:11
**cams** 36:10,12
**cancel** 40:7,11
**canceled** 40:3
**capacity** 14:8

16:1 29:23
**capture** 57:3
**captures** 137:12
**car** 43:21 44:1,1
44:1,4,5,10
47:12 55:19
59:3 67:19,20
67:21,23,24
69:12 70:2,4
74:16 80:1
82:4 83:20
85:21 93:1,2
94:13,17,18
97:20 121:22
123:11 124:13
124:16,22,22
135:4,5 149:16
150:4,7 158:23
159:7,10,12
160:16,16
**cardiac** 111:9
**cardio** 17:22
**care** 85:10 137:3
158:5
**career** 10:23
129:17
**Carrie** 34:3,6
**carried** 41:3,6
**carry** 40:24 41:8
96:1
**cars** 54:12
**case** 10:13,17
37:24 38:16
46:6 91:23
108:22 112:16
123:10 124:1,7
137:22 142:7
143:3,16
147:14 151:7
151:12 152:3
152:15,22
153:3 155:8
158:18 159:7
164:12
**cases** 4:22

**caught** 29:20
36:8 110:12
**cause** 18:23 19:1
25:15 27:6
48:10 156:22
**caused** 94:3
155:21 156:23
157:12,14
**causes** 25:18
**Cedar** 106:16
**cell** 9:19 14:15
128:1,4 130:17
137:11,12
**center** 52:22
**Central** 11:14
11:15,19,21
**certain** 9:7
32:17 47:16
57:8 96:4
140:5
**certainty** 156:22
**Certificate** 2:24
**Certified** 1:16
165:5
**certify** 165:7,11
165:15
**chain** 123:23
144:11
**chairs** 48:24
**chance** 5:6
**change** 5:8,10
11:7 49:12
163:20
**changed** 89:8
**charge** 31:13,20
32:2 33:16
41:14 46:14
113:24 127:21
128:6 148:5,7
151:10
**charges** 50:16
61:12,23,24
66:3 148:2
152:20 155:8
**charging** 46:12

**check** 119:18
126:21 133:10
**cheek** 139:18
**chemicals**
126:16
**chest** 17:16
25:17 73:23
76:8 81:2,4
82:7,18 83:15
83:20 88:19
**chewing** 92:18
92:20 93:11,13
93:16,22 95:5
96:14 97:24
100:13 130:2
**chews** 93:4
**Chicago** 2:4
166:2
**chief** 31:24 37:5
37:5 121:24
130:9
**choke** 98:10,11
106:13
**choked** 114:20
**choking** 17:3
18:15 98:15
99:16 103:9
106:6,7 108:15
108:17,19,20
108:24 110:7,9
110:13,16,18
116:11
**circle** 42:10
**circling** 138:6
**circumstances**
21:4
**citizens** 46:17
**City** 10:2
**civil** 1:14 4:24
**civilian** 14:3
**clarify** 5:10
**clarifying** 26:24
**clasp** 42:11,11
42:11,13
**Class** 40:21

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 171

classes 16:6
17:18 19:13
clear 66:20 84:4
91:5 123:15
124:4 131:12
134:4,7 136:5
161:22
clearly 67:21
69:4 72:14
clerk 29:7 50:10
58:9
clerks 51:10
55:10
client 30:24
138:23 139:10
139:19
client's 36:21
139:1 140:5,19
141:9,23
157:12
clientele 55:12
clip 134:21
136:7
close 34:17 59:3
70:22 81:13
87:6,12,15
117:7 131:22
closed 102:19
105:4,7
closer 84:11
clothes 136:19
clothing 80:3
coaching 14:19
Coast 11:16,18
cocaine 125:4
126:13,16,19
126:22 127:9
127:10 128:20
129:10,21,24
143:13 145:3
146:22 147:11
147:20 149:18
149:19 150:24
151:4 157:14
coffee 29:5

collapse 104:11
color 93:14
126:20
coloring 126:18
come 11:4 37:21
39:23 40:9
102:10 120:18
127:16 129:13
145:5 147:13
152:20 153:5
159:4 160:6
comes 81:14
comfortable
55:13
coming 49:22
59:21 79:12,14
85:13,16 87:12
88:8 116:9,23
121:21 161:1
command 9:4
112:18 113:24
119:19 121:20
127:23
commander
31:24 33:15,18
37:3 49:19
113:23 143:24
commanders
162:22
commands
64:22 85:24
commenced
165:13
commencing
1:19
comment
100:13,17
111:18
common 20:9
93:4
communication
29:15
communicatio...
52:22
compartment

45:5
complaints 14:2
14:4,5
complete 5:14
completed 23:22
completely
33:19
compliant 24:14
77:6
comprised 33:5
computer 55:22
conceal 95:13,16
concerned 64:4
67:9
concrete 83:21
83:23 84:1
Condell 113:4
119:8
condition 122:3
CONDON 2:7
conduct 62:1
65:18,20
147:23
conducted 6:1
conducting
38:19
confrontation
59:13
consciousness
118:19,22
119:16 122:13
consider 9:9
considered
11:21 21:8,12
152:23
consist 48:22
constant 14:12
14:20
contact 8:11,14
14:13,20 28:19
31:24 78:6,9
78:12 88:10,16
89:7 91:22
contain 115:24
containing

157:1
continue 85:17
105:23
continued 51:1
57:24 59:13
61:14,17,19,23
85:23
contract 34:12
34:15
Contreras 31:4
161:11,23
control 22:19
23:7,9 24:18
26:3,4 27:17
77:21
controlled 71:7
72:6 73:9,13
73:14 76:8,10
76:15,15
conversation
38:3,15 114:15
conversations
29:21 37:16
convicted 16:3
COOK 165:3
cooperating
77:9
cooperative
23:8
copy 164:18
coroner's
153:22 155:16
156:9
correct 4:12,20
5:8,10 6:2,21
7:18 8:9,10
10:8,10,11
12:12 16:12
17:18 21:17,24
22:1,24 23:24
39:7 42:24
43:1 47:24
48:1 55:16
56:6,22 58:16
60:20 69:15,18

70:8 71:16
72:20,23 74:1
74:20 81:6,15
85:3 87:18
88:2 90:3,11
90:15 91:15
94:21 96:12
100:7 103:19
114:3 123:19
125:15 129:1
131:14 132:9
133:1,5 135:19
135:20 142:7
143:3,5 146:15
146:22 147:2
147:20,21,23
148:15,21,22
149:22,24
150:6,22,23
152:8 161:2
163:1,5,12,14
Corrections
13:3 14:11
correctly 100:1
cough 103:8
counsel 164:10
165:16,17
County 9:24
13:1,4 14:11
32:15 33:1,6
165:3
couple 6:16 8:7
11:10 45:23
46:2,3 48:14
60:22 106:17
118:3 119:6
122:6 123:16
130:2 137:23
course 5:7 7:21
court 1:1 14:14
164:13,16
courthouse
154:15
Courts 1:14
covered 13:12

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 172

118:15,16
covert 56:9 57:7
coworkers 8:12
CPR 17:18,20
   17:23 18:1
   111:3
Cramer 1:8,12
   3:4,12 4:3,10
   4:12 134:11
   165:7
crashes 31:18
credibility 30:16
crime 16:3
   29:24 61:16
crime's 36:20
crime-related
   113:18,19
crimes 31:17
   32:15 33:1,16
   33:17,22 34:2
   34:4,20 37:20
   130:10 142:14
   148:12 149:1,2
   151:7,13,17
   153:12,16
   162:24 163:4
criminal 4:22
   38:19,22 155:8
   155:24 160:24
critical 49:5
crouched 89:11
crowd 85:15
   154:15
crying 133:18
CSR 1:16 2:23
   2:24 166:10,13
cuffed 22:20
cuffs 41:5
curb 56:19 71:6
   74:19 83:21
   84:1,1
curious 50:22
   156:4
currently 8:8
   33:3

cursor 138:7
curve 131:21
custody 85:12
   119:15,22
   121:11 123:23
   124:5 144:11
cut 138:9,12,13

—— D ——

D 3:1
dad 13:21
damage 156:23
dash 6:18,18
   36:13 47:13,14
   159:2,6,9
   160:16
date 28:19,21
   165:12
David 2:7 97:1
   162:6
day 34:10 39:9
   40:15,17,19
   44:2 48:16,17
   68:14 95:4
   108:12 153:12
   165:13 166:3
days 40:2,6,6,8
   40:8,12,13
   153:9
de-escalate
   63:20 67:8
de-escalated
   64:11
dead 64:9,10
deadly 21:16,17
deal 19:6 52:6
deals 8:16
dealt 87:17
death 155:22
   156:22 157:12
deceased 1:4
decided 11:7
   73:4 121:6
decides 111:11
decipher 102:6

decision 12:15
   31:23 147:9,17
   151:15,15,19
defendant 37:24
   38:15 46:6
defendants 1:10
   2:11 37:11
defense 138:1
defer 158:4
defibrillator
   111:8
definitely 98:16
   118:15,16
   121:19
definition 65:19
degree 156:21
department
   8:15 9:1 10:7
   13:3 31:11,15
   33:11 154:2
depending 21:3
   45:24
depends 146:23
depict 149:18
depicted 46:5
   83:1 149:12
   155:22
deposition 1:12
   3:12 4:14 5:2,5
   5:9,15,18 6:12
   7:4 8:6 96:24
   130:6,13,21
   137:17 138:16
   139:13,24
   140:15 141:3
   141:18 142:19
   144:15 149:7
   159:3 165:9,11
   165:13
depositions 1:15
   4:22 5:4
deputy 31:24
   37:5 121:24
   130:9
describe 18:12

40:20 72:16
   82:1 83:17
   98:19 109:8
   117:9,13
   118:13 129:10
described 41:22
   63:24 64:4
   85:9 86:12
   91:9 92:14
   97:4 102:12
   127:6 131:17
   145:13 150:9
describing
   157:11 163:17
description
   145:5,23
   146:11
desire 57:7
desks 49:1
detailed 145:5
   145:22 146:11
detain 20:22
detained 61:15
   61:24 66:1,3
detainee 121:11
detective 33:7
   34:3 107:22
   123:4
detectives 9:5
detention 85:17
determination
   151:10
determine
   155:20
determined
   147:18 154:14
determining
   119:15 155:22
device 46:8
diaphragm
   19:17 20:2,5
   25:18
difference 42:1
different 11:12
   20:20 23:9

24:9,9,11 44:8
   53:3 145:15
   148:17
difficult 101:13
difficulty 20:7
   62:20 66:22
   67:2
direct 31:24
   49:18
direction 61:4
   103:3 165:10
directly 165:18
discharging
   21:16
discipline 14:7
   14:10,21 15:16
discoloration
   139:18 140:6
   140:20 141:10
discussed 7:1
dislodge 103:11
   111:4,6
dislodged
   149:20,21
disorderly 62:1
   65:18,19
   147:22
dispatch 44:6,13
   53:4 54:14,15
   54:21,24 55:2
   110:10 113:6
   123:5
dispatched 50:7
dispute 60:4
distance 87:8
District 1:1,1,14
   11:18,20 165:1
disturbed 65:21
DIVISION 1:2
   165:2
dmathues@hc...
   2:10
DNA 151:1,4,8
   151:19
doctor 115:19

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 173

122:15,21
**document**
128:24 137:16
138:18 139:16
140:2 142:6,21
144:13,17,20
144:23 148:9
148:20 149:4,9
149:13
**documentation**
142:10
**documented**
152:21
**documenting**
144:4
**doing** 8:16 13:9
15:9 22:11
27:20 29:16,19
51:6 64:1 70:5
73:24 74:14,14
81:16 83:12
85:11,11 88:4
88:11 90:21
93:24 95:5
97:12 100:3,19
103:22 108:7
110:4 132:6
155:9 159:22
**donkey** 82:3,5
**door** 56:20 70:2
83:20 143:22
**doors** 67:17
**dots** 149:18
**double** 78:18
**downstairs**
55:19
**downward** 19:4
27:11,16
**dozen** 4:18
**Dr** 156:8,15,21
157:3 160:5,6
160:10 161:8
**draw** 64:17
**drawing** 33:15
**dressed** 40:19

**drive** 48:11
119:10 120:17
**driver** 128:8
**drop-down**
145:18 146:9
146:10,18,20
**drop-downs**
146:13
**drove** 114:6
**drug** 96:4
**Dude** 92:18
96:13 97:5
**due** 108:21
148:5
**duly** 4:4 165:7
**duties** 31:14,19
**duty** 15:22
49:15 50:21
52:11

