

Transcript of the Deposition of
# Heath Atwell
## (Defendant Officer)

**Case:** Fabiola Rosiles v. Village of Round Lake Beach; et al.
**Taken On:** August 18, 2022

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

EXHIBIT
H

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FABIOLA ROSILES, as Independent        )
Administrator of the Estate of         )
ABEL ROSILES, JR., Deceased,           )
                                       )
                    Plaintiff,         )
                                       )
          vs.                          )  No. 21 CV 3236
                                       )
VILLAGE OF ROUND LAKE BEACH;           )
J. SCHEITHE; J. BERTHOLOMEY;           )
T. CRAMER; and H. ATWELL,              )
                                       )
                    Defendants.        )


        The deposition of HEATH ATWELL, taken via

videoconference, called by the Plaintiff for examination,

pursuant to notice and pursuant to the Federal Rules of

Civil Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Tina M. Hickey, Certified Shorthand Reporter, on

August 18th, 2022, at 9:05 a.m.

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 2

```
 1   APPEARANCES (via videoconference):

 2        HALE & MONICO, LLC
          MR. JASON MARX
 3        53 West Jackson Boulevard
          Suite 337
 4        Chicago, Illinois 60604
          Phone:  312.341.9646
 5        E-mail:  jmarx@halemonico.com

 6            On behalf of the Plaintiff;

 7        HERVAS, CONDON & BERSANI, P.C.
          MR. G. DAVID MATHUES
 8        333 Pierce Road
          Suite 195
 9        Itasca, Illinois 60143
          Phone:  630.733.4774
10        E-mail:  dmathues@hcbattorneys.com

11            On behalf of the Defendants.

12   ALSO PRESENT:  Jeremy Scheithe

13                      *   *   *   *   *

14

15

16

17

18

19

20

21

22

23

24
```

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 3

1                    I  N  D  E  X

2   WITNESS                              PAGE

3   HEATH ATWELL

4         Examination by Mr. Marx...............   4

5         Examination by Mr. Mathues...........  147

6

7                 E  X  H  I  B  I  T  S

8   ATWELL DEPOSITION EXHIBIT             PAGE

9         No. 1.................................  116

10        No. 2.................................  118

11        No. 3.................................  125

12        No. 4.................................  125

13        No. 5.................................  126

14        No. 6.................................  127

15        No. 7.................................  132

16        Exhibit No. 2 was retained by Mr. Marx.

17

18

19

20

21

22

23

24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 4

1    (Witness sworn.)
2    WHEREUPON:
3         HEATH ATWELL,
4    called as a witness herein, having been first duly sworn,
5    was examined and testified via videoconference as
6    follows:
7         EXAMINATION
8    BY MR. MARX:
9    Q.   Good morning.
10   A.   Morning, sir.
11   Q.   Could you please state and spell your full
12   name?
13   A.   Heath Atwell, H-E-A-T-H, A-T-W-E-L-L.
14   Q.   Thank you, Mr. Atwell.  Have you ever given a
15   deposition before?
16   A.   I have not.
17   Q.   Is it true that you were present at least for
18   part of the time for the deposition of Officer --
19   A.   Officer Cramer.
20   Q.   -- Officer Timothy Cramer yesterday?
21   A.   Yes.
22   Q.   Okay.  So your attorney probably went over
23   most of how a deposition works, and you watched part of
24   it, so I'm not going to go over all of the rules of a

Page 5

1    deposition.  I just would say that if you'd like to
2    change or correct anything during your deposition; that
3    is, while we're talking, if you think of something
4    different or additional or you'd like to clarify
5    something, please let me know during this deposition.
6    I'll be happy to go back over it, and we will change it
7    and address what you want to address.  Okay?
8    A.   Okay.
9    Q.   Mr. Atwell, is there any reason that you won't
10   be able to give complete and honest answers here today?
11   A.   No.
12   Q.   Did you review any materials in preparation
13   for your deposition today?
14   A.   Yes.
15   Q.   What did you review?
16   A.   I reviewed the statement that I gave to Major
17   Crimes Task Force.  I reviewed some of the -- I think
18   they call it "interrogatives" [sic], the questions that
19   you guys sent to us and my answers to those.  And then I
20   watched some video as well.
21   Q.   That statement that you gave to the Major
22   Crimes Task Force, did you notice any errors in what they
23   reported that you said?
24   A.   No.

Page 6

1    Q.   Those interrogatories, those questions that
2    you answered about -- I'd say about a month or two ago,
3    did you notice any errors in your answers to those
4    interrogatories?
5    A.   No.
6    Q.   And that video that you watched, are you
7    talking about a cell phone video that's approximately
8    1 minute and 42 seconds long?  Is that the video you're
9    referring to?
10   A.   That was one of them.  I also watched one of
11   the videos from Thorntons and some squad video and a
12   bodycam video.
13   Q.   There's many Thorntons' videos.  About how
14   many videos from Thorntons did you watch?
15   A.   Just one, just inside the business.
16   Q.   Is it the one where my client appears to be
17   taken into custody?
18   A.   Yes.
19   Q.   There's many squad videos.  Whose squad videos
20   did you watch; do you know?
21   A.   I'm not sure whose squad it was.  It was the
22   only individual video that really showed, you know,
23   anything of substance.
24   Q.   And do you know whose bodycam videos you

Page 7

1    watched?
2    A.   Officer Kaminski.
3    Q.   And, of course, you should not tell me what
4    you -- Strike that.
5         Have you reviewed anything else in preparation
6    for your deposition besides those things that you
7    mentioned?
8    A.   No.
9    Q.   And you should not mention what you spoke to
10   your attorney about, but have you met with your attorney
11   in preparation for your deposition?
12   A.   Yes.
13   Q.   How many times would you say you've met in
14   person with your attorney?
15   A.   In preparation for the deposition?
16   Q.   No, ever.
17   A.   I think three times.
18   Q.   Okay.  How many times would you say you talked
19   via Zoom with your attorney?
20   A.   Zero.
21   Q.   And how many times would you say you've talked
22   with your attorney on the phone?
23   A.   I don't know if ever.  We've just e-mailed.
24   Q.   In all these in-person meetings, did you ever

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 8

1  have meetings with just you and him, or were there
2  meetings --were there other people present?
3      A.   Generally, there were other people present.
4      Q.   Okay.  I think you said about three in-person
5  meetings.  In these about three, was somebody always
6  present, that being somebody -- that being
7  Officer Scheithe, Bertholomey, or Cramer?
8      A.   Yeah.  It varied.  I can't remember exactly.
9  But usually it was -- to expedite things, we would meet
10 together.
11     Q.   You worked for the Village of Round Lake Beach
12 Police Department from March of 2012 until June of 2021,
13 correct?
14     A.   Correct.
15     Q.   And you resigned in June of 2021, correct?
16     A.   Correct.
17     Q.   Why did you resign?
18     A.   There were multiple factors.  The simplest way
19 to say it is it was getting really difficult on my
20 family.  I was shot in March of 2020.  I worked my way
21 back from that and immediately worked the riots, you
22 know, was pelted with bottles and bricks, my wife and
23 kids were pretty upset by that.  And then this happened,
24 where, you know, there's protests with my picture on it,

Page 9

1  trying to paint me as a murderer, when I was just trying
2  to help somebody.  At that point, it just -- I got an
3  opportunity for a new job that would allow me to be
4  around my kids more.  It was safer.  So I took it.  I
5  loved being a cop, but it was a better decision for my
6  family.
7      Q.   I'm sorry to hear that you got shot.  Where
8  did you get shot?
9      A.   Thank you.  In the right leg.
10     Q.   What's your new job?
11     A.   I sell metalworking fluids.
12     Q.   What does that mean?
13     A.   I go into machine shops where they, you know,
14 have CNC machines and do welding, forming, all those
15 types of things.  And we sell fluids that they use to
16 make those products, so like coolants, cleaners, rust
17 preventatives.  So if you're in the market, let me know.
18     Q.   I'm not, but thank you.
19          How long have you been doing that?
20     A.   Since about a week after I left the
21 department.
22     Q.   What's the name of your employer?
23     A.   DuraMet Fluid Solutions.
24     Q.   DuraMet?

Page 10

1      A.   D-U-R-A-M-E-T.
2      Q.   Besides the Village of Round Lake Beach
3  Police, did you have any prior law enforcement
4  experience?
5      A.   No.
6      Q.   Why did you become a police officer?
7      A.   It was always something I was interested in.
8  My grandfather was an auxiliary officer for Henry County,
9  and my uncle was in the FBI -- or I'm sorry -- Secrete
10 Service.  And so it was something that kind of piqued my
11 interest when I was younger.  So, initially, I went to
12 college for that.  And one day an advisor of mine said,
13 "Hey, if there's anything else that you're interested in,
14 I recommend getting a degree in that as a backup, because
15 if you have a degree, you can become a cop; you know, a
16 degree in anything."
17          So I went into education, and I graduated with
18 a degree in education and started teaching and then kind
19 of realized that law enforcement was my true calling, and
20 I wanted to give it a shot while I was still young.  So I
21 started applying to places, and I was happy I made the
22 switch.
23     Q.   You obtained a degree in education?
24     A.   Yes.

Page 11

1      Q.   Okay.  And were you a teacher or auxiliary
2  teacher for a while?
3      A.   This was in 2010, so finding teaching jobs was
4  pretty difficult back then.  It was a lot different than
5  now.  So I worked for a district where they basically
6  plugged me in wherever they could.  I coached three
7  sports.  I was a paraprofessional for a while.  I did
8  permanent subbing where I would sub for a teacher for a
9  full semester while they were out.  Usually it was
10 maternity leave.  And during that time, I obtained my
11 special ed certification, so I started doing a lot more
12 special-ed-type education as well.
13     Q.   How long did you do that before you became a
14 police officer?
15     A.   Almost two years.
16     Q.   Can you tell me what positions you've held
17 within the Round Lake Beach Police Department and
18 basically a description of your duties?
19     A.   I was a patrol officer.  I was an officer in
20 charge.  I ran our warrant service team.  I was a
21 firearms instructor.  I ran the taser program.  And I was
22 a squad leader for the Northern Illinois Police
23 Associate- --- sorry -- Northern Illinois Police Alarm
24 System, NIPAS, which is the area squad team.

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 12

1    Q.  What's an officer in charge?
2    A.  An officer charge is the person that runs the
3  shift when there is not someone from the command staff
4  there.  So it was kind of like our version of sergeants
5  for a while because they had gotten rid of sergeants.  So
6  when the commander wasn't there, I would take the shift.
7    Q.  I didn't ask the previous two deponents, but
8  what's, to your knowledge, the ranking of the Round Lake
9  Beach Police; that is, what's the first rank, second
10  rank, third rank?
11    A.  It's different now.  They've changed it.  But
12  at that time, it was patrol officer, officer in charge,
13  commander, deputy chief, and then chief.  Since then,
14  they've added sergeants to that as well.
15    Q.  And at the time you worked, approximately how
16  big was the sworn number of personnel on the department?
17    A.  I believe the allowable amount that could work
18  there, like the number that we shot for, was around 40.
19  But we were usually very understaffed, and part of that
20  was command staff.  So I think we were usually around 19
21  or 20 patrol.
22    Q.  And around that time -- we're talking about
23  June of 2020 -- is it fair to say there was typically
24  three or four patrol officers on any given shift?

Page 13

1    A.  It varied shift to shift.  Midnights had a
2  minimum of three.  Days had a minimum of four.  And
3  afternoons I believe had a minimum of five.  Again,
4  that's changed too because they work different shifts
5  now.
6    Q.  When did you become an officer in charge?
7    A.  March 15th, 2020.
8    Q.  So only a couple months before this incident?
9    A.  Correct.
10    Q.  Did that include a pay raise, or was it simply
11  more responsibility without a pay raise?
12    A.  It's the kind of thing you talked about
13  yesterday.  We get $20 a day, I believe it was.  It was
14  more of a leadership-type thing.  You kind of had to do
15  it because you were kind of called into it.
16    Q.  It's my understanding that Round Lake Beach
17  police, at least at the relevant time frame -- we're
18  talking June of 2020 -- the patrol was divided into three
19  sections, like Section 1, 2, and 3, or is it north,
20  south, and east?
21    A.  North, east, and west, yes.
22    Q.  Okay.
23    A.  Different beats, I guess you could say.
24    Q.  And as an officer charge, did you have a

Page 14

1  particular beat?
2    A.  I was 9281, was the officer-in-charge number.
3  And we generally had a number that -- they knew not to
4  dispatch immediately to 9281.  Since I was in a
5  leadership role, I wouldn't take mundane calls.  I had to
6  be free to do stuff.  So I would usually, when I was in
7  charge, put the other two officers as west and east cars.
8  And as long as we weren't busy, I would take the north
9  calls.
10    Q.  Not being familiar with Round Lake Beach that
11  much, is there a section of Round Lake Beach that gets
12  the most calls, so to speak, or at least in your
13  experience?
14    A.  It varies.  The north side has all of our
15  businesses, so you're going to get a lot more, you know,
16  of those types of crimes:  shoplifting, fraud, those
17  types of things.  The east and west are where we get, you
18  know, shootings, fights, domestics.  I mean, we still get
19  those types of things on the north; but, generally, you
20  get a lot more of those on the east and west.  You get a
21  lot more paper calls on the north.
22    Q.  Paper calls being like reporting of theft or
23  something like that; is that what you're saying?
24    A.  Yeah, where you're going to do a report.  It's

Page 15

1  not, you know, where you kind of show up and do some
2  notes and leave.  It's more follow-ups.
3    Q.  Are you aware of any complaints that have been
4  made against you in your capacity as a law enforcement
5  officer?
6    A.  No.
7    Q.  Have you ever received any form of discipline
8  in your capacity as a law enforcement officer?
9    A.  Yes.
10    Q.  What are you aware of?
11    A.  I took a -- it was either 10- or 12-day
12  suspension in 2017.
13    Q.  Okay.  What was alleged against you?
14    A.  There was a car crash that occurred.  And when
15  myself and another officer arrived, we realized that the
16  driver was drunk.  He crashed into a pole.  He pulled out
17  a badge and showed it to us, said he was an officer.  We
18  arrested -- I arrested him.  I was primary on the call,
19  so I arrested him and took him down for booking while the
20  other officer stayed at the scene and processed the
21  vehicle.  And so after all that was done and after the
22  guy was released with his court date, he came to the
23  police department to get his belongings from the car and
24  get a copy of the report.  So he was -- at that point, he

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 16

1   and his wife were given his duty weapon back, and so he
2   asked if -- he asked for the report, asked for the duty
3   weapon, got it, and left.
4            When his department called that week and spoke
5   to the other officer, they asked if he had his duty
6   weapon on when he was on the crash, and he told them no.
7   So I heard that from that officer. I told him, "I think
8   that's a big mistake, and I think you should tell them
9   the truth." I said, "I'm not gonna lie."
10           So he continued to go with that for about a
11  week until finally he confessed to their department,
12  "Yeah, he did have his duty weapon on. I just was trying
13  not to cause any more trouble than had already occurred."
14  And so he ended up resigning because he had lied to them.
15  And because I did not turn him in immediately when I knew
16  that he had lied, I got a 12-day suspension.
17      Q.   Did not turn him in for what?
18      A.   For lying to their department during the
19  investigation.
20      Q.   Okay. Your department felt that you had an
21  obligation to report that he lied about the duty-weapon
22  issue; is that what you're saying?
23      A.   Yes. They said I should have gone to the
24  other officer's department and told them the truth,

Page 17

1   turned him in.
2       Q.   What jurisdiction was that officer from?
3       A.   I believe Woodstock.
4       Q.   What's that officer's name?
5       A.   I don't remember. Sorry.
6       Q.   He resigned?
7       A.   That officer?
8       Q.   Yeah.
9       A.   I believe he's actually the chief of police at
10  another jurisdiction now.
11      Q.   Do you know which jurisdiction?
12      A.   I don't. I just was told that.
13      Q.   But you're saying -- did you say that he
14  resigned shortly after his arrest regarding this
15  incident, but now --
16      A.   No, the other officer in our department
17  resigned. The officer I was on scene with that had been
18  untruthful, he resigned because he knew that was the best
19  thing to do.
20      Q.   Any other discipline besides that?
21      A.   No.
22      Q.   Have you ever been stripped of your police
23  powers?
24      A.   When I was suspended, I guess you could say.

Page 18

1   But other than that, no.
2       Q.   Well, I guess -- I mean, were you actually
3   stripped? I mean, did you not have law enforcement
4   powers for those 12 days?
5       A.   Yes.
6       Q.   Okay. Have you ever been found unfit for
7   duty?
8       A.   No.
9       Q.   Have you ever been sued in your capacity as a
10  law enforcement officer besides this case?
11      A.   No.
12      Q.   Have you ever been convicted of a crime?
13      A.   No.
14      Q.   You went to the police academy, right?
15      A.   Yes.
16      Q.   How long was that?
17      A.   Just over three months before.
18      Q.   Was that sometime in 2011?
19      A.   That would have been 2012.
20      Q.   Okay. Early in 2012?
21      A.   March 2012. It was right around my start
22  date.
23      Q.   Can you tell me some of the things they taught
24  you in the police academy?

Page 19

1       A.   It's a lot. You know, law -- traffic law,
2   criminal law, active shooter. I mean, it's -- three
3   months of a lot of stuff.
4       Q.   Did they teach you basic first aid?
5       A.   I believe so.
6       Q.   And throughout your career working for Round
7   Lake Beach, did you have continuing training?
8       A.   I think we did it two or three more times in
9   my time there.
10      Q.   You guys didn't have like a training session?
11      A.   Yes, like a one-day training session.
12      Q.   Okay. In those two or three times, did you
13  have any further first aid training?
14      A.   Yes.
15      Q.   Okay. Did you have it each of those two or
16  three times?
17      A.   Yeah.
18      Q.   Were you ever trained on what the word
19  "asphyxiation" means?
20      A.   I'm sure it was discussed. I couldn't give
21  you an exact definition out of the dictionary right now
22  but the gist of it, yeah.
23      Q.   Well, what's your understanding of what that
24  word means?

7 (Pages 16 to 19)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 20

1    A.  Having something cause you to struggle to
2    breathe.
3        Q.  Have you ever received training on recognizing
4    the signs and symptoms of someone who might be suffering
5    from asphyxiation?
6    A.  It's possible.  I don't recall.
7        Q.  Well, do you have an understanding of what
8    some of the signs and symptoms might be of somebody
9    suffering from asphyxia?
10   A.  Yeah.  I mean, if they're -- that they're not
11   breathing, that they're panicked, those types of things,
12   yeah.
13       Q.  Any other signs and symptoms that you're aware
14   of?
15   A.  There's a lot.  I mean, they could begin to
16   turn blue, you know.
17       Q.  Prior to June 10th, 2020, have you ever
18   encountered anybody in your personal or professional life
19   that you believed was choking on something?
20   A.  I was at a training one time and another
21   officer was eating a sandwich or something and he started
22   choking, and everyone kind of rushed, and he had to give
23   the Heimlich to get it out.  I wasn't the one that
24   Heimliched him, but I was standing next to him when it

Page 21

1    happened.
2        Q.  You didn't do the Heimlich, but you saw
3    somebody else do it?
4    A.  Yeah.  There were about 60 people in the room,
5    so someone was on it before anyone could talk.
6        Q.  And since you watched it, did you see
7    something get expelled out of his mouth?
8    A.  I believe so.  I don't remember.
9        Q.  That was at one of your training sessions, you
10   said?
11   A.  Yeah.  It was on a lunch break.
12       Q.  Just a lunch break at work or a training
13   session?
14   A.  A lunch break and -- so it was training for
15   work.  We were on a lunch break.  It wasn't part of the
16   training is what I mean.
17       Q.  I understand.  But you just happened to be --
18   have a training session when it happened, is what I'm
19   saying, right?
20   A.  Yeah, correct.
21       Q.  That was one of your two or three training
22   sessions you received while at Round Lake Beach?
23   A.  No.  I've had a lot of other kinds of
24   training.  I was just saying specific to CPR, first aid

Page 22

1    type stuff, I only had about three of those while I was
2    there.
3        Q.  Oh, I see.  Thank you for clarifying that.
4    A.  No.  We've done a lot of other training days
5    on different topics.
6        Q.  Right.  You've received training, I assume,
7    throughout on, for example, use of force, right?
8    A.  Yeah.
9        Q.  I'm sorry.  Was that a "yes"?
10   A.  Yes.
11       Q.  Okay.  Yeah.  The court reporter just can't
12   take down a shake of the head.  If you said "yes," I
13   apologize.  I didn't catch it.
14   A.  It's okay.
15       Q.  Have you ever received training on how to
16   potentially treat somebody who might be suffering from
17   asphyxiation?
18   A.  In what capacity?  I mean like they're choking
19   or they're -- you know, I mean, there are multiple ways
20   of suffering from asphyxiation.
21       Q.  That was one of my questions too.  Would you
22   agree with me there's multiple ways one might be
23   suffering from asphyxiation?
24   A.  Yeah.

Page 23

1        Q.  What are some of the ways that you're aware
2    of?
3    A.  You can choke.  You could -- for example, if
4    you had been shot or stabbed in the chest, you could have
5    a sucking chest wound and struggling to breathe that way.
6    You could have pneumonia.  There's, I'm sure, countless
7    ways it could happen.
8        Q.  Okay.  Have you received training on how you
9    might treat something with asphyxiation?  Have you ever
10   received any sort of training on that?
11   A.  Yeah.  In our -- the three trainings I was
12   talking about, we went over Heimlich, and we went over
13   CPR.
14       Q.  Okay.  What's CPR?
15   A.  I believe it stands for something like
16   cardiopulmonary resuscitation, I believe.
17       Q.  Have you ever performed CPR on somebody?
18   A.  I have.
19       Q.  Okay.  Besides training you have, is what I'm
20   saying?
21   A.  Yes, one time.
22       Q.  Okay.  Was that in your personal or
23   professional life?
24   A.  Professional life.  It was a drug overdose.

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 24

1    Q.    Could you briefly describe what happened?
2    A.    I was a newer officer, and I responded to a
3  drug overdose.  And I got there, and he was unconscious
4  on the bed.  As I said, I was a new officer, so I was a
5  little bit more -- probably not paying attention to the
6  signs that I should, in that he had been dead for quite
7  some time.  So I pulled him off the bed and started
8  giving him compressions and performing CPR.  And the
9  paramedics got there and said, "Good effort, but he's
10 been gone for a while."
11   Q.    And you received training on the Heimlich
12 maneuver?
13   A.    Yes.
14   Q.    Have you ever performed that on somebody
15 outside of training?
16   A.    No.
17   Q.    Have you ever heard of something called
18 "positional asphyxia"?
19   A.    Yes.
20   Q.    What's your understanding of what that term
21 means?
22   A.    Based on the position of a person, them
23 struggling to breathe.
24   Q.    An example of that -- Strike that.

Page 25

1         Would you agree with me an example of that
2  might be where a person is facedown on the ground and
3  their face is so much on the ground such that they can't
4  give enough space for their nose or mouth to be able to
5  get air in?
6    A.    You're saying like they're being suffocated
7  because they can't get air through their mouth and nose?
8    Q.    Yes.
9    A.    Yeah, that would probably restrict breathing.
10   Q.    For example, that might happen to like a small
11 child, like a baby?  Have you ever heard of that before,
12 that a baby might have trouble --
13   A.    Yes.  I have kids.
14   Q.    Okay.  Right, and that's perhaps why a baby
15 should be placed on their back and not on their stomach,
16 because they might have a hard time getting off of their
17 face which might be covered by the ground?
18   A.    Yeah.  I think it's the first year they don't
19 have the cognitive ability to lift their head, so that's
20 why they stay on their back.  Actually, it's until they
21 can roll over, I believe it is.  Sorry.
22   Q.    But would you agree with me the same concept
23 applies to an adult?  If the adult, for some reason, for
24 whatever reason, is unable to get sufficient space,

Page 26

1  breathing space, for their nose or mouth, that they
2  themselves might suffer from positional asphyxia?
3    A.    Yeah.  I think it's different than a kid.  A
4  baby doesn't have the cognitive ability to lift their
5  head.  But, yeah, if there was something causing an
6  adult's face to be so that their mouth and nose are
7  covered, then, yeah, they wouldn't be able to breathe.
8    Q.    In these training classes, these first aid
9  classes, have you ever received any like basic anatomy
10 lesson?
11   A.    I'm sure we went over some basics.
12   Q.    Okay.  Have you ever heard of the diaphragm in
13 the human body?
14   A.    I've heard it referenced, yeah.
15   Q.    Okay.  What's your understanding of what that
16 is?
17   A.    I believe it's a muscle in the abdominal area
18 that helps a person expand and contract so that they can
19 breathe.
20   Q.    Do you have any further understanding of
21 exactly how it works, or is that pretty much your
22 understanding of how it helps one breathe?
23   A.    That's pretty much my understanding.
24   Q.    Were you ever trained that if the diaphragm

Page 27

1  can't move, for whatever reason, that that could lead to
2  a person suffering from asphyxia?
3    A.    Possibly.
4    Q.    And like we've mentioned before, you've
5  received numerous trainings on an officer's use of force,
6  correct?
7    A.    Yes.
8    Q.    And would you agree with me that there's a
9  wide variety of force that an officer might use depending
10 on what circumstances he's faced with?
11   A.    Absolutely.
12   Q.    Anything from very minimal force to deadly
13 force; is that fair?
14   A.    Yes.
15   Q.    And have you received training on what I
16 commonly refer to as takedowns?
17   A.    Yes, arrest and defense tactics, those types
18 of things, yeah.
19   Q.    Right.  They're called various things:
20 takedowns, emergency handcuffing, things like that.  What
21 I'm referring to generally is taking someone to the
22 ground to get them into handcuffs, is basically what I'm
23 driving at.  You've received specific instruction on how
24 one might do that?

9 (Pages 24 to 27)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

---

Page 28

1    A.   Yeah, very basic from the department.
2    Q.   What are some of the ways you have been
3    trained in which to take someone to the ground, if
4    necessary, of course, to get them into handcuffs?
5    A.   There's the standard armbar takedown is one
6    that's a big one, and, you know, tripping the legs,
7    pulling them to the ground.  You know, it depends,
8    again -- like you said earlier, it depends on the level
9    of escalation of the suspect.  You know, sometimes a
10   minimally resisting suspect, you can get them to the
11   ground with an armbar pretty easily.  But if someone is
12   really fighting you hard, you may need to trip them or
13   push them to the ground.
14   Q.   Have you ever received training on how to take
15   someone to the ground if they're handcuffed behind their
16   back already?
17   A.   Not specifically, I don't think.
18   Q.   In all the trainings you received, have you
19   ever received a training in which a handcuffed suspect
20   was running away from your custody, and then you were
21   then trained on how to apprehend that person again?
22   A.   No.
23   Q.   Nothing that specific is what you're saying?
24   A.   I don't recall ever being -- discussing that

---

Page 29

1    situation.
2    Q.   Besides that allegedly happening on June 10th,
3    2020, had that ever happened to you before, where a
4    suspect in your custody, who was already handcuffed, just
5    started running away?
6    A.   I've had people pull away and, you know, fight
7    or resist while they were in handcuffs, but I've never
8    had someone break free and run like that.
9    Q.   How many people would you say in -- Strike
10   that.
11   Were you an officer for approximately ten
12   years?
13   A.   Yes.
14   Q.   How many people would you say in your
15   experience pulled away or otherwise fought you while they
16   were in handcuffs?
17   A.   I don't know.  Hundreds.
18   Q.   And did you put some of those people on the
19   ground?
20   A.   Yes.
21   Q.   Okay.  Did you put most of those people on the
22   ground, or how would you describe it?
23   A.   Generally, if someone is fighting or resisting
24   and they're in handcuffs, I'd put them on the ground for

---

Page 30

1    their own safety because they don't have their hands to
2    brace themselves.  So if I allow them to kick or run or
3    thrash or any of that stuff, they run the risk of falling
4    and hitting their head.
5    Q.   Were you ever trained to handcuff somebody in
6    the front of their body or always in the back?
7    A.   Only in the most extreme circumstances would
8    it be the front, if you have, you know, a frail -- very
9    frail, old person or someone with a catastrophic injury.
10   But for the most part, it's always in the back.
11   Q.   Officer Cramer was talking about some sort of
12   like leg restraint, not a leg shackle, but a restraint of
13   some of sort, maybe like a giant -- I described as like a
14   giant rubber band that an officer might use if a subject
15   is using their legs to resist in some fashion.  Were you
16   present when we talked about that, by the way?
17   A.   Yeah, I know what you're referencing.
18   Q.   Okay.  Have you ever used one of those while
19   working as a police officer?
20   A.   No.  I was actually thinking that I wished I
21   would have known about that because it sounded like a
22   pretty cool thing, but I had not heard of that existing.
23   Q.   Fair to say the Round Lake Beach Department
24   didn't have that as one of their tools for officers to

---

Page 31

1    use?
2    A.   No, not that I know of, not that I'm aware of.
3    I shouldn't say "no" outright.
4    Q.   Do you know what the prone position is,
5    P-R-O-N-E?
6    A.   Yes.
7    Q.   What is that?
8    A.   I believe it's laying flat on your stomach.
9    Q.   In all the trainings that you received on the
10   use of force, have you ever been trained on prone
11   restraint?
12   A.   I believe so.
13   Q.   Okay.  What type of training, generally, have
14   you received in that area?
15   A.   It was handcuffing in a prone position,
16   mostly, and how to deal with handcuffing someone while
17   they're on their chest or stomach.
18   Q.   And more specifically, how are you trained to
19   handcuff someone if they're on their chest?
20   A.   Well, you always receive training in a
21   controlled environment, so using an armbar to get
22   leverage to get a handcuff and then controlling the other
23   arm you don't have in an armbar over to the handcuff.
24   But, again, it's in a controlled environment, so that was

---

10 (Pages 28 to 31)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 32

1  kind of, you know, the standard if you're able to do it.
2      Q.   Were you ever trained that it's an acceptable
3  use of force to put your knee on a subject's back to
4  handcuff them behind their back?
5      A.   If the circumstances call for it, it would be
6  allowable.  Again, it all depends on the actions of the
7  suspect.
8      Q.   Can you give me an example of why you might
9  put your knee on a suspect's back to handcuff them behind
10  their back?
11      A.   If they're fighting really hard, you know,
12  they're kicking, and you need to get some leverage to get
13  them restrained because, obviously, the goal is to get
14  them in handcuffs for your safety but also for their
15  safety.  The longer a scuffle goes on, the higher the
16  likelihood that both parties get injured.  So you could
17  possibly use a knee or a higher-level use of force to get
18  them in cuffs quicker for their own safety.
19      Q.   Do you agree with me that, in general, it's
20  tougher to breathe when one is lying down in the prone
21  position as opposed to, for example, just standing up?
22      A.   I would assume that's the case.
23      Q.   I don't want you to assume anything.  Do you
24  believe that to be true?  It's okay if you don't.  I just

Page 33

1  want to understand what your belief is.
2      A.   Laying down it's more difficult than standing
3  up?
4      Q.   Yeah.
5      A.   It could be.  I mean, definitively, I don't
6  know.  Again, there's factors that go into things.  You
7  know, I sleep on my chest, so it can't be that hard to
8  breathe at that time.  You know what I mean?
9      Q.   A lot of people do.
10          Well, let me ask you this:  I mean, do you
11  agree that keeping a detained person in a prone position
12  for an extended period of time could increase their risk
13  of suffering from asphyxiation?
14      A.   Yes.
15      Q.   Okay.  Was there ever a training that you
16  received that said you shouldn't leave a person in a
17  prone position for more than one minute or two minutes or
18  five minutes or anything like that?
19      A.   I don't think there was a specific time given.
20  They just said more than necessary, you know, more than
21  you have to.
22      Q.   Right.  An officer's force has to be
23  reasonable, correct?
24      A.   Correct.

Page 34

1      Q.   Reasonable is based on the totality of the
2  circumstances that you're confronted with, right?
3      A.   Correct.
4      Q.   So it's within your discretion as to how long
5  the person stays in the prone position, correct?
6      A.   For the most part, yes.
7      Q.   Why wouldn't it be your discretion?
8      A.   Well, because -- No.  I'm saying it is, but
9  you don't have just carte blanche, you know.  It's gotta
10  be -- it's gotta make sense to other people as well, you
11  know.
12      Q.   Well, again, your use of force has to be
13  reasonable, and if you believe it to be reasonable to
14  leave somebody in a prone position for a minute, you're
15  going to do that, right?
16      A.   Yes.
17      Q.   But if you believe it's unreasonable, you're
18  not going to do that, right?
19      A.   Correct.
20      Q.   I'm sorry.  Was that a "yes"?
21      A.   Yes, correct.
22      Q.   Maybe it just cut out for a second.  That's
23  all.
24      A.   I think when one of us is talking, it mutes

Page 35

1  the other one.
2      Q.   Sorry.  I know you can anticipate where I'm
3  going sometimes.  I'll try to pause a little bit, so ...
4      A.   No.  It's all good.
5      Q.   Were you ever trained that it's an acceptable
6  use of force to have somebody who's retrained in the
7  prone position, that is handcuffed in the prone position,
8  that it's an acceptable use of force to then push on that
9  person on their back?
10      A.   Again, if the circumstances are dictated,
11  then -- it is all dependent on the actions of the
12  suspect.
13      Q.   Can you give me an example of why you might do
14  that, that scenario I just described?
15      A.   If someone is fighting or kicking or, you
16  know, trying to get back up, those types of things you
17  may put some pressure down there but only for as long as
18  necessary.
19      Q.   As long as necessary for what?
20      A.   To regain control.
21      Q.   Would you agree that people are generally in
22  control -- you're in control of people that are
23  handcuffed behind their back and in the prone position?
24      MR. MATHUES:  Objection to foundation.

