

Transcript of the Deposition of
# Jeremiah Scheithe
## (Defendant Officer)

**Case:** Fabiola Rosiles v. Village of Round Lake Beach; et al.
**Taken On:** August 18, 2022

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

EXHIBIT

J

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
FABIOLA ROSILES, as Independent   )
Administrator of the Estate of    )
ABEL ROSILES, JR., Deceased,      )
                                  )
                     Plaintiff,   )
                                  )
          vs.                     )  No. 21 CV 3236
                                  )
VILLAGE OF ROUND LAKE BEACH;      )
J. SCHEITHE; J. BERTHOLOMEY;      )
T. CRAMER; and H. ATWELL,         )
                                  )
                     Defendants.  )
```

The deposition of JEREMIAH SCHEITHE, taken via
videoconference, called by the Plaintiff for examination,
pursuant to notice and pursuant to the Federal Rules of
Civil Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Tina M. Hickey, Certified Shorthand Reporter, on
August 18th, 2022, at 1:05 p.m.

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 2

```
 1   APPEARANCES (via videoconference):

 2        HALE & MONICO, LLC
          MR. JASON MARX
 3        53 West Jackson Boulevard
          Suite 337
 4        Chicago, Illinois 60604
          Phone:  312.341.9646
 5        E-mail:  jmarx@halemonico.com

 6            On behalf of the Plaintiff

 7        HERVAS, CONDON & BERSANI, P.C.
          MR. G. DAVID MATHUES
 8        333 Pierce Road
          Suite 195
 9        Itasca, Illinois 60143
          Phone:  630.733.4774
10        E-mail:  dmathues@hcbattorneys.com

