**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Fabiola Rosiles,

    *Plaintiff,*

v.

Village of Round Lake Beach, et al.

    *Defendants.*

No. 21 CV 3236

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

Fabiola Rosiles ("Plaintiff"), in her capacity as the Independent Administrator of Abel Rosiles Jr.'s ("Rosiles") Estate, sued the Village of Round Lake Beach and several members of its police force—Officers Bertholomey, Scheithe, Cramer and Atwell (collectively, "Defendants")—alleging that Defendants used excessive force during a June 2020 incident that led to Rosiles's death in violation of 42 U.S.C. § 1983. The Complaint also brings several dependent state-law claims.[1] Currently before the Court is Defendants' motion for summary judgment on all counts. For the following reasons, the motion is granted in part and denied in part. All denials are without prejudice subject to the Court's request for *Daubert* briefing as explained below.

## I.  Local Rule 56.1

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v.*

---

[1]  Willful and wanton conduct under the Illinois Wrongful Death Act (Count I); willful and wanton conduct under the Illinois Survival Act (Count II); battery (Count III); and intentional infliction of emotional distress (Count IV).

*Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3).

## II.    Background

The following facts are taken from the parties' Local Rule 56.1 statements and supporting exhibits, including video exhibits.[2] [Dkts. 52, 57.] The Court presents the facts in the light most favorable to Plaintiff. *Emad v. Dodge Cty.*, 71 F.4th 649, 650 (7th Cir. 2023). These facts are undisputed except where a dispute is noted.

### A.    Events Prior to Rosiles's Ingestion of a Plastic Bag

On June 10, 2020, Antwan Stanley began his shift at a Thornton's gas station in Round Lake Beach, Illinois, when he was confronted by Abel Rosiles, who had previously sold Stanley marijuana on a handful of occasions. [Dkt. 52 ¶¶ 4-5.] Rosiles threatened he would "fold [Stanley] like clean laundry" because Stanley had recently complained about the quality of marijuana Rosiles sold him. [*Id.* ¶¶ 7, 9.] The two were separated, and after Rosiles left the store, Stanley called the police and informed

---

[2]    A court may consider video evidence on summary judgment, but a video can only resolve a factual dispute where "there could be no reasonable disagreement about what the video depicts." *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023).

Officer Bertholomey that he had a dispute with someone named Abel who had threatened to wait for him after work. [*Id.* ¶ 10.]

Rosiles returned to the Thornton's later that evening to sell Shelby Brubaker cocaine; Rosiles reentered the store once the transaction was complete. [*Id.* ¶¶ 6, 12-13.] Still at work and fearing another encounter with Rosiles, Stanley hit the store's emergency alarm button, which prompted all Defendant officers to arrive on the scene. [*Id.* ¶¶ 13-14.] Stanley told Defendants that Rosiles was in the bathroom, and that Rosiles's girlfriend, Sinahy Gomez-Reyes, had threatened him on Rosiles's behalf. [*Id.* ¶ 16.] Rosiles and Stanley exchanged "hostile" words once Rosiles left the bathroom, and Defendants arrested Rosiles for disorderly conduct. [*Id.* ¶¶ 17, 19.]

The officers brought Rosiles outside for a pat down search, which began without incident, but Rosiles attempted to flee once Officer Cramer reached his right leg. [*Id.* ¶¶ 20-21.] Defendants quickly regained control over Rosiles in the middle of a nearby road, and Cramer and Officer Atwell placed Rosiles face down on the grass. [*Id.* ¶ 22.] While the parties dispute whether Rosiles continued to resist arrest and what means the officers used to control him, video evidence confirms there was some struggle between the parties. [*Id.* ¶¶ 25-27; Dkt. 44, Ex. K at 3:30-3:45.]

After Rosiles told the officers he was "done" resisting, Cramer and Bertholomey stood him up next to a squad car and resumed their search. [Dkt. 52 ¶ 28.] While this search was ongoing, the parties dispute whether Rosiles continued to resist. According to Defendants, Rosiles was trying to remove one of his socks with his foot, and when Bertholomey went to control his legs, Rosiles kicked him in the chest.