_____
                E
_____

**E** 3:1,11
**e-mail** 2:5,10
162:21
**e-mails** 162:10
**E-tran** 164:18
**early** 40:9
**easier** 20:3
**easily** 27:23
67:12
**east** 44:1 56:18
58:22
**eastbound** 70:6
**EASTERN** 1:2
165:2
**effect** 34:16 53:1
62:14 79:20
80:17 84:22
106:7 108:19
110:7,8,18
117:4 118:7,15
144:5
**effecting** 20:19
**efforts** 69:22
**eight** 12:1

**eight-and-a-h...**
30:14
**either** 8:3,20
44:7 47:22
81:6 93:1
98:13 143:14
**electronic** 111:8
**elevator** 14:16
**else's** 6:3
**emergency**
22:12,12,19
**employee**
165:16,17
**EMS** 106:6
111:15,23
112:3,7 118:21
119:1
**en** 15:1 51:13
53:7 79:16
**encouraging**
103:8
**ended** 54:10
85:16 124:1
**enforcement**
9:22 10:23
14:1,4,8 16:1
17:24 33:6
**engaged** 29:15
**entailed** 114:16
**enter** 48:11
60:11
**entering** 57:11
**entire** 59:11
70:15,16
136:23
**envelope** 143:15
143:16 145:9
145:11,13,17
145:18,20
**envelopes**
145:15
**equipment**
40:24
**escape** 77:3
**escort** 69:22

**escorted** 62:2
63:22 67:19
**escorting** 67:17
69:17
**essentially** 149:5
158:4
**Estate** 1:4
**estimate** 30:5
47:9 159:18
**event** 57:9
**eventually**
104:23
**everybody** 26:8
64:12
**evidence** 113:18
113:19 115:12
123:12,14
125:1,16,24
126:9,10,12
127:5,18,22
128:23,23
143:3,8,8,12
143:14,15,19
143:21,23,23
143:24 144:3,7
147:13,17
149:16,17
**exact** 15:10
17:21
**exactly** 22:7
34:15 37:6
63:4 68:17
91:10 122:11
126:23 127:13
**examination**
1:13 3:5,6,7,8
3:9 4:6 158:1
161:5 162:8,18
**examined** 4:5
**example** 8:13
21:11,15 47:10
146:15
**excited** 60:15
**exclusive** 44:13
**excused** 164:20

**escorted** 62:2
**exhibit** 3:12,14
3:15,16,17,18
3:19,20,21,22
3:23,24 130:5
130:6,12,16
137:15,17
138:15,16,20
139:12,13,23
139:24 140:14
140:15 141:3,5
141:5,17,18
142:18,19
144:14,15
149:6,7,11
164:11
**existed** 36:4
**exit** 116:13,17
116:22
**exited** 62:3
**expand** 19:20
20:3
**expel** 18:14
103:10 104:19
**experience**
55:14 129:13
**expert** 157:5
**explain** 22:7
76:12
**extended** 25:6
**extent** 9:7 57:8
77:17 109:10
135:24 157:4
**extracted**
123:15
**eyes** 105:7,9
158:12
**eyeshot** 57:4

_____
                F
_____

**Fabiola** 1:3 31:1
162:2
**face** 93:7 94:1
98:3,17 99:21
100:9,18,24
101:7,8,12,16

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 174

101:18 131:6,9
139:1
**faced** 21:4,17
**facility** 126:11
**facing** 10:16
45:3,3,5 56:16
56:17,19,20
81:8 82:3
85:21 100:9,10
100:10 103:2
**fact** 60:9 61:24
70:7 86:24
153:9 155:12
155:24 163:14
**factors** 155:22
**fair** 6:22 7:23
9:12,18 10:24
11:2 16:5
18:21 19:21
20:12 21:13
22:15 31:19
33:5 35:19,22
37:10 39:9,15
40:2 44:11
52:18 54:13
69:6 84:9 91:7
101:17 105:11
112:19 117:3
119:24 129:20
132:13 133:15
147:19 152:15
158:17,21
160:22 162:17
**fairly** 130:20
**false** 51:9
**family** 10:15
31:7,8 120:7,7
120:9,11
122:23 160:12
161:7,20
**far** 6:14 22:8
38:10 40:8
48:1 54:7 60:7
70:21 77:21
119:9

**fast** 15:4,6
**father** 13:19
**father-in-law**
11:5 13:21,22
**feat** 102:1
**federal** 1:13
12:2,8,13
**feel** 55:13
**feeling** 36:16
**feels** 44:13
**feet** 46:3 71:5
73:7 74:12
78:20,23 80:4
80:18,21,22
81:16 82:22
83:22 87:9,13
94:10 99:23,24
101:20,23
**felony** 146:22
147:1,4,7,10
**felt** 10:20
**female** 68:2
122:18,19
132:9
**females** 85:18
**field** 5:22 6:4,6
145:3
**field-tested**
125:3 149:19
**fight** 26:20
57:23 58:4,7
**fighting** 24:13
26:5,10,14,15
26:17,18 28:4
28:6,10
**fights** 161:17
**figure** 20:10
37:17 48:11
56:1 71:4,23
73:15 79:12
80:24 85:11
88:7 93:3
97:11 102:4
110:22 112:15
**figured** 74:13

**fill** 144:2,23
148:9,20
**fill-out** 146:9,10
**filled** 142:7
**filling** 31:23
**final** 11:19
**finances** 11:6
43:15
**financial** 11:8
13:18
**financially**
165:18
**find** 8:12 13:10
42:17 50:20
76:16 98:24
113:19 153:5
163:13 164:2
**fine** 28:10 87:11
122:8,12 133:8
164:9
**fingerprints**
151:1,4,20
**fire** 110:5
**fire-rescue**
106:14
**firearm** 21:16
**first** 4:4 16:5,11
19:15 32:23
50:3 52:16
57:20 58:18,19
58:20,20 59:7
60:2,3,10 65:9
86:3,12 107:5
107:5,7,10
153:7 165:7
**five** 18:4,6
106:18 112:4
132:8,16
133:12 134:13
134:15 157:22
**Five/six** 12:20
**flashlight** 99:9
**floor** 101:1,2
115:20
**flop** 72:15 73:4

**Florida** 4:19,23
9:23 10:24
11:2,12,13,14
11:19,22 12:14
24:20 42:7,14
42:15
**focused** 90:8,9
91:4
**follow** 51:17
**follow-ups** 49:4
**following** 9:22
**follows** 4:5
**foot** 80:7,19,20
81:15 82:4
94:8 95:2
**footage** 36:12
**footie** 115:18
117:1 150:8,13
**FOP** 33:23 34:8
34:12 154:5
**force** 5:22,23,24
20:12,18,20,22
20:24 21:3,7,9
21:9,11,15,16
21:17 22:2
25:21 27:2
32:15,19 33:1
33:12 34:20,22
36:20 38:18
72:19 91:23
155:20
**forced** 39:16,19
**forcefully** 85:24
**forceps** 111:5
115:1
**forgot** 23:11
33:19
**form** 14:7 25:9
25:23 27:4
92:8 102:16
114:10 129:22
**former** 8:12
13:19
**Fort** 11:16
**forward** 27:14

38:12 149:3
151:8
**found** 10:22
15:22 60:9
**foundation** 25:9
25:23 27:4
129:22
**four** 11:17 18:4
18:6 128:24
129:1 145:3
**frame** 9:12
130:22 131:8
**framed** 10:18
**free** 70:6
**frequently**
47:11
**Friday** 40:10
**friend** 122:24
**friendly** 9:17
29:19
**friends** 9:9
**front** 45:3,5
56:20 57:10
67:17
**fuck** 62:14,15
**full** 40:21
**full-time** 12:23
13:10
**fully** 40:21
105:14,14
**further** 3:7,8,9
11:21 28:4
61:16 144:2
161:5 162:8,18
165:11,15

---

**G**

**G** 2:7 146:17
**gang** 107:22
**gas** 58:3
**gasping** 17:3
102:8,9,11,18
103:6 119:1
**gasps** 100:1
119:1

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 175

gathered 109:15
127:22
general 161:9
generally 20:17
22:15 160:15
160:19
George 67:22
68:10,11,14,19
69:2
getting 22:20
38:11 42:18
43:5 57:13
67:7 73:7
74:24 80:4
106:13 113:7
159:3,6 163:21
giant 42:8
girlfriend 36:7
67:21 68:6
69:3 85:20
86:8,13,18
87:7,11
gist 38:11
give 4:22 5:14
15:11 35:4
36:24 37:21
46:15 47:9,11
64:22 122:13
152:4 154:18
157:16 160:10
given 4:14 14:12
14:18 15:4
18:1 35:14
124:6 158:18
giving 34:9 37:4
156:8
glance 90:16
glass 42:18
glob 118:16
gloves 95:19,22
96:2,2,6,6,8
116:2 125:6,8
125:10,12,13
125:14 131:11
go 5:1,8,10,11

7:9 15:6 22:9
23:6,6,7 29:5
47:1,6 48:9
49:1,14,15
51:11,15 52:9
52:24 53:7,19
53:24 54:15
55:8,12,22,24
57:2 61:14,17
61:18 63:12
66:24 68:18
72:13,14 76:3
78:19 110:11
110:21,21
111:13 112:17
113:21 119:7
120:3 121:18
123:7 151:8
157:7 160:22
goal 23:23 24:24
goes 6:15
going 5:1 8:5,22
15:2,4 28:6,7
28:14 32:13,15
32:16 36:17
37:8,21 38:11
44:1 46:12,13
48:9 50:11
52:5 53:6,20
54:11,15 57:21
59:11 62:17
63:9 64:8,16
65:24 66:10,13
67:12,20,22
70:4,5,23 71:4
71:24 72:16
79:13 82:21
88:7,11,13
90:22 92:3
102:4 104:23
107:14 110:1
114:22 119:16
119:19 121:1
123:22 124:5
124:11 130:4,5

130:23 132:4
132:16 133:14
133:24 134:13
137:15 138:15
142:6,18
147:12,13
148:3,4,7,11
149:1 151:8,9
151:11 156:24
157:16 160:17
160:24 164:11
164:15
golf 129:11,12
Gomez 30:19
69:7 133:17
good 11:9 46:15
54:8 57:19
75:10 80:2
120:22
gotten 114:24
grab 82:22
grabbed 82:19
83:4,7
grabbing 22:19
gram 146:19
grams 129:1,1
130:2 145:3
147:5
grasp 59:11
70:10,16 71:4
grass 71:21,22
74:11 75:16,24
76:17 77:11,16
79:12 83:22,22
131:18
grassy 71:6
74:12,15,18,20
76:18,21 77:1
83:18 111:22
great 21:15
ground 22:17,21
22:24 23:3,8
26:23 71:3,7,9
71:15 72:3,9
72:11,14,15,17

72:23 73:5,10
73:17,19,21
74:1,3,7 76:3
76:11,15,18,24
77:16,20 82:12
82:15 83:10,13
83:14,16 84:8
85:8 86:11
87:21,24 88:5
89:18 91:8,24
92:2,13 93:19
96:15 97:3
100:5,10,24
101:8,12,18
104:8,11,12
131:13,16
132:9 135:11
158:22 159:13
guess 22:22 46:6
77:3 101:11
Gulf 11:16
gun 40:22 64:17
guy 51:20 52:6
59:20
guys 53:16
107:22

**H**

H 1:9 3:11
HALE 2:2
half 13:24 30:7
97:7 112:2,9
159:21
hand 23:23
24:10 27:10,16
63:9,13,21,23
64:3,13 88:9
88:15 89:20,21
116:24 132:18
133:4 134:17
135:3 140:20
140:20 166:2
handcuff 22:18
23:20 24:3,9
24:18 26:23

handcuffed
26:18,21 28:3
66:14 67:3,14
70:7 119:21,23
handcuffing
21:12 22:6,12
22:19 24:23
65:13 66:16
handcuffs 20:21
27:3,18 41:2
61:13,15 63:11
104:12
handful 48:3
handgun 41:2
handled 34:23
50:8 51:14
54:5 85:15
87:14
handling 116:3
hands 14:17
24:11 61:19
62:24 63:6,17
63:18 64:23,24
67:13 77:21,23
88:14 89:17
132:22 134:23
136:10,15
137:4
happen 27:10
150:2 158:12
happened 6:7
15:15 36:2,24
37:17,17 42:19
50:22 51:18
52:12 56:24
59:10 70:1
71:1 74:9 82:2
97:8 114:5
116:6 129:16
148:15 150:12
152:3
happening 50:4
52:15 56:2
85:9 99:22
101:2 103:5