11  (Pages 32 to 35)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 36

1    Go ahead.
2    BY THE WITNESS:
3    A.  Not necessarily.
4    **Q.  What do you mean by that?**
5    A.  I've seen people in handcuffs do some pretty
6    nasty things.
7    **Q.  What have you seen people do in handcuffs?**
8    A.  I've been personally kicked in the face with
9    someone in handcuffs.  I've seen them fight from the
10   ground to a standing position while other officers were
11   holding them and handcuffed.  If someone is motivated and
12   potentially on a substance, they could be dangerous in
13   handcuffs still.  I've actually heard of officers -- not
14   in our department but officers that have been shot,
15   stabbed, really hurt by someone in handcuffs.
16   **Q.  More specifically, have you ever been hurt by**
17   **somebody who was in handcuffs who is -- Strike that.**
18   **More specifically, have you ever been hurt by**
19   **somebody who is in the prone position who is in**
20   **handcuffs?**
21   A.  Yes.
22   **Q.  Okay.  How?  How were you hurt?**
23   A.  I was kicked in the face.
24   **Q.  When did what happen?**

Page 37

1    A.  I don't know the exact year.  I would say it
2    was probably around 2015.  It was an intoxicated subject
3    being arrested, and he was fighting a lot, and we were
4    trying to regain control when he was in cuffs, and he
5    reached back and kicked me in the head.
6    **Q.  And what were you doing right before he kicked**
7    **you?**
8    A.  Trying to gain control of him.
9    **Q.  More specifically, how?**
10   A.  Trying to get control of his legs.
11   **Q.  You were trying to grab his legs?**
12   A.  Yeah, that was his base.
13   **Q.  That was his base?  I'm sorry.  What did you**
14   **say?**
15   A.  His legs would be his base, so I was trying to
16   control it so he couldn't -- obviously, he's not gonna
17   push himself up with his arms.  His legs is going to be
18   what he's going to push himself up with.
19   **Q.  Were you ever trained that using prone back**
20   **pressure on a subject could prevent the diaphragm from**
21   **moving, thereby making it difficult for the person to**
22   **breathe?**
23   A.  I don't know about specific training, but I'm
24   sure -- I know it's been discussed, yes.

Page 38

1    **Q.  Do you believe that to be true, that if one is**
2    **in the prone position and restrained in handcuffs, that**
3    **if you or somebody else were to push on their back in**
4    **that position, that might make it difficult for them to**
5    **breathe?**
6    A.  Yes.
7    **Q.  Do you believe that to be true if one were to**
8    **then also push on that person's neck or head area?**
9    A.  Oh, I'm sure, yeah.
10   **Q.  I'm going to ask you about your knowledge of a**
11   **couple people.**
12   **So prior to June 10th, 2020, did you know who**
13   **Abel Rosiles, Jr., was?**
14   A.  No.
15   **Q.  To the best of your knowledge, had you had any**
16   **contact with him prior to that date?**
17   A.  No.
18   **Q.  To the best of your knowledge, had you heard**
19   **anybody speak his name at any point?**
20   A.  No.
21   **Q.  The same questions apply to somebody named**
22   **Antoine Stanley.**
23   A.  I believe I had contact with him as a clerk at
24   Thorntons but nothing more than any of the other clerks

Page 39

1    at Thorntons.
2    **Q.  As in "contact with," "Hey, how you doing?**
3    **Can I pay for this" type of conversation?**
4    A.  Yeah.
5    **Q.  To the best of your knowledge, had you ever**
6    **arrested him before?**
7    A.  I don't believe so.
8    **Q.  To the best of your knowledge, had you ever**
9    **responded as him being a victim or a witness to a crime?**
10   A.  I don't recall.
11   **Q.  Is it possible that you have and just don't**
12   **have a specific recollection of doing that?**
13   A.  Yes, it's very possible.
14   **Q.  Before June 10th, 2020, did you have any**
15   **opinion as to the credibility or lack of credibility of**
16   **Antoine Stanley?**
17   A.  No.
18   **Q.  Is it fair to say you didn't really know him**
19   **that well; you just kind of knew him as a clerk from**
20   **Thorntons?**
21   A.  Yes, that's fair to say.
22   **Q.  Prior to June 10th, 2020, did you know who**
23   **Sinahy Gomez Reyes was?**
24   A.  No.

12 (Pages 36 to 39)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

---

Page 40

1    Q.  Prior to June 10th, 2020, did you know who
2  Shelby Brubaker, or Brubaker, was?
3    A.  No.
4    Q.  Prior to June 10th, 2020, did you know who my
5  client, Fabiola Rosiles, was?
6    A.  No.
7    Q.  So to the best of your knowledge, did you even
8  know who the Rosiles family was, who they were and who
9  the family members were?
10    A.  No.
11    Q.  Prior to June 10th, 2020, did you know who a
12  Julie Contreras was?
13    A.  No.
14    Q.  Do you know who Julie Contreras is now?
15    A.  Just based on what I've seen on the news and
16  the Internet.
17    Q.  When did you first become aware of her?
18    A.  When there were protests and videos that
19  started to circulate.
20    Q.  Have you ever talked to her?
21    A.  No.
22    Q.  Have you ever seen her in person?
23    A.  I don't believe so.
24    Q.  Okay.  It's my understanding members of the

---

Page 41

1  Lake County Major Crimes Task Force interviewed you the
2  day after this incident we're here to talk about,
3  correct?
4    A.  Yes.
5    Q.  According to the report that I saw, it was an
6  Investigator Alovsky (phonetic) and Herdus, H-E-R-D-U-S.
7  My question is, did you know who those two investigators
8  were prior to them talking to you?
9    A.  No.
10    Q.  Am I correct that this conversation took place
11  at the Round Lake Beach Police Department?
12    A.  Yes.
13    Q.  And that your FOP representative, Laura
14  Scarry, S-C-A-R-R-Y, was there?
15    A.  She's not the FOP rep.  She's an attorney that
16  I contacted.
17    Q.  Oh, thank you for clarifying.
18       So to your knowledge -- I'm sorry.  Did you
19  pay for her services, for her representation on that day?
20    A.  No.  We pay into a legal defense fund at the
21  police department.  It's basically like insurance.  And
22  so in the event that you need representation of any kind,
23  it's covered through that insurance policy.
24    Q.  That's separate and apart from any FOP?

---

Page 42

1    A.  Well, we do it through the FOP.  It's separate
2  from that attorney, though, yes.  But we do -- as an FOP
3  union at the department, we all contribute.
4    Q.  Oh, well, I guess I'm confused.  Is that
5  person an FOP attorney, so to speak, or not an FOP
6  attorney?
7    A.  No, she's not an FOP attorney.
8    Q.  So she doesn't represent the union; that is,
9  the FOP, right?
10    A.  Correct.
11    Q.  Okay.  Why was she present for your statement?
12    A.  I had -- I know her reputation as an attorney.
13  I know that she works with a lot of police officers.  I
14  don't trust a lot of people, so I knew -- I trust her,
15  and so I reached out to her, and she was available, and
16  so she said she would come in.
17    Q.  Did you know her prior to this date?
18    A.  I had heard her speak, I think, at a SWAT
19  conference one time.  She was there just talking about
20  legal stuff, but I never spoke to her personally.
21    Q.  But you requested her to be there, and she
22  agreed and came?
23    A.  Yes.
24    Q.  Was there anybody else present besides you,

---

Page 43

1  your attorney, and these two investigators when you gave
2  your statement?
3    A.  I don't believe so.
4    Q.  Was your interview audio or video recorded to
5  your knowledge?
6    A.  I don't remember.  I'm not sure.
7    Q.  According to the paperwork I saw, your
8  interview took place at 9:03 p.m. on June 11th, 2020.
9  And according to the paperwork I saw from this arrest;
10  that is, Abel's arrest, took place at -- I believe it was
11  11:04, the day before.  So it looks like you gave your
12  statement a little under 24 hours, the next day, correct?
13    A.  Correct.
14    Q.  In that 24-hour period, who did you speak to
15  about this incident?
16    A.  It's gonna be hard to remember specifics
17  because there were a lot of officers on scene.  While I
18  was on scene, I remember specifically talking to
19  Commander Barr, obviously the other officers -- initial
20  officers responding, possibly Officer Kaminski.  And then
21  I went to the hospital from there and then basically, due
22  to my injuries, was sent home as soon as I got back to
23  the police department, so I didn't really have too much
24  conversation with anyone once I got back to the PD.  Then

---

13 (Pages 40 to 43)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 44

1　I spoke to Officer Scheithe on the phone probably
2　45 minutes before we went in for the Major Crimes
3　interview.
4　　　Q.　So it's fair to say that within that
5　less-than-24-hour period, you talked to Cramer,
6　Bertholomey and Scheithe?
7　　　A.　Yes.
8　　　Q.　Okay.  And you talked to them on scene,
9　correct?
10　　　A.　Yes.
11　　　Q.　And it sounds like then you talked to Scheithe
12　shortly before you gave your statement?
13　　　A.　Yes, before I went in to the PD.
14　　　Q.　Do you know who gave their statement first out
15　of the four of you; that is, Cramer, Bertholomey, and
16　Scheithe?
17　　　A.　I don't.  I'm not sure.
18　　　Q.　What did you talk to Scheithe about right
19　before you gave your statement?
20　　　A.　He called me to tell me that he had been
21　speaking to his father-in-law for some time about going
22　to work for him.  He said he had been considering it, and
23　kind of this whole stressful situation was kind of the
24　final straw.  He said he's going to go -- he's gonna take

Page 45

1　the job with his father-in-law, and he's going to leave
2　the PD.
3　　　Q.　I'm sorry.  Is he the officer that's in the
4　room with you too?
5　　　A.　Yes.
6　　　Q.　Thank you.
7　　　A.　Yup.
8　　　Q.　Before talking to the Lake County Major Crimes
9　Task Force, did you watch any audio or video?
10　　　A.　No.
11　　　Q.　Did you want to?
12　　　A.　Not really.  We didn't have body cameras at
13　the time, so I didn't really feel a need.  I mean,
14　there's nothing to be gained from it.
15　　　Q.　Did the Lake County investigators advise you
16　that they were conducting a criminal investigation?
17　　　A.　Possibly, but I don't recall.
18　　　Q.　Did they advise you of your Miranda rights?
19　　　A.　I don't think so.  I mean, I wasn't being
20　detained, so it wouldn't make sense to read Miranda to
21　me.  I was there on my own free will.
22　　　Q.　Were you yourself ever a member of the Lake
23　County Task Force?
24　　　A.　No.

Page 46

1　　　Q.　Do you know how one becomes a member?
2　　　A.　I believe you have to be either a detective,
3　an evidence technician, some sort of supervisor, and then
4　apply to it.  I know departments just supply one or two
5　officers to it to help.
6　　　Q.　Did you ever apply to it?
7　　　A.　No.
8　　　Q.　Okay.  I'd like to focus on June 10th, 2020.
9　What shift were you working that day?
10　　　A.　I was working midnight shift.
11　　　You okay?
12　　　Q.　Sorry.  There's a loud siren out there.  Go
13　ahead.
14　　　I'm sorry.  What shift were you working that
15　day?
16　　　A.　I was working the third shift, midnight shift.
17　Actually, at the time we called it first shift, so I
18　should clarify on that.  But it was midnights.
19　　　Q.　What hours were you scheduled to work that
20　day?
21　　　A.　I believe it was 10:45 to 7:15.
22　　　Q.　Was that your typical shift?
23　　　A.　Yes.  But as Cramer said before, since we had
24　so few guys on mids, we got stuck working 12-hour shifts

Page 47

1　quite a bit.
2　　　Q.　Did you start your shift at 10:45 that day?
3　　　A.　Yes.
4　　　Q.　Can you describe what you were wearing during
5　your shift?
6　　　A.　My standard uniform.  I had, you know, blue
7　pants, blue shirt with the patches on the sleeves, a vest
8　carrier on the outside with my badge and name plate, my
9　duty belt and duty boots.
10　　　Q.　Can you describe what tools or equipment you
11　were carrying on your person?
12　　　A.　Oh, and I had a mask because of the COVID
13　thing.
14　　　As far as tools go, I would have had a Glock
15　pistol; I would have had two magazines, a taser, pepper
16　spray, two sets of handcuffs, tourniquets, pressure
17　dressings, and then a pocket knife.
18　　　Q.　What's the first thing you can recall
19　happening when you arrived on your shift?
20　　　A.　It was kind of up in the air at that time,
21　because with COVID going on, we didn't really have
22　official shift changes because they didn't want everyone
23　crammed into a room, but we would do stuff in passing.
24　So it wasn't -- during that time, it wasn't the normal

14 (Pages 44 to 47)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 48

1    "Everyone sit down.  Everyone be quiet while we talk."
2    It was more of passing information from afternoons to
3    midnights and me telling the guys where they were going
4    to go.
5        Q.    Were you advised of anything by anybody that
6    was finishing their shift?
7        A.    I believe I was advised by Commander Barr that
8    there was someone who had been arrested, that someone
9    needed to be processed that was in a holding cell.  And
10   then I was advised that there was some sort of incident
11   that had happened at Thorntons.  It was a -- someone had
12   threatened someone, and there was a potential of that
13   person to turn, so he wanted us to be aware of it.
14       Q.    Who advised you of the incident at Thorntons?
15       A.    I can't remember specifically.  Based on my --
16   the statements I gave to Major Crimes a couple years ago,
17   it sounds like it was either Officer DeWelde or Commander
18   Barr.
19       Q.    And DeWelde, for the sake of the court
20   reporter, is D-E-W-E-L-D-E, as far as you know?
21       A.    Yes.  And he would have just been an afternoon
22   patrol officer.
23       Q.    Anything else that you recall being advised of
24   about this incident at Thorntons?

Page 49

1        A.    Not specifically.
2        Q.    For example, you weren't advised -- to your
3    knowledge, you weren't advised that it involved a
4    skateboard or something like that?
5        A.    Not at that time, I don't think.  Possibly.  I
6    know at some point I was told that.  But during that
7    information exchange and all that stuff going on, we
8    don't get into a ton of specifics.  You know, it's kind
9    of more kind of the meat and potatoes:  Tell me what I
10   need to do so I can get my guys going.
11       Q.    You were the officer in charge for that shift?
12       A.    Yes.
13       Q.    Who were you in charge of for that shift?
14       A.    I believe it was just Scheithe and Cramer.
15       Q.    How many times would you say you had worked
16   with Scheithe and Cramer prior to that day?
17       A.    I don't know.  I had worked with Scheithe
18   quite a bit more than Cramer.  I had just recently come
19   back to midnight shift from day shift.  Both of those
20   guys were on mids for most of their career.  I worked
21   with Scheithe when I was on mids prior to my first son
22   being born for white a while.  But Cramer, we hadn't
23   worked together a whole lot.
24       Q.    Are you saying "mids" as in midnight shifts?

Page 50

1    Is that what you're saying?
2        A.    Yeah.
3        Q.    How about Bertholomey?  Had you worked with
4    him a lot?
5        A.    I had actually trained him, an FTO.  But as
6    far as working on the road together, not a ton.  We
7    always just seemed to be on different shifts.
8        Q.    So it is fair to say you worked with Scheithe
9    a lot prior to this date and Cramer and Bertholomey a lot
10   less?
11       A.    Correct.
12       Q.    Are you friends with Officer Scheithe?
13       A.    I'd say we're friends, yes.
14       Q.    I'll ask him the same question coming up soon.
15       A.    Make him be under oath for it, you know.
16       Q.    Okay.  Is there anything else you recall being
17   advised of before you began your shift that day?
18       A.    Not that I recall.  But, again, it was over
19   two years ago, so, you know, a lot -- the little, tiny
20   things kind of fade away.
21       Q.    Am I correct you were driving a Dodge Charger
22   that day?
23       A.    Correct.
24       Q.    Fully marked?

Page 51

1        A.    Correct.
2        Q.    And did it have an in-car camera system?
3        A.    Yes.
4        Q.    Did you ever activate the in-car camera system
5    that day?
6        A.    I don't recall.  If I hit my lights, then it
7    would have activated; but if I didn't, then no.
8        Q.    Okay.  So it sounds like you had just started
9    your shift, basically, and then this incident, well,
10   began; is that fair?
11       A.    Yes.
12       Q.    How did you first become aware of an incident
13   at Thorntons?
14       A.    Which --
15       Q.    Sorry.  We already talked about -- it sounds
16   like you've exhausted your memory as to what you knew
17   about that first incident.  We're here to talk about now
18   the second incident at Thorntons.  How did you become
19   aware of the second incident at Thorntons?
20       A.    It was called over the radio.
21       Q.    What did the call advise you of?
22       A.    That there was a panic alarm at Thorntons.
23       Q.    What's a panic alarm?
24       A.    That's an alarm that a clerk would push as

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 52

1    opposed to like a burglar alarm that would be tripped
2    when someone breaks into a building or opens a locked
3    door.
4         Q.   Had you ever responded to a panic alarm at the
5    Thorntons before that?
6         A.   I don't recall.  If I had, it was very, very
7    minimally.
8         Q.   So you're saying that it was unusual to
9    receive a panic alarm from there?
10        A.   Yes.
11        Q.   Are you saying that the dispatcher basically
12   says to you, "There's a panic alarm going off at
13   Thorntons"?
14        A.   Yeah.  I think they called it a "holdup alarm"
15   at the time.  But, yes, that's what they told us.
16        Q.   It's not necessarily a holdup all the time,
17   right?  It could be anything that causes a clerk to hit
18   the panic button, right?
19        A.   Exactly, yeah.
20        Q.   It could be just them accidentally hitting it,
21   correct?
22        A.   Yeah.  With alarms, it's kind of all about
23   context, you know.  Because there's some places that an
24   alarm goes off three times a day, and we're constantly

Page 53

1    responding there.  And we don't take it seriously,
2    but it's commonplace, whereas a place that you don't hear
3    it a lot, if ever, you know, it makes you think a little
4    bit more.
5         Q.   Do you happen to know where the panic alarm
6    was in this Thorntons, by the way?
7         A.   I do not.
8         Q.   So to the best of your recollection, did
9    dispatch give you any further information besides it
10   being a panic alarm or a holdup alarm at the Thorntons?
11        A.   I don't recall.
12        Q.   Where were you when you heard that?
13        A.   I believe I was standing in the shift change
14   room.
15        Q.   At the station?
16        A.   Yeah.
17        Q.   Do you know if anybody else was near you when
18   that came over?
19        A.   I don't remember details.  I mean, I remember
20   I was talking to Commander Barr, you know, about shift
21   change and all that kind of stuff.  I don't remember if I
22   still was or not.  It happened so long ago.
23        Q.   Okay.  What did you do when you heard that?
24        A.   I believe I -- if they had -- So at the

Page 54

1    beginning of each shift, we have to send in a log that
2    says what were officers were assigned to what number.  And
3    I don't recall if I had sent that in yet or not.  But if
4    that's not sent in yet, then they don't know what officer
5    to dispatch.  They don't even know who's working at our
6    dispatch center.
7              So I would assume, since it was so early
8    still, that I probably had to tell them, "Officer Cramer
9    and Officer Scheithe are working.  They'll be en route."
10   I planned to be en route as well as quickly as possible;
11   but, you know, being in charge, I have to take care of
12   everything.
13             So as soon as I had everything ready to go as
14   far as administratively, I went down and -- when I go to
15   a call, I always think worst case scenario first and then
16   work your way back.  So I hear "holdup alarm," I think
17   somebody is robbing a gas station, and so I think I'm
18   going to want my rifle with me if that's the case, in
19   case there's a hostage situation.  So I stopped at my
20   car, put my rifle in the trunk, and then headed to
21   Thorntons.
22        Q.   Did you travel alone?
23        A.   Yes.
24        Q.   Did Scheithe travel in his own vehicle to your

Page 55

1    knowledge?
2         A.   I believe so.  We generally always run one-man
3    cars unless it's a specialty unit.
4         Q.   To the best of your recollection, did you,
5    more or less, leave at the same time?
6         A.   No.  I believe they all left ahead of me.
7         Q.   You believe he left before you?
8         A.   Yeah, all the other officers, I believe, left
9    prior to me leaving.
10        Q.   Okay.  Well, were you aware of Cramer and
11   Bertholomey responding as well?
12        A.   I knew Cramer was going to be because he was
13   one of my guys.  I'm not sure about Bertholomey since
14   he's on afternoon shift.  I don't think at that point I
15   even knew he was primary on that first call.
16        Q.   So did you activate your lights and sirens on
17   the way to the Thorntons?
18        A.   I don't recall.  Thorntons, in relation to our
19   police department -- normally in a situation, I would.
20   But Thorntons is like a half a mile from our police
21   department.  And so sometimes throwing your lights and
22   sirens on, if there is an incident going on, can tip off
23   the person that's involved in that crime.
24        Q.   Why is that important in your opinion, not to

16 (Pages 52 to 55)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 56

1  tip off the person involved?
2      A.  It could cause all kinds of issues.  I mean,
3  they could get skittish and shoot the person that they're
4  holding up.  They could plan an ambush for us.  There's
5  all kinds of issues.  You want the -- you want to be able
6  to show up, assess the situation, and make a good
7  decision before they know you're there.
8      Q.  Did you park at the Thorntons?
9      A.  Yes.  So as I was pulling up -- generally, I
10 would park a couple parking lots away and approach on
11 foot; again, to keep the element of surprise, for lack of
12 a better term, in my favor.  But I had also already heard
13 the other officers go location and that they were inside
14 the Thorntons.  And so I thought there's no reason to
15 park three parking lots away, so I pulled right in the
16 parking lot and got out.
17     Q.  Did you pull right in front of the door?
18     A.  I can't remember exactly where in the parking
19 lot.  I just remember thinking there's no reason to park
20 far away and take the time to walk all the way over
21 there.  It's smarter, tactically, to just drive up to the
22 building.
23     Q.  Were you advised that somebody got there
24 before you?

Page 57

1      A.  Yes.
2      Q.  Who got there, to your understanding, before
3  you?
4      A.  I heard other officers call out that they were
5  going location, is what we call it.  So they're arriving
6  on the scene.  I don't recall if I knew at the time which
7  officers were saying it, but I heard multiple officers
8  saying that they were there.
9      Q.  Fair to say that you weren't the first person
10 there, though, the first officer, that is?
11     A.  Yes, very fair to say.
12     Q.  And what's the first thing you recall doing
13 after you parked your car?
14     A.  Looking around the parking lot, looking into
15 the building from outside, just trying to assess the
16 whole situation.
17     Q.  When you looked at the building from the
18 outside, did you notice anything of note?
19     A.  Just that the officers had someone handcuffed
20 inside or were in the process of handcuffing.  They were
21 taking someone into custody.
22     Q.  I guess that was my next question.  Do you
23 have a recollection of my client actually being in
24 handcuffs when you first looked into the building, or was

Page 58

1  that handcuffing just about to happen, or what's your
2  recollection?
3      A.  I don't recall that specifically.
4      Q.  Did you actually go into the Thorntons at that
5  time?
6      A.  Yes.
7      Q.  Okay.  When you first went into the Thorntons
8  at that time, what did you observe?
9      A.  I observed the suspect in handcuffs,
10 aggressively speaking to the clerk, and then the clerk
11 kind of saying some words back.
12     Q.  It's okay to swear if that's what they said,
13 or can you tell me what you remember the clerk and this
14 suspect saying?
15     A.  I'm sure they were swearing, but I don't
16 remember specifics.
17     Q.  Did you know who the suspect was at the time?
18     A.  No.
19     Q.  But you now know it's Abel Rosiles, Jr.,
20 correct?
21     A.  Correct.
22     Q.  And who was already -- I'm sorry.
23 Officer-wise, who was already in the Thorntons when you
24 walked in?

Page 59

1      A.  I believe Officer Scheithe and Officer Cramer
2  and -- oh, and Officer Bertholomey.  All three of them
3  were in there.
4      Q.  And when you heard my client speak, in your
5  opinion, did he have any difficulty speaking?
6      A.  I don't recall any difficulty speaking.
7      Q.  Did it appear to you the two of them were
8  arguing?
9      A.  Yes.
10     Q.  Do you know what they were arguing about?
11     A.  I didn't at that time, no.
12     Q.  Did my client appear to be resisting in any
13 way; that is, you know, refusing to be escorted, held, or
14 thrashing in any way?
15     A.  I'm not sure.  It seemed to be escalating.
16 And that's why the first thing I did when I walked in was
17 say, "Get him to a car.  Get him out of here."  Separate
18 them, basically.  So I wanted the officers in there to
19 take the person in cuffs out of the building because
20 nothing good is going to come out of those two continuing
21 to talk.
22     Q.  Is that what happened?  They left with my
23 client out the building?
24     A.  Yes.

17 (Pages 56 to 59)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 60

1    Q.   How long were you in the Thorntons before you
2  left again?
3    A.   I don't know specific time.  No more than a
4  couple minutes.  I stayed with Officer Bertholomey while
5  he spoke to the clerk.  And I said -- I basically cut him
6  off and said, "Are you going to do -- do you want to do a
7  written statement?" before he started, you know, going
8  into too much detail, and he says yes.  And I said,
9  "Okay.  I'm going to go get a written statement form, and
10  we can do this formal statement then."  And that was when
11  we, Officer Bertholomey and I, walked out to his car to
12  get a written statement form.
13    Q.   Was my client under arrest?
14    A.   At that point, I did not know.
15    Q.   You didn't arrest my client, right?
16    A.   I did not, no.  I was just kind of supervising
17  the situation.
18    Q.   "Arrest" is kind of a legal term, a term of
19  art, obviously.  Just because -- Let me say this:  Just
20  because somebody is in handcuffs doesn't necessarily mean
21  they're under arrest; is that fair?
22    A.   Correct.
23    Q.   Somebody can be detained pending a further
24  investigation, correct?

Page 61

1    A.   Yes.
2    Q.   And you don't know -- at the point you saw my
3  client in handcuffs in the Thorntons, you didn't know if
4  he was actually under arrest or simply being detained
5  subject to a further investigation, right?
6    A.   Yeah.  I also want to clarify on your last
7  question, you can also be detained for other reasons too,
8  like if it's a safety concern.  For instance, if someone
9  keeps reaching for their pockets and you say, "You're
10  making me uncomfortable.  I'm just going to detain you
11  for my safety and your safety right now."  So you could
12  also detain someone for safety reasons.
13       But I'm sorry.  Would you mind repeating your
14  next question.
15    Q.   I forgot it.  I'll just ask something
16  different.
17       Did you see my client in the Thorntons ever
18  reach into one or both of his pockets?
19    A.   I don't believe so.  I think he was pretty
20  much cuffed up by the time I got in there.
21    Q.   Do you recall what my client was wearing?
22    A.   I believe a sweatshirt, but I don't remember
23  any specifics other than that.
24    Q.   Do you actually have a memory of that, or are

Page 62

1  you saying that because you saw some videos of this in
2  the not too far distant past?
3    A.   Probably a video.  Yeah, probably a video.
4    Q.   Do you recall if my client had a face mask or
5  anything covering his face when you saw him in the
6  Thorntons?
7    A.   I don't recall.
8    Q.   Do you recall my client ever having any sort
9  of face mask on when you interacted with him?
10    A.   I don't remember.
11    MR. MARX:  We usually take a break around now.  I'll
12  just ask, could we just take a five-minute break?  Okay,
13  everyone?
14    MR. MATHUES:  Sounds good.
15       (A short break was had.)
16  BY MR. MARX:
17    Q.   I think where we left off, you were outside.
18    A.   We were outside, and I just told them -- Oh,
19  no.  We were walking to the car to get the written
20  statement.
21    Q.   So your intention was to walk to your vehicle
22  to get a written form for Antoine Stanley to fill out as
23  to what happened; is that fair?
24    A.   We were going to walk to Bertholomey's car to

Page 63

1  get it, yeah.
2    Q.   Okay.  And who was escorting Abel out; do you
3  recall?
4    A.   I believe Officer Scheithe and Officer Cramer.
5    Q.   Okay.  And did you notice anything happen
6  while they began walking him out of the building?
7    A.   At some point, I saw him pull away and start
8  running into Orchard Road.
9    Q.   Do you recall a female approaching you or Abel
10  or both of you shortly before that happened?
11    A.   No.  I didn't see a female until later.
12    Q.   So you're walking to Bertholomey's car to get
13  this form, and what do you notice?
14    A.   I notice Abel kind of break free a little bit
15  and take off running into Orchard and the other two
16  officers right behind him running as well.
17    Q.   About how far away were you when you first
18  observed Abel breaking free?
19    A.   I'm not sure, between maybe 15 and 40 yards.
20  I don't know.
21    Q.   And was Abel near a squad car when he broke
22  away?
23    A.   I believe so.  I can't remember specific
24  details about where they were at that point.