11            On behalf of the Defendants.

12                    *   *   *   *   *

13

14

15

16

17

18

19

20

21

22

23

24
```

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 3

1                    I  N  D  E  X

2   WITNESS                                  PAGE

3   JEREMIAH SCHEITHE

4        Examination by Mr. Marx..............  4

5        Examination by Mr. Mathues...........  131

6        Further Examination by Mr. Marx.......  135

7

8                  E  X  H  I  B  I  T  S

9   SCHEITHE DEPOSITION EXHIBIT                 PAGE

10       No. 1................................  102

11       No. 2................................  108

12       No. 3................................  113

13       No. 4................................  114

14       No. 5................................  114

15       No. 6................................  115

16       No. 7................................  115

17       Exhibit Nos. 1 and 2 were retained by Mr. Marx.

18

19

20

21

22

23

24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 4

1          (Witness sworn.)
2    WHEREUPON:
3              JEREMIAH SCHEITHE,
4    called as a witness herein, having been first duly sworn,
5    was examined and testified via videoconference as
6    follows:
7              EXAMINATION
8    BY MR. MARX:
9        Q.   Can you please state and spell your full name?
10       A.   Yes.  Jeremiah Scheithe.  That's
11   J-E-R-E-M-I-A-H, S-C-H-E-I-T-H-E.
12       Q.   Thank you.
13           Mr. Scheithe, you are currently not a police
14   officer, correct?
15       A.   That's correct.
16       Q.   Is it okay, for the ease of myself, that I
17   call you "Officer" as opposed to "Mr. Scheithe" for the
18   rest of the deposition?
19       A.   Yes, sir, that's fine.
20       Q.   Okay.  Thank you.  I appreciate that.
21           Officer, have you ever given a deposition
22   before?
23       A.   I have not.
24       Q.   All right.  Were you present for

Page 5

1    Officer Cramer's and Officer Atwell's depositions?
2        A.   Yes, sir.
3        Q.   Okay.  So I'm not going to go over the rules
4    of a deposition.  The only thing I'll say is this
5    deposition is my one chance to talk to you before trial
6    if in fact there is a trial.  So I'd ask, if you want to
7    clarify, change, or correct any answer, please let me
8    know.  I'll be happy to go back over what you previously
9    said and we can talk about it.  Okay?
10       A.   Okay.
11       Q.   Officer, is there any reason why you won't be
12   able to give complete and honest answers here today?
13       A.   No.
14       Q.   Did you review any materials in preparation
15   for your deposition?
16       A.   Yes.
17       Q.   What did you review?
18       A.   Some squad video from two squads, the interior
19   video of Thorntons.  I reviewed the Major Crimes' report
20   as long as -- with the interrogatories, I believe they're
21   called, and some cell phone video as well.
22       Q.   Okay.  Do you remember whose squad videos you
23   watched?
24       A.   I believe they were mine and Officer Cramer's.

Page 6

1        Q.   And you reviewed the report made by the Lake
2    County Major Crimes Task Force regarding what they said
3    that you told them, correct?
4        A.   Yes, sir.
5        Q.   Did you notice anything inaccurate about what
6    they said that you said?
7        A.   No, sir.
8        Q.   By the way, did they give you an opportunity
9    to review it prior to them finalizing it?
10       A.   I believe so, yeah.  I believe so.
11       Q.   Okay.  Do you recall at that time having any
12   issue with it?
13       A.   I don't believe there were any issues with
14   that one either.
15       Q.   Is it fair to say that you're friends with
16   Mr. Heath Atwell?
17       A.   Yes.
18       Q.   Okay.  Are you friends with Mr. Bertholomey
19   and Cramer?
20       A.   Yeah.  I would say not as close but definitely
21   friendly.
22       Q.   Okay.  You shouldn't talk to me, of course,
23   about what you talked to your attorney about.  That's
24   privileged.  But have you met in person with your

Page 7

1    attorney?
2        A.   Yes.
3        Q.   How many times throughout -- that is,
4    throughout -- since this lawsuit has been filed, have you
5    met with your attorney?
6        A.   I believe it's only been once or twice for me.
7        Q.   Okay.  Was that in person?
8        A.   It was.
9        Q.   Have you ever met him over Zoom, so to speak?
10       A.   No.
11       Q.   How about over the phone?
12       A.   Yes.
13       Q.   Okay.  When you met in person, was anybody
14   else present?
15       A.   No, except for these depositions, but it was
16   just me and him the other time.
17       Q.   Okay.  By saying that, you and him, is that
18   privately at one point?
19       A.   Yes.
20       Q.   But, otherwise, you met with at least some of
21   the other defendant officers in this case and your
22   attorney?
23       A.   Yes, sir.
24       Q.   How many times has that happened?

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 8

1    A.   Just a couple of times.
2    Q.   Okay.  You worked for the Village of Round
3    Lake Beach Police from June of 2015 until June 11th of
4    2020; is that correct?
5    A.   Can you say the last date?  Was it June 11th?
6    Q.   June 11th, 2020.
7    A.   I believe it was the 20th.  I think it's --
8    because I know I made it a full year.  So I think it was
9    either the 20th or 21st.
10    Q.   Well, did you technically resign on June 20th
11    but you, on paper, were still on the job because you had
12    accumulated like time off or something like that?
13    A.   No.  I provided my two-week notice on the
14    11th.
15    Q.   Why did you provide your two-week notice on
16    June 11th?
17    A.   Because I had an opportunity to work for my
18    father-in-law, and I took that opportunity.
19    Q.   What type of work is that?
20    A.   I handle -- he owns a flooring store, so I
21    handle the freight for that and do some sales for that
22    company.
23    Q.   Is that in Lake Geneva, Wisconsin?
24    A.   Correct.

Page 9

1    Q.   And have you been doing that ever since you
2    left Round Lake Beach Police?
3    A.   Yes.
4    Q.   Are you enjoying it?
5    A.   Yeah.  I have more time with my family, so
6    that's the most important.
7    Q.   Did this incident have anything to do with
8    your decision?
9    A.   I believe it was the icing on the cake, if you
10    will.  I've been -- my father-in-law has been kind of
11    trying to recruit me for about a year now -- or then.
12    And once this happened, it was just -- I talked to my
13    wife and made the decision just to make the switch.
14    Q.   What about this incident was kind of the icing
15    on the cake for you?
16    A.   Just the stress of the whole incident, the
17    stress that I knew what it was going to entail with Major
18    Crimes and everything that was getting involved.  And I
19    was already halfway out the door before this.  This was
20    just kind of the final push.  I already talked to
21    officers before this about me leaving.
22    Q.   I think it was Atwell that said something like
23    he talked to you for about 45 minutes on the 11th.  Do
24    you recall talking to him?

Page 10

1    A.   Yeah, it was -- I don't know how long the call
2    was, but I do remember talking to him and telling him
3    about me wanting to leave or going to leave.
4    Q.   Okay.  What he said about your conversation,
5    was that mostly accurate?
6    A.   Yes.
7    Q.   All right.  Did you have any prior law
8    enforcement experience?
9    A.   No.
10    Q.   Why did you become a police officer to begin
11    with?
12    A.   I always wanted to help people.  That was my
13    number one reason for wanting to become a police officer,
14    and my father was in the military and it just stuck with
15    me.  So I always wanted to be a police officer when I was
16    young.
17    Q.   Any plans to once again become an officer?
18    A.   I'm sorry.  Say that again.
19    Q.   Any plans to once again become an officer?
20    A.   No, sir.
21    Q.   You think that's it for you?
22    A.   That's it, yeah.  That was it.
23    Q.   Are you aware of any complaints that have been
24    made against you -- that were made against you while

Page 11

1    being a police officer?
2    A.   No.
3    Q.   As a police officer, did you receive any form
4    of discipline?
5    A.   No.
6    Q.   Were you ever stripped of your police powers?
7    A.   No.
8    Q.   Were you ever found unfit for duty?
9    A.   No, sir.
10    Q.   Were you ever sued in your capacity as a
11    police officer besides this lawsuit?
12    A.   No.
13    Q.   Have you ever been convicted of a crime?
14    A.   No.
15    Q.   In your own personal life -- in your own
16    personal life, have you ever taken any first aid classes?
17    A.   In my personal life, you said?
18    Q.   Yeah.
19    A.   In my personal life, no, but for policing I
20    did.
21    Q.   Okay.  Do you recall receiving some first aid
22    classes when you first went to the academy?
23    A.   Yes, sir.
24    Q.   Okay.  Do you remember how long it was, as in,

5 (Pages 8 to 11)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 12

1   was it an hour or two, or was it a whole day or two or --
2       A. I am not entirely sure.
3       Q. Okay. Do you remember anything about that
4   class, like what was taught, what the subjects were?
5       A. I do not.
6       Q. Besides having first aid classes in the police
7   academy, did you have any further training with regard to
8   first aid throughout your career at Round Lake Beach
9   Police?
10      A. Yes.
11      Q. How many times would you say specifically for
12  first aid?
13      A. I would say three or four times while I was
14  there.
15      Q. Okay. Was it online, or was it in person or
16  both?
17      A. In person.
18      Q. Do you remember the name of any instructors?
19      A. I believe Officer Wade was one of the
20  instructors.
21      Q. Any other instructors?
22      A. Not that I remember, no.
23      Q. Do you remember what years you took these
24  trainings?

Page 13

1       A. I do not.
2       Q. Do you remember generally what was discussed
3   at these trainings?
4       A. I remember CPR being taught and the Heimlich.
5   Other than that, I don't recall.
6       Q. First aid is kind of a broad category, right?
7   It also talks about basic wound control, right?
8       A. Um-hmm.
9       Q. Yes, sir. Is that a "yes"?
10      A. Yes, sorry. I apologize.
11      Q. It's okay. It probably also talked about --
12  well, did it talk about drug overdoses and possible
13  short-term treatment for drug overdose?
14      A. I don't recall that being taught in it.
15      Q. Oh, okay.
16          In the trainings that you received as a police
17  officer, that is, were you ever trained on what
18  asphyxiation means?
19      A. I'm sure that we were taught what asphyxiation
20  is, yes.
21      Q. Do you have an understanding of what that term
22  means?
23      A. Yes.
24      Q. What's your understanding?

Page 14

1       A. The lack of oxygen getting to your body.
2       Q. And are you aware of some of the signs and
3   symptoms of asphyxiation?
4       A. Yes.
5       Q. What are you aware of?
6       A. The inability to breathe. I think bulging
7   eyes is a symptom, discoloration of the face; possibly,
8   you know, holding your hands to your neck, yeah.
9       Q. And have you received any training on how you
10  might treat somebody who is suffering from asphyxiation?
11      A. The Heimlich or getting someone off of -- you
12  know, off of their stomach.
13      Q. So you were taught it's important to get
14  somebody off their stomach if they might be suffering
15  from asphyxia?
16      A. Yes.
17      Q. Why were you taught -- Strike that.
18          Do you have an understanding as to why that's
19  important?
20      A. Yes, because it restricts the oxygen flow; it
21  can.
22      Q. And would you say it's fair to say that
23  there's several things that -- many things that could
24  cause somebody to suffer from asphyxia?

Page 15

1       A. Yes.
2       Q. What are some of the things that you're aware
3   of?
4       A. Something getting lodged into the throat,
5   being in a position to where you can't breathe, yeah.
6       Q. Okay. Do you know what the diaphragm is in
7   the body?
8       A. I do.
9       Q. What is it?
10      A. You have to be able to -- your chest has to be
11  able to expand in order to take in oxygen.
12      Q. And do you know more specifically how the
13  diaphragm helps that happen?
14      A. I do not.
15      Q. You're not a medical doctor, right?
16      A. Correct.
17      Q. You're not a nurse, right?
18      A. Correct.
19      Q. You did listen to the same questions that were
20  given in this last deposition, right?
21      A. Yes, sir.
22      Q. Okay. And the one for Cramer too, right?
23      A. Yes, sir.
24      Q. Were you there for Bertholomey or no?

6 (Pages 12 to 15)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 16

1    A.  No, sir.
2    Q.  Okay.  Were you ever trained that if the
3  diaphragm can't move properly, for whatever reason, that
4  that could lead to somebody suffering from asphyxia?
5    A.  I don't know if I was trained in that
6  specifically.
7    Q.  Do you believe that to be true?
8    A.  Yes.
9    Q.  You've received multiple trainings on an
10  officer's use of force, correct?
11    A.  Correct.
12    Q.  You understand that there's a variety of
13  different levels of force you can use, depending on the
14  situation you're faced with, right?
15    A.  Yes.
16    Q.  And have you received training on how to take
17  somebody to the ground?
18    A.  Yes.
19    Q.  Okay.  Have you received training on what's
20  called "emergency handcuffing procedures"?
21    A.  I don't necessarily remember it being called
22  "emergency handcuffing procedures," but I've been trained
23  in handcuffing procedures, yes.
24    Q.  You received training on how to handcuff

Page 17

1  somebody who might be resisting, correct?
2    A.  Correct.
3    Q.  And there's a variety of things you could do
4  based on what you're confronted with, right?
5    A.  Correct.
6    Q.  One of them is to try to take the person to
7  the ground, get them in the prone position, and put cuffs
8  on them that way, right?
9    A.  Yes.
10    Q.  You could do other things too if you felt it
11  was appropriate, right?
12    A.  Yes.
13    Q.  Like, you could just simply try to grab both
14  of their arms together while they're still standing up if
15  you believed that was appropriate, right?
16    A.  Right, yes, sir.
17    Q.  What are some of the ways you've been trained
18  on how to take somebody to the ground?
19    A.  Several.  There's the straight armbar
20  takedown, just taking them to the ground, pulling them
21  down, sweep.  There's several ways, but those are the
22  ones I can think of.
23    Q.  How does one perform an armbar takedown?
24    A.  If they were to straighten out their arm, if I

Page 18

1  remember -- it's been years now, but if I remember, you
2  just put your arm back -- your hand back here and kind of
3  sweep them down, as if you -- you turn your body, you
4  take a step back, and turn them down, and get them -- use
5  the leverage of their arm to take them down.
6    Q.  You maintain control of their arm, kind of
7  pivot your hips, and pull them to the ground?
8    A.  Yes, sir.
9    Q.  While trying to maintain control of their arm?
10    A.  Yes.
11    Q.  What's a sweep?
12    A.  That would be using your legs to kind of trip
13  them.
14    Q.  Any other ways that you can recall how to take
15  somebody to the ground, or is that the only two you can
16  recall?
17    A.  That's the only ones I can recall.  You can
18  tackle them to the ground.
19    Q.  Tackle, as in what's commonly known as like a
20  football tackle?  You tackle them in the waist area
21  somewhere?
22    A.  Right.  I don't know if I've ever done that,
23  but --
24    Q.  When you use force on someone, did the Round

Page 19

1  Lake Beach Police require you to fill out a document
2  indicating that you used force?
3    A.  There was a document, yes.
4    Q.  What was it called?
5    A.  I think it was called a use-of-force report.
6    Q.  And did you fill out a use-of-force report
7  regarding your contact with Abel Rosiles on June 10th,
8  2020?
9    A.  I did not.
10    Q.  Why not?
11    A.  Because I think it had to meet -- if I
12  recall -- I have to look at the policy, but it had to
13  meet a certain criteria for that use of force.
14    Q.  Did you use force on Abel?
15    A.  Yes.
16    Q.  What force did you use?
17    A.  I took him down to the ground just to control
18  him.  That's basically it.
19    Q.  We'll get back to that in a little bit.
20    A.  Okay.
21    Q.  Do you know what the prone position is?
22    A.  Yes.
23    Q.  What is that?
24    A.  That's when you're laying down on your

7 (Pages 16 to 19)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 20

1  stomach.
2      Q.   Okay.  Were you ever taught how to handcuff
3  somebody who might be in the prone position?
4      A.   Yes.
5      Q.   What were you taught to do?
6      A.   If I remember, it's -- I remember in the
7  academy, you would keep their arm up and then kind of
8  bring their arm back to the side and then grab their
9  other arm and bring them over, but it's been a while.
10     Q.   That's the last training you received
11 regarding that specific technique in the academy that you
12 can recall?
13     A.   No.  I believe we -- that specific technique I
14 don't think we -- we learned at Round Lake Beach, but I
15 can't specifically remember what we learned in Round Lake
16 Beach.
17     Q.   Do you agree with me that keeping a detained
18 subject; that is, a handcuffed subject, in a prone
19 position for an extended period of time could increase
20 the risk of that person having difficulty breathing?
21     MR. MATHUES:  Objection to foundation.
22 BY THE WITNESS:
23     A.   Yes, it could.
24     Q.   Why do you believe that?

Page 21

1      A.   Because it can restrict the oxygen to the
2  body, doesn't allow the diaphragm to expand.
3      Q.   Were you ever trained that it's an acceptable
4  use of force to restrain somebody who's in the prone
5  position by putting pressure on their back?
6      A.   Not necessarily trained to apply pressure, no.
7      Q.   Well, have you ever put -- have you ever put
8  any part of your body weight on somebody while they're
9  handcuffed behind their back and in a prone position?
10     A.   If they're still fighting, I would, just to
11 control them, yes.
12     Q.   And did you do that to Abel Rosiles?
13     A.   At some points I'm sure I put some amount of
14 pressure needed in order to control him, yes.
15     Q.   What do you mean by "in order to control"?
16     A.   In order for him to stop running, I would have
17 to apply some pressure.
18     Q.   If somebody is in the prone position, they're
19 not running, right?
20     A.   Correct, in the prone position.  But if
21 they're trying to get up, I have to apply some pressure
22 to get them back down.  Yeah, I just ...
23     Q.   I'll just ask you a couple names and ask you
24 if you're familiar with any of them.

Page 22

1      A.   Okay.
2      Q.   So prior to June 10th, 2020, did you know who
3  Abel Rosiles, Jr., was?
4      A.   No.
5      Q.   To the best of your knowledge, had you had any
6  contact with him prior to that night?
7      A.   No.
8      Q.   To the best of your knowledge, had any
9  officer, or anybody, for that matter, ever spoken his
10 name before?
11     A.   No.
12     Q.   Did you know who the Abel -- Sorry.  Did you
13 know who the Rosiles family, any member of their
14 family was, prior to that night?
15     A.   No, sir.
16     Q.   How about the same questions for Antoine
17 Stanley?  Did you know who he was?
18     A.   I knew of him, working midnights, to be the
19 clerk of Thorntons, but I never knew his name.
20     Q.   To the best of your knowledge, had you ever
21 arrested him?
22     A.   No.
23     Q.   To the best of your knowledge, had you ever,
24 prior to this night that we're about to talk about,

Page 23

1  filled out a report regarding him being a victim or a
2  witness to a crime?
3      A.   No.
4      Q.   Is it fair to say that you saw him frequently
5  at the Thorntons while you were on your shift?
6      A.   That would be fair.
7      Q.   How often did you go to Thorntons?
8      A.   It would -- coffee was not my choice.  My
9  choice was Mountain Dew, so I'd go there and get a drink
10 probably, I would say, once a night.  So I would see him
11 when he was working those nights.
12     Q.   That's typically where you would get it from,
13 that particular location?
14     A.   Yes, sir.
15     Q.   By the way, is there a different Thorntons in
16 Round Lake Beach that you're aware of, or is this the
17 Thorntons in Round Lake Beach?
18     A.   I think that's the Thorntons unless it's
19 changed.  I haven't been there since, but ...
20     Q.   You haven't gone back there since you
21 resigned?
22     A.   No, I have gone there I think for some
23 ceremonies, but I haven't actually driven around Round
24 Lake Beach like I used to.

8  (Pages 20 to 23)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 24

1      Q.   With regard to Antoine, had you ever -- Well,
2   a better question is, prior to June 10th, 2020, did you
3   have any reason to have any issue with his credibility?
4      A.   No.
5      Q.   Did you know a Sinahy Gomez Reyes before
6   June 10th, 2020?
7      A.   No.
8      Q.   Did you know a Shelby Brubaker before
9   June 10th, 2020?
10     A.   No.
11     Q.   Did you know my client, Fabiola Rosiles,
12  before June 10th, 2020?
13     A.   No.
14     Q.   Did you know a Julie Contreras prior to
15  June 10th, 2020?
16     A.   No.
17     Q.   Do you now know who that person is?
18     A.   Yes.
19     Q.   How do you know that person?
20     A.   From media.
21     Q.   When did you first become aware of her?
22     A.   I am not entirely sure.  I think it was
23  shortly after this happened, but I'm not sure.
24     Q.   Have you ever actually seen her in person?

Page 25

1      A.   No.
2      Q.   So therefore you haven't talked to her?
3      A.   Right, I have not talked to her, no.
4      Q.   According to the task force,
5   Investigators Vermister (phonetic) and Kolar interviewed
6   you on June 11th, 2020.  My question is, do you have any
7   idea who those -- that is, did you have any idea who they
8   were before they interviewed you?
9      A.   No.
10     Q.   How, by the way, did you get notified that you
11  were going to be asked for an interview?
12     A.   I believe I was called before my shift.  I'm
13  not entirely sure who it was by, but I was called by
14  someone.
15     Q.   This incident we're talking about started,
16  more or less, I think, at 10:30 p.m. on June 10th.  Do
17  you recall what time you actually stopped working that
18  day?
19     A.   I do not recall when I -- I think I stayed
20  late, but I can't recall.
21     Q.   Were you scheduled to work the next day; that
22  is, June 11th?
23     A.   I believe so.
24     Q.   And you're saying you believe you got

Page 26

1   contacted before your shift about this interview?
2      A.   Yes.
3      Q.   When you heard that, what did you think?
4      A.   Just I think it was -- I was just stressed
5   out.  I knew it was probably going to come, but I just --
6   I'd been stressed out about the job for a while; but,
7   like I said, it was the icing on the cake.
8      Q.   Is it fair to say you were angry to some
9   extent?
10     A.   No, I don't think I was angry, no.
11     Q.   Frustrated?
12     A.   I don't know.  I don't know if I was
13  frustrated at the time.
14     Q.   Is it fair to say that you really didn't want
15  to give a statement, that you were kind of upset and
16  didn't want to talk to them?
17     A.   No.
18     Q.   Okay.  You were willing to talk to them?
19     A.   Yes.
20     Q.   Did you contact an FOP representative or
21  attorney?
22     A.   I believe he was there when I got there.
23     Q.   Who was it; do you recall?
24     A.   I think his name is Roche.  I want to say

Page 27

1   Roche.
2      Q.   Did you know who that person was before that
3   date?
4      A.   I knew it was the FOP attorney because we
5   would have contract negotiations.
6      Q.   To the best of your recollection, had you ever
7   seen him speak or at least been in the same room with him
8   before that day?
9      A.   Yes.
10     Q.   Okay.  Had you had him assist you before then;
11  that is, on some prior unrelated incident?
12     A.   No.
13     Q.   Do you know why he was there, by the way?
14     A.   I do not.
15     Q.   I mean, did you specifically ask for him, or
16  it's your memory he was actually already there?
17     A.   He was already there.  I don't remember asking
18  for him at all.
19     Q.   Do you recall him speaking during your
20  statement, by the way?
21     A.   I don't recall, no.
22     Q.   Do you recall him being in the room when you
23  talked to the investigators?
24     A.   Yes.

9  (Pages 24 to 27)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 28

1    Q.   Did the investigators tell you they were
2  investigating this matter for potential criminal charges?
3    A.   I don't remember them actually saying that.
4  I'm not sure if they did.
5    Q.   Do you recall them advising you of your
6  Miranda rights?
7    A.   No.
8    Q.   As in you have a memory of them not doing
9  that?
10   A.   Correct. I do not believe they read my
11 Miranda rights.
12   Q.   So according to the document that I saw, your
13 statement was taken at approximately 9:13 p.m. on
14 June 11th, and Abel was arrested at approximately
15 11:04 p.m. on June 10th. So that's about 22 hours
16 between the time of the arrest until your statement. So
17 my question is, who do you recall speaking to in that
18 time frame?
19   A.   I would have spoken to the other officers on
20 scene. I believe it was DC Wilde, Commander Barr. I
21 spoke to, obviously, my wife. And I remember talking to
22 Atwell before I came back in for the interrogation.
23   Q.   How did you resign, by the way? Did you send
24 an e-mail or a letter?

Page 29

1    A.   I believe that I went and told them that I was
2  giving my two-week notice, and then I think they
3  requested me to do a letter and then e-mail it.
4    Q.   Who did you orally tell?
5    A.   DC Wilde.
6    Q.   He was then the deputy chief, not the actual
7  chief?
8    A.   Correct.
9    Q.   And now he's chief to your knowledge?
10   A.   Yes, sir.
11   Q.   Who was the letter written to?
12   A.   I honestly do not remember.
13   Q.   Do you recall what it said?
14   A.   I do not.
15   Q.   Prior to giving your statement, did you watch
16 any videos or listen to any audio?
17   A.   No.
18   Q.   Did you want to --
19   A.   I don't remember wanting to, no.
20   Q.   You don't remember asking or having the desire
21 to is what you're saying?
22   A.   Right.
23   Q.   Do you know if any audio or video existed that
24 captured any part of this at the time you gave your

Page 30

1  statement?
2    A.   I knew Abel's girlfriend was taking videos
3  on-scene. That's what it appeared to be like. But other
4  than that, I wasn't entirely sure there was going to be
5  any video.
6    Q.   You weren't wearing bodyworn camera that
7  night, correct?
8    A.   Correct.
9    Q.   You never wore one for Round Lake Beach
10 Police, correct?
11   A.   That's correct.
12   Q.   Do you know when they started, as in, do you
13 know when officers started wearing them, if they have?
14   A.   I do not.
15   Q.   By the way, do you have any issue with that?
16 Some officers do, some officers don't. But do you have
17 any issue with wearing -- would you have had an issue
18 wearing a bodyworn camera?
19   A.   No. I would have liked it.
20   Q.   Why would you have liked it?
21   A.   Well, for this case, just case in point, it
22 would have been nice to have video from all other
23 officers on scene --
24   Q.   Were you wearing an audio-recording device on

Page 31

1  your person?
2    MR. MATHUES: I don't think the witness finished his
3  statement, so I would try to let the witness finish.
4    MR. MARX: Oh, I didn't intentionally do that.
5    MR. MATHUES: I'm sure. I'm sure. I know it was an
6  accident.
7  BY THE WITNESS:
8    A.   No. I was saying for this incident it would
9  have been nice for the officers to have bodyworn cameras
10 because it would have shown everything instead of piecing
11 together squad-car video.
12   Q.   Right. You're not aware of any one single
13 video that captures this entire incident that we're here
14 to talk about, right?
15   A.   Correct.
16   Q.   Were you wearing any sort of audio-recording
17 device on your person that night?
18   A.   No.
19   Q.   Did the Round Lake Beach Police Department to
20 your knowledge have such a device available for officers
21 at that time?
22   A.   Yes.
23   Q.   Why weren't you wearing one?
24   A.   It was only common practice for me to wear

10 (Pages 28 to 31)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 32

1  them when I was on traffic stops.  I believe that was
2  only when we were required to wear them, traffic stops.
3  But other than that, it wasn't common practice for me to
4  wear them.
5      Q.  Are you saying it's your belief there's a
6  general order, a special order, or directive that says
7  you must wear and activate that device during a traffic
8  stop?
9      A.  I can't tell you.  I'm not entirely sure if
10  it's required, but I just know it was common practice for
11  me.  I believe it was, but I'm not entirely sure.
12      Q.  Okay.  Are you aware of a general order or
13  special order or any sort of directive that states
14  whether you must or shall wear one and use it during
15  non-traffic stops?
16      A.  Not that I'm aware of, no.
17      Q.  Why was it your common practice to wear it for
18  traffic stops but not for other events?
19      A.  I'm not entirely sure.  I just know that was
20  what I did.  It was just habit for me to grab it, put it
21  on my vest, and walk to the car.
22      Q.  If you weren't using it for a traffic stop,
23  where would it be?  Where would you keep it, so to speak?
24      A.  In the charger above the computer, under the

Page 33

1  squad car -- or I'm sorry -- under the squad-car video.
2      Q.  I heard one officer describe it as kind of
3  like the size of a pager, if you know what those are from
4  the '80s and '90s.  Do you agree with that description of
5  the size?
6      A.  Yes, sir, I would agree with that.
7      Q.  All right.  That particular day, June 10th,
8  2020, what was your shift?
9      A.  Midnight shift.
10      Q.  What hours was that?
11      A.  10:45 to 7:15 in the morning.
12      Q.  And do you believe you started at 10:45 that
13  day?
14      A.  Yes.
15      Q.  Okay.  Is there like a way that you clock in
16  or somehow -- some sort of way that would be documented
17  that you started that day at that time?
18      A.  Yes.  We had a clock-in machine, I guess you
19  would say, where you put your palm on it, type in the
20  code, and it would clock you in.
21      Q.  It was a hand scanner; then you typed in
22  your -- like your employee ID number or something like
23  that?
24      A.  Yes, sir.

Page 34

1      Q.  Okay.  That was at the station, I assume?
2      A.  Yes.
3      Q.  I'm sorry.  Did you say 10:45 was your start
4  time?
5      A.  Yes.
6      Q.  And is that when you actually started that
7  day?
8      A.  Yes.
9      Q.  What's the first thing you can recall
10  happening when you first got to the station that day?
11      A.  I would have, obviously, put my uniform on and
12  then went upstairs to the roll call room like I normally
13  do.
14      Q.  Was there roll call that day?
15      A.  Honestly, I'm not entirely sure.  I know there
16  were some days we didn't at that point, but I'm not
17  entirely sure if there was that day or not.
18      Q.  I've heard that COVID sometimes complicated --
19  or it didn't -- not complicated, but sometimes it lended
20  itself to not there being an actual roll call where
21  everybody stayed in the same room.  Is that what you're
22  trying to express?
23      A.  Correct.  There were some days where we would
24  have an informal roll call where things would get texted

Page 35

1  out -- the beat you were on that day would get
2  disseminated via text or any other information or in
3  passing.
4      Q.  Okay.  So you're at the station.  You're
5  obviously dressed at that point, correct?
6      A.  Correct.
7      Q.  By the way, do you dress at home or at the
8  station?
9      A.  I dress at the station.
10      Q.  What's your uniform at the station?  What do
11  you dress into?
12      A.  It would be blue pants, a blue shirt with the
13  Round Lake Beach emblem on the sides.  Then you had your
14  vest with your badge, duty belt, work boots.  I think I
15  had -- I think we were allowed to wear -- yeah, we were
16  allowed to wear our hats.  I'm not entirely sure if I was
17  wearing one at that point.
18      Q.  What equipment were you carrying on your
19  person?
20      A.  I would have had -- it's been so long --
21  handcuffs, my gun, I think another pair of handcuffs
22  behind me, OC spray.  I had a little pouch with rubber
23  gloves behind me, a taser.  And then I didn't carry my
24  baton at that point, I don't believe.  And then I believe

11 (Pages 32 to 35)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 36

1    that's it.
2        Q.   Did you say a little pouch with rubber gloves?
3        A.   Yeah.  They weren't always stocked, but I
4    would have like a little pouch behind me that sometimes
5    would have rubber gloves in it.
6        Q.   Like thin plastic -- thin rubber gloves that
7    one would think you could buy at the store sometimes?
8        A.   Yes, yes, sir.
9        Q.   What was the purpose of that, as in, why did
10   you carry that sometimes?
11       A.   In case there was any biohazard, blood --
12   maybe blood or anything else, urine, that I didn't want
13   to touch with my gloves that I had, my rubber -- not
14   rubber but my duty gloves that I would have on.
15       Q.   Do you remember having plastic gloves on your
16   person that particular day?
17       A.   I do not remember that.
18       Q.   Are you saying it's typical or you normally
19   did; you just don't recall?
20       A.   Yeah, I do not recall, no.
21       Q.   You did say you had work gloves on that
22   particular day?
23       A.   Yes.
24       Q.   Can you describe those?

Page 37

1        A.   They're black with, I want to say, like
2    leather palms on each hand, and they're Velcro where they
3    Velcro to the wrist.
4        Q.   Some gloves, they cut off at some point on the
5    finger.  Did yours fully enclose the finger or not?
6        A.   Fully enclosed, yes, sir.
7        Q.   Some gloves have a hard protective shell on
8    the outside of them.  Do you know if yours had any sort
9    of hard surface on the outside for protective purposes?
10       A.   It did not.
11       Q.   Where did you get those gloves?
12       A.   I'm not entirely sure.
13       Q.   Did the department issue you gloves?
14       A.   No, but I believe you could buy them with your
15   clothing allowance.
16       Q.   I was going to say, is that typical that you