Relying on Brubaker's testimony, Plaintiff argues that it was Defendants who were trying to pull off Rosiles's socks and that she never saw Rosiles kick an officer.[3] [*Id.* ¶¶ 29-31.] Regardless, an altercation during the second pat down attempt led Cramer and Officer Scheithe to place Rosiles back in the prone position. [*Id.* ¶ 32.]

Shortly after Rosiles was taken to the ground, Brubaker herself was arrested by Atwell and Bertholomey for failing to comply with the officers' commands.[4] [*Id.* ¶¶ 33-34.] While Brubaker and Rosiles were on the ground, Gomez-Reyes began recording the arrests on her cell phone, but left on Brubaker's instructions. [*Id.* ¶ 35.] Once Brubaker was handcuffed, Atwell requested backup for additional police officers from neighboring jurisdictions to arrive on the scene. [*Id.* ¶ 37.]

### B. Prone Position and Rosiles's Ingestion of the Plastic Bag

After the second pat down incident, Cramer and Scheithe placed Rosiles on his stomach, with a portion of his body on the pavement and a portion in the grass. [*Id.* ¶ 32.] Rosiles swallowed a plastic bag that contained a white powdery substance while in this position, the bag lodged in his throat, and he ultimately asphyxiated after revival attempts proved unsuccessful. [*Id.* ¶ 48.] The exact manner of how and when the bag got into Rosiles's mouth is somewhat contested, but not essential to the

---

[3]   The value of Brubaker's testimony on this point is dubious. She testified in her deposition that she did not see Rosiles standing up (i.e. when he would have kicked Bertholomey) and does not remember seeing Rosiles being taken to the ground. [Dkt. 44-3 at 49:23-50:14.] Plaintiff has also argued elsewhere that Brubaker arrived after Rosiles was put in the prone position. [*Id.* ¶ 33.]

[4]   Defendants' Rule 56.1 Statement says Brubaker arrived before Rosiles was taken to the ground, but the deposition testimony they cite in support of this point states Brubaker arrived afterward. [*Id.* ¶ 33.]

resolution of the motion.[5] What occurred while Rosiles was in the prone position and after he was removed from that position, however, is important and disputed by the parties.

The parties' key disagreements are how long Rosiles was prone, the amount of force Cramer and Scheithe used to keep him there, where on Rosiles's body this force was applied, and Rosiles's condition once removed from the prone position. As to timing, Defendants contend that he was in this position for no more than four minutes, but Plaintiff argues it was five to six minutes, including "for at least one minute after the cell phone video ended", [*id.* ¶¶ 38-39], which is noteworthy because there is no dispute that Rosiles was conscious and moving his head during the recording. [*Id.* ¶ 42.]

Regarding the amount and positional application of force Cramer and Scheithe used on Rosiles while he was in the prone position, Plaintiff contends that the officers placed their full body weight—including their knees—on Rosiles's neck, back, legs, arms, and shoulders continuously throughout the encounter to keep Rosiles subdued. [*Id.* ¶¶ 40-41, 43.] In contrast, Defendants argue the officers used their hands intermittently to exert a portion of their body weight on Rosiles to control him, but never touched his neck and never used their knees. [*Id.*] None of the citations Plaintiff relies on for her contention that the officers touched Rosiles's neck or used their knees—including the Gomez-Reyes video—supports Plaintiff's position, so the Court

---

[5]     Plaintiff does not concede that Rosiles himself put the bag in his mouth, [*Id.* ¶¶ 47-51], but as explained further below, Plaintiff abandons the theory that Defendants placed the bag in Rosiles's mouth, so the means by which Rosiles swallowed the bag is no longer a basis for liability and is therefore immaterial.

disregards it. [*Id.* ¶¶ 40-41]; L.R. 56.1(e)(3). Instead, the record shows Cramer and Scheithe placed their hands on Rosiles's legs, back, shoulders, and arms, and a genuine dispute exists as to how much force was used and whether it was constant. [*Id.*]

At some point while Rosiles was prone, the officers realized that he was choking, although the parties have vastly different accounts of what occurred next. According to Defendants, Scheithe noticed Rosiles chewing on his sock, and a few moments after Scheithe removed the sock from Rosiles's mouth, Rosiles appeared to be struggling to breathe.[6] [*Id.* ¶¶ 47-51.] Scheithe asked Rosiles if he had swallowed something, and Rosiles nodded without speaking. [*Id.* ¶ 52.] The officers then looked into his mouth to see if they could identify the source of the obstruction but did not see anything. [*Id.* ¶ 53.] Atwell instructed Scheithe and Cramer to bring Rosiles to his knees, and made a radio call for medical assistance. [*Id.* ¶¶ 54-55.]