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 176

110:23 155:12
**happens** 57:10
 57:18 84:14,15
**happy** 5:9
**harassment**
 50:17 59:15
 62:1
**hard** 72:10
 101:9 118:17
**harmful** 158:15
**head** 83:19 84:9
 97:13 98:7,17
 99:20 100:5,8
 100:14 138:7
**headbutting**
 27:20 28:4
**healing** 139:6
**health** 10:15
**hear** 68:23 75:1
 75:7 78:21
 85:13 92:14,17
 96:14 133:7,13
 133:14,15,17
 133:18,19,19
 134:7,10,11
**heard** 8:23 19:7
 28:22 30:18
 31:7 40:1
 52:19 53:14
 57:20 62:19
 66:20 80:22
 92:18 96:13
 97:5 100:21
 101:2,5 102:8
 102:10 105:22
 153:17 156:17
 156:20 158:14
**hearing** 84:24
 85:4
**heart** 111:9,10
**heat** 11:9
**heated** 62:18
**Heath** 2:13
**height** 23:16
**Heights** 9:24

12:12,18 16:9
36:11 43:11
107:8
**Heimlich** 18:10
 18:19 100:3
 103:11,14
 104:6,15,22
 105:2,17
 106:19 108:2,7
 115:1 119:22
 159:23,23
 160:2
**held** 147:12,17
**help** 20:2 26:7
 99:24 108:20
 110:2
**helped** 79:20
**helpful** 42:17
 44:14
**helping** 24:8
 108:19
**helps** 19:19
 27:21
**hereunto** 166:1
**Herrera** 123:4
**HERVAS** 2:7
**hey** 8:16,18
 74:10
**hi** 29:19
**hide** 129:21
**hiding** 129:14
**high** 23:6
**high-risk** 14:13
**higher** 43:16
**highly** 59:9
**Highway** 9:23
 10:24 11:13,22
**Hill** 34:6
**hip** 23:5
**hired** 161:7
**hit** 45:23 47:17
 51:8 73:20
 82:6 83:14
**hits** 83:16
**hobble** 41:23

42:2
**hold** 115:14
**holding** 56:12
 115:17 150:16
**holdup** 48:8,10
 51:4,8,9 52:20
 52:21,23 53:1
 53:10,14 54:7
 54:18 55:3
**home** 15:2,4
 37:19 128:5
**honest** 5:14
**hooded** 63:7
 65:4
**hoodie** 63:3
**horrible** 107:21
**hospital** 37:8,8
 38:5 112:17
 114:6,7 115:19
 119:5,12,21
 120:4,8,13,15
 121:3 122:2,3
 122:22 123:2,6
 137:21 150:5
**hour** 7:17 15:3,7
 29:20 120:22
**hours** 11:17
 30:12 35:18,21
 37:14 39:24
 121:5
**houses** 46:2
**hug-type** 19:6
**human** 19:18
**hunch** 95:6,11
**hundred** 46:3
 140:4
**hurt** 27:24 121:2
 124:2
**hurts** 108:23
**hypoxic** 156:23
**hysterical** 86:20

— I —

**idea** 43:13 47:11
 53:20 56:2

68:12 75:10
94:5 138:13
142:3 156:1
**identified** 61:5
**Illinois** 1:1,17
 2:4,9 11:4
 65:20 146:21
 165:1,2 166:2
**illness** 8:6
**Image** 138:20
**immediately**
 92:23
**immigrants'**
 161:18
**important** 17:13
 19:21,24 92:1
 101:5
**impression** 51:3
**in-car** 6:18,19
 44:24 45:11
 48:4
**in-depth** 38:10
**inability** 101:7
**inaccurate**
 164:2
**inch** 42:9
**inches** 117:12
**incident** 6:17
 32:1,4 35:19
 36:2 37:14
 38:13 49:23
 50:4,5,11 60:2
 98:13 137:13
 142:11 149:1
 155:5 156:15
 160:23 162:11
 162:21,23
**incidents** 49:3
**included** 158:19
**increase** 25:7
**Independent** 1:3
**indicate** 105:1
**indicating**
 117:12 144:2
**indirectly**

165:18
**individual** 17:10
 65:8 131:13
**individually**
 155:13
**infer** 93:9
**information**
 50:20 53:20
 54:17 110:2,3
 112:18 162:24
**informed**
 155:11,13
 156:3
**infrequently**
 47:11
**ingested** 158:19
**initial** 51:12
 52:7
**initially** 94:17
 163:10
**injection** 106:22
**injury** 20:23
 27:7 120:16
**inmate** 14:13
**inner** 126:16
**inquest** 153:23
 155:16,19
 156:9
**inquired** 97:12
 162:23
**inside** 57:16,18
 57:23 58:4,7
 59:6 65:10,11
 120:3 123:17
 125:2 126:7
 145:8 150:8
 161:1
**instructing**
 157:7
**intentional**
 133:8
**interacting**
 46:17
**interest** 134:2
**interested**

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 177

| | | | |
|---|---|---|---|
| 133:23 134:2 | 42:21 | 87:1 90:22 | **know** 5:9 7:1,22 |
| 165:18 | **Jason** 2:2 96:21 | 91:23 92:1 | 8:24 9:6,7 |
| **interference** | 133:6 | 96:2 99:11 | 14:18 15:10 |
| 156:23 | **jeans** 65:5 | 101:5 115:20 | 17:20,21,23,23 |
| **interior** 45:3 | **Jeremiah** 2:13 | 123:23 124:5 | 19:17,19,23,24 |
| **internal** 14:4,5 | jmarx@hale... | **keeping** 25:5 | 20:1 21:19 |
| **interrupt** 133:6 | 2:5 | **keeps** 42:12 | 22:5,5 28:15 |
| **interview** 6:1 | **job** 10:14 12:22 | **kept** 8:13 41:11 | 29:4 30:6,21 |
| 33:23 34:9 | 13:10 18:7,18 | 42:18 63:9 | 32:21 33:10 |
| 35:7,16 163:4 | **jobs** 14:1 | 137:1 | 34:6,9,11,15 |
| 164:3 | **jogging** 109:23 | **kick** 42:6 80:6 | 34:17,19 35:10 |
| **interviewed** | **John** 33:24 | 82:1,3,5 | 36:4,6 38:21 |
| 32:20 148:14 | 154:5 | **kicked** 42:19 | 38:21,23 39:2 |
| **invasion** 15:2,4 | **Jr** 1:4 28:16 | 75:23 81:1,4 | 39:16,22 40:17 |
| **investigating** | **judgment** 93:12 | 148:10,21 | 41:11 43:3,6 |
| 151:14,17 | 158:4 | **kicking** 27:20 | 44:17 45:10,22 |
| 155:8 | **Julie** 31:4 | 28:4 42:5,21 | 45:24 46:19,20 |
| **investigation** | 161:11 | 80:18 81:22 | 46:21,23,24 |
| 38:20,22 149:2 | **jumped** 108:7 | 82:16,21,22 | 47:6,9,15,20 |
| 155:12 156:1 | 113:8,10 | 84:14,15 85:6 | 48:2,18 50:9 |
| **investigations** | **June** 23:16 | 85:6 92:11 | 53:4,18 54:20 |
| 121:6 | 28:15 29:14,22 | 137:5,6,9 | 55:1 57:14 |
| **investigator** | 30:4,15,18,21 | 148:3,8 | 58:5,18 60:24 |
| 32:20 36:20 | 33:10 35:17 | **kicks** 82:4 | 61:20,21 63:6 |
| 121:8 153:15 | 39:4 40:16 | **kids** 12:7 | 63:9,19 64:8 |
| **investigators** | 43:18 | **kind** 20:9 21:6 | 65:19 66:18 |
| 32:21 38:19 | **jurisdiction** | 63:10 96:19 | 68:4,8,11,14 |
| **involved** 32:5 | 16:6 | 118:11 124:2 | 68:17,21 69:6 |
| 61:21 142:10 | | **kit** 126:13 | 74:23 75:22,23 |
| 152:10 153:13 | **K** | **knee** 24:17 42:4 | 76:14 79:16 |
| **issue** 30:16 44:9 | **Kaminski** 107:7 | 89:13 141:9 | 86:21 90:6 |
| 51:20 62:13 | 107:10,17 | **knees** 25:2 72:12 | 91:1,17 93:16 |
| 63:21 86:17,17 | 108:2,6 111:14 | 73:22 83:24 | 93:20 94:2,4 |
| 109:22 164:1 | 112:1,7,10 | 89:11,15 97:14 | 95:12 100:19 |
| **issued** 128:4,5 | 118:24 159:11 | 101:22 104:8 | 102:11,17 |
| **Itasca** 2:9 | 159:17,20 | 104:12,18,23 | 104:9,10,14 |
| **item** 18:14 145:1 | 160:2 | 105:5,8,11 | 105:21 106:15 |
| 146:2 | **Kaminski's** | 135:6,12,19,23 | 109:3 110:6,10 |
| **items** 125:23 | 159:7 | 136:3 159:16 | 110:11,12,13 |
| 143:9,17 | **Karen** 1:16 2:23 | **knew** 11:6 34:18 | 110:19 111:20 |
| | 165:5 166:10 | 36:6,12,14 | 111:20,23 |
| **J** | **keep** 8:11 14:20 | 50:5,12 51:8 | 113:3 114:16 |
| **J** 1:8,8 | 26:6,22 27:18 | 60:6 67:11 | 115:23 116:4 |
| **Jackson** 2:3 | 27:19 28:3 | 68:9 86:8 92:3 | 120:11,18,23 |
| **jail** 13:4 41:17 | 42:4,13 57:4,7 | **knife** 95:18 | 121:23 122:10 |

| |
|---|
| 124:9 125:13 |
| 127:14,17,17 |
| 127:19 128:10 |
| 128:11,20 |
| 132:5 136:12 |
| 139:3,10 140:9 |
| 140:11,22,24 |
| 141:12,14 |
| 143:12 147:4,7 |
| 150:2,3,12,18 |
| 150:20,24 |
| 153:12,12 |
| 154:10 155:1,9 |
| 156:4,18 158:7 |
| 158:11 160:12 |
| 160:13 161:7 |
| 161:14,22 |
| 163:18,19 |
| **knowledge** 15:5 |
| 20:9 23:15 |
| 28:14,18 31:6 |
| 35:8 45:7 55:7 |
| 68:18 69:3 |
| 71:12 83:2 |
| 94:12,16 99:14 |
| 103:21 108:9 |
| 108:23 132:11 |
| 136:18 138:21 |
| 139:15 141:8 |
| 141:20 160:6,9 |
| 161:10,19 |
| **known** 85:22 |
| 161:9 |
| |
| **L** |
| **lab** 125:16 |
| **lacking** 109:19 |
| **Lake** 1:7 8:15 |
| 9:2,24,24 10:1 |
| 10:7 12:12,18 |
| 13:1,4,11,12 |
| 14:11 15:1 |
| 16:9 30:10 |
| 31:8,11,15 |
| 32:15,24 33:6 |