18 (Pages 60 to 63)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 64

1    Q.    Do you know whose squad car they were near?
2    A.    I'm not sure.
3    Q.    And he ran into Orchard, did you say?
4    A.    Yes.
5    Q.    And how far would you say he made it, as in
6    how far would you say he ran before he was stopped?
7        A.    I would say he got about halfway across
8    Orchard, probably about the middle of the street.
9    Q.    Is Orchard a two-way, as in two lanes going
10   one way, two lanes going the other way, or what is it?
11       A.    No. It's one lane going each way. But
12   there's also, when you get close to Rollins, there's a
13   turn lane. I'm not sure exactly at that part if there's
14   a turn lane or not.
15   Q.    Was there any traffic in the roadway in the
16   near vicinity of where Abel was when he actually made it
17   into the roadway?
18       A.    I don't believe at that time there was.
19   Q.    And what did you do when you saw him run into
20   the roadway?
21       A.    I think I actually said out loud, "You gotta
22   be kidding me" and took off to run over to assist them.
23   Q.    And how did you assist?
24       A.    The first thing was, he was kicking and

Page 65

1    thrashing a lot, so I assisted them in taking them to the
2    ground -- or taking him to the ground.
3    Q.    How was Abel taken to the ground?
4        A.    It was kind of a pushing, tripping motion. We
5    knew we were on concrete, though, so we made sure to be
6    as gentle as possible but still use the proper amount of
7    force necessary.
8    Q.    A kicking, pushing motion, did you say?
9        A.    Tripping, pushing. Basically, you put your
10   foot in front of him, control his arms, and then trip him
11   to go to his chest in the road. But it wasn't like a --
12   you know, throw him -- because we knew his hands were
13   behind his back, and he's on concrete, so it was setting
14   him down. But because he was fighting so much, we did
15   that to push him and trip him a little bit.
16   Q.    What do you mean he was fighting so much?
17   Wasn't he just running away?
18       A.    Until we caught up to him, and then he was
19   kicking and trying to get out of our grasp.
20   Q.    How was he kicking?
21       A.    What do you mean?
22   Q.    Well, I know what a kick is, but could you
23   describe it more specifically? How was he kicking?
24       A.    Well, so there's -- I would say when you're

Page 66

1    arresting someone, there's two categories. You've got
2    someone that wants to fight you and someone that wants to
3    fight you to get away. He wanted to fight us to get
4    away. So he's kicking, trying to push away from us.
5    Obviously, he knows he doesn't have his arms, so his legs
6    are the only thing he can use. Like I said before, you'd
7    be -- for someone that hasn't arrested somebody before,
8    you'd be extremely surprised at how resourceful someone
9    can be in staying on their feet, even with their arms
10   behind their back.
11   Q.    So you're saying he was kicking back towards
12   you?
13       A.    Kicking every direction just to try to get
14   away.
15   Q.    And you said he was thrashing? I think
16   those --
17       A.    Yeah.
18   Q.    -- you used the word "thrashing." What does
19   that mean?
20       A.    I mean like pulling away, like, you know,
21   thrashing his body to try and break free of a grip.
22   Q.    So you and who else took him to the ground?
23       A.    Well, I know that Officer Cramer and
24   Officer Scheithe were probably there because they were

Page 67

1    the original two that had control of him, and they were
2    the two that chased him. I don't remember if
3    Officer Bertholomey was there at that point or not.
4    Q.    And when he hit the ground, what part of his
5    body hit the ground?
6        A.    We lowered him onto his chest, I believe.
7    Q.    And how long was he on his chest before he was
8    up off of his chest?
9        A.    In the street, it was pretty much immediate.
10   I said -- I looked at where we were at, and I said, We're
11   in the middle of a road, a busy road. I do not want a
12   car to come by and hit us, so we're going to get him over
13   to the grass. So we were pretty diligent about trying to
14   keep him from getting his feet under him again, but we
15   kind of dragged him over to the grass.
16   Q.    And so about how long was he on the ground?
17       A.    In the street?
18   Q.    Yeah.
19       A.    Between, I don't know, three and ten seconds,
20   maybe. I don't have a specific time.
21   Q.    You said you dragged him over to the grass.
22   Why did you drag?
23       A.    Maybe that's not the best word to use. We got
24   control of both of his arms, and we pulled him to the

19 (Pages 64 to 67)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 68

1  grass, trying to prevent him from getting his feet under
2  him because he was still attempting to resist. He's
3  attempting to get his feet under him to try and fight us,
4  so we were trying to keep his feet from going under him
5  again so he could resist more.
6       Q.  So you were kind of carrying him over to the
7  grass, is what you're saying?
8       A.  Yeah, lifted him upright so he was just -- he
9  wasn't walking under his own power, I would probably say,
10  because we were trying to prevent that from happening.
11       Q.  Was Abel saying anything in the street?
12       A.  Probably. I don't remember.
13       Q.  Were you or any other officer saying anything
14  when you guys were in the street?
15       A.  In the street? I would -- I assume we were
16  probably all saying, "Stop resisting. Stop resisting."
17  It's kind of instinctual when someone is resisting.
18  You'd say that repetitively so that they know to stop.
19       Q.  But you just don't have a specific memory of
20  what you or other officers said in the street?
21       A.  Correct.
22       Q.  How far away is the grassy area from where he
23  stopped in the street?
24       A.  I'm not sure. About the width of a lane of

Page 69

1  traffic, so I'd say probably 10 to 20 feet.
2       Q.  Okay. What happened when you guys got to the
3  grassy area?
4       A.  Again, like I said, he was still resisting,
5  still trying to get his feet under him. I didn't really
6  understand the purpose of it at the time, why he was
7  doing that. But he continued to resist, continued to
8  resist. So we put him down again onto his stomach, and
9  he -- I vividly remember him trying to get his knees
10  under him which caused him to pop his butt into the air,
11  so he was kind of on his shoulder and on his knees, and
12  he had his butt up in the air because he was trying to
13  get his feet under him.
14       Q.  So when you got him to the grassy area, you
15  put him back on his stomach again?
16       A.  We attempted to, but that's when he pulled his
17  knees up under him and was kind of on his knees and his
18  shoulders.
19       Q.  So is it fair to say at this point on the
20  grassy area you're trying to keep him down on the ground?
21       A.  Yeah. At this point, I remember saying, "Act
22  like an adult. Stop resisting." And what I did at that
23  point was -- because he had his butt in the air and he
24  was on his knees, I basically just used -- tried to put

Page 70

1  forward momentum forward so that he would flatten out
2  because I knew that his knees being under him was a
3  problem. That was causing him to have the strength to
4  keep resisting. So I pushed forward on his butt and
5  flattened him out. And I believe that was when
6  Officer Cramer said, "Are you done? Are you done?" He
7  said, "I'm done."
8       Q.  After you pushed his butt forward and he got
9  flattened out, did you or any other officer put their
10  body weight on him?
11       A.  I don't believe so. I can speak for myself.
12  I did not. Obviously, we know what had just occurred a
13  few weeks before that with the whole George Floyd thing.
14  And so in my mind throughout the whole incident, I'm
15  thinking, "Do not put more body weight on him than is
16  necessary. Do not put more body weight on him than is
17  necessary." And I can't speak for the other officers,
18  but that was going through my head the entire time. I
19  never at any time put body weight on him where it was not
20  extremely necessary.
21       Q.  So while he's in this grass area, you're
22  saying you yourself didn't put your body weight on him,
23  correct?
24       A.  Not after we flattened him out.

Page 71

1       Q.  Not -- I'm sorry?
2       A.  Not after we flattened him out.
3       Q.  Right. And you don't recall if the other
4  officers put their body weight on him or not in the
5  grassy area?
6       A.  I don't believe so. From what I recall, there
7  was one officer on one side of him, another officer on
8  the other side, and I was kind of on top of his legs,
9  trying to hold his legs together once I got him flattened
10  out.
11       Q.  So on the grass area, was he in the prone
12  position?
13       A.  Yes.
14       Q.  After he got flattened out, right?
15       A.  Correct.
16       Q.  How long did he remain in the prone position?
17       A.  I can't give you a specific time frame on
18  that. I know that it was probably no more than three and
19  a half minutes based on the video.
20       Q.  Well, I guess I'm -- Now I guess we're talking
21  about two different incidents. I mean, not incidents,
22  but -- Let me say this: It's my understanding he went
23  from the street to the grassy area and then brought much
24  closer to the police cruiser, and he was also placed down

20 (Pages 68 to 71)

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 72

1  partially in the grassy area there. So I guess my
2  question is, is it your recollection that he went from
3  the street to the grassy area immediately next to the
4  street and then to an area much closer to the police
5  cruiser?
6      A.  So I don't have specific details on that
7  because after we got him flattened out after he said,
8  "I'm done," there was a female that appeared to be
9  recording on her phone and screaming and yelling at us,
10 and she appeared very upset. And she was getting closer
11 and closer as this was going on. So once I knew they had
12 control of Abel, I stood up to address her. I told her,
13 "You need to get back. You need to get back." And she
14 said something like, "F you. I have the right to
15 record." I said, "You do have the right to record but
16 from a safe distance, so you need to be back a ways." So
17 I was dealing with her when they must have moved him from
18 the grassy area over to where the squad car was.
19     Q.  Okay. So I'm just trying to understand what
20 your memory is because, obviously, that's all I could ask
21 of you. So it's my understanding he was put on the
22 ground, so to speak, three times. Once in the middle of
23 the road, once in this grassy area immediately next to
24 the road, and --

Page 73

1      A.  Yes.
2      Q.  -- a third time near -- feet away from
3  Officer Cramer's squad car. So what I'm saying is, is
4  that your memory, that he was once placed in the ground
5  in the middle of the road, once in the grass area next to
6  the middle of the road, and then once very close to the
7  squad car?
8      A.  Yes.
9      Q.  Okay. So I guess my question before was, just
10 to backtrack, about how long do you think he was on the
11 ground in the grassy area right after he came out of the
12 roadway?
13     A.  Again, I'm not sure because, like I said, I
14 got up and started addressing the female that was
15 standing there, and so I'd just be speculating if I said.
16     Q.  Okay. So at some point while Abel is on the
17 ground, you heard an officer say, "Are you done yet?" or
18 something like that?
19     A.  Yeah. Cramer was saying, "Are you done? Are
20 you done fighting? You done?" And then the only thing I
21 specifically remember -- the only words I specifically
22 remember from that night is hearing Abel say, "I'm done.
23 I'm done."
24     Q.  Okay. Did you say something to the effect of,

Page 74

1  "Act like a man. Stop resisting." Or something like
2  that?
3      A.  No, act like an adult, not act like a man.
4  Act like an adult. I want to make that clear because I
5  think there are two very different connotations with
6  that. I was telling him that his behavior was childish
7  as opposed to "Act like a man." You know, there's
8  different connotations that go with that.
9      Q.  I understand. Yet you heard Abel say words to
10 the effect of, "Okay. I'm done. I'm done." Something
11 like that?
12     A.  Yes. And then he appeared to stop resisting
13 at that point.
14     Q.  When you heard Abel speak, did he appear to
15 speak without difficulty; that is, without any difficulty
16 expressing his words?
17     A.  Well, I mean, we had all kind of just been
18 scuffling for, you know, a decent amount of time. So he
19 was -- seemed winded and out of breath. I don't know. I
20 mean, it wasn't just like normal "I'm done." There was
21 definitely some labor behind it.
22     Q.  Okay. But as far as you could tell, he didn't
23 have any sort of like foreign object in his mouth that
24 made him speak garbled or something like that or not

Page 75

1  intelligible?
2      A.  I don't recall anything like that.
3      Q.  So is it fair to say that while Abel is on the
4  ground in the grassy area, a female approached and
5  started saying something towards you guys?
6      A.  Yes.
7      Q.  What did she say?
8      A.  She was just yelling a lot, cursing. She was
9  kind of hysterical and appeared to be recording with her
10 phone.
11     Q.  Do you now know that person to be Sinahy Gomez
12 Reyes?
13     A.  I believe so. I haven't had any contact with
14 her since that night, so I'm not sure.
15     Q.  Is it now your understanding that she was the
16 girlfriend of Abel?
17     A.  I believe so. I believe that was -- I heard
18 that.
19     Q.  So she got relatively close to you guys and
20 started using her phone in a manner that appeared to be
21 recording is what you're saying?
22     A.  Yeah. It wasn't that she was super close to
23 us that was making me uncomfortable. It was her
24 demeanor. She was getting more and more amped up.

21 (Pages 72 to 75)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 76

1  That's why I wanted her a safe distance, because I didn't
2  want to her close the distance she was at. So that's why
3  I kind of kept saying, "Stay back. You can record.
4  That's fine. But you have to do it from a distance."
5  Because I didn't want her to get involved in the
6  situation and make things worse.
7      **Q. Do you recall any specific words that she was**
8  **saying?**
9      A. The "F" word, I think, a couple times. But
10  other than that, nothing really stands out.
11      **Q. She was upset though, appeared to be crying or**
12  **screaming or both?**
13      A. Yeah, she definitely appeared upset.
14      **Q. And what happened then?**
15      A. I believe at some point then I heard them kind
16  of scuffling with Abel again, like there was -- he was
17  resisting or something going on. And so I turned back to
18  the other officers that were dealing with Abel, and I
19  don't know if I saw them take him to the ground or he was
20  already on the ground, but I just remember there was some
21  sort of resisting going on back there, so I went to
22  assist them if they needed it.
23      **Q. Okay. So while Abel is on the ground near the**
24  **grassy area -- Strike that.**

Page 77

1      **While Abel was on the ground in the grassy**
2  **area, this female comes up and says what you said, and**
3  **your attention is drawn to her, correct?**
4      A. Yes.
5      **Q. And then the next thing you recall with regard**
6  **to Abel is you looked back and saw either he was**
7  **resisting or he was already on the ground, is what you're**
8  **saying?**
9      A. There was some sort of resisting going on. I
10  saw that. I don't remember if he was standing when I
11  turned around or if he was already on the ground. Again,
12  it's over two years ago, so I don't -- you know,
13  that's -- the specifics of that, I just remember that he
14  was kind of thrashing again and resisting the officers
15  and eventually was put on the ground.
16      **Q. Okay. So when you saw this, did you go over**
17  **to assist the officers?**
18      A. I did. So as a supervisor, I was kind of
19  trying to stay out of everything specifically. I was
20  trying to manage the situation. So I went over to see if
21  they needed help, but I don't think I really got as
22  involved with the actual hands on at that point.
23      **Q. What did you observe happening? If you didn't**
24  **go hands on, what did you observe happening in front of**

Page 78

1  **you?**
2      A. Again, they took him to the ground the same
3  way that we had the past two times; you know, lowered him
4  down, just tried to get him to stop fighting again. You
5  know, that was the goal -- whenever someone is standing
6  up fighting in handcuffs, they're a danger to themselves
7  or a danger to everyone else. We were just trying to get
8  him to the ground to get him to stop, and then we would
9  stand him back up again.
10      **Q. If you didn't take him to the ground at this**
11  **point or assist them in that, who did?**
12      A. I'm not sure. I don't recall.
13      **Q. Cramer said he helped in that, and from what I**
14  **note, Scheithe is the other one who did. Do you have any**
15  **reason to think that isn't accurate?**
16      A. No. It could have been any of the four of us.
17      **Q. And when you said see him being taken to the**
18  **ground this third time, is it fair to say that he's very**
19  **close to a squad car?**
20      A. Yeah, he was next to the squad car.
21      **Q. Okay. When he's taken to the ground, is it**
22  **fair to say he's again in the prone position?**
23      A. He ended up there, yes.
24      **Q. Okay. And can you describe the specific area**

Page 79

1  where he's laying, as in, is it pavement? is it grass? is
2  it both?
3      A. I believe, just based on video I've seen now
4  at this point -- because in these rapidly evolving
5  situations, little details like that, you know, kind of
6  get remembered weirdly, you know. But based on the video
7  I saw, it looked like he was near like a curb, where the
8  parking lot met the grass.
9      **Q. Based on the video that you saw, is it fair to**
10  **say that part of his body was in the parking lot, and**
11  **part of his body was in the grass?**
12      A. Yeah, in the video I saw.
13      **Q. Okay. Is it fair to say, in the video that**
14  **you saw, the curb is somewhere near his midsection?**
15      A. I believe so.
16      **Q. Okay. So after he's taken to the ground,**
17  **what's the next thing you recall happening?**
18      A. Immediately, a female subject -- not his
19  girlfriend. Another female subject -- comes running from
20  the parking lot very aggressively, cursing, shouting,
21  balling her fists. It's clear she's coming with bad
22  intentions. And so my attention was immediately drawn to
23  her.
24      **Q. Did you hear her say anything?**

22 (Pages 76 to 79)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 80

1    A.  Just a lot of cursing, "Get the fuck off him,"
2  those types of things; and, you know, just a lot of
3  swearing and a lot of yelling.
4    Q.  According to the investigators on the task
5  force, she said, "What are you doing?" and "Get the fuck
6  off of him."  Does that sound about accurate of what she
7  was saying?
8    A.  That sounds about accurate, yeah.
9    Q.  And is it fair to say she was yelling that,
10  not just saying it?
11    A.  Yes.
12    Q.  Is it fair to say she was saying that --
13  Strike that.
14        Is it fair to say she was yelling that
15  multiple times?
16    A.  Yes.
17    Q.  You said you saw her ball her fist up?
18    A.  Yeah.  She was running with an aggressive
19  posture.
20    Q.  What was aggressive about it?
21    A.  Basically -- Like I said, fists balled but
22  like the way you'd approach someone in an aggressive way.
23  Like, she had her shoulders squared to us, and she was
24  closing the distance very quickly.

Page 81

1    Q.  She ran towards you?
2    A.  A slow run, yes.
3    Q.  And what did you do then?
4    A.  I said, "Get back," but she -- I mean, before
5  I could even get the words out of my mouth, she's closing
6  the distance, so I broke off from dealing with them and
7  went to grab her wrist, and that's when she began
8  fighting, tried to pull away.  And so she was pulling
9  away, pushing off me, just, again, thrashing is the best
10  word I could use, but fought for a little bit until
11  Officer Bertholomey came over and secured her other arm.
12  And we were able to basically use a double armbar
13  takedown, is what we call it, where we both have leverage
14  on her arms and just kind of sweep her feet out and lay
15  her out on her stomach.
16    Q.  You were trying to get her in cuffs?
17    A.  Yes.
18    Q.  What was the reason you were trying to get her
19  in cuffs?
20    A.  Obstructing.  So she was obstructing our
21  investigation by intervening.  So I couldn't focus on
22  what I was doing with Abel because she came in and
23  obstructed.  And then she began to resist when I grabbed
24  onto her wrist and, to be honest, batter me.  So she was

Page 82

1  under arrest for all of those things.
2    Q.  How did she batter you?
3    A.  Pushing, you know, trying to get away from me,
4  shoving.  She made physical contact with me, which, under
5  the letter of the law, is battery, and resulted in, you
6  know, the injury that I sustained, so ...
7    Q.  Okay.  So you eventually got her to the ground
8  in handcuffs, correct?
9    A.  Yes.
10    Q.  With the assistance of Officer Bertholomey?
11    A.  Yes.
12    Q.  And what did you do then?
13    A.  Once I -- once we had her in cuffs, I said,
14  "Officer Bertholomey, are you good?"  He said, "Yeah."
15  So I stood up.  I went over to the other officers, and I
16  said, "Are you guys okay?" and checked on them.  I think
17  on my way over to see them, I think I told -- I can't
18  remember his girlfriend's name.  I think I said, "Stay
19  back.  Stay back.  Don't get involved in this.  Stay
20  back."  I think I said, "If you get involved" -- "If you
21  get involved in this too, you're going to be going as
22  well, so stay back."
23        And so then I went over to the other officers
24  too, Cramer and Scheithe, and said, "Are you guys okay?"

Page 83

1  And they said, "Yes."  I said, "Everyone stay put.  Stay
2  exactly how you are.  We're going to hold the situation
3  until we get more officers here," because people kept
4  showing up and getting involved.  We only had four of us
5  there.  I didn't know who else was going to show up next,
6  so I wanted more officers there to control the situation
7  as soon as possible.  So I called out over the radio, "We
8  need officers from surrounding towns here right now."
9    Q.  Did you call for specific officers or specific
10  officers from certain towns, or what did you say?
11    A.  I believe so.  I think I said, "Can I get one
12  officer from the Heights and one officer from Round Lake"
13  or something like that.  I know Round Lake Heights and
14  Round Lake Park run less officers, so I like to take from
15  Round Lake first, but Round Lake Heights is also the
16  closest, so that's why I think -- I don't think I
17  requested from the Park.
18    Q.  It sounds like you looked over at Cramer,
19  Scheithe, and Abel for a moment and said something like,
20  "Are you guys good?" or something like that?
21    A.  I said, "Are you guys okay right now?"
22    Q.  Did they respond?
23    A.  I believe so.  They didn't say anything was
24  wrong.  I could tell you that.

23  (Pages 80 to 83)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 84

1    Q.  And at that point, is it fair to say Abel is
2    in the prone position, as you previously described?
3    A.  I believe so.
4    Q.  And what are Cramer and Scheithe doing?
5    A.  Just maintaining what they were doing as far
6    as I remember, just maintaining control and holding put,
7    like I said.
8    Q.  Were they touching Abel?
9    A.  I don't know.  I don't remember.
10   Q.  Do you believe they were touching him?
11   A.  I would assume they probably had a grip on his
12   arm or a grip on his leg or something just to prevent him
13   from standing up again.
14   Q.  But you don't have a specific recollection of
15   them touching him when you noticed them in that position
16   there?
17   A.  No.
18   Q.  Did you hear Abel say anything at that time
19   while he was in that prone position there?
20   A.  I don't believe so.  But, again, there was
21   yelling.  Both the female subjects were yelling the
22   entire time.  So even if he had said something, I
23   probably wouldn't have heard it.
24   Q.  Okay.  What's the next thing you recall

Page 85

1    happening?
2    A.  Other officers -- Oh, no.  I apologize.  The
3    very next thing -- so I called out for more units to come
4    to the area.  And the very next thing I remember is
5    either Officer Cramer or Officer Scheithe saying, "Hey,
6    he's choking."  And I said, "What?"  And so the other
7    officers were around at this point.  I ran over to where
8    they were with Abel, and I said, "Get him up onto his
9    knees."  And so he got up onto his knees.  And I looked
10   at him and said, "Are you choking?"  And he nodded his
11   head yes.  And so I began to -- I said, "I'm going to get
12   behind him," and I began to do the Heimlich maneuver.
13   Oh, I apologize.  I need to correct it.  As soon as he
14   said, "I'm choking," I called for rescue at that point,
15   and then I got behind him and did the Heimlich maneuver.
16   Q.  About how long was Abel on the ground in the
17   prone position before you heard an officer say, "He's
18   choking"?
19   A.  I really don't know.  Like I said, it was a
20   rapidly evolving situation, so it's -- and I was dealing
21   with Shelby during at that time, so ...
22   Q.  Well, Shelby was on the ground in handcuffs,
23   and Bertholomey was standing next to her, right?
24   A.  Yes.

Page 86

1    Q.  And the other female, Sinahy -- we know her
2    name now -- you were dealing with her, right?
3    A.  Yes.
4    Q.  Besides dealing with her, what else were you
5    doing before you heard the words, "He's choking"?
6    A.  Calling for more units.  Again, keeping my eye
7    on the parking lot because these -- Sinahy and Shelby
8    both came running out of the parking lot, and I didn't
9    know they were coming, you know, until they were right
10   there.  So I started looking at the parking lot seeing
11   who else was going to show up.
12   Q.  So you don't know -- Strike that.
13       Would you say my client was in the prone
14   position, as you previously described, for under one
15   minute or over one minute before you heard the words,
16   "He's choking"?
17   A.  Again, I would be taking a guess if I said it,
18   because when you're in a situation like that, time
19   doesn't really -- it moves differently, you know, in a
20   high-stress situation.
21   Q.  So you can't give me any estimate as to how
22   long he was on the ground before you heard the words
23   "He's choking"?
24   A.  It seemed like under a minute, but that's -- I

Page 87

1    mean, again, it's kind of a guess.  It's just what it
2    seemed like to me.
3    Q.  Who said, "He's choking"?
4    A.  I would assume it was either Cramer or
5    Scheithe since they were next to him.  I just heard the
6    words come from behind me.
7    Q.  You don't have a recollection of exactly who
8    said it?
9    A.  No.
10   Q.  Does that surprise you?
11   A.  Yeah.
12   Q.  Before you heard those words, did you ever
13   notice Abel's shoes or socks off?
14   A.  I did not.  But, again, like I said, I was
15   more trying to manage the whole situation.  I wasn't
16   really specific to Abel throughout the whole thing.
17   Q.  I'll represent to you that I saw a video in
18   which one officer goes into the street -- this is before
19   the part we're talking about.  But one officer goes into
20   the street and appears to retrieve what looks like Abel's
21   shoe from the street.  So my question is, do you recall
22   doing that, or do you recall who might have done that?
23   A.  I mean, it could have been me.  It's such like
24   a minor detail in the grand scheme of things.  It could

24  (Pages 84 to 87)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 88

1 have been something I forgot that I did, but I don't
2 recall who did it.
3 **Q. Do you recall seeing a video like that too?**
4 A. I don't recall seeing a video of someone
5 retrieving something from the street, no. If I saw the
6 video, I might be able to tell you who it was or at least
7 if it was me.
8 **Q. Maybe, maybe not. It's from a distance, but**
9 **it's okay. I just wanted to know what your memory is.**
10 A. Yeah.
11 **Q. So you don't have a specific memory of him**
12 **having removed -- Strike that.**
13 **You don't have a specific memory of him having**
14 **one or more shoes or socks off before you heard somebody**
15 **say, "He's choking"?**
16 A. No. But, again, I was not really focused in
17 on him as much as the situation as a whole.
18 **Q. Well, you were not focused on one particular**
19 **thing at the moment, right?**
20 A. Yeah, I'm not focused on -- I'm assessing the
21 whole situation as a whole.
22 **Q. Right. Is it fair to say that you're looking**
23 **at Abel; you're also looking at Shelby; you're also**
24 **looking at Sinahy, and you're also trying to keep a view**

Page 89

1 of your surroundings in the event that there's anybody
2 else that could pose a safety threat?
3 A. Absolutely, yes.
4 **Q. Okay. But at least part of the time you're**
5 **looking at Abel, correct?**
6 A. Yeah, part of the time.
7 **Q. Okay. So before you started doing -- Strike**
8 **that.**
9 **You said you started doing the Heimlich**
10 **maneuver?**
11 A. I did, yes.
12 **Q. Before you started doing the Heimlich**
13 **maneuver, did anybody say anything about him chewing on a**
14 **sock or having a sock in his mouth?**
15 A. They may have. Again, I was focused on
16 specific things in the situation. You know, he's
17 choking. We've still got aggressive people, you know,
18 that are not detained right now. There was a lot going
19 on, so I don't remember specifics of what anyone said,
20 really, at that point. I just remember starting the
21 Heimlich maneuver.
22 **Q. So by saying that, you're saying that you**
23 **don't have a specific recollection of Scheithe saying**
24 **words to the effect of, "He's chewing on his sock," or**

Page 90

1 something like that?
2 A. I don't recall that. I don't believe -- I
3 would -- again, if I can look at my report for a second,
4 I may have said something different to Major Crimes. But
5 over the course of two years, that whole aspect of the
6 sock thing has been talked about so much that it's kind
7 of clouded my memory.
8 **Q. Do you recall ever seeing a sock near Abel's**
9 **mouth?**
10 A. I don't recall that. But, again, I was facing
11 the opposite direction, so ...
12 **Q. Have you ever seen a suspect chew on a sock**
13 **before?**
14 A. I've seen suspects do all kinds of crazy
15 things.
16 **Q. I don't doubt that, but have you ever seen one**
17 **chew on a sock before?**
18 A. Not specifically chew on a sock, no.
19 **Q. I believe I know the answer, but before you**
20 **heard the words "He's choking," did you hear Abel say**
21 **anything while he was on the ground?**
22 A. I don't recall anything. But, again, Shelby
23 and Sinahy were pretty loud, so even if he had said
24 something, I probably wouldn't have been able to hear it.

Page 91

1 **Q. Besides an officer saying, "He's choking," is**
2 **there something about Abel that led you to believe that**
3 **that might be true?**
4 A. When I had him pop up onto his knees and I
5 looked him in the face and he was nodding and going like
6 this (indicating) and I asked him if he was choking, it
7 appeared that he was in distress. You know, he was
8 trying to convey to me that "Yes, I am choking."
9 **Q. Are you trying to say that he looked like he**
10 **had a distressed look on his face?**
11 A. Yeah. In his eyes, he looked concerned, and
12 he was -- his mouth was open, and he was going like that
13 (indicating) to nod his head "Yes, I am choking," when I
14 asked him.
15 **Q. His mouth was open when you saw him shaking**
16 **his head yes?**
17 A. I think like a little bit. Like, I mean, not
18 like wide open, but, you know, a little bit.
19 **Q. Before starting the Heimlich, did you look in**
20 **his mouth?**
21 A. I did -- I believe so. I mean, I would assume
22 that I would have because that's generally the first
23 thing you do when you're talking with a choking patient.
24 Again, if you have someone that's compliant, you may

25 (Pages 88 to 91)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 92

1   stick your hands in there to see if you can feel anything
2   that you can't see. But he had been obviously fighting
3   with us, scuffling with us, doing a lot of things that
4   led us to believe if I put my hand in his mouth, I could
5   lose that finger. So at that point, I did not do that.
6       Q.  Do you have a specific recollection of
7   actually looking into his mouth, or are you just saying
8   you believe you would have done that based on your prior
9   experience?
10      A.  I don't have a specific recollection, but I
11  would assume that's the first step when someone is
12  choking, is to look in their mouth, if they're willing to
13  open it and show you.
14      Q.  Do you have any recollection of any other
15  officer specifically looking into his mouth?
16      A.  I don't recall.
17      Q.  Did you have a flashlight on you at that
18  moment?
19      A.  I generally carry a flashlight with me.
20      Q.  Do you have a specific recollection of having
21  one on you at that time, or are you just saying it's
22  likely that you did because you generally do?
23      A.  It's likely that I did because I generally do.
24      Q.  Okay.  Do you keep it on your vest or in your

Page 93

1   cargo pocket on your pants?
2       A.  I usually carried about two or three, between
3   my vest and my pockets and my belt, because it's the
4   midnight shift.
5       Q.  Okay.  After you heard somebody say, "He's
6   choking," you went over there, and you asked him if he
7   was, and he shook his head yes, and you believe it's
8   likely that he was at that time; is that fair to say?
9       A.  Yes.
10      Q.  So then you began the Heimlich yourself?
11      A.  Yes.
12      Q.  And what position was Abel in when you started
13  the Heimlich?
14      A.  I believe he was kneeling at that point.  I
15  believe I squatted down behind him to get a little more
16  leverage and did it while he was kneeling.
17      Q.  How long did you do the Heimlich for?
18      A.  I don't remember a specific amount of time.  I
19  was doing it, and I learned later that my thumb was
20  pretty catastrophically messed up.  So every time I
21  would do the Heimlich, it was in a great deal of pain.
22  So I did it for a little while.  And then I can't
23  remember exactly how Scheithe and I talked about it, but
24  Scheithe took over then, and he started doing the

Page 94

1   Heimlich.  And that allowed me to be freed up to once
2   again start handling the scene.
3       Q.  Can you give me an estimate of how long you
4   did it for?  Are we talking about, for example, under one
5   minute or over one minute that you did the Heimlich?
6       A.  I would say probably under one minute.
7       Q.  Okay.  And then Scheithe took over, you said?
8       A.  Yes.
9       Q.  And was Abel handcuffed at that point?
10      A.  Yes.
11      Q.  Was he on his knees when you were doing it?
12      A.  When I did the Heimlich, I believe he was on
13  his knees.  I'm not a hundred percent sure.  I believe,
14  based on video, that he was standing when Scheithe did
15  it, though.  So he may have been standing when I did it
16  as well.  I can't remember.
17      Q.  Did it appear to you that your efforts in
18  doing the Heimlich were successful?
19      A.  No.
20      Q.  What led you to believe that it was
21  unsuccessful?
22      A.  For me personally or when everyone was doing
23  it?
24      Q.  No, when you were doing it.  What led you to

Page 95

1   believe it wasn't working when you were doing it?
2       A.  I didn't see anything come out of his mouth.
3   He didn't start talking.  You know, we were talking to
4   him the whole time, you know, trying to get responses out
5   of him and stuff.  You know, because all the other
6   officers were around.  I believe Bertholomey was still
7   with Shelby, but Cramer and Scheithe were there, and they
8   were talking to him.  So since he didn't respond to any
9   of the questions, you know, it led me to believe we
10  hadn't dislodged whatever was in there.
11          And at this point, like I said, I believed he
12  was choking.  He said he was choking.  But I still wasn't
13  a hundred percent certain if that was what was causing
14  him to be in distress.  You know, we were just running
15  through our options.
16      Q.  Do you recall how long Scheithe did the
17  Heimlich?
18      A.  I don't.  He did it until Officer Kaminski
19  arrived, and then officer Kaminski took over.
20      Q.  Did it appear to you that at some point Abel
21  lost consciousness?
22      A.  Yeah, I do specifically remember how that
23  happened, because I was standing in front of Abel, and I
24  was talking to him, saying, "Stay with us.  Stay with

26  (Pages 92 to 95)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 96

1    us." And then his head dipped, and I lifted his head and
2    saw that his eyes had closed and said, "Get the cuffs off
3    because now it's -- now we need to start working other
4    angles."
5        Q.   So at that point, his cuffs were taken off?
6        A.   Yes.
7        Q.   And what did you do then?
8        A.   We laid him down I believe in the recovery
9    position at that point on his side, and then we started
10   going through the possible treatments we could do. I
11   believe someone started with a sternum rub, which could
12   be used to -- it's kind of uncomfortable, and sometimes
13   it will wake someone up if they're just kind out from
14   drugs or something like that or alcohol. That didn't
15   work. So someone suggested Narcan in case possibly he
16   had ingested some drugs and he was overdosing. We used
17   Narcan on him. And then after that, sometime close
18   around that time, paramedics started to arrive, and they
19   took over.
20       Q.   Do you remember what paramedics arrived, as
21   in, do you know the names?
22       A.   I don't.
23       Q.   You had called for fire rescue, correct?
24       A.   Yes.

Page 97

1        Q.   About how long after you called would you say
2    they arrived?
3        A.   Again, that would be purely a guess. I have
4    no idea. It was a usual response time for, you know, a
5    middle of the night call to them.
6        Q.   You don't have like a recollection of them
7    taking an especially long time or being there extremely
8    quickly, you're saying? It seemed like a normal amount
9    of time in your mind?
10       A.   Yes.
11       Q.   When they arrived, did you notice if they
12   walked, jogged, or ran up to you guys?
13       A.   I have been to a lot of rescue calls, and I
14   don't think I have ever seen them run. And the reason I
15   believe that is because -- I usually don't run on calls
16   either unless I'm chasing someone because you don't move
17   faster than you can think. So that was -- they did walk,
18   but I believe that was why. You know, you have to
19   process things as you're walking up, and it kind of seems
20   to be a rule with firefighters and paramedics that they
21   generally briskly walk to a scene. They don't ever run.
22       Q.   Did you observe the paramedics briskly walk up
23   to you guys?
24       A.   Yes.