17   buy something like gloves or shirts through your clothing
18   allowance, and the department would reimburse you?  Is
19   that how it worked?
20       A.   They would give you -- I'm not entirely sure
21   of dollar amount, but they would give you certain amounts
22   that you're able to utilize on the website.
23       Q.   Okay.  I'm sorry.  I forgot if you answered
24   this.  Did you have -- what type of footwear did you

Page 38

1    have?
2        A.   They were just my duty boots.  I think they
3    were leather boots.
4        Q.   It sounds like you had been to that Thorntons
5    many times before June 10th, 2020, correct?
6        A.   Correct.
7        Q.   Sounds like mostly for beverages, fair?
8        A.   That is fair.
9        Q.   But how about for work purposes?  Like, how
10   many times would you say you've been there for work
11   purposes before that date?
12       A.   I mean, maybe ten times for maybe drive-offs,
13   but I'm not entirely sure.
14       Q.   Okay.  Drive-offs being like people not paying
15   for gas?
16       A.   Correct.
17       Q.   In your opinion was there a high crime area in
18   Round Lake Beach?
19       A.   Yeah, Round Lake Beach, I would say, it was a
20   high crime area.
21       Q.   No, not the -- Well, are you saying the whole
22   city was a high crime area or -- more specific, I was
23   trying to find out is there a section in Round Lake Beach
24   that was more high crime than others?

Page 39

1        A.   I would say not entirely.
2        Q.   Okay.  Because it's my understanding that
3    there's a north, east, and a west patrol area in Round
4    Lake Beach; is that correct?
5        A.   Yes.
6        Q.   In your experience was the north, east, or
7    west -- out of those three, did one of them have a more
8    heavy police call?
9        A.   I would say either probably the west or the
10   east.  Especially being on midnights, the retail section
11   wasn't really a big deal because they were -- most of the
12   businesses were closed.
13       Q.   The north section is where this Thorntons was?
14       A.   Correct.
15       Q.   It's more businesses than it is residential?
16       A.   Correct.
17       Q.   Besides rubber gloves that might be used for a
18   biohazard or something similar to that, did you have any
19   other type of first-aid or medical-type gear on your
20   person?
21       A.   I would carry a tourniquet in my pocket.
22       Q.   Anything else?
23       A.   I had Narcan that was in my other pocket, or I
24   guess it could be in the same pocket.  I'm not entirely

12 (Pages 36 to 39)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 40

1    sure.
2        Q.   Anything else?
3        A.   Not that I can think of, no.
4        Q.   How about in your vehicle?  Would you carry
5    any sort of first-aid-type material in your vehicle?
6        A.   I believe that there was like a first aid kit
7    attached to my duty belt, but I'm not entirely sure.
8    It's been a while.
9        Q.   Okay.  On that particular night, near the
10   beginning of your shift, were you made aware of something
11   that happened at the Thorntons?
12       A.   Prior to -- like a prior incident?
13       Q.   Good question.  Were you made aware of
14   something -- when you first started working your shift,
15   where you made aware of something happening at the
16   Thorntons?
17       A.   I was not, not any prior incidences at
18   Thorntons, no.
19       Q.   Okay.  You now know that there was a prior
20   incident at Thorntons, correct?
21       A.   Correct.
22       Q.   Okay.  If your shift started at 10:45, were
23   you at the station until you went to the Thorntons?
24       A.   Yes.

Page 41

1        Q.   Okay.  And what information do you recall
2    receiving regarding what happened at the Thorntons that
3    caused you to go there?
4        A.   I just remember there being a holdup alarm at
5    Thorntons being dispatched.
6        Q.   Okay.  So is it fair to say a dispatcher went
7    over the radio and said, "We have a holdup alarm," or
8    words to that effect, at the Thorntons?
9        A.   Correct.
10       Q.   Do you recall the dispatcher saying anything
11   differently or anything else?
12       A.   I do not recall, no.
13       Q.   Okay.  What do you recall doing when hearing
14   that?
15       A.   I remember just going and getting ready and
16   going en route to that call.
17       Q.   Do you recall if anybody else went en route to
18   that call?
19       A.   Yes.  I know that Cramer and
20   Officer Bertholomey were en route as well.
21       Q.   Were they in the station with you?
22       A.   I do not recall.
23       Q.   Do you know where Atwell was?
24       A.   I do not.

Page 42

1        Q.   Do you remember discussing that radio call
2    with anybody at the station before you left?
3        A.   No.
4        Q.   Had you ever responded to a panic alarm at the
5    Thorntons prior to that date?
6        A.   I believe there was one that I can remember.
7    There was one other time.
8        Q.   And what did that entail?
9        A.   I think it was a clerk -- not the same
10   clerk -- she was having problems with a customer, and I
11   think she hit the panic alarm.  But other than that, I'm
12   not entirely sure what happened with that call.
13       Q.   So when you hear about this panic alarm, panic
14   alert, you travel in your own vehicle to the location?
15       A.   Correct.
16       Q.   And it's within a mile, less than a mile; is
17   that fair?
18       A.   That is fair.
19       Q.   Did you go anywhere else between the time you
20   heard about the alarm to go to the location?
21       A.   I don't remember.  I know I used to take my
22   rifle out and put it -- out of my car, into the squad,
23   but I'm not entirely sure if I did that at that point.
24       Q.   Why did you keep your rifle in your personal

Page 43

1    vehicle?  Why didn't you just keep it at the station?
2        A.   I just brought it home every night with me.
3        Q.   Did you also bring your handgun home with you
4    as well?
5        A.   My handgun I did not.
6        Q.   Is there a gun locker at the station?
7        A.   We have personal lockers that we would leave
8    it in, yes.
9        Q.   Okay.  Did your rifle fit in the locker or not
10   fit in the locker?
11       A.   Honestly, I'm not entirely sure.
12       Q.   It was just a choice you made to take it home
13   is what you're saying?
14       A.   Yeah, it was a personal rifle I had actually
15   purchased myself, so ...
16       Q.   Did you get reimbursement from the department
17   for it?
18       A.   No.
19       Q.   How about the handgun?  How did that work?
20   Did you purchase it and get reimbursement, or was it some
21   sort of an allowance?
22       A.   It was something that you're issued when you
23   first become a police officer there.
24       Q.   So they actually gave you one?

13 (Pages 40 to 43)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 44

1      A.   Yeah, yes, sir.
2      Q.   So you went to the Thorntons.  Did you
3   activate -- Strike that.
4           What type of vehicle were you driving?
5      A.   It was a Dodge Charger.
6      Q.   And did it have full Round Lake Beach Police
7   markings on it?
8      A.   Yes.
9      Q.   And did it have an in-car camera system?
10     A.   Yes.
11     Q.   And did you activate that system at any point
12  that night?
13     A.   I think I activated it when I transported
14  Brubaker to CenCom; but other than that, I don't think I
15  did.
16     Q.   What's CenCom?
17     A.   CenCom is our dispatching center and also our
18  holding cells underneath in the basement area.
19     Q.   That's a separate facility than the actual
20  police station?
21     A.   Yes, sir.
22     Q.   How far are they apart, by the way?
23     A.   It's on the other side of -- it's in the west
24  side, on the other side of the town, I'd say, but I'm not

Page 45

1   entirely sure of the distance.
2      Q.   Did you activate your lights and sirens going
3   to the Thorntons?
4      A.   I don't believe so, no.
5      Q.   Why not?
6      A.   I know that Officer Bertholomey and
7   Officer Cramer were already en route or already there at
8   that time, so I did not activate my lights and sirens.
9      Q.   Did you speed to the Thorntons?
10     A.   Did I what?
11     Q.   Speed to the Thorntons, as in, go over the
12  speed limit to the Thorntons?
13     A.   I don't believe that I sped to the Thorntons,
14  no.
15     Q.   I mean, you're allowed to, correct?
16     A.   Correct.
17     Q.   Right.  Did you feel it was appropriate to
18  speed to the Thorntons or not?
19     A.   I know that they were already there, so, I
20  mean, I could have, but I am not entirely sure.
21     Q.   Who did you know was there first?
22     A.   I know that Officer Bertholomey and
23  Officer Cramer were arriving on-scene or already did.
24  I'm not entirely sure.

Page 46

1      Q.   How did you know that?
2      A.   They would have called at their location when
3   they arrived.
4      Q.   Officers are supposed to respond to dispatch
5   indicating that they're going to a location and also
6   notify dispatch that they arrived; is that fair?
7      A.   That is fair, yes.
8      Q.   And when they change location, they're
9   supposed to notify dispatch if feasible?
10     A.   Right.
11     Q.   Not necessarily all the time but usually?
12     A.   Right, yes, sir.
13     Q.   All right.  So where did you park when you got
14  there?
15     A.   I would have parked in an actual parking spot
16  facing north, northbound at the building.
17     Q.   Okay.  Did you park right in front of the
18  entrance?
19     A.   No.  I think it was to the east of the
20  entrance.
21     Q.   Any reason why you didn't park right in front
22  of the entrance?
23     A.   No.  I just picked one spot and parked in it.
24     Q.   What did you do when you got there?

Page 47

1      A.   I went inside the building.
2      Q.   What happened when you got in there?
3      A.   I observed Officer Cramer and
4   Officer Bertholomey already had a subject in custody.
5      Q.   And when you looked at that person, did you
6   know who it was?
7      A.   I did not.
8      Q.   You now know it's Abel Rosiles, Jr., correct?
9      A.   Correct.
10     Q.   When you looked at that person, do you
11  remember if he was wearing a face covering or mask?
12     A.   I do not.
13     Q.   Did you hear Abel say anything while in the
14  Thorntons?
15     A.   Not that I can honestly remember, no.
16     Q.   Did you hear Antoine Stanley say anything to
17  Abel or directed towards Abel at the Thorntons?
18     A.   I don't remember.
19     Q.   So by saying that, you don't have a
20  recollection of Abel and Antoine kind of yelling at each
21  other?
22     A.   Honestly, it's been two years, and I honestly
23  do not remember.
24     Q.   When you say that those officers already had

14 (Pages 44 to 47)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 48

1  him in custody, are you saying Abel was already
2  handcuffed behind his back?
3      A.  I believe he was already handcuffed, but they
4  could have been in the process of handcuffing.  I
5  honestly don't remember.  They were either in the process
6  or he was already handcuffed.
7      Q.  Do you have any recollection of Abel resisting
8  handcuffing or resisting being escorted out of that
9  Thorntons?
10     A.  At that point I don't believe he was
11  resisting, no.
12     Q.  So what did you do when you noticed these
13  things in the Thorntons?
14     A.  I just know that I -- I think Officer Atwell
15  arrived shortly after I did, and we were instructed to
16  take him out of the building to get away -- for him to
17  get away from the situation.
18     Q.  So did you help escort Abel out of the
19  building?
20     A.  Yes, sir.
21     Q.  And do you recall what he was wearing?
22     A.  I know that he was wearing a black hoodie, but
23  that could be from the video I saw.  I don't know If I
24  knew that otherwise.

Page 49

1      Q.  From the video -- Strike that.
2          I appreciate that.  This happened about two
3  years ago, a little over two years ago, right?  So
4  sometimes you might remember things and sometime you are
5  telling me the answer because you saw a video of it
6  recently; is that fair?
7      A.  That would be fair, yes.
8      Q.  So I appreciate you making that distinction
9  when I ask you a specific question like that.  I do
10  appreciate that.
11         Do you recall what type of pants or shorts he
12  was wearing?
13     A.  I do not.  I believe they were shorts, but I'm
14  not entirely sure.
15     Q.  Do you remember what type of shoes, style,
16  type they were?
17     A.  I do not.  I know they weren't boots, and I
18  know they weren't sandals.  I think they were like tennis
19  shoes.
20     Q.  So Atwell asked you to escort Abel out of the
21  Thorntons, and you did so?
22     A.  Correct.
23     Q.  You were accompanied by who?
24     A.  It was Officer Cramer.

Page 50

1      Q.  And what side were you escorting Abel on?
2      A.  I would have been on his left side.
3      Q.  And what does "escort" mean?  What did you do?
4      A.  I was transporting him from the Thorntons to
5  Cramer's squad car.
6      Q.  Specifically, is it fair to say you're holding
7  on to the forearm area in walking with him?
8      A.  Yes, that would be fair, yes.
9      Q.  And you're on his left side while doing so,
10  correct?
11     A.  Correct.
12     Q.  And when you got outside, do you recall
13  somebody speaking to you and/or Abel when you got outside
14  the Thorntons?
15     A.  I honestly -- I don't recall.
16     Q.  You remember Atwell speaking to you but not
17  anybody else at that moment, right?
18     A.  I do not -- yeah, I do not remember.
19     Q.  And where were you taking Abel?
20     A.  To the rear of Cramer's squad car.
21     Q.  And where was Cramer's squad car?
22     A.  It was parked just in the entrance of
23  Thorntons' parking lot, right off of Orchard.
24     Q.  I believe I know the answer, but was Cramer's

Page 51

1  squad car facing north when it was parked?
2      A.  It was not.  It was facing -- it would have
3  been facing west.
4      Q.  Okay.  I apologize if I asked this:  Do you
5  recall Abel saying anything in the store?
6      A.  I do not recall him saying anything, no.
7      Q.  Do you recall Abel saying anything shortly
8  after he got outside?
9      A.  I do remember him speaking.  I don't remember
10  what he said, though.
11     Q.  And what was your understanding as to why he
12  was in handcuffs at that point?
13     A.  For disorderly conduct.
14     Q.  Who told you that?
15     A.  It would have been Officer -- either
16  Officer Cramer or Officer Bertholomey.  I'm not entirely
17  sure.
18     Q.  Was he your arrest, so to speak?
19     A.  He would not have been my arrest.
20     Q.  By "your arrest," I'm getting a little
21  specific.  I mean, do you believe you had probable cause
22  to arrest him for disorderly conduct, you personally?
23         MR. MATHUES:  Objection to the extent it calls for a
24  legal conclusion.

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 52

1  BY THE WITNESS:
2      A.  I believe that I trust in Officer Cramer's
3  judgment, and he was already in handcuffs when I arrived,
4  so I trust in Officer Cramer's judgment.  But, yes, I
5  believe we had probable cause to arrest him at that point
6  or detain him, at the very best.
7      Q.   But you personally didn't have firsthand
8  knowledge of what disorderly conduct, if any, he
9  committed, correct?
10     A.  Correct.
11     Q.   You're saying that you're relying on a fellow
12 officer to inform you of what it was, correct?
13     A.  Correct.
14     Q.   Did another officer actually say to you
15 specifically what Abel did to cause him to be put in
16 cuffs?
17     MR. MATHUES:  Objection, vague as to time.
18     MR. MARX:  Oh, all right.  That's fair.
19 BY MR. MARX:
20     Q.   At the time that Abel was placed in the cuffs,
21 did an officer tell you within one minute of that
22 happening what caused Abel to be placed in cuffs?
23     A.  I believe so because that's normally what I
24 would have asked, is, "What's going on?" and he would

Page 53

1  have advised.
2      Q.   And who advised you of something?
3      A.  I believe it was Officer Cramer who would have
4  told me what happened.
5      Q.   What did Cramer tell you?
6      A.  I believe he said he was arrested for
7  disorderly conduct, but as to what exactly he said, I'm
8  not entirely sure.
9      Q.   So as you're escorting Abel towards
10 Officer Cramer's squad, does Abel appear to be walking in
11 a normal fashion; that is, not in a resistive fashion?
12     A.  Correct.
13     Q.   What happens when you get to the squad?
14     A.  We start doing a search of his -- a pat-down
15 of his person, and then we get him to the rear of the
16 squad and start -- I remember Cramer starting the
17 pat-down search, and I did one side; he did the other
18 side.
19     Q.   So did you pat down his left side since you're
20 escorting his left side?
21     A.  I would have, yes.
22     Q.   Okay.  Did you begin patting him down?
23     A.  Yes.
24     Q.   Okay.  And did something happen at that point?

Page 54

1      A.  Yeah.  I remember him moving his -- his feet
2  were spread, and I remember him moving one of his other
3  legs to kind of scratch his sock, and I remember, you
4  know, moving his foot back just spread apart so I can
5  continue the search.  And then he did it again, and I
6  asked him, you know, "What do you have in your sock?"
7  And that's when he ran towards Orchard.
8      Q.   So you're starting to search him, and you
9  notice that he's doing what with his foot?
10     A.  Taking -- it seems like he's taking his other
11 foot and kind of scratching the sock or like trying to
12 take it off.  And then I instructed him to spread his
13 feet again, and then he did it again.  And I asked him
14 what does he have in his sock, and that's when he ran.
15     Q.   Are you're saying it looked like he was trying
16 to use one of his feet to take off the shoe and sock of
17 another foot?
18     A.  I'm not entirely sure if he was trying to take
19 it off or just trying to dislodge something, but I'm not
20 entirely sure what he was doing.
21     Q.   Before he started running, did you see if he
22 was successful in getting a shoe or a sock off?
23     A.  I do not.  I do not recall.
24     Q.   Just so I understand, he initially had his

Page 55

1  legs apart, and then he put them together and did that
2  foot motion like you said, right?
3      A.  Right.
4      Q.   You told him to "Spread your legs," and did he
5  do so?
6      A.  He did for a little -- for a few seconds, and
7  then he tried to do the same thing again.
8      Q.   Do you remember what shoe or sock he was doing
9  this to, as in, what foot he was using to do it to what
10 foot?
11     A.  Honestly, I'm not entirely sure.
12     Q.   How long were you at the squad before he
13 started running?
14     A.  Honestly, I couldn't give you a good time.  I
15 would say less than a minute.
16     Q.   And when he was at the squad -- this is, you
17 know, initially, obviously -- was he facing the back of
18 the squad?
19     A.  He was on the passenger side of the squad.
20     Q.   Was he near the rear passenger side of the
21 squad?
22     A.  Yes.
23     Q.   Was he up against the squad, as in, was his
24 body up against the squad car while you guys are

16 (Pages 52 to 55)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 56

1    searching him?
2         A.   He probably would have been at least touching
3    the squad at some point.
4         Q.   Did Abel say anything when you were searching
5    him at that squad?
6         A.   Not that I recall, no.
7         Q.   So he starts to run, correct?
8         A.   Correct.
9         Q.   Did you lose grasp of him as he ran?
10        A.   I did not.
11        Q.   What were you holding on to?
12        A.   I was holding on to his -- it would have been
13   his arm, his left arm.
14        Q.   Did you actually have a grip on the arm, or at
15   this point were you holding on to his sweatshirt as he's
16   running?
17        A.   No.  I believe I had a grip on his whole arm.
18        Q.   And is it fair to say he's still continuing to
19   run even while you're holding on to his arm?
20        A.   Yes.
21        Q.   Is he saying anything while he's doing this?
22        A.   I don't remember him saying anything, no.
23        Q.   Are you saying anything to him?
24        A.   I don't know if I was saying anything at that

Page 57

1    moment.  I'm not entirely sure.
2         Q.   Where is Cramer when he starts running?
3         A.   I think he was able to break free from Cramer,
4    and I believe Cramer was running behind us, but I'm not
5    entirely sure.
6         Q.   And does Abel make it to the street?
7         A.   Yes.
8         Q.   How far?
9         A.   I would say probably halfway in the street.
10        Q.   And were there any cars in the immediate area;
11   that is, within, let's say, 100 feet of you and Abel,
12   when you guys are in the middle of the street?
13        A.   I'm not entirely sure.
14        Q.   And what happens when you and Abel get to
15   approximately the middle of the street?
16        A.   I was able to bring him down to the ground.
17        Q.   Did you do that yourself or with the
18   assistance of other officers?
19        A.   I believe Cramer was there at that point.  He
20   had caught up to us.  But I'm not entirely sure.
21        Q.   What do you remember doing, yourself, to bring
22   Abel to the ground?
23        A.   I just remember pulling him to the ground.  I
24   don't know if I used my body weight to pull him down or

Page 58

1    what.  I'm not entirely sure.  I just know I did pull him
2    to the ground.
3         Q.   And is it fair to say you had a grasp on his
4    left arm the entire time during the events you just
5    described?
6         A.   Yes.
7         Q.   Okay.  So it's then that you pulled him down
8    by his left arm?
9         A.   Correct.
10        Q.   And when he went to the ground, how did he go
11   to the ground?  Can you describe?
12        A.   I believe he would have probably gone down
13   chest -- you know, I would have probably pulled him down
14   chest first, but I'm not entirely sure.
15        Q.   Do you have a specific recollection of how he
16   hit the ground?
17        A.   I do not.
18        Q.   But you believe it would have been chest
19   first?
20        A.   I believe so.
21        Q.   Do you have any recollection of what
22   Officers Atwell and Bertholomey are doing when you're
23   doing this?
24        A.   I do not, no.

Page 59

1         Q.   And what happens when Abel is on the ground?
2         A.   I know Officer Cramer and me, we helped him to
3    the -- not helped him.  We took him to the grassy area.
4         Q.   How long was Abel on the ground in the street?
5         A.   An estimated time would probably be less than
6    10 seconds, maybe less than 15 seconds.
7         Q.   What, if anything, did you do -- Strike that.
8              Did you touch Abel when he was on the ground?
9         A.   In the street?
10        Q.   Yes.
11        A.   Yes.  I would have been touching him the
12   entire time.
13        Q.   Where did you touch him while he was on the
14   ground in the street?
15        A.   It would have been on his arm that I had ahold
16   of.
17        Q.   The same left arm?
18        A.   Correct.
19        Q.   And did you notice other officers touching him
20   when he was in the street?
21        A.   Yeah.  I believe Officer Cramer was also there
22   as well, touching his -- would have been his right arm.
23        Q.   Okay.  Were you or him holding him down on the
24   ground in the street?

17 (Pages 56 to 59)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 60

1   A.   I don't know if we were holding him down, but
2   we were just making sure we had control of him.
3       Q.   What's the difference in your mind between
4   holding him down and having control over him?
5       A.   I feel like holding him down would be putting
6   a ton of pressure on him to keep him on the -- you know,
7   on the ground, and I don't necessarily know if that was
8   the case.
9       Q.   So did you help Abel up after this time period
10  you said that he was on the ground?
11      A.   Yeah, we would have helped him up.
12      Q.   Okay.  And how did he get to the grassy area
13  from the street?
14      A.   We would have assisted him or carried him to
15  the grassy area.
16      Q.   Do you recall how he got to the grassy area?
17      A.   In terms of the care we would have used?
18      Q.   I guess I'm wondering, do you have a
19  recollection if you actually carried him over there or if
20  he willingly walked over there or something different?
21      A.   I'm not entirely sure if we fully carried him,
22  but we would have assisted him in some way, obviously,
23  because we both had an arm on each arm.
24      Q.   And is it fair to say the grassy area is right

Page 61

1   next to the street?
2       A.   Yes.
3       Q.   What happened when you got to the grassy area?
4       A.   I remember him -- he was resisting, and I
5   remember him going back to the ground because he was
6   still fighting us.
7       Q.   How was he resisting and still fighting you,
8   specifically?
9       A.   I just remember him, you know, moving around a
10  lot.  And I'm not entirely sure exactly what he was
11  doing, but I just know he was moving around a lot, and we
12  just weren't able to control him at that point.
13      Q.   And you helped take him to the ground again?
14      A.   Yeah, I know we -- yes, I helped him back --
15  to get control of him again, we went back to the ground.
16      Q.   How did you take him to the ground on the
17  grassy area there?
18      A.   I think it would have been the same way we --
19  Cramer had one arm; I had the other, and we would have
20  just taken him to the ground.
21      Q.   Do you recall what Atwell and Bertholomey were
22  doing at that moment?
23      A.   I believe it was Officer Atwell who was with
24  us, but I'm not entirely sure what he was doing.

Page 62

1       Q.   And did Abel to go to the ground?
2       A.   Yes, he did.
3       Q.   How was he positioned on the ground?
4       A.   He would have been on his chest, in the prone
5   position.
6       Q.   And did you put any of your body weight on
7   Abel while he was on the ground at that point?
8       A.   I would have applied some pressure in order to
9   keep control of him but not my full body weight, because
10  I was on one side of him, so I wouldn't have needed to
11  put body weight on him.
12      Q.   Well, you need to put some body weight on him
13  to prevent him from getting back up, right?
14      A.   Right.  I would have needed to put some
15  pressure in order to keep him from resisting but not my
16  full body weight.
17      Q.   When you say "resisting," I mean, how is he --
18  Strike that.
19           Is he resisting when he's now in the prone
20  position on the grass?
21      A.   I remember him still moving around, and I had
22  one arm, and I just remember him still -- you know, he
23  was still struggling with us.  And I remember asking him
24  if he was -- you know, we were trying to calm him down or

Page 63

1   tell him -- I remember saying -- I guess I don't remember
2   specifically saying, but I know I would normally say,
3   "Stop resisting," those types of words.
4       Q.   Was it your goal for him to stop moving
5   around?
6       A.   I'm sorry?
7       Q.   Was it your goal for him to stop moving
8   around?
9       A.   Not necessarily stop moving around, per se,
10  but just stop pulling away from us and attempting to
11  escape like he had already done before.
12      Q.   And you believed he was trying to pull away in
13  an attempt to escape when he was in that grassy area?
14      A.   Yes, that's what I would have believed because
15  he had already done it once.
16      Q.   Did you notice any other officers putting any
17  of their body weight on Abel in that grassy area?
18      A.   No.
19      Q.   I know you said you don't specifically
20  remember saying, "Stop resisting," but that's typically
21  what you would have said, correct?
22      A.   Correct.
23      Q.   Do you remember any other officers saying
24  anything?

18 (Pages 60 to 63)

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 64

1    A.   I don't recall any right now, but I'm sure
2  they would have been doing the same thing.  It's kind of
3  what we al --
4    Q.   Go ahead.
5    A.   No.  I'm just saying, that's kind of what we
6  always do.  We kind of just, you know, yell, "Stop
7  resisting," those kinds of things.
8    Q.   Do you recall Abel saying anything while he's
9  on the ground in the grassy area?
10   A.   I do not.
11   Q.   How long was Abel on the ground in that
12  position, the prone position, as you described, in that
13  grassy area?
14   A.   Can I go back to your previous question?  I
15  apologize.
16   Q.   Sure.
17   A.   I do remember I did specifically ask him if he
18  was good.  I said, "Are you good?"  And he nodded, and he
19  did say, "Yes."
20   Q.   Okay.  Thank you.
21        By saying, "Are you good?" is that kind of an
22  indication -- you were kind of asking him like, "Are you
23  calmed down now?" so to speak?
24   A.   Correct.

Page 65

1    Q.   Okay.  And he said the word, "Yes"?
2    A.   Yes.
3    Q.   When he said, "Yes," did you happen to --
4  Strike that.
5        When he said, "Yes," was it your opinion that
6  he was saying that unobstructed; that is, he wasn't
7  having any difficulty speaking at that point?
8    A.   Correct.
9    Q.   How long was he on the ground before he said
10  the word, "Yes"?
11   A.   I'm not entirely sure how long he was on the
12  ground for.
13   Q.   Can you give me an estimate?  For example, was
14  it under 30 seconds or over 30 seconds?
15   A.   I would say it was possibly under 30 seconds.
16   Q.   And what did you do when he said, "Yes"?
17   A.   Then any pressure that I would have been
18  applying at that point would have gone away because now
19  he has calmed down.  I remember him calming down at that
20  point.  So any pressure I would have had would have gone
21  away.
22   Q.   Okay.  And then what did you do?
23   A.   I remember Officer Cramer and I escorted him
24  to the squad, the rear, back where he was originally, at

Page 66

1  the rear of the squad.
2    Q.   With you again on the left side, or had you
3  changed positions at this point?
4    A.   I'm not entirely sure how -- I know I was on
5  the right side at one point, but I'm not entirely sure at
6  what point we had switched positions.
7    Q.   Okay.  Is it your recollection that you and
8  Cramer then -- just the two of you escorted him back to
9  the squad?
10   A.   I remember us two, yes.
11   Q.   Is it fair to say the grassy area is not too
12  far away from the squad at that point?
13   A.   That would be fair to say, yes.
14   Q.   As far as the layout of where the squad is, is
15  it fair to say that there's a squad -- there's a small
16  amount of pavement, then a curb, and then a grassy area
17  that's near the squad car?
18   A.   Correct.
19   Q.   Okay.  And what happens when you get back
20  towards the squad?
21   A.   I remember he was again starting to resist us
22  and pull away and kind of moved his shoulders again
23  and -- just like he had done before and thrashing around.
24   Q.   Okay.  And did you say anything at this point,

Page 67

1  and did he say anything at this point?
2    A.   I probably would have kept saying, "Stop
3  resisting," but I'm not entirely sure.
4    Q.   How tall are you?
5    A.   I am 5, 10.
6    Q.   And how much do you weigh?
7    A.   I currently weigh 205.
8    Q.   Do you believe you were the same size on that
9  particular night?
10   A.   Probably not.  I think I've gained probably
11  10 pounds since.  Pure muscle, but ...
12   Q.   Okay.  So now you're at the squad, and you're
13  saying he's resisting just as he did before, correct?
14   A.   Correct.
15   Q.   At this point when you're at the squad again,
16  do you recall what side you're on?
17   A.   I believe -- I'm not entirely sure.  I believe
18  I was on the right side, but I'm not entirely sure.
19   Q.   Then what's the next thing you recall
20  happening?
21   A.   I remember taking him to the ground, yeah.
22   Q.   Was Officer Cramer with you when that
23  happened?
24   A.   He was.

19 (Pages 64 to 67)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

---

Page 68

1    Q.   How did you take him to the ground?
2    A.   Probably just bringing him down to the
3    ground -- if I go -- if I -- I'm not entirely sure, but
4    I'm sure I probably went down to my knee and brought him
5    down with me.
6    Q.   Is it fair to say it was done in a similar
7    fashion as what happened in the street and what happened
8    in the grassy area?
9    A.   I believe so, but I'm not entirely sure how he
10   was brought in that time.
11   Q.   I notice you kind of interjected "this time,"
12   at least that you believe you might have went to a knee.
13   Are you saying that that's what might be different about
14   this time than the other two times?
15   A.   Well, the first time it would have been
16   difficult for me to get to a knee and bring him down
17   because I was hanging on to him.  I'm not entirely sure
18   how he got brought down the second time, but I know that
19   one of our ways to take people down is if we go down,
20   they will kind of come down with us.  But I'm not
21   entirely sure how he was taken down the third time.
22   Q.   And now when you take him down, what do you
23   do?
24   A.   I would have just held him until we had

---

Page 69

1    control of him.  I would have just put my hand on his arm
2    or -- just to gain control of him so he wasn't -- you
3    know, making sure he wasn't gonna run again.
4    Q.   Before he was placed on the ground a third
5    time, did you notice if he was missing a shoe or a sock?
6    A.   I do not recall.
7    Q.   Have you ever seen a squad car video of what
8    appears to be an officer walking into the roadway and
9    picking up what appears to be a shoe?
10   A.   I do not recall that.
11   Q.   Do you think that's possible that that
12   happened; you're just saying you don't have a memory of
13   that happening?
14   A.   It is possible it happened.  I just don't
15   remember.
16   Q.   Is it unlikely that that was you that did that
17   because you still had control of Abel during this time
18   period?
19   A.   Correct.  If it was during that time period,
20   it couldn't have been me.
21   Q.   So when you're on the ground -- Strike that.
22   When Abel is on the ground, where are you
23   physically positioned in relation to him?
24   A.   I would have been by his right shoulder, right

---

Page 70

1    arm area.
2    Q.   And are you squatting or kneeling or how?
3    A.   I would have probably been kneeling.
4    Q.   Okay.  Are both of your knees on the pavement
5    or not?
6    A.   They would be on the pavement, yes.
7    Q.   Did you ever put your knee on Abel's body?
8    A.   No.
9    Q.   While he was on the ground, this third time,
10   that is, did you touch Abel?
11   A.   I would have been touching him, yes.