The officers then stood Rosiles up and began administering the Heimlich maneuver. [*Id.* ¶¶ 56-57.] Within moments, Officer Kaminski from the neighboring Village of Round Lake Heights arrived on the scene and took over the Heimlich. [*Id.*

---

[6] Plaintiff argues that the police officers and other first responders should be prohibited from offering so-called expert opinions on issues such as whether Rosiles was breathing, had a heartbeat, or had his throat obstructed. [Dkt. 51 at 7; *see also e.g.,* Dkt. 52 ¶¶ 61, 76.] The Court disagrees; police officers are permitted to explain their personal observations and perception of events without becoming experts. FED. R. EVID. 701; *see also Jones v. City of Chicago*, 2017 WL 413613, at *14 (N.D. Ill. Jan. 31, 2017) ("a police officer does not necessarily testify as an expert if he is testifying about his state of mind and observations on a particular day, even if his specialized knowledge informed his mental state") (citing *United States v. Oriedo*, 498 F.3d 593, 602 (7th Cir. 2007); *see also U.S. v. Rollins*, 544 F.3d 820, 833 (7th Cir. 2008) (a police officer's testimony "based on his own personal observations and perceptions derived from [a] particular case … is admissible as lay opinion testimony.")

6

¶¶ 58-60.] Officer Kaminski was equipped with an activated body-worn camera. [Dkt. 44, Ex. M.] Rosiles lifted his head after several thrusts and Kaminski could feel Rosiles breathe and his stomach move, but the breathing turned shallow with "agonal gasps", at which point Kaminski asked the paramedics to expedite their arrival. [*Id.* ¶¶ 61-63.] Uncertain as to whether Rosiles ingested drugs, Atwell administered Narcan, and Rosiles's head subsequently moved in several gag-like motions[7], although it is not clear whether the movement is voluntary. [*Id.* ¶¶ 65-66.]

When the paramedics arrived roughly three-and-a-half minutes after Kaminski, they began treating Rosiles with a bag valve mask used to provide oxygen. [*Id.* ¶ 70.] The valve was not functioning properly (a sign that Rosiles's airway was obstructed) which prompted Battalion Chief Carraro from the Round Lake Fire Department to use a laryngoscope, blade, and adult size Magill forceps to remove a bag containing a white powdery substance from Rosiles's throat. [*Id.* ¶¶ 71-72.] The bag was not visible to Carraro when he opened Rosiles's mouth, but he saw, with the aid of the laryngoscope, that the bag was covering Rosiles's esophagus and trachea. [*Id.* ¶¶ 75-76.] Once the bag was removed, it took paramedics roughly 20 minutes to restore a pulse and circulation to Rosiles. Rosiles passed away roughly eight days later. [*Id.* ¶¶ 82, 84.]

According to Dr. Mark Witeck, an independent forensic pathologist for the Lake County Coroner's Office, the cause of Rosiles's death was lack of oxygen to the brain from Rosiles choking on the plastic bag. [*Id.* ¶¶ 87-88.] Dr. Witek further found,

---

[7] Plaintiff argues Rosiles was not moving, but there is video evidence to the contrary. [Dkt. 44, Ex. M at 4:10-4:30.]

and Plaintiff does not dispute, that Rosiles had no other significant internal injuries, that his external injuries were limited to "superficial abrasions and contusions" unrelated to his death, and that there were no injuries or abnormalities to his neck or neck muscles. [*Id.* ¶¶ 90-91.]