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 178

| | | | | |
|---|---|---|---|---|
| 36:11,11 40:22 | 89:20 90:1,18 | **listening** 86:15 | **look** 15:9 30:2 | **lunch** 145:14 |
| 43:11,11 55:10 | 91:13,14,15,16 | 87:11 | 33:17,20 46:20 | **Lunn** 130:9 |
| 106:16 107:8 | 91:18,21 92:5 | **literally** 73:4 | 80:21 81:17 | **lying** 21:24 |
| 107:18,19 | 93:3 95:1,7,10 | **little** 9:8 11:20 | 85:18 90:17,18 | |
| 128:4 130:8 | 97:10,17,21 | 11:24 32:8 | 92:19 98:3,16 | **M** |
| 137:20 142:23 | 100:11 103:3 | 35:18 51:9 | 98:22 99:1,21 | **magazine** 41:2 |
| 144:19 145:19 | 113:7 121:4 | 73:2,2,3,11,17 | 107:23 157:17 | **main** 152:18,19 |
| 149:11 154:2 | 123:2,17 140:5 | 77:2 78:18 | 162:24 | **major** 32:1,15 |
| 162:12 | 140:19 141:9 | 117:15 118:13 | **looked** 85:20 | 33:1,16,17,22 |
| **lane** 70:23 | 146:8 149:20 | 122:13 124:3 | 86:4,12 98:23 | 34:2,3,20 |
| **lapel** 46:11 | **left-turn** 70:23 | 126:14 133:18 | 99:6 125:1 | 37:20 38:13 |
| **large** 8:24 21:9 | **leg** 23:4 41:8,16 | 134:7,10 135:2 | 126:17 163:11 | 49:3 130:10 |
| **lasting** 49:8 | 41:20,24 70:5 | **living** 31:8 | **looking** 50:16 | 142:14 148:11 |
| **late** 37:3 40:10 | 82:18 83:5,6,8 | **LLC** 2:2 | 62:2 88:6,12 | 149:1,1 151:7 |
| **Laura** 154:4 | 83:9 136:11,12 | **loaded** 111:3 | 90:14 94:1 | 151:13,17 |
| **law** 9:22 10:23 | 140:5 | 113:3 | 101:17 113:15 | 153:12,16 |
| 14:1,4,8 16:1 | **legal** 34:22 | **location** 28:13 | 131:6 138:24 | 162:23 163:4 |
| 17:24 33:5 | **legs** 42:4,12 | **locker** 126:11 | 140:6 | **majority** 27:15 |
| **lawsuit** 8:19 | 82:17,20 83:21 | 143:8,19,20 | **looks** 130:22 | 53:15 58:8 |
| 15:24 37:11 | 83:23,24 92:10 | 144:3,5 149:16 | 131:11,22 | **making** 25:10 |
| **laying** 19:3,4,12 | 137:4 | **lodged** 18:14 | 135:8 136:20 | 31:17 85:16 |
| **lead** 20:6 | **lesser** 10:14 | 157:14 | 138:11 139:7 | 87:14 100:17 |
| **leads** 118:23 | **lessons** 19:14 | **log** 45:13 128:23 | **loosening** 42:13 | 102:8 133:17 |
| **learn** 122:5 | **let's** 11:24 39:4 | **long** 7:16 11:22 | **lose** 40:14 70:10 | **male** 122:19 |
| 153:7 | 41:2 71:21 | 12:9,19 13:7 | 118:19 | **maneuver** 18:10 |
| **learned** 122:6 | 78:19 100:4 | 13:15,23 23:8 | **lost** 118:22 | 18:19 159:23 |
| **leather** 96:8 | 154:4 | 26:23 38:10 | **lot** 39:13,16,18 | 159:23 160:2 |
| **leave** 10:21 | **level** 9:5 109:8 | 49:8 52:2,4 | 39:19,20 46:1 | **Manila** 143:16 |
| 13:17 40:10 | 113:24 147:4,7 | 55:17 64:9 | 51:23 52:1 | 143:16 145:15 |
| 113:3 116:12 | **levels** 21:7 | 74:6 79:1 | 56:18,21 58:20 | 145:17,20 |
| 157:21 | **life** 10:15 11:8 | 91:18 93:16,20 | 59:4 74:18 | **manipulated** |
| **leaving** 51:2 | 101:4,5 | 97:3,21 103:13 | 83:18 84:2 | 94:7 |
| 96:22 113:7 | **lift** 101:8 | 104:14 106:10 | 86:21 118:13 | **manipulating** |
| **led** 93:9 94:20 | **lifted** 159:19 | 109:24 112:23 | **lots** 11:12 | 80:6,20 |
| 155:17 | **lights** 48:9 56:5 | 115:4 117:12 | **loud** 134:8 | **manner** 71:7 |
| **left** 8:14 11:20 | 106:17 160:17 | 118:2 119:3 | **low** 23:6 39:13 | 76:16,19 |
| 31:12 51:21 | 160:22 | 120:20 121:3 | 133:11,12 | **manpower** |
| 52:6 67:16 | **limit** 15:8 | 127:8,9 130:18 | **lower** 23:8 73:22 | 39:13 |
| 72:2 77:24 | **limp** 105:12,15 | 134:4 142:16 | 76:20 77:8 | **manually** 47:24 |
| 78:2,7 79:7,8 | **lines** 88:20 | 160:18 161:24 | 83:9,24 88:20 | 48:1 160:20 |
| 80:10 83:6,8,9 | **lips** 102:16 | **longer** 12:7 | **lowered** 72:5,7,9 | **marked** 130:6 |
| 83:9 87:24 | **listed** 147:1 | 18:15 24:24 | 73:6,8,8 82:17 | 137:17 138:16 |
| 88:9,9,14,15 | **listen** 52:24 | 25:17 50:9 | 104:11 | 139:13,24 |
| 88:16,17,20 | 61:13 63:10 | 103:10 105:13 | **Lowering** 83:13 | 140:15 141:3 |
| 89:2,3,5,6,13 | 85:23 | 121:7,15 | **luck** 12:15 | 141:18 142:19 |

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

144:15 149:7
**markings**
138:24
**Marx** 2:2 3:5,7,9
3:14 4:7 97:1,2
114:11,12
133:9,11,21
134:7,12
138:17 139:14
140:1,16 141:4
141:19 142:20
144:16 149:8
157:16,20
161:4,6 162:5
162:15,19
164:5,7,10,13
164:15,17
**Marx's** 25:11
**mask** 66:18
131:6,9
**material** 42:3,10
96:6,10 149:17
**materials** 5:17
7:14
**Mathues** 2:7 3:6
3:8 7:6 25:9,23
27:4 66:23
77:17 81:19
91:11 92:8
96:21 109:10
114:10 129:22
133:6,10,15
134:4,10
135:24 157:4
157:22 158:2
161:3 162:7,9
162:14,17
164:6,8,18
**matter** 91:19
97:23 129:4
**mean** 22:16 26:4
26:14,16 57:20
72:7,14 73:1
77:4 88:18
94:16 98:20

121:10 143:18
143:19 145:19
152:17
**meaning** 26:9
84:1
**means** 16:15,18
19:10 145:16
152:18
**media** 161:10
**medical** 111:2
114:13,17
156:21 157:5
**meet** 7:3,8,16
**meet-up** 29:7
**meeting** 8:5
51:24
**member** 21:12
32:24 120:7,7
161:7,19
**members** 9:1
33:10 122:23
**memory** 79:10
**mental** 10:15
**mentioned**
15:17 80:5
159:22 161:11
162:15 163:10
**mentioning**
161:12
**messages** 8:16
**messed** 124:2
**met** 9:15 34:14
34:18
**metal** 138:11
**microphone**
45:15 160:15
160:15
**middle** 48:20
68:21 70:22,24
71:1 138:7
**midnight** 31:13
39:24 50:24
53:16 54:5
**midsection**
18:17 131:20

**midway** 49:13
**mileage** 15:10
**miles** 15:3,7
**mind** 52:17
57:22 64:6
96:20
**Mine** 6:3
**minimal** 21:8,11
**minute** 91:19
92:6 97:6,6
112:2,2,9
130:18 157:16
157:18 159:21
**minutes** 38:4
42:21 52:5
54:9 55:20
106:18 112:5
113:6,8,11,12
115:6 119:6
127:11 157:22
**Miranda** 38:24
**mischaracteri...**
77:18 136:1
**mob** 88:8
**moment** 71:18
81:18 111:18
112:24 120:23
**Momentarily**
70:11
**Monday** 40:10
**money** 11:9 12:8
**MONICO** 2:2
**monitor** 111:10
**months** 8:7,17
11:10 12:20
32:3 43:4,7
**morning** 29:6
30:13
**mouth** 76:13
93:6,10 94:6
97:5 98:21,22
99:1,7 101:1
102:19 104:20
105:4 129:14
129:21

**move** 12:15 20:6
27:14,23
102:16
**moving** 77:5
**mucousy** 117:10
117:23 118:12
**mucousy-type**
118:9
**mule** 82:5
**multiple** 16:11
**Mundelein** 10:2
10:14 13:14,15
**murderers**
10:18
**muscle** 19:22,23
**Myers** 11:16

**N**

**N** 3:1
**name** 4:8,10
28:22 33:15,18
33:19 34:11,18
59:17 68:21
69:7,10 107:9
107:20 158:7
161:12
**named** 29:1
30:19 31:3,7
**names** 107:21
107:23 109:3
**Narcan** 104:13
106:20,21
107:24 108:8
108:12,23
158:15,18
**narcotics** 64:14
95:9,13 129:14
**nasal** 106:22
**naturally** 50:22
**nature** 54:18
**near** 57:10 59:1
71:18,19,20
83:19 84:9
89:9 94:5
120:1 131:20

132:14,19
**necessarily**
22:20 27:11
**necessary** 44:14
112:18 151:12
**need** 26:15
33:20 105:23
128:6 154:21
164:13
**needed** 12:22
24:22 26:8,9
38:11,12 49:5
51:14 54:3
57:3 87:8
111:9 112:15
113:17 115:1
115:23 151:10
154:8 155:2
**nervous** 63:10
**never** 14:6 40:13
51:7,15 55:7
64:8 69:8
93:22 119:23
122:23 129:20
129:24 135:16
156:3
**Nichols** 32:20
**nickname** 68:24
**night** 37:16
44:17,22 45:8
45:11 47:19
48:5,6 49:18
49:20,21 50:4
50:6 51:4
95:23 96:7
99:14
**nights** 30:11
**Nitrile** 96:2
125:12
**noise** 102:10
**noises** 86:21
**noncompliant**
87:2
**Nope** 94:7
**normal** 17:15

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 180

25:19 29:19
31:16 40:8
55:12 122:14
normally 17:14
96:1,8
north 11:17,18
11:21 12:15
44:1,4
northeast 74:17
Northern 1:1
11:4,14 165:1
nose 101:1
Notary 165:6
notating 6:7
note 52:15 96:21
notes 5:22 6:4,6
126:21 157:17
notice 59:7 62:4
63:12,15,24
64:19 71:19
80:15 83:11
86:9 87:12
89:8 90:4
100:9 101:12
105:4 117:19
118:14
noticed 4:19
64:16 80:15
82:11 84:4
85:21 86:4
94:19 100:14
101:15 102:18
117:23
notified 54:14
54:15 153:10
number 44:5
145:1 146:5
numbers 9:19
numerous 27:20
nurse 122:16,17
122:20
nurses 115:19
153:21
Nursing 120:12
nylon 42:10

**O**

o'clock 29:6
49:13 52:10
o'clock/3:00
29:6
object 118:1
objection 25:9
25:11,23 27:4
66:23 77:17
81:19 91:11
92:8 109:10
114:10 129:22
134:5 135:24
157:4
obligation
163:19
obscenities
62:10
observations
88:12
observe 109:18
118:2
observed 115:15
116:16,24
125:2 129:24
observing
109:14
obviously 26:18
28:10 36:9
38:13 62:13
83:3 119:18
126:15
OC 41:2
Ocala 11:20
occasionally
40:11
occupation
161:14
occurred 49:3
odd 80:20
off-balance
72:11,18 73:6
76:20
office 10:1 13:2

166:2
officer 2:13,13
4:12 7:18
13:20,23 14:8
16:1,7 17:24
20:17,19 21:3
26:6 31:12,13
31:20 32:2
33:8 40:23,23
41:14 43:9
44:19,20 49:20
49:21 50:7
53:17,17,18
54:8 61:14
64:19 67:18,19
69:17 71:11
73:24 74:10
75:7 77:13
78:11,21 87:14
90:4,10 92:15
92:23 96:22,23
99:6 107:5,7
107:16,18,19
111:14 115:12
120:14,16
127:2,17,21
130:8,9 131:23
134:22 148:4,8
148:10,21
152:23 158:11
158:21 159:7
159:11,20,22
160:1,2 162:20
officer's 20:11
officer-wise
44:18
officers 9:4
31:21 36:10
37:11,24 38:7
38:16 43:19
44:22 46:6
53:21 54:5,12
72:19 75:1
79:4,5,7,16
84:18 85:14

107:3,5,16
official 162:11
Oh 13:22 163:2
OIC 41:12,13
44:22,23 49:20
127:19,20
okay 4:14 5:1,11
5:12 6:4,14
7:13 8:2,8,19
9:12,16,18,21
10:6,23 12:17
13:4,7,9,12
14:1,10,24
16:20 17:8,18
18:5 21:23
22:22 31:14
32:17,18 33:20
37:13 38:6
40:19 45:15,21
50:3 51:11
52:18 58:15
60:10,24 61:9
67:14,23 70:17
71:12 72:22
73:1,11,20
74:5 78:18
79:18 81:14
84:8 85:8 97:1
99:20 101:4,11
101:20 102:8
102:15 103:1,5
104:3 105:17
108:14 110:23
115:21 120:3
124:15 125:17
126:2 128:3
130:23 131:2,8
131:12 133:21
134:20 136:10
136:21 137:20
138:1 139:9
142:12 146:14
163:9 164:5
on-call 154:13
once 4:24 20:15