Page 98

1        Q.   Do you take issue with how briskly or lack of
2    brisk that they walked to get to the scene?
3        A.   No.
4        Q.   Do you recall hearing a body-worn-camera video
5    in which some officer says, "Come on, guys. There's
6    somebody choking here," something like that?
7        A.   Yes. Something that, as officers, we do a
8    lot, where we'll get on the radio and say, "Go faster.
9    Go faster. You gotta move faster." We try and tell them
10   how to do their jobs, and they try to tell us how to do
11   our jobs. We kind of get guilty of getting into that
12   situation from time to time, but I do remember hearing
13   Kaminski say that.
14       Q.   Well, it's okay if you take issue with it. I
15   just want to know your opinion.
16       A.   No, I --
17       Q.   If Kaminski said that, which I believe he did,
18   do you agree with his statement that they should have
19   moved a little faster?
20       A.   No. I mean, obviously, in any situation, I
21   would like someone to sprint up. But like I said, I
22   understand their reasoning for not sprinting. Because
23   anytime I have ever sprinted to a call, I get there and I
24   don't have a plan; I haven't evaluated my surroundings;

Page 99

1    you know, I'm moving faster than I can think, that's
2    never good. So I understand why they moved the way they
3    did.
4        Q.   I do appreciate what you're saying. And, of
5    course, the paramedics, or at least some of them, will
6    likely be deposed. But would you agree with me that if,
7    in fact, somebody is choking, time is of the essence?
8        A.   Yes, time is of the essence.
9        Q.   Okay. So would you agree with me that it's
10   important to act quickly to try to save that person if
11   you're able to try to act quickly?
12       MR. MATHUES: Objection to foundation and form.
13       Go ahead.
14   BY THE WITNESS:
15       A.   Yeah, I mean, that's kind of a tricky question
16   there because, yes, I agree that you should move as fast
17   as you can -- as fast as you can think, you should move.
18   That's, I guess, what I would say.
19       Q.   Right. I mean, by saying that, it's not like
20   you intentionally waited for a long period of time to
21   start doing the Heimlich maneuver, right?
22       A.   No, but I evaluated what was going on, and
23   then I started it.
24       Q.   You started doing it pretty quickly after you

27 (Pages 96 to 99)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

---

Page 100

1  believed him to be choking, right?
2      A.  Yeah.  I walked up; I assessed him, looked at
3  him, talked to him, and then did the Heimlich.
4      Q.  You thought it was appropriate because you
5  thought he might be choking, right?
6      A.  Yeah.
7      Q.  Okay.  So when the paramedics, is it fair to
8  say they took over for the care -- medical care, that is,
9  of Abel?
10     A.  Yes.
11     Q.  What did you do when the paramedics arrived?
12     A.  There were a lot more officers starting to
13  arrive.  Commander Barr had shown up, and so he obviously
14  outranked me, so I wanted to let him know exactly what
15  was going on, so I talked to him.  I kind of evaluated
16  the scene a little bit, tried to fill in other officers
17  that were just getting there on exactly what we had.  A
18  lot of stuff.  I mean, stop me when you want me ...
19     Q.  Did you tell Commander Barr anything different
20  than what you've already said here today?
21     A.  No.
22     Q.  Is it fair to say you gave him a summation of
23  what occurred?
24     A.  Yes.

---

Page 101

1      Q.  There's a video of a certain officer saying
2  words to the effect of, "Is she under arrest?"  That's
3  Brubaker.  And then somebody said, "Yes," and he said,
4  "All right.  Take her to a squad over there."
5      A.  That's Commander Barr saying that.
6      Q.  That was Commander Barr?
7      A.  Yeah.  He was frustrated because she was being
8  so loud and boisterous and causing a scene that when he
9  walked up, he thought there should be no reason why she
10  should still be standing there as opposed to in a
11  car, because all she's doing is causing more problems.
12  So he was frustrated with us in that situation.
13     Q.  Did you take Shelby to the car?
14     A.  I did not.  Another officer did.
15     Q.  Do you know whose car she was in, by the way?
16     A.  I don't.
17     Q.  Did you notice at some point that Abel went
18  into the ambulance?
19     A.  Yes.
20     Q.  I say "the ambulance," but there were multiple
21  on scene, right?
22     A.  At that time, there was only one.
23     Q.  About how long after the paramedics arrived
24  would you say he was actually placed into an ambulance?

---

Page 102

1      A.  I'm not sure.  I was doing so much.  I don't
2  think I actually saw them put him in.  I think at one
3  point I looked over and he was in an ambulance already.
4      Q.  Okay.  It sounds like you're talking to
5  Commander Barr on scene.  What else were you doing on
6  scene?
7      A.  I had to -- as an officer in charge, it's my
8  job to make notifications to the deputy chief whenever we
9  have a big incident, you know.  And so I called Deputy
10  Chief -- he's now the chief -- Wilde and just gave him a
11  synopsis of what happened and told him where we were at,
12  what the status was, and told him I would call him again
13  if I got any more information.
14     Q.  I've heard that there's a work cell phone.  I
15  forgot what it's called, OIC phone or something like
16  that.
17     A.  Yup.
18     Q.  Did you make a call on your work cell phone or
19  was it your personal?
20     A.  I believe it was the work phone.
21     Q.  Did you have it that night or that shift?
22     A.  I believe so.  I mean, usually, we grab it at
23  the start of every shift.  Sometimes if an officer is out
24  on the road and still has it, you have to meet up with

---

Page 103

1  them.  But under normal circumstances, I would have had
2  it, yeah.
3      Q.  Is that typically in the possession of the
4  officer in charge?
5      A.  Yes, or the commander, whoever is the highest
6  ranking officer.
7      Q.  Okay.  At some point did you become aware of
8  something that was happening with Abel in the ambulance?
9      A.  Yeah.  We were all obviously very concerned
10  about him, and so we were kind of lingering around the
11  ambulance, wanting to make sure he was okay and trying to
12  get status updates from the paramedics.
13     Q.  Were you getting updates?
14     A.  I don't remember specifics.  I remember at one
15  point they opened the door and they said, "We just pulled
16  a large bag out of his trachea," was I believe their
17  words.
18     Q.  Do you recall who said that?
19     A.  One of the paramedics.  I can't remember.
20     Q.  And you were standing near the ambulance
21  somewhere when that was said?
22     A.  Yeah.  I believe I was standing -- not at the
23  back, like, the double doors but the back side door.
24     Q.  This person, was it a man?

---

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 104

1    A.  I believe so.
2        Q.  Besides being a man, can you give me another
3    description?  For example, age, height, weight, race,
4    anything?
5        A.  I don't remember.  I went to so many rescue
6    calls after that, you know, just they all blend together.
7        Q.  When that person said that, did the person
8    actually show you what they allegedly pulled out of his
9    throat?
10       A.  I don't know if they showed me right at that
11   exact time, but they put it into something they had.  I
12   think it was like a boot cover or something.  They put
13   the baggie into that and gave it to me, and then I
14   brought that over to, I believe, Commander Barr.
15       Q.  I think it was talked about yesterday; a boot
16   cover like -- is it like a surgical slipper that
17   typically goes over like a doctor's shoe or something
18   like that?
19       A.  Yeah, I think so.  I think it -- whatever
20   color it is, it looks kind of like a hairnet, I guess.
21       Q.  But for your feet?
22       A.  Yes.
23       Q.  Right.  So is the person who said they pulled
24   a bag out of his throat the same person that put this bag

Page 105

1    in a boot cover?
2        A.  I don't remember.  They just -- I think they
3    showed me a set of, what you call them, forceps or
4    tweezers or something.  And they said something about
5    they had to reach deep, deep down to get this bag out.
6    So I think that's why they said it was his trachea, I
7    believe was the word they used.  I'm not a big anatomy
8    guy.  But they conveyed to me that they had to -- they
9    couldn't see it.  They had to reach down into there to
10   pull it out.
11       Q.  And did you say a paramedic handed you a
12   plastic baggie that was in a boot cover?
13       A.  Yes.
14       Q.  You don't recall who that person is?
15       A.  No.
16       Q.  But you just believe it to be a male
17   paramedic, and you don't have any further description
18   besides that?
19       A.  I believe so.  And I think there's only one or
20   two females that worked at our fire department, so it may
21   just be me thinking -- thinking like that, that it's a
22   male.  It could have been a female too.  I don't
23   remember.
24       Q.  To the best of your knowledge, was this a

Page 106

1    person that worked for Round Lake Beach Fire?
2        A.  Yes.
3        Q.  And where were you when they handed it to you?
4        A.  Standing outside the ambulance, just outside
5    the door.
6        Q.  Were you wearing gloves?
7        A.  At that point, I don't know.  I don't
8    remember.  I know I had gloves on at one point because
9    when I started to notice my thumb was messed up, I took
10   my glove off to check it.  So at some point I did have
11   gloves on, so it would make sense that I put them on to
12   handle evidence.
13       Q.  What type of gloves were you wearing -- Well,
14   strike that.
15           What type of gloves did you typically wear?
16       A.  I typically wore the -- they're called
17   mechanics' gloves.
18       Q.  What type are those?  Can you describe them
19   more?
20       A.  It's kind of like a -- I think it's a leather
21   palm and like a cloth backing.  I tried lots of gloves
22   over the years.  I've got weird-shaped hands, and those
23   ones just seemed to be the ones that fit my hand the
24   best, gave me the best dexterity.

Page 107

1        Q.  Those are the typical gloves you would wear
2    during your shift?
3        A.  Yes.
4        Q.  Some gloves have -- well, some gloves are cut
5    off near the fingertips and thumb tip.  Were your gloves
6    cut off, or did you have gloves that were fully covering
7    your hand?
8        A.  They're full gloves.  They're not cut off.
9        Q.  This plastic baggie in a boot cover, it was
10   just handed to you by a paramedic while you were standing
11   outside of the ambulance?
12       A.  Yes.
13       Q.  And, again, at that very moment you don't
14   recall if you had gloves on or not, correct?
15       A.  I don't recall a hundred percent, no.
16       Q.  What did you do with that?
17       A.  I believe I brought it over to Commander Barr.
18   I'm not a hundred percent sure that it was him.  I
19   brought it to another officer because we needed to get it
20   into an evidence bag or something to get it locked into a
21   trunk.  That's generally what we do with evidence to make
22   sure we have it secured.  And so I think I went to
23   Commander Barr.  We got it secured; we put it into a
24   trunk and made sure it was locked.

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

---

Page 108

1     **Q. Okay. So you believe you went to**
2 **Commander Barr and asked him for an evidence bag; is that**
3 **what you're saying?**
4     A. I believe so, yeah.
5     **Q. What's an evidence bag?**
6     A. We've got different kinds of bags. There's
7 paper bags, plastic bags, basically, just any sort of
8 receptacle that can hold the evidence until you can get
9 it processed.
10     **Q. Do you recall what type of bag you placed it**
11 **in?**
12     A. I don't. I don't even recall if it was me
13 that placed it in a bag or if I handed it to somebody and
14 they placed it in a bag.
15     **Q. Before it was placed in a bag, did you show it**
16 **to an officer or officers?**
17     A. I'm fairly certain that I went over to
18 Commander Barr and showed it to him. You know, like I
19 said, he's the boss on the scene at that point, so I
20 generally would run everything through him.
21     **Q. Before you walked it over to Barr -- you said**
22 **you likely did it with him because he was the supervising**
23 **officer -- did you show it or at least stop along the way**
24 **to show it to other people?**

---

Page 109

1     A. I don't think -- I don't think so. I mean, if
2 someone saw it, maybe they saw it, but I didn't stop and
3 say, "Here, look, look" to other people. You know, I was
4 pretty intentional and focused on what I was doing at
5 that time.
6     **Q. Again, you don't recall if you actually gave**
7 **it to Barr or if you gave it to somebody else to put into**
8 **an evidence bag?**
9     A. Correct.
10     **Q. Did anybody else touch it to your knowledge**
11 **before you gave it to Barr or somebody else?**
12     A. I mean, besides the paramedics, not to my
13 knowledge.
14     **Q. And, again, you don't have a specific**
15 **recollection of what type of bag it was put in?**
16     MR. MATHUES: Objection, asked and answered.
17 BY THE WITNESS:
18     A. No.
19     **Q. You don't have a specific recollection of**
20 **whether it was you, Barr, or somebody else who put it in**
21 **an evidence bag?**
22     A. No, but I'm sure if you spoke to -- if you
23 spoke to them, I'm sure they would probably be able to
24 confirm that. I just remember that it went into a trunk

---

Page 110

1 and was secured.
2     **Q. Whose trunk did it go into?**
3     A. I don't remember. It was one of the squads
4 that was parked in the parking lot, but there were so
5 many squads showing up at that point from all different
6 directions, you know.
7     **Q. Are you saying you have a memory of putting it**
8 **in somebody's trunk or you just believe that to be the**
9 **truth?**
10     A. I remember watching it get put into a trunk
11 and the trunk getting closed. I just don't remember the
12 chain of events that happened where it was put into a bag
13 and then put into the trunk, who did what at what time.
14 You know, it's two and a half years ago.
15     **Q. I understand. I'm just trying to get the best**
16 **of your recollection because I don't think there's actual**
17 **video that captures this moment in time.**
18     A. Okay.
19     **Q. So just to recap, you don't recall if you put**
20 **it in the evidence bag, correct?**
21     A. Correct.
22     **Q. And you don't recall if you put it -- that is,**
23 **the evidence bag -- in a trunk, correct?**
24     MR. MATHUES: Objection to asked and answered.

---

Page 111

1 BY THE WITNESS:
2     A. Correct.
3     **Q. Before it was placed in a trunk, did you look**
4 **at it for at least a moment?**
5     A. I'm sure I did.
6     **Q. And do you have any recollection of what you**
7 **were looking at?**
8     A. I just remember a plastic bag. I don't
9 remember specifics or details. With the time that's gone
10 by, you know, I've seen so many pictures of it. There's
11 been so much talk about it that, you know, I know exactly
12 what it looks like, but I can't remember if it's from
13 seeing it that night or seeing it in pictures now. I
14 mean ...
15     **Q. I understand. I appreciate that. You've seen**
16 **a picture fairly recently, but my question is more**
17 **specific. Mine was, do you recall looking at it at that**
18 **moment?**
19     A. Yeah, I -- I'm sure I did. I don't recall
20 specifically, though.
21     **Q. What else did you do on scene?**
22     A. So at that point, we had a call of a
23 suspicious vehicle that happened at some of our
24 apartments on the other side of town. And so Commander

---

30 (Pages 108 to 111)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 112

1  Barr took another officer, and they went to go check that
2  out while I maintained the scene there. This is about
3  the time I was calling Deputy Chief Wilde.
4        And when they got there, I heard over the
5  radio that it was a stolen vehicle that they had come
6  upon full of people, and it was fleeing from them. We
7  have a no-pursue policy, so they let it go because they
8  were supposed to. So at that point, I was still
9  maintaining the scene but also listening to the radio to
10 hear what was going on with them, making sure they were
11 okay.
12       And then it was during this time that I really
13 started noticing my thumb. There was a problem with my
14 hand. And so I can't remember when exactly I called for
15 another ambulance or who called for another ambulance,
16 but an ambulance was called to the scene. I do remember
17 that I did not want to get in an ambulance or do anything
18 until Commander Barr came back because I wanted to make
19 sure I turned the scene over to him before I left or was
20 in the back of an ambulance.
21     Q.  Which thumb was hurting you?
22     A.  My left thumb.
23     Q.  Can you describe the pain? How did it hurt
24 you?

Page 113

1     A.  It was just -- I couldn't move it, and it was
2  just really a lot of pain. At the time, I figured I
3  broke it, but I didn't know exactly what it was. But,
4  again, it's a thumb, so I wasn't going to just go leave
5  everyone to do all this work, you know, when I could
6  still contribute, so ...
7     Q.  Did you, in fact, injure your thumb?
8     A.  Yes.
9     Q.  What was the injury?
10    A.  They call it a skier's fracture. I tore a
11 ligament in my thumb and had to have it surgically
12 repaired.
13    Q.  How do you believe that thumb became injured?
14    A.  It's hard to tell for sure. I believe when
15 Ms. Brubaker was swinging and thrashing, I think she hit
16 it. Because basically what happens is, it gets hit here
17 (indicating), and this ligament just rips off the bone,
18 and so the thumb just kind of freely hangs. And so I
19 think when I was kind of scuffling with her, she swung,
20 and that's what snapped it.
21    Q.  Do you believe your contact with Mr. Rosiles
22 contributed to the injury of your thumb?
23    A.  I think it contributed to it. I can't say a
24 hundred percent when it happened. I remember -- because

Page 114

1  there were so many little scuffles that happened that
2  night. I just remember at one point I heard a snap when
3  I -- when it happened. But my adrenaline was kind of
4  going, so I just didn't really do too much about it. So
5  it could have been when I was -- when Abel was kicking,
6  or it could have been when she was swinging at me. I
7  just probably assumed it was when I was with Shelby, but
8  I'm not a hundred percent sure.
9     Q.  So did you get medical treatment for your
10 thumb?
11    A.  I went to the hospital that night, and they
12 put me in a soft cast. And they weren't sure if there
13 was anything wrong. They x-rayed it, said there were no
14 broken bones, but I had to follow up with a specialist.
15 So a couple days later, I went to a specialist, and he
16 took it, and just went like this (indicating), and it
17 just continued to move, and he said, "That's not supposed
18 to happen, obviously." And so he said, "You're gonna
19 have to have" -- he didn't seem overly concerned because
20 he said he sees that injury from time to time, and they
21 were just gonna have to screw it back to the bone, so ...
22    Q.  Did you go directly from the scene to the
23 hospital?
24    A.  Yes. It's procedure. They make us go in an

Page 115

1  ambulance.
2     Q.  So if my client's arrest happened at about
3  11:04 p.m., about what time did you actually leave the
4  scene?
5     A.  I don't know for sure. I mean, the log would
6  say when the ambulance left, but I would assume probably
7  close to midnight if I was just taking a shot-in-the-dark
8  guess.
9     Q.  Do you have any other recollection of doing
10 anything else on the scene besides what we've talked
11 about?
12    A.  Not to my recollection.
13    Q.  At the hospital did you see another officer
14 there?
15    A.  Eventually, another officer must have come to
16 pick me up. I got transported by myself. I was in the
17 room by myself for a while, and then I got back somehow,
18 so I assume someone came and got me. I forgot who it
19 was.
20    Q.  What hospital did you go to?
21    A.  Condell in Libertyville.
22    Q.  Do you know where Abel was taken to?
23    A.  I would assume Condell as well. That's
24 generally where we transport people to.

31 (Pages 112 to 115)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

---

Page 116

1    Q.  While there, did you inquire about Abel; that
2  is, if he was there and how he was doing?
3    A.  I think so.  I mean, obviously, I was very
4  concerned, and so I would -- I don't think I talked to
5  the doctors about it, but I think whenever the other
6  officer came in, I probably asked for a status and what
7  was going on.
8    Q.  Do you recall getting a status?
9    A.  I don't think so.  I don't recall.  Again, you
10  know, the timeline kind of gets a little fuzzy over two
11  years.
12    Q.  I'm just going to show you a couple exhibits
13  now.
14    A.  Okay.
15        (Whereupon, a document is shown via
16          Zoom.)
17  BY MR. MARX:
18    Q.  Do you see a document on your screen?
19    A.  Yes.
20    Q.  It's Round Lake 3635.  This will be Exhibit 1.
21    A.  Yup.
22    Q.  Is this a photograph of you?
23    A.  Yes.
24    Q.  Do you know who took this photo?

---

Page 117

1    A.  I don't.
2    Q.  What's depicted in this photo?
3    A.  My arm and the cast that was on it.
4    Q.  Is there a reason why you're showing your arm?
5    A.  Yeah.  I believe there were some scrapes and
6  bruising on that, so they wanted me to show my entire
7  arm.
8    Q.  Is there a reason why you're smiling?
9    A.  I believe it was because they were giving me a
10  hard time because I had just gotten back from the
11  shooting, and I was in a cast already.  And so I think
12  they were kind of making fun of me for getting hurt
13  again, so ...
14    Q.  You weren't in a cast at the time of this
15  incident, were you?
16    A.  No.  At the time that -- can you --
17    Q.  Sure.  Sorry.  I forgot when the shooting
18  occurred.  When did the shooting occur?
19    A.  March 15th of 2020.
20    Q.  Okay.  My question was, you weren't in a cast
21  at the time of this incident on June 10th, 2020, were
22  you?
23    A.  No, no.  I'm saying I'm back in a cast -- I'm
24  in a cast now, though.  So they were kind of giving me a

---

Page 118

1  hard time about being injury-prone.
2    Q.  Okay.  Let me show you Exhibit 2 here.
3        (Whereupon, a video is shown via
4          Zoom.)
5  BY MR. MARX:
6    Q.  Exhibit 2 is a cell phone video.  It's
7  Plaintiff's Exhibit 184, it says.
8    A.  Is there a way to go to full screen on that?
9    Q.  I'm sorry.  What did you say?
10    A.  I said, is there a way to go to full screen on
11  this, on this video?
12    Q.  No.  It is full screen, as in, this is the
13  full screen of the video in its -- this is what it looks
14  like.  I know what -- I believe I know what you're
15  saying.  Is there a way to make the whole image across
16  the whole screen, is what you're saying?
17    A.  Yeah, because it's kind of unclear.  But,
18  yeah, that's what I was asking.
19    Q.  I don't believe there's a way to do that.  I
20  would if I could.
21    A.  We made it a little bit bigger on this side.
22  It's good.
23    Q.  Okay.  I know I didn't play it yet, but it's a
24  minute-and-42-second video.  Is this one of the videos

---

Page 119

1  you've seen at least a couple of times?
2    A.  I believe so, yes.
3    Q.  When is the first time you recall seeing this
4  video?
5    A.  Like on the news or YouTube or something like
6  that.
7    Q.  Did you -- Well, let me say this:  Did you
8  suspect this video existed before you actually saw it?
9    A.  I actually suspected the video was a lot
10  longer than this video.
11    Q.  Why do you say that?
12    A.  Because when I was interacting with -- I
13  forget his girlfriend's name -- Sinahy, she appeared to
14  be recording the majority of the time she was there, much
15  longer than a minute and 42 seconds.
16    Q.  You never took possession of her cell phone,
17  right?
18    A.  Not at that time, I did not.
19    Q.  Did you ever get possession of her cell phone?
20    A.  I believe that maybe detectives requested it,
21  and there was some issue with her turning it in from what
22  I heard.  Again, that's just what I heard in passing.  I
23  can't say for sure.
24    Q.  I'm just going to play it and stop it at a

---

32 (Pages 116 to 119)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

---

Page 120

1 couple points and ask a couple questions about it.
2     A. Okay.
3     Q. The audio I heard yesterday was very faint.
4 I'm not interested in what you're saying or what's being
5 spoken, just so you know. So in the event that the audio
6 is difficult to hear, I'm not going to be asking you,
7 "What did you say?" or, "What did she say?" or something
8 like that, just so you're aware. Okay?
9         (Whereupon, a video is being played
10         via Zoom.)
11 BY MR. MARX:
12     Q. Okay. I'm stopping at three seconds. Are you
13 able to identify who's in the frame at three seconds?
14     A. It's pretty grainy, but I would assume, based
15 on that time, that it would have been Officer Cramer and
16 Officer Scheithe.
17     Q. Okay. Cramer said this was him in the white
18 face mask. Do you have any reason to think that's not
19 true?
20     A. Nope.
21     Q. I haven't asked Scheithe, but do you believe
22 this is Scheithe who's on what would be Abel's right
23 side?
24     A. Sure, yes.

---

Page 121

1     Q. Do you have any reason to think that's not
2 him?
3     A. No.
4     Q. Is this Abel that's on the ground here?
5     A. Yes.
6     Q. I'm starting again at three seconds.
7     I'm stopping at five seconds. Are you
8 depicted in this video?
9     A. Yes.
10     Q. Where are you in relation to the three
11 individuals in the video?
12     A. I am the one with the shaved head on top of
13 Shelby.
14     Q. And who's next to you?
15     A. That would have been Officer Bertholomey.
16     Q. And Shelby is on the ground, correct?
17     A. Correct.
18     Q. Would you agree with me at 11 seconds here
19 that Cramer and Scheithe are touching Abel?
20     A. Yes.
21     Q. Okay. Where does, in your opinion, Cramer
22 appear to be touching Abel?
23     A. I could see pretty clearly he's got his hand
24 on his calf.

---

Page 122

1     Q. Okay. And where is Scheithe, in your opinion,
2 touching Abel?
3     A. That one is harder to tell for sure. I mean,
4 it's kind of garbled. You can't really tell. I can't
5 even tell what parts of Abel are right there, you know.
6     Q. It looks like Abel is wearing a black
7 sweatshirt of some of sort, correct?
8     A. Yeah, that's what it looks like, yeah.
9     Q. Is it fair to say that Scheithe might be
10 wearing a black glove?
11     A. Yes. That's fair to say.
12     Q. So are you saying it's not really clear where
13 he's touching him because it might be a black glove on a
14 black sweater and it's difficult to discern?
15     A. Correct.
16     Q. I'm stopping it again at 20 seconds. Is it
17 fair to say that the two officers in the video and Abel
18 are more or less in the same position?
19     A. Yes.
20     Q. Do you know why they're likely touching him in
21 this video?
22     A. I can't speculate what their reasoning would
23 be.
24     Q. What justification do you believe there is for

---

Page 123

1 them to touch him?
2     A. He had tried to run and resist multiple times
3 throughout the night, so to secure him in place would be,
4 I think, more than reasonable.
5     Q. I'm starting again at 20 seconds.
6     I'm stopping at 57 seconds. Did you see in
7 that clip it looked like Scheithe appeared to push down
8 on Abel's back?
9     A. No, I did not. That wasn't -- if you want to
10 play it again, I could take a look.
11     Q. Sure. I'll just play like the last ten
12 seconds of it; that is, from 47 to 57.
13     All right. Did you see him push on his back
14 in that clip?
15     A. I would be speculating if I said -- It looked
16 like the same amount of contact that it's been the whole
17 time, to me. He took his hand off for a second and
18 looked like maybe braced himself on the tire or something
19 and then went back to putting his hand exactly where it
20 was before.
21     Q. I don't want you to speculate. I'm just
22 asking you what you saw.
23     A. Yeah, that's what I saw. So I saw him take
24 his hand off where it was, put it on the tire for a

---

33 (Pages 120 to 123)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 124

1    second, and then put his hand back where it was.
2        Q.  Okay.  So my question was, did you see
3    Officer Scheithe push on Abel's back, and you're saying
4    you did not see that?
5        A.  No.
6        Q.  Okay.  I'm starting again at 56 seconds.
7            I'm stopping at 1:09.  Did you happen to see
8    Officer Cramer take off one of Abel's socks in that clip?
9        A.  Can you play it again?  I wasn't looking at --
10       Q.  Sorry.  If you could draw your attention to
11   Officer Cramer from :56 to 1:09.
12       A.  Yup.  Yes.  I see what you're talking about.
13       Q.  Okay.  Do you know why Officer Cramer would
14   have been doing that at that point?
15       A.  I don't.  It's for him to tell you.
16       Q.  I'm starting again at 1:09.
17           Okay.  The video is stopped at 1:42.  Would
18   you agree with me, in that minute-and-42 video, that Abel
19   is in the prone position the entire time?
20       A.  Yes.
21       Q.  I'll just show you a couple pictures here.
22           (Whereupon, photographs are shown via
23           Zoom.)
24

Page 125

1    BY MR MARX:
2        Q.  So this will be Exhibit 3.  It's Image 3564.
3    To the best of your recollection, have you ever seen this
4    photo before?
5        A.  I don't recall seeing it.
6        Q.  I'll represent to you that I produced it
7    relatively recently, I think a couple weeks ago, to
8    plaintiff's [sic] counsel.  Do you see three areas of
9    like discoloration on my client's face here on the photo?
10       A.  Yes.
11       Q.  Do you know if those are abrasions or not?
12       A.  They could be.  I can't tell you based on a
13   photo.
14       Q.  If they are abrasions, did you know how my
15   client sustained those?
16       A.  I don't know.  I can't tell you that they are,
17   so I can't tell you -- I mean, like I said, we did -- he
18   did resist, and we did have to take him to the ground a
19   couple times.  So if they are, that could be what it's
20   from, but I don't know if that's what they are, so ...
21       Q.  I'll show you Exhibit 4.  It's marked
22   Image 3612.
23           (Whereupon, a photograph is shown via
24           Zoom.)

Page 126

1    BY MR. MARX:
2        Q.  Mr. Cramer -- sorry -- Mr. Atwell, do you see
3    a discoloration on my client's side of his face here?
4        A.  Yeah.
5        Q.  Do you know if that's an abrasion or not?
6        A.  I'm not sure.  This photo is even grainier
7    than the last one.
8        Q.  I would agree with you on that, but if it is
9    an abrasion, do you know how it got there?
10       A.  Again, I don't know what it is, so it's hard
11   for me to say, if it is something, what could it be, you
12   know.
13       Q.  I know.  Obviously, I'm proposing that it is.
14   I'm saying that it is an abrasion.  Assuming that it is,
15   do you know how he sustained that?
16       A.  Again, he was resisting a great deal
17   throughout the situation, so it could have been from, you
18   know, being in the grass or initially going down on the
19   road.  I'm not sure.
20       Q.  One more picture here.  I'm going to show you
21   Exhibit 5.  It's Bates-stamped Round Lake 3929.
22       A.  Okay.
23           (Whereupon, a photograph is shown via
24           Zoom.)

Page 127

1    BY MR. MARX:
2        Q.  This is one of the autopsy photos that I
3    received.  Have you seen any autopsy photos in this case?
4        A.  I don't recall.  I don't think so, but I don't
5    remember.
6        Q.  Do you see what appears to be, in this photo,
7    an injury near the middle of my client's forehead?
8        A.  I see what appears to be -- yeah, something
9    there, yeah.
10       Q.  Assuming that it is an injury, of course, do
11   you know how my client sustained that injury?
12       A.  I would assume during medical treatment,
13   maybe, but I don't know.
14       Q.  What makes you think that it might be medical
15   treatment that caused that injury?
16       A.  Because I know that they do -- when you are in
17   a rough condition, they will put monitors on your head to
18   check, you know, brain function, those types of things.
19   So I assume it was probably related to that.
20       Q.  I'm going to show you another exhibit here.
21           (Whereupon, a photograph is shown via
22           Zoom.)
23   BY MR. MARX:
24       Q.  Exhibit 6 will be Round Lake 3628.  Is it fair

34 (Pages 124 to 127)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 128

1  to say you've seen this photo multiple times?
2      A.  Yes.
3      Q.  Do you know who took this photo?
4      A.  I do not.
5      Q.  Were you present when it was taken?
6      A.  No.
7      Q.  Well, what's depicted in this photo?
8      A.  The bag that was handed to me in the
9  ambulance, and it looks like a positive cocaine test,
10  field test.
11     Q.  How do you know it's positive, or what makes
12  you think it's positive?
13     A.  If I remember correctly, if it turns that
14  pinkish-purplish color, whatever that was, I believe
15  that's indicative of cocaine. I can't remember a hundred
16  percent, though. I haven't done one in a while.
17     Q.  Do you know whatever happened to the foot boot
18  that you said it was placed in?
19     A.  I don't. It could have been taken out of the
20  boot and put into an evidence bag. I'm not sure.
21     Q.  After the baggie was placed in an evidence bag
22  and placed in a trunk of a police vehicle, did you ever
23  see the baggie again?
24     A.  In person?

Page 129

1      Q.  In person.
2      A.  I don't think so.
3      Q.  What was your expectation as to what was going
4  to happen with that baggie?
5      A.  It would be submitted into evidence.
6      Q.  What does that mean?
7      A.  We have evidence lockers in the basement of
8  the police department. And you go back -- I assume it
9  would be tested for whatever kind of substance they
10  thought was in it. And then after it was tested, it
11  would be weighed, labeled, and then added to an evidence
12  locker for processing by an evidence technician later.
13     Q.  Do you know who was responsible for processing
14  the evidence, so to speak?
15     A.  That night or in general?
16     Q.  That night with regard to this piece of
17  evidence.
18     A.  I don't. When I went to the hospital, I kind
19  of handed everything off and lost track of who did what.
20     Q.  Was it your job to assign somebody to process
21  the evidence?
22     A.  Not once it's handed over to Barr. But even
23  if Barr wasn't there, generally, it would be either the
24  primary officer on the call that would put it into

Page 130

1  evidence or if there was an evidence technician working
2  at the time.
3      Q.  Just one moment.
4          Have you ever seen a photograph of this baggie
5  on a scale?
6      A.  I don't think so.
7      Q.  Have you ever seen a photograph of this baggie
8  next to a ruler?
9      A.  I believe so.
10     Q.  When do you believe you've seen one next to a
11  ruler?
12     A.  I saw it during one of the -- maybe I didn't.
13  I don't know. There was a press conference that the
14  chief held to talk to the public, and I thought he had a
15  picture of it with a ruler next to it, but I could be
16  misremembering it.
17     Q.  Well, I'll follow up with your attorney.
18     MR. MARX:  David, for the record, I'd like that if
19  that does exist, but I'll make a specific request when
20  we're done.
21     MR. MATHUES:  I will represent to you that I've
22  never seen that, but I also -- I can follow up with the
23  former chief.
24

Page 131

1  BY THE WITNESS:
2      A.  I could be misremembering. I mean, I've seen
3  a lot of pictures with rulers next to them, so it could
4  be something that, again, over two years popped into my
5  head.
6      Q.  I understand. I'm just -- this is just really
7  more of a discussion between the lawyers. I appreciate
8  what you're saying, though.
9      A.  Yeah.
10     Q.  Do you know how much that alleged cocaine
11  weighed?
12     A.  I don't recall.
13     Q.  Would you describe the amount of that cocaine
14  to be about the size of a golf ball?
15     A.  I can't recall based on this photo. There's
16  no reference, you know.
17     Q.  When you looked at it on scene, do you recall
18  it being about the size of a golf ball?
19     A.  I don't recall. I'm not sure.
20     Q.  With regard to the test; that is, the testing
21  of it for a controlled substance, do you know how that
22  test is performed?
23     A.  Again, it's been a while since I've done one.
24  But to the best of my memory, you tear open the packet

35 (Pages 128 to 131)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 132

1  like one of those wet wipes you use on your hands, and
2  you dab it in some of the -- in some of the substance. I
3  believe the more pure the cocaine, the more you're going
4  to get, you know, color on the little swab thing. Again,
5  it's been a while since I've done one, so ...
6      Q.  Just one moment.
7          (Whereupon, a document is shown via
8          Zoom.)
9  BY MR. MARX:
10     Q.  I'm showing you Exhibit 7. It's Round
11 Lake 2646. Mr. Atwell, have you ever seen this document
12 before?
13     A.  I don't think so.
14     Q.  It says, "Case Officer Timothy Cramer" at the
15 top, correct?
16     A.  Yes.
17     Q.  Would it be your understanding that Timothy
18 Cramer filled out this report?
19     A.  I would assume so if his name is on it.
20     Q.  I ask you about it because it has your name on
21 it in a couple spots. It says -- for example, Item
22 No. 1, it says, "Collected by Heath Atwell," correct?
23     A.  Yes. So that would mean I got it from the
24 paramedics. I collected it on scene.