12   Q.   Where were you touching Abel while he was on
13   the ground?
14   A.   It would have probably been the right shoulder
15   blade or the right arm.
16   Q.   You said it probably would have been the right
17   shoulder blade or right arm.  Are you saying that you
18   specifically remember doing that?
19   A.   I don't specifically remember where I was
20   touching him, but I'm sure if we were trying to gain
21   control of him, I'm not just not going to -- I have to
22   maintain control and hold him somewhere.
23   Q.   So that's where you believe you would have
24   been touching him, correct?

---

Page 71

1    A.   Right.
2    Q.   While Abel was on the ground, this third time,
3    of course, did you touch his back?
4    A.   I'm not entirely sure.
5    Q.   So by saying that, are you saying that you
6    don't have a recollection one way or the other if you
7    touched his back?
8    A.   Yeah, I don't remember if I ever touched his
9    back.
10   Q.   While Abel is on the ground, this third time,
11   of course, do you remember touching him anywhere else?
12   A.   I don't remember touching him anywhere else,
13   no.
14   Q.   And why were you touching him while he was on
15   the ground?
16   A.   To maintain control of him.
17   Q.   Why did you believe it was necessary to
18   maintain control of him when he was on the ground?
19   A.   Because he had already resisted us a few times
20   and he's already run one time, and I didn't want him to
21   get up and run again.
22   Q.   So if you didn't want him to get up and run
23   again, is it fair to say that you would have put some of
24   your body weight on the area that you were touching him?

---

20  (Pages 68 to 71)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 72

1    A.   I probably would have maintained a little bit
2   of pressure, yes, a minimum amount of pressure that was
3   needed to make sure he was not going to, you know, escape
4   or that I would know if something was happening.
5        Q.   Do you recall about how tall and how heavy
6   Abel was?
7        A.   I do not recall.
8        Q.   If I told you he was approximately 5, 7 or
9   5, 8 and 180 pounds, does that sound about a fair
10  estimate?
11       A.   Yeah, I would say that would be fair.
12       Q.   Do you know about how big; that is, how tall
13  and how heavy, Officer Cramer is?
14       A.   Are you asking me how heavy he is?
15       Q.   Yeah.  Do you know how tall and how heavy
16  Officer Cramer is?
17       A.   I know that Officer Cramer is taller than I
18  am.  In terms of his weight, I'm not entirely sure.
19       Q.   Did you see Officer Cramer touching Abel while
20  he was on the ground at that third time?
21       A.   He probably would have been doing the same
22  thing and making sure he wasn't going anywhere.  You
23  know, but I can't actually remember him touching him, no.
24       Q.   While Abel is on the ground this third time,

Page 73

1   did you say anything to him?
2        A.   No, not when he came down, no.
3        Q.   While Abel is on the ground this third time,
4   did you hear him say anything?
5        A.   No.
6        Q.   While Abel is on the ground, did you see
7   Officer Cramer remove one of Abel's socks?
8        A.   I don't remember seeing it at the time, but I
9   know a video -- I've seen video of him removing a sock,
10  yes.
11       Q.   Do you know why he -- Strike that.
12            The first time you saw the video, did you see
13  him removing the sock?
14       A.   I'm not entirely sure if I saw that the first
15  time, to be honest.
16       Q.   Well, when was the first time you saw that
17  video?  It's the cell phone video that we're talking
18  about, right?
19       A.   Correct.
20       Q.   When do you recall seeing that the first time?
21       A.   I believe I saw that on YouTube.  When it went
22  on there, I'm not entirely sure.
23       Q.   Do you remember seeing it with other people
24  the first time, other officers or anyone else?

Page 74

1        A.   I don't recall.
2        Q.   Did Officer Cramer ever tell you why he
3   removed a sock?
4        A.   It would have been because I would have -- I
5   saw a sock in Abel's mouth and told him about it.
6        Q.   How long was Abel on the ground in the prone
7   position before you noticed a sock in his mouth?
8        A.   Honestly, I'm not entirely sure.
9        Q.   Can you give me an estimate?  Would you say it
10  was under 30 seconds or over 30 seconds?
11       A.   I would probably say it was over 30 seconds
12  that he was -- that he was prone down before I saw the
13  sock.
14       Q.   Would you say it was under a minute or over a
15  minute?
16       A.   Honestly, I'm not entirely sure.  I'm
17  confident in over 30, but I'm not entirely sure how long.
18       Q.   So is there something in particular that drew
19  your attention to his face and his mouth?
20       A.   I believe I just looked down and I saw the
21  sock in his mouth.
22       Q.   Do you have any idea how he got a sock in his
23  mouth?
24       A.   No, sir, I have no idea.

Page 75

1        Q.   So to the best of your knowledge, was it
2   Abel's sock in his mouth?
3        A.   Yes, to the best of my knowledge, it is.
4        Q.   What led you to believe that it was?
5        A.   I mean, there was no sock there before that I
6   would have saw, and I believe it was the same exact sock
7   that was on his other foot.
8        Q.   Well, you didn't know it was the exact same
9   sock or same type of sock that was on his other foot at
10  the moment you saw the sock in his mouth; is that fair?
11       A.   That is fair, yes.
12       Q.   But is it fair to say that sometime shortly
13  thereafter, you looked at the sock and noticed that it
14  was the same sock as what Cramer pulled off his foot?
15       A.   I don't know if I would have known that
16  Cramer -- at the time that Officer Cramer had taken off
17  his sock.  All I know at that moment is that he did have
18  a sock in his mouth.
19       Q.   What color was the sock?
20       A.   It was black.
21       Q.   Do you know what type or brand it was?
22       A.   I do not.
23       Q.   And besides it being in his mouth, did you see
24  him doing anything with the sock?

21 (Pages 72 to 75)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 76

1    A.  I just remember it being in his mouth.
2    Q.  How long was it in his mouth?
3    A.  I'm not entirely sure.
4    Q.  How long did you see it in his mouth?
5    A.  The moment I saw it in his mouth, I removed it
6    from his mouth, and I put it, I believe, near the squad.
7    Q.  You immediately removed the sock the moment
8    you saw it?
9    A.  Yes.
10   Q.  Did he resist giving up the sock, as in, did
11   he bite down on the sock and make it difficult for you to
12   pull it out?
13   A.  I don't believe so.  I think I just pulled it
14   out.
15   Q.  What did you do with the sock?
16   A.  I believe I put it near the squad somewhere.
17   I would have been on his left side, so I would have put
18   it near the squad.
19   Q.  On the ground?
20   A.  I'm not entirely sure.  It could have been on
21   the ground; it could have been on the squad.  I'm not
22   entirely sure.
23   Q.  You didn't travel very far to place the sock;
24   is that fair?

Page 77

1    A.  Correct.
2    Q.  Did you maintain control of Abel while you
3    removed the sock and placed it somewhere?
4    A.  I believe I probably would have kept a hand on
5    him, yes.
6    Q.  Did you say anything when you noticed a sock
7    in his mouth?
8    A.  I remember telling Cramer that there was a
9    sock in his mouth.
10   Q.  And did you hear Cramer say anything in
11   response?
12   A.  I don't recall.  I'm not entirely sure.
13   Q.  Did it surprise you that there was a sock in
14   his mouth?
15   A.  Yes.
16   Q.  Why did it surprise you?
17   A.  Because I've never seen anybody chewing on
18   their -- chewing on a sock before.
19   Q.  Especially not somebody who's handcuffed
20   behind their back, right?
21   A.  Correct.
22   Q.  What do you recall happening after you took
23   the sock out of his mouth?
24   A.  I know that I looked at him and I -- he had --

Page 78

1    was gasping for air.  I had asked him if he swallowed
2    anything.  He shook his head yes.  And I remember taking
3    my flashlight out, and I remember telling Atwell -- or I
4    think I just said it out loud that he had swallowed
5    something or choked.  He was choking.  And I remember
6    taking my flashlight out, and I looked down his throat to
7    see if I could see anything, which I didn't.
8    Q.  You said you noticed he was gasping for air?
9    A.  Yeah.  He was kind of like, you know, like a
10   gasping noise he would make if he was choking.
11   Q.  I know that we're not video-recording this,
12   but can you kind simulate what you heard?
13   A.  I don't know if he was like (indicating), that
14   kind of thing.
15   Q.  And how long after you removed the sock did
16   you hear this gasping?
17   A.  It was within seconds, fairly immediate.
18   Q.  And in response, you asked him what?
19   A.  I asked him if he was -- if he was choking or
20   if he had swallowed something, something along those
21   lines.
22   Q.  Okay.  And you were saying he shook his head
23   in the affirmative?
24   A.  Yes.

Page 79

1    Q.  Did he look at you when he said that?
2    A.  Yes, he was looking at me.
3    Q.  And then you said, "He's choking" out loud; is
4    that what you said?
5    A.  I'm not entirely sure of the verbiage -- the
6    exact words I would have said, but I believe it was just
7    that he was choking.
8    Q.  And you took a flashlight -- Strike that.
9    You had a flashlight on your person?
10   A.  Yes.
11   Q.  Where was it?
12   A.  It's always kept in my right -- my duty belt,
13   on the right side, behind my duty weapon.
14   Q.  And what position did you place Abel in to
15   look into his mouth?
16   A.  I believe I would have turned him, and he was
17   somewhat sitting up -- maybe leaning back a little bit
18   but somewhat sitting up so that I could look into his
19   mouth.
20   Q.  When you first turned him up, was his mouth
21   open, closed, or partially open?
22   A.  I believe it was partially open or maybe a
23   little bit wider than that.
24   Q.  Did you ask him to open it up or anything like

22 (Pages 76 to 79)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 80

1 that?
2 A. I don't believe so because I feel like it was
3 open enough for me to get a light in there to see.
4 Q. And do you believe you got a good look into
5 the mouth, as in, you felt like you were able to see well
6 enough into the mouth?
7 A. Yeah. I mean, I believe that I -- for what --
8 you know, I believe that I saw enough that I couldn't see
9 actually anything in his throat.
10 Q. How long did you look into his mouth?
11 A. Not very long, just a few seconds, just to --
12 because I knew if he's choking, if I don't see anything,
13 I have to do something else.
14 Q. To be clear, did you use your flashlight to
15 point it towards his mouth?
16 A. Yes, the back of his throat, yeah.
17 Q. Did you ask him or did he tilt his head back
18 at all?
19 A. I believe his head was tilted back, but I
20 don't remember asking him anything. But to get a better
21 look, he probably would have tilted his head back a
22 little bit.
23 Q. I mean, do you have a specific recollection of
24 that happening, you either asking him or he actually did

Page 81

1 tilt his head back?
2 A. I don't remember asking him to tilt his head
3 back. I remember having his head back because I was able
4 to see his throat. And I feel like if it wasn't tilted
5 back, I wouldn't have been able to see it.
6 Q. You saw nothing resembling a plastic bag of
7 any sort in his mouth or throat?
8 A. Yeah, I didn't see anything in his throat.
9 Q. And you looked for, you said, at least a
10 couple of seconds?
11 A. Yeah.
12 Q. Do you recall how many seconds, approximately?
13 A. Honestly, I do not. I would say less than ten
14 seconds.
15 Q. Do you know if any other officer looked in his
16 throat?
17 A. I do not. I'm not entirely sure.
18 Q. By saying that, you're saying it's possible
19 they did; you just don't have a specific recollection of
20 that happening?
21 A. Correct.
22 Q. What did you do then after you didn't see
23 anything in his mouth or throat?
24 A. I think Officer Atwell is the one who first

Page 82

1 started the Heimlich when I had advised that he was --
2 you know, that he was choking. I believe Officer Atwell
3 was the first one to do the Heimlich.
4 Q. What did you do?
5 A. I was just there, and then I took over for
6 Officer Atwell.
7 Q. What position was Abel in when the Heimlich
8 was first performed?
9 A. I believe he was standing. Yeah, he was
10 standing at that point.
11 Q. Was he standing under his own will?
12 A. I don't believe so because I remember it
13 being -- there was a lot of weight that was on me, so I
14 think he was already kind of becoming unconscious at that
15 point.
16 Q. How long would you say that Atwell performed
17 the Heimlich?
18 A. I'm not entirely sure.
19 Q. Would you say it was under 30 seconds or over
20 30 seconds?
21 A. I would say it was under 30 seconds.
22 Q. And did you see anything be expelled from
23 Abel's mouth?
24 A. No, sir.

Page 83

1 Q. And did you say you then tried the Heimlich?
2 A. I did.
3 Q. And what position was Abel in when you tried?
4 A. That was the standing. I apologize. I
5 thought you asked me, when I did the Heimlich, what
6 position he was in. He was standing when I did the
7 Heimlich.
8 Q. What position was he in when Atwell did the
9 Heimlich?
10 A. I'm not entirely sure. I think at one point
11 he would have stood up with him because I remember the
12 handoff. I think he was standing by that point, but I'm
13 not entirely sure.
14 Q. Okay. Are you saying, when you performed the
15 Heimlich, he was standing, but mostly you were holding
16 him up at that point?
17 A. Yes.
18 Q. How long did you do the Heimlich?
19 A. I would probably say under 30 seconds as well.
20 Q. And did you see anything expelled from his
21 mouth?
22 A. No, sir.
23 Q. At some point did you believe that Abel became
24 unconscious?

23 (Pages 80 to 83)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 84

1    A.   Yes.
2    Q.   At what point would you say that happened at?
3    A.   I think it was -- I remember him being heavy
4  when I was -- like, he was limp when I was doing the
5  Heimlich, so it would have probably been around that
6  time.
7    Q.   Right after you did the Heimlich, did you get
8  a look at Abel's face?
9    A.   I'm not entirely sure if I got a good look at
10  his face.
11    Q.   What did you do after you did the Heimlich?
12    A.   It was Officer Kaminski who came up and took
13  over for me.
14    MR. MARX:  We've been going a little while.  Is it
15  okay if we take five minutes?
16    MR. MATHUES:  That's a great idea.
17        (A short break was had.)
18  BY MR. MARX:
19    Q.   So at this point Officer Cramer is trying to
20  perform -- is performing the Heimlich, correct?
21    A.   It was Officer Atwell, then me, then
22  Officer Kaminski.
23    Q.   Thank you, Kaminski.
24    A.   Correct.  I'm sorry.

Page 85

1    Q.   And what were you doing while Kaminski was
2  attempting the Heimlich?
3    A.   I'm not entirely sure what I was doing at that
4  point.  I think I was just sitting up or off the side,
5  just observing him, while -- it wasn't very long that he
6  was there doing it.
7    Q.   Did you ever call for fire and rescue?
8    A.   I did not.
9    Q.   Do you know who did?
10    A.   I knew somebody did it at that time, but I'm
11  not entirely sure who it was.
12    Q.   When you were on the job, did you keep a radio
13  with a microphone on your shoulder area, such that you
14  could just lean over and talk into it?
15    A.   I believe I used to keep it on my shoulder,
16  but it was always -- I moved it to my -- more of my chest
17  area later in my career.
18    Q.   So at some point Officer Kaminski arrives,
19  obviously, right?
20    A.   Correct.
21    Q.   You recognized other officers that came and,
22  if so, who?
23    A.   I know that Officer Kaminski was there with a
24  trainee that I had never met before, and I know

Page 86

1  Officer Robinson was there at one point as well from
2  Round Lake.
3    Q.   And do you know approximately how long
4  Kaminski was trying the Heimlich?
5    A.   I would say again probably under 30 seconds.
6    Q.   Did you see anything be expelled out of Abel's
7  mouth during that time?
8    A.   I did not.
9    Q.   What's the next thing you recall after
10  Kaminski attempted the Heimlich?
11    A.   I believe that's when the handcuffs were taken
12  off.  After Kaminski did his Heimlich, I believe that's
13  when the handcuffs were taken off, and he was put in the
14  recovery position on his side.
15    Q.   Why was he put in the recovery position at
16  that point, to your knowledge?
17    A.   I know that's the position we would put people
18  in, just on their side.  It's been a long time since I --
19  I just know we would do that, put them on their side in
20  the recovery position.
21    Q.   And what happened after that?
22    A.   I know that I administered Narcan nasally, I
23  believe.  Yeah, nasally.  And then I think another
24  officer did it as well.

Page 87

1    Q.   What's Narcan used for?
2    A.   Narcan is to reverse a heroin overdose or an
3  opiate overdose.
4    Q.   Had you administered it before that day?
5    A.   I have.
6    Q.   About how many times would you say?
7    A.   Many, many times.  I couldn't even give an
8  estimate.
9    Q.   And in your opinion, did it work many times?
10    A.   Yes.
11    Q.   Did you suspect that he might have been
12  suffering from a drug overdose?
13    A.   It was possible, yes.  I wasn't entirely sure.
14  That's why I would have, just in case, used the Narcan.
15    Q.   You hadn't seen any narcotics on or near his
16  person at that point, correct?
17    A.   That's correct.
18    Q.   Is it fair to say that your primary thought is
19  that he was choking?
20    A.   Yes, that was my primary thought, was that he
21  was choking.
22    Q.   Is it fair to say that your secondary thought
23  was, well, maybe he's also -- or maybe he's just
24  suffering from a drug overdose?

24 (Pages 84 to 87)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 88

1    A.    That was a possibility. That was there, so I
2    wanted to -- obviously, I had it on me, so I wanted to
3    use it just in case. So it was definitely a thought I
4    had.
5        Q.    Did his condition change at all after Narcan?
6    A.    It did not.
7        Q.    Now, after Narcan was applied, where is Abel?
8    How is he positioned?
9        A.    I believe he's on his -- I believe he's up
10   over the curb now, but I'm not entirely sure.
11       Q.    And do you see paramedics arrive?
12   A.    Yes.
13       Q.    Again, you don't know who called them, so you
14   don't know what time they exactly called them, right?
15   A.    Right, I do not.
16       Q.    Did you recognize any of the paramedics that
17   arrived?
18   A.    No.
19       Q.    Did you see them actually approach Abel?
20   A.    Yes, I would have saw them approach, yes.
21       Q.    Is it fair to say that they were walking up to
22   Abel?
23   A.    Yes.
24       Q.    Do you believe they should have been jogging

Page 89

1    or running up to Abel?
2    A.    Not entirely, no.
3        Q.    Why not?
4    A.    I just know that I've been in many, many calls
5    later on, and they don't run. I know they carry heavy
6    equipment. I know that they have bags all over them.
7    You know, I don't think running, I mean, would have
8    really helped in that situation, especially if one of
9    them would have fallen. It -- (inaudible) -- more than it
10   actually is good.
11       Q.    Well, that's fair. I hadn't thought of that
12   aspect of it. You don't want a paramedic to trip and
13   fall. You'd have to call the paramedics for the
14   paramedics.
15   A.    Right.
16       Q.    That's something I had not thought of until
17   you mentioned that; however, would you agree with me that
18   if in fact somebody was choking, that every second
19   counts, so to speak?
20   A.    Yes, I would agree with that.
21       Q.    Okay. Knowing that, you don't really take
22   issue with them kind of walking up to Abel?
23   A.    No, sir.
24       Q.    Sorry. I don't recall the answer. Do you

Page 90

1    know who the paramedics were that arrived?
2    A.    I do not.
3        Q.    Do you remember how many arrived?
4    A.    No, sir.
5        Q.    What were you doing when the paramedics
6    arrived?
7    A.    I believe I had just -- I think I had just
8    administered Narcan at that point, so I think I was just
9    standing up when they arrived, and they took over
10   lifesaving measures.
11       Q.    This whole time that we've been talking, we
12   haven't mentioned -- well, we really haven't talked about
13   the females that were on the scene. Do you recall at
14   some point some females approaching you, Abel, and the
15   other officers?
16   A.    I do.
17       Q.    Okay. So when is the first time you noticed
18   at least one female approaching you and Abel and the
19   other officers?
20   A.    I do remember there was one recording, that
21   being Abel's girlfriend. And I strictly remember
22   screaming coming from what would have been my right side
23   and a female running towards us. And that's when I had
24   to break my attention from Abel and look to the right.

Page 91

1        Q.    So you first noticed a person you now know
2    to be Abel's girlfriend?
3    A.    Recording, yes.
4        Q.    Okay. Well, fair to say you don't know if she
5    was actually recording? Is that fair?
6    A.    That would be fair, yes.
7        Q.    Are you saying that she was holding her phone
8    up as if she was recording?
9    A.    Correct.
10       Q.    Did she say anything that led you to believe
11   that she was actually recording?
12   A.    Not that I recall, no.
13       Q.    When did you first notice her, as in, when, in
14   relation to the events we just talked about, did you
15   notice that?
16   A.    I'm not entirely sure. I think it was when
17   Abel was at the third position. I think she was
18   recording it. I know she was recording it at that point,
19   but I'm not entirely sure when I first observed her over
20   there.
21       Q.    We're going to watch a video in a moment, but
22   is it fair to say that she, more or less, came up from
23   your back side and was kind of at your back side for most
24   of the time that you were near Abel on the ground?

25 (Pages 88 to 91)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 92

1    A.  I know that she was to my rear.  I'm not
2  entirely sure how close she got, but she was to my rear,
3  like my right rear, I guess you would say.
4    Q.  So is it fair to say you're not exactly sure
5  when she arrived, let's say, within 50 feet of you?
6    A.  Right, I'm not entirely sure.
7    Q.  And is it fair to say you're not exactly sure
8  when she actually started recording?
9    A.  Correct.
10    Q.  But you do believe, based on the video that
11  you saw, that she did at least record part of the
12  incident, correct?
13    A.  Correct.
14    Q.  Do you recall anything that she ever said
15  while you were on-scene?
16    A.  No.
17    Q.  With regard to this other female, did she
18  arrive later than his girlfriend, to your knowledge?
19    A.  Yes, sir.
20    Q.  Okay.  And how long after the first female
21  arrived did you notice the second female?
22    A.  I'm not entirely sure of the difference in
23  time, but I just know that she was running -- while Abel
24  was on the ground, she was running towards us, that

Page 93

1  being -- she being Brubaker, Brubaker?
2    Q.  Right.  You didn't know who that person was,
3  right?
4    A.  At the time, no.
5    Q.  You just know it was a female that was running
6  towards you?
7    A.  Correct.
8    Q.  Do you remember anything that she said while
9  you were on-scene?
10    A.  I just know that she was screaming.  I'm not
11  entirely sure what she said.
12    Q.  According to Officer Atwell, who I just
13  deposed, and you were present for most of it, short of
14  some like bathroom breaks is what I heard.
15    A.  Correct.
16    Q.  I think Atwell said that he remembers her
17  saying words to the effect of, "What are you doing?" and
18  "Get the fuck off of him" and repeating that loudly.  Is
19  that -- does that sound -- well, do you have any memory
20  of those words being spoken?
21    A.  I do not, no.
22    Q.  Do you have any reason to doubt that that
23  would be accurate?
24    A.  I do not.  It could be accurate.

Page 94

1    Q.  Was it your recollection she was actually
2  yelling, not just speaking?
3    A.  She was yelling, yes.
4    Q.  Did you still maintain contact with Abel
5  despite both the females being on-scene at that point?
6    A.  Yes, I would have maintained contact with him.
7    Q.  Did you notice that Atwell and Bertholomey
8  then dealt with Brubaker female?
9    A.  Yes, sir.  They were dealing with her behind
10  us.
11    Q.  Were they next to you prior to that; that is,
12  shortly before Brubaker arrived on-scene, were
13  Bertholomey and Atwell in close proximity to you and
14  Abel?
15    A.  I think they were relatively close.  I think
16  Bertholomey was.  I'm not entirely sure if Atwell was
17  close.
18    Q.  Were Atwell and Bertholomey touching Abel
19  while he was on the ground shortly before Brubaker
20  arrived?
21    A.  I don't believe so, no.
22    Q.  It was just you and Cramer at that point?
23    A.  Correct.
24    Q.  I didn't ask you before, but when you noticed

Page 95

1  Abel with a sock in his mouth, did you then, shortly
2  thereafter, look down and see that one of his feet
3  already had a shoe and a sock off?
4    A.  I don't remember if I looked down and saw
5  anything with his feet.
6    Q.  About how long would you say Abel -- Strike
7  that.
8       After paramedics arrived, about how long would
9  you say it was before Abel was placed into an ambulance?
10    A.  I'd say a few minutes.
11    Q.  Can you give me an estimate?  Would you say it
12  was under five minutes or over five minutes?
13    A.  I'd say probably right around the five-minute
14  mark.
15    Q.  Did you ever actually see him get loaded into
16  the ambulance?
17    A.  I remember him putting -- I think I remember
18  putting -- him putting him on the gurney, but I don't
19  remember him actually going into the ambulance.
20    Q.  Is it fair to say that you believe he went
21  unconscious around the time that you were doing the
22  Heimlich maneuver?
23    A.  Yes.
24    Q.  And as far as you're aware of, did you ever

26 (Pages 92 to 95)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 96

1  see him become conscious again after that moment?
2      A.  No.
3      Q.  And what else do you recall doing on-scene
4  besides what we've already described here?
5      A.  I know that I transported Brubaker to CenCom.
6      Q.  I recall there being a video in which an
7  officer went and talked to Brubaker while she was in the
8  back of a squad; that is, the officer was standing --
9  the officer was standing outside the squad and talking to
10  Brubaker.  Do you recall seeing a video like that?
11      A.  I do recall seeing a video of that, yes.
12      Q.  Do you know who that officer was?
13      A.  I do not.
14      Q.  Do you know what squad she was in?
15      A.  I do not.  I think she may have been in my
16  squad, but I can't be certain.
17      Q.  Do you recall Commander Barr arriving on-scene
18  at some point?
19      A.  Yes, sir.
20      Q.  Where would you say, in the series of events,
21  that that happened?
22      A.  I think it was around the time that he -- that
23  Abel went into the ambulance.  I think it was around that
24  time.

Page 97

1      Q.  Do you recall speaking to him on-scene?
2      A.  I don't recall that, no.
3      Q.  Do you think it's likely you would have; you
4  just don't recall as you sit here two years later?
5      A.  Yes.  And, actually, I do remember.  He's the
6  one who instructed me to transport Brubaker to CenCom.
7      Q.  While on-scene, did you ever see the plastic
8  baggie with the white powder inside of it that was
9  allegedly removed from my client's throat?
10      A.  No, I do not remember seeing that on-scene,
11  no.
12      Q.  Do you remember hearing about it while
13  on-scene?
14      A.  Yes.
15      Q.  Who told you about it?
16      A.  I believe that I overheard the paramedics say
17  that they had taken something out of Abel's throat.
18      Q.  Do you recall which paramedic or paramedics
19  said that?
20      A.  No, sir.
21      Q.  Were you actually speaking to the paramedic or
22  paramedics, or is this more or less something that you
23  heard by being in relative close proximity to them
24  speaking?

Page 98

1      A.  Yes, the close proximity.  I don't remember
2  ever speaking to a paramedic.
3      Q.  As far as you know, were there only Round Lake
4  Beach paramedics on-scene?
5      A.  Correct, as far as I know.
6      Q.  And when you overheard a paramedic or
7  paramedics say that, did that surprise you?
8      A.  Not entirely.
9      Q.  It surprised you a little bit?
10      A.  Yeah, that it was -- that it was stuck in his
11  throat.  Yeah, it was surprising, I guess.
12      Q.  Is it fair to say it was at least a little bit
13  surprising because you had looked into his mouth and
14  throat and you said you thought you got a good look at
15  it?
16      A.  Yeah, but I didn't entirely know what -- you
17  know, I knew I couldn't see all the way down his throat.
18  I knew he was choking on something.  I just didn't know
19  entirely what it was.
20      Q.  Do you recall about what time you left the
21  scene to take Brubaker to CenCom?
22      A.  I do not recall what time that was at.
23      Q.  Do you recall doing anything else on-scene
24  besides what we already discussed?

Page 99

1      A.  I believe I collected a sock and put that into
2  an evidence bag, one of the socks.
3      Q.  Do you believe you collected one or two socks?
4      A.  I'm not entirely sure how many socks I would
5  have collected.
6      Q.  Can you describe the evidence bag that you
7  would have put it in?
8      A.  It was probably a paper bag that we would
9  normally put evidence into.  It could have also been a
10  plastic bag, like a sandwich baggie.  But I'm not
11  entirely sure what it was.
12      Q.  Did you carry both types in your vehicle?
13      A.  There usually were in the squad cars evidence
14  bags in the back.  So there usually were plastic bags or
15  paper bags in the back of squads.
16      Q.  You just don't have a recollection of what
17  type of bag the sock or socks went into?
18      A.  Correct.
19      Q.  Where was the sock or socks when you took
20  possession of it and put it in an evidence bag?
21      A.  Honestly, at this point I'm not entirely sure,
22  two years later.  I don't know where it was collected.
23      Q.  Did you fill out a report of any sort that
24  said you took possession of the sock or socks and put it

27 (Pages 96 to 99)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 100

1    into an evidence bag?
2        A.   I did not.
3        Q.   Any reason why not?
4        A.   Because I would have given it to Cramer to put
5    it in evidence.
6        Q.   Why would you have done that?
7        A.   Because he's the -- he was the primary officer
8    on it, and he was already putting stuff into evidence.
9        Q.   What's your -- Sorry.
10       A.   No. I'm sorry. I did a pause there. I was
11   saying, usually, as the primary officer, they always put
12   their own evidence usually into -- into evidence.
13       Q.   What's your understanding of what the primary
14   officer means?
15       A.   The one that is usually -- it's the one that's
16   assigned that beat, not always, but usually it is the
17   person who's assigned. In this specific incident, it
18   would have been the north car.
19       Q.   It's your understanding that that person would
20   require out any -- they would fill out any required
21   paperwork regarding an arrest or evidence or both?
22       A.   Correct.
23       Q.   Do you recall any conversation having taken
24   place with you and Shelby on the ride to the station?

Page 101

1        A.   Not entirely, no.
2        Q.   Technically, it's not the station. It's the
3    CenCom, as you said?
4        A.   Correct.
5        Q.   Have you ever watched the video of the
6    recording of that ride?
7        A.   No, sir.
8        Q.   What did you do when you got to the CenCom?
9        A.   I would have booked and processed her. And I
10   believe Officer -- or I'm sorry -- Commander Barr was --
11   advised to just release her at that point.
12       Q.   You would have filled out the necessary
13   paperwork for her to be processed?
14       A.   Correct.
15       Q.   Is that what you recall doing?
16       A.   Correct, fingerprinting, taking photographs.
17       Q.   To the best of your recollection, she was
18   released that -- well, that same night, early that
19   morning, so to speak?
20       A.   Correct, yes, sir.
21       Q.   What would you have done with the sock or
22   socks that you took into evidence?
23       A.   I would have put them in my squad and then
24   given it to Cramer that same morning.

Page 102

1        Q.   Do you have a specific recollection of doing
2    that, or do you believe that's what was done?
3        A.   I believe that is what is done. I don't
4    remember that specifically.
5        Q.   Okay. Do you remember anything else happening
6    during this shift; that is, before you ended your shift?
7        A.   I do not remember anything else.
8        Q.   Do you have any idea what time you got done
9    with work that morning?
10       A.   I do not.
11       Q.   I'm going to show you some exhibits.
12       A.   Okay.
13            (Whereupon, a video is shown via
14       Zoom.)
15   BY MR. MARX:
16       Q.   Officer, do you see the start of a video on
17   your screen?
18       A.   Yes, sir.
19       Q.   Okay. Exhibit 1 will be Round Lake 3662.
20   It's your squad video, it says here. It's Video No. 3.
21   I believe there is a 1 and a 2. Do you know if you
22   watched this particular video, No. 3?
23       A.   I don't remember.
24       Q.   I'm going to start it at 2:14. We're just

Page 103

1    going to play a portion of it, and I'll ask you a couple
2    questions.
3        A.   Yes, sir.
4            (Whereupon, a video is being played.)
5    BY MR. MARX:
6        Q.   I'm stopping it at 2:19. Do you recognize
7    who's depicted in the frame in 2:19?
8        A.   I do. I'm the furthest officer away from the
9    squad on his left side. That's me. And Officer Cramer
10   is on his right side, and that's who you're pointing at
11   right now. And that's Abel.
12       Q.   Thank you.
13       A.   Yes, sir.
14       Q.   I'm going to start it from 2:19.
15            I'm stopping it at 2:59. Do you recognize
16   who's in the still frame at 2:59?
17       A.   Yes, sir. The officer on the left is
18   Officer Atwell, and the officer on the right is
19   Officer Bertholomey.
20       Q.   Thank you.
21       A.   Yes, sir.
22       Q.   Now, when I play it from 2:59, I just want to
23   draw your attention to the far right-hand corner here