Plaintiff tells a different story. Plaintiff argues that the amount of constant prone back pressure Cramer and Scheithe, who each weigh roughly 200 pounds, placed on Rosiles for several minutes caused Rosiles to suffer positional asphyxia. [*Id.* ¶¶ 93-94; *see also* Dkt. 57 ¶¶ 2-3.] According to Plaintiff, Rosiles was no longer breathing by the time he was taken out of the prone position (i.e. when Defendants argue Scheithe and Cramer stood him up after they noticed he was choking). [Dkt. 52 ¶ 95.] Plaintiff contends that Rosiles could not support himself when Defendants initiated the Heimlich maneuver, and that the various testimony from police officers that Rosiles was breathing or nodding after he was removed from the prone position is based on a misunderstanding of Rosiles's body's response to the asphyxia. [*See e.g.*, *id.* ¶¶ 38, 51.] Plaintiff's expert, Dr. Michael Baden, concludes that Rosiles's death was caused by the interference with Rosiles's oxygen supply to the brain from both the prone back pressure and obstruction of his windpipe from the plastic bag. [*Id.* ¶ 88.]

Plaintiff sued Defendants alleging that Cramer and Scheithe used excessive force on Rosiles when he was in the prone position, and that Atwell and Bertholomey failed to intervene. [*See* Dkt. 1.] Plaintiff also alleged that the Defendants placed the plastic bag in Rosiles's mouth. [Dkt. 1 ¶¶ 22, 36.] Defendants have moved for

summary judgment on all claims[8], arguing that Defendants did not use excessive force, that they are entitled to qualified immunity, and that Defendants could not have caused Rosiles to asphyxiate because he was breathing after he was removed from the prone position. Although both parties retained experts who filed reports, neither filed *Daubert* motions.[9]

## III. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019).

Ultimately, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party

---

[8] Defendants did not separately move for summary judgment on Plaintiff's failure to intervene theory, but that claim is dependent on the excessive force claim. *Abdullahi v. City of Madison*, 423 F.3d 763, 767-768 (7th Cir. 2005) ("plaintiff's failure to intervene claim is closely linked to that of her excessive force claim since, by definition, if there was no excessive force then there can be no failure to intervene.")

[9] This case was reassigned to this Court shortly before the close of expert discovery, which occurred on March 24, 2023. [Dkt. 39 at 3.]

opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex*, 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## IV.    Analysis

Plaintiff alleged two theories in her complaint for how Defendants used excessive force on Rosiles: (i) the officers placed the bag in his mouth; and (ii) used an unreasonable amount of force while he was in the prone position. [Dkt. 1 at 3-6.][10] Regarding the plastic bag, Defendants argue that Plaintiff has not presented any evidence to support this allegation and has otherwise abandoned the theory in her briefing. [Dkt. 45 at 16; Dkt. 56 at 2.] As for prone pressure, Defendants contend that they are entitled to qualified immunity because the force employed was reasonable, but that even if it was not, their actions were not clearly unlawful. On causation, Defendants argue that Plaintiff has failed to establish a triable issue of fact because

---

[10]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

there is uncontroverted evidence that Rosiles was breathing after being removed from the prone position, and therefore the only possible conclusion a fact finder could reach is that it was the plastic bag alone, not the prone pressure, that caused Rosiles's asphyxiation. [Dkt. 45 at 17-18; Dkt. 56 at 5-7.] And without a valid Constitutional claim, Defendants contend Plaintiff's state-law claims necessarily fail.

The Court agrees that Defendants are entitled to summary judgment on the bag placement theory but denies without prejudice Defendants' remaining arguments until the parties supplement the record with a *Daubert* analysis. As explained below, Defendants have raised serious shortcomings with Dr. Baden's report and testimony regarding causation that could resolve the case. The Court concludes judicial economy would be best served by addressing these shortcomings related to causation and expert reports prior to definitively ruling on the other outstanding issues.

### A. Excessive Force

#### 1. Forcing Rosiles to Swallow the Bag

Plaintiff alleged in her complaint that Defendants used excessive force against Rosiles in part by "plant[ing] a bag of cocaine in the decedent's mouth causing him to choke." [Dkt. 1 ¶¶ 16, 22.] In moving for summary judgment on this allegation, Defendants argue that there is no evidence whatsoever that would support this conclusion, and that the most Plaintiff can say is that it is unclear how the bag got into Rosiles's mouth. [Dkt. 45 at 16.] Plaintiff's response brief does not address this argument and she has therefore waived it. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument... results in waiver"); *see also Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (where plaintiff failed to

11

defend her claim against defendant's arguments on summary judgment, she abandoned that claim).