25:10 26:20
42:15 58:7
63:13 82:9
100:13 103:10
105:21 106:5
119:22 143:21
158:3
one-year 15:13
ones 16:9 137:24
ongoing 44:9
open 25:18
98:21 102:19
102:19,20
105:4,5,7,8,9
opened 126:7,14
opiate 158:19
opinion 118:19
156:21 157:3
160:5,7
opinions 160:10
opioid 108:10
opportunity
13:18
opposed 109:23
opposite 103:3
option 36:16
Orchard 56:16
56:21 59:1,2,3
70:19
order 28:3 45:7
160:10 164:15
orders 64:22
86:15
original 24:20
36:24 75:17
79:24 89:19
123:10 145:10
originally 35:1
61:12 76:7
outdoors 11:10
outlets 161:10
outside 8:20
18:5,7 57:1,17
62:2 67:8,16
68:1 119:24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 181

123:18 154:15
**overdose** 104:13
108:11,21,22
**overdoses** 96:5
**overtime** 39:14
39:14,17,19
40:14 50:6
**oxygen** 156:23

**P**

**P.C** 2:7
**p.m** 1:19 35:17
39:10 40:17,18
52:16 157:19
157:19 165:14
**package** 143:11
**packaged** 143:7
143:13 145:4
**packaging**
145:10 146:1
**pad** 126:15,20
**page** 3:3,12
107:15 144:7
**pager** 45:18
**pair** 41:15
**panic** 48:10
57:20 58:3,5,8
**paper** 143:14
145:4,12,14,16
145:20,21
**paperwork** 54:4
**paramedics**
106:8 109:3
110:24 115:3
115:11 158:3
**park** 48:11
56:15
**parked** 56:16,19
56:23 58:22
123:11
**parking** 51:23
52:1 56:18,21
58:20 59:3
74:17 83:18
84:2

**part** 11:13 14:17
27:22 31:22
34:3,13 43:16
73:20 74:17
83:14,17
112:16 117:21
117:22,23,24
131:17,18
137:12 138:2
148:11 159:3
**part-time** 12:20
12:22
**partially** 102:19
105:5,8
**particular** 39:9
40:15 43:22
48:15,17,18
**parties** 165:16
**partner** 43:18
107:17
**parts** 32:13
130:23
**passed** 49:5
111:17 113:1
153:8 159:19
**passenger** 84:9
**passenger-side**
100:6
**pastor** 161:17
**pat-down** 67:8
70:3,5 80:1,9
80:24
**patches** 40:22
**patient** 111:9
113:5
**patrol** 9:23
10:24 11:13,23
31:21 40:23
43:22 44:11,18
96:6
**patrolling** 31:16
31:18
**pavement**
131:17
**pay** 32:5

**paying** 10:14
29:16
**PD** 11:5 153:17
**Peak** 128:8
**pelvis** 83:15
**pen** 45:16
**people** 22:23
24:7 28:15
56:13 72:19
85:13,16 98:10
102:11 106:21
**people's** 25:2
**percent** 82:24
99:5 105:10
136:5 140:4
150:11
**perfectly** 133:8
**perform** 103:17
**performed**
18:18 104:14
104:23 106:19
**performing** 18:9
**period** 25:4,6,14
35:24 36:1
113:14
**permission**
35:12,14
**person** 7:11,12
20:18,22 21:23
22:16 23:23
24:18 25:5,7
26:15 30:19
31:3 41:1
45:17 50:8
51:7 57:24
59:23,24 60:19
68:16 96:3
98:11 108:6
110:7 122:23
158:7 161:11
**person's** 42:3
107:20
**personal** 101:4
127:24 160:5,9
165:10

**personally** 99:1
160:12
**personnel** 33:6
114:13,17
122:2
**pertaining** 1:15
**phone** 2:4,9 7:11
8:4 9:19 33:17
33:21 36:7,9
58:6 85:21
86:14 107:23
127:19,20,21
127:23,23
128:1,4 130:17
137:11,12
**phones** 127:24
**phonetic** 123:4
**photo** 127:2,3
128:8,12,13,15
128:17 138:3
138:21 140:7
140:17 141:6
141:17,21
**photograph**
127:1,10 152:7
152:12
**photographed**
129:7
**photographic**
128:6
**photos** 128:10
137:22,22,23
138:2
**phrase** 17:21
**physical** 88:10
89:7 91:22
**physically** 48:22
62:22 73:15
108:20
**pick** 79:21 121:8
121:21 123:6
137:6
**picked** 71:22
121:6 123:5
**picture** 126:21

127:16,24
129:4
**piece** 37:18 42:2
42:11
**Pierce** 2:8
**place** 17:10
20:15 35:17
65:22 89:15,17
97:19 115:23
135:4 143:21
151:23
**placed** 61:13
65:15 70:4
71:7,23 74:13
76:8,24 77:15
77:20 92:24
97:8 115:11,13
124:15 126:2
144:3 145:11
147:19,22
148:1 149:14
149:15 150:17
**placing** 25:2
**Plaintiff** 1:5 2:6
**Plaintiff's**
130:12,16
**plastic** 96:11
111:5 114:23
115:7 116:3
117:10,11
123:18 126:2,5
143:14 145:6,8
156:24 158:8
**play** 57:2 110:21
130:23 132:4
132:16 134:14
**playback** 57:15
**please** 4:8 5:9
157:18
**plus** 11:8
**pocket** 61:17,18
63:3,12,18,23
64:3,13,16
**pockets** 61:14
61:20 63:1,2,7

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 182

64:23
**point** 10:21
12:11 26:20
28:11 36:5,14
38:7 49:16
59:14 62:12
63:19 66:1,22
67:11 72:2
75:15 76:3
77:2,23 78:3,9
78:12,16,17
80:13 81:1,5,8
82:16 85:5
88:12 90:16,17
92:13 93:3
95:11 97:14
103:1,24 104:2
104:7,10 107:3
108:3,5 111:4
112:14 119:14
121:14 123:22
124:16 125:3,9
126:6 133:16
136:11 137:5,8
147:17 148:6
149:3 151:7
**pointed** 59:21
59:22 60:14
61:4 64:21
**pointing** 134:1
141:10
**points** 90:14
**police** 8:15,24
9:2 10:7,14
11:7 13:10
15:19 16:7
31:11,12,15
33:11 57:5
154:2 158:11
**policies** 47:1
**policing** 10:21
12:15
**policy** 14:17
15:3,5,10
46:20,21

**poor** 71:13
**poorly** 29:11
**popped** 60:13
**port** 46:12
123:12
**position** 17:11
19:11 21:19,21
21:23 22:6,17
23:21 24:3
25:6,22 26:10
26:12 28:3,8,9
31:10 74:3,6
76:9,21 78:15
78:22 79:1,3,4
79:24 89:18
91:9 92:14
97:4 101:14
131:16 134:17
136:23 137:1
159:13,15,20
**positional** 19:7
100:23
**positioned** 20:4
88:21 100:6
**positioning**
57:18
**positions** 9:5
**positive** 125:5
126:9,18
127:10 145:3
149:19
**positively** 104:5
**possession**
146:21 147:10
152:12
**possible** 18:24
24:15 26:11
28:12 44:7
46:9,11 60:18
63:21 67:11
84:21 85:1
92:10 99:4
104:13 108:21
122:7 127:9
135:15 139:5

155:8 156:11
162:22
**possibly** 16:9
38:8 54:24
57:24 64:7
103:15 106:18
113:15
**posted** 15:8
**potential** 154:18
**potentially**
158:15
**powder** 125:4
145:2 157:1
**powdered** 146:6
**powers** 15:20
**practiced** 22:6
**pre-filled** 146:9
**preparation**
5:17 6:12
130:20
**prepare** 7:3
154:18
**prepared**
154:21
**presence** 7:22
8:20 21:12
35:2 59:23
**present** 2:1,13
7:13,19 33:24
34:21,24 35:1
35:5 37:9
96:22 127:3,5
154:10
**pressing** 47:24
**pressure** 19:4
24:21 25:22
26:2,3,8,9,16
26:22 27:2,8
27:11,17,19
28:2 89:5
156:24
**pretty** 31:22
79:6 106:12
111:24
**prevent** 20:23

42:4
**previous** 50:5,14
**previously** 39:6
135:18
**primary** 44:12
53:21 123:10
124:7 152:14
153:2
**prior** 28:15,19
28:21 29:14,22
30:4,15,18,21
32:22 34:9
100:16,16
112:9 114:22
136:1 139:5
**priority** 97:15
**prison** 12:8
**prisoner** 41:17
45:6 119:14
**Prisons** 9:23
12:3,6,13
**privileged** 7:2
**probably** 4:18
8:7 18:4 30:6,8
32:3 34:17
42:9 46:2 47:3
51:3,7,24 52:1
52:4 53:1,15
55:19 57:23
70:23 81:12
82:23 87:13
88:19 91:19
95:21 113:6
117:11,15
119:10 120:22
123:5 129:12
142:17 143:15
150:14 153:21
155:2
**problem** 52:6
100:21 133:21
**Procedure** 1:14
**proceeded** 69:14
70:3
**process** 43:5

110:2
**processing**
110:3
**produced** 138:1
138:2 156:13
**professional**
1:18 101:5
165:6
**prolonged** 25:14
**prolonging** 25:4
**prone** 21:19,21
22:3,6,17
23:20 24:3
25:6,21 27:2
28:2,8 74:4,5,6
76:9,21 77:11
77:16 79:1,9
89:18,20 91:8
92:14 97:4
100:24 101:14
136:23 156:24
159:12,19
**proper** 115:23
150:17,18
**properly** 24:14
27:8 34:23
47:22 85:12
126:24 160:18
**property** 58:23
125:22
**protocol** 152:13
**provide** 158:5
**public** 65:21,22
165:6
**pull** 73:3
**pulled** 56:18
58:19 59:2
72:16 114:23
115:8
**pulmonary**
17:22
**punishment**
15:11
**purchased** 43:8
**purple** 125:13

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 183

142:1
purportedly 6:5
purpose 56:22
89:9 91:20
108:8 142:9
purposes 27:17
pursuant 1:13
pursue 61:24
pursuing 50:16
push 55:15 73:2
76:11 135:2,5
pushed 72:15
73:11,16,18
76:10
pushing 27:16
put 20:9 23:23
24:16 26:15
27:2 28:2,7
45:20 46:14
51:5 61:15,19
63:11,18 64:3
64:13,24 76:13
77:10 79:24
86:11 94:24
96:5 112:24
126:9 134:23
143:14 149:16
158:22
putting 19:4
20:21 25:22
27:11 63:23
136:13

**Q**

quads 47:16
qualified 157:6
quantity 146:2
question 10:3
25:11 31:3
32:21 46:6
71:13 94:15
97:22 157:2,8
162:7
questioning
133:7

questions 5:6
9:8 29:1 30:24
114:18 130:24
134:6 157:20
157:23 160:4
160:14 161:3,4
162:5 164:5
quick 26:11
106:12 107:14
127:15
quicker 26:13
54:11 103:16
110:2
quickest 24:13
quickly 51:14
54:11 55:15
87:14 108:6
110:1
quiet 96:19
quite 104:16
108:13
quote/unquote
124:6

**R**

radio 52:23
110:19,20
radios 110:11
raise 32:5
raised 32:7
ran 70:13 74:23
random 8:16
29:21 52:1
range 45:22
46:2
ranging 21:7
rank 31:11
reached 71:1
react 64:8
read 5:24 6:4
156:19
ready 43:8
53:21 54:8,12
59:10 159:3,7
real 134:8

realized 103:10
106:5
really 96:20
101:17 156:6
rear 45:3,5
83:19,20 84:9
100:6
reason 5:13 20:6
46:7 47:18
56:3,23 124:18
129:3,7 148:23
149:3 150:15
162:3
reasoning 63:19
reasons 61:15
128:7
recall 19:16
38:14 49:6
52:7,15 62:16
63:4,8 65:3
66:19 69:20
75:20 78:8,11
78:24 79:3,7
80:12 81:21,22
84:18,23,24
85:2,9 86:18
86:22 90:2
91:5,9 93:14
95:22,24 96:18
99:3,6,8,22
100:1,12
102:19 103:5
105:6,7,24
106:3,8,10,23
107:2,6,8
110:23 114:19
116:2 122:15
123:2 135:18
135:22 156:8
156:10,14
receive 19:14
54:17 121:14
received 14:7,21
16:5,11,20
17:5,8 18:9