Page 133

1      Q.  With regards to the Item No. 1 being the
2  powder substance, it doesn't indicate that you got it
3  from the paramedics in this particular document, right?
4      A.  Correct.
5      Q.  It basically says that it's collected by you?
6      A.  Yeah. I believe that's a drop-down tab in the
7  program that says what officer collected it. You don't
8  get to elaborate on it.
9      Q.  This time here, again, this is filled out by
10 Cramer, as far as you know, correct?
11     A.  Yes.
12     Q.  This time here is likely something Cramer put
13 in then?
14     A.  Correct.
15     Q.  The time and date says, 6/10/2020 at
16 23:35 hours?
17     A.  Correct.
18     Q.  So is it your understanding that's when Cramer
19 believes that you took possession of it?
20     A.  Yeah. I would guess he kind of approximated
21 at the time since we didn't have, you know, video running
22 at that exact moment to time-stamp it.
23     Q.  Having looked at this document, do you have
24 like a specific recollection now of handing item No. 1 to

Page 134

1  Mr. Cramer?
2      A.  I don't. I don't recall.
3      Q.  Having looked at this document, do you now
4  have a specific recollection of you -- or seeing someone
5  put Item No. 1 into Mr. Cramer's vehicle?
6      A.  I don't remember what vehicle it was. I just
7  remember it went into a vehicle.
8      Q.  It says the weight here is 4.0 grams, correct?
9      A.  Correct.
10     Q.  Do you have any reason to think that's
11 inaccurate?
12     A.  No.
13     Q.  Can you describe the place that it's held;
14 that is, where Mr. Cramer would have likely put this
15 item?
16     A.  It is an evidence room in the basement of the
17 police department. It has a series of lockers. So after
18 you weigh it, photograph it, test it, whatever you need
19 to do, you can secure it in a locker. And the locker
20 opens on the other side where only a couple officers that
21 are trained, certified evidence technicians can then open
22 it on the other side and process the evidence.
23     Q.  I know this is a two-page document, and I'm
24 only showing you one of two, but do you have any reason

Page 135

1  to think that the boot -- the foot boot that was holding
2  the white plastic baggie was inventoried into evidence?
3      A.  I'm not sure. I don't know.
4      Q.  You think there's any evidentiary value to
5  that thing?
6      A.  Possibly. I mean, it depends on what you're
7  looking for, I guess. I would guess it probably wouldn't
8  really have too much of an evidentiary value because it
9  is more of a receptacle than anything. You would have to
10 use discretion with the size evidence room we have on
11 what you put in, you know.
12     Q.  Do you know if Abel's socks were taken into
13 evidence?
14     A.  I'm not sure.
15     Q.  Would you expect them to be?
16     A.  I don't know. It would be at the discretion
17 of the -- hindsight, I mean, if you say hindsight, which
18 is 20/20, then, yeah, you know, obviously, I would expect
19 them to be. But at the time, based on the totality of
20 the circumstances and what they were seeing on scene, I'm
21 not sure.
22     Q.  At the time, what was your understanding of
23 who decided what was placed in evidence and what was not?
24     A.  I would assume that Commander Barr, after

36 (Pages 132 to 135)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

---

Page 136

1     taking control of the scene, would probably decide what
2     would go into evidence and what wouldn't. But,
3     generally, officers kind of have that responsibility
4     themselves. We don't micromanage the PD. Everyone has a
5     job to do, and they know the job. We're trusted to do it
6     the right way, so we try and do it to the best of our
7     abilities.
8          Q.   Just about that photo again, do you recall --
9     Strike that.
10         Regarding the photo that we just saw, do you
11    know what time that photograph was taken?
12         A.   Which photo? The one of the bag?
13         Q.   Yes.
14         A.   I'm not sure.
15         Q.   Do you know if there's a document that
16    indicates what time that baggie was actually put into the
17    evidence locker?
18         A.   There should be a time stamp when it's
19    submitted into evidence.
20         Q.   Do you know what the name of that document is
21    called?
22         A.   I don't. I'm not an evidence tech. I just
23    know that when we submit it, it usually says, "Date and
24    time collected," "Date and time submitted."

---

Page 137

1          Q.   Do you know who the evidence tech, if any, was
2     at the time of this incident?
3          A.   I don't know who the certified techs in the
4     building were. I believe Sergeant Callese was one and
5     maybe -- I don't know. It was kind of a revolving door
6     with evidence techs.
7          Q.   In your law enforcement career, have you ever
8     seen someone try to hide narcotics in their mouth?
9          A.   Yes.
10         Q.   Okay. Have you ever seen somebody try to hide
11    this amount of cocaine in their mouth that was allegedly
12    pulled out of Abel's throat?
13         MR. MATHUES: Objection to foundation.
14    BY THE WITNESS:
15         A.   Okay. I don't remember if it was cocaine or
16    not, but she put a rather large bag in her mouth and
17    tried to swallow it. It was, I believe, too big for her
18    to actually get down her throat, though, and we were able
19    to retrieve it before she got it down her throat.
20         Q.   How were you able to retrieve it?
21         A.   At that time, we pulled her out of the car,
22    put her on her back. And I can't remember if something
23    was put in between her teeth or exactly how it was done,
24    but we made sure her mouth was open and got the bag out

---

Page 138

1     because we saw her do this (indicating) and put it in her
2     mouth.
3          Q.   Oh, you actually saw her take her hand and put
4     something in her mouth?
5          A.   Yeah, on that specific occasion. I had other
6     ones where I didn't see them do it but I know they did.
7     It's kind of a somewhat common thing for people to try
8     and eat the evidence.
9          Q.   Are you saying in that female situation, that
10    was the only time you saw something about the same size
11    as what was comparable here pulled out of somebody's
12    mouth?
13         A.   I would say that's the only time that I
14    really -- that one was bigger than this one. But I would
15    say that was the only time I really remember, from start
16    to finish, seeing it go in, seeing it come out, all those
17    things, the whole process. There was other times where
18    people -- I know they ate it and swallowed it. I
19    couldn't really prove it. I saw residue of drugs in
20    their mouth that they had eaten. So that's a specific
21    time where I remember a bag going in, a bag coming out,
22    and it was big.
23         Q.   And you or somebody else reached into that
24    person's mouth and pulled it out?

---

Page 139

1          A.   I did not, yeah. It was somebody else.
2          Q.   Do you know if that plastic bag was ever
3     tested for DNA or fingerprints?
4          A.   Which one?
5          Q.   The same plastic baggie that we've been
6     talking about the whole time that was allegedly in my
7     client's throat.
8          A.   I though you were talking about on the other
9     one where she tried to eat it. No. I don't know if it
10    was or was not.
11         Q.   Do you think it should be tested for DNA or
12    fingerprints?
13         A.   I'm not sure. I'm not an evidence tech.
14         Q.   Who, to your knowledge, makes that decision as
15    to what, if anything, gets tested for DNA or
16    fingerprints?
17         MR. MATHUES: Objection to foundation and vague as
18    to what kind of case.
19         Go ahead.
20    BY THE WITNESS:
21         A.   That was actually what I was going to say. It
22    depends on the case, actually. You know, if I make a
23    small drug arrest, I would submit that to be tested
24    for -- to confirm that it was drugs. But in a larger

---

37 (Pages 136 to 139)

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

| Page 140 |
| --- |

1  case like this, the decision to have DNA tests and
2  fingerprints and all that I would assume would fall on
3  the detectives or Major Crimes.
4       Q.  You're saying you assume it would fall on
5  detectives with the Round Lake Beach Police Department or
6  the Major Crimes Task Force investigators?
7       A.  I would assume it would fall on Major Crimes
8  detectives.  Sorry.
9       Q.  Did you ever request that it be tested for DNA
10 or fingerprints?
11      A.  I did not, but I did not have that authority
12 to do that.  Plus, I was out for -- with the injury for a
13 while after that.
14      Q.  It sounds like you did have the authority to
15 do it.  You said that you asked for things to be tested
16 before.  Are you saying that you don't have that
17 authority when somehow it's a bigger crime?
18      A.  Once --
19      MR. MATHUES:  Objection to foundation and to the
20 extent it mischaracterizes prior testimony.
21 BY THE WITNESS:
22      A.  What I'm saying is, when Major Crimes comes in
23 and takes over, I no longer -- and I'm involved in the
24 investigation, I no longer have the authority to make

| Page 141 |
| --- |

1  calls like that.
2       Q.  What's that based on?  Why do you believe that
3  to be true?
4       A.  Because they want an impartial party to rule
5  on everything.  They don't want us to be directly
6  involved with the investigation.  That way, if we ever
7  have any -- no one gets upset about the impartiality.
8       Q.  Do you believe the Lake County Major Crimes
9  Task Force to be an impartial law enforcement group?
10      A.  Yes.  And I also believe that's why the
11 officers from your home department or the host agency are
12 required to recuse themselves from the investigation as
13 well.  So any officers from our department that are
14 involved in Major Crimes are no longer allowed to be a
15 part of the investigation.  Just, again, another layer of
16 impartiality there.
17      Q.  Fair to say at some point you found out Abel
18 Rosiles passed?
19      A.  Yes.
20      Q.  How long after this incident did you find that
21 out?
22      A.  I believe it was like five days to a week,
23 something like that.
24      Q.  How did you find out?

| Page 142 |
| --- |

1       A.  I can't remember specifically at this point.
2  I'm sure someone from the police department notified me.
3       Q.  Do you recall having any reaction to it?
4       A.  Yeah.
5       Q.  What do you recall?
6       A.  I was sad.  You know, I felt empathy for his
7  parents.  I have sons myself, and it's upsetting, you
8  know.
9       Q.  Do you recall watching a coroner's inquest
10 regarding Mr. Rosiles?
11      A.  I don't think I watched it.  We met at the
12 police department in case we needed to be questioned for
13 the inquest, but I don't believe they ever ended up
14 talking to us.
15      Q.  It's my understanding, at least from somebody
16 else, that it was on Zoom; somebody had it on a computer
17 on Zoom at the police station.  I guess my question is,
18 do you recall watching and listening to some of the
19 testimony on Zoom?
20      A.  No, I didn't see any of it.  We were in a room
21 with attorneys separate from the police department, and
22 so it was just, I believe, the four officers in there:
23 Cramer, Scheithe, Bertholomew, and myself, and then a
24 couple of attorneys.  And we just waited in case they

| Page 143 |
| --- |

1  needed us for the inquest.
2       Q.  What attorneys were with you?
3       A.  I believe Laura Scarry, and then I can't
4  remember if it was Chuck or David.  Someone from this
5  firm was there.
6       Q.  Have you ever spoken to anybody from the
7  State's Attorney's Office or a representative from the
8  State's Attorney's Office regarding this incident?
9       A.  No.
10      Q.  Are you aware of -- Strike that.
11          Are you aware, one way or the other, if the
12 State's Attorney's Office is conducting an investigation
13 into this matter?
14      A.  I would assume so.
15      Q.  Why would you assume so?
16      A.  Because anytime there's an incident like this,
17 that someone loses their life, and it's more of a
18 high-profile-type situation, they conduct their own
19 investigation as well.
20      Q.  By saying that, do you know if there's -- do
21 you know the status of any part of this investigation, if
22 there is an investigation?
23      A.  No, but I would love to know that, actually.
24 I've been trying to find that out for the past two years,

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

---

Page 144

1  actually. So it's kind of a point of frustration.
2  **Q. Have you been contacting Ms. Scarry or**
3  **somebody else regarding that?**
4  A. I haven't talked to Laura since last year.
5  She --
6  **Q. Don't talk to me about what you talked about**
7  **with her. Sorry.**
8  A. No, no.
9  **Q. I guess my question is, did you try to contact**
10 **an attorney regarding this investigation or status of it?**
11 A. Just the initial time when I spoke to her and,
12 you know, she said if anything pops up, she'll let me
13 know, and if I hear anything, to contact her; otherwise
14 to talk to David and Chuck and just go --
15 **Q. Okay. Okay. Have you ever heard the name**
16 **Dr. Baden, B-A-D-E-N?**
17 A. Just on the news, I believe.
18 **Q. Okay. Did you see or hear him speak?**
19 A. I think I saw he got up in front of a press
20 conference or something.
21 **Q. Okay. I'll represent to you that he wrote a**
22 **report, and I produced it to your counsel in the case.**
23 **Have you ever seen a report that he wrote regarding this**
24 **incident?**

---

Page 145

1  A. I don't believe so.
2  **Q. Okay. I'm just going to read to you one**
3  **sentence from the report and ask you a question about it.**
4  **Okay?**
5  A. Okay.
6  **Q. Dr. Baden wrote, It is my opinion to a**
7  **reasonable degree of medical certainty that the cause of**
8  **Mr. Rosiles's death was hypoxic brain damage caused by**
9  **interference with oxygen going to his brain by prone**
10 **pressure and a plastic bag containing white powder in his**
11 **throat.**
12 **And my question to you is, do you agree with**
13 **that opinion?**
14 MR. MATHUES: Objection to the extent that it calls
15 for expert medical testimony under Rule 702 and 703.
16 BY THE WITNESS:
17 A. Yeah, I'm not a doctor, so, you know, I can't
18 tell you specifics of that. I will say I don't believe
19 that any positional issues impacted him based on when I
20 spoke to Abel and when he popped up and I said, "Are you
21 choking?" and he nodded his head, and he was completely
22 coherent. If there was some sort of impact from him
23 being deprived air while he was in a different position,
24 I don't know how that would affect him once he's out of

---

Page 146

1  that position.
2  **Q. So by saying that, are you saying that you**
3  **don't believe that prone back pressure was a cause of his**
4  **death?**
5  A. No. But, again, I'm not a doctor, so ...
6  **Q. Did you ever e-mail somebody regarding this**
7  **incident, whether it be your work e-mail or your personal**
8  **e-mail, for that matter?**
9  A. I don't believe so. Maybe on my work e-mail
10 when I was still at the PD to ask about an inquest or
11 just about dates and information like that but never any
12 details of the case.
13 MR. MARX: If you just give me two, three minutes, I
14 want to look through my notes and see if there's anything
15 else, but I may be very close to being done. Okay?
16 THE WITNESS: Take your time.
17 (A short break was had.)
18 MR. MARX: That's all the questions I have. Your
19 attorney may have some, but I will leave that up to him.
20 MR. MATHUES: Heath, I have less than five
21 questions.
22 THE WITNESS: Okay.
23
24

---

Page 147

1  EXAMINATION
2  BY MR. MATHUES:
3  **Q. Did you actually have surgery on your thumb**
4  **for the injury you sustained in this incident?**
5  A. Yes.
6  **Q. How much time did you miss of work due to that**
7  **surgery?**
8  A. It was probably about five months.
9  **Q. Did you see with your own eyes any paramedics**
10 **remove the baggie from Mr. Rosiles' throat?**
11 A. No.
12 **Q. And if Major Crimes had wanted to test the**
13 **baggie or any other item from this incident or DNA or**
14 **anything else, would you have had an objection to that?**
15 A. Absolutely not.
16 MR. MATHUES: That's all I have.
17 MR. MARX: I don't have anything based on that.
18 I'm going to order it, David, so would you
19 like to read or waive?
20 MR. MATHUES: We'll reserve and read.
21 MR. MARX: For the record, counsel and I agreed on
22 this before, and I'm going to retain the cell phone video
23 as an exhibit, and I will forward you the remaining
24 exhibits.

---

39 (Pages 144 to 147)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 148

1          MR. MATHUES:  Also, just for purposes of the record,
2     Officer Scheithe was physically present in the room
3     during this deposition.  He stepped out once or twice to
4     use the bathroom, but the overwhelming majority of the
5     time he was here.  No one else was here.  And since
6     Mr. Marx is ordering a copy -- ordering a transcript, I
7     will take a copy, E-tran, regular time.
8               (Witness excused.)
9               (Deposition concluded at 12:20 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

```
                                                        Page 149

  1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
  2                         EASTERN DIVISION

  3
       FABIOLA ROSILES, as Independent    )
  4    Administrator of the Estate of     )
       ABEL ROSILES, JR., Deceased,       )
  5                                       )
                           Plaintiff,     )
  6                                       )
                  vs.                     )  No. 21 CV 3236
  7                                       )
       VILLAGE OF ROUND LAKE BEACH;       )
  8    J. SCHEITHE; J. BERTHOLOMEY;       )
       T. CRAMER; and H. ATWELL,          )
  9                                       )
                           Defendants.    )
 10

 11

                   I, HEATH ATWELL, state that I have read the
 12
       foregoing transcript of the testimony given by me via
 13
       videoconference at my deposition on August 18th, 2022,
 14
       and that said transcript constitutes a true and correct
 15
       record of the testimony given by me at said deposition
 16
       except as I have so indicated on the errata sheets
 17
       provided herein.
 18

 19                            _____
                                         HEATH ATWELL
 20
       No corrections (Please initial)_____
 21    Number of errata sheets submitted_____(pgs.)

 22    SUBSCRIBED AND SWORN to
       before me this _____ day
 23    of _____, 2022.

 24    _____
```

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 150

```
 1   UNITED STATES OF AMERICA        )
     NORTHERN DISTRICT OF ILLINOIS   )
 2   EASTERN DIVISION                )    SS.
     STATE OF ILLINOIS               )
 3   COUNTY OF COOK                  )

 4

 5              I, Tina M. Hickey, Certified Shorthand

 6   Reporter, do hereby certify that HEATH ATWELL was first

 7   duly sworn by me via videoconference to testify the whole

 8   truth and that the above deposition was reported

 9   stenographically by me and reduced to typewriting under

10   my personal direction.

11              I further certify that the said deposition was

12   taken via videoconference on the date and time specified

13   and that the taking of said deposition commenced on

14   August 18th, 2022, at 9:05 a.m.

15              The signature of the witness, HEATH ATWELL, was

16   reserved by agreement of counsel.

17              I further certify that I am not a relative or

18   employee or attorney or counsel of any of the parties,

19   nor a relative or employee of such attorney or counsel or

20   financially interested directly or indirectly in this

21   action.

22

23

24
```

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 151

1          Witness my official signature as a Certified

2     Shorthand Reporter in the State of Illinois, on

3     September 9th, 2022.

4

5

6

7

8

9

10                    _____
                      TINA M. HICKEY, CSR
11                    161 North Clark Street
                      Suite 3050
12                    Chicago, Illinois 60601
                      Phone:  312.361.8851
13
      CSR No. 084-003858
14

15

16

17

18

19

20

21

22

23

24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 152

| A | | | |
|---|---|---|---|
| **A-T-W-E-L-L** 4:13 | abrasions 125:11,14 | 49:2,3 50:17 56:23 | 131:10 |
| **a.m** 1:18 150:14 | **Absolutely** 27:11 89:3 147:15 | advisor 10:12 | allegedly 29:2 104:8 137:11 139:6 |
| abdominal 26:17 | academy 18:14 18:24 | affect 145:24 | allow 9:3 30:2 |
| **Abel** 1:4 38:13 58:19 63:2,9 63:14,18,21 64:16 65:3 68:11 72:12 73:16,22 74:9 74:14 75:3,16 76:16,18,23 77:1,6 81:22 83:19 84:1,8 84:18 85:8,16 87:16 88:23 89:5 90:20 91:2 93:12 94:9 95:20,23 100:9 101:17 103:8 114:5 115:22 116:1 121:4,19,22 122:2,5,6,17 124:18 141:17 145:20 149:4 | acceptable 32:2 35:5,8 | afternoon 48:21 55:14 | allowable 12:17 32:6 |
| | accidentally 52:20 | afternoons 13:3 48:2 | allowed 94:1 141:14 |
| | accurate 78:15 80:6,8 | age 104:3 | Alovsky 41:6 |
| | act 69:21 74:1,3 74:3,4,7 99:10 99:11 | agency 141:11 | ambulance 101:18,20,24 102:3 103:8,11 103:20 106:4 107:11 112:15 112:15,16,17 112:20 115:1,6 128:9 |
| | action 150:21 | aggressive 80:18 80:20,22 89:17 | |
| | actions 32:6 35:11 | aggressively 58:10 79:20 | |
| | activate 51:4 55:16 | ago 6:2 48:16 50:19 53:22 77:12 110:14 125:7 | |
| | activated 51:7 | | |
| | active 19:2 | | ambush 56:4 |
| | actual 77:22 110:16 | agree 22:22 25:1 25:22 27:8 32:19 33:11 35:21 98:18 99:6,9,16 121:18 124:18 126:8 145:12 | AMERICA 150:1 |
| | added 12:14 129:11 | | amount 12:17 65:6 74:18 93:18 97:8 123:16 131:13 137:11 |
| | additional 5:4 | agreed 42:22 147:21 | |
| **Abel's** 43:10 87:13,20 90:8 120:22 123:8 124:3,8 135:12 137:12 | address 5:7,7 72:12 | agreement 150:16 | amped 75:24 |
| | addressing 73:14 | ahead 36:1 46:13 55:6 99:13 139:19 | anatomy 26:9 105:7 |
| | administrativ... 54:14 | | angles 96:4 |
| abilities 136:7 | Administrator 1:4 149:4 | aid 19:4,13 21:24 26:8 | answer 90:19 |
| ability 25:19 26:4 | adrenaline 114:3 | air 25:5,7 47:20 69:10,12,23 145:23 | answered 6:2 109:16 110:24 |
| able 5:10 25:4 26:7 32:1 56:5 81:12 88:6 90:24 99:11 109:23 120:13 137:18,20 | adult 25:23,23 69:22 74:3,4 | alarm 11:23 51:22,23,24 52:1,4,9,12,14 52:24 53:5,10 53:10 54:16 | answers 5:10,19 6:3 |
| | adult's 26:6 | | anticipate 35:2 |
| | advise 45:15,18 51:21 | | Antoine 38:22 39:16 62:22 |
| abrasion 126:5 126:9,14 | advised 48:5,7 48:10,14,23 | alarms 52:22 | anybody 20:18 38:19 42:24 48:5 53:17 89:1,13 109:10 143:6 |
| | | alcohol 96:14 | |
| | | alleged 15:13 | anytime 98:23 143:16 |

| | | | |
|---|---|---|---|
| apart 41:24 | | | |
| apartments 111:24 | | | |
| apologize 22:13 85:2,13 | | | |
| appear 59:7,12 74:14 94:17 95:20 121:22 | | | |
| **APPEARAN...** 2:1 | | | |
| appeared 72:8 72:10 74:12 75:9,20 76:11 76:13 91:7 119:13 123:7 | | | |
| appears 6:16 87:20 127:6,8 | | | |
| applies 25:23 | | | |
| apply 38:21 46:4 46:6 | | | |
| applying 10:21 | | | |
| appreciate 99:4 111:15 131:7 | | | |
| apprehend 28:21 | | | |
| approach 56:10 80:22 | | | |
| approached 75:4 | | | |
| approaching 63:9 | | | |
| appropriate 100:4 | | | |
| approximated 133:20 | | | |
| approximately 6:7 12:15 29:11 | | | |
| area 11:24 26:17 31:14 38:8 68:22 69:3,14 69:20 70:21 71:5,11,23 72:1,3,4,18,23 73:5,11 75:4 | | | |

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

76:24 77:2
78:24 85:4
**areas** 125:8
**arguing** 59:8,10
**arm** 31:23 81:11
84:12 117:3,4
117:7
**armbar** 28:5,11
31:21,23 81:12
**arms** 37:17
65:10 66:5,9
67:24 81:14
**arrest** 17:14
27:17 43:9,10
60:15,15,18,21
61:4 82:1
101:2 115:2
139:23
**arrested** 15:18
15:18,19 37:3
39:6 48:8 66:7
**arresting** 66:1
**arrive** 96:18
100:13
**arrived** 15:15
47:19 95:19
96:20 97:2,11
100:11 101:23
**arriving** 57:5
**art** 60:19
**asked** 16:2,2,2,5
91:6,14 93:6
108:2 109:16
110:24 116:6
120:21 140:15
**asking** 118:18
120:6 123:22
**aspect** 90:5
**asphyxia** 20:9
24:18 26:2
27:2
**asphyxiation**
19:19 20:5
22:17,20,23
23:9 33:13

**assess** 56:6
57:15
**assessed** 100:2
**assessing** 88:20
**assign** 129:20
**assigned** 54:2
**assist** 64:22,23
76:22 77:17
78:11
**assistance** 82:10
**assisted** 65:1
**Associate-** 11:23
**assume** 22:6
32:22,23 54:7
68:15 84:11
87:4 91:21
92:11 115:6,18
115:23 120:14
127:12,19
129:8 132:19
135:24 140:2,4
140:7 143:14
143:15
**assumed** 114:7
**Assuming**
126:14 127:10
**ate** 138:18
**attempted** 69:16
**attempting** 68:2
68:3
**attention** 24:5
77:3 79:22
124:10
**attorney** 4:22
7:10,10,14,19
7:22 41:15
42:2,5,6,7,12
43:1 130:17
144:10 146:19
150:18,19
**Attorney's**
143:7,8,12
**attorneys**
142:21,24
143:2

**Atwell** 1:8,12
3:3,8 4:3,13,14
5:9 126:2
132:11,22
149:8,11,19
150:6,15
**audio** 43:4 45:9
120:3,5
**August** 1:18
149:13 150:14
**authority**
140:11,14,17
140:24
**autopsy** 127:2,3
**auxiliary** 10:8
11:1
**available** 42:15
**aware** 15:3,10
20:13 23:1
31:2 40:17
48:13 51:12,19
55:10 103:7
120:8 143:10
143:11

—————————
**B**
—————————
**B** 3:7
**B-A-D-E-N**
144:16
**baby** 25:11,12
25:14 26:4
**back** 5:6 8:21
11:4 16:1
25:15,20 28:16
30:6,10 32:3,4
32:9,10 35:9
35:16,23 37:5
37:19 38:3
43:22,24 49:19
54:16 58:11
65:13 66:10,11
69:15 72:13,13
72:16 76:3,17
76:21 77:6
78:9 81:4

82:19,19,20,22
103:23,23
112:18,20
114:21 115:17
117:10,23
123:8,13,19
124:1,3 129:8
137:22 146:3
**backing** 106:21
**backtrack** 73:10
**backup** 10:14
**bad** 79:21
**Baden** 144:16
145:6
**badge** 15:17
47:8
**bag** 103:16
104:24,24
105:5 107:20
108:2,5,10,13
108:14,15
109:8,15,21
110:12,20,23
111:8 128:8,20
128:21 136:12
137:16,24
138:21,21
139:2 145:10
**baggie** 104:13
105:12 107:9
128:21,23
129:4 130:4,7
135:2 136:16
139:5 147:10
147:13
**bags** 108:6,7,7
**ball** 80:17
131:14,18
**balled** 80:21
**balling** 79:21
**band** 30:14
**Barr** 43:19 48:7
48:18 53:20
100:13,19
101:5,6 102:5

104:14 107:17
107:23 108:2
108:18,21
109:7,11,20
112:1,18
129:22,23
135:24
**base** 37:12,13,15
**based** 24:22
34:1 40:15
48:15 71:19
79:3,6,9 92:8
94:14 120:14
125:12 131:15
135:19 141:2
145:19 147:17
**basement** 129:7
134:16
**basic** 19:4 26:9
28:1
**basically** 11:5
11:18 27:22
41:21 43:21
51:9 52:11
59:18 60:5
65:9 69:24
80:21 81:12
108:7 113:16
133:5
**basics** 26:11
**Bates-stamped**
126:21
**bathroom** 148:4
**batter** 81:24
82:2
**battery** 82:5
**Beach** 1:7 8:11
10:2 11:17
12:9 13:16
14:10,11 19:7
21:22 30:23
41:11 106:1
140:5 149:7
**beat** 14:1
**beats** 13:23

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 154

bed 24:4,7
began 50:17
  51:10 63:6
  81:7,23 85:11
  85:12 93:10
beginning 54:1
behalf 2:6,11
behavior 74:6
belief 33:1
believe 12:17
  13:3,13 17:3,9
  19:5 21:8
  23:15,16 25:21
  26:17 31:8,12
  32:24 34:13,17
  38:1,7,23 39:7
  40:23 43:3,10
  46:2,21 48:7
  49:14 53:13,24
  55:2,6,7,8 59:1
  61:19,22 63:4
  63:23 64:18
  67:6 70:5,11
  71:6 75:13,17
  75:17 76:15
  79:3,15 83:11
  83:23 84:3,10
  84:20 90:2,19
  91:2,21 92:4,8
  93:7,14,15
  94:12,13,20
  95:1,6,9 96:8
  96:11 97:15,18
  98:17 102:20
  102:22 103:16
  103:22 104:1
  104:14 105:7
  105:16,19
  107:17 108:1,4
  110:8 113:13
  113:14,21
  117:5,9 118:14
  118:19 119:2
  119:20 120:21
  122:24 128:14

130:9,10 132:3
133:6 137:4,17
141:2,8,10,22
142:13,22
143:3 144:17
145:1,18 146:3
146:9
believed 20:19
  95:11 100:1
believes 133:19
belongings
  15:23
belt 47:9 93:3
BERSANI 2:7
Bertholomey
  1:8 8:7 44:6,15
  50:3,9 55:11
  55:13 59:2
  60:4,11 67:3
  81:11 82:10,14
  85:23 95:6
  121:15 142:23
  149:8
Bertholomey's
  62:24 63:12
best 17:18 38:15
  38:18 39:5,8
  40:7 53:8 55:4
  67:23 81:9
  105:24 106:24
  106:24 110:15
  125:3 131:24
  136:6
better 9:5 56:12
big 12:16 16:8
  28:6 102:9
  105:7 137:17
  138:22
bigger 118:21
  138:14 140:17
bit 24:5 35:3
  47:1 49:18
  53:4 63:14
  65:15 81:10
  91:17,18

100:16 118:21
black 122:6,10
  122:13,14
blanche 34:9
blend 104:6
blue 20:16 47:6
  47:7
body 26:13 30:6
  45:12 66:21
  67:5 70:10,15
  70:16,19,22
  71:4 79:10,11
body-worn-ca...
  98:4
bodycam 6:12
  6:24
boisterous 101:8
bone 113:17
  114:21
bones 114:14
booking 15:19
boot 104:12,15
  105:1,12 107:9
  128:17,20
  135:1,1
boots 47:9
born 49:22
boss 108:19
bottles 8:22
Boulevard 2:3
brace 30:2
braced 123:18
brain 127:18
  145:8,9
break 21:11,12
  21:14,15 29:8
  62:11,12,15
  63:14 66:21
  146:17
breaking 63:18
breaks 52:2
breath 74:19
breathe 20:2
  23:5 24:23
  26:7,19,22

32:20 33:8
37:22 38:5
breathing 20:11
  25:9 26:1
bricks 8:22
briefly 24:1
brisk 98:2
briskly 97:21,22
  98:1
broke 63:21
  81:6 113:3
broken 114:14
brought 71:23
  104:14 107:17
  107:19
Brubaker 40:2,2
  101:3 113:15
bruising 117:6
building 52:2
  56:22 57:15,17
  57:24 59:19,23
  63:6 137:4
burglar 52:1
business 6:15
businesses 14:15
busy 14:8 67:11
butt 69:10,12,23
  70:4,8
button 52:18

─────────
C
─────────
calf 121:24
call 5:18 15:18
  32:5 51:21
  54:15 55:15
  57:4,5 81:13
  83:9 97:5
  98:23 102:12
  102:18 105:3
  111:22 113:10
  129:24
called 1:13 4:4
  13:15 16:4
  24:17 27:19
  44:20 46:17