24   because I'm going to ask you a couple questions of what

28 (Pages 100 to 103)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 104

1    occurs over there.  Okay?
2        A.  Okay.
3        Q.  I just stopped it at 3:19.  Would you agree
4    with me that in that clip, that that at least partially
5    depicts Abel running into the road?
6        A.  Yes, sir.
7        Q.  And would you agree with me that at least
8    partially depicts Abel going to the ground in the road
9    and then getting picked back up shortly thereafter?
10       A.  Yes, sir.
11       Q.  Would you agree with me that the word
12   "partial" is fair because there just appears to be this
13   black obstruction on the right-hand side of the video?
14       A.  Correct, yes, sir.
15       Q.  And at 3:19 you see another person in the
16   frame?
17       A.  Yes.
18       Q.  Knowing what you know now, do you know who
19   that is?
20       A.  I believe that to be Abel's girlfriend.
21       Q.  You are correct.  It's Sinahy Gomez Reyes.
22       A.  Okay.
23       Q.  I'm going to play from 3:19, and then I'll
24   stop it again.

Page 105

1        A.  Okay.
2        Q.  Stopping at 3:25, would you agree with me that
3    in that clip, that you and other officers took Abel out
4    of the street and then put him back on the ground in the
5    grassy area?
6        A.  Yes.
7        Q.  I'm going to start it from 3:25.
8            Stopping at 4:10, would you agree, during that
9    clip, that Abel was put back on the ground, and it looks
10   like three officers are very close to Abel, and one
11   officer is kind of standing nearby; that is, outside of
12   the close proximity of Abel?
13       A.  Yes.
14       Q.  Okay.  Do you know who's actually standing as
15   opposed to being very close to Abel at that time?
16       A.  I do not.
17       Q.  Do you believe that you are one of the
18   officers that was having physical contact with Abel at
19   that point?
20       A.  Yes.
21       Q.  Do you believe the other one was Cramer?  At
22   least one of the other officers was Cramer?
23       A.  Yes, sir.
24       Q.  And so, therefore, you're not sure if it was

Page 106

1    Atwell or Bertholomey who was just kind of standing off
2    to the side?
3        A.  That's correct.
4        Q.  Do you believe that clip that we just watched
5    depicts one or more officers lying on top of Abel?
6        A.  I would not say that depicts us laying on top
7    of him, no.
8        Q.  Okay.  What would you say that depicts?
9        A.  That just depicts us taking control of him.  I
10   can't say anybody was laying on top of him.
11       Q.  You'd agree with me the quality is not great,
12   right?
13       A.  I would agree with that, yes.
14       Q.  But you're saying, from the quality that you
15   can tell, you would not think it's a fair
16   characterization to say anybody was laying on top of him?
17       A.  Correct.
18       Q.  I'm going to start playing it from 4:10.
19           Okay.  I'm stopping at 4:15.  In that short
20   clip that we just watched, is it fair to say that Abel
21   walked just off screen to the right?
22       A.  Yes.
23       Q.  And did you happen to notice another officer
24   that looked like they walked into the street area?

Page 107

1        A.  I did not notice that, no.
2        Q.  I will just play that five -- that six seconds
3    again.
4            Stopping at 4:16, did you notice what appeared
5    to be an officer walk into the street area, pick up --
6        A.  It did look like it.  I'm sorry.
7        Q.  -- pick up an object and then kind of toss it
8    onto the grass?
9        A.  I did see that.  It did look like he was going
10   over -- I can't tell if it was in the street itself, but
11   it did look like that somebody picked something up.
12       Q.  Do you know who that was?
13       A.  I do not, no, sir.
14       Q.  Do you think it's highly unlikely that it was
15   you, considering you were actually escorting Abel at that
16   time?
17       A.  That is correct.  It would not have been me.
18       Q.  Do you think it was likely Atwell or
19   Bertholomey?
20       A.  It looks like Atwell is right there dealing
21   with -- I apologize.  I don't remember the name but
22   Abel's girlfriend.  So I believe it would have been
23   Bertholomey.
24       Q.  Right.  I believe that to be true too.  Is it

29 (Pages 104 to 107)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 108

1  fair to say that you weren't really looking behind
2  yourself at that point when Bertholomey -- likely,
3  Bertholomey went to the road and picked up what he picked
4  up?
5      A.  Correct.
6      Q.  Okay.  I'm going to show you another exhibit.
7          (Whereupon, a video is shown via
8          Zoom.)
9  BY MR. MARX:
10     Q.  Can you see a still frame of a video?
11     A.  I can, yes.
12     Q.  This is Exhibit 2.  It's a cell phone video.
13 It's called Plaintiff's Exhibit 184.  I know we haven't
14 watched it now, but is it fair to say you've seen this
15 video multiple times now?
16     A.  Yes, sir.
17     Q.  Okay.  I'll just stop it at a couple of
18 points, and I'll ask you some questions about it.
19     A.  Okay.
20     Q.  All right.  I stopped it at three seconds.
21 Can you tell in this video where you're depicted?
22     A.  Yes.  I'm on the right side, where your cursor
23 is right now.
24     Q.  Okay.  And who's this on the left side?

Page 109

1      A.  That is Officer Cramer.
2      Q.  Okay.  Is it fair to say that Abel is on the
3  ground at this point?
4      A.  Yes, sir.
5      Q.  Okay.  Is it fair to say at this three-second
6  mark that the upper half of Abel's body is in the
7  pavement; the lower half is in the grassy area, and his
8  stomach area is near the curb?
9      A.  Yes, sir.
10     Q.  Can you tell what you're doing in this
11 particular still frame?
12     A.  I cannot tell what I am doing, no.
13     Q.  Is it fair to say that you're very close to
14 Abel in it?
15     A.  Yes, I would be close to Abel, yes.
16     Q.  Would you agree with me that Officer Cramer is
17 touching Abel's leg at this point?
18     A.  Yes, sir.
19     Q.  Do you have any recollection of Officer Cramer
20 putting his knee or knees on Abel at any point?
21     A.  No.
22     Q.  I'm stopping it at 11 seconds here.  Would you
23 agree with me that at 11 seconds, you're touching Abel's
24 back?

Page 110

1      A.  I can't actually tell if I'm touching him, but
2  I would say that it's probable that I am.
3      Q.  Would you agree with me that Officer Cramer
4  appears to be touching Abel's leg?
5      A.  Yes, sir.
6      Q.  I'll start it again from 11 seconds.
7          I'm stopping at 46 seconds.  Would you agree
8  with me that Officer Cramer appears to be still touching
9  Abel's leg?
10     A.  Yes, sir.
11     Q.  And at 46 seconds, would you agree with me
12 that you're touching Abel's back?
13     A.  I do not know if I am touching him at that
14 point.
15     Q.  I'll start it again at 46.
16         I'm stopping at 56 seconds.  Would you agree
17 with me in that clip that you put at least one of your
18 hands on Abel's back?
19     A.  Can I rewatch that part?  I did not --
20     Q.  Sure.  I'll start it again at 46 seconds.
21         Stopping at 57 seconds.  My question is,
22 during that clip, would you agree with me that you put at
23 least one of your hands on Abel's back?
24     A.  I'm not entirely sure where I put my hand, but

Page 111

1  it does look like it may have been on his back.
2      Q.  Would you agree with me in that clip that you
3  used one of your hands to push down on Abel's back?
4      A.  I can't say that I pushed down on his back,
5  no.  I have no idea the amount of pressure that I would
6  have put on his back.  I could have just been touching
7  it.
8      Q.  Do you believe there would be any reason to be
9  pushing on his back at this point?
10     A.  Pushing on it?  No.  I would not have pushed
11 on his back.
12     Q.  Do you believe you ever pushed on his back?
13     A.  To gain control of him at those certain parts,
14 I would have applied some amount of pressure, yes.  But
15 while he's sitting there at no threat, I would have never
16 pushed down on him.
17     Q.  I guess I'm using a different word.  You're
18 saying, "apply pressure," and I'm using "push."  Do you
19 believe there's a difference between those two?
20     A.  I mean, obviously, if you push something,
21 you're applying pressure.  But I would have never applied
22 pressure -- a large amount of pressure.  If anything, I
23 would have just touched his back to make sure he wasn't
24 gonna go anywhere.

30 (Pages 108 to 111)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 112

1  Q.  You had applied pressure by pushing on it in
2  some manner, right?
3  A.  I don't know if I did that -- I can tell you I
4  didn't do that there because I never pushed.  There would
5  be no reason for me to push on his back.
6  Q.  I'll start it again from 57 seconds.
7  I'm stopping at 1:09.  Did you happen to
8  notice Officer Cramer take off one of Abel's socks at
9  that point?
10  A.  I did notice that, yes.
11  Q.  Okay.  But at the time, you didn't recognize
12  that that's what he had done?
13  A.  Correct.
14  Q.  And is it fair to say at 1:09 that you have at
15  least one of your hands on Abel?
16  A.  It's probable.  I'm not entirely sure.  I
17  could be reaching over him, but I'm not entirely sure
18  where my hands are at that point.
19  Q.  The video is stopped at 1:42.  Would you agree
20  with me, during the entirety of that video, for a minute
21  and 42 seconds, Abel is in the prone position?
22  A.  Yes, sir.
23  Q.  And now knowing that Abel is in the prone
24  position for a minute and 42 while he was near the squad

Page 113

1  car, can you give me any estimate as to how long he was
2  in the prone position in total?
3  A.  I'm not entirely sure.  I would probably say
4  less than three minutes.
5  Could I make an objection on that?
6  Q.  Yes.
7  A.  So I know that Abel went down to the ground
8  around the same time as Brubaker came to the scene, and I
9  know that Officer Kaminski arrived -- I think it was
10  like -- according to just on the video, it was like three
11  and a half minutes, and he was already up -- standing up
12  when we were doing the Heimlich.  So I don't think it
13  could have been more than that three and a half minutes,
14  piecing those videos together.
15  Q.  Okay.  Just a couple more exhibits.
16  (Whereupon, a photograph is shown via
17  Zoom.)
18  BY MR. MARX:
19  Q.  Do you see a document on your screen?
20  A.  Yes, sir.
21  Q.  This will be Exhibit 3.  It's 3564.  Do you
22  see some three areas of discoloration on my client's
23  face?
24  A.  I do.

Page 114

1  Q.  Do you know if those are abrasions or not?
2  A.  I do not.
3  Q.  If they are abrasions, do you know how my
4  client sustained them?
5  A.  I do not.
6  (Whereupon, a photograph is shown via
7  Zoom.)
8  BY MR. MARX:
9  Q.  Exhibit 4 will be 3567.
10  Officer, do you see a discoloration on my
11  client's cheek area?
12  A.  Yes, sir.
13  Q.  And do you know if that's an abrasion or not?
14  A.  I do not know.
15  Q.  If it is an abrasion, do you know how he
16  sustained it?
17  A.  No, sir.
18  (Whereupon, a photograph is shown via
19  Zoom.)
20  BY MR. MARX:
21  Q.  Exhibit 5 will be 3609.  I believe this to be
22  my client's left leg.  Do you ever see some
23  discoloration on the left leg?
24  A.  Yes, sir.

Page 115

1  Q.  Do you know if those are abrasions or not?
2  A.  I do not.
3  Q.  If they are abrasions, do you know how he
4  sustained them?
5  A.  I do not.
6  (Whereupon, a photograph is shown via
7  Zoom.)
8  BY MR. MARX:
9  Q.  Exhibit 6 will be 3611.  I believe, but I'm
10  not sure, that this is my client's shin.  Do you see some
11  discoloration on the skin?
12  A.  I do.
13  Q.  Do you know if that's an abrasion or not?
14  A.  I do not.
15  Q.  Do you know -- if it is an abrasion, do you
16  know how he sustained it?
17  A.  I do not.
18  (Whereupon, a photograph is shown via
19  Zoom.)
20  BY MR. MARX:
21  Q.  I'll show you one more regarding this.
22  Exhibit 7 will be Round Lake 3929.  Do you see what
23  appears to be some sort of abrasion or cut near the top
24  of my client's head?

31 (Pages 112 to 115)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 116

1    A.   Yes.
2    Q.   Do you know if that's a cut or an abrasion?
3    A.   I do not.
4    Q.   If it is, do you know how he sustained that?
5    A.   I do not.
6    Q.   You saw the baggie with the white powder
7    substance in it at some point during this incident,
8    correct?
9    A.   Correct.
10   Q.   When is the first time you saw it?
11   A.   I believe the first time I saw it was in the
12   evidence room with Officer Cramer.
13   Q.   Was anyone else present when you saw it?
14   A.   I believe it was just me and Officer Cramer.
15   Q.   Do you know what time you saw it at, as in,
16   was it before or after you took Shelby to the CenCom?
17   A.   It would have been after.
18   Q.   Okay.  And can you give me an approximation of
19   when you would have seen it?
20   A.   I do not.  I know it was near the -- I think
21   it was -- honestly, I don't know.
22   Q.   I forgot.  What time were you scheduled to end
23   your shift?
24   A.   I was scheduled to end at 7:15.

Page 117

1    Q.   Again, you don't recall what time you actually
2    stopped?
3    A.   No.  I believe it was after that.  I remember
4    staying late, but I'm not entirely sure what time.
5    Q.   Is it fair to say you would have first viewed
6    the baggie towards the end of your shift?
7    A.   Correct.
8    Q.   And where was the baggie when you observed it?
9    A.   It would have been on the counter in the
10   evidence room, or tabletop or counter area.
11   Q.   Did you ever touch the baggie?
12   A.   I don't remember ever actually touching the
13   baggie, no.
14   Q.   Is that you're pretty sure you didn't?
15   A.   I'm pretty sure I did not.
16   Q.   Is it fair to say you're not a hundred percent
17   certain, but you're pretty sure you didn't?
18   A.   That's fair.  I'm not entirely sure.  I was in
19   the evidence room with them, and I -- so I'm not entirely
20   sure.
21   Q.   Did you photograph the baggie?
22   A.   Another thing, I am not entirely sure if I --
23   I don't recall.  It's very possible I would have taken
24   the picture.  I am not entirely sure.

Page 118

1    Q.   If you would have photographed it, is it
2    likely you would have then touched it?
3    A.   Not if all I was doing was taking the picture.
4    If it was already set up, then I would have just snapped
5    the picture.
6    Q.   How many pictures did you take -- Strike that.
7    If you took a picture, how many pictures did
8    you take?
9    A.   I believe if I did, it would have probably
10   just been that one.
11   Q.   If you did take a picture, is there any reason
12   why you didn't take a picture of the baggie next to a
13   ruler?
14   A.   I think I just took it -- if I took it -- I'm
15   not entirely sure I did, but if I did, I was just taking
16   it to show that it was field tested positive for cocaine.
17   Q.   That was the primary purpose of the photo, if,
18   in fact, you took it?
19   A.   Correct.
20   Q.   Don't you believe it's also important to have
21   some sort of scale; that is, a ruler next to it?
22   A.   I would agree that that would be important.
23   Q.   If you took the photo, is there any reason why
24   you didn't take a picture of the baggie on a scale?

Page 119

1    A.   I'm not entirely sure.
2    Q.   Have you ever done that before, taken a
3    picture of a narcotic on a scale before?
4    A.   I'm sure I have.  I don't think I did it every
5    single time, but I'm not entirely sure.
6    Q.   Have you ever done that before, take a picture
7    of a narcotic next to a ruler?
8    A.   I don't believe I've ever done that, no.
9    Q.   How would you describe the baggie?
10   A.   It was like a white powder substance in a
11   clear plastic bag with some extra bag on top.
12   Q.   Did you say, "with some extra bag on top"?
13   A.   Yeah.  It was just a white powder substance
14   underneath, and there was like -- I don't know how to
15   describe it, per se, but the extra bag that would kind of
16   go off to the side.
17   Q.   Do you know what Saran Wrap is?
18   A.   Yes.
19   Q.   Technically, Saran Wrap, in your experience,
20   is not an actual bag, right?
21   A.   Correct.  It would not be a bag.
22   Q.   It's just a wrap; that is, it's a sheet,
23   correct?
24   A.   Correct.

32 (Pages 116 to 119)

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 120

1      Q.   So would you describe this substance, this
2  white powder substance, as being in a baggie?  Or would
3  you say it was more something like akin to a
4  Saran-Wrap-type material?
5      A.   There was no ziplock or anything, so it could
6  very possibly have just been a sheet of plastic that it
7  was wrapped in, but I'm not entirely sure.
8      Q.   According to a report that I saw, it was
9  4.0 grams.  My question to you is, do you have any reason
10 to think that that report was inaccurate?
11     A.   No.
12     Q.   Do you have any idea who measured -- I'm
13 sorry.  Strike that.
14          Do you have any idea who weighed that
15 narcotic?
16     A.   It would have probably been Officer Cramer.
17     Q.   Why do you believe that to be true?
18     A.   Because it was his case, and he was the one
19 entering it into evidence.
20     Q.   Is there a scale in the evidence room that you
21 described?
22     A.   Yes, sir.
23     Q.   Is it on the same table that the picture would
24 have been taken on?

Page 121

1      A.   Quite possibly, yes.
2      Q.   Okay.  I think you said sometimes you take
3  pictures with evidence on the scale, and sometimes you
4  don't.  Is that what you said?
5      A.   I believe so, that I would have taken some
6  pictures on the scale, but I know it wouldn't have been
7  every single time.
8      Q.   Would one of the factors be the amount?  For
9  example, if it was a very small amount of narcotics, you
10 wouldn't put it on a scale and take a picture, but if you
11 believed it was a larger amount, you might take a picture
12 of it on a scale?
13     A.   That could be a factor, but I'm not entirely
14 sure.
15     Q.   Are you aware of a general order or special
16 order or directive that speaks to whether or not an
17 officer is supposed to take a picture of a narcotic on a
18 scale or not?
19     A.   I am not sure of any.
20     Q.   Are you aware of any general order, special
21 order or directive, that indicates whether or not an
22 officer should or must take a picture next to a ruler of
23 a narcotic?
24     A.   I am unsure.  I'm not entirely sure of that.

Page 122

1      Q.   Would you describe the size of the white
2  powder as being about the size of a golf ball?
3      A.   It's hard to tell from just the image.  I'm
4  not entirely sure how big it was.
5      Q.   And just from your recollection, you can't
6  give me an estimate?
7      A.   Honestly, I'm not entirely sure.
8      Q.   In your experience have you ever seen anybody
9  try to hide that large amount of narcotics in their mouth
10 before?
11     A.   No.
12     Q.   Have you ever in your experience had somebody
13 try to conceal narcotics in their mouth?
14     A.   Not that I can remember, no.
15     Q.   Do you know if that plastic bag -- Strike
16 that.
17          If, in fact, you took the picture with
18 Officer Cramer in the room, do you recall what, if
19 anything else, he would have done with that plastic bag?
20     A.   He would have put it into an evidence bag and
21 then put it into evidence.
22     Q.   And is that the last time you actually saw the
23 plastic bag?
24     A.   Right, yes.  Well, that's not entirely -- I

Page 123

1  saw it on a press conference with -- on the news or -- I
2  think it was with the former chief, Rivera.
3      Q.   To be more exact, is that the first and the
4  last time you saw that plastic bag in person?
5      A.   Correct, yes, sir.
6      Q.   Okay.  Every other time you saw it was either
7  that picture or on the news?
8      A.   Yes, sir.
9      Q.   Do you know if that plastic bag was tested for
10 DNA or fingerprints?
11     A.   I do not.
12     Q.   Do you know whose responsibility it is to test
13 items for DNA or fingerprints?
14     A.   I would say whoever -- if it's a -- whoever
15 took primary on that case, it would be their
16 responsibility to submit.
17     Q.   And in this case, that would be Officer Cramer
18 to your knowledge?
19     A.   I would say it would have been mostly on Major
20 Crimes at that point.
21     Q.   Well, you said that the primary -- you would
22 expect the primary to submit an item for testing, but
23 you're saying that wouldn't be the case now?
24     A.   Well, I believe that normally, on normal cases

33 (Pages 120 to 123)

Royal Reporting Services, Inc.
312.361.8851

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 124

1  like this, it would be the primary Officer. But in cases
2  where Major Crimes is involved, we're always instructed
3  to let them take over the investigation.
4      Q.   And do you know if they actually submitted it
5  for testing or not?
6      A.   No, sir, I do not know.
7      Q.   Do you think it should be?
8      A.   It wouldn't hurt, that's for sure, especially
9  for fingerprints. It's very tough to get fingerprints
10 off of a plastic bag like that. But it definitely would
11 not hurt.
12     Q.   What do you mean "it wouldn't hurt"?
13     A.   I mean, if it was to get tested, I mean, I
14 would have no issues with that. I think it would be
15 better than not. So I don't know what they're going to
16 gather from it, but ...
17     Q.   Did you yourself fill out any paperwork
18 related to this incident?
19     A.   No.
20     Q.   I think you said you did some processing for
21 Shelby. Did you actually fill out paperwork regarding
22 her arrest?
23     A.   That, I would have processed her and did the
24 fingerprints, and I believe I filled out her ticket as

Page 125

1  well, her -- the ticket that I would have given to her.
2      Q.   Besides documents related to Shelby, do you
3  have any recollection of filling out any paperwork
4  regarding the Abel Rosiles incident?
5      A.   No, sir.
6      Q.   You were made aware of a coroner's inquest at
7  some point, correct?
8      A.   I was.
9      Q.   And did you physically show up to it; that is,
10 where it was taking place, or what did you do?
11     A.   I actually was not involved with that as well.
12 I remember it happening, but I actually was not there for
13 that.
14     Q.   Did you watch it or listen to it on a Zoom
15 link?
16     A.   No.
17     Q.   When did you find out about it?
18     A.   Honestly, I'm not entirely sure.
19     Q.   So you may or may not have known about it at
20 the time it occurred?
21     A.   Yeah, I believe I may have known about it, but
22 I know that I was never subpoenaed, and so I'm not
23 entirely sure when I found out about it.
24     Q.   You definitely weren't working at that point,

Page 126

1  correct?
2      A.   Correct. Working for Round Lake Beach?
3      Q.   Right, to be clear.
4           Has anyone from the State's Attorney's Office;
5  that is, a State's attorney or a representative from
6  their office, ever contacted you regarding this case?
7      A.   No, sir.
8      Q.   Are you aware if they're conducting any
9  criminal investigation in this matter?
10     A.   I'm not sure if they are.
11     Q.   So, therefore, you're not sure what the
12 status, if any, is of any investigation they're
13 conducting?
14     A.   Correct.
15     Q.   Is it fair to say you're curious to find out
16 answers to these questions?
17     A.   Sure. Yeah, I would definitely want to know
18 that.
19     Q.   Now, of course I don't want you to talk about
20 anything you talked about with your attorney, but have
21 you ever heard of Dr. Baden, B-A-D-E-N?
22     A.   Not the name, no.
23     Q.   Were you ever made aware or have you ever
24 learned that he gave some testimony at this coroner's

Page 127

1  inquest?
2      A.   I know there was a doctor who did give some
3  testimony, yes, but I was not entirely sure of his name.
4      Q.   There were a couple doctors that gave
5  testimony at the coroner's inquest, but you're not sure
6  of which one that you're aware of?
7      A.   Correct.
8      Q.   Have you ever read a report by a Dr. Baden
9  regarding his report on the Abel Rosiles incident?
10     A.   No, sir.
11     Q.   I'm just going to read you a sentence from his
12 report and ask you a question about it. Okay?
13     A.   Okay.
14     Q.   Dr. Baden wrote, It is my opinion to a
15 reasonable degree of medical certainty that the cause of
16 Mr. Rosiles's death was hypoxic brain damage caused by
17 interference with oxygen going to his brain by prone back
18 pressure and a plastic bag containing white powder in his
19 throat.
20          My question is, do you agree with that
21 opinion?
22     MR. MATHUES: Objection. The question is calling
23 for expert testimony under Rule 712 and 703.
24

34 (Pages 124 to 127)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 128

1  BY THE WITNESS:
2      A.  I do not agree with that, no.
3      Q.  Why don't you agree with that?
4      A.  Because I believe that he -- the cause was the
5  thing that was lodged into -- the baggie that was lodged
6  into his throat,
7      Q.  If Sinahy Reyes Gomez or Shelby Brubaker said
8  that you and other officers were holding Abel down on the
9  ground in the prone position for several minutes, would
10 you disagree with that statement?
11     A.  I would disagree with that, yes.
12     Q.  If you just give me two minutes to look at my
13 notes, I'd just like to see if there's anything else I'd
14 like to ask you; but, otherwise, I think we're almost
15 done.
16     A.  Yes, sir.
17 MR. MATHUES:  Sounds good,
18 MR. MARX:  Okay.  Just give me a few-minute break.
19            (Whereupon, a document is shown via
20            Zoom.)
21 BY MR. MARX:
22     Q.  While Abel was in the prone position the third
23 time; that is, near the squad car, did you ever touch
24 Abel's head?

Page 129

1      A.  Touch his head?
2      Q.  Yes.
3      A.  No.
4      Q.  I'm sorry.  What was your answer?
5      A.  No, I do not recall touching his head, no.
6      Q.  While Abel was in the prone position the third
7  time near the squad car, did you ever touch Abel's neck?
8      A.  No.
9      Q.  While Abel was in the prone position the third
10 time near the squad car, did you ever touch Abel's
11 shoulder?
12     A.  I would have touched his shoulder, yes.
13     Q.  At any time while Abel is in the prone
14 position by the squad car the third time, did you ever
15 touch Abel's chest?
16     A.  Touch his chest?  No, I did not touch his
17 chest.
18     Q.  At any time while Abel was in the prone
19 position the third time near the squad car, did you ever
20 touch Abel's back?
21     A.  It's very possible I touched his back, yes.
22     Q.  Can you give me an estimate as to how long you
23 touched Abel's shoulder while he was in the prone
24 position that third time near the squad car?

Page 130

1      A.  I am not entirely sure, no.  I couldn't even
2  give you an estimate.
3      Q.  Can you give me an estimate of the time period
4  you touched Abel's back while he was in the prone
5  position the third time near that squad car?
6      A.  I cannot give you an estimate, no.
7      Q.  Did you ever use your personal or professional
8  e-mail to e-mail anybody about this incident?
9      A.  I do not believe so, unless -- I think it was
10 the work e-mail when Major Crimes e-mailed me the report
11 to go over.  I believe that was through -- yeah, that
12 would have been through work e-mail.
13     Q.  And do you believe you would have responded at
14 some point with words to the effect of "This looks fine
15 to me" or "This is accurate to me" or something like
16 that?
17     A.  Something like that, yes.
18     Q.  Besides that, do you have any recollection of
19 conducting any more e-mails personally or professionally;
20 that is, regarding this incident?
21     A.  No.
22 MR. MARX:  That's all the questions I have.  Your
23 attorney may have some questions.
24 MR. MATHUES:  I have maybe five minutes' worth of

Page 131

1  questions, Mr. Scheithe.
2            EXAMINATION
3  BY MR. MATHUES:
4      Q.  Back towards the beginning of this deposition,
5  you made a statement that you wish you had had bodycam
6  throughout this instance.  Do you remember that?
7      A.  Yes.
8      Q.  You also talked about observing the woman you
9  now know to be Ms. Gomez Reyes and believing she was
10 taking cell phone video.  Do you remember that?
11     A.  Yes.
12     Q.  Do you have any idea why Ms. Gomez Reyes
13 started recording when she did?
14     A.  I do not.
15     Q.  Do you have any idea why Ms. Gomez Reyes
16 stopped recording when she did?
17     A.  I do not.
18     Q.  As you sit here today, do you wish she would
19 have continued recording longer rather than turning off
20 her cell phone when she did?
21     A.  Definitely.
22     Q.  Did you personally ever tell Ms. Gomez Reyes
23 to stop recording?
24     A.  No.

35 (Pages 128 to 131)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 132

1    Q.   Did you ever hear any other law enforcement
2 officer tell Ms. Gomez Reyes to stop recording?
3    A.   No.
4    Q.   Mr. Marx asked you, at the end, about touching
5 Mr. Rosiles's back when he was prone the third time by
6 the car.  My question to you is, at any point during your
7 encounter with Mr. Rosiles throughout this whole
8 incident, did you ever put pressure on Mr. Rosiles' neck?
9    A.   No.
10    Q.   I think you told Mr. Marx that you definitely
11 touched Mr. Rosiles' shoulder for some point of time and
12 probably touched his back; is that fair?
13    A.   Yes, that is fair.
14    Q.   Is it fair to say that when you were touching
15 Mr. Rosiles' back -- touching Mr. Rosiles' shoulder and
16 potentially touching his back, you would have put a
17 slight amount of -- put at least some pushing or pressure
18 on Mr. Rosiles' body?
19    A.   Correct, yes.
20    Q.   Did you ever put your full body weight on
21 Mr. Rosiles' shoulder or back?
22    A.   No.
23    Q.   Did you ever put most of your body weight on
24 Mr. Rosiles' shoulder or back?

Page 133

1    A.   No.
2    Q.   Once the paramedics arrived, is it fair to say
3 that you deferred to their judgment as to how best
4 treat Mr. Rosiles?
5    A.   Yes.
6    Q.   And you don't have a paramedic's license or
7 any sort of medical license; is that correct?
8    A.   That's correct.
9    Q.   Did you see with your own eyes the bag that
10 the paramedics -- did you see with your own eyes
11 paramedics remove a bag or baggie from Mr. Rosiles'
12 throat?
13    A.   No.
14    Q.   Mr. Marx showed you the cell phone video,
15 correct?
16    A.   Correct.
17    Q.   You've seen that video a number of times; is
18 that fair?
19    A.   That is fair.
20    Q.   Do you recall, in the times that you've
21 watched the video, around the 55-, 56-, 57-second mark,
22 the video depicts you making a physical motion with your
23 hand from Mr. Rosiles' body towards the car?
24    A.   Yes.

Page 134

1    Q.   Would you like to see that part of the clip
2 again, or are you comfortable just talking about it?
3    A.   I'm comfortable talking about it.
4    Q.   Is it fair to say that the resolution and
5 lighting quality of that video is not very good?
6    A.   Yes.
7    Q.   Are you able to tell what you're doing when
8 you make the physical motion depicted in the cell phone
9 video around the 55-second mark?
10    A.   I'm unsure what I'm doing.
11    Q.   As you sit here today, do you have some
12 possibilities as to what you may have been doing even
13 though you cannot be entirely certain?
14    A.   Yes.
15    Q.   What do you think are the possibilities which
16 you -- that may have been taking place in that physical
17 motion?
18    MR. MARX:  Objection, form.
19 BY THE WITNESS:
20    A.   I could have been bracing myself against the
21 tire if I was, you know, leaning one away.  It looks like
22 I may be bracing myself.  And it looks like I could have
23 been taking the sock off and moving it towards the --
24 taking the sock out of Rosiles's mouth and moving it

Page 135

1 towards the squad.  It's a possibility.
2    Q.   But, again, because of the quality of the
3 video, as you sit here today, you can't say under oath
4 you're certain?
5    A.   Correct.
6    Q.   If the video was a better quality, would that
7 help?
8    A.   That would help.
9    Q.   And for clarity, you were talking about the
10 time that passed between when Ms. Brubaker arrived and
11 when Officer Kaminski arrived.  Do you recall that?
12    A.   Yes.
13    Q.   When Officer Kaminski arrived, was Mr. Rosiles
14 still in a prone position, or had he been gotten up?
15    A.   He had already been gotten up.
16    MR. MATHUES:  That is all the questions that I have
17 for you.  Mr. Marx might have a few more.
18          FURTHER EXAMINATION
19 BY MR. MARX:
20    Q.   You've seen the complaint in this case,
21 correct?
22    A.   I'm not entirely sure. I believe so.
23    Q.   Are you aware that one of the allegations is
24 that you used excessive force against my client?

36 (Pages 132 to 135)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 136

1    A.  I believe that's one of the -- yes.

2    **Q.  And is it fair to say you've been told that**

3  **before; that is, by -- you've learned that through your**

4  **training before, that an officer cannot use excessive**

5  **force?**

6    A.  Correct.

7    **Q.  Is it fair to say you've been trained that an**

8  **officer can use force, correct?**

9    A.  Yes.

10    **Q.  They just can't use excessive force, correct?**

11    A.  Correct.

12    **Q.  And you used force on Abel Rosiles on**

13  **June 10th, 2020, correct?**

14    A.  I did use force, yes.

15    **Q.  You're not denying that you used some level of**

16  **force, correct?**

17    A.  Correct.

18    **Q.  In your opinion, it was not excessive,**

19  **correct?**

20    A.  That is correct.

21    **Q.  If you saw an officer using what you believed**

22  **to be excessive force, would you do something about it?**

23    A.  Yes.

24    **Q.  Okay.  What would do you?**

Page 137

1    A.  I would intervene.

2    **Q.  Is it your understanding you have a duty to**

3  **intervene, if you can, if you see an officer using**

4  **excessive force?**

5    A.  Yes, sir.

6    **Q.  Did you see any officer using excessive force**

7  **on Abel Rosiles on June 10th, 2020?**

8    A.  No, sir.

9    MR. MARX:  That's all the questions I have.

10    MR. MATHUES:  Nothing based on that.

11    Jeremiah, you haven't done a deposition

12  before, so I'll explain it to you.  You have the right to

13  read the transcript and make sure -- you can't change

14  your answer from a "yes" to a "no," but you can look at

15  it for spelling errors, et cetera, or you can just say,

16  "I waive" and let the court reporter -- trust the court

17  reporter.  Your call.

18    THE WITNESS:  I'll waive it.

19    MR. MATHUES:  We'll waive signature.  Presuming

20  Mr. Marx is going to order, I will take a copy.

21    MR. MARX:  I will order.

22    MR. MATHUES:  E-Tran, regular time.

23    (Witness excused.)

24    (Deposition concluded at 4:13 p.m.)

37 (Pages 136 to 137)

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 138