Even if the Court considered Plaintiff's statement of facts on the issue, the most she can say is there is "speculation" as to how Rosiles swallowed the bag, and that Dr. Baden posits someone other than Mr. Rosiles (but not necessarily a Defendant) put the bag in his mouth. [*See* Dkt. 51; Dkt. 52 ¶¶ 48, 98.] The Court's obligation to construe facts and reasonable inferences in Plaintiff's favor does not "extend to drawing inferences that are supported by only speculation or conjecture", *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020), which is precisely what Plaintiff has done here. The motion is granted on Plaintiff's excessive force claim to the extent it is based on a Defendant placing the bag in Rosiles's mouth.

### 2. Prone Pressure and Qualified Immunity

Plaintiff's other excessive force claim concerns the pressure Scheithe and Cramer exerted on Rosiles's back while he was in the prone position. Defendants argue that they are entitled to qualified immunity. [Dkt. 45 at 13-15, 19-22.] The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Siler v. City of Kenosha*, 957 F.3d 751, 758 (7th Cir. 2020). This inquiry focuses on "whether the plaintiff's allegations make out a deprivation of a constitutional right and whether the right was clearly established at the time of defendant's alleged misconduct." *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021).

Courts look to the Fourth Amendment's protection against unreasonable seizures to determine if a constitutional violation occurred. This "reasonableness standard is objective, 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Such an analysis is inherently fact-dependent, requiring consideration of such factors as the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers." *Taylor*, 10 F.4th 800, at 806-807 (citing *Graham*, 490 U.S. 386 at 396). Because excessive force claims often involve disputed facts, summary judgment motions on such claims are "granted sparingly." *Id.*, at 811. This is particularly true where the alleged victim of excessive force has died. *Siler*, 957 F.3d 751, at 759.

When determining whether a right was clearly established under the second prong, courts must "look at past cases with specificity", *Lopez v. Sheriff of Cook Cty.*, 993 F.3d 981, 988 (7th Cir. 2021), to determine if "the existing precedent … place[s] the statutory or constitutional question beyond debate." *Taylor*, 10 F.4th at 807. The facts of the previous case do not need to be identical, but a reasonable officer must be on notice that his actions are violating the constitutional right. *Id.*

The Court declines to undertake a full qualified immunity analysis at this stage, and will instead wait to decide the issue (if necessary) until after the *Daubert* briefing. For now, however, the Court notes it doubts that summary judgment based

on qualified immunity is appropriate. When viewed in the light most favorable to Plaintiff, the facts are that Scheithe and Cramer kept Rosiles in the prone position for at least four straight minutes, and continuously used their body weight on Rosiles's back in some capacity to control him, even though Rosiles did not resist arrest while in the prone position. [Dkt. 51 at 3.]

If a jury were to believe this version of events, it could find that the officers' use of force was unreasonable. Briefly applying the *Graham* factors, 490 U.S. 386 at 396, Rosiles was initially arrested for disorderly conduct, a misdemeanor. To be sure, Rosiles compounded this minor crime by resisting, but there are disputes over the amount of that resistance. And while Rosiles posed some threat to the officers based on his prior resistance, by the time he was placed back into the prone position, he was weaponless and handcuffed. There is no dispute that once Rosiles was placed back into the prone position, he did not attempt to flee or further resist arrest. A reasonable jury could conclude it was objectively unreasonable under such circumstances to control Rosiles by applying non-stop pressure to his back for over four minutes, even if the officers were initially justified in placing Rosiles in that position. This is particularly true because Rosiles—Plaintiff's best witness—cannot testify, which is why summary judgment is particularly inappropriate in excessive force cases involving a decedent. *Siler*, 957 F.3d at 759.