20:11,14 22:3
22:3,11,23
23:18,19 24:2
24:5
Recess 157:19
recognize
107:10 149:12
recognizing
16:21
recollection
28:22 53:9
55:21 58:11
73:16 78:4
83:4 85:4 86:3
86:13 87:23
88:23 89:24
110:15 127:12
135:16 138:3
150:21
record 4:9 15:13
25:10 35:12
96:21 164:10
record-after-t...
36:16
recorded 35:7
recording 36:7
36:15 86:14,19
records 22:9
recover 122:8
153:21
recovered 158:8
158:8
recovery 17:11
26:12 28:9
reduced 165:10
refer 59:19
referred 59:20
referring 143:5
regain 119:16
122:13
regard 17:9 24:6
30:24 31:3
34:8 37:23
regarding 45:11
133:24 155:4

156:15 162:20
Registered 1:17
165:6
regular 164:18
relate 163:22
related 162:10
relation 106:14
relative 165:15
165:17
relatively
127:15
relay 112:18
119:19
relayed 49:4
52:22 55:1
110:9,14
162:24
relieved 114:7
remain 96:24
remained 87:20
113:12
remember
34:12 35:9,9
35:11,13 37:6
38:8 41:18
47:19 49:8
51:15 64:20
65:12 75:11
79:13 81:14
84:17 87:10
92:11 96:19
104:10 107:7
107:17,19,20
122:11,19
126:23 142:12
142:16 145:18
154:20 156:16
161:12
remembered
47:15 130:9
remove 64:23
136:8
removed 93:2
repeat 71:14
repeating 42:23

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 184

**replay** 112:8
**replayed** 112:3
**report** 5:21,23
5:24 6:7 33:22
35:16 142:7,9
142:16,24
143:2 144:2,6
152:18,19
156:13,14,20
162:24 163:4
163:14,15,23
**reported** 2:23
120:7 158:8
165:9
**Reporter** 1:17
1:18 164:13,16
165:5,6
**reports** 7:10
30:2 148:24
149:3
**represent**
130:17 138:23
140:19 156:12
161:22 162:1,1
**representation**
34:22
**representative**
34:8 155:4
**reprimand**
14:12,19 15:4
**request** 34:24
35:1 151:3
**requested** 40:7
40:11,13
**require** 134:3
**required** 39:15
46:16,19
121:15
**rescue** 110:5
**reserve** 164:7
**residue** 126:17
**resign** 10:12
**resigned** 10:10
**resist** 65:13
69:22

**resisting** 84:22
86:2 148:5
**resolved** 51:1
**respect** 109:1
**respond** 43:20
54:14 58:11
**responded**
36:10 44:9
53:22 104:10
**responding**
31:16 56:2
104:5,8,9
105:2
**response** 98:6
**responsibilities**
32:6
**rest** 9:4 96:24
**restart** 111:9
**restrain** 25:21
26:7 27:7
28:11
**restrained** 86:1
**restraint** 22:4,7
41:23
**restraints** 22:5
23:23 42:2
**restrict** 17:16
**restricted** 18:16
**Restriction**
16:19
**restricts** 42:5
**restroom** 62:3
62:23
**resuscitation**
17:22
**retain** 164:11
**retained** 3:14
160:10,13
**retired** 11:5
**reverse** 108:10
108:10,21
**review** 5:17,20
6:9,11,14 36:1
**reviewed** 130:20
**reviewing** 7:14

**Reyes** 30:19
69:7 133:17
**rhythm** 111:10
**rid** 115:24
**ride** 112:16
**right** 6:3 24:2
28:7 45:19
46:11 50:1
52:13 56:19
59:2,23 60:11
63:9,13 69:21
70:2,5 73:12
79:10,11 80:11
80:12,20 81:16
81:18 82:4,21
83:19,20 84:6
84:14,14 85:6
85:6 86:11
88:2 89:4,13
89:21 90:2,7
90:13,17,18,19
90:23 91:1
93:23 95:6
96:11 97:19
99:4 100:11,15
101:16 102:24
103:4 111:1
116:14,20
117:8 128:1
131:9 132:18
134:15 135:13
135:14 146:3
147:4,6,24
148:14 149:17
152:5,6 161:23
**rights** 38:24
161:18
**risk** 25:7
**road** 2:8 70:24
71:2 106:16
**roadway** 75:19
116:21
**robberies** 58:13
**robbery** 58:10
58:10

**Robinson**
107:18
**Roche** 33:24
154:5
**roles** 53:3
**roll** 30:13 46:13
48:16,19,20,22
48:24 49:7,8
49:11,12,14
52:20 53:2,10
153:11
**rolling** 27:19
**Rollins** 106:16
**room** 7:19 9:6
41:12,13 48:24
96:23 119:13
120:1,4 125:1
125:17,24
127:5 143:21
143:23,24
144:1 149:17
**Rosiles** 1:3,4
28:16 31:1,7,7
158:5,18,22
159:12,19
161:7,20 162:2
**Rosiles'** 156:22
158:9
**roughly** 30:7
112:4 117:12
156:17 159:21
**Round** 1:7 8:15
9:2,24 10:1,6
12:12,18 13:11
13:12 15:1
16:8 30:10
31:8,11,15
33:8,11 36:10
36:11,11 40:22
43:10,11 55:10
107:8,18,19
128:3 130:8
137:20 142:23
144:19 145:19
149:11 154:2

162:12
**route** 15:1 51:13
53:7 79:16
154:14
**rowdy** 154:15
**RPR** 2:23
166:10
**rubber** 42:8
96:1 125:12,13
125:14
**Rule** 157:5
**ruler** 128:18
129:8
**rules** 1:13 5:1
**run** 57:1 70:6,7
70:14 71:24
72:20 88:12
**running** 57:9
74:22 75:2
109:23 158:24
159:4
**rush** 164:16,17
164:19
**rushing** 110:1

**S**

**S** 3:11
**safe** 26:9 63:20
64:11 90:22
137:6
**safer** 154:16
**safest** 154:14
**safety** 61:14
**Salato** 32:20
**sally** 123:12
**sandwich**
117:13,15,17
145:19
**sanitary** 115:20
**Saran** 117:11
**sat** 114:6 119:24
**saw** 10:19 32:23
36:7 43:6 65:7
93:7,22 97:24
116:8,18 117:7

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 185

117:9,22
123:18 124:10
124:21 135:4
137:2,23 150:2
156:16 158:11
159:9
**saying** 18:6 28:1
37:19 43:5
46:24 51:19
61:6 64:1 69:2
77:15 81:23
82:19,20 84:15
84:16,18,21
85:1 86:12,18
86:21,23 87:10
90:1 93:11
96:17 110:15
116:10 133:3
133:23 134:9
135:1,1,22
145:12 146:8
148:21 150:22
151:15,17,18
151:22,22
163:2
**says** 35:16 81:15
128:24 143:7
145:12 164:8
**scale** 128:15
129:5
**scared** 55:10,11
**Scarry** 154:4
**scene** 38:1,3
85:15,17 86:10
88:6 106:8
107:3,6 109:13
112:3,20 113:7
113:12 115:8
137:7 158:4
**scheduled** 39:21
39:22 40:7
**Scheithe** 1:8
2:13 7:19 8:14
9:9 44:19
53:17 67:18,19

69:17 70:14,15
71:11,15 73:24
76:1 79:11
80:11,12 81:6
82:13 83:11
87:20 88:2
90:4 91:3
92:15,23 93:7
94:2,24 95:1
96:13,23 97:5
97:11,12,22
98:5,17 99:16
99:18 100:2,13
100:15 103:11
103:18,21
104:3,14
105:17 106:19
107:2 111:18
127:2,18 129:3
132:2,6,21
134:23 136:14
136:18 154:9
158:22 159:22
160:2
**Scheithe's** 93:12
**Schultz** 130:8
**Schuster** 34:3,5
**screaming** 62:5
62:8
**screen** 130:14
130:14 137:16
138:18 142:21
144:17 149:9
**screened** 147:15
**scrub** 115:19
**seal** 166:2
**sealed** 145:4,9
145:12
**search** 67:3 70:3
80:1 85:12
**second** 48:13
50:19 163:12
**seconds** 60:22
74:8,9 78:16
79:2,19 97:23

103:15 104:17
118:3 130:18
131:2,3,8
132:4,5,8,16
132:17 133:12
134:13,15,15
134:20,21
136:6
**section** 43:23
145:23 146:2,3
146:16
**sections** 32:17
**secure** 137:8
143:8
**secured** 28:12
123:12 124:14
126:9 143:18
**see** 11:24 27:15
29:19 30:3
36:17 41:2
45:13 47:7
50:24 51:16
61:18 62:22
65:5,6 81:17
82:9 85:18
86:6 92:19,22
93:6 94:9
98:10,23,23
104:19 109:6
112:8,11 113:4
115:7 116:7,12
116:17,22
118:17 124:12
128:12 130:13
130:13 131:3
133:1,3 135:1
135:5,12 136:7
137:9,16 138:6
138:18,24
139:18 140:6
140:20 141:9
142:21 143:9
143:12 144:17
149:9 154:4
160:1

**seeing** 63:5
102:13 107:19
156:10,14
**seen** 6:22 30:5
65:9,11 95:13
95:16 98:11
128:13,15,17
129:20 137:21
138:3,21
139:15 140:2
140:17 141:6
141:20 156:20
159:2,6
**seg** 14:13
**select** 146:19
**sent** 162:10
**sentence** 156:19
**sentences**
142:17
**separate** 58:15
**September**
166:3
**served** 154:12
**service** 31:17
**set** 107:16 166:1
**sets** 41:5
**settle** 77:8
**shackles** 41:9,16
41:20,24
**shallower** 25:19
**Shelby** 30:22
85:22 86:17,22
87:12 93:19
132:11 137:3
**Sheriff's** 9:24
13:1
**shift** 30:9,14
31:21 32:7
40:16 43:24
49:12,14,22
50:24 53:16,24
54:2,9
**shifts** 30:14
31:13 39:20,24
49:24

**shin** 131:10
132:19 134:18
141:9
**shoe** 75:18,20,22
80:17 81:15
84:4 125:19
**shoes** 72:1 75:13
115:14 123:16
125:21 143:17
**shook** 97:13
98:7,17 99:20
**short** 149:4
**Shorthand** 1:16
165:5
**shortly** 52:18
124:11
**shorts** 80:3
**shot** 56:14
111:11
**shoulder** 23:7
24:21 27:21
45:19 46:11
71:6 74:18
77:24 78:5,7
78:18 82:18
89:3,6 91:15
**shoulders** 73:9
73:11,16 76:10
77:5
**show** 32:16
116:7 130:4
137:15 138:15
142:6,18
144:13
**showed** 54:23
112:1,4 115:10
120:9,11,12
126:18 158:3
159:17
**showing** 112:10
130:12 141:5
**shows** 112:7
**shut** 143:21,22
**side** 20:4 26:12
26:21 58:22

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

66:13 69:20,21
72:2 78:1,2,7
79:7,8,11 80:8
80:10,11,13
81:6 87:24
88:9,14,15,16
88:17 91:13,16
91:18,21 92:5
102:24 103:3,4
108:3 110:12
116:14,18,20
116:23 129:11
135:8,10,20
143:23 152:21
158:22 159:11
163:22
**sides** 17:11
102:21 103:1
118:17
**sidewalk** 74:18
74:20 87:7
**signs** 16:21,24
113:15
**similar** 40:1
145:16
**simply** 21:12
49:15
**Sinahy** 30:19
69:7
**single** 20:15
47:7
**sirens** 48:10
56:6 160:17,23
**sister** 162:2
**sit** 17:11 84:23
85:2 119:17
121:7,8,10,15
**sitting** 9:6 26:22
104:1 119:4
**sitting-up** 26:10
**situation** 27:13
50:13,14 51:1
56:9 58:3
59:11 61:20
63:21 67:7