51:20 52:14
83:7 85:3,14
96:23 97:1
102:9,15
106:16 112:14
112:15,16
136:21
Callese 137:4
calling 10:19
  86:6 112:3
calls 14:5,9,12
  14:21,22 97:13
  97:15 104:6
  141:1 145:14
camera 51:2,4
cameras 45:12
capacity 15:4,8
  18:9 22:18
captures 110:17
car 15:14,23
  54:20 57:13
  59:17 60:11
  62:19,24 63:12
  63:21 64:1
  67:12 72:18
  73:3,7 78:19
  78:20 101:11
  101:13,15
  137:21
cardiopulmon...
  23:16
care 54:11 100:8
  100:8
career 19:6
  49:20 137:7
cargo 93:1
carried 93:2
carrier 47:8
carry 92:19
carrying 47:11
  68:6
cars 14:7 55:3
carte 34:9
case 18:10 32:22
  54:15,18,19

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 155

96:15 127:3
132:14 139:18
139:22 140:1
142:12,24
144:22 146:12
cast 114:12
117:3,11,14,20
117:23,24
catastrophic
30:9
catastrophically
93:20
catch 22:13
categories 66:1
caught 65:18
cause 16:13 20:1
56:2 145:7
146:3
caused 69:10
127:15 145:8
causes 52:17
causing 26:5
70:3 95:13
101:8,11
cell 6:7 48:9
102:14,18
118:6 119:16
119:19 147:22
center 54:6
certain 83:10
95:13 101:1
108:17
certainty 145:7
certification
11:11
certified 1:17
134:21 137:3
150:5 151:1
certify 150:6,11
150:17
chain 110:12
change 5:2,6
53:13,21
changed 12:11
13:4

changes 47:22
charge 11:20
12:1,2,12 13:6
13:24 14:7
49:11,13 54:11
102:7 103:4
Charger 50:21
chased 67:2
chasing 97:16
check 106:10
112:1 127:18
checked 82:16
chest 23:4,5
31:17,19 33:7
65:11 67:6,7,8
chew 90:12,17
90:18
chewing 89:13
89:24
Chicago 2:4
151:12
chief 12:13,13
17:9 102:8,10
102:10 112:3
130:14,23
child 25:11
childish 74:6
choke 23:3
choking 20:19
20:22 22:18
85:6,10,14,18
86:5,16,23
87:3 88:15
89:17 90:20
91:1,6,8,13,23
92:12 93:6
95:12,12 98:6
99:7 100:1,5
145:21
Chuck 143:4
144:14
circulate 40:19
circumstances
27:10 30:7
32:5 34:2

35:10 103:1
135:20
Civil 1:15
clarify 5:4 46:18
61:6
clarifying 22:3
41:17
Clark 151:11
classes 26:8,9
cleaners 9:16
clear 74:4 79:21
122:12
clearly 121:23
clerk 38:23
39:19 51:24
52:17 58:10,10
58:13 60:5
clerks 38:24
client 6:16 40:5
57:23 59:4,12
59:23 60:13,15
61:3,17,21
62:4,8 86:13
125:15 127:11
client's 115:2
125:9 126:3
127:7 139:7
clip 123:7,14
124:8
close 64:12 73:6
75:19,22 76:2
78:19 96:17
115:7 146:15
closed 96:2
110:11
closer 71:24
72:4,10,11
closest 83:16
closing 80:24
81:5
cloth 106:21
clouded 90:7
CNC 9:14
coached 11:6
cocaine 128:9,15

131:10,13
132:3 137:11
137:15
cognitive 25:19
26:4
coherent 145:22
collected 132:22
132:24 133:5,7
136:24
college 10:12
color 104:20
128:14 132:4
come 42:16
49:18 59:20
67:12 85:3
87:6 95:2 98:5
112:5 115:15
138:16
comes 77:2
79:19 140:22
coming 50:14
79:21 86:9
138:21
command 12:3
12:20
commander
12:6,13 43:19
48:7,17 53:20
100:13,19
101:5,6 102:5
103:5 104:14
107:17,23
108:2,18
111:24 112:18
135:24
commenced
150:13
common 138:7
commonly
27:16
commonplace
53:2
comparable
138:11
complaints 15:3

complete 5:10
completely
145:21
compliant 91:24
compressions
24:8
computer
142:16
concept 25:22
concern 61:8
concerned 91:11
103:9 114:19
116:4
concluded 148:9
concrete 65:5,13
Condell 115:21
115:23
condition
127:17
CONDON 2:7
conduct 143:18
conducting
45:16 143:12
conference
42:19 130:13
144:20
confessed 16:11
confirm 109:24
139:24
confronted 34:2
confused 42:4
connotations
74:5,8
consciousness
95:21
considering
44:22
constantly 52:24
constitutes
149:14
contact 38:16,23
39:2 75:13
82:4 113:21
123:16 144:9
144:13

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 156

contacted 41:16
contacting
144:2
containing
145:10
context 52:23
continued 16:10
69:7,7 114:17
continuing 19:7
59:20
contract 26:18
Contreras 40:12
40:14
contribute 42:3
113:6
contributed
113:22,23
control 35:20,22
35:22 37:4,8
37:10,16 65:10
67:1,24 72:12
83:6 84:6
136:1
controlled 31:21
31:24 131:21
controlling
31:22
conversation
39:3 41:10
43:24
convey 91:8
conveyed 105:8
convicted 18:12
COOK 150:3
cool 30:22
coolants 9:16
cop 9:5 10:15
copy 15:24
148:6,7
coroner's 142:9
correct 5:2 8:13
8:14,15,16
13:9 21:20
27:6 33:23,24
34:3,5,19,21

41:3,10 42:10
43:12,13 44:9
50:11,21,23
51:1 52:21
58:20,21 60:22
60:24 68:21
70:23 71:15
77:3 82:8
85:13 89:5
96:23 107:14
109:9 110:20
110:21,23
111:2 121:16
121:17 122:7
122:15 132:15
132:22 133:4
133:10,14,17
134:8,9 149:14
corrections
149:20
correctly 128:13
counsel 125:8
144:22 147:21
150:16,18,19
countless 23:6
County 10:8
41:1 45:8,15
45:23 141:8
150:3
couple 13:8
38:11 48:16
56:10 60:4
76:9 114:15
116:12 119:1
120:1,1 124:21
125:7,19
132:21 134:20
142:24
course 7:3 28:4
90:5 99:5
127:10
court 1:1 15:22
22:11 48:19
149:1
Courts 1:15

cover 104:12,16
105:1,12 107:9
covered 25:17
26:7 41:23
covering 62:5
107:6
COVID 47:12
47:21
CPR 21:24
23:13,14,17
24:8
Cramer 1:8 4:19
4:20 8:7 30:11
44:5,15 46:23
49:14,16,18,22
50:9 54:8
55:10,12 59:1
63:4 66:23
70:6 73:19
78:13 82:24
83:18 84:4
85:5 87:4 95:7
120:15,17
121:19,21
124:8,11,13
126:2 132:14
132:18 133:10
133:12,18
134:1,14
142:23 149:8
Cramer's 73:3
134:5
crammed 47:23
crash 15:14 16:6
crashed 15:16
crazy 90:14
credibility 39:15
39:15
crime 18:12
39:9 55:23
140:17
crimes 5:17,22
14:16 41:1
44:2 45:8
48:16 90:4

140:3,6,7,22
141:8,14
147:12
criminal 19:2
45:16
cruiser 71:24
72:5
crying 76:11
CSR 151:10,13
cuffed 61:20
cuffs 32:18 37:4
59:19 81:16,19
82:13 96:2,5
curb 79:7,14
cursing 75:8
79:20 80:1
custody 6:17
28:20 29:4
57:21
cut 34:22 60:5
107:4,6,8
CV 1:6 149:6

**D**

D 3:1
D-E-W-E-L-D...
48:20
D-U-R-A-M-...
10:1
dab 132:2
damage 145:8
danger 78:6,7
dangerous
36:12
date 15:22 18:22
38:16 42:17
50:9 133:15
136:23,24
150:12
dates 146:11
David 2:7
130:18 143:4
144:14 147:18
day 10:12 13:13
41:2,19 43:11

43:12 46:9,15
46:20 47:2
49:16,19 50:17
50:22 51:5
52:24 149:22
days 13:2 18:4
22:4 114:15
141:22
dead 24:6
deadly 27:12
deal 31:16 93:21
126:16
dealing 72:17
76:18 81:6
85:20 86:2,4
death 145:8
146:4
Deceased 1:4
149:4
decent 74:18
decide 136:1
decided 135:23
decision 9:5
56:7 139:14
140:1
deep 105:5,5
Defendants 1:9
2:11 149:9
defense 27:17
41:20
definitely 74:21
76:13
definition 19:21
definitively 33:5
degree 10:14,15
10:16,18,23
145:7
demeanor 75:24
department
8:12 9:21
11:17 12:16
15:23 16:4,11
16:18,20,24
17:16 28:1
30:23 36:14

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 157

41:11,21 42:3
43:23 55:19,21
105:20 129:8
134:17 140:5
141:11,13
142:2,12,21
**departments**
46:4
**dependent**
35:11
**depending** 27:9
**depends** 28:7,8
32:6 135:6
139:22
**depicted** 117:2
121:8 128:7
**deponents** 12:7
**deposed** 99:6
**deposition** 1:12
3:8 4:15,18,23
5:1,2,5,13 7:6
7:11,15 148:3
148:9 149:13
149:15 150:8
150:11,13
**depositions** 1:16
**deprived** 145:23
**deputy** 12:13
102:8,9 112:3
**describe** 24:1
29:22 47:4,10
65:23 78:24
106:18 112:23
131:13 134:13
**described** 30:13
35:14 84:2
86:14
**description**
11:18 104:3
105:17
**detail** 60:8 87:24
**details** 53:19
63:24 72:6
79:5 111:9
146:12

**detain** 61:10,12
**detained** 33:11
45:20 60:23
61:4,7 89:18
**detective** 46:2
**detectives**
119:20 140:3,5
140:8
**DeWelde** 48:17
48:19
**dexterity** 106:24
**diaphragm**
26:12,24 37:20
**dictated** 35:10
**dictionary** 19:21
**different** 5:4
11:4 12:11
13:4,23 22:5
26:3 50:7
61:16 71:21
74:5,8 90:4
100:19 108:6
110:5 145:23
**differently**
86:19
**difficult** 8:19
11:4 33:2
37:21 38:4
120:6 122:14
**difficulty** 59:5,6
74:15,15
**diligent** 67:13
**dipped** 96:1
**direction** 66:13
90:11 150:10
**directions** 110:6
**directly** 114:22
141:5 150:20
**discern** 122:14
**discipline** 15:7
17:20
**discoloration**
125:9 126:3
**discretion** 34:4
34:7 135:10,16

**discussed** 19:20
37:24
**discussing** 28:24
**discussion** 131:7
**dislodged** 95:10
**dispatch** 14:4
53:9 54:5,6
**dispatcher**
52:11
**distance** 72:16
76:1,2,4 80:24
81:6 88:8
**distant** 62:2
**distress** 91:7
95:14
**distressed** 91:10
**district** 1:1,1,15
11:5 149:1,1
150:1
**divided** 13:18
**DIVISION** 1:2
149:2 150:2
**dmathues@hc...**
2:10
**DNA** 139:3,11
139:15 140:1,9
147:13
**doctor** 145:17
146:5
**doctor's** 104:17
**doctors** 116:5
**document**
116:15,18
132:7,11 133:3
133:23 134:3
134:23 136:15
136:20
**Dodge** 50:21
**doing** 9:19 11:11
37:6 39:2,12
57:12 69:7
80:5 81:22
84:4,5 86:5
87:22 89:7,9
89:12 92:3

93:19,24 94:11
94:18,22,24
95:1 99:21,24
101:11 102:1,5
109:4 115:9
116:2 124:14
**domestics** 14:18
**door** 52:3 56:17
103:15,23
106:5 137:5
**doors** 103:23
**double** 81:12
103:23
**doubt** 90:16
**Dr** 144:16 145:6
**drag** 67:22
**dragged** 67:15
67:21
**draw** 124:10
**drawn** 77:3
79:22
**dressings** 47:17
**drive** 56:21
**driver** 15:16
**driving** 27:23
50:21
**drop-down**
133:6
**drug** 23:24 24:3
139:23
**drugs** 96:14,16
138:19 139:24
**drunk** 15:16
**due** 43:21 147:6
**duly** 4:4 150:7
**DuraMet** 9:23
9:24
**duties** 11:18
**duty** 16:1,2,5,12
18:7 47:9,9
**duty-weapon**
16:21

---
**E**
---
**E** 3:1,7

**e-mail** 2:5,10
146:6,7,8,9
**e-mailed** 7:23
**E-tran** 148:7
**earlier** 28:8
**early** 18:20 54:7
**easily** 28:11
**east** 13:20,21
14:7,17,20
**EASTERN** 1:2
149:2 150:2
**eat** 138:8 139:9
**eaten** 138:20
**eating** 20:21
**ed** 11:11
**education** 10:17
10:18,23 11:12
**effect** 73:24
74:10 89:24
101:2
**effort** 24:9
**efforts** 94:17
**either** 15:11
46:2 48:17
77:6 85:5 87:4
97:16 129:23
**elaborate** 133:8
**element** 56:11
**emergency**
27:20
**empathy** 142:6
**employee**
150:18,19
**employer** 9:22
**en** 54:9,10
**encountered**
20:18
**ended** 16:14
78:23 142:13
**enforcement**
10:3,19 15:4,8
18:3,10 137:7
141:9
**entire** 70:18
84:22 117:6

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 158

124:19
**environment**
31:21,24
**equipment**
47:10
**errata** 149:16,21
**errors** 5:22 6:3
**escalating** 59:15
**escalation** 28:9
**escorted** 59:13
**escorting** 63:2
**especially** 97:7
**essence** 99:7,8
**Estate** 1:4 149:4
**estimate** 86:21
94:3
**evaluated** 98:24
99:22 100:15
**event** 41:22 89:1
120:5
**events** 110:12
**eventually** 77:15
82:7 115:15
**evidence** 46:3
106:12 107:20
107:21 108:2,5
108:8 109:8,21
110:20,23
128:20,21
129:5,7,11,12
129:14,17,21
130:1,1 134:16
134:21,22
135:2,10,13,23
136:2,17,19,22
137:1,6 138:8
139:13
**evidentiary**
135:4,8
**evolving** 79:4
85:20
**exact** 19:21 37:1
104:11 133:22
**exactly** 8:8
26:21 52:19

56:18 64:13
83:2 87:7
93:23 100:14
100:17 111:11
112:14 113:3
123:19 137:23
**examination**
1:13 3:4,5 4:7
147:1
**examined** 4:5
**example** 22:7
23:3 24:24
25:1,10 32:8
32:21 35:13
49:2 94:4
104:3 132:21
**exchange** 49:7
**excused** 148:8
**exhausted** 51:16
**exhibit** 3:8,16
116:20 118:2,6
118:7 125:2,21
126:21 127:20
127:24 132:10
147:23
**exhibits** 116:12
147:24
**exist** 130:19
**existed** 119:8
**existing** 30:22
**expand** 26:18
**expect** 135:15
135:18
**expectation**
129:3
**expedite** 8:9
**expelled** 21:7
**experience** 10:4
14:13 29:15
92:9
**expert** 145:15
**expressing**
74:16
**extended** 33:12
**extent** 140:20

145:14
**extreme** 30:7
**extremely** 66:8
70:20 97:7
**eye** 86:6
**eyes** 91:11 96:2
147:9

---

# F

**F** 72:14 76:9
**Fabiola** 1:3 40:5
149:3
**face** 25:3,11
26:6 36:8,23
62:4,5,9 91:5
91:10 120:18
125:9 126:3
**faced** 27:10
**facedown** 25:2
**facing** 90:10
**fact** 99:7 113:7
**factors** 8:18
33:6
**fade** 50:20
**faint** 120:3
**fair** 12:23 27:13
30:23 39:18,21
44:4 50:8
51:10 57:9,11
60:21 62:23
69:19 75:3
78:18,22 79:9
79:13 80:9,12
80:14 84:1
88:22 93:8
100:7,22 122:9
122:11,17
127:24 141:17
**fairly** 108:17
111:16
**fall** 140:2,4,7
**falling** 30:3
**familiar** 14:10
**family** 8:20 9:6
40:8,9

**far** 47:14 48:20
50:6 54:14
56:20 62:2
63:17 64:5,6
68:22 74:22
84:5 133:10
**fashion** 30:15
**fast** 99:16,17
**faster** 97:17
98:8,9,9,19
99:1
**father-in-law**
44:21 45:1
**favor** 56:12
**FBI** 10:9
**Federal** 1:14
**feel** 45:13 92:1
**feet** 66:9 67:14
68:1,3,4 69:1,5
69:13 73:2
81:14 104:21
**felt** 16:20 142:6
**female** 63:9,11
72:8 73:14
75:4 77:2
79:18,19 84:21
86:1 105:22
138:9
**females** 105:20
**field** 128:10
**fight** 29:6 36:9
66:2,3,3 68:3
**fighting** 28:12
29:23 32:11
35:15 37:3
65:14,16 73:20
78:4,6 81:8
92:2
**fights** 14:18
**figured** 113:2
**fill** 62:22 100:16
**filled** 132:18
133:9
**final** 44:24
**finally** 16:11

**financially**
150:20
**find** 141:20,24
143:24
**finding** 11:3
**fine** 76:4
**finger** 92:5
**fingerprints**
139:3,12,16
140:2,10
**fingertips** 107:5
**finish** 138:16
**finishing** 48:6
**fire** 96:23
105:20 106:1
**firearms** 11:21
**firefighters**
97:20
**firm** 143:5
**first** 4:4 12:9
19:4,13 21:24
25:18 26:8
40:17 44:14
46:17 47:18
49:21 51:12,17
54:15 55:15
57:9,10,12,24
58:7 59:16
63:17 64:24
83:15 91:22
92:11 119:3
150:6
**fist** 80:17
**fists** 79:21 80:21
**fit** 106:23
**five** 13:3 33:18
121:7 141:22
146:20 147:8
**five-minute**
62:12
**flashlight** 92:17
92:19
**flat** 31:8
**flatten** 70:1
**flattened** 70:5,9

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 159

70:24 71:2,9
71:14 72:7
**fleeing** 112:6
**Floyd** 70:13
**Fluid** 9:23
**fluids** 9:11,15
**focus** 46:8 81:21
**focused** 88:16
88:18,20 89:15
109:4
**follow** 114:14
130:17,22
**follow-ups** 15:2
**follows** 4:6
**foot** 56:11 65:10
128:17 135:1
**FOP** 41:13,15
41:24 42:1,2,5
42:5,7,9
**force** 5:17,22
22:7 27:5,9,12
27:13 31:10
32:3,17 33:22
34:12 35:6,8
41:1 45:9,23
65:7 80:5
140:6 141:9
**forceps** 105:3
**foregoing**
149:12
**forehead** 127:7
**foreign** 74:23
**forget** 119:13
**forgot** 61:15
88:1 102:15
115:18 117:17
**form** 15:7 60:9
60:12 62:22
63:13 99:12
**formal** 60:10
**former** 130:23
**forming** 9:14
**forward** 70:1,1
70:4,8 147:23
**fought** 29:15

81:10
**found** 18:6
141:17
**foundation**
35:24 99:12
137:13 139:17
140:19
**four** 12:24 13:2
44:15 78:16
83:4 142:22
**fracture** 113:10
**frail** 30:8,9
**frame** 13:17
71:17 120:13
**fraud** 14:16
**free** 14:6 29:8
45:21 63:14,18
66:21
**freed** 94:1
**freely** 113:18
**friends** 50:12,13
**front** 30:6,8
56:17 65:10
77:24 95:23
144:19
**frustrated** 101:7
101:12
**frustration**
144:1
**FTO** 50:5
**fuck** 80:1,5
**full** 4:11 11:9
107:8 112:6
118:8,10,12,13
**fully** 50:24
107:6
**fun** 117:12
**function** 127:18
**fund** 41:20
**further** 19:13
26:20 53:9
60:23 61:5
105:17 150:11
150:17
**fuzzy** 116:10

**G**

**G** 2:7
**gain** 37:8 78:9
**gained** 45:14
**garbled** 74:24
122:4
**gas** 54:17
**general** 32:19
129:15
**generally** 8:3
14:3,19 27:21
29:23 31:13
35:21 55:2
56:9 91:22
92:19,22,23
97:21 107:21
108:20 115:24
129:23 136:3
**gentle** 65:6
**George** 70:13
**getting** 8:19
10:14 25:16
67:14 68:1
72:10 75:24
83:4 98:11
100:17 103:13
110:11 116:8
117:12
**giant** 30:13,14
**girlfriend** 75:16
79:19
**girlfriend's**
82:18 119:13
**gist** 19:22
**give** 5:10 10:20
19:20 20:22
25:4 32:8
35:13 53:9
71:17 86:21
94:3 104:2
146:13
**given** 4:14 12:24
16:1 33:19
149:12,15

**giving** 24:8
117:9,24
**Glock** 47:14
**glove** 106:10
122:10,13
**gloves** 106:6,8
106:11,13,15
106:17,21
107:1,4,4,5,6,8
107:14
**go** 4:24 5:6 9:13
16:10 33:6
36:1 44:24
46:12 47:14
48:4 54:13,14
56:13 58:4
60:9 65:11
74:8 77:16,24
98:8,9 99:13
110:2 112:1,7
113:4 114:22
114:24 115:20
118:8,10 129:8
136:2 138:16
139:19 144:14
**goal** 32:13 78:5
**goes** 32:15 52:24
87:18,19
104:17
**going** 4:24 14:15
14:24 34:15,18
35:3 37:17,18
38:10 44:21,24
45:1 47:21
48:3 49:7,10
52:12 54:18
55:12,22 57:5
59:20 60:6,7,9
61:10 62:24
64:9,10,11
67:12 68:4
70:18 72:11
76:17,21 77:9
82:21,21 83:2
83:5 85:11

86:11 89:18
91:5,12 96:10
99:22 100:15
112:10 113:4
114:4 116:7,12
119:24 120:6
126:18,20
127:20 129:3
132:3 138:21
139:21 145:2,9
147:18,22
**golf** 131:14,18
**Gomez** 39:23
75:11
**gonna** 16:9
37:16 43:16
44:24 114:18
114:21
**good** 4:9 24:9
35:4 56:6
59:20 62:14
82:14 83:20
99:2 118:22
**gotta** 34:9,10
64:21 98:9
**gotten** 12:5
117:10
**grab** 37:11 81:7
102:22
**grabbed** 81:23
**graduated** 10:17
**grainier** 126:6
**grainy** 120:14
**grams** 134:8
**grand** 87:24
**grandfather**
10:8
**grasp** 65:19
**grass** 67:13,15
67:21 68:1,7
70:21 71:11
73:5 79:1,8,11
126:18
**grassy** 68:22
69:3,14,20

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

71:5,23 72:1,3
72:18,23 73:11
75:4 76:24
77:1
**great** 93:21
126:16
**grip** 66:21 84:11
84:12
**ground** 25:2,3
25:17 27:22
28:3,7,11,13
28:15 29:19,22
29:24 36:10
65:2,2,3 66:22
67:4,5,16
69:20 72:22
73:4,11,17
75:4 76:19,20
76:23 77:1,7
77:11,15 78:2
78:8,10,18,21
79:16 82:7
85:16,22 86:22
90:21 121:4,16
125:18
**group** 141:9
**guess** 13:23
17:24 18:2
42:4 57:22
71:20,20 72:1
73:9 86:17
87:1 97:3
99:18 104:20
115:8 133:20
135:7,7 142:17
144:9
**guilty** 98:11
**guy** 15:22 105:8
**guys** 5:19 19:10
46:24 48:3
49:10,20 55:13
68:14 69:2
75:5,19 82:16
82:24 83:20,21
97:12,23 98:5

**H**

**H** 1:8 3:7 149:8
**H-E-A-T-H**
4:13
**H-E-R-D-U-S**
41:6
**hairnet** 104:20
**HALE** 2:2
**half** 55:20 71:19
110:14
**halfway** 64:7
**hand** 92:4
106:23 107:7
112:14 121:23
123:17,19,24
124:1 138:3
**handcuff** 30:5
31:19,22,23
32:4,9
**handcuffed**
28:15,19 29:4
35:7,23 36:11
57:19 94:9
**handcuffing**
27:20 31:15,16
57:20 58:1
**handcuffs** 27:22
28:4 29:7,16
29:24 32:14
36:5,7,9,13,15
36:17,20 38:2
47:16 57:24
58:9 60:20
61:3 78:6 82:8
85:22
**handed** 105:11
106:3 107:10
108:13 128:8
129:19,22
**handing** 133:24
**handle** 106:12
**handling** 94:2
**hands** 30:1
65:12 77:22,24

92:1 106:22
132:1
**hangs** 113:18
**happen** 23:7
25:10 36:24
53:5 58:1 63:5
114:18 124:7
129:4
**happened** 8:23
21:1,17,18
24:1 29:3
48:11 53:22
59:22 62:23
63:10 69:2
76:14 95:23
102:11 110:12
111:23 113:24
114:1,3 115:2
128:17
**happening** 29:2
47:19 68:10
77:23,24 79:17
85:1 103:8
**happens** 113:16
**happy** 5:6 10:21
**hard** 25:16
28:12 32:11
33:7 43:16
113:14 117:10
118:1 126:10
**harder** 122:3
**head** 22:12
25:19 26:5
30:4 37:5 38:8
70:18 85:11
91:13,16 93:7
96:1,1 121:12
127:17 131:5
145:21
**headed** 54:20
**hear** 9:7 53:2
54:16 79:24
84:18 90:20,24
112:10 120:6
144:13,18

**heard** 16:7
24:17 25:11
26:12,14 30:22
36:13 38:18
42:18 53:12,23
56:12 57:4,7
59:4 73:17
74:9,14 75:17
76:15 84:23
85:17 86:5,15
86:22 87:5,12
88:14 90:20
93:5 102:14
112:4 114:2
119:22,22
120:3 144:15
**hearing** 73:22
98:4,12
**Heath** 1:12 3:3
4:3,13 132:22
146:20 149:11
149:19 150:6
150:15
**height** 104:3
**Heights** 83:12
83:13,15
**Heimlich** 20:23
21:2 23:12
24:11 85:12,15
89:9,12,21
91:19 93:10,13
93:17,21 94:1
94:5,12,18
95:17 99:21
100:3
**Heimliched**
20:24
**held** 11:16 59:13
130:14 134:13
**help** 9:2 46:5
77:21
**helped** 78:13
**helps** 26:18,22
**Henry** 10:8
**Herdus** 41:6

**HERVAS** 2:7
**Hey** 10:13 39:2
85:5
**Hickey** 1:17
150:5 151:10
**hide** 137:8,10
**high-profile-t...**
143:18
**high-stress**
86:20
**higher** 32:15
**higher-level**
32:17
**highest** 103:5
**hindsight**
135:17,17
**hit** 51:6 52:17
67:4,5,12
113:15,16
**hitting** 30:4
52:20
**hold** 71:9 83:2
108:8
**holding** 36:11
48:9 56:4 84:6
135:1
**holdup** 52:14,16
53:10 54:16
**home** 43:22
141:11
**honest** 5:10
81:24
**hospital** 43:21
114:11,23
115:13,20
129:18
**host** 141:11
**hostage** 54:19
**hours** 43:12
46:19 133:16
**human** 26:13
**hundred** 94:13
95:13 107:15
107:18 113:24
114:8 128:15

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 161

Hundreds 29:17
hurt 36:15,16,18
  36:22 112:23
  117:12
hurting 112:21
hypoxic 145:8
hysterical 75:9

**I**

idea 97:4
identify 120:13
Illinois 1:1 2:4,9
  11:22,23 149:1
  150:1,2 151:2
  151:12
image 118:15
  125:2,22
immediate 67:9
immediately
  8:21 14:4
  16:15 72:3,23
  79:18,22
impact 145:22
impacted
  145:19
impartial 141:4
  141:9
impartiality
  141:7,16
important 55:24
  99:10
in-car 51:2,4
in-person 7:24
  8:4
inaccurate
  134:11
incident 13:8
  17:15 41:2
  43:15 48:10,14
  48:24 51:9,12
  51:17,18,19
  55:22 70:14
  102:9 117:15
  117:21 137:2
  141:20 143:8

143:16 144:24
  146:7 147:4,13
incidents 71:21
  71:21
include 13:10
increase 33:12
Independent 1:3
  149:3
indicate 133:2
indicated
  149:16
indicates 136:16
indicating 91:6
  91:13 113:17
  114:16 138:1
indicative
  128:15
indirectly
  150:20
individual 6:22
individuals
  121:11
information
  48:2 49:7 53:9
  102:13 146:11
ingested 96:16
initial 43:19
  144:11 149:20
initially 10:11
  126:18
injure 113:7
injured 32:16
  113:13
injuries 43:22
injury 30:9 82:6
  113:9,22
  114:20 127:7
  127:10,11,15
  140:12 147:4
injury-prone
  118:1
inquest 142:9,13
  143:1 146:10
inquire 116:1
inside 6:15

56:13 57:20
instance 61:8
instinctual
  68:17
instruction
  27:23
instructor 11:21
insurance 41:21
  41:23
intelligible 75:1
intention 62:21
intentional
  109:4
intentionally
  99:20
intentions 79:22
interacted 62:9
interacting
  119:12
interest 10:11
interested 10:7
  10:13 120:4
  150:20
interference
  145:9
Internet 40:16
interrogatives
  5:18
interrogatories
  6:1,4
intervening
  81:21
interview 43:4,8
  44:3
interviewed
  41:1
intoxicated 37:2
inventoried
  135:2
investigation
  16:19 45:16
  60:24 61:5
  81:21 140:24
  141:6,12,15
  143:12,19,21

143:22 144:10
Investigator
  41:6
investigators
  41:7 43:1
  45:15 80:4
  140:6
involved 49:3
  55:23 56:1
  76:5 77:22
  82:19,20,21
  83:4 140:23
  141:6,14
issue 16:22 98:1
  98:14 119:21
issues 56:2,5
  145:19
Itasca 2:9
item 132:21
  133:1,24 134:5
  134:15 147:13

**J**

J 1:8,8 149:8,8
Jackson 2:3
JASON 2:2
Jeremy 2:12
jmarx@hale...
  2:5
job 9:3,10 45:1
  102:8 129:20
  136:5,5
jobs 11:3 98:10
  98:11
jogged 97:12
Jr 1:4 38:13
  58:19 149:4
Julie 40:12,14
June 8:12,15
  12:23 13:18
  20:17 29:2
  38:12 39:14,22
  40:1,4,11 43:8
  46:8 117:21
jurisdiction

17:2,10,11
justification
  122:24

**K**

Kaminski 7:2
  43:20 95:18,19
  98:13,17
keep 56:11
  67:14 68:4
  69:20 70:4
  88:24 92:24
keeping 33:11
  86:6
keeps 61:9
kept 76:3 83:3
kick 30:2 65:22
kicked 36:8,23
  37:5,6
kicking 32:12
  35:15 64:24
  65:8,19,20,23
  66:4,11,13
  114:5
kid 26:3
kidding 64:22
kids 8:23 9:4
  25:13
kind 10:10,18
  12:4 13:12,14
  13:15 15:1
  20:22 32:1
  39:19 41:22
  44:23,23 47:20
  49:8,9 50:20
  52:22 53:21
  58:11 60:16,18
  63:14 65:4
  67:15 68:6,17
  69:11,17 71:8
  74:17 75:9
  76:3,15 77:14
  77:18 79:5
  81:14 87:1
  90:6 96:12,13

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 162

97:19 98:11
99:15 100:15
103:10 104:20
106:20 113:18
113:19 114:3
116:10 117:12
117:24 118:17
122:4 129:9,18
133:20 136:3
137:5 138:7
139:18 144:1
**kinds** 21:23 56:2
56:5 90:14
108:6
**knee** 32:3,9,17
**kneeling** 93:14
93:16
**knees** 69:9,11,17
69:17,24 70:2
85:9,9 91:4
94:11,13
**knew** 14:3 16:15
17:18 39:19
42:14 51:16
55:12,15 57:6
65:5,12 70:2
72:11
**knife** 47:17
**know** 5:5 6:20
6:22,24 7:23
8:22,24 9:13
9:17 10:15
14:15,18 15:1
17:11 19:1
20:16 22:19
28:6,7,9 29:6
29:17 30:8,17
31:2,4 32:1,11
33:6,7,8,20
34:9,11 35:2
35:16 37:1,23
37:24 38:12
39:18,22 40:1
40:4,8,11,14
41:7 42:12,13