```
 1   UNITED STATES OF AMERICA        )
     NORTHERN DISTRICT OF ILLINOIS   )
 2   EASTERN DIVISION                )   SS.
     STATE OF ILLINOIS               )
 3   COUNTY OF COOK                  )

 4

 5             I, Tina M. Hickey, Certified Shorthand

 6   Reporter, do hereby certify that JEREMIAH SCHEITHE was

 7   first duly sworn by me to testify the whole truth and

 8   that the above deposition was reported stenographically

 9   by me and reduced to typewriting under my personal

10   direction.

11             I further certify that the said deposition was

12   taken on the date and time specified and that the taking

13   of said deposition commenced on August 18th, 2022, at

14   1:05 o'clock p.m.

15             The signature of the witness, JEREMIAH

16   SCHEITHE, was waived by agreement of counsel.

17             I further certify that I am not a relative or

18   employee or attorney or counsel of any of the parties,

19   nor a relative or employee of such attorney or counsel or

20   financially interested directly or indirectly in this

21   action.

22

23

24
```

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 139

1              Witness my official signature as a Certified

2      Shorthand Reporter in the State of Illinois, on

3      September 9th, 2022.

4

5

6

7

8

9

10                                          _____
                                            TINA M. HICKEY, CSR
11                                          161 North Clark Street
                                            Suite 3050
12                                          Chicago, Illinois 60601
                                            Phone:  312.361.8851
13
       CSR No. 084-003858
14

15

16

17

18

19

20

21

22

23

24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

**A**

**Abel** 1:4 19:7,14
21:12 22:3,12
28:14 47:8,13
47:17,17,20
48:1,7,18
49:20 50:1,13
50:19 51:5,7
52:15,20,22
53:9,10 56:4
57:6,11,14,22
59:1,4,8 60:9
62:1,7 63:17
64:8,11 69:17
69:22 70:10,12
71:2,10 72:6
72:19,24 73:3
73:6 74:6 77:2
79:14 82:7
83:3,23 88:7
88:19,22 89:1
89:22 90:14,18
90:24 91:17,24
92:23 94:4,14
94:18 95:1,6,9
96:23 103:11
104:5,8 105:3
105:9,10,12,15
105:18 106:5
106:20 107:15
109:2,14,15,20
112:15,21,23
113:7 125:4
127:9 128:8,22
129:6,9,13,18
136:12 137:7
**Abel's** 30:2 70:7
73:7 74:5 75:2
82:23 84:8
86:6 90:21
91:2 97:17
104:20 107:22
109:6,17,23
110:4,9,12,18

110:23 111:3
112:8 128:24
129:7,10,15,20
129:23 130:4
**able** 5:12 15:10
15:11 37:22
57:3,16 61:12
80:5 81:3,5
134:7
**abrasion** 114:13
114:15 115:13
115:15,23
116:2
**abrasions** 114:1
114:3 115:1,3
**academy** 11:22
12:7 20:7,11
**acceptable** 21:3
**accident** 31:6
**accompanied**
49:23
**accumulated**
8:12
**accurate** 10:5
93:23,24
130:15
**action** 138:21
**activate** 32:7
44:3,11 45:2,8
**activated** 44:13
**actual** 29:6
34:20 44:19
46:15 119:20
**administered**
86:22 87:4
90:8
**Administrator**
1:4
**advised** 53:1,2
82:1 101:11
**advising** 28:5
**affirmative**
78:23
**ago** 49:3,3
**agree** 20:17 33:4

33:6 89:17,20
104:3,7,11
105:2,8 106:11
106:13 109:16
109:23 110:3,7
110:11,16,22
111:2 112:19
118:22 127:20
128:2,3
**agreement**
138:16
**ahead** 64:4
**ahold** 59:15
**aid** 11:16,21
12:6,8,12 13:6
40:6
**air** 78:1,8
**akin** 120:3
**al-** 64:3
**alarm** 41:4,7
42:4,11,13,20
**alert** 42:14
**allegations**
135:23
**allegedly** 97:9
**allow** 21:2
**allowance** 37:15
37:18 43:21
**allowed** 35:15
35:16 45:15
**ambulance** 95:9
95:16,19 96:23
**AMERICA**
138:1
**amount** 21:13
37:21 66:16
72:2 111:5,14
111:22 121:8,9
121:11 122:9
132:17
**amounts** 37:21
**and/or** 50:13
**angry** 26:8,10
**answer** 5:7 49:5
50:24 89:24

129:4 137:14
**answered** 37:23
**answers** 5:12
126:16
**Antoine** 22:16
24:1 47:16,20
**anybody** 7:13
22:9 41:17
42:2 50:17
77:17 106:10
106:16 122:8
130:8
**apart** 44:22 54:4
55:1
**apologize** 13:10
51:4 64:15
83:4 107:21
**appear** 53:10
**APPEARAN...**
2:1
**appeared** 30:3
107:4
**appears** 69:8,9
104:12 110:4,8
115:23
**applied** 62:8
88:7 111:14,21
112:1
**apply** 21:6,17,21
111:18
**applying** 65:18
111:21
**appreciate** 4:20
49:2,8,10
**approach** 88:19
88:20
**approaching**
90:14,18
**appropriate**
17:11,15 45:17
**approximately**
28:13,14 57:15
72:8 81:12
86:3
**approximation**

116:18
**area** 18:20 38:17
38:20,22 39:3
44:18 50:7
57:10 59:3
60:12,15,16,24
61:3,17 63:13
63:17 64:9,13
66:11,16 68:8
70:1 71:24
85:13,17 105:5
106:24 107:5
109:7,8 114:11
117:10
**areas** 113:22
**arm** 17:24 18:2
18:5,6,9 20:7,8
20:9 56:13,13
56:14,17,19
58:4,8 59:15
59:17,22 60:23
60:23 61:19
62:22 69:1
70:1,15,17
**armbar** 17:19
17:23
**arms** 17:14
**arrest** 28:16
51:18,19,20,22
52:5 100:21
124:22
**arrested** 22:21
28:14 53:6
**arrive** 88:11
92:18
**arrived** 46:3,6
48:15 52:3
88:17 90:1,3,6
90:9 92:5,21
94:12,20 95:8
113:9 133:2
135:10,11,13
**arrives** 85:18
**arriving** 45:23
96:17

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 141

**asked** 25:11
49:20 51:4
52:24 54:6,13
78:1,18,19
83:5 132:4
**asking** 27:17
29:20 62:23
64:22 72:14
80:20,24 81:2
**aspect** 89:12
**asphyxia** 14:15
14:24 16:4
**asphyxiation**
13:18,19 14:3
14:10
**assigned** 100:16
100:17
**assist** 27:10
**assistance** 57:18
**assisted** 60:14
60:22
**assume** 34:1
**attached** 40:7
**attempt** 63:13
**attempted** 86:10
**attempting**
63:10 85:2
**attention** 74:19
90:24 103:23
**attorney** 6:23
7:1,5,22 26:21
27:4 126:5,20
130:23 138:18
138:19
**Attorney's**
126:4
**Atwell** 1:8 6:16
9:22 28:22
41:23 48:14
49:20 50:16
58:22 61:21,23
78:3 81:24
82:2,6,16 83:8
84:21 93:12,16
94:7,13,16,18

103:18 106:1
107:18,20
**Atwell's** 5:1
**audio** 29:16,23
**audio-recording**
30:24 31:16
**August** 1:18
138:13
**available** 31:20
**aware** 10:23
14:2,5 15:2
23:16 24:21
31:12 32:12,16
40:10,13,15
95:24 121:15
121:20 125:6
126:8,23 127:6
135:23

_____
**B**

**B** 3:8
**B-A-D-E-N**
126:21
**back** 5:8 18:2,2
18:4 19:19
20:8 21:5,9,22
23:20 28:22
48:2 54:4
55:17 61:5,14
61:15 62:13
64:14 65:24
66:8,19 71:3,7
71:9 77:20
79:17 80:16,17
80:19,21 81:1
81:3,3,5 91:23
91:23 96:8
99:14,15 104:9
105:4,9 109:24
110:12,18,23
111:1,3,4,6,9
111:11,12,23
112:5 127:17
129:20,21
130:4 131:4

132:5,12,15,16
132:21,24
**Baden** 126:21
127:8,14
**badge** 35:14
**bag** 81:6 99:2,6
99:8,10,17,20
100:1 119:11
119:11,12,15
119:20,21
122:15,19,20
122:23 123:4,9
124:10 127:18
133:9,11
**baggie** 97:8
99:10 116:6
117:6,8,11,13
117:21 118:12
118:24 119:9
120:2 128:5
133:11
**bags** 89:6 99:14
99:14,15
**ball** 122:2
**Barr** 28:20
96:17 101:10
**based** 17:4
92:10 137:10
**basement** 44:18
**basic** 13:7
**basically** 19:18
**bathroom** 93:14
**baton** 35:24
**Beach** 1:7 8:3
9:2 12:8 19:1
20:14,16 23:16
23:17,24 30:9
31:19 35:13
38:18,19,23
39:4 44:6 98:4
126:2
**beat** 35:1 100:16
**becoming** 82:14
**beginning** 40:10
131:4

**behalf** 2:6,11
**belief** 32:5
**believe** 5:20,24
6:10,10,13 7:6
8:7 9:9 12:19
16:7 20:13,24
25:12,23,24
26:22 28:10,20
29:1 32:1,11
33:12 35:24,24
37:14 40:6
42:6 45:4,13
48:3,10 49:13
50:24 51:21
52:2,5,23 53:3
53:6 56:17
57:4,19 58:12
58:18,20 59:21
61:23 67:8,17
67:17 68:9,12
70:23 71:17
73:21 74:20
75:4,6 76:6,13
76:16 77:4
79:6,16,22
80:2,4,7,8,19
82:2,9,12
83:23 85:15
86:11,12,23
88:9,9,24 90:7
91:10 92:10
94:21 95:20
97:16 99:1,3
101:10 102:2,3
102:21 104:20
105:17,21
106:4 107:22
107:24 111:8
111:12,19
114:21 115:9
116:11,14
117:3 118:9,20
119:8 120:17
121:5 123:24
124:24 125:21

128:4 130:9,11
130:13 135:22
136:1
**believed** 17:15
63:12,14
121:11 136:21
**believing** 131:9
**belt** 35:14 40:7
79:12
**BERSANI** 2:7
**Bertholomey**
1:8 6:18 15:24
41:20 45:6,22
47:4 51:16
58:22 61:21
94:7,13,16,18
103:19 106:1
107:19,23
108:2,3
**best** 22:5,8,20
22:23 27:6
52:6 75:1,3
101:17 133:3
**better** 24:2
80:20 124:15
135:6
**beverages** 38:7
**big** 39:11 72:12
122:4
**biohazard** 36:11
39:18
**bit** 19:19 72:1
79:17,23 80:22
98:9,12
**bite** 76:11
**black** 37:1 48:22
75:20 104:13
**blade** 70:15,17
**blood** 36:11,12
**blue** 35:12,12
**body** 14:1 15:7
18:3 21:2,8
55:24 57:24
62:6,9,11,12
62:16 63:17

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 142

70:7 71:24
109:6 132:18
132:20,23
133:23
**bodycam** 131:5
**bodyworn** 30:6
30:18 31:9
**booked** 101:9
**boots** 35:14 38:2
38:3 49:17
**Boulevard** 2:3
**bracing** 134:20
134:22
**brain** 127:16,17
**brand** 75:21
**break** 57:3
84:17 90:24
128:18
**breaks** 93:14
**breathe** 14:6
15:5
**breathing** 20:20
**bring** 20:8,9
43:3 57:16,21
68:16
**bringing** 68:2
**broad** 13:6
**brought** 43:2
68:4,10,18
**Brubaker** 24:8
44:14 93:1,1
94:8,12,19
96:5,7,10 97:6
98:21 113:8
128:7 135:10
**building** 46:16
47:1 48:16,19
**bulging** 14:6
**businesses** 39:12
39:15
**buy** 36:7 37:14
37:17

————————
**C**
**cake** 9:9,15 26:7

**call** 4:17 10:1
34:12,14,20,24
39:8 41:16,18
42:1,12 85:7
89:13 137:17
**called** 1:13 4:4
5:21 16:20,21
19:4,5 25:12
25:13 46:2
88:13,14
108:13
**calling** 127:22
**calls** 51:23 89:4
**calm** 62:24
**calmed** 64:23
65:19
**calming** 65:19
**camera** 30:6,18
44:9
**cameras** 31:9
**capacity** 11:10
**captured** 29:24
**captures** 31:13
**car** 32:21 33:1
42:22 50:5,20
50:21 51:1
55:24 66:17
69:7 100:18
113:1 128:23
129:7,10,14,19
129:24 130:5
132:6 133:23
**care** 60:17
**career** 12:8
85:17
**carried** 60:14,19
60:21
**carry** 35:23
36:10 39:21
40:4 89:5
99:12
**carrying** 35:18
**cars** 57:10 99:13
**case** 7:21 30:21
30:21 36:11

60:8 87:14
88:3 120:18
123:15,17,23
126:6 135:20
**cases** 123:24
124:1
**category** 13:6
**caught** 57:20
**cause** 14:24
51:21 52:5,15
127:15 128:4
**caused** 41:3
52:22 127:16
**cell** 5:21 73:17
108:12 131:10
131:20 133:14
134:8
**cells** 44:18
**CenCom** 44:14
44:16,17 96:5
97:6 98:21
101:3,8 116:16
**center** 44:17
**ceremonies**
23:23
**certain** 19:13
37:21 96:16
111:13 117:17
134:13 135:4
**certainty** 127:15
**Certified** 1:17
138:5 139:1
**certify** 138:6,11
138:17
**cetera** 137:15
**chance** 5:5
**change** 5:7 46:8
88:5 137:13
**changed** 23:19
66:3
**characterizati...**
106:16
**charger** 32:24
44:5
**charges** 28:2

**cheek** 114:11
**chest** 15:10
58:13,14,18
62:4 85:16
129:15,16,17
**chewing** 77:17
77:18
**Chicago** 2:4
139:12
**chief** 29:6,7,9
123:2
**choice** 23:8,9
43:12
**choked** 78:5
**choking** 78:5,10
78:19 79:3,7
80:12 82:2
87:19,21 89:18
98:18
**city** 38:22
**Civil** 1:15
**clarify** 5:7
**clarity** 135:9
**Clark** 139:11
**class** 12:4
**classes** 11:16,22
12:6
**clear** 80:14
119:11 126:3
**clerk** 22:19 42:9
42:10
**client** 24:11
114:4 135:24
**client's** 97:9
113:22 114:11
114:22 115:10
115:24
**clip** 104:4 105:3
105:9 106:4,20
110:17,22
111:2 134:1
**clock** 33:15,20
**clock-in** 33:18
**close** 6:20 92:2
94:13,15,17

97:23 98:1
105:10,12,15
109:13,15
**closed** 39:12
79:21
**clothing** 37:15
37:17
**cocaine** 118:16
**code** 33:20
**coffee** 23:8
**collected** 99:1,3
99:5,22
**color** 75:19
**come** 26:5 68:20
**comfortable**
134:2,3
**coming** 90:22
**Commander**
28:20 96:17
101:10
**commenced**
138:13
**committed** 52:9
**common** 31:24
32:3,10,17
**commonly**
18:19
**company** 8:22
**complaint**
135:20
**complaints**
10:23
**complete** 5:12
**complicated**
34:18,19
**computer** 32:24
**conceal** 122:13
**concluded**
137:24
**conclusion**
51:24
**condition** 88:5
**CONDON** 2:7
**conduct** 51:13
51:22 52:8

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

53:7
**conducting**
126:8,13
130:19
**conference**
123:1
**confident** 74:17
**confronted** 17:4
**conscious** 96:1
**considering**
107:15
**contact** 19:7
22:6 26:20
94:4,6 105:18
**contacted** 26:1
126:6
**containing**
127:18
**continue** 54:5
**continued**
131:19
**continuing**
56:18
**contract** 27:5
**Contreras** 24:14
**control** 13:7
18:6,9 19:17
21:11,14,15
60:2,4 61:12
61:15 62:9
69:1,2,17
70:21,22 71:16
71:18 77:2
106:9 111:13
**conversation**
10:4 100:23
**convicted** 11:13
**COOK** 138:3
**copy** 137:20
**corner** 103:23
**coroner's** 125:6
126:24 127:5
**correct** 4:14,15
5:7 6:3 8:4,24
15:16,18 16:10

16:11 17:1,2,5
21:20 28:10
29:8 30:7,8,10
30:11 31:15
34:23 35:5,6
38:5,6,16 39:4
39:14,16 40:20
40:21 41:9
42:15 45:15,16
47:8,9 49:22
50:10,11 52:9
52:10,12,13
53:12 56:7,8
58:9 59:18
63:21,22 64:24
65:8 66:18
67:13,14 69:19
70:24 73:19
77:1,21 81:21
84:20,24 85:20
87:16,17 91:9
92:9,12,13
93:7,15 94:23
98:5 99:18
100:22 101:4
101:14,16,20
104:14,21
106:3,17
107:17 108:5
112:13 116:8,9
117:7 118:19
119:21,23,24
123:5 125:7
126:1,2,14
127:7 132:19
133:7,8,15,16
135:5,21 136:6
136:8,10,11,13
136:16,17,19
136:20
**counsel** 138:16
138:18,19
**counter** 117:9
117:10
**counts** 89:19

**County** 6:2
138:3
**couple** 8:1 21:23
81:10 103:1,24
108:17 113:15
127:4
**course** 6:22 71:3
71:11 126:19
**court** 1:1 137:16
137:16
**Courts** 1:15
**covering** 47:11
**COVID** 34:18
**CPR** 13:4
**Cramer** 1:8 6:19
15:22 41:19
45:7,23 47:3
49:24 51:16
53:3,5,16 57:2
57:3,4,19 59:2
59:21 61:19
65:23 66:8
67:22 72:13,16
72:17,19 73:7
74:2 75:14,16
75:16 77:8,10
84:19 94:22
100:4 101:24
103:9 105:21
105:22 109:1
109:16,19
110:3,8 112:8
116:12,14
120:16 122:18
123:17
**Cramer's** 5:1,24
50:5,20,21,24
52:2,4 53:10
**credibility** 24:3
**crime** 11:13
23:2 38:17,20
38:22,24
**Crimes** 6:2 9:18
123:20 124:2
130:10

**Crimes'** 5:19
**criminal** 28:2
126:9
**criteria** 19:13
**CSR** 139:10,13
**cuffs** 17:7 52:16
52:20,22
**curb** 66:16
88:10 109:8
**curious** 126:15
**currently** 4:13
67:7
**cursor** 108:22
**custody** 47:4
48:1
**customer** 42:10
**cut** 37:4 115:23
116:2
**CV** 1:6

**D**

**D** 3:1
**damage** 127:16
**date** 8:5 27:3
38:11 42:5
138:12
**DAVID** 2:7
**day** 12:1 25:18
25:21 27:8
33:7,13,17
34:7,10,14,17
35:1 36:16,22
87:4
**days** 34:16,23
**DC** 28:20 29:5
**deal** 39:11
**dealing** 94:9
107:20
**dealt** 94:8
**death** 127:16
**Deceased** 1:4
**decision** 9:8,13
**defendant** 7:21
**Defendants** 1:9
2:11

**deferred** 133:3
**definitely** 6:20
88:3 124:10
125:24 126:17
131:21 132:10
**degree** 127:15
**denying** 136:15
**department**
31:19 37:13,18
43:16
**depending**
16:13
**depicted** 103:7
108:21 134:8
**depicts** 104:5,8
106:5,6,8,9
133:22
**deposed** 93:13
**deposition** 1:12
3:9 4:18,21 5:4
5:5,15 15:20
131:4 137:11
137:24 138:8
138:11,13
**depositions** 1:16
5:1 7:15
**deputy** 29:6
**describe** 33:2
36:24 58:11
99:6 119:9,15
120:1 122:1
**described** 58:5
64:12 96:4
120:21
**description** 33:4
**desire** 29:20
**despite** 94:5
**detain** 52:6
**detained** 20:17
**device** 30:24
31:17,20 32:7
**Dew** 23:9
**diaphragm** 15:6
15:13 16:3
21:2

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 144

**difference** 60:3
92:22 111:19
**different** 16:13
23:15 60:20
68:13 111:17
**differently**
41:11
**difficult** 68:16
76:11
**difficulty** 20:20
65:7
**directed** 47:17
**direction** 138:10
**directive** 32:6
32:13 121:16
121:21
**directly** 138:20
**disagree** 128:10
128:11
**discipline** 11:4
**discoloration**
14:7 113:22
114:10,23
115:11
**discussed** 13:2
98:24
**discussing** 42:1
**dislodge** 54:19
**disorderly** 51:13
51:22 52:8
53:7
**dispatch** 46:4,6
46:9
**dispatched** 41:5
**dispatcher** 41:6
41:10
**dispatching**
44:17
**disseminated**
35:2
**distance** 45:1
**distinction** 49:8
**District** 1:1,1,15
138:1
**DIVISION** 1:2

138:2
**dmathues@hc...**
2:10
**DNA** 123:10,13
**doctor** 15:15
127:2
**doctors** 127:4
**document** 19:1
19:3 28:12
113:19 128:19
**documented**
33:16
**documents**
125:2
**Dodge** 44:5
**doing** 9:1 28:8
41:13 50:9
53:14 54:9,20
55:8 56:21
57:21 58:22,23
61:11,22,24
64:2 70:18
72:21 75:24
84:4 85:1,3,6
90:5 93:17
95:21 96:3
98:23 101:15
102:1 109:10
109:12 113:12
118:3 134:7,10
134:12
**dollar** 37:21
**door** 9:19
**doubt** 93:22
**Dr** 126:21 127:8
127:14
**draw** 103:23
**dress** 35:7,9,11
**dressed** 35:5
**drew** 74:18
**drink** 23:9
**drive-offs** 38:12
38:14
**driven** 23:23
**driving** 44:4

**drug** 13:12,13
87:12,24
**duly** 4:4 138:7
**duty** 11:8 35:14
36:14 38:2
40:7 79:12,13
137:2

**E**

**E** 3:1,8
**e-mail** 2:5,10
6:10 28:24
29:3 130:8,8
130:10,12
**e-mailed** 130:10
**e-mails** 130:19
**E-Tran** 137:22
**early** 101:18
**ease** 4:16
**east** 39:3,6,10
46:19
**EASTERN** 1:2
138:2
**effect** 41:8 93:17
130:14
**either** 6:14 8:9
39:9 48:5
51:15 80:24
123:6
**emblem** 35:13
**emergency**
16:20,22
**employee** 33:22
138:18,19
**en** 41:16,17,20
45:7
**enclose** 37:5
**enclosed** 37:6
**encounter** 132:7
**ended** 102:6
**enforcement**
10:8 132:1
**enjoying** 9:4
**entail** 9:17 42:8
**entering** 120:19

**entire** 31:13
58:4 59:12
**entirely** 12:2
24:22 25:13
30:4 32:9,11
32:19 34:15,17
35:16 37:12,20
38:13 39:1,24
40:7 42:12,23
43:11 45:1,20
45:24 49:14
51:16 53:8
54:18,20 55:11
57:1,5,13,20
58:1,14 60:21
61:10,24 65:11
66:4,5 67:3,17
67:18 68:3,9
68:17,21 71:4
72:18 73:14,22
74:8,16,17
76:3,20,22
77:12 79:5
81:17 82:18
83:10,13 84:9
85:3,11 87:13
88:10 89:2
91:16,19 92:2
92:6,22 93:11
94:16 98:8,16
98:19 99:4,11
99:21 101:1
110:24 112:16
112:17 113:3
117:4,18,19,22
117:24 118:15
119:1,5 120:7
121:13,24
122:4,7,24
125:18,23
127:3 130:1
134:13 135:22
**entirety** 112:20
**entrance** 46:18
46:20,22 50:22

**equipment**
35:18 89:6
**errors** 137:15
**escape** 63:11,13
72:3
**escort** 48:18
49:20 50:3
**escorted** 48:8
65:23 66:8
**escorting** 50:1
53:9,20 107:15
**especially** 39:10
77:19 89:8
124:8
**Estate** 1:4
**estimate** 65:13
72:10 74:9
87:8 95:11
113:1 122:6
129:22 130:2,3
130:6
**estimated** 59:5
**et** 137:15
**events** 32:18
58:4 91:14
96:20
**everybody**
34:21
**evidence** 99:2,6
99:9,13,20
100:1,5,8,12
100:12,21
101:22 116:12
117:10,19
120:19,20
121:3 122:20
122:21
**exact** 75:6,8
79:6 123:3
**exactly** 53:7
61:10 88:14
92:4,7
**examination**
1:13 3:4,5,6
4:7 131:2

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

135:18
examined 4:5
example 65:13
  121:9
excessive 135:24
  136:4,10,18,22
  137:4,6
excused 137:23
exhibit 3:9,17
  102:19 108:6
  108:12,13
  113:21 114:9
  114:21 115:9
  115:22
exhibits 102:11
  113:15
existed 29:23
expand 15:11
  21:2
expect 123:22
expelled 82:22
  83:20 86:6
experience 10:8
  39:6 119:19
  122:8,12
expert 127:23
explain 137:12
express 34:22
extended 20:19
extent 26:9
  51:23
extra 119:11,12
  119:15
eyes 14:7 133:9
  133:10

**F**

**Fabiola** 1:3
  24:11
**face** 14:7 47:11
  74:19 84:8,10
  113:23
**faced** 16:14
**facility** 44:19
**facing** 46:16

51:1,2,3 55:17
fact 5:6 89:18
  118:18 122:17
factor 121:13
factors 121:8
fair 6:15 14:22
  23:4,6 26:8,14
  38:7,8 41:6
  42:17,18 46:6
  46:7 49:6,7
  50:6,8 52:18
  56:18 58:3
  60:24 66:11,13
  66:15 68:6
  71:23 72:9,11
  75:10,11,12
  76:24 87:18,22
  88:21 89:11
  91:4,5,6,22
  92:4,7 95:20
  98:12 104:12
  106:15,20
  108:1,14 109:2
  109:5,13
  112:14 117:5
  117:16,18
  126:15 132:12
  132:13,14
  133:2,18,19
  134:4 136:2,7
fairly 78:17
fall 89:13
familiar 21:24
family 9:5 22:13
  22:14
far 44:22 57:8
  66:12,14 76:23
  95:24 98:3,5
  103:23
fashion 53:11,11
  68:7
father 10:14
father-in-law
  8:18 9:10
feasible 46:9

**Federal** 1:14
**feel** 45:17 60:5
  80:2 81:4
**feet** 54:1,13,16
  57:11 92:5
  95:2,5
**fell** 89:9
**fellow** 52:11
**felt** 17:10 80:5
**female** 90:18,23
  92:17,20,21
  93:5 94:8
**females** 90:13
  90:14 94:5
**few-minute**
  128:18
**field** 118:16
**fighting** 21:10
  61:6,7
**filed** 7:4
**fill** 19:1,6 99:23
  100:20 124:17
  124:21
**filled** 23:1
  101:12 124:24
**filling** 125:3
**final** 9:20
**finalizing** 6:9
**financially**
  138:20
**find** 38:23
  125:17 126:15
**fine** 4:19 130:14
**finger** 37:5,5
**fingerprinting**
  101:16
**fingerprints**
  123:10,13
  124:9,9,24
**finish** 31:3
**finished** 31:2
**fire** 85:7
**first** 4:4 11:16
  11:21,22 12:6
  12:8,12 13:6

24:21 34:9,10
  40:6,14 43:23
  45:21 58:14,19
  68:15 73:12,14
  73:16,20,24
  79:20 81:24
  82:3,8 90:17
  91:1,13,19
  92:20 116:10
  116:11 117:5
  123:3 138:7
first-aid 39:19
first-aid-type
  40:5
firsthand 52:7
fit 43:9,10
five 84:15 95:12
  95:12 107:2
  130:24
five-minute
  95:13
flashlight 78:3,6
  79:8,9 80:14
flooring 8:20
flow 14:20
follows 4:6
foot 54:4,9,11,17
  55:2,9,10 75:7
  75:9,14
football 18:20
footwear 37:24
FOP 26:20 27:4
force 6:2 16:10
  16:13 18:24
  19:2,13,14,16
  21:4 25:4
  135:24 136:5,8
  136:10,12,14
  136:16,22
  137:4,6
forearm 50:7
forgot 37:23
  116:22
form 11:3
  134:18

**former** 123:2
**found** 11:8
  125:23
**foundation**
  20:21
**four** 12:13
**frame** 28:18
  103:7,16