For these same reasons, a reasonable jury could also find that the Defendants violated the clearly established constitutional right of not being subjected to force once subdued. *Taylor*, at 810 (it is clearly established that "officers may not use

14

unnecessary force when a civilian is already subdued or compliant"); *Abdullahi*, 423 F.3d 763 at 771 ("dropping down on an individual or applying one's full weight (particularly if one is heavy) could actually cause death"); *Becker v. Elfreich*, 821 F.3d 920, 928-29 (7th Cir. 2016) (it is "well established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects"); *Whitney v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 2019 WL 218801, at \*5 (N.D. Ill. Jan. 16, 2019) (excessive pressure on arrestee's back during arrest precluded summary judgment finding on excessive force claim); *see also Lombardo v. City of St. Louis*, 141 S. Ct. 2239 (2021) (discussing potential for prone back pressure to constitute excessive force); *McCue v. City of Bangor*, 838 F.3d 55, 64 (1st Cir. 2016) ("Even without particular Supreme Court and First Circuit cases directly on point, it was clearly established in September 2012 that exerting significant, continued force on a person's back while that person is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force") (internal quotations omitted); *Weigel v. Broad*, 544 F.3d 1143, 1152-55 (10th Cir. 2008) (qualified immunity inappropriate where officer applied pressure for three minutes to a person's back who was in the prone position, subdued, and had another officer laying across his legs).

The Court does not intend for the above to constitute a definitive ruling, but instead provides this preliminary analysis for why summary judgment appears improper on qualified immunity grounds.[11]

---

[11] Likewise, the Court is not requesting additional briefing from the parties on qualified immunity, which it deems sufficient. Rather, the Court would prefer to avoid ruling unnecessarily on qualified immunity if Plaintiff cannot remedy the causation deficiencies discussed below.

### 3.    Causation

The parties' final major disagreement is whether a reasonable jury could conclude that the prone back pressure caused Rosiles's death. [Dkt. 45 at 17-18; Dkt. 56 5-7.] The parties agree that there are two causation disputes: (1) whether Rosiles was still breathing after he was brought out of the prone position; and (2) if Rosiles was still breathing at that point, whether prone back pressure could have then caused him to stop breathing. [Dkt. 56 at 5.] To recover under Section 1983, a plaintiff must establish that the constitutional violation itself was the cause-in-fact and proximate cause of Rosiles's harm. 42 U.S.C. § 1983; *Taylor*, 10 F.4th 800 at 812; *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012). Here, because the Court has granted summary judgment on the theory that Defendants are responsible for the bag being placed in Rosiles's mouth, to prevail, Plaintiff must show that Rosiles would have lived but-for the prone pressure. *Whitlock*, 682 F.3d 567, at 582 (causation requires a showing that "the injury would not have occurred absent the conduct.")

Although causation "is fundamentally a jury question", *Taylor*, at 812, Defendants' position is based on the purportedly uncontroverted evidence that Rosiles was still breathing after he was removed from the prone position. [Dkt. 45 at 17.] According to Defendants, if Rosiles was breathing after Defendants stopped applying prone pressure, Rosiles could not have asphyxiated because of the prone pressure, but instead solely from the plastic bag caught in his throat. [*Id.* at 17-18.]

In support of their contention that Rosiles was still breathing after he was removed from the prone position, Defendants rely primarily on the body camera footage and testimony of Officer Kaminski. [*Id.*; *see also* Dkt. 44, Ex. M at 1:00-5:00.]

16

As explained above, Kaminski took over administering the Heimlich to Rosiles once he arrived on the scene. While performing the Heimlich, Kaminski notes that Rosiles has a pulse and that he can feel Rosiles breathing and his stomach moving, but the breathing turned shallow with "agonal gasps". [Dkt. 52 ¶¶ 61-63.] Defendants contend that Kaminski's testimony is unrebutted, seizing on the fact that Plaintiff's expert Dr. Baden had not seen the Kaminski body cam footage when he issued his report. [Dkt. 45 at 18.] Because experts cannot rely on facts that are contradicted by undisputed evidence, they argue Dr. Baden's opinion that Rosiles stopped breathing in the prone position is inadmissible and should not be considered. [*Id.*]