86:2 109:14,15
109:20 110:1
**six/seven** 117:12
**size** 45:16,19
117:14
**skateboard** 60:4
60:8
**skin** 141:10,24
142:3
**slam** 73:10
**sleep** 37:19
**slight** 26:2 27:18
**slime** 118:12
**slimy** 118:11
**small** 10:19
101:6 130:2
**smaller** 129:12
**Sneaker** 75:21
**social** 161:10
**sock** 80:6,17,19
92:18,20,23
93:3,6,12,13
93:14,17,23
94:5,9,12,16
94:21,24 95:1
95:5,6,7,10,17
95:20 96:14
97:5,8,10,17
97:20,21,24
98:1 100:14,17
111:18 136:8
136:13 137:7
**socks** 93:5 95:14
123:16 125:19
125:21 143:17
**soda** 29:6
**solid** 117:24
**solo** 24:23 43:19
43:20
**somebody** 20:21
20:23 23:19
25:17 26:5
27:3,11 29:1
44:14 56:12
72:23 95:13

106:6,20
108:15,19,24
110:15,16
121:11 129:14
**somebody's**
18:15
**someone's** 24:17
27:16 28:2
**soon** 24:15
111:24
**sorry** 13:22 28:9
29:11 32:10
71:13 94:23
99:17,18 133:9
162:15
**sort** 19:14 42:8
63:4 138:9
158:5
**sorts** 134:6
**sound** 17:2
52:13 129:1
133:7,10,11,14
134:3,5,8,10
**sounds** 5:3
23:18 79:18
102:8
**south** 11:14
148:6
**southbound**
70:23
**southwest** 11:16
**speak** 14:4
29:18 36:22
60:12 62:19
66:2,4,6,7,12
69:3 74:1
100:2,10
105:12 114:13
120:9 121:16
122:2,9 152:24
155:3
**speaking** 20:17
22:16 62:20
66:22 85:5
160:15,19

**specific** 22:10
48:9 49:16
88:23 89:23
96:20 127:12
127:19,20
144:4,5
**specifically** 20:1
20:8 46:24
59:22 61:5
72:7 76:17,18
78:8 83:3,17
90:2 105:24
124:9
**specifics** 8:23
**specified** 165:12
**speculation**
77:18 109:11
**speed** 15:8
**spell** 4:8
**spoke** 34:16,19
36:19 38:16
55:1 65:23
122:23
**spoken** 28:22
69:9
**spot** 92:7 132:19
**spray** 41:3
**squad** 44:10
47:23 57:8
67:19 69:23
70:2,4 74:16
80:1 81:8,10
81:11 82:3
83:20 93:1,2
94:13,17,18,24
96:3 97:3,9
121:21 123:11
149:16 150:7
158:23 159:7
159:10,12
160:16
**squirm** 77:4
**squirming** 77:2
**SS** 165:2
**stability** 24:22

27:12
**staff** 112:18
119:19 120:12
121:20 127:23
**stand** 14:15 28:7
105:16
**standby** 154:13
**standing** 62:24
89:12 101:24
102:3,22,23
103:6,24 104:2
108:3 159:16
**stands** 17:20
**Stanley** 29:2,7
60:11
**Stanley's** 30:16
**staring** 90:13
**start** 40:16 49:1
77:9 133:12
134:13 136:6
**started** 10:23
11:15 30:6
43:3 49:10
67:17 70:5
73:7 80:1,23
97:11,15 100:2
103:17 104:23
106:13 108:7
111:4
**starting** 111:23
112:2 130:24
134:20 137:7
**state** 1:17 4:8
11:12 15:5
146:23 147:8
147:15,16
151:9 156:1
165:2
**State's** 155:3,4,7
**statement** 32:14
32:14 35:5
36:2,22 37:15
37:22 152:4
**statements**
133:17

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 187

states 1:1,14
  143:2 156:21
  165:1
stating 163:24
station 38:7,8
  46:13 48:23
  53:11,13 55:18
  58:4 123:7,9
  124:21 125:11
  125:15,17
status 37:1,7,9
  147:18 156:2,4
statute 147:1
stay 85:24 87:10
  112:23
stayed 37:3 40:6
  119:13
staying 86:15
stays 25:17
stenographica...
  165:9
step 87:3 100:4
sticks 52:17
stomach 21:22
  21:24,24 72:12
  82:7 100:23
stood 103:2,13
stop 12:5,21
  13:9 50:18
  82:22 84:22
  130:24 133:13
  134:14
stopped 73:4
  131:2 134:16
  136:21
stopping 132:8
  132:17 133:13
  134:21 136:7
storage 43:15
  123:13 126:11
  143:20
store 56:13,20
  57:1,4,10 59:6
  59:8 79:14
story 163:22

strange 163:13
strategically
  48:11
street 70:17
  71:10,16 72:4
  74:15,16,19
  75:4,8,10
  83:18 84:5
  107:22
streets 41:19
strength 105:15
strike 23:21
  39:5 89:10
  91:5 94:15
  104:4 105:18
  114:11 128:12
  151:16 153:6
  163:2,18
stripped 15:19
stuff 9:15 30:1
  44:10 57:17
subject 50:15,23
  60:7 61:1
submit 123:12
  128:22 145:8
  163:7
submitted
  125:22 126:10
  143:2,8 145:7
  163:2
submitting
  163:1
subpoena
  154:12
subpoenaed
  154:7
substance
  117:19,20
  125:2 126:7,8
  145:2 146:6
  152:8
sued 15:24
suffering 16:22
  17:6 25:7
suffocated

157:11
suggested
  151:11
suggestion
  59:22
suggestions
  151:23
Suite 2:3,8
summarize
  149:4
supervisor
  31:21 36:23
  49:18
supervisory
  49:24
supplemental
  5:21
supported
  105:13
supposed 103:9
  126:24
sure 5:2 14:20
  22:10 24:14
  25:3 26:8
  32:12 34:23
  36:6 41:6 53:6
  57:16 64:10
  68:17 71:20
  73:9 79:6 80:2
  84:24 85:14
  87:15 88:10
  89:7 90:18
  91:22 95:8
  108:4 114:15
  119:18 123:24
  127:11,13,14
  133:21 159:9
  163:1,16,23
surprise 153:19
surroundings
  90:11
survive 119:19
  147:14 153:19
suspect 61:1
  64:14 95:9

sustained
  138:13 139:10
  140:24 141:14
swab 125:4
  126:14,16
  149:18
swabs 126:13
swallow 97:13
  98:5 99:17
  157:13
swallowed 98:1
  98:18 99:19
  102:5,7 110:17
swallowing
  130:1
swearing 60:16
  60:17
sweatshirt 63:4
  63:7 65:5
sweeps 23:4
swiped 126:16
switched 103:1
sworn 4:1,5 9:1
  9:3 165:7
symptoms 16:21
  17:1
sync 47:17
system 45:1,12
  48:5 144:7,8

───────────
      T
───────────
T 1:8 3:11
T-i-m-o-t-h-y
  4:10
table 126:3
take 10:14 22:16
  23:3,4,5,6,19
  50:23 54:5
  55:17 63:17
  72:22 76:18
  82:15 85:10
  94:9 96:23
  100:4 109:22
  113:5 121:11
  125:23 127:1

127:16,23
  128:5,7 129:4
  152:7,11
  164:18
takedown 22:11
  22:12,22 23:22
  72:6 75:17
  89:19
takedowns
  23:10 72:10
taken 1:13,15
  17:18 72:3
  82:11,17 84:8
  104:12 112:11
  113:9,16 117:4
  118:20 127:3
  127:10 128:10
  137:3 157:19
  165:12
takes 82:4 113:5
talk 29:22 32:16
  35:19 36:19
  37:24 38:6
  39:3,4 51:22
  52:2 55:22
  56:4 60:11
  71:8 107:13
  120:6
talked 7:22,24
  8:3,19 37:10
  49:6 50:13
  60:2,3 68:9
  69:11 156:19
talking 6:5 18:5
  22:22 32:22
  37:23 38:10
  40:15 107:1
  110:20 144:20
tall 23:11
Tampa 11:18
tap 78:18
tape 126:10
Taser 41:4
  64:17
task 5:22,22,24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 188

32:15,19 33:1
33:12 34:20,22
36:20 38:18
48:17
**tasked** 37:8
**tasks** 48:18
55:22
**taught** 19:13
**taxes** 32:9,11,12
**tech** 127:18
**technically**
31:20 100:22
121:10
**technician**
143:24,24
**techniques** 23:7
**tell** 33:18 43:17
49:17 58:21
59:17 60:1,4
66:10 73:1
82:24 105:10
117:24 118:8
121:24 132:24
134:24 135:6,9
135:17 136:16
136:17 137:23
138:11 139:8
148:17 150:10
**telling** 14:19
15:14 73:3
**temporarily**
24:17 108:10
115:14
**temporary**
115:22 123:13
126:10 143:20
**ten** 87:13 112:5
113:6,11,11
**ten-minute**
113:14
**term** 19:7
**terms** 22:16
**test** 126:8,12,13
126:24 127:10
151:19 152:8

152:12
**tested** 125:4,5
126:8,24 127:8
127:9 145:3
151:1,4
**testified** 4:5
**testify** 154:8,21
165:8
**testimony** 77:18
136:1 154:19
156:9 157:5
**Thank** 26:24
50:18 97:1
130:11 133:12
**thick** 42:9
**thin** 96:11
117:11
**thing** 5:5 15:14
60:10 85:9
99:8,21 115:22
118:9 146:18
**things** 6:9 18:22
27:21 84:21
143:3
**think** 9:14 21:6
38:2 42:23
45:18 57:12,15
57:21 69:1
84:3 102:11
124:18 133:16
152:14 162:3
**Thorntons** 29:5
30:2 44:3 50:4
50:8,10,15,21
51:5,11,23
52:23 53:2
54:19 55:4,18
56:17 58:12,14
58:16 65:10
67:4 106:15
119:9 160:23
**thought** 57:19
108:15
**threat** 20:19
89:22 91:3

**threatening**
59:14
**threats** 58:1
59:16 88:13
90:9,19 94:1
**three** 37:11,23
38:6,15 44:20
46:5 87:6
105:20 129:18
131:2,3,8
132:4,5 138:24
157:22
**threw** 97:19
150:14
**throat** 18:15
103:12 114:23
115:8 117:4
118:7 123:16
149:15 157:1
157:14 158:9
**thrusts** 18:16
100:3 104:16
**thumb** 121:2
**Thursday** 35:17
**tightened** 42:12
**tightening** 19:5
**Tim** 25:10 66:24
158:3
**time** 8:2 12:14
24:10,11,24
25:4,6,14 30:7
32:23 33:17
34:4,14,17
36:14,21,24
37:5,14 38:9
43:2 46:10,15
47:10,21 50:9
51:2 52:7 54:3
54:5 55:2,24
57:12,13,19
58:8 65:7
67:18 68:7
70:15,16 71:18
77:6 79:14,15
80:14 82:11

84:19 86:17
88:13,19,21
92:2 93:18,20
95:2 97:16,24
100:20 101:15
106:12 108:6
111:15,17
112:3,9 113:1
113:2,5,6,7,7,9
113:10 114:1
117:21 118:1
118:21,22
122:13,22
123:2 136:4,23
144:4 147:12
153:7 155:23
158:23 159:17
159:18,19,20
163:12 164:19
165:12
**time-stamped**
123:3
**times** 4:17 16:12
18:3,6 27:15
30:4 45:23
46:1 48:3
63:15 64:4
82:9 96:4
108:13 129:16
129:18 145:17
**Timothy** 1:12
3:4 4:3,10
165:7
**tire** 83:19 93:1
100:6,11
**tired** 11:8
**title** 32:6
**today** 5:14,15,18
7:24 8:2 84:23
85:2 148:18
**told** 22:8 38:23
39:23 43:24
49:15 51:18
54:21,23 60:19
63:17 75:9

87:3,9 112:16
113:21 114:8
121:18 148:15
148:18 149:21
149:24 152:1
153:15,20
**top** 83:23 94:24
97:9 117:16,22
**torso** 141:23
**torso-abdomen**
88:18
**tosses** 23:5
**touch** 91:8 92:6
118:4
**touched** 21:6
77:16 91:10
92:10 95:19
135:19
**touching** 78:5
81:10,11 88:9
88:24 89:24
90:1,5 91:13
91:18,20 92:5
125:6 135:22
**traffic** 31:17
106:17
**trained** 16:14
17:13 20:5,8
23:3 24:16
25:20 27:1
72:22 90:10
103:19,22
**trainee** 107:8
111:14
**training** 16:10
16:11,20 17:5
17:8 18:5,7,9
19:15 20:11,14
22:2,3,8,11,23
23:18,20 24:2
24:5,20 25:1
158:14
**trainings** 24:9
**transferred**
11:17,19