42:17 44:14
46:1,4 47:6
48:20 49:6,8
49:17 50:15,19
52:23 53:3,5
53:17,20 54:4
54:5,11 56:7
58:17,19 59:10
59:13 60:3,7
60:14 61:2,3
63:20 64:1
65:12,22 66:20
66:23 67:19
68:18 70:12
71:18 74:7,18
74:19 75:11
76:19 77:12
78:3,5 79:5,6
80:2 82:3,6
83:5,13 84:9
85:19 86:1,9,9
86:12,19 88:9
89:16,17 90:19
91:7,18 95:3,4
95:5,9,14
96:21 97:4,18
98:15 99:1
100:14 101:15
102:9 104:6,10
106:7,8 108:18
109:3 110:6,14
111:10,11,11
113:3,5 115:5
115:22 116:10
116:24 118:14
118:14,23
120:5 122:5,20
124:13 125:11
125:14,16,20
126:5,9,10,12
126:13,15,18
127:11,13,16
127:18 128:3
128:11,17
129:13 130:13

131:10,16,21
132:4 133:10
133:21 134:23
135:3,11,12,16
135:18 136:5
136:11,15,20
136:23 137:1,3
137:5 138:6,18
139:2,9,22
142:6,8 143:20
143:21,23
144:12,13
145:17,24
**knowledge** 12:8
38:10,15,18
39:5,8 40:7
41:18 43:5
49:3 55:1
105:24 109:10
109:13 139:14
**known** 30:21
**knows** 66:5

**L**

**labeled** 129:11
**labor** 74:21
**lack** 39:15 56:11
98:1
**laid** 96:8
**Lake** 1:7 8:11
10:2 11:17
12:8 13:16
14:10,11 19:7
21:22 30:23
41:1,11 45:8
45:15,22 83:12
83:13,14,15,15
106:1 116:20
126:21 127:24
132:11 140:5
141:8 149:7
**lane** 64:11,13,14
68:24
**lanes** 64:9,10
**large** 103:16

137:16
**larger** 139:24
**Laura** 41:13
143:3 144:4
**law** 10:3,19 15:4
15:8 18:3,10
19:1,1,2 82:5
137:7 141:9
**lawyers** 131:7
**lay** 81:14
**layer** 141:15
**laying** 31:8 33:2
79:1
**lead** 27:1
**leader** 11:22
**leadership** 14:5
**leadership-type**
13:14
**learned** 93:19
**leather** 106:20
**leave** 11:10 15:2
33:16 34:14
45:1 55:5
113:4 115:3
146:19
**leaving** 55:9
**led** 91:2 92:4
94:20,24 95:9
**left** 9:20 16:3
55:6,7,8 59:22
60:2 62:17
112:19,22
115:6
**leg** 9:9 30:12,12
84:12
**legal** 41:20
42:20 60:18
**legs** 28:6 30:15
37:10,11,15,17
66:5 71:8,9
**less-than-24-h...**
44:5
**lesson** 26:10
**letter** 82:5
**level** 28:8

**leverage** 31:22
32:12 81:13
93:16
**Libertyville**
115:21
**lie** 16:9
**lied** 16:14,16,21
**life** 20:18 23:23
23:24 143:17
**lift** 25:19 26:4
**lifted** 68:8 96:1
**ligament** 113:11
113:17
**lights** 51:6 55:16
55:21
**likelihood** 32:16
**lingering** 103:10
**listening** 112:9
142:18
**little** 24:5 35:3
43:12 50:19
53:3 63:14
65:15 79:5
81:10 91:17,18
93:15,22 98:19
100:16 114:1
116:10 118:21
132:4
**LLC** 2:2
**location** 56:13
57:5
**locked** 52:2
107:20,24
**locker** 129:12
134:19,19
136:17
**lockers** 129:7
134:17
**log** 54:1 115:5
**long** 6:8 9:19
11:13 14:8
18:16 34:4
35:17,19 53:22
60:1 67:7,16
71:16 73:10

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 163

85:16 86:22
93:17 94:3
95:16 97:1,7
99:20 101:23
141:20
**longer** 32:15
119:10,15
140:23,24
141:14
**look** 90:3 91:10
91:19 92:12
109:3,3 111:3
123:10 146:14
**looked** 57:17,24
67:10 77:6
79:7 83:18
85:9 91:5,9,11
100:2 102:3
123:7,15,18
131:17 133:23
134:3
**looking** 57:14,14
86:10 88:22,23
88:24 89:5
92:7,15 111:7
111:17 124:9
135:7
**looks** 43:11
87:20 104:20
111:12 118:13
122:6,8 128:9
**lose** 92:5
**loses** 143:17
**lost** 95:21
129:19
**lot** 11:4,11 14:15
14:20,21 19:1
19:3 20:15
21:23 22:4
33:9 37:3
42:13,14 43:17
49:23 50:4,9,9
50:19 53:3
56:16,19 57:14
65:1 75:8 79:8

79:10,20 80:1
80:2,3 86:7,8
86:10 89:18
92:3 97:13
98:8 100:12,18
110:4 113:2
119:9 131:3
**lots** 56:10,15
106:21
**loud** 46:12 64:21
90:23 101:8
**love** 143:23
**loved** 9:5
**lowered** 67:6
78:3
**lunch** 21:11,12
21:14,15
**lying** 16:18
32:20

### M

**M** 1:17 150:5
151:10
**machine** 9:13
**machines** 9:14
**magazines**
47:15
**maintained**
112:2
**maintaining**
84:5,6 112:9
**Major** 5:16,21
41:1 44:2 45:8
48:16 90:4
140:3,6,7,22
141:8,14
147:12
**majority** 119:14
148:4
**making** 37:21
61:10 75:23
112:10 117:12
**male** 105:16,22
**man** 74:1,3,7
103:24 104:2

**manage** 77:20
87:15
**maneuver** 24:12
85:12,15 89:10
89:13,21 99:21
**manner** 75:20
**March** 8:12,20
13:7 18:21
117:19
**marked** 50:24
125:21
**market** 9:17
**Marx** 2:2 3:4,16
4:8 62:11,16
116:17 118:5
120:11 125:1
126:1 127:1,23
130:18 132:9
146:13,18
147:17,21
148:6
**mask** 47:12 62:4
62:9 120:18
**materials** 5:12
**maternity** 11:10
**Mathues** 2:7 3:5
35:24 62:14
99:12 109:16
110:24 130:21
137:13 139:17
140:19 145:14
146:20 147:2
147:16,20
148:1
**matter** 143:13
146:8
**mean** 9:12 14:18
18:2,3 19:2
20:10,15 21:16
22:18,19 33:5
33:8,10 36:4
45:13,19 53:19
56:2 60:20
65:16,21 66:19
66:20 71:21

74:17,20 81:4
87:1,23 91:17
91:21 98:20
99:15,19
100:18 102:22
109:1,12
111:14 115:5
116:3 122:3
125:17 129:6
131:2 132:23
135:6,17
**means** 19:19,24
24:21
**meat** 49:9
**mechanics'**
106:17
**medical** 100:8
114:9 127:12
127:14 145:7
145:15
**meet** 8:9 102:24
**meetings** 7:24
8:1,2,5
**member** 45:22
46:1
**members** 40:9
40:24
**memory** 51:16
61:24 68:19
72:20 73:4
88:9,11,13
90:7 110:7
131:24
**mention** 7:9
**mentioned** 7:7
27:4
**messed** 93:20
106:9
**met** 7:10,13 79:8
142:11
**metalworking**
9:11
**micromanage**
136:4
**middle** 64:8

67:11 72:22
73:5,6 97:5
127:7
**midnight** 46:10
46:16 49:19,24
93:4 115:7
**midnights** 13:1
46:18 48:3
**mids** 46:24
49:20,21,24
**midsection**
79:14
**mile** 55:20
**mind** 61:13
70:14 97:9
**mine** 10:12
111:17
**minimal** 27:12
**minimally** 28:10
52:7
**minimum** 13:2,2
13:3
**minor** 87:24
**minute** 6:8
33:17 34:14
86:15,15,24
94:5,5,6
119:15
**minute-and-** 42
124:18
**minute-and-4...**
118:24
**minutes** 33:17
33:18 44:2
60:4 71:19
146:13
**Miranda** 45:18
45:20
**mischaracteri...**
140:20
**misremember...**
130:16 131:2
**mistake** 16:8
**moment** 83:19
88:19 92:18

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 164

107:13 110:17
111:4,18 130:3
132:6 133:22
momentum 70:1
MONICO 2:2
monitors 127:17
month 6:2
months 13:8
  18:17 19:3
  147:8
morning 4:9,10
motion 65:4,8
motivated 36:11
mouth 21:7 25:4
  25:7 26:1,6
  74:23 81:5
  89:14 90:9
  91:12,15,20
  92:4,7,12,15
  95:2 137:8,11
  137:16,24
  138:2,4,12,20
  138:24
move 27:1 97:16
  98:9 99:16,17
  113:1 114:17
moved 72:17
  98:19 99:2
moves 86:19
moving 37:21
  99:1
multiple 8:18
  22:19,22 57:7
  80:15 101:20
  123:2 128:1
mundane 14:5
murderer 9:1
muscle 26:17
mutes 34:24

**N**

N 3:1
name 4:12 9:22
  17:4 38:19
  47:8 82:18

86:2 119:13
132:19,20
136:20 144:15
named 38:21
names 96:21
Narcan 96:15,17
narcotics 137:8
nasty 36:6
near 53:17
  63:21 64:1,16
  73:2 76:23
  79:7,14 90:8
  103:20 107:5
  127:7
necessarily 36:3
  52:16 60:20
necessary 28:4
  33:20 35:18,19
  65:7 70:16,17
  70:20
neck 38:8
need 28:12
  32:12 41:22
  45:13 49:10
  72:13,13,16
  83:8 85:13
  96:3 134:18
needed 48:9
  76:22 77:21
  107:19 142:12
  143:1
never 29:7 42:20
  70:19 99:2
  119:16 130:22
  146:11
new 9:3,10 24:4
newer 24:2
news 40:15
  119:5 144:17
night 73:22
  75:14 97:5
  102:21 111:13
  114:2,11 123:3
  129:15,16
NIPAS 11:24

no-pursue 112:7
nod 91:13
nodded 85:10
  145:21
nodding 91:5
Nope 120:20
normal 47:24
  74:20 97:8
  103:1
normally 55:19
north 13:19,21
  14:8,14,19,21
  151:11
Northern 1:1
  11:22,23 149:1
  150:1
nose 25:4,7 26:1
  26:6
note 57:18 78:14
notes 15:2
  146:14
notice 1:14 5:22
  6:3 57:18 63:5
  63:13,14 87:13
  97:11 101:17
  106:9
noticed 84:15
noticing 112:13
notifications
  102:8
notified 142:2
number 12:16
  12:18 14:2,3
  54:2 149:21
numerous 27:5

**O**

oath 50:15
object 74:23
objection 35:24
  99:12 109:16
  110:24 137:13
  139:17 140:19
  145:14 147:14
obligation 16:21

observe 58:8
  77:23,24 97:22
observed 58:9
  63:18
obstructed
  81:23
obstructing
  81:20,20
obtained 10:23
  11:10
obviously 32:13
  37:16 43:19
  60:19 66:5
  70:12 72:20
  92:2 98:20
  100:13 103:9
  114:18 116:3
  126:13 135:18
occasion 138:5
occur 117:18
occurred 15:14
  16:13 70:12
  100:23 117:18
Office 143:7,8
  143:12
officer 4:18,19
  4:20 7:2 8:7
  10:6,8 11:14
  11:19,19 12:1
  12:2,12,12
  13:6,24 15:5,8
  15:15,17,20
  16:5,7 17:2,7
  17:16,17 18:10
  20:21 24:2,4
  27:9 29:11
  30:11,14,19
  43:20 44:1
  45:3 48:17,22
  49:11 50:12
  54:4,8,9 57:10
  59:1,1,2 60:4
  60:11 63:4,4
  66:23,24 67:3
  68:13 70:6,9

71:7,7 73:3,17
  81:11 82:10,14
  83:12,12 85:5
  85:5,17 87:18
  87:19 91:1
  92:15 95:18,19
  98:5 101:1,14
  102:7,23 103:4
  103:6 107:19
  108:16,23
  112:1 115:13
  115:15 116:6
  120:15,16
  121:15 124:3,8
  124:11,13
  129:24 132:14
  133:7 148:2
officer's 16:24
  17:4 27:5
  33:22
officer-in-cha...
  14:2
Officer-wise
  58:23
officers 12:24
  14:7 30:24
  36:10,13,14
  42:13 43:17,19
  43:20 46:5
  54:2 55:8
  56:13 57:4,7,7
  57:19 59:18
  63:16 68:20
  70:17 71:4
  76:18 77:14,17
  82:15,23 83:3
  83:6,8,9,10,14
  85:2,7 95:6
  98:7 100:12,16
  108:16 122:17
  134:20 136:3
  141:11,13
  142:22
official 47:22
  151:1

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 165

oh 22:3 38:9
41:17 42:4
47:12 59:2
62:18 85:2,13
138:3
OIC 102:15
okay 4:22 5:7,8
7:18 8:4 11:1
13:22 15:13
16:20 18:6,20
19:12,15 22:11
22:14 23:8,14
23:19,22 25:14
26:12,15 29:21
30:18 31:13
32:24 33:15
36:22 40:24
42:11 44:8
46:8,11 50:16
51:8 53:23
55:10 58:7,12
60:9 62:12
63:2,5 69:2
72:19 73:9,16
73:24 74:10,22
76:23 77:16
78:21,24 79:13
79:16 82:7,16
82:24 83:21
84:24 88:9
89:4,7 92:24
93:5 94:7
98:14 99:9
100:7 102:4
103:7,11 108:1
110:18 112:11
116:14 117:20
118:2,23 120:2
120:8,12,17
121:21 122:1
124:2,6,13,17
126:22 137:10
137:15 144:15
144:15,18,21
145:2,4,5

146:15,22
old 30:9
once 43:24 71:9
72:11,22,23
73:4,5,6 82:13
82:13 94:1
129:22 140:18
145:24 148:3
one-day 19:11
one-man 55:2
ones 106:23,23
138:6
open 91:12,15
91:18 92:13
131:24 134:21
137:24
opened 103:15
opens 52:2
134:20
opinion 39:15
55:24 59:5
98:15 121:21
122:1 145:6,13
opportunity 9:3
opposed 32:21
52:1 74:7
101:10
opposite 90:11
options 95:15
Orchard 63:8
63:15 64:3,8,9
order 147:18
ordering 148:6
148:6
original 67:1
outranked
100:14
outright 31:3
outside 24:15
47:8 57:15,18
62:17,18 106:4
106:4 107:11
overdose 23:24
24:3
overdosing

96:16
overly 114:19
overwhelming
148:4
oxygen 145:9

_____

**P**

P-R-O-N-E 31:5
P.C 2:7
p.m 43:8 115:3
148:9
packet 131:24
PAGE 3:2,8
pain 93:21
112:23 113:2
paint 9:1
palm 106:21
panic 51:22,23
52:4,9,12,18
53:5,10
panicked 20:11
pants 47:7 93:1
paper 14:21,22
108:7
paperwork 43:7
43:9
paramedic
105:11,17
107:10
paramedics
24:9 96:18,20
97:20,22 99:5
100:7,11
101:23 103:12
103:19 109:12
132:24 133:3
147:9
paraprofessio...
11:7
parents 142:7
park 56:8,10,15
56:19 83:14,17
parked 57:13
110:4
parking 56:10

56:15,16,18
57:14 79:8,10
79:20 86:7,8
86:10 110:4
part 4:18,23
12:19 21:15
30:10 34:6
64:13 67:4
79:10,11 87:19
89:4,6 141:15
143:21
partially 72:1
particular 14:1
88:18 133:3
parties 32:16
150:18
parts 122:5
party 141:4
passed 141:18
passing 47:23
48:2 119:22
patches 47:7
patient 91:23
patrol 11:19
12:12,21,24
13:18 48:22
pause 35:3
pavement 79:1
pay 13:10,11
39:3 41:19,20
paying 24:5
PD 43:24 44:13
45:2 136:4
146:10
pelted 8:22
pending 60:23
people 8:2,3
21:4 29:6,9,14
29:18,21 33:9
34:10 35:21,22
36:5,7 38:11
42:14 83:3
89:17 108:24
109:3 112:6
115:24 138:7

138:18
pepper 47:15
percent 94:13
95:13 107:15
107:18 113:24
114:8 128:16
performed
23:17 24:14
131:22
performing 24:8
period 33:12
43:14 44:5
99:20
permanent 11:8
person 7:14 12:2
24:22 25:2
26:18 27:2
28:21 30:9
33:11,16 34:5
35:9 37:21
40:22 42:5
47:11 48:13
55:23 56:1,3
57:9 59:19
75:11 99:10
103:24 104:7,7
104:23,24
105:14 106:1
128:24 129:1
person's 38:8
138:24
personal 20:18
23:22 102:19
146:7 150:10
personally 36:8
42:20 94:22
personnel 12:16
pertaining 1:16
pgs 149:21
phone 2:4,9 6:7
7:22 44:1 72:9
75:10,20
102:14,15,18
102:20 118:6
119:16,19

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 166

phonetic 41:6
photo 116:24
  117:2 125:4,9
  125:13 126:6
  127:6 128:1,3
  128:7 131:15
  136:8,10,12
photograph
  116:22 125:23
  126:23 127:21
  130:4,7 134:18
  136:11
photographs
  124:22
photos 127:2,3
physical 82:4
physically 148:2
pick 115:16
picture 8:24
  111:16 126:20
  130:15
pictures 111:10
  111:13 124:21
  131:3
piece 129:16
Pierce 2:8
pinkish-purpl...
  128:14
piqued 10:10
pistol 47:15
place 41:10 43:8
  43:10 53:2
  123:3 134:13
placed 25:15
  71:24 73:4
  101:24 108:10
  108:13,14,15
  111:3 128:18
  128:21,22
  135:23
places 10:21
  52:23
Plaintiff 1:5,13
  2:6 149:5

plaintiff's 118:7
  125:8
plan 56:4 98:24
planned 54:10
plastic 105:12
  107:9 108:7
  111:8 135:2
  139:2,5 145:10
plate 47:8
play 118:23
  119:24 123:10
  123:11 124:9
played 120:9
please 4:11 5:5
  149:20
plugged 11:6
Plus 140:12
pneumonia 23:6
pocket 47:17
  93:1
pockets 61:9,18
  93:3
point 9:2 15:24
  38:19 49:6
  55:14 60:14
  61:2 63:7,24
  67:3 69:19,21
  69:23 73:16
  74:13 76:15
  77:22 78:11
  79:4 84:1 85:7
  85:14 89:20
  92:5 93:14
  94:9 95:11,20
  96:5,9 101:17
  102:3 103:7,15
  106:7,8,10
  108:19 110:5
  111:22 112:8
  114:2 124:14
  141:17 142:1
  144:1
points 120:1
pole 15:16
police 8:12 10:3

10:6 11:14,17
  11:22,23 12:9
  13:17 15:23
  17:9,22 18:14
  18:24 30:19
  41:11,21 42:13
  43:23 55:19,20
  71:24 72:4
  128:22 129:8
  134:17 140:5
  142:2,12,17,21
policy 41:23
  112:7
pop 69:10 91:4
popped 131:4
  145:20
pops 144:12
pose 89:2
position 24:22
  31:4,15 32:21
  33:11,17 34:5
  34:14 35:7,7
  35:23 36:10,19
  38:2,4 71:12
  71:16 78:22
  84:2,15,19
  85:17 86:14
  93:12 96:9
  122:18 124:19
  145:23 146:1
positional 24:18
  26:2 145:19
positions 11:16
positive 128:9
  128:11,12
possession 103:3
  119:16,19
  133:19
possible 20:6
  39:11,13 54:10
  65:6 83:7
  96:10
possibly 27:3
  32:17 43:20
  45:17 49:5

96:15 135:6
posture 80:19
potatoes 49:9
potential 48:12
potentially
  22:16 36:12
powder 133:2
  145:10
power 68:9
powers 17:23
  18:4
preparation
  5:12 7:5,11,15
present 2:12
  4:17 8:2,3,6
  30:16 42:11,24
  128:5 148:2
press 130:13
  144:19
pressure 35:17
  37:20 47:16
  145:10 146:3
pretty 8:23 11:4
  26:21,23 28:11
  30:22 36:5
  61:19 67:9,13
  90:23 93:20
  99:24 109:4
  120:14 121:23
prevent 37:20
  68:1,10 84:12
preventatives
  9:17
previous 12:7
previously 84:2
  86:14
primary 15:18
  55:15 129:24
prior 10:3 20:17
  38:12,16 39:22
  40:1,4,11 41:8
  42:17 49:16,21
  50:9 55:9 92:8
  140:20
probably 4:22

24:5 25:9 37:2
  44:1 54:8 62:3
  62:3 64:8
  66:24 68:9,12
  68:16 69:1
  71:18 84:11,23
  90:24 94:6
  109:23 114:7
  115:6 116:6
  127:19 135:7
  136:1 147:8
problem 70:3
  112:13
problems
  101:11
procedure 1:15
  114:24
process 57:20
  97:19 129:20
  134:22 138:17
processed 15:20
  48:9 108:9
processing
  129:12,13
produced 125:6
  144:22
products 9:16
professional
  20:18 23:23,24
program 11:21
  133:7
prone 31:4,10
  31:15 32:20
  33:11,17 34:5
  34:14 35:7,7
  35:23 36:19
  37:19 38:2
  71:11,16 78:22
  84:2,19 85:17
  86:13 124:19
  145:9 146:3
proper 65:6
proposing
  126:13
protests 8:24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 167

40:18
prove 138:19
provided 149:17
public 130:14
pull 29:6 56:17
63:7 81:8
105:10
pulled 15:16
24:7 29:15
56:15 67:24
69:16 103:15
104:8,23
137:12,21
138:11,24
pulling 28:7
56:9 66:20
81:8
pure 132:3
purely 97:3
purpose 69:6
purposes 148:1
pursuant 1:14
1:14
push 28:13 35:8
37:17,18 38:3
38:8 51:24
65:15 66:4
123:7,13 124:3
pushed 70:4,8
pushing 65:4,8,9
81:9 82:3
put 14:7 29:18
29:21,24 32:3
32:9 35:17
54:20 65:9
69:8,15,24
70:9,15,16,19
70:22 71:4
72:21 77:15
83:1 84:6 92:4
102:2 104:11
104:12,24
106:11 107:23
109:7,15,20
110:10,12,13

110:19,22
114:12 123:24
124:1 127:17
128:20 129:24
133:12 134:5
134:14 135:11
136:16 137:16
137:22,23
138:1,3
putting 110:7
123:19

————————
Q
question 41:7
50:14 57:22
61:7,14 72:2
73:9 87:21
99:15 111:16
117:20 124:2
142:17 144:9
145:3,12
questioned
142:12
questions 5:18
6:1 22:21
38:21 95:9
120:1 146:18
146:21
quicker 32:18
quickly 54:10
80:24 97:8
99:10,11,24
quiet 48:1
quite 24:6 47:1
49:18

————————
R
race 104:3
radio 51:20 83:7
98:8 112:5,9
raise 13:10,11
ran 11:20,21
64:3,6 81:1
85:7 97:12
rank 12:9,10,10

ranking 12:8
103:6
rapidly 79:4
85:20
reach 61:18
105:5,9
reached 37:5
42:15 138:23
reaching 61:9
reaction 142:3
read 45:20
145:2 147:19
147:20 149:11
ready 54:13
realized 10:19
15:15
really 6:22 8:19
28:12 32:11
36:15 39:18
43:23 45:12,13
47:21 69:5
76:10 77:21
85:19 86:19
87:16 88:16
89:20 112:12
113:2 114:4
122:4,12 131:6
135:8 138:14
138:15,19
reason 5:9 25:23
25:24 27:1
56:14,19 78:15
81:18 97:14
101:9 117:4,8
120:18 121:1
134:10,24
reasonable
33:23 34:1,13
34:13 123:4
145:7
reasoning 98:22
122:22
reasons 61:7,12
recall 20:6 28:24
39:10 45:17

47:18 48:23
50:16,18 51:6
52:6 53:11
54:3 55:18
57:6,12 58:3
59:6 61:21
62:4,7,8 63:3,9
71:3,6 75:2
76:7 77:5
78:12 79:17
84:24 87:21,22
88:2,3,4 90:2,8
90:10,22 92:16
95:16 98:4
103:18 105:14
107:14,15
108:10,12
109:6 110:19
110:22 111:17
111:19 116:8,9
119:3 125:5
127:4 131:12
131:15,17,19
134:2 136:8
142:3,5,9,18
recap 110:19
receive 31:20
52:9
received 15:7
20:3 21:22
22:6,15 23:8
23:10 24:11
26:9 27:5,15
27:23 28:14,18
28:19 31:9,14
33:16 127:3
receptacle 108:8
135:9
recognizing
20:3
recollection
39:12 53:8
55:4 57:23
58:2 72:2
84:14 87:7

89:23 92:6,10
92:14,20 97:6
109:15,19
110:16 111:6
115:9,12 125:3
133:24 134:4
recommend
10:14
record 72:15,15
76:3 130:18
147:21 148:1
149:15
recorded 43:4
recording 72:9
75:9,21 119:14
recovery 96:8
recuse 141:12
reduced 150:9
refer 27:16
reference
131:16
referenced
26:14
referencing
30:17
referring 6:9
27:21
refusing 59:13
regain 35:20
37:4
regard 77:5
129:16 131:20
regarding 17:14
136:10 142:10
143:8 144:3,10
144:23 146:6
regards 133:1
regular 148:7
related 127:19
relation 55:18
121:10
relative 150:17
150:19
relatively 75:19
125:7

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 168

| | | | | |
|---|---|---|---|---|
| **released** 15:22 | 132:18 144:22 | 95:8 | 72:15 73:11 | 106:1 116:20 |
| **relevant** 13:17 | 144:23 145:3 | **responded** 24:2 | 83:8,21 85:23 | 126:21 127:24 |
| **remain** 71:16 | **reported** 5:23 | 39:9 52:4 | 86:2,9 88:19 | 132:10 140:5 |
| **remaining** | 150:8 | **responding** | 88:22 89:18 | 149:7 |
| 147:23 | **reporter** 1:17 | 43:20 53:1 | 99:19,21 100:1 | **route** 54:9,10 |
| **remember** 8:8 | 22:11 48:20 | 55:11 | 100:5 101:4,21 | **rub** 96:11 |
| 17:5 21:8 43:6 | 150:6 151:2 | **response** 97:4 | 104:10,23 | **rubber** 30:14 |
| 43:16,18 48:15 | **reporting** 14:22 | **responses** 95:4 | 119:17 120:22 | **rule** 97:20 141:4 |
| 53:19,19,21 | **represent** 42:8 | **responsibility** | 122:5 123:13 | 145:15 |
| 56:18,19 58:13 | 87:17 125:6 | 13:11 136:3 | 133:3 136:6 | **ruler** 130:8,11 |
| 58:16 61:22 | 130:21 144:21 | **responsible** | **rights** 45:18 | 130:15 |
| 62:10 63:23 | **representation** | 129:13 | **riots** 8:21 | **rulers** 131:3 |
| 67:2 68:12 | 41:19,22 | **restrained** 32:13 | **rips** 113:17 | **rules** 1:14 4:24 |
| 69:9,21 73:21 | **representative** | 38:2 | **risk** 30:3 33:12 | **run** 29:8 30:2,3 |
| 73:22 76:20 | 41:13 143:7 | **restraint** 30:12 | **road** 2:8 50:6 | 55:2 64:19,22 |
| 77:10,13 82:18 | **reputation** | 30:12 31:11 | 63:8 65:11 | 81:2 83:14 |
| 84:6,9 85:4 | 42:12 | **restrict** 25:9 | 67:11,11 72:23 | 97:14,15,21 |
| 89:19,20 93:18 | **request** 130:19 | **resulted** 82:5 | 72:24 73:5,6 | 108:20 123:2 |
| 93:23 94:16 | 140:9 | **resuscitation** | 102:24 126:19 | **running** 28:20 |
| 95:22 96:20 | **requested** 42:21 | 23:16 | **roadway** 64:15 | 29:5 63:8,15 |
| 98:12 103:14 | 83:17 119:20 | **retain** 147:22 | 64:17,20 73:12 | 63:16 65:17 |
| 103:14,19 | **required** 141:12 | **retained** 3:16 | **robbing** 54:17 | 79:19 80:18 |
| 104:5 105:2,23 | **rescue** 85:14 | **retrained** 35:6 | **role** 14:5 | 86:8 95:14 |
| 106:8 109:24 | 96:23 97:13 | **retrieve** 87:20 | **roll** 25:21 | 133:21 |
| 110:3,10,11 | 104:5 | 137:19,20 | **Rollins** 64:12 | **runs** 12:2 |
| 111:8,9,12 | **reserve** 147:20 | **retrieving** 88:5 | **room** 21:4 45:4 | **rushed** 20:22 |
| 112:14,16 | **reserved** 150:16 | **review** 5:12,15 | 47:23 53:14 | **rust** 9:16 |
| 113:24 114:2 | **residue** 138:19 | **reviewed** 5:16 | 115:17 134:16 | |
| 127:5 128:13 | **resign** 8:17 | 5:17 7:5 | 135:10 142:20 | **S** |
| 128:15 134:6,7 | **resigned** 8:15 | **revolving** 137:5 | 148:2 | |
| 137:15,22 | 17:6,14,17,18 | **Reyes** 39:23 | **Rosiles** 1:3,4 | **S** 3:7 |
| 138:15,21 | **resigning** 16:14 | 75:12 | 38:13 40:5,8 | **S-C-A-R-R-Y** |
| 142:1 143:4 | **resist** 29:7 30:15 | **rid** 12:5 | 58:19 113:21 | 41:14 |
| **remembered** | 68:2,5 69:7,8 | **rifle** 54:18,20 | 141:18 142:10 | **sad** 142:6 |
| 79:6 | 81:23 123:2 | **right** 9:9 18:14 | 149:3,4 | **safe** 72:16 76:1 |
| **remove** 147:10 | 125:18 | 18:21 19:21 | **Rosiles'** 147:10 | **safer** 9:4 |
| **removed** 88:12 | **resisting** 28:10 | 21:19 22:6,7 | **Rosiles's** 145:8 | **safety** 30:1 |
| **rep** 41:15 | 29:23 59:12 | 25:14 27:19 | **rough** 127:17 | 32:14,15,18 |
| **repaired** 113:12 | 68:16,16,17 | 33:22 34:2,15 | **Round** 1:7 8:11 | 61:8,11,11,12 |
| **repeating** 61:13 | 69:4,22 70:4 | 34:18 37:6 | 10:2 11:17 | 89:2 |
| **repetitively** | 74:1,12 76:17 | 42:9 44:18 | 12:8 13:16 | **sake** 48:19 |
| 68:18 | 76:21 77:7,9 | 52:17,18 56:15 | 14:10,11 19:6 | **sandwich** 20:21 |
| **report** 14:24 | 77:14 126:16 | 56:17 60:15 | 21:22 30:23 | **save** 99:10 |
| 15:24 16:2,21 | **resourceful** 66:8 | 61:5,11 63:16 | 41:11 83:12,13 | **saw** 21:2 41:5 |
| 41:5 90:3 | **respond** 83:22 | 71:3,14 72:14 | 83:14,15,15 | 43:7,9 61:2 |
| | | | | 62:1,5 63:7 |