  104:16 108:10
  109:11
**free** 57:3
**freight** 8:21
**frequently** 23:4
**friendly** 6:21
**friends** 6:15,18
**front** 46:17,21
**frustrated** 26:11
  26:13
**fuck** 93:18
**full** 4:9 8:8 44:6
  62:9,16 132:20
**fully** 37:5,6
  60:21
**further** 3:6 12:7
  135:18 138:11
  138:17
**furthest** 103:8

**G**

**G** 2:7
**gain** 69:2 70:20
  111:13
**gained** 67:10
**gas** 38:15
**gasping** 78:1,8
  78:10,16
**gather** 124:16
**gear** 39:19
**general** 32:6,12
  121:15,20
**generally** 13:2
**Geneva** 8:23
**getting** 9:18
  14:1,11 15:4
  41:15 51:20

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

54:22 62:13
104:9
**girlfriend** 30:2
90:21 91:2
92:18 104:20
107:22
**give** 5:12 6:8
26:15 37:20,21
55:14 65:13
74:9 87:7
95:11 113:1
116:18 122:6
127:2 128:12
128:18 129:22
130:2,3,6
**given** 4:21 15:20
100:4 101:24
125:1
**giving** 29:2,15
76:10
**gloves** 35:23
36:2,5,6,13,14
36:15,21 37:4
37:7,11,13,17
39:17
**go** 5:3,8 23:7,9
41:3 42:19,20
45:11 58:10
62:1 64:4,14
68:3,19 111:24
119:16 130:11
**goal** 63:4,7
**going** 5:3 9:17
10:3 25:11
26:5 30:4
37:16 41:15,16
45:2 46:5
52:24 61:5
70:21 72:3,22
84:14 91:21
95:19 102:11
102:24 103:1
103:14,24
104:8,23 105:7
106:18 107:9

108:6 124:15
127:11,17
137:20
**golf** 122:2
**Gomez** 24:5
104:21 128:7
131:9,12,15,22
132:2
**gonna** 69:3
111:24
**good** 40:13
55:14 64:18,18
64:21 80:4
84:9 89:10
98:14 128:17
134:5
**gotten** 135:14,15
**grab** 17:13 20:8
32:20
**grams** 120:9
**grasp** 56:9 58:3
**grass** 62:20
107:8
**grassy** 59:3
60:12,15,16,24
61:3,17 63:13
63:17 64:9,13
66:11,16 68:8
105:5 109:7
**great** 84:16
106:11
**grip** 56:14,17
**ground** 16:17
17:7,18,20
18:7,15,18
19:17 57:16,22
57:23 58:2,10
58:11,16 59:1
59:4,8,14,24
60:7,10 61:5
61:13,15,16,20
62:1,3,7 64:9
64:11 65:9,12
67:21 68:1,3
69:4,21,22

70:9,13 71:2
71:10,15,18
72:20,24 73:3
73:6 74:6
76:19,21 91:24
92:24 94:19
104:8 105:4,9
109:3 113:7
128:9
**guess** 33:18
39:24 60:18
63:1 92:3
98:11 111:17
**gun** 35:21 43:6
**gurney** 95:18
**guys** 55:24
57:12

---

**H**

**H** 1:8 3:8
**habit** 32:20
**HALE** 2:2
**half** 109:6,7
113:11,13
**halfway** 9:19
57:9
**hand** 18:2 33:21
37:2 69:1 77:4
110:24 133:23
**handcuff** 16:24
20:2
**handcuffed**
20:18 21:9
48:2,3,6 77:19
**handcuffing**
16:20,22,23
48:4,8
**handcuffs** 35:21
35:21 51:12
52:3 86:11,13
**handgun** 43:3,5
43:19
**handle** 8:20,21
**handoff** 83:12
**hands** 14:8

110:18,23
111:3 112:15
112:18
**hanging** 68:17
**happen** 15:13
53:24 65:3
106:23 112:7
**happened** 7:24
9:12 24:23
40:11 41:2
42:12 47:2
49:2 53:4 61:3
67:23 68:7,7
69:12,14 84:2
86:21 96:21
**happening**
34:10 40:15
52:22 67:20
69:13 72:4
77:22 80:24
81:20 102:5
125:12
**happens** 53:13
57:14 59:1
66:19
**happy** 5:8
**hard** 37:7,9
122:3
**hats** 35:16
**head** 78:2,22
80:17,19,21
81:1,2,3
115:24 128:24
129:1,5
**hear** 42:13
47:13,16 73:4
77:10 78:16
132:1
**heard** 26:3 33:2
34:18 42:20
78:12 93:14
97:23 126:21
**hearing** 41:13
97:12
**Heath** 6:16

**heavy** 39:8 72:5
72:13,14,15
84:3 89:5
**Heimlich** 13:4
14:11 82:1,3,7
82:17 83:1,5,7
83:9,15,18
84:5,7,11,20
85:2 86:4,10
86:12 95:22
113:12
**held** 68:24
**help** 10:12 48:18
60:9 135:7,8
**helped** 59:2,3
60:1 61:13,14
89:8
**helps** 15:13
**heroin** 87:2
**HERVAS** 2:7
**Hickey** 1:17
138:5 139:10
**hide** 122:9
**high** 38:17,20,22
38:24
**highly** 107:14
**hips** 18:7
**hit** 42:11 58:16
**hold** 70:22
**holding** 14:8
44:18 50:6
56:11,12,15,19
59:23 60:1,4,5
83:15 91:7
128:8
**holdup** 41:4,7
**home** 35:7 43:2
43:3,12
**honest** 5:12
73:15
**honestly** 29:12
34:15 43:11
47:15,22,22
48:5 50:15
55:11,14 74:8

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 147

74:16 81:13
99:21 116:21
122:7 125:18
**hoodie** 48:22
**hour** 12:1
**hours** 28:15
33:10
**hundred** 117:16
**hurt** 124:8,11,12
**hypoxic** 127:16

—————— **I** ——————
**icing** 9:9,14 26:7
**ID** 33:22
**idea** 25:7,7
74:22,24 84:16
102:8 111:5
120:12,14
131:12,15
**Illinois** 1:1 2:4,9
138:1,2 139:2
139:12
**image** 122:3
**immediate**
57:10 78:17
**immediately**
76:7
**important** 9:6
14:13,19
118:20,22
**in-car** 44:9
**inability** 14:6
**inaccurate** 6:5
120:10
**inaudible** 89:9
**incidences** 40:17
**incident** 9:7,14
9:16 25:15
27:11 31:8,13
40:12,20 92:12
100:17 116:7
124:18 125:4
127:9 130:8,20
132:8
**increase** 20:19

**Independent** 1:3
**indicates** 121:21
**indicating** 19:2
46:5 78:13
**indication** 64:22
**indirectly**
138:20
**inform** 52:12
**informal** 34:24
**information**
35:2 41:1
**initially** 54:24
55:17
**inquest** 125:6
127:1,5
**inside** 47:1 97:8
**instance** 131:6
**instructed** 48:15
54:12 97:6
124:2
**instructors**
12:18,20,21
**intentionally**
31:4
**interested**
138:20
**interference**
127:17
**interior** 5:18
**interjected**
68:11
**interrogation**
28:22
**interrogatories**
5:20
**intervene** 137:1
137:3
**interview** 25:11
26:1
**interviewed**
25:5,8
**investigating**
28:2
**investigation**
124:3 126:9,12

**investigators**
25:5 27:23
28:1
**involved** 9:18
124:2 125:11
**issue** 6:12 24:3
30:15,17,17
37:13 89:22
**issued** 43:22
**issues** 6:13
124:14
**Itasca** 2:9
**item** 123:22
**items** 123:13

—————— **J** ——————
**J** 1:8,8
**J-E-R-E-M-I-...**
4:11
**Jackson** 2:3
**JASON** 2:2
**Jeremiah** 1:12
3:3 4:3,10
137:11 138:6
138:15
**jmarx@hale...**
2:5
**job** 8:11 26:6
85:12
**jogging** 88:24
**Jr** 1:4 22:3 47:8
**judgment** 52:3,4
133:3
**Julie** 24:14
**June** 8:3,3,5,6
8:10,16 19:7
22:2 24:2,6,9
24:12,15 25:6
25:16,22 28:14
28:15 33:7
38:5 136:13
137:7

—————— **K** ——————
**Kaminski** 84:12

84:22,23 85:1
85:18,23 86:4
86:10,12 113:9
135:11,13
**keep** 20:7 32:23
42:24 43:1
60:6 62:9,15
85:12,15
**keeping** 20:17
**kept** 67:2 77:4
79:12
**kind** 9:10,14,20
13:6 18:2,6,12
20:7 26:15
33:2 47:20
54:3,11 64:2,5
64:6,21,22
66:22 68:11,20
78:9,12,14
82:14 89:22
91:23 105:11
106:1 107:7
119:15
**kinds** 64:7
**kit** 40:6
**knee** 68:4,12,16
70:7 109:20
**kneeling** 70:2,3
**knees** 70:4
109:20
**knew** 9:17 22:18
22:19 26:5
27:4 30:2
48:24 80:12
85:10 98:17,18
**know** 5:8 8:8
10:1 14:8,12
15:6,12 16:5
18:22 19:21
22:2,12,13,17
24:5,8,11,14
24:17,19 26:12
26:12 27:2,13
29:23 30:12,13
31:5 32:10,19

33:3 34:15
37:8 40:19
41:19,23 42:21
45:6,19,21,22
46:1 47:6,8
48:14,22,23
49:17,18 50:24
54:4,6 55:17
56:24 57:24
58:1,13 59:2
60:1,6,7 61:9
61:11,14 62:22
62:24 63:2,19
64:6 66:4
68:18 69:3
72:3,4,12,15
72:17,23 73:9
73:11 75:8,15
75:17,21 77:24
78:9,11,13
80:8 81:15
82:2 85:9,23
85:24 86:3,17
86:19,22 88:13
88:14 89:4,5,6
89:7 90:1 91:1
91:4,18 92:1
92:23 93:2,5
93:10 96:5,12
96:14 98:3,5
98:16,17,18
99:22 102:21
104:18,18
105:14 107:12
108:13 110:13
112:3 113:7,9
114:1,3,13,14
114:15 115:1,3
115:13,15,16
116:2,4,15,20
116:21 119:14
119:17 121:6
122:15 123:9
123:12 124:4,6
124:15 125:22

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 148

126:17 127:2
131:9 134:21
**knowing** 89:21
104:18 112:23
**knowledge** 22:5
22:8,20,23
29:9 31:20
52:8 75:1,3
86:16 92:18
123:18
**known** 18:19
75:15 125:19
125:21
**Kolar** 25:5

**L**

**lack** 14:1
**Lake** 1:7 6:1 8:3
8:23 9:2 12:8
19:1 20:14,15
23:16,17,24
30:9 31:19
35:13 38:18,19
38:23 39:4
44:6 86:2 98:3
102:19 115:22
126:2
**large** 111:22
122:9
**larger** 121:11
**late** 25:20 117:4
**law** 10:7 132:1
**lawsuit** 7:4
11:11
**laying** 19:24
106:6,10,16
**layout** 66:14
**lead** 16:4
**lean** 85:14
**leaning** 79:17
134:21
**learned** 20:14
20:15 126:24
136:3
**leather** 37:2

38:3
**leave** 10:3,3
43:7
**leaving** 9:21
**led** 75:4 91:10
**left** 9:2 42:2
50:2,9 53:19
53:20 56:13
58:4,8 59:17
66:2 76:17
98:20 103:9,17
108:24 114:22
114:23
**leg** 109:17 110:4
110:9 114:22
114:23
**legal** 51:24
**legs** 18:12 54:3
55:1,4
**lended** 34:19
**let's** 57:11 92:5
**letter** 28:24 29:3
29:11
**level** 136:15
**levels** 16:13
**leverage** 18:5
**license** 133:6,7
**life** 11:15,16,17
11:19
**lifesaving** 90:10
**light** 80:3
**lighting** 134:5
**lights** 45:2,8
**liked** 30:19,20
**limit** 45:12
**limp** 84:4
**lines** 78:21
**link** 125:15
**listen** 15:19
29:16 125:14
**little** 19:19
35:22 36:2,4
49:3 51:20
55:6 72:1
79:17,23 80:22

84:14 98:9,12
**LLC** 2:2
**loaded** 95:15
**location** 23:13
42:14,20 46:2
46:5,8
**locker** 43:6,9,10
**lockers** 43:7
**lodged** 15:4
128:5,5
**long** 5:20 10:1
11:24 35:20
55:12 59:4
64:11 65:9,11
74:6,17 76:2,4
78:15 80:10,11
82:16 83:18
85:5 86:3,18
92:20 95:6,8
113:1 129:22
**longer** 131:19
**look** 19:12 79:1
79:15,18 80:4
80:10,21 84:8
84:9 90:24
95:2 98:14
107:6,9,11
111:1 128:12
137:14
**looked** 47:5,10
54:15 74:20
75:13 77:24
78:6 81:9,15
95:4 98:13
106:24
**looking** 79:2
108:1
**looks** 105:9
107:20 130:14
134:21,22
**lose** 56:9
**lot** 50:23 61:10
61:11 82:13
**loud** 78:4 79:3
**loudly** 93:18

**lower** 109:7
**lying** 106:5

**M**

**M** 1:17 138:5
139:10
**machine** 33:18
**maintain** 18:6,9
70:22 71:16,18
77:2 94:4
**maintained** 72:1
94:6
**Major** 5:19 6:2
9:17 123:19
124:2 130:10
**making** 49:8
60:2 69:3
72:22 133:22
**maneuver** 95:22
**manner** 112:2
**mark** 95:14
109:6 133:21
134:9
**markings** 44:7
**Marx** 2:2 3:4,6
3:17 4:8 31:4
52:18,19 84:14
84:18 102:15
103:5 108:9
113:18 114:8
114:20 115:8
115:20 128:18
128:21 130:22
132:4,10
133:14 134:18
135:17,19
137:9,20,21
**mask** 47:11
**material** 40:5
120:4
**materials** 5:14
**Mathues** 2:7 3:5
20:21 31:2,5
51:23 52:17
84:16 127:22

128:17 130:24
131:3 135:16
137:10,19,22
**matter** 22:9 28:2
126:9
**mean** 21:15
27:15 38:12
45:15,20 50:3
51:21 62:17
75:5 80:7,23
89:7 111:20
124:12,13,13
**means** 13:18,22
100:14
**measured**
120:12
**measures** 90:10
**media** 24:20
**medical** 15:15
127:15 133:7
**medical-type**
39:19
**meet** 19:11,13
**member** 22:13
**memory** 27:16
28:8 69:12
93:19
**mentioned**
89:17 90:12
**met** 6:24 7:5,9
7:13,20 85:24
**microphone**
85:13
**middle** 57:12,15
**Midnight** 33:9
**midnights** 22:18
39:10
**mile** 42:16,16
**military** 10:14
**mind** 60:3
**mine** 5:24
**minimum** 72:2
**minute** 52:21
55:15 74:14,15
112:20,24

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 149

**N**

N 3:1
name 4:9 12:18
22:10,19 26:24
107:21 126:22
127:3
names 21:23
Narcan 39:23
86:22 87:1,2
87:14 88:5,7
90:8
narcotic 119:3,7
120:15 121:17
121:23
narcotics 87:15
121:9 122:9,13
nasally 86:22,23
near 40:9 55:20
66:17 76:6,16
76:18 87:15
91:24 109:8
112:24 115:23
116:20 128:23
129:7,10,19,24
130:5
nearby 105:11
necessarily
16:21 21:6
46:11 60:7
63:9
necessary 71:17
101:12
neck 14:8 129:7
132:8
need 62:12
needed 21:14
62:10,14 72:3
negotiations
27:5
never 22:19 30:9
77:17 85:24
111:15,21
112:4 125:22
news 123:1,7

minutes 9:23
84:15 95:10,12
95:12 113:4,11
113:13 128:9
128:12
minutes' 130:24
Miranda 28:6
28:11
missing 69:5
moment 50:17
57:1 61:22
75:10,17 76:5
76:7 91:21
96:1
MONICO 2:2
morning 33:11
101:19,24
102:9
motion 55:2
133:22 134:8
134:17
Mountain 23:9
mouth 74:5,7,19
74:21,23 75:2
75:10,18,23
76:1,2,4,5,6
77:7,9,14,23
79:15,19,20
80:5,6,10,15
81:7,23 82:23
83:21 86:7
95:1 98:13
122:9,13
134:24
move 16:3
moved 66:22
85:16
moving 54:1,2,4
61:9,11 62:21
63:4,7,9
134:23,24
multiple 16:9
108:15
muscle 67:11

nice 30:22 31:9
night 22:6,14,24
23:10 30:7
31:17 40:9
43:2 44:12
67:9 101:18
nights 23:11
nodded 64:18
noise 78:10
non-traffic
32:15
normal 53:11
123:24
normally 34:12
36:18 52:23
63:2 99:9
123:24
north 39:3,6,13
46:16 51:1
100:18 139:11
northbound
46:16
NORTHERN
1:1 138:1
Nos 3:17
notes 128:13
notice 1:14 6:5
8:13,15 29:2
54:9 59:19
63:16 68:11
69:5 91:13,15
92:21 94:7
106:23 107:1,4
112:8,10
noticed 48:12
74:7 75:13
77:6 78:8
90:17 91:1
94:24
notified 25:10
notify 46:6,9
number 10:13
33:22 133:17
nurse 15:17

**O**

o'clock 138:14
oath 135:3
object 107:7
objection 20:21
51:23 52:17
113:5 127:22
134:18
observed 47:3
91:19 117:8
observing 85:5
131:8
obstruction
104:13
obviously 28:21
34:11 35:5
55:17 60:22
85:19 88:2
111:20
OC 35:22
occurred 125:20
occurs 104:1
office 126:4,6
officer 4:14,17
4:21 5:1,1,11
5:24 10:10,13
10:15,17,19
11:1,3,11
12:19 13:17
22:9 33:2
41:20 43:23
45:6,7,22,23
47:3,4 48:14
49:24 51:15,16
51:16 52:2,4
52:12,14,21
53:3,10 59:2
59:21 61:23
65:23 67:22
69:8 72:13,16
72:17,19 73:7
74:2 75:16
81:15,24 82:2
82:6 84:12,19

84:21,22 85:18
85:23 86:1,24
93:12 96:7,8,9
96:12 100:7,11
100:14 101:10
102:16 103:8,9
103:17,18,18
103:19 105:11
106:23 107:5
109:1,16,19
110:3,8 112:8
113:9 114:10
116:12,14
120:16 121:17
121:22 122:18
123:17 124:1
132:2 135:11
135:13 136:4,8
136:21 137:3,6
officer's 16:10
officers 7:21
9:21 28:19
30:13,16,16,23
31:9,20 46:4
47:24 57:18
58:22 59:19
63:16,23 73:24
85:21 90:15,19
105:3,10,18,22
106:5 128:8
official 139:1
Oh 13:15 31:4
52:18
okay 4:16,20 5:3
5:9,10,22 6:11
6:18,22 7:7,13
7:17 8:2 10:4
11:21,24 12:3
12:15 13:11,15
15:6,22 16:2
16:19 19:20
20:2 22:1
26:18 27:10
32:12 33:15
34:1 35:4

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 150

37:23 38:14
39:2 40:9,19
40:22 41:1,6
41:13 43:9
46:17 51:4
53:22,24 58:7
59:23 60:12
64:20 65:1,22
66:7,19,24
67:12 70:4
78:22 83:14
84:15 89:21
90:17 91:4
92:20 102:5,12
102:19 104:1,2
104:22 105:1
105:14 106:8
106:19 108:6
108:17,19,24
109:2,5 112:11
113:15 116:18
121:2 123:6
127:12,13
128:18 136:24
**on-scene** 30:3
45:23 92:15
93:9 94:5,12
96:3,17 97:1,7
97:10,13 98:4
98:23
**once** 7:6 9:12
10:17,19 23:10
63:15 133:2
**ones** 17:22 18:17
**online** 12:15
**open** 79:21,21
79:22,24 80:3
**opiate** 87:3
**opinion** 38:17
65:5 87:9
127:14,21
136:18
**opportunity** 6:8
8:17,18
**opposed** 4:17

105:15
**orally** 29:4
**Orchard** 50:23
54:7
**order** 15:11
21:14,15,16
32:6,6,12,13
62:8,15 121:15
121:16,20,21
137:20,21
**originally** 65:24
**outside** 37:8,9
50:12,13 51:8
96:9 105:11
**overdose** 13:13
87:2,3,12,24
**overdoses** 13:12
**overheard** 97:16
98:6
**owns** 8:20
**oxygen** 14:1,20
15:11 21:1
127:17

———— **P** ————
**P.C** 2:7
**p.m** 1:18 25:16
28:13,15
137:24 138:14
**PAGE** 3:2,9
**pager** 33:3
**pair** 35:21
**palm** 33:19
**palms** 37:2
**panic** 42:4,11,13
42:13
**pants** 35:12
49:11
**paper** 8:11 99:8
99:15
**paperwork**
100:21 101:13
124:17,21
125:3
**paramedic**

89:12 97:18,21
98:2,6
**paramedic's**
133:6
**paramedics**
88:11,16 89:13
89:14 90:1,5
95:8 97:16,18
97:22 98:4,7
133:2,10,11
**park** 46:13,17
46:21
**parked** 46:15,23
50:22 51:1
**parking** 46:15
50:23
**part** 21:8 29:24
92:11 110:19
134:1
**partial** 104:12
**partially** 79:21
79:22 104:4,8
**particular** 23:13
33:7 36:16,22
40:9 67:9
74:18 102:22
109:11
**parties** 138:18
**parts** 111:13
**passed** 135:10
**passenger** 55:19
55:20
**passing** 35:3
**pat** 53:19
**pat-down** 53:14
53:17
**patrol** 39:3
**patting** 53:22
**pause** 100:10
**pavement** 66:16
70:4,6 109:7
**paying** 38:14
**people** 10:12
38:14 68:19
73:23 86:17

**percent** 117:16
**perform** 17:23
84:20
**performed** 82:8
82:16 83:14
**performing**
84:20
**period** 20:19
60:9 69:18,19
130:3
**person** 6:24 7:7
7:13 12:15,17
17:6 20:20
24:17,19,24
27:2 31:1,17
35:19 36:16
39:20 47:5,10
53:15 79:9
87:16 91:1
93:2 100:17,19
104:15 123:4
**personal** 11:15
11:16,17,19
42:24 43:7,14
130:7 138:9
**personally**
51:22 52:7
130:19 131:22
**pertaining** 1:16
**phone** 2:4,9 5:21
7:11 73:17
91:7 108:12
131:10,20
133:14 134:8
139:12
**phonetic** 25:5
**photo** 118:17,23
**photograph**
113:16 114:6
114:18 115:6
115:18 117:21
**photographed**
118:1
**photographs**
101:16

**physical** 105:18
133:22 134:8
134:16
**physically** 69:23
125:9
**pick** 107:5,7
**picked** 46:23
104:9 107:11
108:3,3
**picking** 69:9
**picture** 117:24
118:3,5,7,11
118:12,24
119:3,6 120:23
121:10,11,17
121:22 122:17
123:7
**pictures** 118:6,7
121:3,6
**piecing** 31:10
113:14
**Pierce** 2:8
**pivot** 18:7
**place** 76:23
79:14 100:24
125:10 134:16
**placed** 52:20,22
69:4 77:3 95:9
**Plaintiff** 1:5,13
2:6
**Plaintiff's**
108:13
**plans** 10:17,19
**plastic** 36:6,15
81:6 97:7
99:10,14
119:11 120:6
122:15,19,23
123:4,9 124:10
127:18
**play** 103:1,22
104:23 107:2
**played** 103:4
**playing** 106:18
**please** 4:9 5:7

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

pocket 39:21,23
39:24
point 7:18 30:21
34:16 35:5,17
35:24 37:4
42:23 44:11
48:10 51:12
52:5 53:24
56:3,15 57:19
61:12 62:7
65:7,18,20
66:3,5,6,12,24
67:1,15 80:15
82:10,15 83:10
83:12,16,23
84:2,19 85:4
85:18 86:1,16
87:16 90:8,14
91:18 94:5,22
96:18 99:21
101:11 105:19
108:2 109:3,17
109:20 110:14
111:9 112:9,18
116:7 123:20
125:7,24
130:14 132:6
132:11
pointing 103:10
points 21:13
108:18
police 4:13 8:3
9:2 10:10,13
10:15 11:1,3,6
11:11 12:6,9
13:16 19:1
30:10 31:19
39:8 43:23
44:6,20
policing 11:19
policy 19:12
portion 103:1
position 15:5
17:7 19:21
20:3,19 21:5,9

21:18,20 62:5
62:20 64:12,12
74:7 79:14
82:7 83:3,6,8
86:14,15,17,20
91:17 112:21
112:24 113:2
128:9,22 129:6
129:9,14,19,24
130:5 135:14
positioned 62:3
69:23 88:8
positions 66:3,6
positive 118:16
possession 99:20
99:24
possibilities
134:12,15
possibility 88:1
135:1
possible 13:12
69:11,14 81:18
87:13 117:23
129:21
possibly 14:7
65:15 120:6
121:1
potential 28:2
potentially
132:16
pouch 35:22
36:2,4
pounds 67:11
72:9
powder 97:8
116:6 119:10
119:13 120:2
122:2 127:18
powers 11:6
practice 31:24
32:3,10,17
preparation
5:14
present 4:24
7:14 93:13

116:13
press 123:1
pressure 21:5,6
21:14,17,21
60:6 62:8,15
65:17,20 72:2
72:2 111:5,14
111:18,21,22
111:22 112:1
127:18 132:8
132:17
Presuming
137:19
pretty 117:14,15
117:17
prevent 62:13
previous 64:14
previously 5:8
primary 87:18
87:20 100:7,11
100:13 118:17
123:15,21,22
124:1
prior 6:9 10:7
22:2,6,14,24
24:2,14 27:11
29:15 40:12,12
40:17,19 42:5
94:11
privately 7:18
privileged 6:24
probable 51:21
52:5 110:2
112:16
probably 13:11
23:10 26:5
39:9 56:2 57:9
58:12,13 59:5
67:2,10,10
68:2,4 70:3,14
70:16 72:1,21
74:11 77:4
80:21 83:19
84:5 86:5
95:13 99:8

113:3 118:9
120:16 132:12
problems 42:10
Procedure 1:15
procedures
16:20,22,23
process 48:4,5
processed 101:9
101:13 124:23
processing
124:20
professional
130:7
professionally
130:19
prone 17:7
19:21 20:3,18
21:4,9,18,20
62:4,19 64:12
74:6,12 112:21
112:23 113:2
127:17 128:9
128:22 129:6,9
129:13,18,23
130:4 132:5
135:14
properly 16:3
protective 37:7
37:9
provide 8:15
provided 8:13
proximity 94:13
97:23 98:1
105:12
pull 18:7 57:24
58:1 63:12
66:22 76:12
pulled 58:7,13
75:14 76:13
pulling 17:20
57:23 63:10
purchase 43:20
purchased
43:15
Pure 67:11

purpose 36:9
118:17
purposes 37:9
38:9,11
pursuant 1:14
1:14
push 9:20 111:3
111:18,20
112:5
pushed 111:4,10
111:12,16
112:4
pushing 111:9
111:10 112:1
132:17
put 17:7 18:2
21:7,7,13
32:20 33:19
34:11 42:22
52:15 55:1
62:6,11,12,14
69:1 70:7
71:23 76:6,16
76:17 86:13,15
86:17,19 99:1
99:7,9,20,24
100:4,11
101:23 105:4,9
110:17,22,24
111:6 121:10
122:20,21
132:8,16,17,20
132:23
putting 21:5
60:5 63:16
95:17,18,18
100:8 109:20

---

**Q**

quality 106:11
106:14 134:5
135:2,6
question 24:2
25:6 28:17
40:13 49:9

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 152

64:14 110:21
120:9 127:12
127:20,22
132:6
**questions** 15:19
22:16 103:2,24
108:18 126:16
130:22,23
131:1 135:16
137:9
**Quite** 121:1

**R**
**radio** 41:7 42:1
85:12
**ran** 54:7,14 56:9
**reaching** 112:17
**read** 28:10
127:8,11
137:13
**ready** 41:15
**really** 26:14
39:11 89:8,21
90:12 108:1
**rear** 50:20 53:15
55:20 65:24
66:1 92:1,2,3
**reason** 5:11
10:13 16:3
24:3 46:21
93:22 100:3
111:8 112:5
118:11,23
120:9
**reasonable**
127:15
**recall** 6:11 9:24
11:21 13:5,14
18:14,16,17
19:12 20:12
25:17,19,20
26:23 27:19,21
27:22 28:5,17
29:13 34:9
36:19,20 41:1

41:10,12,13,17
41:22 48:21
49:11 50:12,15
51:5,6,7 54:23
56:6 60:16
61:21 64:1,8
67:16,19 69:6
69:10 72:5,7
73:20 74:1
77:12,22 81:12
86:9 89:24
90:13 91:12
92:14 96:3,6
96:10,11,17
97:1,2,4,18
98:20,22,23
100:23 101:15
117:1,23
122:18 129:5
133:20 135:11
**receive** 11:3
**received** 13:16
14:9 16:9,16
16:19,24 20:10
**receiving** 11:21
41:2
**recognize** 88:16
103:6,15
112:11
**recognized**
85:21
**recollection**
27:6 47:20
48:7 58:15,21
60:19 66:7
71:6 80:23
81:19 94:1
99:16 101:17
102:1 109:19
122:5 125:3
130:18
**record** 92:11
**recording** 90:20
91:3,5,8,11,18
91:18 92:8

101:6 131:13
131:16,19,23
132:2
**recovery** 86:14
86:15,20
**recruit** 9:11
**reduced** 138:9
**regard** 12:7 24:1
92:17
**regarding** 6:2
19:7 20:11
23:1 41:2
100:21 115:21
124:21 125:4
126:6 127:9
130:20
**regular** 137:22
**reimburse** 37:18
**reimbursement**
43:16,20
**related** 124:18
125:2
**relation** 69:23
91:14
**relative** 97:23
138:17,19
**relatively** 94:15
**release** 101:11
**released** 101:18
**relying** 52:11
**remember** 5:22
10:2 11:24