The Kaminski body cam footage indisputably shows that Kaminski *says* that Rosiles was breathing, but whether Rosiles was, in fact, breathing is not evident from the video itself. Most of the footage is dark (Kaminski's body is pressed against Rosiles's), and when Rosiles is visible, it is not definitively clear whether he is breathing. [Dkt. 44, Ex. M at 1:00-5:00.] A possible exception to this is Rosiles's reaction to being administered Narcan, [*id.* at 4:10-4:30], but the Court cannot conclude on this record that Rosiles's movements were voluntary or that those movements are conclusive proof he was breathing. Plaintiff argues the video irrefutably shows that Rosiles was *not* breathing, [Dkt. 51 at 6], but this "is certainly not the rare case where the video definitively demonstrates what occurred." *Kailin*, 77 F.4th at 482 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Video evidence can "eviscerate a factual dispute" but only when the video "utterly discredits" facts such that it leaves no room for interpretation by a fact finder. *Id*. at 781. Here, it is not

possible to conclusively determine whether Rosiles was breathing from the video evidence; the video simply does not resolve the parties' dispute. *Ferguson v. McDonough*, 13 F.4th 574, 581 (7th Cir. 2021) (declining to apply the *Scott* exception where the video was open to interpretation and did not utterly discredit one version of the facts); *Gupta v. Melloh*, 19 F.4th 990, 998 (7th Cir. 2021) (reversing a grant of summary judgment where reasonable jurors could have many different and opposing conclusions about what they saw in video evidence).

Video aside, Defendants argue that Plaintiff has done nothing more to rebut Kaminski's testimony other than to insist he is lying, [Dkt. 45 at 17], but that is inaccurate. Dr. Baden testified at his deposition that police officers often think someone is breathing, when in fact the person's body is responding to asphyxiation. [Dkt. 51 at 6-7.] If true, then Kaminski was not necessarily lying when he said he could feel Rosiles breathe, he was mistaken.[12]

The problem for Plaintiff, however, is that Dr. Baden did not say Kaminski was mistaken; indeed, he said at his deposition that he did not "have enough evidence to dispute" Kaminski's belief that Rosiles was breathing. [Dkt. 56 at 6; *see also* Dkt. 44-10 at 72:4-75:12.] Perhaps this is because Dr. Baden had not seen Kaminski's body cam footage (including the footage of Rosiles responding to Narcan) until his deposition. [Dkt. 45 at 18.] Regardless, Dr. Baden's expert reports—both of which were issued prior to his deposition and not amended afterward—are bereft of any

---

[12]    Plaintiff repeats the argument that Kaminski is not qualified to offer an opinion on whether Rosiles was breathing or had a pulse. [Dkt. 51 at 7.] The Court rejects this argument for the reasons stated in footnote 6, *supra*.

analysis of whether and why Kaminski was mistaken in believing Rosiles was breathing. [Dkt. 52-2; Dkt. 52-3.]

The furthest Dr. Baden goes in his reports is to acknowledge that Kaminski felt Rosiles breathe, [Dkt. 52-3 at 3], but he does not say that Kaminski was incorrect, let alone provide an explanation for how he reached that conclusion based on the evidence he reviewed. And by failing to depose Kaminski, Plaintiff forfeited the opportunity to probe the basis for Kaminski's belief. [Dkt. 56 at 7.] Accordingly, it appears Plaintiff has done nothing more than raise "metaphysical doubts" as to whether Kaminski was mistaken when he said that Rosiles was breathing. This is insufficient at summary judgment. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. 574, at 586.

Plaintiff faces a similar problem in the second causation issue; that if Rosiles was breathing after being removed from the prone position, then the prone pressure could not have caused his death. [Dkt. 45 at 17-18.] Dr. Baden's deposition testimony is again at the center of the dispute. Dr. Baden said in his deposition that it is "correct" that "once [Rosiles] is removed from the prone position, prone back pressure is no longer limiting his ability to breathe." [Dkt. 56 at 5.] As the plain language suggests, Defendants interpret this quote to mean that once a person is removed from the prone position, breathing can resume unimpeded. [*Id.* at 5-6.] And because Rosiles was breathing after being removed from the prone position, Defendants say, the only permissible conclusion is that the plastic bag caused him to asphyxiate. [*Id.*]

Plaintiff's response to this is that Dr. Baden also testified at his deposition that prone back pressure can interfere with cardiac function, which leads to decreased oxygen to the brain. [Dkt. 51 at 7.] Dr. Baden further opined that a person's response to prone back pressure is highly individualistic and that serious complications from prone back pressure can begin within a matter of seconds. Plaintiff posits "it is incorrect to simply conclude that once there is no more prone back pressure, one's ability to breathe is no longer limited." [*Id.* at 7-8.]