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 189

transition 49:24
transport 42:16
transported
  41:21 120:16
transporting
  14:14 42:20
transports
  41:17 45:6
treat 17:6
treatment 111:2
  113:17
trial 5:6,7
tried 29:18
  61:10 63:20
  91:23 122:20
trip 55:6 73:2
tripped 55:7
  72:1,16 75:12
  84:5
trooper 12:8
trouble 85:5
true 25:16
  155:18
trunk 92:24
  93:1 124:13,16
  124:22 150:4
  150:19
trust 93:12
truth 165:8
try 12:15 26:10
  26:21 28:8
  37:9 47:18
  56:3 57:2
  59:11 66:4,6,7
  67:7 71:3,23
  88:11 97:11
  99:24 102:5
  103:11 129:21
  152:22
trying 8:12
  37:17 71:24
  73:15 76:16
  77:3 79:12
  80:5,8,17,18
  80:24 88:6

93:3 102:4,6
  102:15 108:4
  111:21 112:15
  133:6
turn 47:5,10,15
  47:18 126:20
turned 47:2
  133:22
turns 47:12
Twan 69:1
Twanie 69:1
twice 63:16
two 6:17 7:15
  24:7,11 41:6,7
  42:9 44:22
  49:24 55:20
  62:13 85:13,14
  85:16,18 90:13
  105:20 106:21
  106:22 129:18
  142:17 162:22
two-man 23:5
type 8:16 17:8
  58:2 75:20
  115:17 117:11
  125:10 145:20
  145:22 146:1,2
  146:14,16
  148:24
typed 146:4,5,18
types 21:2
typewriting
  165:10
typical 31:18
  39:23 40:23
typically 23:22
  27:9 29:5 30:9
  39:6 41:15
  45:16 46:10
  47:12 49:1
  58:6 96:4
  143:13

_____

U

unable 17:2,2

19:11
underneath
  146:11
understand 57:7
  73:14 151:14
  163:17
understanding
  9:21 16:17,24
  18:12 19:1,10
  39:5 52:12
  53:23 108:18
  123:21 124:5
  151:18 155:19
  161:16
unfit 15:22
uniform 40:21
  40:23
union 34:13,14
unit 14:13 53:2
United 1:1,14
  165:1
unknown 90:9
unraveled
  117:22
unsafe 85:17
unusual 55:3,5,6
  55:8
unwanted 50:12
  50:15,23 60:7
update 37:9
  122:12
updates 37:4
  122:20
upgraded 15:2
upload 128:8
upped 148:5
upper 73:18
upright 20:4
upset 59:9 61:22
  67:21
upward 18:16
  100:3
urgency 109:8
  109:19 110:3
urgent 51:9 53:5

use 20:11,17,20
  20:21,24 21:3
  22:2 24:20
  25:21 27:2
  72:19 102:6
  127:22 128:7
  155:20
uses 145:15,19
usually 41:6
  45:20
utilized 21:1
  155:20,21

_____

V

vacant 9:5
vague 114:10
varying 21:7
vehicle 41:8
  44:24 58:22
  69:15 84:10,13
  150:5
vehicles 58:16
veracity 30:16
verbal-written
  14:12,18
verbiage 146:12
verify 30:3
vest 40:22 99:12
vibrate 46:1
victim 29:23
video 6:11,15
  35:7,9,12 36:1
  36:4 57:3,17
  63:5 65:5,10
  82:23 83:1
  130:4,13,14,17
  130:18 131:3
  131:13,21,24
  132:18,24
  135:6,17 136:4
  136:20,21,22
  137:2,9,11,12
  159:2,6 164:11
videoconference
  1:18 2:1

videos 6:16,18
  6:20,23 7:9
  47:7 130:19
Village 1:7 9:24
  10:1,1,6 12:12
  13:14 30:10
  34:12 128:3
  162:12
violation 15:12
violently 42:6
voices 85:13
volume 133:22
voluntarily
  72:14
volunteered
  53:19
vs- 1:6

_____

W

wait 64:9
waiting 14:16
  64:10
waive 164:7,8
walk 32:13
  69:14 74:12
  109:18 116:6,7
  116:18
walked 59:6
  61:1 67:16
  71:5,22
walking 62:23
  72:1 75:16
  77:6,7 109:16
  109:23 115:15
  116:15
wall 14:15
want 7:1,17,21
  9:3 28:11
  37:21 46:24
  50:18 53:3
  57:8 66:2
  76:13 84:3
  96:21 124:4
  156:18,19
  160:24 162:7

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 190

163:16,22
**wanted** 10:18
39:20 53:5
59:15,24 61:12
61:12 115:24
163:23
**wants** 61:11
**warnings** 39:1
**warrant** 119:17
**wasn't** 38:9
43:16 44:6
46:9,14 55:14
57:15 67:12
77:5 90:8 91:4
93:24 100:1
102:6 104:8,9
105:14 108:16
118:14 129:7
147:19 151:8
151:11 155:2
**watch** 6:20
154:1
**watched** 134:22
**watching** 154:3
154:6
**Waters** 1:16
2:23 165:5
166:10
**Waukegan** 10:2
11:5 13:5,18
13:19,23 33:7
43:9,11 161:17
**way** 10:22 11:7
17:15 24:12
44:7 57:18
60:1 62:20
65:13 72:5
76:7,12 85:13
100:8 103:22
110:14 114:24
131:7 133:22
137:21 143:22
154:18 157:11
**ways** 20:20 23:2
24:9,11 72:13

**we'll** 48:13
127:22
**we're** 40:15 80:4
**we've** 20:24
**weapon** 61:21
64:5,7 67:10
**wear** 43:9 46:10
46:16 115:19
**wearing** 42:24
45:15 65:3,6
116:2 125:6,8
125:10 136:18
**weed** 130:1
**week** 6:10,20
7:9 8:4
**weigh** 23:13,15
**weighed** 128:22
**weight** 77:10,22
105:12 145:3
146:15,16
**weird** 118:12
**well-being**
119:18
**went** 12:2,8,11
12:23 13:1,14
34:7,15 37:18
38:4 55:23
56:5 58:15
63:16 67:23
69:11 72:11
73:17 74:23
104:7,17 105:5
105:8,11,12
110:5,10 113:1
113:2 114:2
119:3,13
121:22 123:11
125:15 148:6
159:16
**weren't** 39:15
66:11,13
101:17
**west** 2:3 11:15
11:18,21 44:1
**westbound**

56:17
**wheel** 84:10
**whereof** 166:1
**white** 145:2
157:1
**white-ish** 125:4
**whopping** 32:7
**Wide-eyed**
98:21
**wife's** 13:21
**Wilde** 37:5
121:24
**willing** 35:4
54:10
**willingly** 72:18
**willingness**
157:13
**win** 26:19
**window** 42:21
**witness** 3:3 4:1,4
25:13 26:1
27:5 29:23
30:1,3 67:1
77:19 81:20
91:12 92:9
109:12 129:23
130:7 136:2
137:18 157:6,9
164:8,20 166:1
**woke** 37:19
**woman's** 69:7
**women** 86:4
90:14
**wondering**
67:22
**word** 16:14,17
110:12 121:14
**worded** 29:11
**words** 60:16
62:14,16 76:13
79:19 80:16
84:22 98:8
102:6,10,16
110:6,8 117:3
118:7 145:22

146:1,5,8,14
**wore** 96:7
**work** 8:8 9:10
9:13 11:22
12:19 13:15
30:9 39:6,19
39:23 40:7
54:10 55:10
109:16 111:21
111:24 128:1,4
162:11,21
**worked** 4:19 9:2
9:22 10:6 13:4
13:13 16:6
20:15 39:14,20
40:14 43:19,20
47:4 55:11
**working** 9:15
12:5,21 14:16
17:24 30:7
31:15,17 39:5
39:10,24 43:18
44:17 45:7,14
47:22 49:2,15
50:6 51:8 53:4
55:5,9 58:14
99:14 104:6
128:3 160:18
**works** 20:2
**worn** 43:10
**worried** 57:13
57:17 93:24
98:3,4 99:21
156:7
**worrisome**
98:16,19
**worse** 108:24
**wouldn't** 39:22
47:6,14,17
52:4 57:8
61:10,13 63:10
66:12 87:4
**Wrap** 117:11
**wrapped** 42:3
**write** 146:12

162:20 164:14
**Writing** 162:22
**written** 15:13
**written-verbal**
15:14
**wrong** 87:2
156:6
**wrote** 5:21 6:5
142:12 156:13
164:2

—————————
X
—————————
**X** 3:1,11
**X-rays** 121:2

—————————
Y
—————————
**yeah** 23:17
31:22 42:9
43:24 44:21
45:18 73:13
76:12 79:6
116:14 131:22
**year** 11:11,19
12:10 13:8,16
**year-round** 11:9
**yearly** 16:10
**years** 12:1 13:24
25:1 47:4 51:6
**yelled** 66:11
**yelling** 62:5,8,9
62:11,12 63:1
63:18,24 66:5
66:21,22 86:20
88:8 133:20
**young** 122:7

—————————
Z
—————————
**zero** 131:1
153:13
**ziplock** 117:16
**zone** 44:6 49:2,3
49:15
**zones** 44:11 53:4
**Zoom** 7:11
153:24 154:1,9

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Timothy Cramer - Taken 8/17/2022

Page 191

154:17 156:12

**0**

**084-004693**
166:13

**1**

**1** 3:14 130:5,6
130:12 145:1
146:5 164:11
**1-minute** 136:22
137:2
**1:00** 1:19 165:14
**10** 3:23 28:15
29:14,22 30:4
30:15,18,21
39:4 104:17
144:14,15
**10-minute**
119:10
**10:30** 52:13
**10:45** 30:13 39:6
40:16
**100** 82:24 99:5
105:10 136:5
140:4 150:11
**105** 15:3
**109** 136:7,10,14
**10th** 40:16 43:18
**11** 3:24 149:7,11
**11:15** 54:2
**11th** 35:17
**12** 39:24 132:17
**12-hour** 39:20
**130** 3:14
**137** 3:15
**138** 3:16
**139** 3:17,18
**140** 3:19
**141** 3:20,21
**142** 3:22 136:21
**144** 3:23
**149** 3:24
**158** 3:6
**161** 3:7

**162** 3:8,9
**17** 1:19
**17th** 165:13
**195** 2:8

**2**

**2** 3:15 137:15,17
**2:00** 29:6
**20** 9:4 15:7 32:7
35:21 37:14
103:15 104:17
**200** 23:14
**2017** 10:7
**2020** 23:16
28:15 29:15,22
30:4,15,18,21
33:10 39:4
**2021** 10:8,10
**2022** 1:19
165:14 166:3
**21** 13:13
**21-cv-3236** 1:6
**24** 9:4 35:18
130:16
**24-hour** 35:24
**25** 15:7 32:8
**2642** 142:23
**2646** 144:19

**3**

**3** 3:16 138:15,16
138:20
**3:51** 157:19
**3:57** 157:19
**30** 13:24 42:20
54:9 79:2,19
103:15
**312.341.9646**
2:4
**333** 2:8
**337** 2:3
**3562** 139:23
**3563** 140:14
**3564** 138:20
**3567** 139:12

**3568** 141:17
**3628** 149:11
**36509** 141:5
**38** 134:15,20
**3929** 137:20

**4**

**4** 3:5,17 139:12
139:13 146:17
146:19
**4.0** 146:15 147:4
147:5
**4.00** 146:17
**40** 9:3
**42** 130:18
**42-second**
136:22 137:2
**45** 42:21
**4lane** 70:22

**5**

**5** 3:18 139:23,24
**53** 2:3
**57** 134:21 136:6

**6**

**6** 3:19 140:14,15
**6'1** 23:12
**6'2** 23:12
**60** 15:9
**60143** 2:9
**60604** 2:4
**630.773.4774**
2:9
**65** 15:9

**7**

**7** 3:20 141:3,5,5
**7:00** 39:10,10
40:17,18 49:10
49:11,13 52:10
52:16
**7:15** 30:13 39:6
**702** 157:5
**703** 157:6

**7th** 166:3

**8**

**8** 3:21 141:17,18
**8:30** 35:17
**84-4693** 1:16
2:24

**9**

**9** 3:22 142:18,19
**90-degree** 82:5
**9271** 44:5

CONFIDENTIAL - SUBJECT TO A PROTECTIVE ORDER



ROUNDLAKE 003628

CONFIDENTIAL - SUBJECT TO A PROTECTIVE ORDER