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 169

| | | | | |
|---|---|---|---|---|
| 64:19 76:19 | 143:3 144:2 | 76:16 92:3 | 125:3 127:3 | 121:16 |
| 77:6,10,16 | **scenario** 35:14 | 113:19 | 128:1 130:4,7 | **shift** 12:3,6,24 |
| 79:7,9,12,14 | 54:15 | **second** 12:9 | 130:10,22 | 13:1,1 46:9,10 |
| 80:17 87:17 | **scene** 15:20 | 34:22 51:18,19 | 131:2 132:11 | 46:14,16,16,17 |
| 88:5 91:15 | 17:17 43:17,18 | 90:3 123:17 | 137:8,10 | 46:22 47:2,5 |
| 96:2 102:2 | 44:8 57:6 94:2 | 124:1 | 144:23 | 47:19,22 48:6 |
| 109:2,2 119:8 | 97:21 98:2 | **seconds** 6:8 | **sees** 114:20 | 49:11,13,19,19 |
| 123:22,23,23 | 100:16 101:8 | 67:19 119:15 | **sell** 9:11,15 | 50:17 51:9 |
| 130:12 136:10 | 101:21 102:5,6 | 120:12,13 | **semester** 11:9 | 53:13,20 54:1 |
| 138:1,3,10,19 | 108:19 111:21 | 121:6,7,18 | **send** 54:1 | 55:14 93:4 |
| 144:19 | 112:2,9,16,19 | 122:16 123:5,6 | **sense** 34:10 | 102:21,23 |
| **saying** 14:23 | 114:22 115:4 | 123:12 124:6 | 45:20 106:11 | 107:2 |
| 16:22 17:13 | 115:10 131:17 | **Secrete** 10:9 | **sent** 5:19 43:22 | **shifts** 13:4 46:24 |
| 21:19,24 23:20 | 132:24 135:20 | **section** 13:19 | 54:3,4 | 49:24 50:7 |
| 25:6 28:23 | 14:11 | 14:11 | **sentence** 145:3 | **shirt** 47:7 |
| 34:8 49:24 | **scheduled** 46:19 | **sections** 13:19 | **separate** 41:24 | **shoe** 87:21 |
| 50:1 52:8,11 | **Scheithe** 1:8 | **secure** 123:3 | 42:1 59:17 | 104:17 |
| 57:7,8 58:11 | 2:12 8:7 44:1,6 | 134:19 | 142:21 | **shoes** 87:13 |
| 58:14 62:1 | 44:11,16,18 | **secured** 81:11 | **September** | 88:14 |
| 66:11 68:7,11 | 49:14,16,17,21 | 107:22,23 | 151:3 | **shook** 93:7 |
| 68:13,16 69:21 | 50:8,12 54:9 | 110:1 | **Sergeant** 137:4 | **shoot** 56:3 |
| 70:22 73:3,19 | 54:24 59:1 | **see** 21:6 22:3 | **sergeants** 12:4,5 | **shooter** 19:2 |
| 75:5,21 76:3,8 | 63:4 66:24 | 61:17 63:11 | 12:14 | **shooting** 117:11 |
| 77:8 80:7,10 | 78:14 82:24 | 77:20 78:17 | **series** 134:17 | 117:17,18 |
| 80:12 85:5 | 83:19 84:4 | 82:17 92:1,2 | **seriously** 53:1 | **shootings** 14:18 |
| 89:22,22,23 | 85:5 87:5 | 95:2 105:9 | **service** 10:10 | **shoplifting** |
| 91:1 92:7,21 | 89:23 93:23,24 | 115:13 116:18 | 11:20 | 14:16 |
| 95:24 97:8 | 94:7,14 95:7 | 121:23 123:6 | **services** 41:19 | **shops** 9:13 |
| 99:4,19 101:1 | 95:16 120:16 | 123:13 124:2,4 | **session** 19:10,11 | **short** 62:15 |
| 101:5 108:3 | 120:21,22 | 124:7,12 125:8 | 21:13,18 | 146:17 |
| 110:7 117:23 | 121:19 122:1,9 | 126:2 127:6,8 | **sessions** 21:9,22 | **Shorthand** 1:17 |
| 118:15,16 | 123:7 124:3 | 128:23 138:6 | **set** 105:3 | 150:5 151:2 |
| 120:4 122:12 | 142:23 148:2 | 142:20 144:18 | **sets** 47:16 | **shortly** 17:14 |
| 124:3 126:14 | 149:8 | 146:14 147:9 | **setting** 65:13 | 44:12 63:10 |
| 131:8 138:9 | **scheme** 87:24 | **seeing** 86:10 | **shackle** 30:12 | **shot** 8:20 9:7,8 |
| 140:4,16,22 | **scrapes** 117:5 | 88:3,4 90:8 | **shake** 22:12 | 10:20 12:18 |
| 143:20 146:2,2 | **screaming** 72:9 | 111:13,13 | **shaking** 91:15 | 23:4 36:14 |
| **says** 52:12 54:2 | 76:12 | 119:3 125:5 | **shaved** 121:12 | **shot-in-the-da...** |
| 77:2 98:5 | **screen** 116:18 | 134:4 135:20 | **she'll** 144:12 | 115:7 |
| 118:7 132:14 | 118:8,10,12,13 | 138:16,16 | **sheets** 149:16,21 | **shoulder** 69:11 |
| 132:21,22 | 118:16 | **seen** 36:5,7,9 | **Shelby** 40:2 | **shoulders** 69:18 |
| 133:5,7,15 | **screw** 114:21 | 40:15,22 79:3 | 85:21,22 86:7 | 80:23 |
| 134:8 136:23 | **scuffle** 32:15 | 90:12,14,16 | 88:23 90:22 | **shouting** 79:20 |
| **scale** 130:5 | **scuffles** 114:1 | 97:14 111:10 | 95:7 101:13 | **shoving** 82:4 |
| **Scarry** 41:14 | **scuffling** 74:18 | 111:15 119:1 | 114:7 121:13 | **show** 15:1 56:6 |

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 170

| | | | | |
|---|---|---|---|---|
| 83:5 86:11 | 83:2,6 85:20 | 144:3 146:6 | special-ed-type | spoken 120:5 |
| 92:13 104:8 | 86:18,20 87:15 | somebody's | 11:12 | 143:6 |
| 108:15,23,24 | 88:17,21 89:16 | 110:8 138:11 | specialist 114:14 | sports 11:7 |
| 116:12 117:6 | 98:12,20 | somewhat 138:7 | 114:15 | spots 132:21 |
| 118:2 124:21 | 101:12 126:17 | son 49:21 | specialty 55:3 | spray 47:16 |
| 125:21 126:20 | 138:9 143:18 | sons 142:7 | specific 21:24 | sprint 98:21 |
| 127:20 | situations 79:5 | soon 43:22 | 27:23 28:23 | sprinted 98:23 |
| showed 6:22 | size 131:14,18 | 50:14 54:13 | 33:19 37:23 | sprinting 98:22 |
| 15:17 104:10 | 135:10 138:10 | 83:7 85:13 | 39:12 60:3 | squad 6:11,19 |
| 105:3 108:18 | skateboard 49:4 | sorry 9:7 10:9 | 63:23 67:20 | 6:19,21 11:22 |
| showing 83:4 | skier's 113:10 | 11:23 17:5 | 68:19 71:17 | 11:24 63:21 |
| 110:5 117:4 | skittish 56:3 | 22:9 25:21 | 72:6 76:7 | 64:1 72:18 |
| 132:10 134:24 | sleep 33:7 | 34:20 35:2 | 78:24 83:9,9 | 73:3,7 78:19 |
| shown 100:13 | sleeves 47:7 | 37:13 41:18 | 84:14 87:16 | 78:20 101:4 |
| 116:5 118:3 | slipper 104:16 | 45:3 46:12,14 | 88:11,13 89:16 | squads 110:3,5 |
| 124:22 125:23 | slow 81:2 | 51:15 58:22 | 89:23 92:6,10 | squared 80:23 |
| 126:23 127:21 | small 25:10 | 61:13 71:1 | 92:20 93:18 | squatted 93:15 |
| 132:7 | 139:23 | 117:17 118:9 | 109:14,19 | SS 150:2 |
| sic 5:18 125:8 | smarter 56:21 | 124:10 126:2 | 111:17 130:19 | stabbed 23:4 |
| side 14:14 71:7 | smiling 117:8 | 140:8 144:7 | 133:24 134:4 | 36:15 |
| 71:8 96:9 | snap 114:2 | sort 23:10 30:11 | 138:5,20 | staff 12:3,20 |
| 103:23 111:24 | snapped 113:20 | 30:13 46:3 | specifically | stamp 136:18 |
| 118:21 120:23 | sock 89:14,14,24 | 48:10 62:8 | 28:17 31:18 | stand 78:9 |
| 126:3 134:20 | 90:6,8,12,17 | 74:23 76:21 | 36:16,18 37:9 | standard 28:5 |
| 134:22 | 90:18 | 77:9 108:7 | 43:18 48:15 | 32:1 47:6 |
| signature | socks 87:13 | 122:7 145:22 | 49:1 58:3 | standing 20:24 |
| 150:15 151:1 | 88:14 124:8 | sound 80:6 | 65:23 73:21,21 | 32:21 33:2 |
| signs 20:4,8,13 | 135:12 | sounded 30:21 | 77:19 90:18 | 36:10 53:13 |
| 24:6 | soft 114:12 | sounds 44:11 | 92:15 95:22 | 73:15 77:10 |
| simplest 8:18 | Solutions 9:23 | 48:17 51:8,15 | 111:20 142:1 | 78:5 84:13 |
| simply 13:10 | somebody 8:5,6 | 62:14 80:8 | specifics 43:16 | 85:23 94:14,15 |
| 61:4 | 9:2 20:8 21:3 | 83:18 102:4 | 49:8 58:16 | 95:23 101:10 |
| Sinahy 39:23 | 22:16 23:17 | 140:14 | 61:23 77:13 | 103:20,22 |
| 75:11 86:1,7 | 24:14 30:5 | south 13:20 | 89:19 103:14 | 106:4 107:10 |
| 88:24 90:23 | 34:14 35:6 | space 25:4,24 | 111:9 145:18 | stands 23:15 |
| 119:13 | 36:17,19 38:3 | 26:1 | specified 150:12 | 76:10 |
| sir 4:10 | 38:21 54:17 | speak 14:12 | speculate | Stanley 38:22 |
| siren 46:12 | 56:23 60:20,23 | 38:19 42:5,18 | 122:22 123:21 | 39:16 62:22 |
| sirens 55:16,22 | 66:7 88:14 | 43:14 59:4 | speculating | start 18:21 47:2 |
| sit 48:1 | 93:5 98:6 99:7 | 70:11,17 72:22 | 73:15 123:15 | 63:7 94:2 95:3 |
| situation 29:1 | 101:3 108:13 | 74:14,15,24 | spell 4:11 | 96:3 99:21 |
| 44:23 54:19 | 109:7,11,20 | 129:14 144:18 | spoke 7:9 16:4 | 102:23 138:15 |
| 55:19 56:6 | 129:20 137:10 | speaking 44:21 | 42:20 44:1 | started 10:18,21 |
| 57:16 60:17 | 138:23 139:1 | 58:10 59:5,6 | 60:5 109:22,23 | 11:11 20:21 |
| 76:6 77:20 | 142:15,16 | special 11:11 | 144:11 145:20 | 24:7 29:5 |

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 171

40:19 51:8
60:7 73:14
75:5,20 86:10
89:7,9,12
93:12,24 96:9
96:11,18 99:23
99:24 106:9
112:13
starting 89:20
91:19 100:12
121:3 123:5
124:6,16
state 4:11
149:11 150:2
151:2
State's 143:7,8
143:12
statement 5:16
5:21 42:11
43:2,12 44:12
44:14,19 60:7
60:9,10,12
62:20 98:18
statements
48:16
States 1:1,15
149:1 150:1
station 53:15
54:17 142:17
status 102:12
103:12 116:6,8
143:21 144:10
stay 25:20 76:3
77:19 82:18,19
82:19,22 83:1
83:1 95:24,24
stayed 15:20
60:4
staying 66:9
stays 34:5
stenographica...
150:9
step 92:11
stepped 148:3
sternum 96:11

stick 92:1
stolen 112:5
stomach 25:15
31:8,17 69:8
69:15 81:15
stood 72:12
82:15
stop 68:16,16,18
69:22 74:1,12
78:4,8 100:18
108:23 109:2
119:24
stopped 54:19
64:6 68:23
124:17
stopping 120:12
121:7 122:16
123:6 124:7
straw 44:24
street 64:8 67:9
67:17 68:11,14
68:15,20,23
71:23 72:3,4
87:18,20,21
88:5 151:11
strength 70:3
stressful 44:23
strike 7:4 24:24
29:9 36:17
76:24 80:13
86:12 88:12
89:7 106:14
136:9 143:10
stripped 17:22
18:3
struggle 20:1
struggling 23:5
24:23
stuck 46:24
stuff 14:6 19:3
22:1 30:3
42:20 47:23
49:7 53:21
95:5 100:18
sub 11:8

subbing 11:8
subject 30:14
37:2,20 61:5
79:18,19
subject's 32:3
subjects 84:21
submit 136:23
139:23
submitted 129:5
136:19,24
149:21
SUBSCRIBED
149:22
substance 6:23
36:12 129:9
131:21 132:2
133:2
successful 94:18
sucking 23:5
sued 18:9
suffer 26:2
suffering 20:4,9
22:16,20,23
27:2 33:13
sufficient 25:24
suffocated 25:6
suggested 96:15
Suite 2:3,8
151:11
summation
100:22
super 75:22
supervising
60:16 108:22
supervisor 46:3
77:18
supply 46:4
supposed 112:8
114:17
sure 6:21 19:20
23:6 26:11
37:24 38:9
43:6 44:17
55:13 58:15
59:15 63:19

64:2,13 65:5
68:24 73:13
75:14 78:12
94:13 102:1
103:11 107:18
107:22,24
109:22,23
111:5,19
112:10,19
113:14 114:8
114:12 115:5
117:17 119:23
120:24 122:3
123:11 126:6
126:19 128:20
131:19 135:3
135:14,21
136:14 137:24
139:13 142:2
surgery 147:3,7
surgical 104:16
surgically
113:11
surprise 56:11
87:10
surprised 66:8
surrounding
83:8
surroundings
89:1 98:24
suspect 28:9,10
28:19 29:4
32:7 35:12
58:9,14,17
90:12 119:8
suspect's 32:9
suspected 119:9
suspects 90:14
suspended
17:24
suspension
15:12 16:16
suspicious
111:23
sustained 82:6

125:15 126:15
127:11 147:4
swab 132:4
swallow 137:17
swallowed
138:18
SWAT 42:18
swear 58:12
swearing 58:15
80:3
sweater 122:14
sweatshirt 61:22
122:7
sweep 81:14
swinging 113:15
114:6
switch 10:22
sworn 4:1,4
12:16 149:22
150:7
swung 113:19
symptoms 20:4
20:8,13
synopsis 102:11
system 11:24
51:2,4

---

**T**

T 1:8 3:7 149:8
tab 133:6
tactically 56:21
tactics 27:17
take 12:6 14:5,8
22:12 28:3,14
44:24 53:1
54:11 56:20
59:19 62:11,12
63:15 76:19
78:10 83:14
98:1,14 101:4
101:13 123:10
123:23 124:8
125:18 138:3
146:16 148:7
takedown 28:5

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 172

| | | | | |
|---|---|---|---|---|
| 81:13 | 11:3 | **thing** 13:12,14 | 113:15,19,23 | 56:15 59:2 |
| **takedowns** | **team** 11:20,24 | 17:19 30:22 | 116:3,4,5,9 | 67:19 71:18 |
| 27:16,20 | **tear** 131:24 | 47:13,18 57:12 | 117:11 120:18 | 72:22 93:2 |
| **taken** 1:12,16 | **tech** 136:22 | 59:16 64:24 | 121:1 123:4 | 120:12,13 |
| 6:17 65:3 | 137:1 139:13 | 66:6 70:13 | 125:7 127:4,14 | 121:6,10 125:8 |
| 78:17,21 79:16 | **technician** 46:3 | 73:20 77:5 | 128:12 129:2 | 146:13 |
| 96:5 115:22 | 129:12 130:1 | 79:17 84:24 | 130:6 132:13 | **throat** 104:9,24 |
| 128:5,19 | **technicians** | 85:3,4 87:16 | 134:10 135:1,4 | 137:12,18,19 |
| 135:12 136:11 | 134:21 | 88:19 90:6 | 139:11 142:11 | 139:7 145:11 |
| 150:12 | **techs** 137:3,6 | 91:23 132:4 | 144:19 | 147:10 |
| **takes** 140:23 | **teeth** 137:23 | 135:5 138:7 | **thinking** 30:20 | **throw** 65:12 |
| **talk** 21:5 41:2 | **tell** 7:3 11:16 | **things** 7:6 8:9 | 56:19 70:15 | **throwing** 55:21 |
| 44:18 48:1 | 16:8 18:23 | 9:15 14:17,19 | 105:21,21 | **thumb** 93:19 |
| 51:17 59:21 | 44:20 49:9 | 18:23 20:11 | **third** 12:10 | 106:9 107:5 |
| 111:11 130:14 | 54:8 58:13 | 27:18,19,20 | 46:16 73:2 | 112:13,21,22 |
| 144:6,14 | 74:22 83:24 | 33:6 35:16 | 78:18 | 113:4,7,11,13 |
| **talked** 7:18,21 | 88:6 98:9,10 | 36:6 50:20 | **Thorntons** 6:11 | 113:18,22 |
| 13:12 30:16 | 100:19 113:14 | 76:6 80:2 82:1 | 6:14 38:24 | 114:10 147:3 |
| 40:20 44:5,8 | 122:3,4,5 | 87:24 89:16 | 39:1,20 48:11 | **time** 4:18 11:10 |
| 44:11 51:15 | 124:15 125:12 | 90:15 92:3 | 48:14,24 51:13 | 12:12,15,22 |
| 90:6 93:23 | 125:16,17 | 97:19 127:18 | 51:18,19,22 | 13:17 19:9 |
| 100:3,15 | 145:18 | 138:17 140:15 | 52:5,13 53:6 | 20:20 23:21 |
| 104:15 115:10 | **telling** 48:3 74:6 | **think** 5:3,17 | 53:10 54:21 | 24:7 25:16 |
| 116:4 144:4,6 | **ten** 29:11 67:19 | 7:17 8:4 12:20 | 55:17,18,20 | 33:8,12,19 |
| **talking** 5:3 6:7 | 123:11 | 16:7,8 19:8 | 56:8,14 58:4,7 | 42:19 44:21 |
| 12:22 13:18 | **term** 24:20 | 25:18 26:3 | 58:23 60:1 | 45:13 46:17 |
| 23:12 30:11 | 56:12 60:18,18 | 28:17 33:19 | 61:3,17 62:6 | 47:20,24 49:5 |
| 34:24 41:8 | **test** 128:9,10 | 34:24 42:18 | **Thorntons'** 6:13 | 52:15,16 55:5 |
| 42:19 43:18 | 131:20,22 | 45:19 49:5 | **thought** 56:14 | 56:20 57:6 |
| 45:8 53:20 | 134:18 147:12 | 52:14 53:3 | 100:4,5 101:9 | 58:5,8,17 |
| 71:20 87:19 | **tested** 129:9,10 | 54:15,16,17 | 129:10 130:14 | 59:11 60:3 |
| 91:23 94:4 | 139:3,11,15,23 | 55:14 61:19 | **thrash** 30:3 | 61:20 64:18 |
| 95:3,3,8,24 | 140:9,15 | 62:17 64:21 | **thrashing** 59:14 | 67:20 69:6 |
| 102:4 124:12 | **testified** 4:5 | 66:15 73:10 | 65:1 66:15,18 | 70:18,19 71:17 |
| 139:6,8 142:14 | **testify** 150:7 | 74:5 76:9 | 66:21 77:14 | 73:2 74:18 |
| **taser** 11:21 | **testimony** | 77:21 78:15 | 81:9 113:15 | 78:18 84:18,22 |
| 47:15 | 140:20 142:19 | 82:16,17,18,20 | **threat** 89:2 | 85:21 86:18 |
| **task** 5:17,22 | 145:15 149:12 | 83:11,16,16 | **threatened** | 89:4,6 92:21 |
| 41:1 45:9,23 | 149:15 | 91:17 97:14,17 | 48:12 | 93:8,18,20 |
| 80:4 140:6 | **testing** 131:20 | 99:1,17 102:2 | **three** 7:17 8:4,5 | 95:4 96:18 |
| 141:9 | **tests** 140:1 | 102:2 104:12 | 11:6 12:24 | 97:4,7,9 98:12 |
| **taught** 18:23 | **thank** 4:14 9:9 | 104:15,19,19 | 13:2,18 18:17 | 98:12 99:7,8 |
| **teach** 19:4 | 9:18 22:3 | 105:2,6,19 | 19:2,8,12,16 | 99:20 101:22 |
| **teacher** 11:1,2,8 | 41:17 45:6 | 106:20 107:22 | 21:21 22:1 | 104:11 109:5 |
| **teaching** 10:18 | **theft** 14:22 | 109:1,1 110:16 | 23:11 52:24 | 110:13,17 |

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 173

111:9 112:3,12
113:2 114:20
114:20 115:3
117:10,14,16
117:21 118:1
119:3,14,18
120:15 123:17
124:19 130:2
133:9,12,15,21
135:19,22
136:11,16,18
136:24,24
137:2,21
138:10,13,15
138:21 139:6
144:11 146:16
147:6 148:5,7
150:12
**time-stamp**
133:22
**timeline** 116:10
**times** 7:13,17,18
7:21 19:8,12
19:16 49:15
52:24 72:22
76:9 78:3
80:15 119:1
123:2 125:19
128:1 138:17
**Timothy** 4:20
132:14,17
**Tina** 1:17 150:5
151:10
**tiny** 50:19
**tip** 55:22 56:1
107:5
**tire** 123:18,24
**today** 5:10,13
100:20
**told** 16:6,7,24
17:12 49:6
52:15 62:18
72:12 82:17
102:11,12
**ton** 49:8 50:6

**tools** 30:24
47:10,14
**top** 71:8 121:12
132:15
**topics** 22:5
**tore** 113:10
**totality** 34:1
135:19
**touch** 109:10
123:1
**touching** 84:8
84:10,15
121:19,22
122:2,13,20
**tougher** 32:20
**tourniquets**
47:16
**town** 111:24
**towns** 83:8,10
**trachea** 103:16
105:6
**track** 129:19
**traffic** 19:1
64:15 69:1
**trained** 19:18
26:24 28:3,21
30:5 31:10,18
32:2 35:5
37:19 50:5
134:21
**training** 19:7,10
19:11,13 20:3
20:20 21:9,12
21:14,16,18,21
21:24 22:4,6
22:15 23:8,10
23:19 24:11,15
26:8 27:15
28:14,19 31:13
31:20 33:15
37:23
**trainings** 23:11
27:5 28:18
31:9
**transcript** 148:6

149:12,14
**transport**
115:24
**transported**
115:16
**travel** 54:22,24
**treat** 22:16 23:9
**treatment** 114:9
127:12,15
**treatments**
96:10
**tricky** 99:15
**tried** 69:24 78:4
81:8 100:16
106:21 123:2
137:17 139:9
**trip** 28:12 65:10
65:15
**tripped** 52:1
**tripping** 28:6
65:4,9
**trouble** 16:13
25:12
**true** 4:17 10:19
32:24 38:1,7
91:3 120:19
141:3 149:14
**trunk** 54:20
107:21,24
109:24 110:2,8
110:10,11,13
110:23 111:3
128:22
**trust** 42:14,14
**trusted** 136:5
**truth** 16:9,24
110:9 150:8
**try** 35:3 66:13
66:21 68:3
98:9,10 99:10
99:11 136:6
137:8,10 138:7
144:9
**trying** 9:1,1
16:12 35:16

37:4,8,10,11
37:15 57:15
65:19 66:4
67:13 68:1,4
68:10 69:5,9
69:12,20 71:9
72:19 77:19,20
78:7 81:16,18
82:3 87:15
88:24 91:8,9
95:4 103:11
110:15 143:24
**turn** 16:15,17
20:16 48:13
64:13,14
**turned** 17:1
76:17 77:11
112:19
**turning** 119:21
**turns** 128:13
**tweezers** 105:4
**twice** 148:3
**two** 6:2 11:15
12:7 14:7 19:8
19:12,15 21:21
33:17 41:7
43:1 46:4
47:15,16 50:19
59:7,20 63:15
64:9,10 66:1
67:1,2 71:21
74:5 77:12
78:3 90:5 93:2
105:20 110:14
116:10 122:17
131:4 134:24
143:24 146:13
**two-page** 134:23
**two-way** 64:9
**type** 22:1 31:13
39:3 106:13,15
106:18 108:10
109:15
**types** 9:15 14:16
14:17,19 20:11

27:17 35:16
80:2 127:18
**typewriting**
150:9
**typical** 46:22
107:1
**typically** 12:23
103:3 104:17
106:15,16

---

**U**

**unable** 25:24
**uncle** 10:9
**unclear** 118:17
**uncomfortable**
61:10 75:23
96:12
**unconscious**
24:3
**understaffed**
12:19
**understand**
21:17 33:1
69:6 72:19
74:9 98:22
99:2 110:15
111:15 131:6
**understanding**
13:16 19:23
20:7 24:20
26:15,20,22,23
40:24 57:2
71:22 72:21
75:15 132:17
133:18 135:22
142:15
**unfit** 18:6
**uniform** 47:6
**union** 42:3,8
**unit** 55:3
**United** 1:1,15
149:1 150:1
**units** 85:3 86:6
**unreasonable**
34:17

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 174

**unsuccessful**
94:21
**untruthful**
17:18
**unusual** 52:8
**updates** 103:12
103:13
**upright** 68:8
**upset** 8:23 72:10
76:11,13 141:7
**upsetting** 142:7
**use** 9:15 22:7
27:5,9 30:14
31:1,10 32:3
32:17,17 34:12
35:6,8 65:6
66:6 67:23
81:10,12 132:1
135:10 148:4
**usual** 97:4
**usually** 8:9 11:9
12:19,20 14:6
62:11 93:2
97:15 102:22
136:23

**V**

**vague** 139:17
**value** 135:4,8
**varied** 8:8 13:1
**varies** 14:14
**variety** 27:9
**various** 27:19
**vehicle** 15:21
54:24 62:21
111:23 112:5
128:22 134:5,6
134:7
**version** 12:4
**vest** 47:7 92:24
93:3
**vicinity** 64:16
**victim** 39:9
**video** 5:20 6:6,7
6:8,11,12,22

43:4 45:9 62:3
62:3 71:19
79:3,6,9,12,13
87:17 88:3,4,6
94:14 98:4
101:1 110:17
118:3,6,11,13
118:24 119:4,8
119:9,10 120:9
121:8,11
122:17,21
124:17,18
133:21 147:22
**videoconference**
1:13 2:1 4:5
149:13 150:7
150:12
**videos** 6:11,13
6:14,19,19,24
40:18 62:1
118:24
**view** 88:24
**Village** 1:7 8:11
10:2 149:7
**vividly** 69:9
**vs** 1:6 149:6

**W**

**waited** 99:20
142:24
**waive** 147:19
**wake** 96:13
**walk** 56:20
62:21,24 97:17
97:21,22
**walked** 58:24
59:16 60:11
97:12 98:2
100:2 101:9
108:21
**walking** 62:19
63:6,12 68:9
97:19
**want** 5:7 32:23
33:1 45:11

47:22 54:18
56:5,5 60:6
61:6 67:11
74:4 76:2,5
98:15 100:18
112:17 123:9
123:21 141:4,5
146:14
**wanted** 10:20
48:13 59:18
66:3 76:1 83:6
88:9 100:14
112:18 117:6
147:12
**wanting** 103:11
**wants** 66:2,2
**warrant** 11:20
**wasn't** 12:6
20:23 21:15
45:19 47:24,24
65:11,17 68:9
74:20 75:22
87:15 95:1,12
113:4 123:9
124:9 129:23
**watch** 6:14,20
45:9
**watched** 4:23
5:20 6,6,10 7:1
21:6 142:11
**watching** 110:10
142:9,18
**way** 8:18,20
23:5 30:16
53:6 54:16
55:17 56:20
59:13,14 64:10
64:10,11 78:3
80:22,22 82:17
99:2 101:15
108:23 118:8
118:10,15,19
136:6 141:6
143:11
**ways** 22:19,22

23:1,7 28:2
72:16
**we'll** 98:8
147:20
**we're** 5:3 12:22
13:17 41:2
50:13 51:17
52:24 67:10,12
71:20 83:2
87:19 130:20
136:5
**we've** 7:23 22:4
27:4 89:17
108:6 115:10
139:5
**weapon** 16:1,3,6
16:12
**wear** 106:15
107:1
**wearing** 47:4
61:21 106:6,13
122:6,10
**week** 9:20 16:4
16:11 141:22
**weeks** 70:13
125:7
**weigh** 134:18
**weighed** 129:11
131:11
**weight** 70:10,15
70:16,19,22
71:4 104:3
134:8
**weird-shaped**
106:22
**weirdly** 79:6
**welding** 9:14
**went** 4:22 10:11
10:17 18:14
23:12,12 26:11
43:21 44:2,13
54:14 58:7
71:22 72:2
76:21 77:20
81:7 82:15,23

93:6 101:17
104:5 107:22
108:1,17
109:24 112:1
114:11,15,16
123:19 129:18
134:7
**weren't** 14:8
49:2,3 57:9
114:12 117:14
117:20
**west** 2:3 13:21
14:7,17,20
**wet** 132:1
**white** 49:22
120:17 135:2
145:10
**wide** 27:9 91:18
**width** 68:24
**wife** 8:22 16:1
**Wilde** 102:10
112:3
**willing** 92:12
**winded** 74:19
**wipes** 132:1
**wished** 30:20
**witness** 3:2 4:1,4
36:2 39:9
99:14 109:17
111:1 131:1
137:14 139:20
140:21 145:16
146:16,22
148:8 150:15
151:1
**Woodstock** 17:3
**word** 19:18,24
66:18 67:23
76:9 81:10
105:7
**words** 58:11
73:21 74:9,16
76:7 81:5 86:5
86:15,22 87:6
87:12 89:24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Heath Atwell - Taken 8/18/2022

Page 175

90:20 101:2
103:17
**wore** 106:16
**work** 12:17 13:4
21:12,15 44:22
46:19 54:16
96:15 102:14
102:18,20
113:5 146:7,9
147:6
**worked** 8:11,20
8:21 11:5
12:15 49:15,17
49:20,23 50:3
50:8 105:20
106:1
**working** 19:6
30:19 46:9,10
46:14,16,24
50:6 54:5,9
95:1 96:3
130:1
**works** 4:23
26:21 42:13
**worse** 76:6
**worst** 54:15
**wouldn't** 14:5
26:7 34:7
45:20 84:23
90:24 135:7
136:2
**wound** 23:5
**wrist** 81:7,24
**written** 60:7,9
60:12 62:19,22
**wrong** 83:24
114:13
**wrote** 144:21,23
145:6

**X**

**X** 3:1,7
**x-rayed** 114:13

**Y**

**yards** 63:19
**yeah** 8:8 14:24
16:12 17:8
19:17,22 20:10
20:12 21:4,11
21:20 22:8,11
22:24 23:11
25:9,18 26:3,5
26:7,14 27:18
28:1 30:17
33:4 37:12
38:9 39:4 50:2
52:14,19,22
53:16 55:8
61:6 62:3 63:1
66:17 67:18
68:8 69:21
73:19 75:22
76:13 78:20
79:12 80:8,18
82:14 87:11
88:10,20 89:6
91:11 95:22
99:15 100:2,6
101:7 103:2,9
103:22 104:19
108:4 111:19
117:5 118:17
118:18 122:8,8
123:23 126:4
127:8,9 131:9
133:6,20
135:18 138:5
139:1 142:4
145:11
**year** 25:18 37:1
144:4
**years** 11:15
29:12 48:16
50:19 77:12
90:5 106:22
110:14 116:11
131:4 143:24
**yelling** 72:9 75:8
80:3,9,14

84:21,21
**yesterday** 4:20
13:13 104:15
120:3
**young** 10:20
**younger** 10:11
**YouTube** 119:5
**Yup** 45:7 102:17
116:21 124:12

**Z**

**Zero** 7:20
**Zoom** 7:19
116:16 118:4
120:10 124:23
125:24 126:24
127:22 132:8
142:16,17,19

**0**

**084-003858**
151:13

**1**

**1** 3:9 6:8 13:19
116:20 132:22
133:1,24 134:5
**1:09** 124:7,11,16
**1:42** 124:17
**10** 69:1
**10-** 15:11
**10:45** 46:21 47:2
**10th** 20:17 29:2
38:12 39:14,22
40:1,4,11 46:8
117:21
**11** 121:18
**11:04** 43:11
115:3
**116** 3:9
**118** 3:10
**11th** 43:8
**12** 18:4
**12-day** 15:11
16:16

**12-hour** 46:24
**12:20** 148:9
**125** 3:11,12
**126** 3:13
**127** 3:14
**132** 3:15
**147** 3:5
**15** 63:19
**15th** 13:7 117:19
**161** 151:11
**184** 118:7
**18th** 1:18 149:13
150:14
**19** 12:20
**195** 2:8

**2**

**2** 3:10,16 13:19
118:2,6
**20** 12:21 13:13
69:1 122:16
123:5
**20/20** 135:18
**2010** 11:3
**2011** 18:18
**2012** 8:12 18:19
18:20,21
**2015** 37:2
**2017** 15:12
**2020** 8:20 12:23
13:7,18 20:17
29:3 38:12
39:14,22 40:1
40:4,11 43:8
46:8 117:19,21
**2021** 8:12,15
**2022** 1:18
149:13,23
150:14 151:3
**21** 1:6 149:6
**23:35** 133:16
**24** 43:12
**24-hour** 43:14
**2646** 132:11

**3**

**3** 3:11 13:19
125:2
**3050** 151:11
**312.341.9646**
2:4
**312.361.8851**
151:12
**3236** 1:6 149:6
**333** 2:8
**337** 2:3
**3564** 125:2
**3612** 125:22
**3628** 127:24
**3635** 116:20
**3929** 126:21

**4**

**4** 3:4,12 125:21
**4.0** 134:8
**40** 12:18 63:19
**42** 6:8 119:15
**45** 44:2
**47** 123:12

**5**

**5** 3:13 126:21
**53** 2:3
**56** 124:6,11
**57** 123:6,12

**6**

**6** 3:14 127:24
**6/10/2020**
133:15
**60** 21:4
**60143** 2:9
**60601** 151:12
**60604** 2:4
**630.733.4774**
2:9

**7**

**7** 3:15 132:10
**7:15** 46:21