12:3,18,22,23
13:2,4 16:21
18:1,1 20:6,6
20:15 27:17
28:3,21 29:12
29:19,20 36:15
36:17 41:4,15
42:1,6,21
47:11,15,18,23
48:5 49:4,15
50:16,18 51:9
51:9 53:16
54:1,2,3 55:8

56:22 57:21,23
61:4,5,9 62:21
62:22,23 63:1
63:1,20,23
64:17 65:19,23
66:10,21 67:21
69:15 70:18,19
71:8,11,12
72:23 73:8,23
76:1 77:8 78:2
78:3,5 80:20
81:2,3 82:12
83:11 84:3
90:3,20,21
93:8 95:4,17
95:17,19 97:5
97:10,12 98:1
102:4,5,7,23
107:21 117:3
117:12 122:14
125:12 131:6
131:10
**remembers**
93:16
**remove** 73:7
133:11
**removed** 74:3
76:5,7 77:3
78:15 97:9
**removing** 73:9
73:13
**repeating** 93:18
**report** 5:19 6:1
19:5,6 23:1
99:23 120:8,10
127:8,9,12
130:10
**reported** 138:8
**reporter** 1:17
137:16,17
138:6 139:2
**representative**
26:20 126:5
**requested** 29:3
**require** 19:1

100:20
**required** 32:2
32:10 100:20
**rescue** 85:7
**resembling** 81:6
**residential**
39:15
**resign** 8:10
28:23
**resigned** 23:21
**resist** 66:21
76:10
**resisted** 71:19
**resisting** 17:1
48:7,8,11 61:4
61:7 62:15,17
62:19 63:3,20
64:7 67:3,13
**resistive** 53:11
**resolution** 134:4
**respond** 46:4
**responded** 42:4
130:13
**response** 77:11
78:18
**responsibility**
123:12,16
**rest** 4:18
**restrain** 21:4
**restrict** 21:1
**restricts** 14:20
**retail** 39:10
**retained** 3:17
**reverse** 87:2
**review** 5:14,17
6:9
**reviewed** 5:19
6:1
**rewatch** 110:19
**Reyes** 24:5
104:21 128:7
131:9,12,15,22
132:2
**ride** 100:24
101:6

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 153

rifle 42:22,24
  43:9,14
right 4:24 10:7
  13:6,7 15:15
  15:17,20,22
  16:14 17:4,8
  17:11,15,16
  18:22 21:19
  25:3 29:22
  31:12,14 33:7
  45:17 46:10,12
  46:13,17,21
  49:3 50:17,23
  52:18 55:2,3
  59:22 60:24
  62:13,14 64:1
  66:5 67:18
  69:24,24 70:14
  70:15,16,17
  71:1 73:18
  77:20 79:12,13
  84:7 85:19
  88:14,15 89:15
  90:22,24 92:3
  92:6 93:2,3
  95:13 103:10
  103:11,18
  106:12,21
  107:20,24
  108:20,22,23
  112:2 119:20
  122:24 126:3
  137:12
right-hand
  103:23 104:13
rights 28:6,11
risk 20:20
Rivera 123:2
road 2:8 104:5,8
  108:3
roadway 69:8
Robinson 86:1
Roche 26:24
  27:1
roll 34:12,14,20

34:24
room 27:7,22
  34:12,21
  116:12 117:10
  117:19 120:20
  122:18
Rosiles 1:3,4
  19:7 21:12
  22:3,13 24:11
  47:8 125:4
  127:9 132:7
  133:4 135:13
  136:12 137:7
Rosiles' 132:8
  132:11,15,15
  132:18,21,24
  133:11,23
Rosiles's 127:16
  132:5 134:24
Round 1:7 8:2
  9:2 12:8 18:24
  20:14,15 23:16
  23:17,23 30:9
  31:19 35:13
  38:18,19,23
  39:3 44:6 86:2
  98:3 102:19
  115:22 126:2
route 41:16,17
  41:20 45:7
rubber 35:22
  36:2,5,6,13,14
  39:17
Rule 127:23
ruler 118:13,21
  119:7 121:22
rules 1:14 5:3
run 56:7,19 69:3
  71:20,21,22
  89:5
running 21:16
  21:19 54:21
  55:13 56:16
  57:2,4 89:1,7
  90:23 92:23,24

93:5 104:5
—————————
**S**
—————————
S 3:8
S-C-H-E-I-T-...
  4:11
sales 8:21
sandals 49:18
sandwich 99:10
Saran 119:17,19
Saran-Wrap-t...
  120:4
saw 23:4 28:12
  48:23 49:5
  73:12,14,16,21
  74:5,12,20
  75:6,10 76:5,8
  80:8 81:6
  88:20 92:11
  95:4 116:6,10
  116:11,13,15
  120:8 122:22
  123:1,4,6
  136:21
saying 7:17
  25:24 28:3
  29:21 31:8
  32:5 36:18
  38:21 41:10
  43:13 47:19
  48:1 51:5,6,7
  52:11 54:15
  56:21,22,23,24
  63:1,2,20,23
  64:5,8,21 65:6
  67:2,13 68:13
  69:12 70:17
  71:5,5 78:22
  81:18,18 83:14
  91:7 93:17
  100:11 106:14
  111:18 123:23
says 32:6 102:20
scale 118:21,24
  119:3 120:20

121:3,6,10,12
  121:18
scanner 33:21
scene 28:20
  30:23 90:13
  98:21 113:8
scheduled 25:21
  116:22,24
Scheithe 1:8,12
  3:3,9 4:3,10,13
  4:17 13:1:1
  138:6,16
scratch 54:3
scratching
  54:11
screaming 90:22
  93:10
screen 102:17
  106:21 113:19
se 63:9 119:15
search 53:14,17
  54:5,8
searching 56:1,4
second 68:18
  89:18 92:21
secondary 87:22
seconds 55:6
  59:6,6 65:14
  65:14,15 74:10
  74:10,11 78:17
  80:11 81:10,12
  81:14 82:19,20
  82:21 83:19
  86:5 107:2
  108:20 109:22
  109:23 110:6,7
  110:11,16,20
  110:21 112:6
  112:21
section 38:23
  39:10,13
see 23:10 54:21
  72:19 73:6,12
  75:23 76:4
  78:7,7 80:3,5,8

80:12 81:4,5,8
  81:22 82:22
  83:20 86:6
  88:11,19 95:2
  95:15 96:1
  97:7 98:17
  102:16 104:15
  107:9 108:10
  113:19,22
  114:10,22
  115:10,22
  128:13 133:9
  133:10 134:1
  137:3,6
seeing 73:8,20
  73:23 96:10,11
  97:10
seen 24:24 27:7
  69:7 73:9
  77:17 87:15
  108:14 116:19
  122:8 133:17
  135:20
send 28:23
sentence 127:11
separate 44:19
September
  139:3
series 96:20
set 118:4
sheet 119:22
  120:6
Shelby 24:8
  100:24 116:16
  124:21 125:2
  128:7
shell 37:7
shift 23:5 25:12
  26:1 33:8,9
  40:10,14,22
  102:6,6 116:23
  117:6
shin 115:10
shirt 35:12
shirts 37:17

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 154

**shoe** 54:16,22 55:8 69:5,9 95:3
**shoes** 49:15,19
**shook** 78:2,22
**short** 84:17 93:13 106:19
**short-term** 13:13
**Shorthand** 1:17 138:5 139:2
**shortly** 24:23 48:15 51:7 75:12 94:12,19 95:1 104:9
**shorts** 49:11,13
**shoulder** 69:24 70:14,17 85:13 85:15 129:11 129:12,23 132:11,15,21 132:24
**shoulders** 66:22
**show** 102:11 108:6 115:21 118:16 125:9
**showed** 133:14
**shown** 31:10 102:13 108:7 113:16 114:6 114:18 115:6 115:18 128:19
**side** 20:8 44:23 44:24,24 50:1 50:2,9 53:17 53:18,19,20 55:19,20 62:10 66:2,5 67:16 67:18 76:17 79:13 85:4 86:14,18,19 90:22 91:23,23 103:9,10 104:13 106:2 108:22,24

119:16
**sides** 35:13
**signature** 137:19 138:15 139:1
**signs** 14:2
**similar** 39:18 68:6
**simply** 17:13
**simulate** 78:12
**Sinahy** 24:5 104:21 128:7
**single** 31:12 119:5 121:7
**sir** 4:19 5:2 6:4,7 7:23 10:20 11:9,23 13:9 15:21,23 16:1 17:16 18:8 22:15 23:14 29:10 33:6,24 36:8 37:6 44:1 44:21 46:12 48:20 74:24 82:24 83:22 89:23 90:4 92:19 94:9 96:19 97:20 101:7,20 102:18 103:3 103:13,17,21 104:6,10,14 105:23 107:13 108:16 109:4,9 109:18 110:5 110:10 112:22 113:20 114:12 114:17,24 120:22 123:5,8 124:6 125:5 126:7 127:10 128:16 137:5,8
**sirens** 45:2,8
**sit** 97:4 131:18 134:11 135:3

**sitting** 79:17,18 85:4 111:15
**situation** 16:14 48:17 89:8
**six** 107:2
**size** 33:3,5 67:8 122:1,2
**skin** 115:11
**slight** 132:17
**small** 66:15 121:9
**snapped** 118:4
**sock** 54:3,6,11 54:14,16,22 55:8 69:5 73:9 73:13 74:3,5,7 74:13,21,22 75:2,5,6,9,9,10 75:13,14,17,18 75:19,24 76:7 76:10,11,15,23 77:3,6,9,13,18 77:23 78:15 95:1,3 99:1,17 99:19,24 101:21 134:23 134:24
**socks** 73:7 99:2 99:3,4,17,19 99:24 101:22 112:8
**somebody** 14:10 14:14,24 16:4 16:17 17:1,18 18:15 20:3 21:4,8,18 50:13 77:19 85:10 89:18 107:11 122:12
**somewhat** 79:17 79:18
**sorry** 10:18 13:10 22:12 33:1 34:3 37:23 63:6

84:24 89:24 100:9,10
101:10 107:6 120:13 129:4
**sort** 31:16 32:13 33:16 37:8 40:5 43:21 81:7 99:23 115:23 118:21 133:7
**sound** 72:9 93:19
**sounds** 38:4,7 128:17
**speak** 7:9 27:7 32:23 51:18 64:23 89:19 101:19
**speaking** 27:19 28:17 50:13,16 51:9 65:7 94:2 97:1,21,24 98:2
**speaks** 121:16
**special** 32:6,13 121:15,20
**specific** 20:11,13 38:22 49:9 51:21 58:15 80:23 81:19 100:17 102:1
**specifically** 12:11 15:12 16:6 20:15 27:15 50:6 52:15 61:8 63:2,19 64:17 70:18,19 102:4
**specified** 138:12
**sped** 45:13
**speed** 45:9,11,12 45:18
**spell** 4:9
**spelling** 137:15
**spoke** 28:21

**spoken** 22:9 28:19 93:20
**spot** 46:15,23
**spray** 35:22
**spread** 54:2,4,12 55:4
**squad** 5:18,22 33:1 42:22 50:5,20,21 51:1 53:10,13 53:16 55:12,16 55:18,19,21,23 55:24 56:3,5 65:24 66:1,9 66:12,14,15,17 66:20 67:12,15 69:7 76:6,16 76:18,21 96:8 96:9,14,16 99:13 101:23 102:20 103:9 112:24 128:23 129:7,10,14,19 129:24 130:5 135:1
**squad-car** 31:11 33:1
**squads** 5:18 99:15
**squatting** 70:2
**SS** 138:2
**standing** 17:14 82:9,10,11 83:4,6,12,15 90:9 96:8,9 105:11,14 106:1 113:11
**Stanley** 22:17 47:16
**start** 34:3 53:14 53:16 102:16 102:24 103:14 105:7 106:18 110:6,15,20 112:6

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 155

started 25:15
30:12,13 33:12
33:17 34:6
40:14,22 54:21
55:13 82:1
92:8 131:13
starting 53:16
54:8 66:21
starts 56:7 57:2
state 4:9 138:2
139:2
State's 126:4,5
statement 26:15
27:20 28:13,16
29:15 30:1
31:3 128:10
131:5
states 1:1,15
32:13 138:1
station 34:1,10
35:4,8,9,10
40:23 41:21
42:2 43:1,6
44:20 100:24
101:2
status 126:12
stayed 25:19
34:21
staying 117:4
stenographica...
138:8
step 18:4
stocked 36:3
stomach 14:12
14:14 20:1
109:8
stood 83:11
stop 21:16 32:8
32:22 63:3,4,7
63:9,10,20
64:6 67:2
104:24 108:17
131:23 132:2
stopped 25:17
104:3 108:20

112:19 117:2
131:16
stopping 103:6
103:15 105:2,8
106:19 107:4
109:22 110:7
110:16,21
112:7
stops 32:1,2,15
32:18
store 8:20 36:7
51:5
straight 17:19
straighten 17:24
street 57:6,9,12
57:15 59:4,9
59:14,20,24
60:13 61:1
68:7 105:4
106:24 107:5
107:10 139:11
stress 9:16,17
stressed 26:4,6
strictly 90:21
Strike 14:17
44:3 49:1 59:7
62:18 65:4
69:21 73:11
79:8 95:6
118:6 120:13
122:15
stripped 11:6
struggling 62:23
stuck 10:14
98:10
stuff 100:8
style 49:15
subject 20:18,18
47:4
subjects 12:4
submit 123:16
123:22
submitted 124:4
subpoenaed
125:22

substance 116:7
119:10,13
120:1,2
successful 54:22
sued 11:10
suffer 14:24
suffering 14:10
14:14 16:4
87:12,24
Suite 2:3,8
139:11
supposed 46:4,9
121:17
sure 12:2 13:19
21:13 24:22,23
25:13 28:4
30:4 31:5,5
32:9,11,19
34:15,17 35:16
37:12,20 38:13
40:1,7 42:12
42:23 43:11
45:1,20,24
49:14 51:17
53:8 54:18,20
55:11 57:1,5
57:13,20 58:1
58:14 60:2,21
61:10,24 64:1
64:16 65:11
66:4,5 67:3,17
67:18 68:3,4,9
68:17,21 69:3
70:20 71:4
72:3,18,22
73:14,22 74:8
74:16,17 76:3
76:20,22 77:12
79:5 81:17
82:18 83:10,13
84:9 85:3,11
87:13 88:10
91:16,19 92:2
92:4,6,7,22
93:11 94:16

99:4,11,21
105:24 110:20
110:24 111:23
112:16,17
113:3 115:10
117:4,14,15,17
117:18,20,22
117:24 118:15
119:1,4,5
120:7 121:14
121:19,24
122:4,7 124:8
125:18,23
126:10,11,17
127:3,5 130:1
135:22 137:13
surface 37:9
surprise 77:13
77:16 98:7
surprised 98:9
surprising 98:11
98:13
suspect 87:11
sustained 114:4
114:16 115:4
115:16 116:4
swallowed 78:1
78:4,20
sweatshirt 56:15
sweep 17:21
18:3,11
switch 9:13
switched 66:6
sworn 4:1,4
138:7
symptom 14:7
symptoms 14:3
system 44:9,11

_____
          T
_____
T 1:8 3:8
table 120:23
tabletop 117:10
tackle 18:18,19
18:20,20

take 15:11 16:16
17:6,18 18:4,5
18:14 42:21
43:12 48:16
54:12,16,18
61:13,16 68:1
68:19,22 84:15
89:21 98:21
112:8 118:6,8
118:11,12,24
119:6 121:2,10
121:11,17,22
124:3 137:20
takedown 17:20
17:23
taken 1:12,16
11:16 28:13
61:20 68:21
75:16 86:11,13
97:17 100:23
117:23 119:2
120:24 121:5
138:12
talk 5:5,9 6:22
13:12 22:24
26:16,18 31:14
85:14 126:19
talked 6:23 9:12
9:20,23 13:11
25:2,3 27:23
90:12 91:14
96:7 126:20
131:8
talking 9:24
10:2 25:15
28:21 73:17
90:11 96:9
134:2,3 135:9
talks 13:7
tall 67:4 72:5,12
72:15
taller 72:17
taser 35:23
task 6:2 25:4
taught 12:4 13:4

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 156

13:14,19 14:13
14:17 20:2,5
**technically** 8:10
101:2 119:19
**technique** 20:11
20:13
**tell** 28:1 29:4
32:9 52:21
53:5 63:1 74:2
106:15 107:10
108:21 109:10
109:12 110:1
112:3 122:3
131:22 132:2
134:7
**telling** 10:2 49:5
77:8 78:3
**ten** 38:12 81:13
**tennis** 49:18
**term** 13:21
**terms** 60:17
72:18
**test** 123:12
**tested** 118:16
123:9 124:13
**testified** 4:5
**testify** 138:7
**testimony**
126:24 127:3,5
127:23
**testing** 123:22
124:5
**text** 35:2
**texted** 34:24
**Thank** 4:12,20
64:20 84:23
103:12,20
**thin** 36:6,6
**thing** 5:4 34:9
55:7 64:2
67:19 72:22
78:14 86:9
117:22 128:5
**things** 14:23,23
15:2 17:3,10

34:24 48:13
49:4 64:7
**think** 8:7,8 9:22
10:21 14:6
17:22 19:5,11
20:14 23:18,22
24:22 25:16,19
26:3,4,10,24
29:2 31:2
35:14,15,21
36:7 38:2 40:3
42:9,11 44:13
44:14 46:19
48:14 49:18
57:3 61:18
67:10 69:11
76:13 78:4
81:24 82:14
83:10,12 84:3
85:4 86:23
89:7 90:7,8
91:16,17 93:16
94:15,15 95:17
96:15,22,23
97:3 106:15
107:14,18
113:9,12
116:20 118:14
119:4 120:10
121:2 123:2
124:7,14,20
128:14 130:9
132:10 134:15
**third** 68:21 69:4
70:9 71:2,10
72:20,24 73:3
91:17 128:22
129:6,9,14,19
129:24 130:5
132:5
**Thorntons** 5:19
22:19 23:5,7
23:15,17,18
38:4 39:13
40:11,16,18,20

40:23 41:2,5,8
42:5 44:2 45:3
45:9,11,12,13
45:18 47:14,17
48:9,13 49:21
50:4,14
**Thorntons'**
50:23
**thought** 83:5
87:18,20,22
88:3 89:11,16
98:14
**thrashing** 66:23
**threat** 111:15
**three** 12:13 39:7
105:10 108:20
113:4,10,13,22
**three-second**
109:5
**throat** 15:4 78:6
80:9,16 81:4,7
81:8,16,23
97:9,17 98:11
98:14,17
127:19 128:6
133:12
**ticket** 124:24
125:1
**tilt** 80:17 81:1,2
**tilted** 80:19,21
81:4
**time** 6:11 7:16
8:12 9:5 20:19
25:17 26:13
28:16,18 29:24
31:21 33:17
34:4 42:7,19
45:8 46:11
52:17,20 55:14
58:4 59:5,12
60:9 68:10,11
68:14,15,18,21
69:5,17,19
70:9 71:2,10
71:20 72:20,24

73:3,8,12,15
73:16,20,24
75:16 84:6
85:10 86:7,18
88:14 90:11,17
91:24 92:23
93:4 95:21
96:22,24 98:20
98:22 102:8
105:15 107:16
112:11 113:8
116:10,11,15
116:22 117:1,4
119:5 121:7
122:22 123:4,6
125:20 128:23
129:7,10,13,14
129:18,19,24
130:3,5 132:5
132:11 135:10
137:22 138:12
**times** 7:3,24 8:1
12:11,13 38:5
38:10,12 68:14
71:19 87:6,7,9
108:15 133:17
133:20
**Tina** 1:17 138:5
139:10
**tire** 134:21
**today** 5:12
131:18 134:11
135:3
**told** 6:3 29:1
51:14 53:4
55:4 72:8 74:5
97:15 132:10
136:2
**ton** 60:6
**top** 106:5,6,10
106:16 115:23
119:11,12
**toss** 107:7
**total** 113:2
**touch** 36:13 59:8

59:13 70:10
71:3 117:11
128:23 129:1,7
129:10,15,16
129:16,20
**touched** 71:7,8
111:23 118:2
129:12,21,23
130:4 132:11
132:12
**touching** 56:2
59:11,19,22
70:11,12,20,24
71:11,12,14,24
72:19,23 94:18
109:17,23
110:1,4,8,12
110:13 111:6
117:12 129:5
132:4,14,15,16
**tough** 124:9
**tourniquet**
39:21
**town** 44:24
**traffic** 32:1,2,7
32:18,22
**trained** 13:17
16:2,5,22
17:17 21:3,6
136:7
**trainee** 85:24
**training** 12:7
14:9 16:16,19
16:24 20:10
136:4
**trainings** 12:24
13:3,16 16:9
**transcript**
137:13
**transport** 97:6
**transported**
44:13 96:5
**transporting**
50:4
**travel** 42:14

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 157

76:23
**treat** 14:10
  133:4
**treatment** 13:13
**trial** 5:5,6
**tried** 55:7 83:1,3
**trip** 18:12 89:12
**true** 16:7 107:24
  120:17
**trust** 52:2,4
  137:16
**truth** 138:7
**try** 17:6,13 31:3
  122:9,13
**trying** 9:11 18:9
  21:21 34:22
  38:23 54:11,15
  54:18,19 62:24
  63:12 70:20
  84:19 86:4
**turn** 18:3,4
**turned** 79:16,20
**turning** 131:19
**twice** 7:6
**two** 5:18 12:1,1
  18:15 47:22
  49:2,3 66:8,10
  68:14 97:4
  99:3,22 111:19
  128:12
**two-week** 8:13
  8:15 29:2
**type** 8:19 33:19
  37:24 39:19
  44:4 49:11,15
  49:16 75:9,21
  99:17
**typed** 33:21
**types** 63:3 99:12
**typewriting**
  138:9
**typical** 36:18
  37:16
**typically** 23:12
  63:20

---

**U**

---

**Um-hmm** 13:8
**unconscious**
  82:14 83:24
  95:21
**underneath**
  44:18 119:14
**understand**
  16:12 54:24
**understanding**
  13:21,24 14:18
  39:2 51:11
  100:13,19
  137:2
**unfit** 11:8
**uniform** 34:11
  35:10
**United** 1:1,15
  138:1
**unobstructed**
  65:6
**unrelated** 27:11
**unsure** 121:24
  134:10
**upper** 109:6
**upset** 26:15
**upstairs** 34:12
**urine** 36:12
**use** 16:10,13
  18:4,24 19:13
  19:14,16 21:4
  32:14 54:16
  80:14 88:3
  130:7 136:4,8
  136:10,14
**use-of-force**
  19:5,6
**usually** 46:11
  99:13,14
  100:11,12,15
  100:16
**utilize** 37:22

---

**V**

---

**vague** 52:17

**variety** 16:12
  17:3
**vehicle** 40:4,5
  42:14 43:1
  44:4 99:12
**Velcro** 37:2,3
**verbiage** 79:5
**Vermister** 25:5
**vest** 32:21 35:14
**victim** 23:1
**video** 5:18,19,21
  29:23 30:5,22
  31:11,13 33:1
  48:23 49:1,5
  69:7 73:9,9,12
  73:17,17 91:21
  92:10 96:6,10
  96:11 101:5
  102:13,16,20
  102:20,22
  103:4 104:13
  108:7,10,12,15
  108:21 112:19
  112:20 113:10
  131:10 133:14
  133:17,21,22
  134:5,9 135:3
  135:6
**video-recording**
  78:11
**videoconference**
  1:13 2:1 4:5
**videos** 5:22
  29:16 30:2
  113:14
**viewed** 117:5
**Village** 1:7 8:2
**vs** 1:6

---

**W**

---

**Wade** 12:19
**waist** 18:20
**waive** 137:16,18
  137:19
**waived** 138:16

**walk** 32:21
  107:5
**walked** 60:20
  106:21,24
**walking** 50:7
  53:10 69:8
  88:21 89:22
**want** 5:6 26:14
  26:16,24 29:18
  36:12 37:1
  71:20,22 89:12
  103:22 126:17
  126:19
**wanted** 10:12,15
  88:2,2
**wanting** 10:3,13
  29:19
**wasn't** 30:4 32:3
  39:11 65:6
  69:2,3 72:22
  81:4 85:5
  87:13 111:23
**watch** 29:15
  91:21 125:14
**watched** 5:23
  101:5 102:22
  106:4,20
  108:14 133:21
**way** 6:8 17:8
  23:15 25:10
  27:13,20 28:23
  30:15 33:15,16
  35:7 44:22
  60:22 61:18
  71:6 98:17
**ways** 17:17,21
  18:14 68:19
**We'll** 19:19
  137:19
**we're** 22:24
  25:15 31:13
  73:17 78:11
  91:21 102:24
  124:2 128:14
**we've** 84:14

**90:11 96:4**
**weapon** 79:13
**wear** 31:24 32:2
  32:4,7,14,17
  35:15,16
**wearing** 30:6,13
  30:17,18,24
  31:16,23 35:17
  47:11 48:21,22
  49:12
**website** 37:22
**weigh** 67:6,7
**weighed** 120:14
**weight** 21:8
  57:24 62:6,9
  62:11,12,16
  63:17 71:24
  72:18 82:13
  132:20,23
**went** 11:22 29:1
  34:12 40:23
  41:6,17 44:2
  47:1 58:10
  61:15 68:4,12
  73:21 95:20
  96:7,23 99:17
  108:3 113:7
**weren't** 30:6
  31:23 32:22
  36:3 49:17,18
  61:12 108:1
  125:24
**west** 2:3 39:3,7,9
  44:23 51:3
**white** 97:8 116:6
  119:10,13
  120:2 122:1
  127:18
**wider** 79:23
**wife** 9:13 28:21
**Wilde** 28:20
  29:5
**willing** 26:18
**willingly** 60:20
**Wisconsin** 8:23

Fabiola Rosiles v. Village of Round Lake Beach; et al.
Deposition of Jeremiah Scheithe - Taken 8/18/2022

Page 158

**wish** 131:5,18
**witness** 3:2 4:1,4
  20:22 23:2
  31:2,3,7 52:1
  128:1 134:19
  137:18,23
  138:15 139:1
**woman** 131:8
**wondering**
  60:18
**word** 65:1,10
  104:11 111:17
**words** 41:8 63:3
  79:6 93:17,20
  130:14
**wore** 30:9
**work** 8:17,19
  25:21 35:14
  36:21 38:9,10
  43:19 87:9
  102:9 130:10
  130:12
**worked** 8:2
  37:19
**working** 22:18
  23:11 25:17
  40:14 125:24
  126:2
**worth** 130:24
**wouldn't** 62:10
  81:5 121:6,10
  123:23 124:8
  124:12
**wound** 13:7
**wrap** 119:17,19
  119:22
**wrapped** 120:7
**wrist** 37:3
**written** 29:11
**wrote** 127:14

**X**

**X** 3:1,8

**Y**

**yeah** 6:20 9:5
  10:1,22 11:18
  14:8 15:5
  21:22 35:15
  36:3,20 38:19
  43:14 44:1
  50:18 54:1
  59:21 60:11
  61:14 67:21
  71:8 72:11,15
  78:9 80:7,16
  81:8,11 82:9
  86:23 98:10,11
  98:16 119:13
  125:21 126:17
  130:11
**year** 8:8 9:11
**years** 12:23 18:1
  47:22 49:3,3
  97:4 99:22
**yell** 64:6
**yelling** 47:20
  94:2,3
**young** 10:16
**YouTube** 73:21

**Z**

**ziplock** 120:5
**Zoom** 7:9
  102:14 108:8
  113:17 114:7
  114:19 115:7
  115:19 125:14
  128:20

**0**

**084-003858**
  139:13

**1**

**1** 3:10,17 102:19
  102:21
**1:05** 1:18 138:14
**1:09** 112:7,14
**1:42** 112:19

**10** 59:6 67:5,11
**10:30** 25:16
**10:45** 33:11,12
  34:3 40:22
**100** 57:11
**102** 3:10
**108** 3:11
**10th** 19:7 22:2
  24:2,6,9,12,15
  25:16 28:15
  33:7 38:5
  136:13 137:7
**11** 109:22,23
  110:6
**11:04** 28:15
**113** 3:12
**114** 3:13,14
**115** 3:15,16
**11th** 8:3,5,6,14
  8:16 9:23 25:6
  25:22 28:14
**131** 3:5
**135** 3:6
**15** 59:6
**161** 139:11
**180** 72:9
**184** 108:13
**18th** 1:18 138:13
**195** 2:8

**2**

**2** 3:11,17 102:21
  108:12
**2:14** 102:24
**2:19** 103:6,7,14
**2:59** 103:15,16
  103:22
**2015** 8:3
**2020** 8:4,6 19:8
  22:2 24:2,6,9
  24:12,15 25:6
  33:8 38:5
  136:13 137:7
**2022** 1:18
  138:13 139:3

**205** 67:7
**20th** 8:7,9,10
**21** 1:6
**21st** 8:9
**22** 28:15

**3**

**3** 3:12 102:20,22
  113:21
**3:19** 104:3,15,23
**3:25** 105:2,7
**30** 65:14,14,15
  74:10,10,11,21
  82:19,20,21
  83:19 86:5
**3050** 139:11
**312.341.9646**
  2:4
**312.361.8851**
  139:12
**3236** 1:6
**333** 2:8
**337** 2:3
**3564** 113:21
**3567** 114:9
**3609** 114:21
**3611** 115:9
**3662** 102:19
**3929** 115:22

**4**

**4** 3:4,13 114:9
**4.0** 120:9
**4:10** 105:8
  106:18
**4:13** 137:24
**4:15** 106:19
**4:16** 107:4
**42** 112:21,24
**45** 9:23
**46** 110:7,11,15
  110:20

**5**

**5** 3:14 67:5 72:8

72:9 114:21
**50** 92:5
**53** 2:3
**55-** 133:21
**55-second** 134:9
**56** 110:16
**56-** 133:21
**57** 110:21 112:6
**57-second**
  133:21

**6**

**6** 3:15 115:9
**60143** 2:9
**60601** 139:12
**60604** 2:4
**630.733.4774**
  2:9

**7**

**7** 3:16 72:8
  115:22
**7:15** 33:11
  116:24
**703** 127:23
**712** 127:23

**8**

**8** 72:9
**80s** 33:4

**9**

**9:13** 28:13
**90s** 33:4
**9th** 139:3

Royal Reporting Services, Inc.
312.361.8851