There are two problems with Plaintiff's position. The first is that the deposition snippet Plaintiff relies on does not support the proposition that prone back pressure can cause a person to stop breathing after the pressure is removed. Defendants asked Dr. Baden whether there were any "anatomical mechanisms" beyond inhibiting the diaphragm's movement that caused a person subject to prone back pressure to asphyxiate. [Dkt. 44-10 at 28:21-29:1.] Dr. Baden answered that prone pressure collapses the veins that enter the heart, which interferes with cardiac function and ultimately leads to diminished oxygen going to the brain. [*Id.* at 29:7-17.] Dr. Baden noted that the amount of time it takes for a person to succumb to prone back pressure varies. [*Id.* at 29:18-31:1.] Nowhere in this testimony (or elsewhere in his deposition or in his expert reports) does he opine that prone back pressure continues to restrict the ability to breathe after it is removed. Instead, he simply states that there are multiple ways that prone back pressure can restrict a person's ability to breathe while it is being applied. In short, Dr. Baden's testimony does not support Plaintiff's interpretation of its meaning.

Second, Plaintiff would still face the same problem discussed above. Dr. Baden does not contend that Rosiles himself continued to suffer adverse breathing effects from the prone pressure after he was removed from the position. That is, even if Dr. Baden said that prone pressure generally can complicate breathing after it is applied, Plaintiff cannot simply point to theoretically possible explanations to defeat summary judgment. Rather, a party must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250.

Plaintiff's failure to apply Dr. Baden's general principles to Rosiles's case— that is, to say that what can happen generally *actually happened to Rosiles*—leaves the Court with serious doubts that a genuine dispute exists such that a jury could reasonably conclude that prone back pressure caused Rosiles's death. While causation concerns on summary judgment are admittedly rare, they are further compounded here by both the sparse explanations in Dr. Baden's reports for how he reached his conclusion that prone back pressure caused Rosiles's death, and that Rosiles choking on the plastic bag was a cause of death. [Dkt. 52-2; Dkt. 52-3.] Yet, "even brief expert reports will suffice at the summary judgment stage." *Abdullahi*, 423 F.3d 763, at 772; *see also Chamberlain Group, Inc. v. Lear Corp.*, 756 F. Supp. 2d 938, 954 (N.D. Ill. 2010) (although experts' opinion was "not as comprehensive as [it] could be, to survive summary judgment" an expert "need not 'give a primer on why the facts allow the expert to reach that conclusion.'") (quoting *Vollmert v. Wis. Dep't of Trans.*, 197 F.3d 293, 300–01 (7th Cir.1999)).

Given these concerns and the low standard for expert reports on summary judgment, the Court concludes the best course of action is to deny Defendants' motion on causation without prejudice, subject to the filing of a *Daubert* motion. See *Cortes–Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) ("[A]t the junction where *Daubert* intersects with summary judgment practice, *Daubert* is accessible, but courts must be cautious ... not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility.") Once briefed, the Court will re-examine the issue of causation, and if necessary, any other outstanding arguments in Defendants' motion.[13]

**B.    Dependent State-Law Claims**

Briefly, the parties agree that Plaintiff's claims for willful and wanton conduct, battery, and intentional infliction of emotional distress cannot proceed without a valid constitutional claim. [Dkt. 51 at 11.] The Court will therefore reserve ruling on these claims until after it decides the viability of the excessive force claim.

---

[13]    An expert is not always required to prove causation. *Taylor*, at 812. But given the complexity of positional asphyxia, the potential intervening cause of the plastic bag, and Kaminski's testimony, it is reasonable to conclude that a jury will not be "as capable of comprehending the primary facts and drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience or observation." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 866 (7th Cir. 2010) (quoting *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)).

## V.     Conclusion

For the reasons stated, Defendants' motion is granted in part and denied in part without prejudice to renewal.

Enter: 21 CV 3236
Date:  March 5, 2024

_____
Lindsay C. Jenkins
United States District Judge